# Exhibit 1

Case 2:18-cv-01115-RSL    Document 44-1    Filed 08/09/18    Page 2 of 266



**PRESS BRIEFINGS**

# Press Briefing by Press Secretary Sarah Sanders

Issued on: **August 1, 2018**



James S. Brady Press Briefing Room

1:32 P.M. EDT

MS. SANDERS: Good afternoon.  Later today, at 1:35 p.m. Hawaii Time, Vice President Mike Pence, at the request of President Trump, will participate in an Honorable Carry Ceremony at Joint Base Pearl Harbor.

The leader of North Korea has followed through on his commitment to return the first set of remains of Americans to our homeland.  These brave souls deserve nothing but our honor and respect.

The families of these soldiers have been waiting for more than 60 years for their loved ones to come home.

We hope that as remains are identified, families like those of Commander John C. Micheel can find peace.

John was assigned to Navy Squadron 125 and was killed while leading a dive-bombing mission into North Korea.

John's nephew, Doug, who lives in Minnesota, recently wrote the President a letter explaining how his uncle was a special person who grew up in the Great Depression and wanted to serve his country.

Another letter from Mary, in Pennsylvania, tells the President of her uncle, Corporal Andrew Boyer, who has been missing in action in Korea since September of 1951. Mary has a picture of her uncle hanging in her living room as a reminder of his commitment and service to our country.

Both of these men and their families represent thousands of proud, patriotic American families. The President is committed to them and will work to bring them the closure they deserve.

On another matter, we have seen all of the alarming images of the wildfires causing severe damage out west. The White House and FEMA have been actively monitoring the wildfires to ensure that federal assistance is provided as quickly as possible.

On Saturday, the President declared that an emergency exists for the California wildfires. As a result, FEMA has placed resources from eight different federal departments and agencies to support the efforts of local firefighters and relief organizations.

The President will continue to monitor this ongoing emergency and make sure the people of California receive the assistance they need to keep them safe and recover. Our prayers are with the firefighters who recently lost their lives battling these fires and their grieving families.

Lastly, the President has been closely following the ongoing situation in Turkey involving Pastor Andrew Brunson.

We've seen no evidence that Pastor Brunson has done anything wrong, and we believe he is a victim of unfair and unjust detention by the government of Turkey.

At the President's direction, the Department of Treasury is sanctioning Turkey's Minister of Justice and Minister of Interior, both of whom played leading roles in the arrest and detention of Pastor Brunson.

As a result, any property, or interest in property, of both ministers within U.S. jurisdiction is blocked, and U.S. persons are generally prohibited from engaging in transactions with them.  For anything further, I would refer you to Treasury Department on that front.

And with that, I will take your questions.  Zeke.

Q   Thank you, Sarah.  First, just a quick note on behalf the press corps.  Last month, there were only three briefings with you, totaling under an hour.  If at some point, over the next month or two — obviously there's travel concerns — but we'd appreciate if you were — if we'd have some more time.  There are lot of issues we'd like to cover.

One of those, first off, is the President's tweet this morning about the Russian probe.  His direction to the Attorney General Jeff Sessions asking him to end the Mueller probe right now.

The President said a few weeks ago that he did — or a few months ago, sorry, that he was not going to intervene with the Department of Justice's handling of that investigation.  Does that tweet this morning mark a change in posture by the President?

MS. SANDERS:  It's not an order.  It's the President's opinion.  And it's ridiculous that — all of the corruption and dishonesty that's gone on with the launching of the witch hunt.  The President wants to — has watched this process play out, but he also wants to see it come to an end, as he stated many times.  And we look forward to that happening.

Q   And on a different topic, Sarah.  You mentioned that the transfer of these remains marked a North Korea — the North Korean leader fulfilling his commitment to the President, as agreed in Singapore.  There was a report yesterday that North Korea is still assembling ICBMs and — as well as, the Pentagon says it's not yet possible to verify that the remains that have been transferred back are, in fact, human or American.

How does that meet, sort of, the test of North Korea fulfilling its commitment that it agreed to in Singapore?

MS. SANDERS:  I'm not going to comment on the first part of your question on any potential intelligence matter.  In terms of the remains, we have the best of the best that have been working over the last several weeks on this process.  We'll keep you updated on it.  But we feel comfortable in the assessment that they've made up until this point.

John.

Q   Sarah, on the next proposed tranche of tariffs against China, the figure initially for tariffs was 10 percent.  But it's our understanding that the President now wants to take that up to 25 percent.  What's the reason behind increasing it from 10 to 25?  And in a tit-for-tat — if you want to call it trade war or something else — who has more bullets? China or the United States?

MS. SANDERS:  The President firmly believes that the United States certainly does.  We'll have an update later today.  And there will be a call at 3:30 this afternoon to walk through the details of that update in regards to the question you asked about 10 to 25.

Look, the bottom line is the President is going to continue to hold China responsible for their unfair trade practices.  This has gone on for long enough, and he's going to do something about it.

Q   Does the President believe that —

MS. SANDERS:  Back here.  Sorry.  Go ahead, John.

Q   I was just going to say, the President has made some headway with the EU in terms of lowering trade barriers, taking steps toward leveling the playing field.  Does the President and his team believe that that is possible with China, without taking some real punitive measures?

MS. SANDERS:  Certainly we'd like to see the playing field level.  The President, as both he and, I think, about 15 members of his administration have said repeatedly, we'd like to see the unfair trade practices stop.  But until that happens, the President is going to hold their feet to the fire.  He's going to continue to put pressure on China.  And he's not going to sit back and allow American industries and American workers to be taken advantage of.

Dave.

Q   Sarah, churches around the country, synagogues, some evangelical leaders have been up in arms in the last few weeks about last year's tax cut law.  They say there's a provision in there that's going to force them to pay a new 21 percent of federal income tax on the benefits that they give to certain employees.  Can you assure churches, from the podium there, that they're not going to have to pay a new tax?

MS. SANDERS:  I'm not going to make a blanket generalization about every church in America.  But certainly the goal of the tax cuts and reforms package was to provide the greatest amount of relief to the greatest number of Americans, and we feel that it's done that.  And we feel that the other policies that the President has put forward when it comes to the economy have certainly moved the ball forward, made our economy infinitely stronger than it has been in decades.  And I think you can see that by all of the numbers that have come out over the last year and a half.

Q   These are traditionally tax-exempt groups.  What is the President prepared to do to make sure they keep their tax-exempt status?

MS. SANDERS:  Certainly something that we're looking into.  But I don't have anything specific for you on that front.

Hunter.

Q   Thank you, Sarah.  Federal law says that, quote, "Any threatening letter or communication aimed at impeding a criminal investigation constitutes obstruction of justice."  Rudy Giuliani issued a statement saying he doesn't think this morning's tweet is obstruction because the President said Sessions "should" stop the Mueller probe, rather than ordering him to halt it.  You just echoed that reasoning before.

What I want to know is, is Rudy Giuliani the one giving the President legal advice on his tweets?  And does that statement reflect the opinion of the President's legal team?

MS. SANDERS:  Look, the President is not obstructing; he's fighting back.  The President is stating his opinion.  He's stating it clearly.  And he's certainly expressing the frustration that he has with the level of corruption that we've seen from people like Jim Comey, Peter Strzok, Andrew McCabe.  There's a reason that the President is angry.  And, frankly, most of America is angry, as well.  And there's no reason he shouldn't be able to voice that opinion.

Margaret.

Q   (Inaudible.)  Isn't he putting —

MS. SANDERS:  Sorry, we're going to keep going.  Margaret, go ahead.

Q   Sorry, will you just — okay.  Tesla plans to spend $5 billion to build a plant in China.  They're saying it's not going to affect Tesla operations in the U.S.  But I'm wondering whether the administration has any concerns about Tesla's plans.

MS. SANDERS:  Certainly we'd love to see all American companies investing here.  I don't have anything specific on Tesla, but we would encourage all companies to build their plants in America, put their investments here, and certainly not engage and help bolster a country like China that has continued to be part of a very unfair process and very unfair trading practices.

Jon.

Q   Thanks a lot, Sarah.  There was reaction to the President's tweets today from some of his allies on Capitol Hill.  Republican Senator Hatch said, "I don't fully get what he's trying to do."  And another Republican senator, Senator Thune, said the Mueller investigation needs to move forward.  He said they ought to let them complete their work.  Do you agree with that sentiment expressed by Senator Thune that this investigation by Mr. Mueller ought to be completed and not be sort of cut off at its (inaudible)?

MS. SANDERS:  We certainly think it should be completed.  We'd like it to be completed sooner rather than later.  It's gone on for an extensive amount of time.  They've still come up with nothing in regards to the President.  We'd like to see it come to a close.  We've said that a number of times.

So, sure, we actually agree on that front.

Cecilia.

Q   If I may —

MS. SANDERS:  Sorry, just because we're tight on time because the President is going to be speaking.

Q   The Attorney General said —

MS. SANDERS:  Cecilia, go ahead.

Q   — recused himself from the Mueller investigation.

MS. SANDERS:  Sorry, Jon, just because we're tight on time, I'll try to get to as many people as possible.

Cecilia, go ahead.

Q   Does the President still believe that millions of people are voting illegally in this country?  Is that the basis for this push for requiring voter IDs?

MS. SANDERS:  Even if there are 10 people that are voting illegally, it shouldn't happen. The President wants to see the integrity of our election systems upheld, and that's the purpose of his comments.  He wants to make sure that anybody that's voting is somebody that should be voting.  And I think that's something that, frankly, should be celebrated, not discriminated.

Major.

Q   When was the last time the President went to a grocery store?

MS. SANDERS:  I'm not sure.  I'm not sure why that matters, either.

Major, go ahead.

Q   Well, because of what he said last night.  Because he said you need an —

Q   He said last night that you need an ID to buy —

Q   You go to the grocery store; I go to a grocery store.  I've never had to show an ID to buy my groceries.

Case 2:18-cv-01115-RSL   Document 44-1   Filed 08/09/18   Page 10 of 266

MS. SANDERS:  I've been a lot lately, actually.

Q   I've never had to show an ID when I go to buy groceries.  Most people don't.

MS. SANDERS:  Certainly if you go to a grocery store and you buy beer and wine, you're certainly going to show your ID.  I don't think that —

Q   Is that what the President, who doesn't drink, meant?

MS. SANDERS:  He's not saying every time he went in.  He said when "you" go to the grocery story.  I'm pretty sure that everybody in here who's been to a grocery store and has purchased beer or wine has probably had to show their ID.  If they didn't, then that's probably a problem with the grocery store.

Major, go ahead.

Q   Sarah, to follow up on Jon Decker's question.  You want the investigation to end.  You want it to end, I presume, also without any obstruction, meaning without any interference.  Many have described the President's tweet this morning as blowing off steam.  Is that a fair characterization?  It's just an opinion he's throwing out there; it has nothing to do with his actual governmental control of, or supervision of, this investigation?

MS. SANDERS:  Once again, as I said earlier, the President is stating his opinion.  It's not an order.  But he's been, I think, crystal clear about how he feels about this investigation from the beginning.

Q   Can I follow up on that?  Because you had said a moment ago that the investigation itself is corrupt, the Mueller investigation.  And then you mentioned Comey and McCabe and Strzok.  They're not — Strzok certainly isn't anymore.  He was for a time.

MS. SANDERS:  The entire investigation is based off a dirty, discredited dossier that was paid for by an opposing campaign and had a lot of corruption within the entity which was overseeing it, which was Peter Strzok, James Comey, Andrew McCabe.  We've laid this out a number of times.  I don't think that we have to go into it every single time we're in here.

Q   If it is corrupt, why doesn't the President just end it, or use the powers he has to end it?

MS. SANDERS:  Once again, the President has allowed this —

Q   If he believes that, why doesn't he follow through on that?

MS. SANDERS:  Once again, the President has allowed this process to play out, but he think it's time for it to come to an end.

Sara, go ahead.

Q   Thank you, Sarah.  I'm just wondering if you can clarify what — this tweet from this morning.  Is it the President's desire for, first, Sessions to un-recuse himself from the probe?  And is it also his desire for the Special Counsel to be fired?

MS. SANDERS:  I think I've clarified this about 10 times now.  It's the President's opinion.  I don't have anything further.

Steve.

Q   Yes, Sarah.  Last night, at the Tampa rally, the President again pushed for creation of a Space Force as a new military branch.  The Defense Department today missed the deadline to submit a report to Congress about how this Space Force is to be structured.  And we're told that the White House has now twice rejected drafts because the Defense

Department doesn't want a Space Force.  It would rather create a Space Command under the existing military structure.

In view of this, how is the President going to force the creation of a Space Force?

MS. SANDERS:  We're continuing to work with the Department of Defense to figure out and determine the best way forward — something the President feels strongly about.  And we're going to work with our team there and figure out the best solution.

Yamiche.

Q   I have a question about — the President is meeting with inner-city pastors today.  Secretary Carson has pushed policies that would raise the rent on many poor people.  He's also pushed policies that would slow anti-immigration initiatives.  What is the President going to say to these inner-city pastors whose areas might be hurt by some of these policies?

MS. SANDERS:  Certainly that's the reason to sit down with these individuals, to hear their feedback, hear their concerns.  I know the primary point of discussion for today is to discuss prison reform, but I wouldn't be surprised if they raised those issues, and that's why the President has invited them here, so that he can have those ongoing conversations and determine how best to help them in a number of different situations.

Q   (Inaudible) in inner cities —

MS. SANDERS:  I'm sorry?

Q   Are those policies that are raising rents on poor people and that are slowing anti-segregation initiatives, are they helping inner cities, in the President's opinion?

MS. SANDERS:  I would have to look at the specific policies you're referencing.  I'd be happy to do — I'd be happy to do that after the briefing.

Julie.

Q   Sarah, members of this administration are apparently talking about big cuts to the Refugee Resettlement Program, which is currently capped at 45,000, but I'm told it's under discussion for cuts as low as 25,000 next year.  Does the President feel that this country admits too many refugees?  What does he think the proper level is?  And what would the rationale be for scaling it back that dramatically for a second year in a row?

MS. SANDERS:  This is part of an ongoing discussion.  And no policy decisions have been made, but we'll keep you posted as they are.

Jeff.

Q   Sarah, you —

Q   Does the President think the program is too big?

MS. SANDERS:  I'm sorry?

Q   Does the President think there are too many refugees coming into this country?

MS. SANDERS:  The President wants to make sure that whoever comes into the country, we know who they are, why they're coming, and that they pose no danger or threat to Americans.  That's the number-one priority.  And we want to make sure that we have the processes in place and the ability to vet any individual that would come into this country.  If the Department of Homeland Security and other agencies that they would work in coordination with determine that they don't have the ability to vet a certain number, then certainly the President would have concerns with that.

Again, the number-one priority is national security and making sure we have the ability to properly vet and process any individual that comes into this country.

Case 2:18-cv-01115-RSL    Document 44-1    Filed 08/09/18    Page 14 of 266

Jeff.

Q    Sarah, you said the President wants this investigation to be completed, but he's not yet made the decision if he will sit down with Bob Mueller.  Isn't he part of dragging this out a bit?  And also, when he tells you something personally, do you take it is a directive or do you take it as his opinion?

MS. SANDERS:  On the first part, I would refer you to the President's outside counsel on specific negotiations with the Special Counsel.  And the second part?  I'm sorry.

Q    You said that his tweet this morning was his opinion.  When he tells you something, as a member of his staff, how do you know if it's a directive from the President or if it's simply his opinion?

MS. SANDERS:  The President makes it pretty clear when I'm having those conversations with him.

David, go ahead.

Q    This morning, though, it seemed pretty clear.  His tweet this morning said that he wanted to — it was time for the investigation to be stopped.  Does the President know that Jeff Sessions can't stop the investigation?  Has he directed Rod Rosenstein to?

MS. SANDERS:  The President is very well aware of how the process works.  Once again, he's stating his opinion.

David, go ahead.

Q    What does the President plan to do specifically about 3D plastic guns?  And has he spoken to the NRA about this issue?

MS. SANDERS:  The Department of Justice made a deal without the President's approval. On those regards, the President is glad this effort was delayed to give more time to review the issue.  And this administration supports the decades-old legislation already on the books that prohibits the ownership of a wholly plastic gun.

Steve.

Q    The case of the pastor in Turkey: Has the President raised this directly with President Erdoğan?

MS. SANDERS:  Are you talking about the imprisonment of Pastor Brunson?  Yes, they've discussed it on several occasions.

Q    And is he upset about it or what?

MS. SANDERS:  I think you can see in the actions that the President has made today that he's not happy with Turkey's decision not to release Pastor Erdoğan [Brunson].

Blake.

Q    Sarah, thank you.  I wanted to ask you one on taxes and one on the possibility of a shutdown.  On taxes: Does the President support possibly restructuring the way capital gains are taxed?  And on the possibility of a shutdown: Is the President talking about potentially endorsing a government shutdown before November's elections?  After November's elections?  Or both?

MS. SANDERS:  On the first of your question, this is something that has a lot of support from various people.  No administration policy has been determined but the President has asked the Treasury Department to take a look into it.

On the second part of your question in regards to the shutdown, the President isn't focused on the timing of before or after the election.  He's focused on the results.  He's

been talking about this for a year and a half.  Our immigration system is completely broken, and he's begging, and has been, for Congress, particularly Democrats in Congress, to step up, do their jobs, stop kicking the ball down the field, and actually work with him to fix our system.  It's that simple.

Q    Does the President, though, have a personal opinion as to whether or not the current system works or that it should be changed?

MS. SANDERS:  Again, he's asked the Treasury Department to look into it.

David.

Q    Thank you, Sarah.  Two quickies about last night in Tampa.  First of all, does the President encourage the support of people who showed up last night in these "QAnon" and "Blacks for Trump" fringe groups?

And secondly, is the White House willing to say right now, in view of what happened with one of our TV colleagues last night, that it is wrong for his most vocal supporters to be menacing toward journalists doing their jobs in a situation like that or any situation?

MS. SANDERS:  On the first part, the President condemns and denounces any group that would incite violence against another individual, and certainly doesn't support groups that would promote that type of behavior.  We've been clear about that a number of times since the beginning of the administration.

On the second part of your question, the President, as I just said, does not support violence against anyone and/or anything.  And we've been very clear every single time we've been asked about that.

When it comes to the media, the President does think that the media holds a responsibility — we fully support a free press, but there also comes a high level of responsibility with that.  The media routinely reports on classified information and

government secrets that put lives in danger and risk valuable national security tools. This has happened both in our administration and in past administrations.

One of the worst cases was the reporting on the U.S. ability to listen to Osama bin Laden's satellite phone in the late '90s. Because of that reporting, he stopped using that phone and the country lost valuable intelligence. Unfortunately, it's now standard to abandon commonsense ethical practices. This is a two-way street. We certainly support a free press. We certainly condemn violence against anybody. But we also ask that people act responsibly and report accurately and fairly.

Q   Sarah, nobody was being violent last night. They were trying to prevent a broadcaster from getting his broadcast out and yelling that his network sucks. Is that right or wrong?

MS. SANDERS:  I'm sorry, what was the first part of your question?

Q   I said, no one was being violent last night in terms of hitting anybody. And no broadcaster was broadcasting state secrets. They were trying to do stand-ups at a public rally, and you had people trying to yell over them, preventing them from doing their jobs, and yelling that their network sucks on live TV. Does the White House support that or not?

MS. SANDERS:  While we certainly support freedom of the press, we also support freedom of speech, and we think that those things go hand in hand.

Ayesha.

Q   Thank you. So you talked a little bit about the tweets earlier. But he also — President Trump also tweeted about Paul Manafort and comparing his treatment to that of Al Capone. And he seems to say that he felt he was being treated unfairly.

I guess, first of all, why does — or does the President feel like Paul Manafort is being treated unfairly?  And when he talked about this issue of solitary confinement and the fact that Manafort hasn't been convicted yet, does this administration have larger concerns about solitary confinement being used for people who haven't been convicted, outside of Paul Manafort?

MS. SANDERS:  I'm not aware of a specific policy position that the administration holds on that front.  Certainly, the President has been clear.  He thinks Paul Manafort has been treated unfairly.

Steve.

Q   You got me.

MS. SANDERS:  Goyal.

Q   Thank you.  Two questions, please.  One India, one is Pakistan.  Sarah, can you confirm if the President has accepted the invitation from Prime Minister Narendra Modi to be the special guest on the India's — Republic Day of India next year, on January 26?

MS. SANDERS:  I know that the invitation has been extended, but I don't believe a final decision has been made.  I do know that both Secretary Mattis and Secretary Pompeo will be traveling to India — I believe it's next month — and will begin the dialogue and the process and potential discussion for a presidential visit later in the year.

Q   And Sarah, Pakistan is concerned that with the historic election and Mr. Khan, he ran on a corruption election in Pakistan.  He had very little to say — good things — about India, U.S., and Israel, but still, he's the Prime Minister of Pakistan today.  How are you going to deal with him?

MS. SANDERS:  The United States —

Case 2:18-cv-01115-RSL    Document 44-1    Filed 08/09/18    Page 19 of 266

Q    (Inaudible) the U.S.-Pakistan relation?

MS. SANDERS:  Certainly, the United States and India have a deep and abiding strategic partnership, and we're going to continue to build on that partnership and advance cooperation.  And I think you'll see that at the meeting that will take place with Secretaries Pompeo and Mattis next month.

Peter.

Q    I'll make them quick.  Does the President believe that Paul Manafort is innocent of the charges he faces?

MS. SANDERS:  I don't believe that that's the President's role to play.  He believes he's being treated unfairly.  Beyond that, I can't say.

Q    Sarah, may I ask then, to follow up on the views of the President expressed on Twitter today saying that Attorney General Jeff Sessions should stop this rigged witch hunt right now — has the President said that directly to Jeff Sessions at any point?

MS. SANDERS:  I'm not aware.  Again, the President is stating his opinion.

We got time for one last question.

Q    Has he said it at any point to Rod Rosenstein?

MS. SANDERS:  Not that I'm aware of.

Last question.  Mike.

Q    Just to follow on that.  So the President — it's the President's opinion that Sessions should end the Mueller probe, but it's also his opinion that the Mueller probe should play itself out?

MS. SANDERS:  The President believes that he's watched this process, frankly, play out. He'd like to see it come to a conclusion since it's been going on for the better part of a year and a half.  And they've found no collusion between the President as he's said many, many times before.

The President has got an event here starting in a couple minutes.

Q   Just one last follow-up on that.

MS. SANDERS:  Sure.

Q   The President — you've also said the President believes he can fire Mueller.  Doesn't it look weak on Twitter for him to say Sessions should end this probe, when it's Rosenstein that can end the probe and the President believes he can end the probe?

MS. SANDERS:  It's not weak for the President of the United States to state his opinion. Thanks so much guys.

END

1:56 P.M. EDT

Exhibit 2

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| DEFENSE DISTRIBUTED and SECOND AMENDMENT FOUNDATION, INC., | § | Case No. 15-CV-372-RP |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | |
| | § | |
| U.S. DEPARTMENT OF STATE, et al., | § | |
| | § | |
| Defendants. | § | |

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Come now Plaintiffs, Defense Distributed and Second Amendment Foundation, Inc., by and

through counsel, and submit their Memorandum of Points and Authorities in Support of their

Motion for Preliminary Injunction.

Dated: May 11, 2015                    Respectfully submitted,

GURA & POSSESSKY, PLLC                 FISH & RICHARDSON P.C.

Alan Gura                              */s/ William B. Mateja*
Virginia Bar No. 68842*                William T. "Tommy" Jacks
Gura & Possessky, PLLC                 Texas State Bar No. 10452000
105 Oronoco Street, Suite 305          William B. Mateja
Alexandria, Virginia 22314             Texas State Bar No. 13185350
703.835.9085 / Fax 703.997.7665        David S. Morris
alan@gurapossessky.com                 Texas State Bar No. 24032877
                                       FISH & RICHARDSON P.C.
Matthew Goldstein                      One Congress Plaza, Suite 810
D.C. Bar No. 975000*                   111 Congress Avenue
Matthew A. Goldstein, PLLC             Austin, Texas 78701
1012 14th Street NW, Suite 620         (512) 472-5070 (Telephone)
Washington, DC 20005                   (512) 320-8935 (Facsimile)
202.550.0040/Fax 202.683.6679          jacks@fr.com
matthew@goldsteinpllc.com              dmorris@fr.com
                                       mateja@fr.com

Josh Blackman
Virginia Bar No. 78292*
1303 San Jacinto Street
Houston, Texas 77002
202.294.9003/Fax: 713.646.1766
joshblackman@gmail.com

*Admission pro hac vice pending

TABLE OF CONTENTS

Preliminary Statement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Statement of Facts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    1.    Defendants' Regulation of "Technical Data". . . . . . . . . . . . . . . . . . . . . . . . . . 1

    2.    Defense Distributed's Publication of Technical Data. . . . . . . . . . . . . . . . . . . . 5

    3.    Defendants' Imposition of a Prior Restraint Against Plaintiffs' Speech. . . . . . . . . . 7

        a.    The Published Files. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

        b.    The "Ghost Gunner" Files. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

        c.    The CAD Files. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

        d.    Prior Restraint on Other Files. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

    4.    Great, Irreparable, and Continuing Harm. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Summary of Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

    I.    Plaintiffs Are Likely to Succeed on the Merits. . . . . . . . . . . . . . . . . . . . . . . . . . . 10

        A.    Congress Never Authorized Defendants' Censorship of
            Privately-Generated, Unclassified Speech. . . . . . . . . . . . . . . . . . . . . . . . . . . 10

        B.    Defendants Are Violating Plaintiffs' First Amendment Rights. . . . . . . . . . . 14

            1.    Plaintiffs' Files Constitute Protected Speech. . . . . . . . . . . . . . . . . . 14

            2.    ITAR's Application to All Public, Unclassified Speech
                Containing Technical Data Is Unconstitutionally Overbroad. . . . . . 16

            3.    Defendants Impose an Unconstitutional Prior Restraint
                Against Plaintiffs' Lawful Speech. . . . . . . . . . . . . . . . . . . . . . . . . . . 19

                a.    Unbridled Discretion to Censor Speech. . . . . . . . . . . . . . . . 20

                b.    Lengthy Delays and the Lack of Procedural Safeguards. . . 21

i

4.    Defendants' Speech Regulation of Plaintiffs' Speech Fails
            Any Level of First Amendment Scrutiny. . . . . . . . . . . . . . . . . . . . . 23

    C.    Defendants' Prior Restraint is Void for Vagueness. . . . . . . . . . . . . . . . . . 24

    D.    Defendants Are Violating Plaintiffs' Second Amendment Rights. . . . . . . . . 25

        1.    The Government Bears the Burden of Proving that Laws
            Burdening Second Amendment Rights Pass Heightened
            Scrutiny Review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

        2.    The Second Amendment Secures the Right to Produce
            Firearms, and to Exchange Technical Data Concerning
            Firearms. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

        3.    Defendants' Regulations Fail Any Level of Second
            Amendment Scrutiny. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

II.    Defendants' Licensing Scheme Irreparably Harms Plaintiffs. . . . . . . . . . . . . . . 29

III.    The Balance of Equities Favors Granting Injunctive Relief. . . . . . . . . . . . . . . . 30

IV.    The Public Interest Warrants Injunctive Relief. . . . . . . . . . . . . . . . . . . . . . . . . . 30

V.    No Bond or Other Security Is Required as a Condition of
    Providing Injunctive Relief. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

## TABLE OF AUTHORITIES

Cases

*Alexander* v. *United States*,
 509 U.S. 544 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Ashcroft* v. *Free Speech Coalition*,
 535 U.S. 234 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Awad* v. *Ziriax*,
 670 F.3d 1111 (10th Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Bernstein* v. *DOC*, No. C-95-0582-MHP,
 2004 U.S. Dist. LEXIS 6672 (N.D. Cal. Apr. 19, 2004). . . . . . . . . . . . . . . . . . . . . 15

*Bernstein* v. *U.S. Dep't of State*,
 192 F.3d 1308 (9th Cir. 1999) (en banc) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Bernstein* v. *U.S. Dep't of State*,
 922 F. Supp. 1426 (N.D. Cal. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 21

*Bernstein* v. *U.S. Dep't of State*,
 945 F. Supp. 1279 (N.D. Cal. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Bernstein* v. *U.S. Dep't of State*,
 974 F. Supp. 1288 (N.D. Cal. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Bernstein* v. *United States Dep't of Justice*,
 176 F.3d 1132 (9th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Bowen* v. *Georgetown Univ. Hospital*,
 488 U.S. 204 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Burson* v. *Freeman*,
 504 U.S. 191 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Carey* v. *Pop. Servs. Int'l*,
 431 U.S. 678 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Catholic Leadership Coalition of Texas* v. *Reisman*,
 764 F.3d 409 (5th Cir. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 19

*Chesapeake B & M, Inc.* v. *Harford County*,
 58 F.3d 1005 (4th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Chevron, U.S.A., Inc.* v. *Natural Res. Def. Council, Inc.,*
    467 U.S. 837 (1984)......................................................... 13

*Christensen* v. *Harris County,*
    529 U.S. 576 (2000) ..................................................... 13, 14

*Citizens United* v. *FEC,*
    558 U.S. 310 (2010) ......................................................... 23

*City of Lakewood* v. *Plain Dealer Publ'g Co.,*
    486 U.S. 750 (1988) ......................................................... 20

*Connally* v. *General Const. Co.,*
    269 U.S. 385 (1926)......................................................... 24

*Deerfield Med. Center* v. *City of Deerfield Beach,*
    661 F.2d 328 (5th Cir. 1981) .............................................. 29

*District of Columbia* v. *Heller,*
    554 U.S. 570 (2008)................................................. 25, 26, 29

*East Brooks Books, Inc.* v. *Shelby County,*
    588 F.3d 360 (6th Cir. 2009) .............................................. 20

*Elrod* v. *Burns,*
    427 U.S. 347 (1976)......................................................... 29

*Ezell* v. *City of Chicago,*
    651 F.3d 684 (7th Cir. 2011) .......................................... 27, 29

*Fantasy Ranch, Inc.* v. *City of Arlington,*
    459 F.3d 546 (5th Cir. 2006) .............................................. 21

*Forsyth County* v. *Nationalist Movement,*
    505 U.S. 123 (1992) ......................................................... 20

*Freedman* v. *Maryland,*
    380 U.S. 51 (1965)................................................. 16, 21, 22

*FW/PBS, Inc.* v. *Dallas,*
    493 U.S. 215 (1990) ......................................................... 20

*Gibson* v. *Tex. Dep't of Ins.–Div. of Workers' Comp.,*
    700 F.3d 227 (5th Cir. 2012) .............................................. 19

*Gorin* v. *United States,*
    312 U.S. 19 (1941) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 18

*Grayned* v. *City of Rockford,*
    408 U.S. 104 (1972). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Herceg* v. *Hustler Magazine, Inc.,*
    814 F.2d 1017 (5th Cir. 1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Hoechst Diafoil Co.* v. *Nan Ya Plastics Corp.,*
    174 F.3d 411 (4th Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Holder* v. *Humanitarian Law Project,*
    561 U.S. 1 (2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Hynes* v. *Mayor & Council of Oradell,*
    425 U.S. 610 (1976). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Immigration and Naturalization Service* v. *St. Cyr,*
    533 U.S. 289 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Jackson Women's Health Org.* v. *Currier,*
    760 F.3d 448 (5th Cir. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Junger* v. *Daily,*
    209 F.3d 481 (6th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Kaepa, Inc.* v. *Achilles Corp.,*
    76 F.3d 624 (5th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Louisiana Pub. Serv. Comm'n* v. *FCC,*
    476 U.S. 355 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Mance* v. *Holder,* No. 4:14-cv-539-O,
    2015 U.S. Dist. LEXIS 16679 (N.D. Tex. Feb. 11, 2015). . . . . . . . . . . . . . . . . . . 27

*Marceaux* v. *Lafayette City-Parish Consol. Gov't,*
    731 F.3d 488 (5th Cir. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Martin* v. *Harrington & Richardson, Inc.,*
    743 F.2d 1200 (7th Cir. 1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*McCullen* v. *Coakley,*
    134 S. Ct. 2518 (2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Michigan* v. *EPA*,
   268 F.3d 1075 (D.C. Cir. 2001)................................................. 10

*Miller* v. *California*,
   413 U.S. 15 (1973)........................................................... 14

*Nat'l Endowment for the Arts* v. *Finley*,
   524 U.S. 569 (1998).......................................................... 24

*Nat'l Rifle Ass'n of Am., Inc.* v. *Bureau of Alcohol, Tobacco, Firearms & Explosives*,
   700 F.3d 185 (5th Cir. 2012) .................................... 25, 26, 28

*Reliable Consultants, Inc.* v. *Earle*,
   517 F.3d 738 (5th Cir. 2008)................................................. 27

*Richmond Newspapers* v. *Virginia*,
   448 U.S. 555 (1980).......................................................... 26

*Riley* v. *Nat'l Fed. of Blind of N.C.*,
   487 U.S. 781 (1988).......................................................... 22

*Shuttlesworth* v. *Birmingham*,
   394 U.S. 147 (1969).......................................................... 20

*Simon & Schuster, Inc.* v. *Members of the N.Y. State Crime Victims Bd.*,
   502 U.S. 105 (1991) ......................................................... 23

*Skidmore* v. *Swift & Co.*,
   323 U.S. 134 (1944)...................................................... 13, 14

*Speiser* v. *Randall*,
   357 U.S. 513 (1958).......................................................... 16

*Texas* v. *Seatrain Int'l, S.A.*,
   518 F.2d 175 (5th Cir. 1975) ................................................ 10

*United States* v. *Alvarez*,
   132 S. Ct. 2537 (2012)....................................................... 16

*United States* v. *Brown*,
   218 F.3d 415 (5th Cir. 2000) ................................................ 19

*United States* v. *Edler Industries*,
   579 F.2d 516 (9th Cir. 1978)............................................. 17-19

*United States* v. *Featherston*,
    461 F.2d 1119 (5th Cir. 1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*United States* v. *Henry*,
    688 F.3d 637 (9th Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*United States* v. *Marzzarella*,
    614 F.3d 85 (3d Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*United States* v. *Masciandaro*,
    638 F.3d 458 (4th Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*United States* v. *Mead Corp.*,
    533 U.S. 218 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 14

*United States* v. *Playboy Entm't Group*,
    529 U.S. 803 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*United States* v. *Scruggs*,
    714 F.3d 258 (5th Cir. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*United States* v. *Stevens*,
    559 U.S. 460 (2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 23

*Universal City Studios, Inc.* v. *Corley*,
    273 F.3d 429 (2d Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Winter* v. *Natural Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10


Statutes, Rules and Regulations

18 U.S.C. § 2339A(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

18 U.S.C. § 794(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

22 C.F.R. Part 120 et seq. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

22 C.F.R. § 120.10 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

22 C.F.R. § 120.10(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

22 C.F.R. § 120.10(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 4, 7

22 C.F.R. § 120.11. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 7

22 C.F.R. § 120.11(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

22 C.F.R. § 120.11(a)(7) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

22 C.F.R. § 120.17(a)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

22 C.F.R. § 120.17(a)(4). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 12

22 C.F.R. § 120.4(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 21

22 C.F.R. § 120.41. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

22 C.F.R. § 120.6 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 21

22 C.F.R. § 121.1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 21

22 C.F.R. § 121.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

22 C.F.R. § 125.4(b)(13). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

22 C.F.R. § 128.1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

22 U.S.C. § 2778(a)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 12

22 U.S.C. § 2778(c). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

22 U.S.C. § 2778(e). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

22 U.S.C. § 2778(h). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Fed. R. Civ. P. 65(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30


Other Authorities

49 Fed. Reg. 47,682 (December 6, 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 13

74 Fed. Reg. 63497 (December 3, 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Andy Greenberg, "3D-Printed Guns As Art: London Design Museum Buys
    Two 'Liberator' Printed Pistols," *Forbes*, (Sep. 15, 2013),
    www.forbes.com/sites/andygreenberg/2013/09/15/3d-printed-guns-
    as-art-london-design-museum-buys-two-liberator-printed-pistols
    (last visited May 4, 2015). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Chris Anderson, "The New MakerBot Replicator Might Just Change Your World,"
    *Wired* (Sep. 19, 2012) http://www.wired.com/2012/09/how-makerbots-
    replicator2-will-launch-era-of-desktop-manufacturing/all (last visited
    May 6, 2015).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Eugene Volokh, *Crime-Facilitating Speech*,
    57 Stan. L. Rev. 1095 (2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Geoffrey Fowler, "MakerBot's Bre Pettis: 3-D Printers Are for 'Everyone,'"
    *Wall St. J. Blog* (June 18, 2014) http://blogs.wsj.com/personal-
    technology/2014/06/18/makerbots-bre-pettis-3-d-printers-are-for-
    everyone (last visited May 6, 2015). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Mark Wilson, "Artist Warps 3-D Printed Gun Blueprints, Protests Gun Violence,"
    *Fast Company* (April 15, 2014), http://www.fastcodesign.com/3028300/
    infographic-of-the-day/artist-warps-3-d-printed-gun-blueprints-protests-
    gun-violence (last visited May 5, 2015). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Paola Antonelli, "Design and Violence Debate I: Open Source,"
    *MOMA* (March 27, 2014) http://designandviolence.moma.org/
    design-and-violence-debate-i-open-source (last visited May 4, 2015). . . . . . . . . . . . . . . . . . 6

Peter Jensen-Haxel, *3D Printers, Obsolete Firearm Supply Controls,
    and the Right to Build Self-Defense Weapons Under Heller*,
    42 Golden Gate U. L. Rev. 447 (2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Rachel Donadio, "A History of the Now, Found in Politically Charged Objects,"
    *New York Times* (July 6, 2014) http://www.nytimes.com/2014/07/07/
    arts/design/victoria-and-albert-museum-pushes-boundaries-of-collecting.
    html (last visited May 4, 2015).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

The Writings of Thomas Jefferson
    (T.J. Randolph, ed., 1830). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

"Final Commodity Jurisdiction Determinations,"
    https://www.pmddtc.state.gov/commodity_
    jurisdiction/determination.html (last visited May 8, 2015). . . . . . . . . . . . . . . . . . . . . . . . 2

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

PRELIMINARY STATEMENT

Contrary to the Justice Department's advice, and in derogation of rulemaking specifically

designed to prevent such conduct, Defendants impose an unconstitutional prior restraint against

Plaintiffs' lawful speech. By asserting that Internet postings regarding arms of the kind in common

civilian use for traditional lawful purposes constitute "exports" subject to prepublication approval

license requirements under the International Traffic in Arms Regulations (22 C.F.R. Part 120 et

seq.) ("ITAR"), Defendants plainly violate Plaintiffs' First, Second, and Fifth Amendment rights,

and those of their customers, visitors and members. A preliminary injunction is warranted.

STATEMENT OF FACTS

1.      *Defendants' Regulation of "Technical Data"*

The State Department's Directorate of Defense Trade Controls ("DDTC") administers the

ITAR regime in order to effectuate the President's limited control over the export of "defense

articles" under the Arms Export Control Act of 1976 ("AECA"), 22 U.S.C. § 2778(a)(1). ITAR's

"U.S. Munitions List" ("USML"), 22 C.F.R. § 121.1, describes those "defense articles" whose

export requires advance government authorization—including "technical data," 22 C.F.R. § 120.6.

"Export means," inter alia, "[s]ending or taking a defense article out of the United States in any

manner, except by mere travel outside of the United States by a person whose personal knowledge

includes technical data," 22 C.F.R. § 120.17(a)(1), and "[d]isclosing (including oral or visual

disclosure) or transferring technical data to a foreign person, whether in the United States or

abroad," 22 C.F.R. § 120.17(a)(4). Unauthorized exports are punishable by up to twenty years in

prison, fines of up to $1,000,000, and civil penalties up to $500,000. 22 U.S.C. § 2778(c), (e).

The ITAR's USML purports to cover twenty-one categories of "technical data," broadly defined as information "required for the design, development, production, manufacture, assembly, operation, repair, testing, maintenance or modification of defense articles." 22 C.F.R. § 120.10(a)(1). This includes "information in the form of blueprints, drawings, photographs, plans, instructions or documentation" and "software" "directly related to defense articles," *Id.*, although it excludes, inter alia, "general scientific, mathematical, or engineering principles commonly taught in schools, colleges, and universities, or information in the public domain . . . ." 22 C.F.R. § 120.10(b). When referring to various types of "technical data," the USML utilizes additional vague terms, such as "military application," *see, e.g.,* 22 C.F.R. § 121.1 at USML paragraphs XII(b), XV(c), and XVIII(b), which is undefined; and/or "specially designed," whose definition exceeds 900 words, 22 C.F.R. § 120.41. Moreover, the USML's Category XXI is a catch-all provision, controlling "Articles, Technical Data, and Defense Services Not Otherwise Enumerated." 22 C.F.R. § 121.1 at USML paragraph XXI(a). These problems in interpreting the scope of ITAR control are aggravated by the fact that, since 2011, the ITAR has been the subject of over fifty proposed and final published notices of rulemaking in the Federal Register.

"[I]f doubt exists as to whether an article or service is covered by the U.S. Munitions List," prospective exporters must obtain a "commodity jurisdiction" determination from DDTC. 22 C.F.R. § 120.4(a). DDTC reports that over four thousand commodity jurisdiction requests have been submitted since 2010.[1] Defendants identify the Office of Freedom of Information and Security Review, the predecessor to the Department of Defense Office of Prepublication Review and Security ("DOPSR"), as the government agency from which persons must obtain prior approval before they

---

[1] "Final Commodity Jurisdiction Determinations," https://www.pmddtc.state.gov/ commodity_jurisdiction/determination.html (last visited May 8, 2015).

2

can publish unclassified technical information subject to ITAR control, regardless of whether the information is privately created. 22 C.F.R. § 125.4(b)(13). However, neither the Code of Federal Regulations nor any other public law establishes a timeline for decision, standard of review, or an appeals process for DOPSR public release determinations. Worsening this situation, DOPSR refuses to review information that it deems is not clearly subject to the ITAR without a formal commodity jurisdiction determination.

Obtaining a commodity jurisdiction determination can take a long time. Reportedly, nonpublic National Security Council ("NSC") guidelines establish a sixty-day deadline for DDTC to render a commodity jurisdiction determination. App. 17. But Government Accountability Office, Office of Inspector General and Defendant DDTC's reports show that the NSC guidelines are routinely disregarded, as commodity jurisdiction requests languish at DDTC awaiting final determinations for well over a year or more. App. 36-41, 84-86.

From 1969 to 1984, Footnote 3 to former ITAR Section 125.11 implied a prepublication approval requirement on privately generated, ITAR-controlled technical data, stating that "[t]he burden for obtaining appropriate U.S. Government approval for the publication of technical data falling within the definition in § 125.01, including such data as may be developed under other than U.S. Government contract, is on the person or company seeking publication." App. 200. Beginning in 1978, the U.S. Department of Justice's Office of Legal Counsel issued a series of publicly-available opinions advising Congress, the White House, and the State Department that the use of ITAR to impose a prior restraint on publications of privately generated unclassified information violates the First Amendment. App. 99-196.

In 1980, Defendant DDTC's predecessor, the Department of State Office of Munitions Control, issued official guidance providing that "[a]pproval is not required for publication of data

3

within the United States as described in Section 125.11(a)(1). Footnote 3 to Section 125.11 does not

establish a prepublication review requirement." App. 205. Thereafter, the State Department

removed Footnote 3 from ITAR, expressly stating its intent to address First Amendment concerns.

*See* 49 Fed. Reg. 47,682, 47,683 (December 6, 1984) ("Concerns were expressed, for example, on

licensing requirements as they relate to the First Amendment to the  Constitution. The revision seeks

to reflect these concerns . . ."). As such, to the extent ITAR imposed any prepublication approval

requirement on public speech containing unclassified technical information, the requirement was

ostensibly removed in 1984.

Moreover, as noted *supra*, ITAR now expressly excludes from its scope information found

in the public domain. *See* 22 C.F.R. § 120.10(b). A reasonable person reading ITAR's expansive

definition of "public domain," 22 C.F.R. § 120.11, would conclude that private speech can thus

enter the public domain without U.S. government approval. This is especially so considering that

"public release . . . after approval by the cognizant U.S. government department or agency," 22

C.F.R. § 120.11(a)(7) is but one of eight sources of "information which is published and which is

generally accessible or available to the public," 22 C.F.R. § 120.11(a). Moreover, anyone reading

the ITAR would reason that "cognizant U.S. government department of agency" is only relevant to

information generated under government contracts, and not to privately generated information.

The Internet contains a large, ever-expanding array of technical information arguably

subject to ITAR control. Simple Google, Amazon, and Yahoo searches reveal all manner of

technical data that might well fit within one or another USML designation published in books,

journals, and other mediums. Indeed, in 1997, the Department of Justice reported to Congress that

> [i]t is readily apparent from our cursory examination that anyone interested in
> manufacturing a bomb, dangerous weapon or weapon of mass destruction can easily obtain
> detailed instructions for fabricating and using such a device. Available sources include not

4

only publications from the so-called underground press but also manuals written for legitimate purposes, such as military, agricultural, industrial and engineering purposes. Such information is also readily available to anyone with access to a home computer equipped with a modem.

App. 160.

  2. *Defense Distributed's Publication of Technical Data*

  First developed in the 1980s, three-dimensional ("3D") printing technology allows a computer to "print" a physical object (as opposed to a two-dimensional image on paper). This technology was not widely available until open source communities such as the RepRap Project (www.reprap.org)[2] developed inexpensive but capable 3D printers.[3] Today, 3D printers are sold at stores such as Home Depot and Best Buy, and the instructions for printing everything from jewelry to toys to car parts are shared and exchanged freely online at sites like GrabCAD.com and Thingiverse.com.

  Plaintiff Defense Distributed was organized and is operated for the purpose of defending the civil liberty of popular access to arms guaranteed by the United States Constitution through facilitating global access to, and the collaborative production of, information and knowledge related to the 3D printing of arms; and to publish and distribute, at no cost to the public, such information and knowledge on the Internet in promotion of the public interest. App. 1, ¶ 2. Beginning in 2012, Defense Distributed privately generated, and posted on the Internet for free access by the public,

---

  [2]Open source communities are online forums through which individuals freely and collaboratively share their knowledge and discoveries.

  [3]Geoffrey Fowler, "MakerBot's Bre Pettis: 3-D Printers Are for 'Everyone,'" *Wall St. J. Blog* (June 18, 2014) http://blogs.wsj.com/personal-technology/2014/06/18/makerbots-bre-pettis-3-d-printers-are-for-everyone (last visited May 6, 2015); Chris Anderson, "The New MakerBot Replicator Might Just Change Your World," *Wired* (Sep. 19, 2012) http://www.wired.com/2012/09/how-makerbots-replicator2-will-launch-era-of-desktop-manufacturing/all (last visited May 6, 2015)

technical information about various gun-related items, including a trigger guard, grips, two

receivers, a magazine for AR-15 rifles, and a handgun named "The Liberator" (the "Published

Files"). At the time, there were no publicly known DDTC enforcement actions for the posting of

files on the Internet. *Id.* ¶ 3.

The Published Files were downloaded hundreds of thousands of times. App. 2, ¶ 4. The

Liberator files in particular generated national media attention, with coverage in Forbes, CNN, NBC

News, the Wall Street Journal, and even an episode of The Colbert Report. *Id.* Apart from their

functional aspects, the Published Files have also proven to have artistic and political utility. For

example, one artist has repurposed the Liberator schematics to create a statement protesting gun

violence.[4] London's Victoria & Albert Museum purchased two 3D printed Liberators to display

during its ongoing Design Festival.[5] And the Liberator prompted the Museum of Modern Art in New

York to host a debate concerning the intersection of design and violence.[6]

---

[4]Mark Wilson, "Artist Warps 3-D Printed Gun Blueprints, Protests Gun Violence," *Fast Company* (April 15, 2014), http://www.fastcodesign.com/3028300/infographic-of-the-day/artist-warps-3-d-printed-gun-blueprints-protests-gun-violence (last visited May 5, 2015).

[5]Andy Greenberg, "3D-Printed Guns As Art: London Design Museum Buys Two 'Liberator' Printed Pistols," *Forbes*, (Sep. 15, 2013), www.forbes.com/sites/andygreenberg/2013/09/15/3d-printed-guns-as-art-london-design-museum-buys-two-liberator-printed-pistols (last visited May 4, 2015); Rachel Donadio, "A History of the Now, Found in Politically Charged Objects," *New York Times* (July 6, 2014) http://www.nytimes.com/2014/07/07/arts/design/victoria-and-albert-museum-pushes-boundaries-of-collecting.html (last visited May 4, 2015).

[6]Paola Antonelli, "Design and Violence Debate I: Open Source," *MOMA* (March 27, 2014) http://designandviolence.moma.org/design-and-violence-debate-i-open-source (last visited May 4, 2015).

3.    *Defendants' Imposition of a Prior Restraint Against Plaintiffs' Speech*

    a.    *The Published Files*

On May 8, 2013, Defendant Smith, Chief of Defendant DDTC's Enforcement Division, sent

Defense Distributed a letter that warned:

> DTCC/END is conducting a review of technical data made publicly available by Defense
> Distributed through its 3D printing website, DEFCAD.org, the majority of which appear to
> be related to items in Category I of the USML. Defense Distributed may have released
> ITAR-controlled technical data without the required prior authorization from the Directorate
> of Defense Trade Controls (DDTC), a violation of the ITAR . . . all such data should be
> removed from public access immediately.

App. 2, ¶ 5; App. 13-14.

At the time it posted the Published Files, Defense Distributed did not know that the

Defendants would demand to pre-approve its speech. Defense Distributed believed, and continues to

believe, that the United States Constitution guarantees a right to share truthful speech—especially

speech concerning fundamental constitutional rights—in open forums. App. 2, ¶ 6. Moreover, as

noted *supra*, ITAR specifically excludes from its coverage "technical data" appearing in the "public

domain," 22 C.F.R. § 120.10(b), the latter term appearing to broadly encompass Defense

Distributed's activities, *see* 22 C.F.R. § 120.11. Nevertheless, for fear of criminal and civil

enforcement, Defense Distributed promptly complied with Defendants' demands and removed all of

the Published Files from its servers. App. 2, ¶ 6.

Defendants' letter further directed Defense Distributed to submit the Published Files to

DDTC for review using the "commodity jurisdiction" procedure. App. 2, ¶ 7, App. 14. Defense

Distributed complied with Defendants' request and filed ten (10) commodity jurisdiction requests

covering the Published Files on June 21, 2013. App. 2, ¶ 7; Exh. 13. Nearly two years later,

Defendants have still not responded to the requests. App. 2, ¶ 7.

7

    b.    *The "Ghost Gunner" Files*

On September 25, 2014, Defense Distributed requested DOPSR's prepublication approval

for public release of files containing technical information on a machine, named the "Ghost

Gunner," that can be used to manufacture a variety of items, including gun parts (the "Ghost

Gunner Files"). App. 3, ¶ 8; Exh. 14.[7] On October 1, 2014, DOPSR informed Defense Distributed

this request for review was refused because DOPSR was unsure whether the Ghost Gunner was

subject to ITAR. DOPSR further recommended that Defense Distributed submit another commodity

jurisdiction request to the Defendants. App. 3, ¶ 8; Exh. 15.

Defense Distributed submitted another commodity jurisdiction request for the Ghost Gunner

to Defendants on January 2, 2015. App. 3, ¶ 9; Exh. 16. On April 15, 2015, Defendant DDTC

determined that the Ghost Gunner machine, user manual, and operating software are not subject to

ITAR, but that "software, data files, project files, coding, and models for producing a defense article,

to include 80% AR-15 lower receivers, are subject to the jurisdiction of the Department of State in

accordance with [ITAR]." App. 3, ¶ 9; Exh. 17.

    c.    *The CAD Files.*

Since September 2, 2014, Defense Distributed has made multiple requests to DOPSR for

prepublication review of certain computer-aided design ("CAD") files. App. 3-4, ¶ 10; Exhs. 18-21.

On December 31, 2014, nearly four months after the first such review request, DOPSR sent Defense

Distributed two letters stating its refusal to review the CAD files. App. 4, ¶ 10; Exh. 22. The letters

directed Defense Distributed to the DDTC Compliance and Enforcement Division for further

---

[7]Any milling machine can be modified to mill components that are unlawful to manufacture, just as any saw that may be purchased at a hardware store can be used to unlawfully shorten a shotgun. However, Ghost Gunner does not ship with the jigs and code to manufacture machine guns, and Defense Distributed has no intention of offering such items for sale. *Id.*

questions on public release of the CAD files. *Id.* However, because this is not the DDTC division

responsible for issuing licenses or other DDTC authorizations, on January 5, 2015, Defense

Distributed requested Defendants' guidance on how to obtain authorization from DDTC

Compliance for release of the CAD files. To date, Defendants have not responded to Defense

Distributed's request for guidance. App. 4, ¶ 11; Exh. 23.

        d.    *Prior Restraint on Other Files*

Defense Distributed has and will continue to create and possess other files that contain

technical information, to include design drawings, rendered images, written manufacturing

instructions, and other technical information that Defense Distributed intends to post to open forums

on the Internet. Many of these files are described in the USML. App. 4, ¶ 13.

Plaintiff Second Amendment Foundation, Inc. ("SAF"), a non-profit membership

organization, has over 650,000 members and supporters nationwide, including in Texas. The

purposes of SAF include promoting the exercise of the right to keep and bear arms; and education,

research, publishing and legal action focusing on the constitutional right to privately own and

possess firearms, and the consequences of gun control. App. 6, ¶ 2. SAF's members have a keen

interest in accessing, studying, sharing, modifying, and learning from Defense Distributed's various

files, as well as similar 3D printing files related to firearm that they or other have created, but have

been barred from doing so by Defendants' actions. *Id.* ¶ 3; App. 8, ¶ 4; App. 9, ¶ 5; App. 10, ¶ 4;

App. 11, ¶ 5.

        4.    *Great, Irreparable, and Continuing Harm*

But for Defendants' impositions upon the distribution of the Published Files, Ghost Gunner

Files, CAD Files, and Defense Distributed's other files (collectively, the "Subject Files"), Plaintiffs

would freely distribute the Subject Files and other files relating to Second Amendment arms.

Plaintiffs refrain from distributing the Subject Files because they reasonably fear that Defendants

would pursue criminal and civil enforcement proceedings against Plaintiffs for doing so. App. 4-5, ¶

14; App. 7, ¶ 4. Defendants' threats have thus silenced Plaintiffs. Defendants have deprived

Plaintiffs' customers, visitors and patrons of access to Plaintiffs' speech; impeded their ability to

likewise speak on the same subjects; and infringed their right to keep and bear arms.

SUMMARY OF ARGUMENT

"A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed

on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3]

that the balance of equities tips in his favor, and [4] that an injunction is in the public interest."

*Winter* v. *Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) (citations omitted). These factors

are measured along a "sliding scale . . . which takes into account the intensity of each [factor] in a

given calculus." *Texas* v. *Seatrain Int'l, S.A.*, 518 F.2d 175, 180 (5th Cir. 1975) (citation omitted).

Each of these four factors weighs heavily in Plaintiffs' favor.

ARGUMENT

I.   PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS

   A.   CONGRESS NEVER AUTHORIZED DEFENDANTS' CENSORSHIP OF
        PRIVATELY-GENERATED, UNCLASSIFIED SPEECH.

"It is axiomatic that an administrative agency's power to promulgate legislative regulations

is limited to the authority delegated by Congress." *Bowen* v. *Georgetown Univ. Hospital*, 488 U.S.

204, 208 (1988). "[A]n agency literally has no power to act . . . unless and until Congress confers

power upon it." *Louisiana Pub. Serv. Comm'n* v. *FCC*, 476 U.S. 355, 374 (1986). Such authority

"may not be lightly presumed." *Michigan* v. *EPA*, 268 F.3d 1075, 1082 (D.C. Cir. 2001). And

"when a particular interpretation of a statute invokes the outer limits of Congress' power, we expect

10

a clear indication that Congress intended that result." *Immigration and Naturalization Service* v. *St. Cyr*, 533 U.S. 289, 299 (2001) (citation omitted).

Defendants have aggrandized for themselves nothing less than a power to censor privately-generated, unclassified "technical data" on the Internet. Their apparent syllogism holds: (1) the Internet is available worldwide, and is also available to foreign persons within the United States; (2) all speech posted to the Internet is thus deemed "exported;" (3) the export of "technical data" may be licensed and reviewed under ITAR; therefore (4) all "technical data" posted to the Internet is subject to ITAR controls and procedures. Q.E.D. Before addressing the constitutionality of this breathtaking regulatory regime, the Court should ask whether Congress granted Defendants such authority. As the Justice Department and Defendants' predecessors have opined, that question is answered "no."

The only potential source of statutory authority for Defendants' conduct would be found in the AECA, which authorizes the President, "[i]n furtherance of world peace and the security and foreign policy of the United States . . . to control the import and the export of defense articles and defense services and to provide foreign policy guidance to persons of the United States involved in the export and import of such articles and services." 22 U.S.C. § 2778(a)(1). To this end, "[t]he President is authorized to designate those items which shall be considered as defense articles and defense services for the purposes of this section and to promulgate regulations for the import and export of such articles and services." *Id.*

To be sure, Plaintiffs do not suggest that Defendants lack authority under the AECA to construct a narrowly-tailored regime to regulate the export of certain technical data. Nor do Plaintiffs suggest that uploading files to the Internet cannot be viewed, in some sense, as an export. Defendants can bar individuals from emailing classified blueprints for secret weapons systems to a foreign agent or providing technical assistance to a foreign person on designing defense articles. But

11

that is a very far cry from supposing that AECA authorizes the imposition of an indecipherable prior

restraint against sharing *all* public speech containing "technical data" on the Internet. And were the

AECA read to contain such a broad grant of prior restraint authority, there would be no reason to

limit that authority to the Internet. Recall that Defendants have broadly defined "export" to

encompass the act of "[d]isclosing (including oral or visual disclosure) . . . technical data to a

foreign person . . . in the United States." 22 C.F.R. § 120.17(a)(4). Any other publication of

"technical data," such as those appearing in countless scientific and academic publications, as well

as on television and at the movies, would be subject to Defendants' prior restraint. No American

could stand on a street corner or public square of any town visited by foreign tourists and declaim

"technical data" without being subject to Defendants' prior restraint.

      This is doubtless not what Congress had in mind when delegating authority to regulate the

export of defense articles "[i]n furtherance of world peace and the security and foreign policy of the

United States." 22 U.S.C. § 2778(a)(1). In 1978, not long after the AECA's enactment, the Justice

Department doubted that the Act authorized a prior restraint against cryptographic speech, and

warned, "It is by no means clear from the language or legislative history of either statute [AECA

and ITAR] that Congress intended that the President regulate noncommercial dissemination of

information, or considered the problems such regulation would engender." App. 102.

> [W]e wish to emphasize our doubts that the executive branch may validly provide for
> licensing or prior approval of exports of cryptographic information without more explicit
> Congressional authorization. The scope of the existing delegation of authority from Congress
> to the President, as we note above, is somewhat unclear. Before imposing a prior restraint on
> exports of public cryptographic information, we believe that a more clear cut indication of
> Congressional judgment concerning the need for such a measure is in order . . . further
> Congressional authorization would obviously be necessary in order to extend governmental
> controls to domestic as well as foreign disclosures of public cryptographic information.

12

App. 113 (citations omitted); *cf.* App. 115 ("we are uncertain whether the present legislative

authority for the technical data provisions of ITAR is adequate.")).

Defendants might claim that Congress's statute is purposefully vague and indeterminate,

leaving to them the task of creating regulations governing the export of defense articles—a task

clothed with a fair degree of judicial deference under the rule of *Chevron, U.S.A., Inc.* v. *Natural*

*Res. Def. Council, Inc.*, 467 U.S. 837, 842 (1984). But *Chevron* deference applies only "when it

appears that Congress delegated authority to the agency generally to make rules carrying the force of

law, and that the agency interpretation claiming deference was promulgated in the exercise of that

authority." *United States* v. *Mead Corp.*, 533 U.S. 218, 227-28 (2001). In other words, the agency

action entitled to deference must involve the exercise of some delegated process. "[A]djudication or

notice-and-comment rulemaking," for example, may carry the force of law. *Id.* at 228. But

"[i]nterpretations such as those in opinion letters—like interpretations contained in policy

statements, agency manuals, and enforcement guidelines, all of which lack the force of law—do not

warrant *Chevron*-style deference." *Christensen* v. *Harris County*, 529 U.S. 576, 587 (2000)

(citations omitted).

Defendants' prior restraint scheme is plainly not the product of its duly adopted rules. To the

contrary, as noted *supra*, First Amendment concerns prompted the State Department to withdraw the

only ITAR provision potentially authorizing a prior restraint regime in 1984, 49 Fed. Reg. 47,682

(December 6, 1984), four years after advising that the offending provision "does not establish a

prepublication review requirement." App. 205. The prior restraint scheme has only been hinted at in

Defendants' threatening letter to Defense Distributed and, perhaps, in Defendants' internal

enforcement guidelines. "[I]nterpretations contained in formats such as opinion letters are 'entitled

to respect' under our decision in *Skidmore* v. *Swift & Co.*, 323 U.S. 134, 140 (1944), but only to the

13

extent that those interpretations have the 'power to persuade.'" *Christensen*, 529 U.S. at 587

(parallel and other citations omitted).

> The weight [accorded to an administrative] judgment in a particular case will depend upon
> the thoroughness evident in its consideration, the validity of its reasoning, its consistency
> with earlier and later pronouncements, and all those factors which give it power to persuade,
> if lacking power to control.

*Mead*, 533 U.S. at 228.

Defendants' prior restraint scheme plainly fails the *Skidmore* test. There is no evidence that

Defendants, unlike their predecessors and the Department of Justice, ever properly considered the

implications of applying a prior restraint to all speech containing technical data that might be

accessed or overheard by a foreigner. The practice is also starkly inconsistent with earlier

pronouncements, wherein the government took steps to clarify that export controls did *not* amount to

a prior restraint on private speech. Nor has this prior restraint been consistently applied. Defense

Distributed appears to be the scheme's *only* target, other websites containing similar computer files

are apparently unimpeded. App. 4, ¶ 12. Defendants' actions in imposing a prior restraint on

unclassified and public speech containing "technical data" lie beyond the authority delegated to

them by Congress—assuming Congress could even restrict constitutional rights so broadly.

    B.    DEFENDANTS ARE VIOLATING PLAINTIFFS' FIRST AMENDMENT RIGHTS.

        1.    *Plaintiffs' Files Constitute Protected Speech.*

"The First Amendment protects works which, taken as a whole, have serious literary,

artistic, political, or scientific value, regardless of whether the government or a majority of the

people approve of the ideas these works represent." *Miller* v. *California*, 413 U.S. 15, 34 (1973).

"[C]omputer code conveying information is 'speech' within the meaning of the First Amendment . . .

." *Universal City Studios, Inc.* v. *Corley*, 273 F.3d 429, 449-50 (2d Cir. 2001); *see also Junger* v.

*Daily*, 209 F.3d 481, 485 (6th Cir. 2000) ("Because computer source code is an expressive means

for the exchange of information and ideas about computer programming, we hold that it is protected

by the First Amendment."); *Bernstein* v. *United States Dep't of Justice*, 176 F.3d 1132, 1141 (9th

Cir.) ("*Bernstein IV*") ("encryption software . . . must be viewed as expressive for First Amendment

purposes, and thus is entitled to the protections of the prior restraint doctrine"), *reh'g in banc*

*granted and opinion withdrawn*, 192 F.3d 1308 (9th Cir. 1999).[8]

To be sure, Plaintiffs' speech might be used to facilitate crime,[9] but that much is true of

virtually all protected speech. "The prospect of crime . . . by itself does not justify laws suppressing

protected speech." *Ashcroft* v. *Free Speech Coalition*, 535 U.S. 234, 245 (2002).

> The constitutional protection accorded to the freedom of speech and of the press is not based
> on the naive belief that speech can do no harm but on the confidence that the benefits society
> reaps from the free flow and exchange of ideas outweigh the costs society endures by
> receiving reprehensible or dangerous ideas.

*Herceg* v. *Hustler Magazine, Inc.*, 814 F.2d 1017, 1019 (5th Cir. 1987). Thus, while speech may

be regulated for its hazardous aspects, "first amendment protection is not eliminated simply because

publication of an idea creates a potential hazard." *Id.* at 1020. *See* Eugene Volokh, *Crime-*

*Facilitating Speech*, 57 Stan. L. Rev. 1095, 1103 (2005).

---

[8]In *Bernstein* v. *U.S. Dep't of State*, 922 F. Supp. 1426 (N.D. Cal. 1996) ("*Bernstein I*"), a
district court held that the source code for an ITAR-designated cryptographic program constituted
protected First Amendment expression. The court subsequently struck down ITAR in *Bernstein* v.
*U.S. Dep't of State*, 945 F. Supp. 1279 (N.D. Cal. 1996) ("*Bernstein II*"). When the government
shifted control over the code's export from the State Department to the Commerce Department, the
plaintiff amended his complaint to challenge the relevant Export Administration Regulations. The
court struck down these regulations as well, *Bernstein* v. *U.S. Dep't of State*, 974 F. Supp. 1288
(N.D. Cal. 1997) ("*Bernstein III*"), and the Ninth Circuit affirmed that decision in *Bernstein IV*.
Although the Court granted rehearing en banc, the government amended its regulations to exclude
plaintiff's code from export controls, mooting the case. *See Bernstein* v. *DOC*, No. C-95-0582-
MHP, 2004 U.S. Dist. LEXIS 6672, at *6 & n.2 (N.D. Cal. Apr. 19, 2004).

[9]It is less obvious that Plaintiffs' files would be particularly useful to foreign governments.

Furthermore, Defendants bear the burden of proving that Plaintiffs' speech is somehow unprotected. *See Freedman* v. *Maryland*, 380 U.S. 51, 58 (1965); *Speiser* v. *Randall*, 357 U.S. 513, 526 (1958). This they cannot do. This is not a case where the speech itself is inherently unprotected (e.g., perjury or fraud), or directly and exclusively aids and abets a criminal act. *Cf. United States* v. *Alvarez*, 132 S. Ct. 2537, 2547 (2012). Even were Plaintiffs' files purely functional and devoid of expressive content, Americans enjoy a fundamental right to possess the items described in and that can be created by the operation of Plaintiffs' files, which are legal to possess throughout most of the United States, including Texas.

2.    *ITAR's Application to All Public, Unclassified Speech Containing Technical Data Is Unconstitutionally Overbroad.*

"A statute is overbroad if in banning unprotected speech, a substantial amount of protected speech is prohibited or chilled in the process." *United States* v. *Scruggs*, 714 F.3d 258, 267 (5th Cir. 2013) (quotation omitted). A speech restriction is unconstitutional if "no set of circumstances exists under which [the law] would be valid or . . . the statute lacks any plainly legitimate sweep." *Catholic Leadership Coalition of Texas* v. *Reisman*, 764 F.3d 409, 426 (5th Cir. 2014) (quoting *United States* v. *Stevens*, 559 U.S. 460, 472 (2010)). A restriction is also unconstitutionally overbroad if "a substantial number of [the law's] applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Id.* (quoting *Stevens*, 559 U.S. at 473).

Given Defendants' sweeping views of what constitutes an "export"—virtually all speech in the presence of foreigners, including all Internet speech—and their equally broad definition of "technical data," ITAR cannot withstand constitutional scrutiny.

Federal laws criminalizing speech typically require that the targeted speech be made with intent or knowledge that the information would be used to facilitate criminal conduct, or with

16

knowledge that a particular recipient of the information intends to use it in the furtherance of

criminal activity. The Espionage Act, for example, only punishes those who seek to communicate

"with intent or reason to believe that [the information] is to be used to the injury of the United States

or to the advantage of a foreign nation." 18 U.S.C. § 794(a); see *Gorin* v. *United States*, 312 U.S.

19, 28 (1941) (upholding constitutionality of Espionage Act owing to scienter requirement). And it

is not a crime to provide material support or resources to terrorists, unless one "know[s] or intend[s]

that they are to be used in preparation for, or in carrying out, a violation" of various law. 18 U.S.C.

§ 2339A(a); *see Holder* v. *Humanitarian Law Project*, 561 U.S. 1 (2010); *see also United States*

v. *Featherston*, 461 F.2d 1119, 1121 (5th Cir. 1972) (upholding convictions for teaching the use or

making of explosives or incendiary devices, as statute "requires those prosecuted to have acted with

intent or knowledge that the information disseminated would be used in the furtherance of a civil

disorder.").

A scienter requirement should likewise limit ITAR's reach in restricting speech. *United*

*States* v. *Edler Industries*, 579 F.2d 516 (9th Cir. 1978). In *Edler*, the Ninth Circuit overturned a

conviction under the AECA's predecessor act, and the ITAR regulations then in effect, because the

trial court rejected arguments that the technical data had non-military applications. The act and its

> definition of technical data are susceptible of an overbroad interpretation. Their expansive
> language may be construed to restrict not only the export of arms and information directly
> leading to the production of articles on the Munitions List, but also the interchange of
> scientific and technical information that of itself is without any substantial military
> application.

*Edler*, 579 F.2d at 520. To avoid the constitutional problem, the court construed ITAR's reach

narrowly, to "control the conduct of assisting foreign enterprises to obtain military equipment and

related technical expertise. So confined, the statute and regulations are not overbroad [or] an

unconstitutional prior restraint on speech." *Id.* at 521.

> [T]echnical data must relate in a significant fashion to some item on the Munitions List.
> Moreover, adequate notice to the potential exporter requires that the relationship be clear . . .
> Presumably, Congress intended that the technical data subject to control would be directly
> relevant to the production of a specified article on the Munitions List, not simply vaguely
> useful for the manufacture of arms.

*Id*. at 520-21. "If the information could have both peaceful and military applications, as Edler

contends that its technology does, the defendant must know or have reason to know that its

information is intended for the prohibited use." *Id*. at 521 (citing *Gorin*, 312 U.S. at 27-28).

Following *Edler*, the Department of Justice Office of Legal Counsel issued a memorandum

to the State Department warning of "serious constitutional questions" were ITAR applied to

"transactions in which an 'exporter' who is not otherwise connected or concerned with any foreign

enterprise transmits technical data knowing, or having reason to know, that the data may be taken

abroad and used by someone there in the manufacture or use of arms." App. 121.

> [T[he revised technical data provisions cannot constitutionally be applied to the
> dissemination of technical data by persons having no direct connection with foreign conduct
> in settings in which there is no more than belief or a reasonable basis for believing (1) that a
> foreign national may take the technical data abroad and (2) that the data could be used by
> someone there in the manufacture or use of items on the Munitions List.

App. 128. "For obvious reasons, the best legal solution for the overbreadth problem is for the

Department of State, not the courts, to narrow the regulations." App. 129; see also App. 131 (1981

DOJ Memorandum to Commerce Dep't).

The Department of Justice reiterated these concerns in its 1997 report to Congress,

counseling that prior restraints against Internet publication of bomb-making and use information

violated the First Amendment, unless the publication was made "(i) with the intent that the

information be used to facilitate criminal conduct, or (ii) with the knowledge that a particular

recipient of the information intends to use it in furtherance of criminal activity." App. 156.

18

Defendants' censorship disregards both of these limitations. Plaintiffs are not seeking to help foreigners build controlled weapons of war. Rather, they are merely communicating with their fellow Americans, through a website, information regarding simple arms of the kind in common use for traditional lawful purposes that are themselves constitutionally protected. Had Defense Distributed designed a new type of diesel engine, that engine's possible utility in a tank would not authorize the State Department to prohibit the dissemination of blue prints, CAD files, or even executable 3D printing files on automotive-themed websites. *Cf. Edler*, 579 F.2d at 519. There is simply no telling where Defendants' censorship might end, unless it ends here.

3.     *Defendants Impose an Unconstitutional Prior Restraint Against Plaintiffs' Lawful Speech.*

"The classic prior restraint, of course, is an 'administrative [or] judicial order[] forbidding certain communications when issued in advance of the time that such communications are to occur.'" *Catholic Leadership Coalition*, 764 F.3d at 437 (quoting *Alexander* v. *United States*, 509 U.S. 544, 550 (1993) (other citations omitted). Prior restraints are, "in other words, laws which require a speaker 'to obtain prior approval for any expressive activities.'" *Gibson* v. *Tex. Dep't of Ins.–Div. of Workers' Comp.*, 700 F.3d 227, 235 (5th Cir. 2012) (quoting *Alexander*, 509 U.S. at 550-51). "Prior restraints face a well-established presumption against their constitutionality." *Marceaux* v. *Lafayette City-Parish Consol. Gov't*, 731 F.3d 488, 493 (5th Cir. 2013) (quotation omitted).

> In general, a prior restraint . . . will be upheld only if the government can establish that the activity restrained poses either a clear and present danger or a serious and imminent threat to a protected competing interest. The government must also establish that the order has been narrowly drawn and is the least restrictive means available.

*United States* v. *Brown*, 218 F.3d 415, 425 (5th Cir. 2000) (quotations omitted).

19

"Constitutional invalidity of prior restraints may result from one or both of 'two evils . . .: (1) the risk of censorship associated with the vesting of unbridled discretion in government officials; and (2) 'the risk of indefinitely suppressing permissible speech' when a licensing law fails to provide for the prompt issuance of a license." *East Brooks Books, Inc.* v. *Shelby County*, 588 F.3d 360, 369 (6th Cir. 2009) (quotation omitted); *FW/PBS, Inc.* v. *Dallas*, 493 U.S. 215, 225-27 (1990) (plurality opinion). Defendants' prior restraint inflicts both evils.

a.      Unbridled Discretion to Censor Speech.

"Statutes or policies" affording government officials "unbridled discretion" to determine "who may speak and who may not . . . are unconstitutional." *City of Lakewood* v. *Plain Dealer Publ'g Co.*, 486 U.S. 750, 763 (1988) (citations omitted). "[E]ven if the government may constitutionally impose content-neutral prohibitions on a particular manner of speech, it may not *condition* that speech on obtaining a license or permit from a government official in that official's boundless discretion." *Id.* at 763-64. Accordingly, standards governing prior restraints must be "narrow, objective and definite." *Shuttlesworth* v. *Birmingham*, 394 U.S. 147, 151 (1969). Standards involving "appraisal of facts, the exercise of judgment, [or] the formation of an opinion" are unacceptable. *Forsyth County* v. *Nationalist Movement*, 505 U.S. 123, 131 (1992) (quotation omitted). "Unbridled discretion naturally exists when a licensing scheme does not impose adequate standards to guide the licensor's discretion." *Chesapeake B & M, Inc.* v. *Harford County*, 58 F.3d 1005, 1009 (4th Cir. 1995) (en banc).

ITAR does not meaningfully limit Defendants' discretion. Reasonable persons must guess at what "specially designed" or "military application" truly mean and there are no limits to what DDTC can claim falls under USML Category XXI. Were Defendants able to readily apply their criteria, perhaps Defense Distributed's ten pending commodity jurisdiction requests would not

20

remain outstanding for nearly two years. "'Technical data' is perhaps the most confusing category of items regulated by the ITAR since it is defined separately and in relation to defense articles, 22 C.F.R. § 120.10, but is also defined as a defense article when it is covered by the USML. *See* 22 C.F.R. § 120.6." *Bernstein I*, 945 F. Supp. at 1284. Indeed, the regulations explicitly bar publication of a "Not Otherwise Enumerated" class of "technical data." 22 C.F.R. § 121.1 at USML paragraph XXI(b). An unenumerated prior restraint is the very definition of unbridled discretion. Respectfully, "if doubt exists as to whether [speech] is covered by the U.S. Munitions List," the solution should not be found in Defendants' inscrutable and often interminable "commodity jurisdiction" procedures. 22 C.F.R. § 120.4(a). Rather, the solution should be found in a judicial declaration that ITAR's speech controls must conform to First Amendment requirements.

b.    Lengthy Delays and the Lack of Procedural Safeguards.

"[T]he Supreme Court established three procedural safeguards to protect against the suppression of constitutionally protected speech by a censorship board." *Fantasy Ranch, Inc.* v. *City of Arlington*, 459 F.3d 546, 563 (5th Cir. 2006) (citing *Freedman*).

> First, any restraint before judicial review occurs can be imposed only for a specified brief period during which the status quo must be maintained; second, prompt judicial review of that decision must be available; and third, the censor must bear the burden of going to court to suppress the speech and must bear the burden of proof in court.

*Id.* (quotation omitted).

"The ITAR scheme, a paradigm of standardless discretion, fails on every count." *Bernstein I*, 945 F. Supp. at 1289. The DOPSR review process contains no publicly-known timelines in which the agency must complete its review. Aggravating this situation, in cases where DOPSR refuses to perform its review because of uncertain export control jurisdiction, as noted above, the period of time it takes to obtain a commodity jurisdiction request to enable DOPSR review can take months to

21

a year or more. Defense Distributed's ten commodity jurisdiction requests regarding the previously

Published Files have been pending at DDTC for nearly two years—a long time throughout which

Defense Distributed has been threatened with criminal enforcement should it republish the files.

And in cases where DOPSR refuses to allow publication and requires that a license be

obtained from Defendants, nothing requires DDTC to issue a licensing decision within a specific and

reasonable period of time. Relevant here, a "Policy on Review Time for License Applications"

established under a 2008 National Security Decision Directive requires that DDTC "complete the

review and adjudication of license applications within 60 days of receipt." *See* 74 Fed. Reg. 63497

(December 3, 2009). A two-month delay on the right to speak is per se unreasonable under the First

Amendment. But even were a two-month delay constitutional, this policy contains broad "national

security exceptions" allowing the government plenary authority to override the timeline. This

exception effectively swallows the two month rule, as it applies where "[t]he Department of Defense

has not yet completed its review" and "[w]hen a related export policy is under active review and

pending final determination by the Department of State." *Id.* A prior restraint that "permits a delay

without limits" is unconstitutional. *Riley* v. *Nat'l Fed. of Blind of N.C.*, 487 U.S. 781, 802 (1988).

And although "only a judicial determination in an adversary proceeding ensures the

necessary sensitivity to freedom of expression, only a procedure requiring a judicial determination

suffices to impose a valid final restraint," *Freedman*, 380 U.S. at 59, judicial review of DDTC or

DOPSR actions is non-existent. In fact, ITAR expressly provides that Defendants' licensing

determinations are *not* subject to judicial review under the Administrative Procedures Act. 22

C.F.R. § 128.1. And the AECA provides that "[t]he designation . . . of items as defense articles or

defense services for purposes of this section shall not be subject to judicial review." 22 U.S.C. §

2778(h).

4.    Defendants' Speech Regulation of Plaintiffs' Speech Fails Any Level of
First Amendment Scrutiny.

"Premised on mistrust of governmental power, the First Amendment stands against attempts

to disfavor certain subjects or viewpoints." *Citizens United* v. *FEC*, 558 U.S. 310, 340 (2010)

(citations omitted). "[A]s a general matter, the First Amendment means that government has no

power to restrict expression because of its message, its ideas, its subject matter, or its content."

*Stevens*, 559 U.S. at 468 (quotation omitted). A speech restriction is "content based if it require[s]

enforcement authorities to examine the content of the message that is conveyed to determine whether

a violation has occurred." *McCullen* v. *Coakley*, 134 S. Ct. 2518, 2531 (2014) (quotation omitted).

This aptly describes Defendants' prior restraint. Plaintiffs are free to publish whatever they want, on

the Internet or anywhere else, unless Defendants deem the content of Plaintiffs' speech to be ITAR-

controlled.

It does not matter that Defendants might claim to be indifferent to any views expressed in

Plaintiffs' speech. The absence of "illicit legislative intent" or an "improper censorial motive" is

irrelevant when considering that Defendants' restriction is content-based. *Simon & Schuster, Inc.* v.

*Members of the N.Y. State Crime Victims Bd.*, 502 U.S. 105, 117 (1991) (quotations omitted).

Defendants have singled out speech about arms—and "the First Amendment's hostility to

content-based regulation extends not only to a restriction on a particular viewpoint, but also to a

prohibition of public discussion of an entire topic." *Burson* v. *Freeman*, 504 U.S. 191, 197 (1992)

(plurality opinion) (citations omitted).

"Since [Defendants' practice] is a content-based speech restriction, it can stand only if it

satisfies strict scrutiny." *United States* v. *Playboy Entm't Group*, 529 U.S. 803, 813 (2000)

(citation omitted). This much, it cannot do. While Defendants may have a compelling interest in

23

controlling the export of sensitive data related to certain defense articles, the restriction is not

narrowly tailored, reaching vastly more speech than needed to advance the regulatory interest, and

capturing vastly more speech than that intended for a foreign audience.

    C.    DEFENDANTS' PRIOR RESTRAINT IS VOID FOR VAGUENESS.

"It is a basic principle of due process that an enactment is void for vagueness if its

prohibitions are not clearly defined." *Grayned* v. *City of Rockford*, 408 U.S. 104, 108 (1972).

Vagueness doctrine applies with particular force in review of laws dealing with speech. "[S]tricter

standards of permissible statutory vagueness may be applied to a statute having a potentially

inhibiting effect on speech; a man may the less be required to act at his peril here, because the free

dissemination of ideas may be the loser." *Hynes* v. *Mayor & Council of Oradell*, 425 U.S. 610, 620

(1976) (quotations omitted). "Under the First and Fifth Amendments, speakers are protected from

arbitrary and discriminatory enforcement of vague standards.'" *Nat'l Endowment for the Arts* v.

*Finley*, 524 U.S. 569, 588 (1998) (citation omitted).

Defendants' prepublication approval requirement is by no means self-evident to reasonable

people reading the ITAR. If anything, ITAR's exclusion of information in the public domain

suggests a variety of avenues by which people might avoid ITAR's strictures by publishing their

information. The regulatory regime has even been amended to remove the suggestion of a pre-

publication review requirement, the validity of which the Justice Department has repeatedly

questioned. The existence of a catch-all provision, and the need to submit to the opaque commodity

jurisdiction procedures, confirm that persons of "common intelligence must necessarily guess at

[ITAR's] meaning and differ as to its application." *Connally* v. *General Const. Co.*, 269 U.S. 385,

391 (1926) (citations omitted). It thus "violates the first essential of due process of law." *Id.*

D.     DEFENDANTS ARE VIOLATING PLAINTIFFS' SECOND AMENDMENT RIGHTS.

1.     *The Government Bears the Burden of Proving that Laws Burdening Second Amendment Rights Pass Heightened Scrutiny Review.*

The Second Amendment functions as a normal constitutional right. As the Supreme Court demonstrated, some laws will be struck down for conflicting with the right's core guarantee, without employing any balancing test. *District of Columbia* v. *Heller*, 554 U.S. 570 (2008). In *Heller*, once it was determined that the Second Amendment secures a right to have handguns for self-defense, city ordinances banning handguns and the keeping of functional firearms simply could not survive. "The Court invalidated the laws because they violated the central right that the Second Amendment was intended to protect . . . ." *Nat'l Rifle Ass'n of Am., Inc.* v. *Bureau of Alcohol, Tobacco, Firearms & Explosives*, 700 F.3d 185, 193 (5th Cir. 2012) ("*NRA*"). Other cases lend themselves to different constitutional tests, *e.g.*, gun licensing laws affording unbridled discretion could be viewed as prior restraints, and disarmed individuals may raise as-applied challenges based on their personal circumstances.

But in large part, when Second Amendment claims arise,

> [a] two-step inquiry has emerged as the prevailing approach: the first step is to determine whether the challenged law impinges upon a right protected by the Second Amendment—that is, whether the law regulates conduct that falls within the scope of the Second Amendment's guarantee; the second step is to determine whether to apply intermediate or strict scrutiny to the law, and then to determine whether the law survives the proper level of scrutiny.

*NRA*, 700 F.3d at 194 (citations omitted). The Fifth Circuit follows this approach in appropriate cases, *Id.*, and this case appears to be well-suited to this approach.

"To determine whether a law impinges on the Second Amendment right, we look to whether the law harmonizes with the historical traditions associated with the Second Amendment guarantee." *Id.* (citations omitted). "If the challenged law burdens conduct that falls outside the Second

25

Amendment's scope, then the law passes constitutional muster. If the law burdens conduct that falls

within the Second Amendment's scope, we then proceed to apply the appropriate level of

means-ends scrutiny." *Id.* at 195 (citations omitted).

"[T]he appropriate level of scrutiny depends on the nature of the conduct being regulated

and the degree to which the challenged law burdens the right." *NRA*, 700 F.3d at 195 (citations

omitted). But at least in the Fifth Circuit, rational basis review is unavailable. Means-ends scrutiny

in Second Amendment cases must always be heightened scrutiny—strict or intermediate. *Id.*

      2.    *The Second Amendment Secures the Right to Produce Firearms, and to Exchange Technical Data Concerning Firearms.*

There is no question that the Second Amendment secures a right to possess firearms,

including handguns such as the Liberator. *See Heller.* Because individuals have the right to render

their firearms operable as such (and not be mere paperweights), *Heller*, 554 U.S. at 630, it follows

that constitutional protection extends to any components necessary to the functioning of one's

constitutionally-protected firearm.

But there must be more. "[C]ertain unarticulated rights are implicit in enumerated

guarantees . . . fundamental rights, even though not expressly guaranteed, have been recognized by

the Court as indispensable to the enjoyment of rights explicitly defined." *Richmond Newspapers* v.

*Virginia*, 448 U.S. 555, 579-80 (1980). Because there is a right to possess handguns, there is,

necessarily, a right to acquire them. And the most basic means of acquiring something, is to make it.

Surely, the Second Amendment secures the right to make the arms that might then be kept or

carried. *Cf. Martin* v. *Harrington & Richardson, Inc.*, 743 F.2d 1200, 1204 (7th Cir. 1984)

(adopting tort doctrines "which would in practice drive [handgun] manufacturers out of business,

would produce a handgun ban by judicial fiat in the face of" a constitutional right to handgun

possession."). If "restricting the ability to purchase an item is tantamount to restricting that item's

use," *Reliable Consultants, Inc.* v. *Earle*, 517 F.3d 738, 743 (5th Cir. 2008) (footnote omitted), the

same must be said of restricting the ability to manufacture that item.[10]

The fact manufactured arms might cross the Nation's borders does not diminish the right to

arms. "Our citizens have always been free to make, vend and export arms. It is the constant

occupation and livelihood of some of them." 3 THE WRITINGS OF THOMAS JEFFERSON 230 (T.J.

Randolph, ed., 1830). "With organized armories inaccessible to the frontier and low barriers to

entering the trade in all regions, the [early American] public could reasonably have understood a

right to acquire arms through self-production." Peter Jensen-Haxel, *3D Printers, Obsolete Firearm*

*Supply Controls, and the Right to Build Self-Defense Weapons Under Heller*, 42 Golden Gate U.

L. Rev. 447, 478 (2012).

In keeping with the familiar rule "vendors and those in like positions . . . have been

uniformly permitted to resist efforts at restricting their operations by acting as advocates for the

rights of third parties who seek access to their market or function," *Carey* v. *Pop. Servs. Int'l*, 431

U.S. 678, 684 (1977) (quotation omitted); *Reliable Consultants*, 517 F.3d at 743, Plaintiffs are

entitled to assert the Second Amendment rights of their customers and website visitors. "[O]perating

a business that provides Second Amendment services is generally protected by the Second

Amendment." *Mance* v. *Holder*, No. 4:14-cv-539-O, 2015 U.S. Dist. LEXIS 16679, at *25 n.8

(N.D. Tex. Feb. 11, 2015); *Ezell* v. *City of Chicago*, 651 F.3d 684, 696 (7th Cir. 2011) ("Action

---

[10]In *United States* v. *Henry*, 688 F.3d 637 (9th Cir. 2012), the Ninth Circuit rejected a
Second Amendment claim to a homemade machine gun. Notably, the court did not address, let alone
deny that the Second Amendment secures the right to make firearms. Rather, the court held that this
particular type of firearm lies outside the Second Amendment's scope. Plaintiffs do not claim a right
in any arms or arms components that would lack Second Amendment protection.

Target, as a supplier of firing-range facilities, is harmed by the firing-range ban"). And SAF has

associational standing to assert its members Second Amendment rights. *Mance*, at \*11-\*12.

        3.    *Defendants' Regulations Fail Any Level of Second Amendment Scrutiny.*

The prior restraint and prohibition of speech relating to the manufacture of firearms and

related components is very much "a salient outlier in the historical landscape of gun control." *NRA*,

700 F.3d at 205. Never mind the Framing Era—nothing like this has existed in the United States

until Defendants ordered the Liberator files taken down. As the record shows, ITAR was long ago

amended specifically to remove the suggestion of such prior restraints. And while the Government's

various opinions over the years have focused on the scheme's First Amendment problems, the fact

remains that this type of conduct lies well outside American tradition and accepted legal norms.

"A regulation that threatens a right at the core of the Second Amendment—for example, the

right of a law-abiding, responsible adult to possess and use a handgun to defend his or her home and

family—triggers strict scrutiny." *NRA*, 700 F.3d at 195; *see also United States* v. *Masciandaro*,

638 F.3d 458, 470 (4th Cir. 2011) ("we assume that any law that would burden the 'fundamental,'

core right of self-defense in the home by a law-abiding citizen would be subject to strict scrutiny").

Defendants' restrictions squarely fit this description, though the outcome would be no different

under intermediate scrutiny, which "requires the government to demonstrate a 'reasonable fit'

between the challenged regulation and an 'important' government objective," *NRA*, 700 F.3d at

195, and "may not burden more [conduct] than is reasonably necessary," *United States* v.

*Marzzarella*, 614 F.3d 85, 98 (3d Cir. 2010).

Again, Plaintiffs do not question that the Government has a compelling interest in regulating

the exportation of arms. But this interest cannot effectively override the traditional, centuries-old

American craft of making arms of the kind to which individuals in this country enjoy a fundamental

right. If allowing Americans to exchange information useful in the manufacture of Second

Amendment arms carries some risk that the information might be gleaned by a foreign government,

there are nonetheless real limits on the Government's ability to mitigate that (theoretical) harm. The

later-enacted Second Amendment acts as a limitation on Congress's authority to regulate foreign

commerce, and not the other way around.

\* \* \*

Plaintiffs are substantially likely to prevail on at least some if not all of their claims.

II.    DEFENDANTS' LICENSING SCHEME IRREPARABLY HARMS PLAINTIFFS.

A finding that a constitutional right "'is either threatened or in fact being impaired'. . .

mandates a finding of irreparable injury." *Deerfield Med. Center* v. *City of Deerfield Beach*, 661

F.2d 328, 338 (5th Cir. 1981) (quoting *Elrod* v. *Burns*, 427 U.S. 347, 373 (1976)). "The loss of

First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable

injury." *Elrod*, 427 U.S. at 373-74 (citations omitted). And no constitutional right is so directly

linked to one's immediate physical well-being as is the right to keep and bear arms. The interest in

self-defense is the "*central component* of the [Second Amendment] right itself," *Heller*, 554 U.S. at

599 (emphasis original). As the Seventh Circuit explained,

> The loss of a First Amendment right is frequently presumed to cause irreparable harm based
> on "the intangible nature of the benefits flowing from the exercise of those rights; and the
> fear that, if those rights are not jealously safeguarded, persons will be deterred, even if
> imperceptibly, from exercising those rights in the future." The Second Amendment protects
> similarly intangible and unquantifiable interests. *Heller* held that the Amendment's central
> component is the right to possess firearms for protection. Infringements of this right cannot
> be compensated by damages.

*Ezell*, 651 F.3d at 699 (citations and footnote omitted).

III.    THE BALANCE OF EQUITIES FAVORS GRANTING INJUNCTIVE RELIEF.

While Plaintiffs suffer irreparable harm when their fundamental rights are violated, an

injunction would not harm Defendants at all. First, it appears that Defendants have thus far targeted

only Defense Distributed's website with a prior restraint on unclassified technical data. Defendants

are not apparently taking action to control all technical data, or even just unclassified technical data

relating to arms, present throughout the public domain. And an injunction would not bar Defendants

from controlling the export of classified information.

IV.    THE PUBLIC INTEREST WARRANTS INJUNCTIVE RELIEF.

"[I]t is always in the public interest to prevent the violation of a party's constitutional

rights." *Jackson Women's Health Org.* v. *Currier*, 760 F.3d 448, 458 n.9 (5th Cir. 2014) (quoting

*Awad* v. *Ziriax*, 670 F.3d 1111, 1132 (10th Cir. 2012)); *De Leon* v. *Perry*, 975 F. Supp. 2d 632,

665 (W.D. Tex. 2014).

V.    NO BOND OR OTHER SECURITY IS REQUIRED AS A CONDITION OF INJUNCTIVE RELIEF.

The security requirement of Fed. R. Civ. P. 65(c) may be dispensed with when there is no

risk of financial harm to the enjoined party. "In holding that the amount of security required

pursuant to Rule 65(c) 'is a matter for the discretion of the trial court,' we have ruled that the court

'may elect to require no security at all.'" *Kaepa, Inc.* v. *Achilles Corp.*, 76 F.3d 624, 628 (5th Cir.

1996) (quotation and citations omitted). Even courts that view Rule 65(c) as mandatory are open to

the idea of the mandatory bond being set at zero. *See Hoechst Diafoil Co.* v. *Nan Ya Plastics Corp.*,

174 F.3d 411, 421 n.3 (4th Cir. 1999). As an injunction would not financially harm Defendants, the

Court should dispense with the bond requirement.

CONCLUSION

Plaintiffs respectfully request that the motion be granted.

30

Dated: May 11, 2015

Respectfully submitted,

GURA & POSSESSKY, PLLC

FISH & RICHARDSON P.C.

Alan Gura
Virginia Bar No. 68842*
Gura & Possessky, PLLC
105 Oronoco Street, Suite 305
Alexandria, Virginia 22314
703.835.9085 / Fax 703.997.7665
alan@gurapossessky.com

*/s/ William B. Mateja*
William T. "Tommy" Jacks
Texas State Bar No. 10452000
William B. Mateja
Texas State Bar No. 13185350
David S. Morris
Texas State Bar No. 24032877
FISH & RICHARDSON P.C.
One Congress Plaza, Suite 810
111 Congress Avenue
Austin, Texas 78701
(512) 472-5070 (Telephone)
(512) 320-8935 (Facsimile)
jacks@fr.com
dmorris@fr.com
mateja@fr.com

Matthew Goldstein
D.C. Bar No. 975000*
Matthew A. Goldstein, PLLC
1012 14th Street NW, Suite 620
Washington, DC 20005
202.550.0040/Fax 202.683.6679
matthew@goldsteinpllc.com

Josh Blackman
Virginia Bar No. 78292*
1303 San Jacinto Street
Houston, Texas 77002
202.294.9003/Fax: 713.646.1766
joshblackman@gmail.com

*Admission pro hac vice pending

31

Exhibit 3

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| DEFENSE DISTRIBUTED, et al., | § | |
|     Plaintiffs, | § | |
| | § | |
| v. | § | No. 1:15-cv-372-RP |
| | § | |
| U.S. DEPARTMENT OF STATE, et al., | § | |
|     Defendants. | § | |

---

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR
<u>A PRELIMINARY INJUNCTION</u>**

# TABLE OF CONTENTS

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION** ........................................................................................ 1

**BACKGROUND** ........................................................................................................ 3

    **I.**    **Statutory and Regulatory Framework** ................................................ 3

    **II.**    **Defendants' Regulation of Plaintiffs' Conduct** ................................ 4

**LEGAL STANDARD** ............................................................................................... 7

**ARGUMENT** ............................................................................................................. 7

    **I.**    **Plaintiffs' Motion for a Preliminary Injunction Should Be Denied.** ............... 7

        A.    Plaintiffs Have Failed to Carry Their Burden of Demonstrating Irreparable Injury. ................................................................................ 8

        B.    The Threatened Harm to the National Security and Foreign Policy Interests of the United States From an Injunction Outweighs any Irreparable Harm to Plaintiffs. .......................................................... 10

        C.    The Public Interest Would be Disserved By a Preliminary Injunction. .......................................................................................... 11

    **II.**    **Plaintiffs' Motion for a Preliminary Injunction Should Be Denied Because Plaintiffs Have Not Shown a Substantial Likelihood of Success on the Merits.** ............... 11

        A.    The Export of CAD Files That Function to Automatically Create a Firearm or its Components is Not the Publishing of an Item of Expressive Speech. ........................................................................... 11

        B.    Even If Limiting the Export of CAD Files Implicates the First Amendment, Defendants Are Likely to Prevail on Plaintiffs' First Amendment Claims. ..................................................................... 14

            1.    ITAR's Export Controls Are a Valid, Content-Neutral Regulation of Plaintiffs' Conduct That Do Not Infringe First Amendment Rights. ................................................................ 15

            2.    ITAR's Export Controls Are Not a Facially Unconstitutional Prior Restraint. ................................................................. 18

            3.    ITAR's Export Controls Are Not Unconstitutionally Overbroad. ................................................................ 21

        B.    Defendants Are Likely to Prevail on Plaintiffs' Second Amendment Claims. ..................................................................... 22

            1.    Plaintiffs Lack Standing for Their Second Amendment Claims. ....... 22

            2.    Plaintiffs Are Unlikely to Succeed on Their Second Amendment Claims. ................................................................ 25

C.    Defendants Are Likely to Prevail on Plaintiffs' Other Claims. ................ 27

1.    ITAR's Standards Are Not Void for Vagueness. .............................. 27

2.    Application of ITAR's Export Requirements to Plaintiffs' CAD Files Does Not Exceed the Statutory Authority Granted by Congress ................................................................................................. 28

**CONCLUSION** ................................................................................................. **31**

# TABLE OF AUTHORITIES

## Cases

*AF Holdings, LLC. v. Does 1-1058,*
    752 F.3d 990 (D.C. Cir. 2014) ................................................................. 6
*Alexander v. U.S.,*
    509 U.S. 544 (1993) ................................................................................ 18
*Bernstein v. U.S. Dep't of Justice,*
    176 F.3d 1132 (9th Cir. 1999) ............................................................... 13
*Bonds v. Tandy,*
    457 F.3d 409 (5th Cir. 2006) ................................................................. 24
*Broadrick v. Oklahoma,*
    413 U.S. 601 (1973) ................................................................................ 21
*Brockett v. Spokane Arcades,*
    472 U.S. 491 (1985) ........................................................................... 21, 22
*Brown v. District of Columbia,*
    888 F. Supp. 2d 28 (D.D.C. 2012) ......................................................... 9
*Brown v. Entm't Merchants Ass'n,*
    131 S. Ct. 2729 (2011) ........................................................................... 12
*Brown v. Town of Cary,*
    706 F.3d 294 (4th Cir. 2013) ................................................................. 28
*Bullfrog Films v. Wick,*
    646 F. Supp. 492 (C.D. Cal. 1986) ....................................................... 14
*Canal Auth. of State of Fla. v. Callaway,*
    489 F.2d 567 (5th Cir. 1974) ................................................................... 8
*Capital Cities/ABC, Inc. v. Brady,*
    740 F. Supp. 1007 (S.D.N.Y. 1990) .................................................. 16, 19
*Carey v. Population Servs. Int'l,*
    431 U.S. 678 (1977) ................................................................................ 25
*City of Lakewood v. Plain Dealer Pub. Co.,*
    486 U.S. 750 (1988) .................................................... 18, 19, 20, 21
*City of Littleton v. Z.J. Gifts D-4,*
    541 U.S. 774 (2004) ................................................................................ 20
*Clark v. Cmty. for Creative Non-Violence,*
    468 U.S. 288 (1984) ................................................................................ 15
*Coates v. City of Cincinnati,*
    402 U.S. 611 (1971) ................................................................................ 28
*Corrosion Proof Fittings v. EPA,*
    947 F.2d 1201 (5th Cir. 1991) ............................................................... 25
*Ctr. for Biological Diversity v. Salazar,*
    706 F.3d 1085 (9th Cir. 2013) ................................................................. 8
*DaimlerChrysler v. Cuno,*
    547 U.S. 332 (2006) ................................................................................ 23
*Dole v. Petroleum Treaters,*
    876 F.2d 518 (5th Cir. 1989) ................................................................. 30
*Emergency Coal. to Defend Educ. Travel v. Dep't of Treas.,*

545 F.3d 4 (D.C. Cir. 2008) ............................................................... 16

*Escamilla v. M2,*
    Tech., 2013 WL 4577538 (E.D. Tex. 2013) ............................................ 11

*Faculty Senate of Fla. Int'l U. v. Winn,*
    477 F. Supp. 2d 1198 (S.D. Fla. 2007) .................................................. 9

*Feit v. Ward,*
    886 F.2d 848 (7th Cir. 1989) ............................................................... 1

*Forsyth Cnty., Ga. v. Nationalist Movement,*
    505 U.S. 123 (1992) ........................................................................... 21

*Frank v. Relin,*
    1 F.3d 1317 (2d Cir. 1993) .................................................................. 1

*Freedman v. Maryland,*
    380 U.S. 51 (1965) ...................................................................... 19, 20

*Gonannies, Inc. v. Goupair.Com, Inc.,*
    464 F. Supp. 2d 603 (N.D. Tex. 2006) ................................................... 9

*Haig v. Agee,*
    453 U.S. 280 (1981) ........................................................................... 14

*Heller v. District of Columbia,*
    670 F.3d 1244 (D.C. Cir. 2011) ........................................................... 27

*Henderson v. Stalder,*
    287 F.3d 374 (5th Cir. 2002) ............................................................... 23

*Holy Land Found. v. Ashcroft,*
    219 F. Supp. 2d 57 (D.D.C. 2002), ...................................................... 11

*House the Homeless v. Widnall,*
    94 F.3d 176 (5th Cir. 1996) ....................................................... 7, 12, 13

*Huitron-Guizar,*
    678 F.3d 1169 ................................................................................... 24

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston,*
    515 U.S. 557 (1995) ........................................................................... 12

*In re Iraq & Afg. Detainees Litig.,*
    479 F. Supp. 2d 85 (D.D.C. 2007) ........................................................ 2

*Johnson v. Moore,*
    958 F.2d 92 (5th Cir. 1992) ................................................................ 24

*Junger v. Daley,*
    209 F.3d 481 (6th Cir. 2000) ............................................................... 13

*Karn v. Dep't of State,*
    925 F.Supp. 1 (D.D.C.1996) ............................................................... 13

*Katt v. Dykhouse,*
    983 F.2d 690 (6th Cir. 1992) ............................................................... 17

*Kirby v. City of Elizabeth,*
    388 F.3d 440 (4th Cir. 2004) ............................................................... 1

*Kleindienst v. Mandel,*
    408 U.S. 753 (1972) ........................................................................... 18

*Kleinman v. City of San Marcos,*
    597 F.3d 323 (5th Cir. 2010) ............................................................... 17

*Laker Airways, Ltd. v. Pan Am. World Airways, Inc.*,
   604 F. Supp. 280 (D.D.C. 1984) ........................................................... 14

*Linick v. U.S.*,
   104 Fed. Cl. 319 (Fed. Cl. 2012) ......................................................... 18

*Lorillard v. Pons*,
   434 U.S. 575 (1978) ............................................................................ 30

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992) ............................................................................ 24

*Mance v. Holder*,
   2015 WL 567302 (N.D. Tex. Feb. 11, 2015) ..................................... 25

*Marchese v. California*,
   545 F.2d 645 (9th Cir. 1976) .............................................................. 26

*Martinez v. Mathews*,
   544 F.2d 1233 (5th Cir. 1976) ..................................................... passim

*Milena Ship Mgmt. Co. v. Newcomb*,
   804 F. Supp. 846 (E.D. La. 1992) ........................................................ 8

*Miss. State Democratic Party v. Barbour*,
   529 F.3d 538 (5th Cir. 2008) .............................................................. 23

*Munn v. Ocean Springs, Miss.*,
   763 F.3d 437 (5th Cir. 2014) ......................................................... 27, 28

*N.Y. State Club Ass'n v. City of New York*,
   487 U.S. 1 (1987) ................................................................................ 21

*NAACP v. Kyle, Tex.*,
   626 F.3d 233 (5th Cir. 2010) .............................................................. 23

*Nation Magazine v. Dep't of Def.*,
   762 F. Supp. 1558 (S.D.N.Y. 1991) ................................................... 14

*Nat'l Rifle Ass'n v. ATF*,
   700 F.3d 185 (5th Cir. 2012) .............................................. 24, 25, 26, 27

*Near v. State of Minn.*,
   283 U.S. 697 (1931) ............................................................................ 20

*Osterweil v. Edmonson*,
   424 F. App'x 342 (5th Cir. 2011) ....................................................... 24

*Planned Parenthood Ass'n of Hidalgo Cnty. Tex. v. Suehs*,
   692 F.3d 343 (5th Cir. 2012) ..................................................... 2, 7, 14

*Promotions v. Conrad*,
   420 U.S. 546 (1975) ............................................................................ 20

*Pub. Citizen, Inc. v. Bomer*,
   274 F.3d 212 (5th Cir. 2001) .............................................................. 23

*Reeves v. McConn*,
   631 F.2d 377 (5th Cir. 1980) .............................................................. 28

*Reliable Consultants, Inc. v. Earle*,
   517 F.3d 738 (5th Cir. 2008) .............................................................. 25

*RTM Media, L.L.C. v. City of Houston*,
   584 F.3d 220 (5th Cir. 2009) .............................................................. 17

*Scott v. Flowers*,
   910 F.2d 201 (5th Cir. 1990) ................................................................ 1

*Sec'y State of Md. v. Munson*,
467 U.S. 947 (1984) ............................................................................ 22

*Siegel v. Lepore*,
234 F.3d 1163 (11th Cir. 2000) ........................................................... 9

*Spence v. Washington*,
418 U.S. 405 (1974) ............................................................................ 12

*Teague v. Reg'l Comm'r of Customs*,
404 F.2d 441 (2d Cir. 1968) ................................................................ 20

*Texas v. Johnson*,
491 U.S. 397 (1989) ............................................................................ 12

*Thomas v. Chicago Park Dist.*,
534 U.S. 316 (2002) ............................................................................ 21

*Tough Traveler, Ltd. v. Outbound Prods.*,
60 F.3d 964 (2d Cir. 1995) .................................................................. 9

*Turner Broad. Sys., Inc. v. FCC*,
512 U.S. 622 (1994) ............................................................................ 15

*U.S. Civil Service Comm. v. Nat'l Ass'n of Letter Carriers*,
413 U.S. 548 (1973) ............................................................................ 28

*U.S. v. 12 200-Ft. Reels*,
413 U.S. 123 (1972) ............................................................................ 14

*U.S. v. Bell*,
414 F.3d 474 (3d Cir. 2005) ................................................................ 17

*U.S. v. Chi Mak*,
683 F.3d 1126 (9th Cir. 2012) ..................................................... passim

*U.S. v. Edler Indus.*,
579 F.2d 516 (9th Cir. 1978) ....................................................... passim

*U.S. v. Gurrola-Garcia*,
547 F.2d 1075 (9th Cir. 1976) ............................................................ 26

*U.S. v. Hicks*,
980 F.2d 963 (5th Cir. 1992) .............................................................. 21

*U.S. v. Hoffman*,
10 F.3d 808 (9th Cir. 1993) ................................................................ 17

*U.S. v. Huitron-Guizar*,
678 F.3d 1164 (10th Cir. 2012) .......................................................... 16

*U.S. v. Mandel*,
914 F.2d 1215 (9th Cir. 1990) ............................................................ 18

*U.S. v. Martinez*,
904 F.2d 601 (11th Cir. 1990) ............................................................ 18

*U.S. v. Marzzarella*,
614 F.3d 85 (3d Cir. 2010) .................................................................. 26

*U.S. v. Merkt*,
794 F.2d 950 (5th Cir. 1986) ................................................................ 2

*U.S. v. O'Brien*,
391 U.S. 367 (1968) ................................................................... 12, 17

*U.S. v. Posey*,
864 F.2d 1487 (9th Cir. 1989) ...................................................... 17, 18

*U.S. v. Ramsey*,
   431 U.S. 606 (1977)................................................................................. 2, 3
*U.S. v. South Carolina*,
   720 F.3d 518 (4th Cir. 2013) ................................................................ 11
*U.S. v. W.T. Grant Co.*,
   345 U.S. 629 (1953) ............................................................................... 9
*U.S. v. Yakou*,
   428 F.3d 241 (D.C. Cir. 1995) .............................................................. 30
*Voting for Am. v. Steen*,
   732 F.3d 382 (5th Cir. 2013) ................................................................ 16
*W. Ala. Quality of Life Coal. v. U.S. Fed. Highway Admin.*,
   302 F. Supp. 2d 672 (S.D. Tex. 2004) ................................................... 9
*Ward v. Rock Against Racism*,
   491 U.S. 781 (1989) ........................................................................ 15, 21
*Warth v. Seldin*,
   422 U.S. 490 (1975)............................................................................. 21
*Water Keeper Alliance v. Dep't of Def.*,
   152 F. Supp. 2d 155 (D.P.R. 2001),...................................................... 11
*Winter v. Natural Res. Def. Council*,
   555 U.S. 7 (2008) ......................................................................... 7, 8, 11
*Wireless Agents, L.L.C. v. T-Mobile USA, Inc.*,
   No. 3:05-CV-0094, 2006 WL 1540587 (N.D. Tex. June 6, 2006) ........... 9
*Wolfe v. Strankman*,
   392 F.3d 358 (9th Cir. 2004) .................................................................. 1

## **Statutes**

22 U.S.C. § 2751 et seq.,...................................................................................... 3
22 U.S.C. § 2778(a)(1)............................................................................ 3, 11, 15, 29
50 U.S.C. § 5(b) (1964) ....................................................................................... 20
22 U.S.C. § 2778(a)(2)......................................................................................... 29
22 U.S.C. § 2778(b)(1)(A)(i) ................................................................................ 29
22 U.S.C. § 2778(b)(2) ........................................................................................ 29

## **Regulations**

22 C.F.R. § 120.10 .......................................................................................... 19, 21
22 C.F.R. § 120.10(a) ........................................................................................... 28
22 C.F.R. § 120.10(a)(1) ......................................................................................... 7
22 C.F.R. § 120.10(a)(5) ....................................................................................... 22
22 C.F.R. § 120.16 ................................................................................................. 4
22 C.F.R. § 120.17(a)(1) ......................................................................................... 4
22 C.F.R. § 120.17(a)(3) ......................................................................................... 4
22 C.F.R. § 120.17(a)(4) ......................................................................................... 4
22 C.F.R. § 120.3 ................................................................................................. 27
22 C.F.R. § 120.4 ................................................................................................... 4
22 C.F.R. § 120.4(d)(1)-(2)...................................................................................... 5

22 C.F.R. § 121.1(I)(a) ............................................................................................................ 3

22 C.F.R. § 125.11 ................................................................................................................. 28

22 C.F.R. § 125.11(a)(1) ....................................................................................................... 30

22 C.F.R. §§ 120-130 ............................................................................................................. 4

22 C.F.R. Part 120 ............................................................................................................... 16

22 C.F.R. Part 121 .......................................................................................................... 3, 19

## **Executive Orders**

Executive Order 12637 ........................................................................................................... 4

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| DEFENSE DISTRIBUTED, et al., | § | |
|     Plaintiffs, | § | |
| | § | |
| v. | § | No. 1:15-cv-372-RP |
| | § | |
| U.S. DEPARTMENT OF STATE, et al., | § | |
|     Defendants. | § | |

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR
A PRELIMINARY INJUNCTION**

At issue in this litigation is the United States' system of export controls for weapons—laws and regulations that seek to ensure that articles useful for warfare or terrorism are not shipped from the United States to other countries (or otherwise provided to foreigners), where, beyond the reach of U.S. law, they could be used to threaten U.S. national security, foreign policy, or international peace and stability. Plaintiffs challenge restrictions on the export of Computer Aided Design ("CAD") files that are indispensable to the creation of guns and their components through a three-dimensional ("3D") printing process. There is no dispute that the Government does not restrict Plaintiffs from sharing CAD files domestically or from using CAD files to make or acquire firearms in the United States. Nonetheless, Plaintiffs seek a mandatory preliminary injunction to bar the Government from preventing the *export* of these design files, which can be easily used to manufacture arms overseas. Plaintiffs' characterization of such an export as the mere "publication" of information is wrong—the CAD files unquestionably control the functioning of a 3D printer and cause it to manufacture firearms. Whatever informational value there may be in the process by which 3D printing occurs, the CAD files are also functional, directly facilitate the manufacture of weapons, and may properly be regulated for export. As set forth below, Plaintiffs' motion for a preliminary injunction should be denied.[1]

---

[1] Injunctive relief designed to affect the conduct of a government entity is available only from official-capacity defendants. *See Scott v. Flowers*, 910 F.2d 201, 213 n.25 (5th Cir. 1990); *accord Wolfe v. Strankman*, 392 F.3d 358, 360 n.2 (9th Cir. 2004); *Kirby v. City of Elizabeth*, 388 F.3d 440, 452 n.10 (4th Cir. 2004); *Frank v. Relin*, 1 F.3d 1317, 1327 (2d Cir. 1993); *Feit v. Ward*, 886 F.2d 848, 858 (7th Cir. 1989); *In re Iraq & Afg. Detainees Litig.*, 479 F. Supp. 2d 85, 118-19 (D.D.C. 2007). This brief is therefore filed only on behalf of Defendants in their official

The Fifth Circuit and the Supreme Court have set forth a demanding four-part test to obtain a preliminary injunction and require that a party seeking such an "extraordinary remedy . . . clearly carr[y] the burden of persuasion" on each element. *Planned Parenthood Ass'n of Hidalgo Cnty. Tex. v. Suehs*, 692 F.3d 343, 348 (5th Cir. 2012). Plaintiffs here have not even attempted to demonstrate: (1) "a substantial threat of irreparable injury if the injunction were not granted," (2) "that their substantial injury outweigh[s] the threatened harm to the party whom they [seek] to enjoin," or (3) "that granting the preliminary injunction would not disserve the public interest." *Id.* As Defendants show below, while Plaintiffs face little immediate harm, entry of an injunction would be likely to irrevocably harm national security and foreign policy and damage the public interest. Under these circumstances, Plaintiffs' failure to address the legal requirements for a preliminary injunction alone warrants the straightforward denial of their motion without addressing the legal issues raised by Plaintiffs' arguments on the merits.

Nonetheless, Plaintiffs also have no likelihood of success on the merits. The International Traffic in Arms Regulations ("ITAR") regulate only the export of defense articles and defense services for the legitimate and important purpose of protecting national security and U.S. foreign policy interests. "Control of one's borders . . . is an essential feature of national sovereignty," *U.S. v. Merkt*, 794 F.2d 950, 955 (5th Cir. 1986), and it is well established that the United States has authority to regulate the trafficking of articles, particularly military articles, across those borders. *See U.S. v. Ramsey*, 431 U.S. 606, 619 (1977) ("border search" exception to Fourth Amendment rooted in "different rules of constitutional law" than apply domestically).

Plaintiffs characterize the cross-border transmission of digital instructions that automatically generate firearms as the "publication" of expression and claim that any licensing requirement on such export is an impermissible prior restraint on speech. But that claim is wrong both factually and legally. The Government does not seek to limit Plaintiffs from spreading ideas or information *about* 3D printing, but rather seeks to apply the generally applicable conduct regulation on exports of arms to CAD files that indisputably control the

---

capacities, and the term "Defendants," as used herein, does not include the individual-capacity Defendants in this action.

functioning of a 3D printer and direct it to manufacture firearms. For these reasons, as other courts have concluded, the claim that the First Amendment forbids application of ITAR's export requirements to these items is meritless.

There is also no dispute that Plaintiffs may use these CAD files to make or acquire firearms in connection with their right to keep and bear arms under the Second Amendment. That Plaintiffs have not done so because they wish to "facilitat[e] *global* access to arms," Complaint ("Compl."), ECF No. 1 at ¶ 1,[2] calls into doubt whether their Second Amendment rights are even at issue, and in any case, Plaintiffs' Second Amendment and other claims likewise fail to satisfy the essential minimums of the legal theories that Plaintiffs assert. The Court should therefore deny Plaintiffs' motion.

## BACKGROUND

### I.      Statutory and Regulatory Framework

The Arms Export Control Act ("AECA"), 22 U.S.C. § 2751 *et seq*., authorizes the President, "[i]n furtherance of world peace and the security and foreign policy of the United States" to "control the import and the export of defense articles and defense services" and to promulgate regulations accordingly. 22 U.S.C. § 2778(a)(1). At the heart of the AECA is the United States Munitions List ("USML"), an extensive listing of materials that constitute "defense articles and defense services" under the AECA. 22 C.F.R. Part 121. Category I of the USML includes all firearms up to .50 caliber, and all technical data directly related to such firearms. *See* 22 C.F.R. § 121.1(I)(a). Technical data is information that "is required for the design, development, production, manufacture, assembly, operation, repair, testing, maintenance or modification of defense articles." *Id.* § 120.10(a).[3]  Section 2778(a) of the AECA authorizes the

---

[2] *See* Mem. in Support of Pls. Mot. for Prelim. Injunction, ECF No. 8 ("Pl. Br."), Ex. 1 ¶ 2 (Decl. of Cody Wilson); *id.* at App. 270 (deposit from prospective foreign "Ghost Gunner" buyer).
[3] Technical data includes information in the form of blueprints, drawings, photographs, plans, instructions or documentation," and broadly exempts information already in the public domain, as defined in Section 120.11. *Id.* § 120.10. On June 3, 2014, the State Department issued a Notice of Proposed Rulemaking to update, *inter alia*, the definitions of "technical data" in the ITAR, the scope of the "public domain" exemption, and the application of ITAR to technical data on the Internet. *See* 80 Fed. Reg. 31525; Aguirre Decl. ¶ 11. The proposal would clarify that CAD files are a form of "technical data" and make explicit that providing technical data on a publicly accessible network, such as the Internet, is an export because of its inherent accessibility to foreign powers. 80 Fed. Reg. 31525. As relevant here, the clarified definitions in this NPRM

President: (1) to designate those defense articles and services to be included on the USML; (2) to require licenses for the export of items on the USML; and (3) to promulgate regulations for the import and export of such items on the USML. *Id.* The President has delegated to the State Department this authority, and the Department has accordingly promulgated the ITAR, which is administered by the State Department's Directorate of Defense Trade Controls ("DDTC"). *See* Executive Order 13637(n)(iii); 22 C.F.R. §§ 120-130.

Importantly, ITAR does not regulate any activities except those that constitute "exports," *i.e.*, the transfer of defense articles abroad or to foreign persons. ITAR's definition of exports includes, in relevant part: (1) "[s]ending or taking a defense article out of the United States in any manner," 22 C.F.R. § 120.17(a)(1); (2) "[d]isclosing (including oral or visual disclosure) or transferring in the United States any defense article to an embassy, any agency or subdivision of a foreign government," *id.* § 120.17(a)(3); and (3) "[d]isclosing (including oral or visual disclosure) or transferring technical data to a foreign person, whether in the United States or abroad." *Id.* § 120.17(a)(4).

In the vast majority of circumstances, there is no doubt as to whether a particular item to be exported is a defense article or defense service. *See* Declaration of Lisa V. Aguirre ("Aguirre Decl.") ¶ 19. For those cases in which there is doubt, however, ITAR contains a "commodity jurisdiction" ("CJ") procedure. Upon written request, the DDTC will provide potential exporters with a determination as to whether the item, service, or data is within the scope of ITAR. 22 C.F.R. § 120.4. These assessments are made on a case-by-case basis through an inter-agency process, evaluating whether the article is covered by the USML, is functionally equivalent to an article on the USML, or has substantial military or intelligence application. *See id.* § 120.4(d).

## II. Defendants' Regulation of Plaintiffs' Conduct

On May 8, 2013, shortly after learning about Defense Distributed's unrestricted posting of CAD files to the Internet, the DDTC's Enforcement Division sent a letter to Defense Distributed noting that "it is unlawful to export any defense article or technical data for which a

---

would simply confirm that treatment of the Plaintiffs' posting of the CAD files to the Internet under the current regulations would remain the same, and thus Defendants do not anticipate the NPRM would impact application of the ITAR to the files at issue in this case.

license or written approval is required without first obtaining the required authorization from the DDTC." Pl. Br. at App. 14; *see* Ex. 1. Observing that "disclosing (including oral or visual disclosure) or transferring foreign data to a foreign person, whether in the United States or abroad, is considered an export," DDTC requested that Defense Distributed submit CJ determination requests for ten CAD files and that Defense Distributed "treat [this] technical data as ITAR-controlled" until DDTC could "provide[] Defense Distributed with final CJ determinations." Pl. Br. at App. 14-15. These files included "a trigger guard, grips, two receivers, a magazine for AR-15 rifles, and a handgun named 'The Liberator.'" Pl. Br. at App. 1, ¶ 3. DDTC therefore suggested that the technical data be removed from Defense Distributed's website—*i.e.*, a location in which it would be disclosed without limitation to a foreign person, *see* 22 C.F.R. § 120.16, should any foreign person visit Defense Distributed's website and download the file, during the review process. Defendants did not suggest in any way that Defense Distributed's CAD files could not be provided to U.S. persons within the U.S. or otherwise used, altered, or discussed in ways that would not constitute "exports."

On June 21, 2013, Defense Distributed filed CJ requests for the ten items identified in the DDTC letter. Defense Distributed described its submissions as "data files" that are "essentially blueprints that can be read by CAD software . . . [as] a means of creating physical 3D models of objects." Pl. Br. at App. 208. These data files instruct 3D printers to create:

> (1) sixteen . . . parts and components of the ["Liberator"] pistol [which] could be assembled into a single shot .380 caliber firearm;
> (2) a barrel and grip for a .22 caliber pistol;
> (3) a solid piece of plastic in the shape of [a 125 mm BK-14M High Explosive Anti-Tank ("HEAT") Warhead];
> (4) a plastic piece in the shape of [a 5.56/.223] muzzle brake;
> (5) nineteen . . . components of a pistol slide for the Springfield XD-40;
> (6) a slip-on sound moderator for an air gun;
> (7) "The Dirty Diane" . . . an oil filter silencer adapter;
> (8) a model of a sub-caliber insert [for] a cylinder with a .22 bore;
> (9) Voltock Electronic Black Powder System . . . models of cylinders of various bores;
> (10) a model of a sight for a VZ-58 rifle.

Pl. Br. at App. 210.

At no time did Defense Distributed inquire about whether ITAR would affect its distribution of CAD files to U.S. persons within the United States or would limit its ability, or

that of other U.S. persons, to use the CAD files in 3D printing.[4]

　　While the Government reviewed Defense Distributed's first CJ ten requests, Defense Distributed submitted an additional request on January 2, 2015, seeking a determination on: (1) the "Ghost Gunner," a "3-axis, computer-numerically-controlled [machine] . . . designed, developed, and manufactured by Defense Distributed to *automatically manufacture* publicly available designs with nearly zero user interaction." Pl. Br. at App. 267 (emphasis added). On April 15, 2015, DDTC provided a CJ determination to Defense Distributed, finding that the Ghost Gunner would not be subject to the jurisdiction of the Department of State (although "project files, data files, or any form of technical data for producing a defense article" would be subject to ITAR jurisdiction). *Id.* at App. 280-81.

　　On June 4, 2015, review of Defense Distributed's first ten requests was completed and DDTC provided CJ determinations for the requested items. *See* Aguirre Decl. ¶ 28. As explained in DDTC's determination letter, the Department of State determined that only six of the CAD files were subject to ITAR control: those for the "Liberator pistol," ".22 [caliber] electric [pistol]," "5.56/.223 muzzle brake," "Springfield XD-40 tactical slide assemble," "sub-caliber insert," and "VZ-58 front sight." *Id.* In finding the CAD files to be within the commodity jurisdiction of the State Department, DDTC classified the CAD files as technical data under Category I, subsection (i) of the USML, relying on the definition of technical data in § 120.10(a)(1). As DDTC's letter explained, these determinations require that a "license or other approval . . . pursuant to the ITAR" be obtained before any export of these CAD files. *Id.*

　　As to the items determined to be within ITAR's commodity jurisdiction, the CJ review process concluded that Defense Distributed's CAD files constitute electronic data that can be used, in conjunction with a 3D printer, to automatically, and without further human intervention, generate a defense article or a component of a defense article identified on the USML. *See*

---

[4] ITAR jurisdiction is limited to *exports* of defense articles and related technical data and does not prohibit the transmission of defense articles from one U.S. person to another known to be a U.S. person within the U.S. Although DDTC's May 8, 2013 letter expressed DDTC's concerns about Defense Distributed's unrestricted postings to the Internet, the availability of online material to users outside the U.S. can be limited in a number of ways. For example, Internet users can be generally located using their Internet Protocol addresses. *See generally AF Holdings, v. Does 1-1058*, 752 F.3d 990, 996 (D.C. Cir. 2014) (discussing geolocation services).

Aguirre Decl. ¶¶ 29-30. The CAD files are "technical data" that are regulated by the ITAR because, absent such regulation, providing the CAD designs to a foreign person or foreign government would be equivalent to providing the defense article itself, enabling the complete circumvention of ITAR's export regulations.

## LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 24 (2008). Rather, a plaintiff seeking a preliminary injunction must show: "(1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction were not granted, (3) that their substantial injury outweighed the threatened harm to the party whom they sought to enjoin, and (4) that granting the preliminary injunction would not disserve the public interest." *Suehs*, 692 F.3d at 348. "In each case, courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24. Due to its "extraordinary" nature, no preliminary injunction should be "granted unless the party seeking it has clearly carried the burden of persuasion on all four requirements." *Id.* (internal quotation omitted).

Here, Plaintiffs' burden is even higher, given the nature of the injunction they seek. Plaintiffs ask this Court to enjoin Defendants "from enforcing any prepublication approval requirement against unclassified information under the International Traffic in Arms Regulations." Proposed Order, ECF No. 7, at 1. This request constitutes "[m]andatory preliminary relief, which goes well beyond simply maintaining the status quo *pendente lite*." *Martinez v. Mathews*, 544 F.2d 1233, 1243 (5th Cir. 1976) (citations omitted). Such relief "is particularly disfavored, and should not be issued unless the facts and law clearly favor the moving party." *Id.* (citations omitted); *see also Milena Ship Mgmt. Co. v. Newcomb*, 804 F. Supp. 846, 852-55 (E.D. La. 1992).

## ARGUMENT

### I. Plaintiffs' Motion for a Preliminary Injunction Should Be Denied.

Plaintiffs must persuasively demonstrate that each of the four conditions for a preliminary

injunction is met, not just a single element of their choosing. *See Winter*, 555 U.S. at 20. This requirement serves interests of critical importance; among them, "preserv[ation] of the court's ability to render a meaningful decision on the merits" based on a fully developed record and the reasoned and considered arguments of the parties. *Canal Auth. of State of Fla. v. Callaway*, 489 F.2d 567, 573 (5th Cir. 1974); *Ctr. for Biological Diversity v. Salazar*, 706 F.3d 1085, 1090 (9th Cir. 2013). Nevertheless, Plaintiffs have elected to rely on only one element of the standard: their likelihood of success. They give short shrift—less than one page in a brief for which the Court granted leave to extend the page limits to thirty—to the three other elements. Plaintiffs' failure to address these other elements alone warrants denial of their motion.

**A.     Plaintiffs Have Failed to Carry Their Burden of Demonstrating Irreparable Injury**.

As the Supreme Court explained in *Winter*, because "[a] preliminary injunction is an extraordinary remedy," courts must consider the actual "effect on each party of the granting or withholding" of relief and do so "[i]n each case." 555 U.S. at 24. But Plaintiffs have disregarded this principle and offered no specifics to support their claim of irreparable harm other than the allegation that Defendants have infringed upon their constitutional rights. *See* Pl. Br. at 29. This *pro forma* statement—particularly in light of Defendants' demonstration below that Plaintiffs' rights have not been violated—is insufficient to carry Plaintiffs' burden to obtain a mandatory injunction.

The presumption that alleged violations of constitutional rights can be sufficient to presume irreparable injury for purposes of injunctive relief should only be made "where there is an 'imminent likelihood that *pure speech* will be chilled or prevented altogether'," and the circumstances presented here undercut Plaintiffs' argument that such injury has occurred. *Faculty Senate of Fla. Int'l U. v. Winn*, 477 F. Supp. 2d 1198 (S.D. Fla. 2007) (declining to find irreparable harm in limits on foreign academic research) (quoting *Siegel v. Lepore*, 234 F.3d 1163, 1178 (11th Cir. 2000) (en banc)). First, Plaintiffs' claim of imminent irreparable injury is significantly undermined by their delay in seeking judicial relief. Plaintiffs challenge the State Department's application of the ITAR to unrestricted postings of technical data on their website—an application of which they have been aware since receiving the State Department's

May 8, 2013 letter.  *See* Compl. ¶¶ 25-27.  Nearly two years later, on May 6, 2015, Plaintiffs

filed this lawsuit.  ECF No. 1.  "[D]elay in seeking a remedy is an important factor bearing on

the need for a preliminary injunction."  *Gonannies, Inc. v. Goupair.Com, Inc.*, 464 F. Supp. 2d

603, 609 (N.D. Tex. 2006) (quoting *Wireless Agents, L.L.C. v. T-Mobile USA, Inc.*, No. 3:05-

CV-0094, 2006 WL 1540587, at *3 (N.D. Tex. June 6, 2006)).  The two-year delay between the

challenged action and the filing of this lawsuit seriously "undercuts the sense of urgency that

ordinarily accompanies a motion for preliminary relief and suggests that there is, in fact, no

irreparable injury."  *Tough Traveler, Ltd. v. Outbound Prods.*, 60 F.3d 964, 968 (2d Cir. 1995)

(internal quotation marks and citation omitted); *see Brown v. District of Columbia*, 888 F. Supp.

2d 28, 32 (D.D.C. 2012) (noting as relevant to the irreparable harm analysis the fact that plaintiff

waited almost seven months to file lawsuit).

    Second, irreparable harm can be "neither speculative nor remote," but must be "actual

and imminent."  *W. Ala. Quality of Life Coal. v. U.S. Fed. Highway Admin.*, 302 F. Supp. 2d

672, 684 (S.D. Tex. 2004) (quoting *U.S. v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953)).  As

discussed above, the State Department's jurisdiction over Defense Distributed's technical data

extends only to its export, and the State Department has not suggested that ITAR imposes any

limitation on Plaintiffs' actual distribution of technical data to U.S. persons in the United States.

Yet despite actual knowledge of U.S. persons interested in obtaining this technical data,

allegedly including co-Plaintiff Second Amendment Foundation ("SAF") and some of its

members, Defense Distributed has apparently done nothing to distribute the technical data in a

manner that would not constitute an export.  Nor have Plaintiffs made any inquiry of Defendants

about any measures Defense Distributed could take that would allow it to post the technical data

on the Internet without violating ITAR.  Plaintiffs' apparent failure to exercise these options

undermines their claim that they have incurred an actual, imminent, and irreparable harm.  In

these circumstances, Plaintiffs' brief citation to inapposite case law does not demonstrate

"irreparable injury," let alone satisfy the heightened standard for a mandatory injunction.[5]

---

[5] The cases relied on by Plaintiffs presented immediate instances of harm not illustrated in
Plaintiffs' threadbare allegations here.  For example, in *Deerfield Med. Ctr. v. Deerfield Beach*,
irreparable harm existed with respect to an abortion clinic denied zoning privileges and its

**B.    The Threatened Harm to the National Security and Foreign Policy Interests of the United States From an Injunction Outweighs any Irreparable Harm to Plaintiffs.**

As explained in detail in the Declaration of Lisa V. Aguirre, Director of the Office of Defense Trade Controls Management, the Department of State has concluded that: (1) export of Defense Distributed's CAD files could cause serious harm to U.S. national security and foreign policy interests; and (2) a preliminary injunction in this case would be likely to cause such harm.

As Plaintiffs described in their submissions to Defendants, their CAD files constitute the functional equivalent of defense articles: capable, in the hands of anyone who possesses commercially available 3D printing equipment, of "automatically" generating a lethal firearm that can be easily modified to be virtually undetectable in metal detectors and other security equipment. *See* Aguirre Decl. ¶ 35; Pl. Br. at App. 208-59.[6]  The unrestricted provision of such undetectable firearms by U.S. persons to individuals in other countries—particularly those countries with stricter firearms regulations that may not have the same security preparedness as the United States—presents a serious risk of acts of violence in those countries.  The State Department is particularly concerned that Plaintiffs' proposed export of undetectable firearms technology could be used in an assassination, for the manufacture of spare parts by embargoed nations, terrorist groups, or guerrilla groups, or to compromise aviation security overseas in a manner specifically directed at U.S. persons.[7]  *See* Aguirre Decl. ¶ 35.  As with the export of firearms themselves, these potential risks to U.S. foreign policy and national security interests warrant subjecting Defense Distributed's CAD files to ITAR's export licensing of technical data.

**C.    The Public Interest Would be Disserved By a Preliminary Injunction**.

The threat of harm to U.S. foreign policy and national security interests tilts the public

---

"physician and those women for whom he would otherwise perform the operation in the meantime."  661 F.2d 328, 338 (5th Cir. 1981).  Similarly, in *Elrod v. Burns*, the Court found irreparable injury where challenged patronage requirements imposed on plaintiffs an obligation to "pledge [] allegiance to another political party" and avoid "associat[ing] with others of [their] political persuasion." 427 U.S. 347, 355-56 (1976).

[6] Indeed, in part for this reason, the Liberator design includes the insertion a sufficient amount of metal into the resulting firearm to ensure its detectability.  *See* Aguirre Decl. ¶ 35.  Although this instruction promotes users' compliance with federal law prohibiting the manufacture of undetectable firearms, federal law does not prevent the manufacture of undetectable firearms by users outside the United States, and the Liberator remains operable without the inserted metal.

[7] The harm is reinforced by the fact that entry of an injunction is likely to bring attention to the availability of the CAD files on the Internet.  *See* Aguirre Decl. ¶ 37.

interest factor heavily in the Government's favor, particularly in the context of a mandatory injunction. *See Winter*, 555 U.S. at 24; *U.S. v. South Carolina*, 720 F.3d 518, 533 (4th Cir. 2013) ("injury to the nation's foreign policy" weighs in favor of the United States in public interest inquiry); *accord Water Keeper Alliance v. Dep't of Def.*, 152 F. Supp. 2d 155, 163 (D.P.R. 2001), *aff'd* 271 F.3d 21, 34-35 (1st Cir. 2001). This is true even where, as here, the harms from an injunction are likely to be felt abroad rather than domestically, because—as recognized by Congress in enacting the AECA, *see* 22 U.S.C. § 2778(a)(1)—"[b]oth the Government and the public have a strong interest in curbing" violent regional conflicts elsewhere in the world, especially when such conflict implicates "the security of the United States and the world as a whole." *Holy Land Found. v. Ashcroft*, 219 F. Supp. 2d 57, 84 (D.D.C. 2002), *aff'd* 333 F.3d 156 (D.C. Cir. 2003). Plaintiffs' barebones discussion of the public interest cannot supersede the demonstrated possibility of harm to national security and foreign policy provided by Defendants. *See Escamilla v. M2 Tech.*, 2013 WL 4577538 (E.D. Tex. 2013) (injunction that would harm "issues of national security," even "indirectly," would disserve public interest).[8]

## II.  Plaintiffs' Motion for a Preliminary Injunction Should Be Denied Because Plaintiffs Have Not Shown a Substantial Likelihood of Success on the Merits.

Plaintiffs have also failed to demonstrate either a likelihood of success on the merits for a preliminary injunction or that "the facts and law clearly favor" their claims; accordingly, they have failed to meet their burden for a mandatory injunction. *See Martinez*, 544 F.2d at 1243.

### A.  The Export of CAD Files That Function to Automatically Create a Firearm or its Components is Not the Publishing of an Item of Expressive Speech.

Underpinning Plaintiffs' First Amendment claims is the assumption that Plaintiffs seek to "publish" CAD files for 3D printers and that doing so is no different than the "publication of an idea." Pl. Br. at 14-15. Plaintiffs themselves recognize this is a critical threshold issue on which they must succeed, *see id.*, but they have failed to make the requisite showing on the merits to obtain a mandatory preliminary injunction.

---

[8] Importantly, because ITAR restricts only exports, any public interest in persons in the U.S. obtaining Defense Distributed's CAD files, whether to manufacture a firearm or for any other lawful purpose, is not affected by the absence of an injunction. The possibility of such a public interest therefore does not weigh against the Government's interests in regulating the export of the CAD files.

Although "speech" under the First Amendment is not limited to written or spoken words, *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*, 515 U.S. 557, 569 (1995), the Supreme Court has made clear that the First Amendment does not encompass all types of conduct. *See Texas v. Johnson*, 491 U.S. 397, 404 (1989) ("[W]e have rejected 'the view that an apparently limitless variety of conduct can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea'" (quoting *U.S. v. O'Brien,* 391 U.S. 367, 376 (1968))). At a minimum, conduct must be sufficiently expressive and communicative to other persons to qualify for protection under the First Amendment. *See Hurley*, 515 U.S. at 569; *Spence v. Washington*, 418 U.S. 405, 409 (1974))). *Cf. Brown v. Entm't Merchants Ass'n*, 131 S. Ct. 2729, 2733 (2011) (First Amendment protects video games because they "communicate ideas—and even social messages—through many familiar literary devices (such as characters, dialogue, plot, and music) and through features distinctive to the medium (such as the player's interaction with the virtual world)"). The ITAR regulations at issue govern the export of defense articles and defense services, including related technical data. As applied to Plaintiffs' CAD files, the regulations are properly focused on restricting an export that can unquestionably facilitate the creation of defense articles abroad.

The CJ requests submitted by Defense Distributed to DDTC themselves illustrate that the mere publication of ideas is not at issue. According to the CJ requests, the CAD files are functional: "essentially blueprints that can be read by CAD software," Pl. Br. at App. 208, to "automatically" generate firearms, firearms components, or other defense articles, *id.* at 267.[9] Further, in its commodity jurisdiction requests, Defense Distributed characterized its role solely in terms of nonexpressive conduct: "Although DD converted this information into CAD file format, DD does not believe that it created any new technical data for the production of the gun." *Id.* at 211. Plaintiffs' own description of the items and planned course of conduct thus fails to establish that the export of CAD files is mere "speech" for First Amendment purposes.

The cases on which Plaintiffs rely fail to establish that the law clearly favors their claim

---

[9] In the CJ determinations, Defendants concluded that only the CAD files, and not Defense Distributed's related files (such as "read-me" text files), fell within the commodity jurisdiction of ITAR.

that export of CAD files is an act of protected speech.  Plaintiffs rely primarily on *Universal City Studios, Inc. v. Corley*, a Second Circuit copyright decision holding that computer code and computer programs can qualify for First Amendment protection.  273 F.3d 429, 445-49 (2d Cir. 2001).  Yet *Corley* expressly distinguished, and thereby recognized the continuing validity of, a prior Second Circuit opinion, *CFTC v. Vartuli*, which held that computer instructions that "induce action without the intercession of the mind or the will of the recipient" are not constitutionally protected speech.  228 F.3d 94, 111 (2d Cir. 2000); *see Corley*, 273 F.3d 448 at n.20 (distinguishing from its holding *Vartuli* and other situations where "a human's mental faculties do not intercede in executing the instructions"), *id.* at 449 (confirming that code used to communicate to a program user is "not necessarily protected" and that code used to communicate to a computer is "never protected").  Importantly, *Vartuli* held that the fact that some users of the computer instructions at issue might interact with those instructions, rather than simply following them, did not change the constitutional analysis: it was the functionality of the code, not its use, that determined whether the regulations were consistent with the First Amendment.[10]  *See Vartuli*, 228 F.3d at 110-12.  Plaintiffs' failure to prove a substantial likelihood of success on this issue alone would be a sufficient basis to deny their motion.  *See Suehs*, 692 F.3d at 348.

Further, Plaintiffs' stated intent to distribute their CAD designs abroad or across U.S. national boundaries also suggests that the First Amendment's application may be limited here.  "It is less [than] clear . . . whether even American citizens are protected specifically by the First Amendment with respect to their activities abroad."  *Laker Airways, Ltd. v. Pan Am. World*

---

[10]  The other two cases cited by Plaintiffs also indicate that code that is purely functional does not warrant First Amendment protection.  In *Bernstein v. U.S. Dep't of Justice*, 176 F.3d 1132, 1139-43 (9th Cir. 1999) and *Junger v. Daley*, 209 F.3d 481, 485 (6th Cir. 2000), the courts held that First Amendment protections extended to computer source code on the theory that it can be read and understood by humans and, unless subsequently compiled, could not directly control the functioning of a computer.  *See also Karn v. Dep't of State*, 925 F.Supp. 1, 9 n.19 (D.D.C. 1996) (computer source code alone is "merely a means of commanding a computer to perform a function").  Even assuming, *arguendo*, that conclusion were correct as to the source code of software here it is undisputed that the CAD files control the functioning of a device.  Indeed, here, the CAD files do not merely cause a computer to function generally, but specifically direct a machine to manufacture a firearm and defense articles.  Plaintiffs' reliance on these cases also ignores that the Ninth Circuit opinion in *Bernstein* was subsequently withdrawn and rehearing granted, *see Bernstein v. U.S. Dep't. of Justice*, 192 F.3d 1308 (9th Cir. 1999), and that, after remand, the plaintiff in *Junger* stipulated to dismissal with prejudice.  *See* Notice of Dismissal, *Junger v. Dep't of Commerce*, No. 96-cv-1723-JG, Dkt. No. 123 (N.D. Ohio Nov. 16, 2000).

*Airways*, *Inc.*, 604 F. Supp. 280 (D.D.C. 1984) (finding that aliens have no First Amendment rights abroad); *see Bullfrog Films v. Wick*, 646 F. Supp. 492, 502 (C.D. Cal. 1986) ("No Supreme Court case squarely holds that the First Amendment applies abroad."); *cf. U.S. v. 12 200-Ft. Reels*, 413 U.S. 123, 125 (1972) (explaining that adjudication of rights at "national borders" implicates "considerations and different rules of constitutional law from domestic regulations"). Even courts that have applied the First Amendment to international speech have recognized that overseas speech or conduct that endangers national security may be outside First Amendment protection. *See, e.g.*, *Haig v. Agee*, 453 U.S. 280, 308 (1981) (even "assuming . . . that First Amendment protections reach beyond our national boundaries," likelihood of damage to national security rendered speech by a former CIA employee "not protected by the Constitution"); *accord Bullfrog Films*, 646 F. Supp. at 502. Here, where Plaintiffs deliberately seek to use the Internet to distribute CAD files abroad and have made no effort to engage in purely domestic distribution, whether on the Internet or otherwise, their foreign distribution of CAD files may not be protected by the First Amendment.

In any event, the Court need not resolve finally the constitutional question at this stage in light of Plaintiffs' failure to meet their burden with regard to the other required elements for an injunction. *Cf. Nation Magazine v. Dep't of Def.*, 762 F. Supp. 1558, 1572 (S.D.N.Y. 1991) (refraining from deciding, absent "a full record," constitutional questions regarding the First Amendment and military interests abroad). Moreover, as explained below, even assuming that Defense Distributed's files constitute protected speech, Defendants may properly restrict their export, consistent with the First Amendment.

**B.      Even If Limiting the Export of CAD Files Implicates the First Amendment, Defendants Are Likely to Prevail on Plaintiffs' First Amendment Claims.**

Plaintiffs' First Amendment theory relies heavily on the notion that the Internet is merely a means of "publication" of ideas, but this characterization misleads when describing CAD files that generate defense articles and/or their parts with minimum human intervention. Plaintiffs consistently use the terms "publish" or "publication," *see, e.g.*, Pl. Br. at 1, 5, 8, 13, 14, but in fact it is an "export" that is at issue. ITAR does not prohibit Plaintiffs from distributing these

files to U.S. persons in the United States.  Similarly, Defendants have not restricted Plaintiffs'
rights to use the Internet to discuss 3D printing, firearms, the Second Amendment, or engage in
other expression.  Rather, the narrow issue here is Plaintiffs' alleged desire to "facilitat[e] global
access" to the CAD files, *i.e.*, to disseminate the automatic ability to make firearms worldwide.

### 1.  ITAR's Export Controls Are a Valid, Content-Neutral Regulation of Plaintiffs' Conduct That Do Not Infringe First Amendment Rights.

Plaintiffs contend that ITAR's export controls on technical data should be subject to strict
scrutiny, Pl. Br. at 23-24, but this argument is in error.  "[R]egulations that are unrelated to the
content of speech" receive less demanding First Amendment scrutiny because they ordinarily
"pose a less substantial risk of excising certain ideas or viewpoints from the public dialogue."
*Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 642 (1994).  And where the Government's
purpose in imposing a regulation is "justified without reference to the content of the regulated
speech," such regulation is content-neutral.  *Clark v. Cmty. for Creative Non-Violence*, 468 U.S.
288, 293 (1984).  It is the Government's purpose, not other factors, that is the "controlling
consideration" in this determination.  *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989).

ITAR regulates the conduct of exporting defense articles for the purpose of "further[ing]"
world peace [and] the [national] security and foreign policy interests" of the United States, 22
U.S.C. § 2778(a)(1), and Defense Distributed's files function to "automatically" produce such
articles or their components.  Pl. Br. at App. 267.  ITAR's regulation of technical data,
particularly Defense Distributed's CAD files, is part and parcel of its regulation of the export of
defense articles, a regulation unrelated to the suppression of free expression.  *See U.S. v. Chi*
*Mak*, 683 F.3d 1126, 1134-35 (9th Cir. 2012) ("AECA prohibits export without a license of
items on the USML without regard to content or viewpoint . . . , defines [] technical data based
on its *function*," and is therefore "content-neutral") (emphasis in original); *U.S. v. Edler Indus.*,
579 F.2d 516, 520 (9th Cir. 1978) (recognizing the equivalence for arms control purposes of
"military equipment" and the "blueprints specifying the construction of the very same
equipment").  The overarching policy objective set forth by Congress and the State Department
is to control the spread of defense articles abroad (and related services and technical data)

because munitions and materiel can be used to jeopardize the United States' security interests, a content-neutral interest.[11]  *See Emergency Coal. to Defend Educ. Travel v. Dep't of Treas.*, 545 F.3d 4, 13-14 (D.C. Cir. 2008).

Plaintiffs' CAD files directly instruct a device to automatically carry out the specified task of manufacturing a defense article.  Whatever expressive value may exist in the theory of the CAD files, they indisputably function to create a weapon.  Thus, the ITAR may restrict their export on the basis of the *literal* functionality to create the very defense articles that could also indisputably be restricted for export.  Moreover, the AECA and ITAR do not attempt in any way to restrict the free flow of public information and ideas about CAD files or 3D printing, either domestically or internationally.  *See* Aguirre Decl. ¶ 30; 22 C.F.R. Part 120.  This regulatory scheme is obviously not the product of government hostility toward the spread of ideas about 3D printing of firearms, but rather against the very *means* to easily do so.  Accordingly, ITAR's limits on the export of Defense Distributed's CAD files are not directed at the content of expression.  *See Chi Mak*, 683 F.3d at 1135; *cf. Capital Cities/ABC, Inc. v. Brady*, 740 F. Supp. 1007, 1013 (S.D.N.Y. 1990) (holding content-neutral a licensing requirement applied to U.S. TV network's broadcasts from Cuba, as part of overall scheme regulating imports and exports).[12] For this reason, strict scrutiny does not apply to a First Amendment analysis of export controls on these CAD files.[13]

---

[11] The government's interest in limiting the distribution of firearms abroad also does not implicate the Second Amendment.  *Cf. U.S. v. Huitron-Guizar*, 678 F.3d 1164 (10th Cir. 2012) (rejecting attempt by non-U.S. person to assert Second Amendment rights).

[12] Should the Court conclude, as Defendants contend above, that Plaintiffs' exports are not expressive at all, *see supra* Part II.A, the appropriate standard of review would be rational-basis scrutiny, which ITAR plainly satisfies.  *See Voting for Am. v. Steen*, 732 F.3d 382, 392 (5th Cir. 2013) (a statute that "regulate[s] conduct alone and do[es] not implicate the First Amendment" should receive rational-basis scrutiny).

[13] Also suggesting that the applicable First Amendment protections are reduced is Plaintiffs' characterization of those to whom they wish to supply their CAD files as "customers," Pl. Br. at 27, and Plaintiffs' allegation that their Internet postings of CAD files are intended to "generate revenue."  Compl. ¶ 22; *see id.* ¶ 24 (Internet postings would have "generated advertising revenue").  Plaintiffs also discuss "offering . . . items for sale," such as "jigs and code."  Pl. Br. at App. 3-4, n.1.  Restrictions on "particular type[s] of commercial transaction[s]" are generally treated as regulations of conduct, not speech, *see, e.g., Katt v. Dykhouse*, 983 F.2d 690, 695-96 (6th Cir. 1992); *U.S. v. Bell*, 414 F.3d 474 (3d Cir. 2005).  Even if treated as speech, it is well-established that "commercial speech enjoys lesser, intermediate-scrutiny constitutional protection."  *RTM Media, L.L.C. v. City of Houston*, 584 F.3d 220, 224 (5th Cir. 2009).

Under intermediate scrutiny, the Government's regulation of "'speech' and 'non-speech' elements [] united in a course of conduct" must be sustained if it is "within the constitutional power of the government; it furthers an important or substantial governmental interest; the government interest is unrelated to the suppression of free expression; and the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." *Kleinman v. City of San Marcos*, 597 F.3d 323, 328 (5th Cir. 2010) (quoting *O'Brien*, 391 U.S. at 376). As the Ninth Circuit held in *Chi Mak*, these standards are met by the "AECA and its implementing regulations," including ITAR. 683 F.3d at 1135. Regulation of arms trafficking is an "important interest" of the Government with "unquestionable legitimacy." *Id.* (quoting *Edler*, 579 F.2d at 520). "The technical data regulations substantially advance that interest, unrelated to the suppression of expression, because they set forth clear procedures for seeking approval for export licenses and policies for limiting USML-designation." *Id.* Nor is the restriction greater than essential: "ITAR makes a point to specifically exclude numerous categories from designation, such as general scientific, mathematical, or engineering papers," as well as other materials in the public domain. *Chi Mak*, 683 F.3d at 1135; *see U.S. v. Hoffman*, 10 F.3d 808 at *4 (9th Cir. 1993) (unpublished disposition) (if defense articles are "in the public domain, then the AECA does not prohibit their exportation"). Accordingly, even if subjected to a heightened standard of review under the First Amendment, ITAR's regulation of technical data exports is constitutional. *See id.*; *see also U.S. v. Posey*, 864 F.2d 1487 (9th Cir. 1989).[14]

Importantly, the government interests at issue here are the type that merit great deference, even in the context of a First Amendment challenge. *See Kleindienst v. Mandel*, 408 U.S. 753, 766-69 (1972). Courts have recognized that the decision on whether to control a particular commodity for export is one that inherently involves national security and foreign policy judgments that should be left to the discretion of the Executive branch. *See U.S. v. Martinez*, 904

---

[14] Defendants do not concede that application of strict scrutiny would be fatal to the application of ITAR to Defense Distributed's CAD files, particularly given that Plaintiffs themselves acknowledge the government interests at issue here as "compelling." *See* Pl. Br. at 28. In light of the arguments set forth herein, however, Plaintiffs have not met the high burden of persuasion required to obtain a mandatory injunction even under a lesser standard of review. *See Martinez*, 544 F.2d at 1243.

F.2d 601, 602 (11th Cir. 1990); *U.S. v. Mandel*, 914 F.2d 1215, 1223 (9th Cir. 1990). Under

Plaintiffs' broad First Amendment theory, export restrictions on the designs to build a rocket, or

software that controls a radar, or technical data concerning missile systems, would all be subject

to strict scrutiny on the theory that each such item has informational content as well. *See* Pl. Br.

at 23-24. It is no answer to suggest, as Plaintiffs do, that the question turns on whether

information is "classified." *See, e.g.*, Pl. Br. at 11. Courts have squarely rejected this argument:

> if the government wished to prevent technical data from being sent to foreign powers, it
> would be required to suppress the information altogether, at home as well as abroad.
> This outcome would blur the fact that national security concerns may be more sharply
> implicated by the export abroad of military data than by the domestic disclosure of such
> data. Technical data that is relatively harmless . . . when available domestically may,
> when sent abroad, pose unique threats to national security. It would hardly serve First
> Amendment values to compel the government to purge the public libraries of every scrap
> of data whose export abroad it deemed for security reasons necessary to prohibit.

*Posey*, 864 F.2d at 1496-97. *Cf. Linick v. U.S.*, 104 Fed. Cl. 319, 321 (Fed. Cl. 2012) (Patent

Office may "order that an invention be kept secret" if "divulgence might harm national security,"

regardless of whether the "Government itself [has] any interest in the invention").

### 2. ITAR's Export Controls Are Not a Facially Unconstitutional Prior Restraint.

Plaintiffs also have no likelihood of success on the merits of their theory that restrictions

on the export of the CAD files constitute an unlawful prior restraint on speech. "The doctrine of

prior restraint originated in the common law of England, where prior restraints of the press were

not permitted, but punishment after publication was." *Alexander v. U.S.*, 509 U.S. 544, 553

(1993). The classic administrative prior restraint is what is often described as a licensing scheme

for speech, where the plaintiff's right to speak is conditioned on prior approval from the

government. *See City of Lakewood v. Plain Dealer Pub. Co.*, 486 U.S. 750, 757 (1988). Such a

prior restraint is contrasted with prohibitions on certain speech enforced by punishment *after* the

fact, which is not a prior restraint. *See id.* at 764 (distinguishing between statute imposing

prohibition on speech and one conditioning speech on obtaining a license or permit). A licensing

requirement for conduct that incidentally impacts expression is not such a classic prior restraint,

however, and courts have so concluded in the context of the AECA and ITAR, and other

prohibitions on imports and exports. *See, e.g.*, *Edler Indus.*, 579 F.2d at 521; *Chi Mak*, 683 F.3d

1136.  *Cf. Capital Cities/ABC*, 740 F. Supp. 1007 (upholding against First Amendment challenge licensing requirements applied to international television broadcasts without concluding such a licensing system constituted a prior restraint).[15]

Plaintiffs rely heavily on *Freedman v. Maryland*, 380 U.S. 51 (1965)—the case that generally defines the requirements for licensing schemes that affect expression—but both the nature of ITAR and the circumstances here demonstrate that ITAR differs significantly from the prior restraint considered in that case.  The "censorship statute" at issue in *Freedman* made it unlawful to exhibit any motion picture unless a state Board of Censors judged the film to be "moral and proper" and not "tend[ing] . . . to debase or corrupt morals or incite to crimes."  380 U.S. at 52 & n.2.  Unlike in *Freedman*, ITAR's export licensing requirement is not directed at a vast and open-ended category of expressive speech like films, but instead governs the act of providing defense articles or related technical data to those outside the United States (or to foreign persons inside the United States), a much narrower category of conduct that is not characteristically expressive nor remotely comparable to the licensing of adult films domestically.  *Compare* 22 C.F.R. Part 121 (the USML) *and* 22 C.F.R. § 120.10 (defining technical data) *with* 380 U.S. at 52; *see also Teague v. Reg'l Comm'r of Customs*, 404 F.2d 441, 446 (2d Cir. 1968) (application of Trading with the Enemy Act, 50 U.S.C. § 5(b) (1964) to academic publications imported from Cuba did not constitute a prior restraint in light of broader regulatory purpose of Act).  The Ninth Circuit in *Edler* thus concluded that ITAR's licensing requirements for technical data, as long as such data is "significantly and directly related to specific articles on the USML," constitute an appropriate means to "control the conduct of

---

[15] Plaintiffs' reliance on opinions of the Department of Justice's Office of Legal Counsel ("OLC"), Pl. Br. at 3, 18, to support their prior restraint claims is misplaced.  These opinions necessarily analyzed the issues at a relatively high level of generality, and do not address the particular application or circumstances presented here.  *See* Pl. Br. at App. 139 (OLC opinions do not "purport to determine the constitutionality of all possible applications of the ITAR").  Thus, Plaintiffs' lengthy quotation of OLC's July 1, 1981 opinion regarding "dissemination of technical data," Pl. Br. at 18, is inapposite.  As the July 1, 1981 opinion made clear, its discussion focused on domestic distribution of technical data to foreign persons who might subsequently take that data abroad, for example, "the conversation of a United States engineer who meets with foreign friends at home to discuss matters of theoretical interest," *id.* at App. 127-28, not a situation like the present where Plaintiffs seek to themselves engage in the overseas transmission of technical data.

19

assisting foreign enterprises to obtain military equipment and related technical expertise," and "not an unconstitutional prior restraint on speech." 579 F.2d at 521.[16]

ITAR's focus on the activity of exporting also mitigates two of the principal concerns raised by classic prior restraint on expression. First, "[b]ecause the censor's business is to censor," when the government establishes a censorship board like that in *Freedman* and requires it to determine whether a film is "moral and proper," it is likely that "the institutional bias of a censorship board . . . [will] lead to the suppression of speech that should be permitted." *Freedman*, 380 U.S. at 57. In contrast, "laws of general application that are not aimed at conduct commonly associated with expression" do not raise the same concerns about censorship because it will only be a "rare occasion [when] an opportunity for censorship will exist." *Lakewood*, 486 U.S. at 760-61. Second, laws directing determinations about, e.g., "moral" expression raise concern about whether such discretion is unreviewable. *See City of Littleton v. Z.J. Gifts D-4*, 541 U.S. 774, 782-83 (2004) (upholding licensing scheme that relied on less-subjective criteria than *Freedman*). But where the statute in question regulates general conduct, these concerns are mitigated because "application of the statute to areas unrelated to expression will provide the courts a yardstick with which to measure the licensor's occasional speech-related decision." *Lakewood*, 486 U.S. at 761. Indeed, the regulation of the export of technical data in furtherance of national security and foreign policy does not focus on the content of expression, moral or otherwise. And the vast majority of ITAR licensing applications are approved, *see* Aguirre Decl. ¶ 33, demonstrating that there is no "institutional bias of a censor" at issue here. *See id.*[17]

---

[16] Prior restraints are traditionally disfavored in substantial part because it is presumed that after-the-fact punishment is available in the absence of a prior restraint. *See Near v. State of Minn.*, 283 U.S. 697, 718-19 (1931); *Se. Promotions v. Conrad*, 420 U.S. 546, 558-59 (1975). Here, however, such an approach is apt to be inadequate because the ITAR licensing system is intended to prevent irreversible harm to national security and foreign policy that may ensure from export. *See Chi Mak*, 683 F.3d at 1136 ("national security concerns may be more sharply implicated by the export abroad of military data than by domestic disclosure"). In the export context, after-the-fact punishment is likely available only for the exporter because foreign actors making harmful use of military data are likely often to be beyond the reach of U.S. prosecution.

[17] For similar reasons, these statutory criteria are precise enough to avoid the dangers of "a licensing statute placing unbridled discretion" in the hands of DDTC. Pl. Br. at 20-21 (quoting *Lakewood*, 486 U.S. at 757). The unbridled discretion doctrine applies only where a statute or regulation lacks "narrow, objective, and definite standards to guide the licensing authority," and the Supreme Court has explained that such standards do not require "perfect clarity and precise guidance." *Forsyth Cnty., Ga. v. Nationalist Movement*, 505 U.S. 123, 131 (1992); *Ward*, 491

20

### 3.    ITAR's Export Controls Are Not Unconstitutionally Overbroad.

Plaintiffs also raise an "overbreadth" challenge to ITAR's regulation of technical data. *See* Pl. Br. at 16-17. Overbreadth is an exception to the prudential standing requirement that a plaintiff may only "assert his own legal rights and interests." *Warth v. Seldin*, 422 U.S. 490, 499 (1975). In circumstances where a regulation is alleged to be so broad that it is incapable of *any* permissible application, courts may allow a party to bring a facial challenge to a statute because it threatens others not before the court. *See N.Y. State Club Ass'n v. City of New York*, 487 U.S. 1, 14 (1987); *Broadrick v. Oklahoma*, 413 U.S. 601 (1973). Overbreadth is "strong medicine" to be used "sparingly and only as a last resort," *Broadrick*, 413 U.S. at 613, and a plaintiff must show that the alleged "overbreadth of a statute [is] not only [] real, but substantial . . . judged in relation to the statute's plainly legitimate sweep." *Id.* at 615.

Here, Plaintiffs' overbreadth claim cannot meet these standards. First, "[c]ourts need not entertain an overbreadth challenge 'where the parties challenging the statute are those who desire to engage in protected speech that the overbroad statute purports to punish.'" *U.S. v. Hicks*, 980 F.2d 963, 969 (5th Cir. 1992) (quoting *Brockett v. Spokane Arcades*, 472 U.S. 491, 504 (1985)). Thus, no overbreadth challenge is "appropriate if the first amendment rights asserted" on behalf of third parties are "essentially coterminous" with those asserted by the plaintiffs themselves. *Id.* Here, as the Supreme Court observed in *Brockett*, "[t]here is . . .  no want of a proper party to challenge the [regulations], no concern that the attack on the [regulations] will be unduly delayed or protected speech discouraged." 472 U.S. at 504. And, indeed, an overbreadth challenge should not properly lie if the regulations have been applied *permissibly* to Plaintiffs, which they have for the reasons outlined above. *See Sec'y State of Md. v. Munson*, 467 U.S. 947, 958 (1984).

Second, even if the merits of Plaintiffs' overbreadth claim are reached, ITAR's export

---

U.S. at 794. As the Ninth Circuit has recognized, the listing of defense articles in the USML and the definition of technical data "delineate narrowly the scope of information subject to arms controls" and thus do not violate the First Amendment. *Chi Mak*, 683 F.3d at 1136; *see* 22 C.F.R. § 120.10 (defining technical data as the matter "required for the design development, production, manufacture, assembly, operation, repair, testing, maintenance or modification of defense articles . . . includ[ing] . . . blueprints, drawings, photographs, plans, instructions and documentation"); USML Category I(a) (defining included firearms). These criteria provide "adequate standards to guide the official's decision." *Thomas v. Chicago Park Dist.*, 534 U.S. 316, 323 (2002).

controls on technical data have a substantially permissible purpose. Plaintiffs have nowhere demonstrated that the regulations have been applied in a substantial number of impermissible ways.[18] To the contrary, the regulations serve the vital purpose of preventing the circumvention of export controls on munitions by the method of providing foreign powers the technical know-how, instructions, blueprints, or—as in the instant case—the automated processes to produce such munitions. *See* Aguirre Decl. ¶ 14. Further, the regulations do not extend to domestic distribution of technical data to U.S. persons and carve out a wide exemption for "public domain" data that helps ensure their reach is appropriately limited. *See* 22 C.F.R. § 120.10(a)(5). For this reason, there is simply no substantial overbreadth here, and Plaintiffs are not likely to succeed on this claim. *See Chi Mak*, 683 F. 3d at 1136 (rejecting overbreadth challenge).

**B.    Defendants Are Likely to Prevail on Plaintiffs' Second Amendment Claims.**

Plaintiffs are also unable to carry their burden for a mandatory preliminary injunction for their Second Amendment claims because the Court lacks subject matter jurisdiction over these claims, and Plaintiffs have not established that the facts and law are clearly in their favor.

### 1.    Plaintiffs Lack Standing for Their Second Amendment Claims.

According to Plaintiffs, Defendants have infringed upon "two complimentary [sic] guarantees" of the Second Amendment: "the right to acquire arms, and the right to make arms." Compl. ¶ 49; Pl. Br. at 25-29. Yet none of the Plaintiffs have demonstrated that they have standing to pursue such Second Amendment claims. To establish standing, "a plaintiff must show: (1) it has suffered, or imminently will suffer, a concrete and particularized injury-in-fact; (2) the injury is fairly traceable to the defendant's conduct; and (3) a favorable judgment is likely to redress the injury." *Miss. State Democratic Party v. Barbour*, 529 F.3d 538, 544 (5th Cir. 2008) (citation omitted). Plaintiffs must also demonstrate standing for each claim asserted. *DaimlerChrysler v. Cuno*, 547 U.S. 332, 352-53 (2006).

With respect to Defense Distributed, Plaintiffs have failed to establish an injury associated with their claims because they have not set forth any facts indicating that Defense

---

[18] Indeed, Plaintiffs plead precisely the opposite. *See* Compl. ¶ 24 ("At the time Defense Distributed posted the Published Files, there was no publicly known case of Defendants enforcing a prepublication approval requirement under the ITAR.").

Distributed's ability to manufacture or acquire arms has been or imminently will be restricted in any way. Rather, Plaintiffs have alleged only a restriction on Defense Distributed's ability to post certain files on its website. *See* Compl. ¶¶ 22-37. Plaintiffs acknowledge that Defense Distributed is in possession of the CAD files that it could use to manufacture firearms or components. *See* Compl. ¶ 37. And Cody Wilson, the "co-founde[r] and now lead[er] [of] Defense Distributed," Pl. Br. at App. 1 ¶ 2, possesses an ATF license to manufacture firearms. *See* BUREAU OF ALCOHOL, TOBACCO, FIREARMS, AND EXPLOSIVES, Listing of Federal Firearms Licensees at lines 61673 & 61675 (May 2015), *available at* https://www.atf.gov/file/83411/ (last accessed June 3, 2015).[19] Plaintiffs have therefore failed to set forth specific facts indicating that Defense Distributed's alleged Second Amendment rights have been injured in fact. *See Pub. Citizen, Inc. v. Bomer*, 274 F.3d 212, 218 (5th Cir. 2001).

Plaintiffs have likewise failed to demonstrate that SAF has direct standing to pursue its Second Amendment claims.[20] "An organization has standing to sue on its own behalf if it meets the same standing test that applies to individuals." *Henderson v. Stalder*, 287 F.3d 374, 381 (5th Cir. 2002) (citation and internal quotation marks omitted). Plaintiffs do not claim that SAF seeks to manufacture or acquire arms, nor is the suggestion that SAF "would expend its resources to publish and promote" CAD files, Compl. ¶ 38, indicative of a "concrete and demonstrable" injury related to these ostensible Second Amendment rights. *Cf. NAACP v. Kyle, Tex.*, 626 F.3d 233, 238 (5th Cir. 2010). Nor is the alleged injury to SAF fairly traceable to Defendants' conduct, which directly affected Defense Distributed only.

To the extent SAF asserts associational Second Amendment claims, its standing fares no better. *See* Pl. Br. at 28, App. 7; *see also* Compl. ¶ 2. An association lacks standing to bring a claim on behalf of its members unless "its members would otherwise have standing to sue in their own right." *Nat'l Rifle Ass'n v. ATF*, 700 F.3d 185, 191 (5th Cir. 2012) (*NRA*) (citation omitted). SAF cannot meet this test. The members' alleged "keen interest" in the CAD files, *see*

---

[19] This monthly report is published by ATF as an online spreadsheet. Updates are made available at https://www.atf.gov/content/firearms/firearms-industry/listing-FFLs.

[20] It is unclear from Plaintiffs' Complaint and motion whether they contend that SAF has direct standing or is asserting associational standing only.

Compl. ¶ 38; *see also* Pl. Br. at App. 6-11, is insufficient to demonstrate that their Second Amendment rights have been injured "in a personal and individual way" as required by Article III. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 563 (1992). This is particularly true for the injunctive relief sought here: SAF members' allegations of future injury, *see* Pl. Br. at App. 9, 11, are purely speculative. *See Lujan*, 504 U.S. at 564; *Osterweil v. Edmonson*, 424 F. App'x 342, 344 (5th Cir. 2011); *Johnson v. Moore*, 958 F.2d 92, 94 (5th Cir. 1992).

Plaintiffs have also failed to establish traceability for any injury to SAF's members to Defendants' actions. Accessing and sharing 3D printing files, *see* Pl. Br. at App. 9, 11, is neither a necessary nor sufficient precondition to manufacturing or acquiring arms. Further, Plaintiffs plead that SAF has members "nationwide" only, Compl. ¶ 2, and ITAR does not limit the ability of Defense Distributed or SAF to distribute CAD files directly to U.S. persons within the United States (or otherwise prevent SAF members from acquiring the CAD files). *See* Aguirre Decl. ¶ 16; *cf. Huitron-Guizar*, 678 F.3d at 1169-70. Therefore, any alleged violation of SAF's members' Second Amendment rights is not fairly traceable to any action taken by Defendants.[21]

Nor can Plaintiffs obtain standing by "assert[ing] the Second Amendment rights of their customers and website visitors." Pl. Br. at 27. Plaintiffs have failed to satisfy the requirements for such third-party standing because they have: (1) failed to adequately allege that they themselves suffered an injury in fact; (2) never demonstrated that they have "a close relation" to the unspecified "customers and website visitors"; and (3) not described any hindrance to these customers' and website visitors' ability to protect their own interests. *See Bonds v. Tandy*, 457 F.3d 409, 416 n.11 (5th Cir. 2006). In contrast to the cases cited by Plaintiffs, no commercial transaction has occurred and no vendor-vendee relationship appears to exist between Plaintiffs and their "customers." *Compare* Compl. ¶¶ 5-6 *with Carey v. Population Servs. Int'l*, 431 U.S. 678 (1977) (vendor relationship) *and Reliable Consultants, Inc. v. Earle*, 517 F.3d 738 (5th Cir. 2008) (commercial transactions). More importantly, however, the Fifth Circuit has explained

---

[21] Although SAF's members assert that they have been unable to "locate [firearms files] on Defense Distributed's website," they make no allegation that they have attempted to request files from Defense Distributed through other channels, an activity outside the purview of ITAR. *See* Pl. Br. at App. 8-11.

that "*Carey . . .* gives *jus tertii* standing to a party only if the party directly affected is incapable of asserting its own interests." *Corrosion Proof Fittings v. EPA*, 947 F.2d 1201, 1210 n.6 (5th Cir. 1991), *opinion clarified* (Nov. 15, 1991) (citations omitted). There is no reason to doubt that Plaintiffs' unspecified "customers and website visitors" are "independent entit[ies], fully capable of asserting their own rights." *See id.*

### 2. Plaintiffs Are Unlikely to Succeed on Their Second Amendment Claims.

Assuming Plaintiffs could establish their standing, they have failed to consistently identify the nature of the Second Amendment right that they seek to enforce or a likelihood of success on these claims. Plaintiffs primarily focus on the claim that the Second Amendment encompasses a right to make or acquire arms. Compl. ¶¶ 48-51; Pl. Br. at 26. Elsewhere, they describe the right as "constitutional protection" of "any components necessary to the functioning of one's constitutionally-protected firearm." Pl. Br. at 26. At another point, they assert their Second Amendment claim as an infringement on the right to "operate a business that provides Second Amendment services." Compl. ¶ 49 (quoting *Mance v. Holder*, 2015 WL 567302, at *15 n.8 (N.D. Tex. Feb. 11, 2015); Pl. Br. at 27 (same). Regardless of the Second Amendment right claimed, however, Defendants have at most restricted Defense Distributed's ability to *export* arms-related technical data, and the Second Amendment does not provide such a right.

The Second Amendment protects "the right of the people to keep and bear Arms." U.S. Const. amend. II. In *District of Columbia v. Heller*, the Supreme Court held that "the District's ban on handgun possession in the home violates the Second Amendment, as does its prohibition against rendering any lawful firearm in the home operable for the purpose of immediate self-defense." 554 U.S. 570, 635-36 (2008). In holding that the Second Amendment secures an individual right, the Court emphasized that the "central right" secured is "to defend oneself in one's home," a right that "is not unlimited." *NRA*, 700 F.3d at 193-94; *Heller*, 554 U.S. at 635.

The Fifth Circuit, like other Courts of Appeals, has adopted a two-step framework for analyzing firearms restrictions challenged on Second Amendment grounds:

> [T]he first step is to determine whether the challenged law impinges upon a right protected by the Second Amendment—that is, whether the law regulates conduct that falls within the scope of the Second Amendment's guarantee; the second step is to

determine whether to apply intermediate or strict scrutiny to the law, and then to
determine whether the law survives the proper level of scrutiny.

*NRA*, 700 F.3d at 194 (citations omitted).  "To determine whether a law impinges on the Second

Amendment right, we look to whether the law harmonizes with the historical traditions

associated with the Second Amendment guarantee."  *Id.* (citing *Heller*, 554 U.S. at 577-628).  "If

the challenged law burdens conduct that falls outside the Second Amendment's scope, then the

law passes constitutional muster."  *Id.* at 195 (citing *U.S. v. Marzzarella*, 614 F.3d 85, 89 (3d Cir.

2010)).  "If the law burdens conduct that falls within the Second Amendment's scope, we then

proceed to apply the appropriate level of means-end scrutiny."  *Id.*

Here, the Court's inquiry can end at Step One because the challenged regulations do not

impose any burden, let alone a substantial burden, on conduct historically protected by the

Second Amendment.  The Second Amendment's "central right" is the right to use arms in self-

defense in the home, not to export arms across international borders.  *Cf. U.S. v. Gurrola-Garcia*,

547 F.2d 1075, 1079 n.6 (9th Cir. 1976) ("Certainly the Second Amendment guarantee of 'the

right of the people to keep and bear Arms' . . . does not protect the efforts of a person to take

munitions across an international border and into a foreign country" (citing *Marchese v.*

*California*, 545 F.2d 645, 647 (9th Cir. 1976))).  Restrictions on arms-related exports are "firmly

historically rooted," and therefore harmonize with historic tradition.  *See NRA*, 700 F.3d at 204.

For example, prior to the Revolution, it was high treason for British subjects to sell arms to the

King's enemies.  4 WILLIAM BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND 82-83

(1769).  The early republic similarly placed restrictions on arms-related exports.  In 1794, just

three years after ratification of the Bill of Rights, "the exportation of munitions of war was

prohibited for a year."  7 JOHN BASSETT MOORE, A DIGEST OF INTERNATIONAL LAW, § 1098

(1906).  These restrictions have also been used to advance foreign policy interests during times

of peace.  In 1902, for example, Congress ratified a treaty with Britain that prevented the export

of firearms to certain regions of the Pacific in order to promote international "humanitarian

purposes."  2 MOORE, § 229.  These historical restrictions therefore confirm that the "activities

covered" by the challenged ITAR provisions are "presumptively not protected from regulation

by the Second Amendment."  *NRA*, 700 F.3d at 196 (quoting *Heller v. District of Columbia*, 670

F.3d 1244, 1253 (D.C. Cir. 2011) (*Heller II*)).

Even if the Court concludes that Plaintiffs' claims implicate conduct protected by the Second Amendment, the challenged provisions readily withstand intermediate scrutiny. The Fifth Circuit has applied intermediate scrutiny to laws that, like ITAR's export controls, do not prevent a "law-abiding, responsible adult" from "possess[ing] and us[ing] a handgun to defend his or her home and family," *See id.* at 195 (citations omitted). In applying intermediate scrutiny, the relevant inquiry is "whether there is a reasonable fit between the law and an important government objective." *Id.* at 207. Here, for the same reasons that ITAR's limits on technical data satisfy intermediate scrutiny under the First Amendment, the regulations survive such review under the Second Amendment. *See supra* Part II.B.[22] For these reasons, Plaintiffs are unlikely to succeed on their Second Amendment claims.

## C. Defendants Are Likely to Prevail on Plaintiffs' Other Claims.

### 1. ITAR's Standards Are Not Void for Vagueness.

Plaintiffs are also unlikely to succeed in their vagueness challenge to the ITAR's restrictions on the export of defense articles, including "components and parts for firearms" and "technical data" relating to those firearms, components, and parts. These restrictions neither "fail[] to provide [people] of ordinary intelligence fair notice of what is prohibited [n]or . . . authorize[] . . . discriminatory enforcement." *Munn v. Ocean Springs, Miss.*, 763 F.3d 437, 439 (5th Cir. 2014). As explained above, the State Department has enumerated the categories of defense articles for which export is prohibited in the USML, and ITAR specifically defines "technical data" as that which is "required for the design development, production, manufacture, assembly, operation, repair, testing, maintenance or modification of defense articles . . . includ[ing] . . . blueprints, drawings, photographs, plans, instructions and documentation." 22

---

[22] In the nomenclature supplied by *NRA*, ITAR: (1) is "focused on a particular problem," namely, unauthorized exports that pose a danger to national security or foreign policy; (2) implicates a concededly compelling government interest; and (3) employs "means that were reasonably adapted to achieving the objective," by compiling and maintaining on the USML those defense articles and defense services that pose a danger to national security and foreign policy, and reasonably defining "export" to address the ways that items can be disseminated. *See NRA*, 700 F.3d at 208-09; 22 C.F.R. § 120.3, 120.17; *see also* Pl. Br. at 11 ("Nor do Plaintiffs suggest that uploading files to the Internet cannot be viewed, in some sense, as an export."), 28 (acknowledging that interest is compelling).

C.F.R. § 120.10(a).  This definition, which accords with the ordinary meaning of the words "technical" and "data," constitutes a "comprehensible normative standard" in which a "standard of conduct is specified."  *Coates v. City of Cincinnati*, 402 U.S. 611, 614 (1971).  If "technical data" as so defined nevertheless "lack[s] the clarity [Plaintiffs] would insist on, it is because . . . 'we can never expect mathematical certainty from our language.'"  *Brown v. Town of Cary*, 706 F.3d 294, 306 (4th Cir. 2013); *accord Munn*, 763 F.3d at 440.  In addition, even if an individual were truly uncertain about the definition of "technical data," that person can apply for a license or submit a CJ request to DDTC.  Thus, no one need risk criminal prosecution or civil sanction because it is possible to get an advance determination as to the application of ITAR.  *See U.S. Civil Service Comm. v. Nat'l Ass'n of Letter Carriers*, 413 U.S. 548, 580 (1973).

Plaintiffs' contention that the exclusion of information in the public domain from ITAR renders the regime unconstitutionally vague is even less well-founded.  The purpose of the vagueness doctrine in the First Amendment context is to protect against enactments that would limit "the free dissemination of ideas."  *Reeves v. McConn*, 631 F.2d 377, 383 (5th Cir. 1980).  Inclusion of the public domain exception in ITAR explicitly promotes the values of free speech and protects First Amendment interests, not the opposite.  Similarly, repeal of ITAR's previous requirement that "[t]he burden for obtaining . . . approval for the publication of technical data . . . is on the [entity] seeking publication," 49 Fed. Reg. 47,682 (Dec. 6, 1984), *see* 22 C.F.R. § 125.11 n.3 (1978), lessens any First Amendment harms caused by ITAR, and does not thereby demonstrate that ITAR's straightforward regulation of exports is impermissibly vague.

### 2. Application of ITAR's Export Requirements to Plaintiffs' CAD Files Does Not Exceed the Statutory Authority Granted by Congress.

Plaintiffs' claim that Congress has not provided the authority to regulate their transmittal of automated firearms assembly techniques ignores the plain text of the statute.  The AECA provides that "the President is authorized to control the import and the export of defense articles and defense services . . . [and] is authorized to designate those items which shall be considered as defense articles and defense services for the purposes of this section and to promulgate regulations for the import and export of such articles and services.  The items so designated shall

28

constitute the USML." 22 U.S.C. § 2778(a)(1).  In doing so, Congress authorized the President

to "take into account whether the export of an article would contribute to an arms race, aid in the

development of weapons of mass destruction, support international terrorism, increase the

possibility of outbreak or escalation of conflict, or prejudice the development of bilateral or

multilateral arms control or nonproliferation agreements or other arrangements."  *Id.*

§ 2778(a)(2).  In addition, the statute requires that "every person . . . who engages in the business

of manufacturing, exporting, or importing any defense articles or defense services designated by

the President under subsection (a)(1) of this section shall register with the United States

Government agency charged with the administration of this section."  *Id.* § 2778(b)(1)(A)(i).

And "[e]xcept as otherwise specifically provided in regulations issued under subsection (a)(1)…,

no defense articles or defense services designated by the President under subsection (a)(1) . . .

may be exported or imported without a license for such export or import."  *Id.* § 2778(b)(2).  The

plain text of the statute therefore directly authorizes the export licensing scheme at issue here.

 Plaintiffs concede that this language provides "authority under the AECA to . . . regulate

the export of certain technical data," and that "uploading files to the Internet can[] be viewed . . .

as an export," but contend that reading these two authorities together—as authorization to

regulate technical data on the Internet—is "not what Congress had in mind."  Pl. Br. at 12.  But

that argument cannot possibly be sustained under a plain reading of the statutory authority.  As

Defense Distributed itself described in its "Ghost Gunner" application, the technical data in files

for that device functions "to automatically find, align, and mill" firearms and their components.

*Id*. at App. 267.  In the crafting of the AECA, Congress expressed specific concern that "arms

transfers [not] become an automatic, unregulated process."  H.R. Rep. No. 94-1144, at 12 (1976),

*reprinted in* 1976 U.S.C.C.A.N. 1378, 1388.  The regulation of Defense Distributed's technical

data thus fits with Congress's intent "that the technical data subject to control would be directly

relevant to the production of a specified article on the Munitions List." *Edler Indus.*, 579 F.2d at

521 (noting that the legislative history of AECA's predecessor statute announced Congress's

direct intention to "allow[] control of munitions, 'including relevant technical data.'") (quoting

S. Rep. No. 83-1799, at 57 (1954), *reprinted in* U.S.C.C.A.N. 3175, 3244).  Thus, Plaintiffs'

*ultra vires* argument is unpersuasive because it would permit the automatic, "virtual export" of defense articles by anyone willing to undertake the expedient of creating a digital model, sending that digital version abroad, and thereby enabling foreign recipients to "automatically" create an unlimited number of identical copies of the original defense article.[23]  *Cf. Edler*, 579 F.2d at 520 ("The authority to regulate arms traffic would be of negligible practical value if it encompassed only the exportation of particular military equipment but not the exportation of blueprints specifying the construction of the very same equipment.").

Nor do the opinions issued to the State Department by OLC demonstrate that ITAR's regulations of technical data exceed the scope of authority granted by Congress.  To the contrary, the July 1, 1981 OLC opinion recognizes that, under ITAR, the State Department has "*traditionally undertaken* to regulate the export of technical *information*" through the technical data provisions.  *Id.*  Although OLC acknowledged as "somewhat unclear" the delegation of technical data authority, *see* Pl. Br. at App. 125, 129 & nn.7, 11, these opinions are drafted at a high level of generality and nowhere do they state that authority is lacking to regulate matters similar to the CAD files at issue here.[24]

## CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for a Preliminary Injunction should be denied.

---

[23] As Plaintiffs note, the State Department's administration of ITAR and the USML has long subjected technical data, including computer code, to export controls.  *See* Pl. Br. at 3; *see also Edler*, 579 F.2d at 519.  Congress has repeatedly ratified the USML, incorporating its definitions into subsequent enactments and requiring the Executive to report to Congress in advance of the removal "of any item from the Munitions List."  *See* P.L. 107-228 § 1406; *id.* § 1403; *see also, e.g.*, PL 104-64 § 573 (relying on USML to restrict scope of antiterrorism assistance provided to foreign countries); Omnibus Diplomatic Security and Antiterrorism Act of 1986, P.L. 99-399 § 509(a) (prohibiting export of items on USML to countries providing support for international terrorism).  "Congressional actions after the interpretation by the [Executive Branch] . . . indicate acquiescence" where Congress "revisit[s]" a statute without "seek[ing] . . . to change the [] definition."  *Dole v. Petroleum Treaters*, 876 F.2d 518, 522 (5th Cir. 1989); *see also Lorillard v. Pons*, 434 U.S. 575, 580 (1978).  Congress has elsewhere ratified ITAR's definitions of persons subject to its requirements.  *See, e.g.*, *U.S. v. Yakou*, 428 F.3d 241, 243-44 (D.C. Cir. 1995).

[24] Neither the 1980 official guidance, nor the amendment to ITAR published on December 6, 1984, *see* 49 Fed. Reg. 47,682, indicates that Defendants lack the authority to regulate Plaintiffs' *export* of technical data via the Internet.  *See* Compl. ¶¶ 19-20.  The former makes clear that it is addressing the "publication of data *within the United States*."  The language removed from ITAR by the latter amendment fell within the public domain exemption to ITAR, and concerned only "the publication of technical data" for purposes of placing such data in the public domain.  *See* 22 C.F.R. § 125.11(a)(1) n.3 (1978); Pl. Br. App. 200.  As explained *supra* Part II.B, publication of technical data is not equivalent to the *export* of such data.

Dated: June 10, 2015

Respectfully submitted,

RICHARD L. DURBIN, JR.
Acting United States Attorney
Western District of Texas

BENJAMIN C. MIZER
Principal Deputy Assistant Attorney General
Civil Division

ZACHARY C. RICHTER
Assistant United States Attorney
Western District of Texas

ANTHONY J. COPPOLINO
Deputy Branch Director
Federal Programs Branch

/s/ *Eric J. Soskin*
ERIC J. SOSKIN
Pennsylvania Bar No. 200663
STUART J. ROBINSON
California Bar No. 267183
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., NW
Washington, DC 20530
Phone: (202) 514-9239;
Fax: (202) 616-8460
Email: stuart.j.robinson@usdoj.gov

*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I certify that on June 10, 2015, I electronically filed this document with the Clerk of Court using the CM/ECF system, which will send notification to

Alan Gura, alan@gurapossessky.com
William B. Mateja, mateja@fr.com
William T. "Tommy" Jacks, jacks@fr.com
David S. Morris, dmorris@fr.com
Matthew Goldstein, matthew@goldsteinpllc.com
*Attorneys for Plaintiffs*

In addition, I have dispatched this document using the United States Postal Service to the following, who is not listed as a CM/ECF participant:

Josh Blackman
1303 San Jacinto Street
Houston, TX 77002

*/s/ Eric J. Soskin*
ERIC J. SOSKIN
Trial Attorney

Exhibit 4

WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

DEFENSE DISTRIBUTED, et al.,
  Plaintiffs,

v.           No. 1:15-cv-372-RP

U.S. DEPARTMENT OF STATE, et al.,
  Defendants.

---

## **DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT**

# TABLE OF CONTENTS

BACKGROUND ...................................................................................................................1

ARGUMENT ......................................................................................................................2

I.    Plaintiffs' First Amendment Claims Should Be Dismissed.............................................2

    A.    The First Amendment Does Not Apply To The Export Of CAD Files That Function To Automatically Create A Firearm Or Its Components ............................................................................................2

    B.    If the First Amendment Applies, This Regulation Survives First Amendment Scrutiny. ...........................................................................5

    C.    ITAR's Export Controls Are Not Unconstitutionally Overbroad................................8

    D.    ITAR's Export Controls Are Not An Unconstitutional Prior Restraint....................10

II.    Plaintiffs' Second Amendment Claims Should Be Dismissed...........................................13

    A.    Plaintiffs Lack Standing to Bring a Second Amendment Challenge.............................13

        1.    Defense Distributed Has Not Suffered a Harm to Second Amendment Interests.................................................................14

        2.    SAF and Conn Williamson Have Failed to Plead Sufficient Allegations of Injury and Any Second Amendment Injury is Not Traceable to Defendants' Acts. ...........................................15

    B.    Plaintiffs' Second Amendment Challenge Fails on the Merits.....................................16

III.    Plaintiffs' Other Claims Should Also Be Dismissed on the Merits. ...........................................19

CONCLUSION.................................................................................................................20

# TABLE OF AUTHORITIES

## CASES

*Ass'n of Am. Physicians & Surgeons, Inc. v. Tex. Med. Bd.,*
    627 F.3d 547 (5th Cir. 2010) ........................................................................15

*Bernstein v. U.S. Dep't. of Justice,*
    192 F.3d 1308 (9th Cir. 1999) ......................................................................4

*Bernstein v. U.S. Dep't. of Justice,*
    176 F.3d 1132 (9th Cir. 1999) ......................................................................4

*Bonds v. Tandy,*
    457 F.3d 409 (5th Cir. 2006) ........................................................................14

*Broadrick v. Oklahoma,*
    413 U.S. 601 (1973) .................................................................................8, 9

*Brockett v. Spokane Arcades,*
    472 U.S. 491 (1985) .......................................................................................9

*Brown v. Entm't Merchs. Ass'n,*
    564 U.S. 786 (2011) .....................................................................................17

*Brown v. Livingston,*
    524 F. Appx. 111 (5th Cir. 2013) ...............................................................15

*Bullfrog Films v. Wick,*
    646 F. Supp. 492 (C.D. Cal. 1986) .............................................................4

*Capital Cities/ABC, Inc. v. Brady,*
    740 F. Supp. 1007 (S.D.N.Y. 1990) ...........................................................11

*Catholic Leadership Coal. of Tex. v. Reisman,*
    764 F.3d 409 (5th Cir. 2014) ........................................................................10

*CFTC v. Vartuli,*
    228 F.3d 94 (2d Cir. 2000) .......................................................................3, 4

*City of Lakewood v. Plain Dealer Publ'g Co.,*
    486 U.S. 750 (1988) ...........................................................................10, 11, 12

*City of Littleton v. Z.J. Gifts D-4,*
    541 U.S. 774 (2004) ...........................................................................11, 12

*Collins v. Morgan Stanley Dean Witter*,
  224 F.3d 496 (5th Cir. 2000) ..................................................................3

*Def. Distributed v. Dep't of State*,
  121 F. Supp. 3d 680 (W.D. Tex. 2015) ("*DD I*") .............................*passim*

*Def. Distributed v. Dep't of State*,
  838 F.3d 451 (5th Cir. 2016) ("*DD II*"),
  rehearing *en banc* denied, 865 F.3d 211 (5th Cir. 2017),
  *certiorari* denied, 138 S. Ct. 638 (2018) ............................................*passim*

*District of Columbia v. Heller*,
  554 U.S. 570 (2008) ................................................................................16

*Equal Rights Ctr. v. Post Properties, Inc.*,
  633 F.3d 1136 (D.C. Cir. 2011) .............................................................16

*Ezell v. City of Chicago*,
  651 F.3d 684 (7th Cir. 2011) ...........................................................13, 14

*Fontenot v. McCraw*,
  777 F.3d 741 (5th Cir. 2015) .................................................................14

*Forsyth Cnty. v. Nationalist Movement*,
  505 U.S. 123 (1992) ................................................................................11

*Freedman v. State of Md.*,
  380 U.S. 51 (1965) ..................................................................................11

*FW/PBS v. City of Dallas*,
  493 U.S. 215 (1990) ................................................................................14

*Hazelwood Sch. Dist. v. Kuhlmeier*,
  484 U.S. 260 (1988) ................................................................................10

*Holder v. Humanitarian Law Project*,
  561 U.S. 1 (2010) ..............................................................................4, 5, 6

*Hotze v. Burwell*,
  784 F.3d 984 (5th Cir. 2015) .................................................................14

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*,
  515 U.S. 557 (1995) ..................................................................................3

*Junger v. Daley*,
  209 F.3d 481 (6th Cir. 2000) ...................................................................5

*Karn v. U.S. Dept. of State*,
    925 F.Supp. 1 (D.D.C. 1996) ........................................................................10

*Laker Airways, Ltd. v. Pan Am. World Airways, Inc.*,
    604 F. Supp. 280 (D.D.C. 1984) .....................................................................4

*Lewis v. Casey*,
    518 U.S. 343 (1996) .......................................................................................14

*Mance v. Sessions*,
    880 F.3d 183 (5th Cir. 2018) ...................................................................*passim*

*Matal v. Tam*,
    137 S. Ct. 1744 (2017) ....................................................................................6

*Mather v. Central Pac. Bank*,
    2014 WL 5580963 (D. Haw. 2014) ..............................................................15

*Members of City Council of City of L.A. v. Taxpayers for Vincent*,
    466 U.S. 789 (1984) .........................................................................................9

*Milwaukee Police Ass'n v. Jones*,
    192 F.3d 742 (7th Cir. 1999) .........................................................................10

*Miss. State Democratic Party v. Barbour*,
    529 F.3d 538 (5th Cir. 2008) .........................................................................14

*N.Y. State Club Ass'n v. City of New York*,
    487 U.S. 1 (1988) .............................................................................................8

*Nat'l Rifle Ass'n of America v. Bureau of Alcohol, Tobacco, Firearms and Explosives*,
    700 F.3d 185 (5th Cir. 2012) ...........................................................15, 16, 17

*Near v. Minnesota ex rel. Olson*,
    283 U.S. 697 (1931) ...............................................................................11, 12

*New York Times Co. v. United States*,
    403 U.S. 713 (1971) .......................................................................................11

*Oller v. Roussel*,
    609 F. App'x 770 (5th Cir. 2015) ..................................................................12

*Petro-Chem Processing v. EPA*,
    866 F.2d 433 (D.C. Cir. 1989) ......................................................................16

*Prometheus Radio Project v. FCC*,
    373 F.3d 372 (3d Cir. 2004) ......................................................................8, 18

*Pub. Citizen, Inc. v. Bomer,*
   274 F.3d 212 (5th Cir. 2001) .................................................................................... 14, 15

*Reed v. Town of Gilbert,*
   135 S. Ct. 2218 (2015) .............................................................................................. 5, 6

*S. Utah Wild. Alliance v. Palma,*
   2011 WL 2565198 (D. Utah 2011) ................................................................................15

*Sec'y of State of Md. v. Munson,*
   467 U.S. 947 (1984) ........................................................................................................9

*Second Amendment Arms v. City of Chicago,*
   135 F. Supp. 3d 743 (N.D. Ill. 2015) ...........................................................................14

*Shelby Cty. v. Holder,*
   133 S. Ct. 2612 (2013) ..................................................................................................17

*Se. Promotions v. Conrad,*
   420 U.S. 546 (1975) ......................................................................................................12

*Spokeo, Inc. v. Robins,*
   136 S. Ct. 1540 (2016) ..................................................................................................14

*Stagg P.C. v. U.S. Dep't of State,*
   158 F. Supp. 3d 203 (S.D.N.Y. 2016),
   *aff'd,* 673 F. App'x 93 (2d Cir. 2016),
   *cert. denied,* 138 S. Ct. 721 (2018) ........................................................................... 6, 9

*Teixeira v. County of Alameda,*
   873 F.3d 670 (9th Cir. 2017) ..............................................................................13, 14, 17

*Texas v. Johnson,*
   491 U.S. 397 (1989) ........................................................................................................2

*U.nited States v. Hicks,*
   980 F.2d 963 (5th Cir. 1992) ....................................................................................... 8, 9

*United States v. Hsu,*
   364 F.3d 192 (4th Cir. 2004) ........................................................................................20

*United States v. Chi Mak,*
   683 F.3d 1126 (9th Cir. 2012) ...............................................................................*passim*

*United States v. Edler Indus., Inc.,*
   579 F.2d 516 (9th Cir. 1978) ...................................................................................... 6, 11

*United States v. Martinez,*
   904 F.2d 601 (11th Cir. 1990) ........................................................................7

*United States v. Posey,*
   864 F.2d 1487 (9th Cir. 1989) .......................................................................6

*United States v. Williams,*
   553 U.S. 285 (2008) ..................................................................................20

*United States v. Zhen Zhou Wu,*
   711 F.3d 1 (1st Cir. 2013),
   *cert. denied sub nom.*, *Yufeng Wei v. United States*, 134 S. Ct. 365 (2013) ..............................2, 20

*Universal City Studios, Inc. v. Corley,*
   273 F.3d 429 (2d Cir. 2001) ..........................................................................4

*Valley Forge Christian College v. Ams. United for Separation of Church and State, Inc.,*
   454 U.S. 464 (1982) ..................................................................................16

*Virginia v. Hicks,*
   539 U.S. 113 (2003) ....................................................................................9

*Voting for Am., Inc. v. Steen,*
   732 F.3d 382 (5th Cir. 2013) .................................................................3, 4, 9

*Warth v. Seldin,*
   422 U.S. 490 (1975) ....................................................................................8

*Williams-Yulee v. Florida Bar,*
   135 S. Ct. 1656 (2015) ................................................................................8

## STATUTES

18 U.S.C. § 2339B ................................................................................5

22 U.S.C. § 2778……………............................................................*passim*

## REGULATIONS

22 C.F.R. § 120.1 *et seq.* ........................................................................2

22 C.F.R. § 120.4 ..............................................................................2, 8

22 C.F.R. § 120.6 ........................................................................2, 7, 20

22 C.F.R. § 120.10 ..........................................................................*passim*

22 C.F.R. § 120.11 ................................................................................................ 7, 11

22 C.F.R. § 120.17 .................................................................................................. 19

**RULES**

Fed. R. Civ. P. 12(b)(6) ............................................................................................. 4

**OTHER AUTHORITIES**

*Black's Law Dictionary* (10th ed. 2014) .................................................................. 8

Constitutionality of the Proposed Revision of the International
Traffic in Arms Regulations,
5 Op. O.L.C. 202 (1981) ................................................................................ 13

WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

DEFENSE DISTRIBUTED, et al.,
    Plaintiffs,

v.

U.S. DEPARTMENT OF STATE, et al.,
    Defendants.

§
§
§
§
§
§
§
§
§
§

No. 1:15-cv-372-RP

## DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT

At issue in this litigation is the United States' ability to control the export of weapons—a system of laws and regulations that seeks to ensure that articles useful for warfare or terrorism are not shipped from the United States to other countries (or otherwise provided to foreigners) without authorization, where, beyond the reach of U.S. law, they could be used to threaten U.S. national security, U.S. foreign policy interests, or international peace and stability. Plaintiffs challenge restrictions on the export of Computer Aided Design ("CAD") files and other, related files, that are indispensable to a three-dimensional ("3-D") printing process used to create firearms and their components. There is no dispute that the Government does not restrict Plaintiffs from disseminating such files domestically to U.S. persons or from using such files to make or acquire firearms in the United States. Nonetheless, Plaintiffs seek to bar the Government from preventing the *export* of these design files, which can be easily used overseas to make firearms that are subject to U.S. export controls. Plaintiffs' characterization of such an export as the mere "publication" of information is wrong—these files unquestionably direct the functioning of a 3-D printer, cause it to manufacture firearms, or otherwise enable the creation of such firearms by those abroad. Whatever informational value there may be in the process by which 3-D printing occurs, the CAD files are also functional, directly facilitate the manufacture of weapons, and may properly be regulated for export. As set forth below, Plaintiffs' Second Amended Complaint should be dismissed.

## BACKGROUND

In the spring of 2015, Plaintiffs filed their initial Complaint in this action and moved for a preliminary injunction. *See* ECF Nos. 1, 7. On August 4, 2015, this Court entered an Order denying Plaintiffs' motion. *See Def. Distributed v. Dep't of State*, 121 F. Supp. 3d 680 (W.D. Tex. 2015) ("*DD*

1

*I*"). Appellate review confirmed the Court's Order, *see Def. Distributed v. Dep't of State*, 838 F.3d 451

(5th Cir. 2016) ("*DD II*"), rehearing *en banc* denied, 865 F.3d 211 (5th Cir. 2017), *certiorari* denied, 138

S. Ct. 638, after which proceedings resumed in this Court. On March 16, 2018, Plaintiffs filed the

Second Amended Complaint ("SAC"). *See* ECF No. 90.

 In its August 4, 2015 Order, the Court set forth an account of the statutory and regulatory

provisions that are the target of Plaintiffs' challenge:

>  Under the Arms Export Control Act ("AECA"), "the President is authorized to control
> the import and the export of defense articles and defense services" and to "promulgate
> regulations for the import and export of such articles and services." 22 U.S.C. § 2778(a)(1).
> The AECA imposes both civil and criminal penalties for violation of its provisions and
> implementing regulations, including monetary fines and imprisonment. *Id.* § 2278(c) & (e).
> The President has delegated his authority to promulgate implementing regulations to the
> Secretary of State. Those regulations, the International Traffic in Arms Regulation ("ITAR"),
> are in turn administered by the [Directorate of Defense Trade Controls ("DDTC")] and its
> employees. 22 C.F.R. 120.1(a).
>  The AECA directs that the "defense articles" designated under its terms constitute the
> United States "Munitions List." 22 U.S.C. § 2278(a)(1). The Munitions List "is not a
> compendium of specific controlled items," rather it is a "series of categories describing the
> kinds of items" qualifying as "defense articles." *United States v. Zhen Zhou Wu*, 711 F.3d 1, 12
> (1st Cir.) *cert. denied sub nom.*, *Yufeng Wei v. United States*, 134 S. Ct. 365 (2013). . . . The term
> "defense articles" also specifically includes "technical data recorded or stored in any physical
> form, models, mockups or other items that reveal technical data directly relating to items
> designated in" the Munitions List. 22 C.F.R. § 120.6.
>  A party unsure about whether a particular item is a "defense article" covered by the
> Munitions List may file a "commodity jurisdiction" request with the DDTC. *See* 22 C.F.R. §
> 120.4 (describing process). The regulations state the DDTC "will provide a preliminary
> response within 10 working days of receipt of a complete request for commodity jurisdiction
> ['CJ']." *Id.* § 120.4(e). If a final determination is not provided after 45 days, "the applicant
> may request in writing to the Director, Office of Defense Trade Controls Policy that this
> determination be given expedited processing." *Id.*

*DD I* at 686-87.[1] This regulatory framework remains in place. *See* 22 C.F.R. 120.1 *et seq.*

## ARGUMENT

I. **Plaintiffs' First Amendment Claims Should Be Dismissed.**

 A. The First Amendment Does Not Apply To The Export Of CAD Files That Function
   To Automatically Create A Firearm Or Its Components.

 The First Amendment does not encompass all types of conduct. *Texas v. Johnson*, 491 U.S.

---

[1] Unless otherwise stated, all internal citations and quotation marks have been omitted in this brief.

397, 404 (1989). At a minimum, conduct must be sufficiently expressive and communicative to other persons to qualify for protection under the First Amendment. *See Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*, 515 U.S. 557, 569 (1995); *see also Voting for Am., Inc. v. Steen*, 732 F.3d 382, 389 (5th Cir. 2013) ("[N]on-expressive conduct does not acquire First Amendment protection whenever it is combined with another activity that involves protected speech."). "To determine whether particular conduct possesses sufficient communicative elements to be embraced by the First Amendment, courts look to whether the conduct shows an intent to convey a particular message and whether the likelihood was great that the message would be understood by those who viewed it." *Steen*, 732 F.3d at 388.

Plaintiffs cannot carry their burden to prove that the First Amendment applies to their technical data for the manufacture of firearms and their components. As an initial matter, the relevant ITAR provisions govern the export of defense articles and defense services, including related technical data. As applied to Plaintiffs' CAD files, the regulations are properly focused on restricting an export that can unquestionably facilitate the creation of defense articles abroad. Indeed, the CJ requests Defense Distributed submitted to DDTC illustrate that the mere publication of ideas is not at issue.[2] The CJ requests make clear the CAD files are functional: "essentially blueprints that can be read by CAD software," ECF No. 8-2, Pl. Br. at App. 208,[3] to generate firearms, firearms components, or other defense articles "automatically." *Id.* at 267. Further, in its CJ requests, Defense Distributed itself described its role solely in terms of nonexpressive conduct: "Although DD converted this information into CAD file format, DD does not believe that it created any new technical data for the production of the gun."[4] *Id.* at 211. Plaintiffs' own description

_____

[2] "[D]ocuments that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to her claim." *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498-99 (5th Cir. 2000).

[3] Defendants determined that only the CAD files, and not Defense Distributed's related files (such as "read-me" text files), fell within ITAR's commodity jurisdiction. Ex. A, attached hereto.

[4] Defendants recognize that, in its Order denying Plaintiffs' preliminary injunction motion, the Court concluded that "the files [are] subject to the protection of the First Amendment," at least "for the purpose of the preliminary injunction analysis," relying on representations "Plaintiffs made . . . at the hearing that Defense Distributed is interested in distributing the files as 'open source.'" *DD I*, 121 F. Supp. 3d at 692. The Court's provisional conclusion at the PI stage may be revisited, however, and as set forth below, even under that view Plaintiffs' claims should be dismissed. Notwithstanding the notice the Court provided that this allegation is important, Plaintiffs make no

of the items thus removes their conduct from the purview of the First Amendment. *See CFTC v. Vartuli*, 228 F.3d 94, 111 (2d Cir. 2000) (rejecting First Amendment challenge to prohibition on distributing software, and emphasizing that software provided "automatic" advice and, rather than educating the consumer, provided explicit instructions about whether to buy or sell); *Universal City Studios, Inc. v. Corley*, 273 F.3d 429, 454 (2d Cir. 2001) (upholding injunction prohibiting the Internet posting of computer software that facilitated the unlawful reproduction of movies stored on DVDs, because the injunction "target[ed] only the nonspeech component" of the software). Nor have Plaintiffs adequately alleged that the intended export of CAD files "shows an intent to convey a particular message" or that "the likelihood was great that the message would be understood by those who viewed it." *See Steen*, 732 F.3d at 388. Moreover, Plaintiffs do not even allege that they have undertaken any effort to engage in purely domestic distribution of their CAD files, whether on the Internet or otherwise, suggesting their true interests lie in export, not expression. These deficiencies, coupled with the First Amendment's limited application abroad, *e.g.*, *Laker Airways v. Pan Am. World Airways*, 604 F. Supp. 280 (D.D.C. 1984); *Bullfrog Films v. Wick*, 646 F. Supp. 492, 502 (C.D. Cal. 1986), warrant dismissal of Plaintiffs' First Amendment claim pursuant to Rule 12(b)(6).[5]

To be sure, the SAC does reference a Ninth Circuit case, *Bernstein v. U.S. Dep't of Justice*, SAC ¶¶ 21, 28, which extended First Amendment protections to computer source code on the theory that it can be read and understood by humans and, unless subsequently compiled, could not directly control the functioning of a computer. *See* 176 F.3d 1132, 1139-43 (9th Cir. 1999). The opinion in that case, however, was subsequently withdrawn and rehearing granted, suggesting the Court should be cautious before relying on it. *See Bernstein v. U.S. Dep't. of Justice*, 192 F.3d 1308 (9th Cir. 1999). And even assuming, *arguendo*, that the Ninth Circuit's conclusion were correct as to the source code of software—a conclusion with which Defendants disagree—the CAD files here do not merely cause a computer to function generally, but provide specific direction to a machine in furtherance of

---

mention in the SAC of their alleged "open source" intention or any other stated intent for "the files . . . to be used by others as a baseline" for discussion. *Compare id.* at *with* SAC, ECF No. 90 (lacking any reference to "open source" distribution).

[5] Should the Court conclude, as Defendants contend, that Plaintiffs' exports are not sufficiently expressive, the appropriate standard of review would be rational-basis scrutiny, which ITAR plainly satisfies. *See Steen*, 732 F.3d 382, 392 (5th Cir. 2013) (a statute that "regulate[s] conduct alone and do[es] not implicate the First Amendment" should receive rational-basis scrutiny).

manufacturing firearms and defense articles.[6]

B.  <u>If the First Amendment Applies, This Regulation Survives First Amendment Scrutiny.</u>

"Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed," which includes laws that "defin[e] regulated speech by particular subject matter . . . [or] by its function or purpose." *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2227 (2015). As a result, the Court should assess whether application of the ITAR "furthers a compelling interest and is narrowly tailored to achieve that interest." *Id.* at 2231.

The Supreme Court's analysis in *Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010) ("*HLP*") illustrates why application of the ITAR to Defense Distributed's would-be export of 3-D printing information is permissible. There, the Supreme Court upheld a restriction on providing "material support or resources to a foreign terrorist organization," 18 U.S.C. § 2339B(a)(1), as applied to a group that sought to "facilitate only the lawful, nonviolent purposes" of certain foreign groups. *HLP*, 561 U.S. at 8. The Court recognized that the particular activities in which the plaintiffs wished to engage—legal training and political advocacy—"consist[ed] of communicating a message" and thus, unlike the computer files at issue here, had an expressive component. *See id.* at 28. But the Court nonetheless upheld the statute against a First Amendment challenge, concluding that Congress had permissibly determined that even support for peaceable, lawful conduct "can further terrorism by foreign groups." *Id.* at 30.

In considering the First Amendment challenge in *HLP*, the Court emphasized that the issues presented "implicate[d] sensitive and weighty interests of national security and foreign affairs." *Id.* at 33-45; *see also id.* at 28 ("Everyone agrees that the Government's interest in combating terrorism is an urgent objective of the highest order."). Giving deference to the Government's determinations of the likely consequences of allowing the material support at issue, the Court also concluded that the statute was narrowly tailored to achieve those important interests. *See id.* at 33-37. In doing so, the

---

[6] As this Court noted, the Sixth Circuit in *Junger v. Daley*, 209 F.3d 481, 485 (6th Cir. 2000) similarly "found . . . 'computer source code is . . . protected by the First Amendment.'" *DD I* at 692 (quoting *Junger*).  Like *Bernstein*, however, the precedential value of this opinion is nil in light of the dismissal with prejudice agreed to by plaintiff in that case on remand. *See Junger v. Dep't of Commerce*, No. 96-cv-1723-JG, Dkt. No. 123 (N.D. Oh. Nov. 16, 2000).

Court explained that "Congress and the Executive are uniquely positioned to make principled distinctions between activities that will further terrorist conduct and undermine United States foreign policy, and those that will not." *Id.* at 35. Thus, where "sensitive interests in national security and foreign affairs [are] at stake," *id.* at 36, courts applying First Amendment scrutiny must give "significant weight" to the "political branches['] . . . determination" of what is "necessary."[7]

Here, Congress and the Executive Branch have concluded that restrictions on the export of arms are essential to the promotion of "world peace and the security and foreign policy of the United States." 22 U.S.C. § 2778(a)(1). Courts have likewise recognized "the Government's important interest in regulating the international dissemination of military information." *United States v. Chi Mak*, 683 F.3d 1126, 1135 (9th Cir. 2012); *see also United States v. Posey*, 864 F.2d 1487, 1496 (9th Cir. 1989) (citing *United States v. Edler Indus., Inc.* 579 F.2d 516, 520 (9th Cir. 1978)). Indeed, on appeal from this Court's denial of Plaintiffs' motion for a preliminary injunction, the Fifth Circuit explained that "the State Department's stated interest in preventing foreign nationals—including all manner of enemies of this country—from obtaining technical data on how to produce weapons and weapons parts" constitutes "a very strong public interest in national defense and national security." *DD II*, 838 F.3d at 458; *accord Posey*, 864 F.2d at 1497 ("Technical data that is relatively harmless and even socially valuable when available domestically may, when sent abroad, pose unique threats to national security."); *Stagg P.C. v. U.S. Dep't of State*, 158 F. Supp. 3d 203, 210-11 (S.D.N.Y.), *aff'd*, 673 F. App'x 93 (2d Cir. 2016), *cert. denied*, 138 S. Ct. 721 (2018) (holding that injunction barring enforcement of the ITAR's licensing provisions "would have very serious adverse impacts on the national security of the United States"; among the "parade of horribles" would be the release of "digital plans for 3D-printable plastic firearms").

Plaintiffs do not contest this point, either in their SAC or elsewhere. *See* Pls'. Mem. in

---

[7] Although Defendants previously briefed this case as one involving a "content-neutral" Regulation to which "intermediate scrutiny" would apply, *see* Defs.' Opp. to Pls.' Mot. for a PI at 15-18, ECF No. 32, and the Court adopted this reasoning, *see DD I*, 121 F. Supp. 3d at 694, the Supreme Court has made clear that "laws that, though facially content neutral . . . cannot be justified without reference to the content of the regulated speech . . . must also satisfy strict scrutiny." *Reed*, 135 S. Ct. at 2227. *Matal v. Tam*, 137 S. Ct. 1744, 1765-66 (2017) ("laws 'targeted at specific subject matter'" are to be treated "as content based discrimination") (citing *Reed*); *see also DD II*, 838 F.3d at 468-69 (Jones, J., dissenting).

Support of PI at 28, ECF No. 8 (acknowledging that "Plaintiffs do not question that the Government has a compelling interest in regulating the exportation of arms"). That concession, coupled with the deference owed by this Court to national security and foreign policy judgments of the Executive Branch, *e.g., HLP*, 561 U.S. at 35; *United States v. Martinez*, 904 F.2d 601, 602 (11th Cir. 1990), leaves no doubt as to the importance of the Government's interests in this case.

The ITAR's licensing requirements are also narrowly tailored to achieve the Government's compelling interests. In longstanding regulations, the Department of State has consistently and reasonably concluded that it is not possible to meaningfully curtail the overseas dissemination of arms if unfettered access to technical data essential to the production of those arms is permitted. *See* 22 C.F.R. §§ 120.6, 120.10; *see also Chi Mak*, 683 F.3d at 1135 ("The authority to regulate arms traffic would be of negligible practical value if it encompassed only the exportation of particular military equipment but not the exportation of blueprints specifying the construction of the very same equipment."). Nevertheless, the statutory and regulatory scheme confirms that the Government "has been conscious of its own responsibility to consider how its actions may implicate constitutional concerns." *HLP*, 561 U.S. at 35; *see* SAC ¶ 20 (recognizing Government's efforts "to address First Amendment concerns").

For example, the "ITAR makes a point to specifically exclude numerous categories from designation, such as general scientific, mathematical, or engineering papers." *Chi Mak*, 683 F.3d at 1135 (citing *HLP*, 561 U.S. at 35-36). The regulations also exclude from the definition of "technical data" "basic marketing information on function or purpose or general system descriptions of defense articles." 22 C.F.R. 120.10(b). Also excluded is information within the public domain, *id.*, broadly defined as "information which is published and which is generally accessible or available to the public," *inter alia*, "[t]hrough sales at newsstands and bookstores," "[a]t libraries open to the public or from which the public can obtain documents," and "[t]hrough unlimited distribution at a conference, meeting, seminar, trade show or exhibition, generally accessible to the public, in the United States," *id.* § 120.11. And of course, the AECA and ITAR restrict only the export of technical data: "Plaintiffs are free to disseminate the computer files at issue domestically in public or private forums, including via the mail or any other medium that does not provide the ability to

7

disseminate the information internationally." *DD I* at 695 (rejecting argument that Defendants' interpretation of "export" was overbroad); *see also id.* at 696 ("ITAR provides a method through the commodity jurisdiction request process for determining whether information is subject to its export controls") (citing 22 C.F.R. § 120.4). *Cf. U.S. v. Hicks*, 980 F.2d 963, 970-72 (5th Cir. 1992) (holding statute prohibiting intimidation of flight crew withstood First Amendment strict scrutiny because, as here, the statute "does not cast a sweeping net at amorphous categories of speech"; "the operative term in the instant case[] ["intimidate" in *Hicks*, as "export" here] is a word that is not simply associated with a type of speech, but includes conduct as well"; and "encompasses only a relatively narrow range of speech").

To be sure, a dissent from the Fifth Circuit's opinion in *DD II* rejected this analysis, concluding that the application of the ITAR here could not survive strict scrutiny. But that opinion incorrectly analyzed the question of "overinclusive[ness]," resting its conclusion on a purported distinction between an "export" and "domestic posting on the Internet." *See DD II*, 838 F.3d at 470-71 (Jones, J., dissenting). But "[b]y nature, the Internet is uniform everywhere. Its content is not dependent on geographic or metropolitan boundaries." *Prometheus Radio Project v. FCC*, 373 F.3d 372, 469 (3d Cir. 2004) (Scirica, C.J., concurring in part and dissenting in part). Overinclusiveness can be measured only with respect to available, less-restrictive alternatives, *see Williams-Yulee v. Fla. Bar*, 135 S. Ct. 1656, 1671 (2015), and because the Internet has no dividing lines, the ITAR's regulation of the export of technical data must encompass all such postings to achieve its ends.[8]

C. ITAR's Export Controls Are Not Unconstitutionally Overbroad.

Plaintiffs also raise an "overbreadth" challenge to the ITAR's regulation of technical data. *See* SAC ¶ 55. Overbreadth is an exception to the prudential standing requirement that a plaintiff may only "assert his own legal rights and interests." *Warth v. Seldin*, 422 U.S. 490, 499 (1975). In circumstances where a regulation is alleged to be so broad that it is incapable of any permissible application, courts may allow a party to bring a facial challenge to a statute because it threatens

---

[8] Nor is it the case that defining "export" to include the transfer abroad of information is improper, as the Fifth Circuit dissent suggests in reliance on, *inter alia*, dictionary definitions of "the verb 'export.'" *DD II*, 838 F.3d at 466-67. But the noun "export" is defined as "[a] product or service created in one country and transported to another." *Export* (noun form), *Black's Law Dictionary* (10th ed. 2014) (emphasis added).

8

others not before the court. *See N.Y. State Club Ass'n v. City of New York*, 487 U.S. 1, 14 (1987); *Broadrick v. Oklahoma*, 413 U.S. 601 (1973). Overbreadth is "strong medicine" to be used "sparingly and only as a last resort," *Broadrick*, 413 U.S. at 613, and a plaintiff must show that the alleged "overbreadth of a statute [is] not only [] real, but substantial . . . judged in relation to the statute's plainly legitimate sweep," *id.* at 615; *see also Steen*, 732 F.3d at 387 (describing this test for First Amendment facial challenges as "daunting").

First, Plaintiffs' overbreadth claim fails because, for the reasons described above, the AECA and ITAR are not directed at speech, but rather to the export of defense articles and related technical data, 22 U.S.C. 2778(a)(1); 22 C.F.R § 120.1. *See Virginia v. Hicks*, 539 U.S. 113, 124 (2003) ("Rarely, if ever, will an overbreadth challenge succeed against a law or regulation that is not specifically addressed to speech or to conduct necessarily associated with speech"); *see also Members of City Council of City of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 800 n.19 (1984). Further, "[c]ourts need not entertain an overbreadth challenge 'where the parties challenging the statute are those who desire to engage in protected speech that the overbroad statute purports to punish.'" *Hicks*, 980 F.2d at 969 (quoting *Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 504 (1985)). Thus, no overbreadth challenge is "appropriate if the first amendment rights asserted" on behalf of third parties are "essentially coterminous" with those asserted by the plaintiffs themselves. *Id.* And an overbreadth challenge should not properly lie if the regulations have been applied permissibly to Plaintiffs. *See Sec'y of State of Md. v. Munson*, 467 U.S. 947, 958 (1984). Here, because Defense Distributed's explicit purpose is international in nature—to promote "global access to . . . 3D[] printing of arms," SAC ¶ 1— the ITAR is being applied directly in its intended manner.

Additionally, Plaintiffs' overbreadth claim fails on the merits. The ITAR's export controls on technical data have a substantially permissible purpose. Specifically, these regulations prevent the circumvention of export controls on munitions by proscribing the export of instructions, blueprints, or—as in the instant case—the automated processes to produce such munitions. *See Stagg PC*, 158 F. Supp. 3d at 210-11; *Chi Mak*, 683 F.3d at 1135. Further, Plaintiffs have nowhere alleged that the regulations have been applied in a substantial number of impermissible ways. To the contrary, they plead that "[a]t the time Defense Distributed posted the Published Files, there was no publicly

known case of Defendants enforcing a prepublication approval requirement under the ITAR." SAC ¶ 27. Plaintiffs' theory also ignores that the regulations do not extend to domestic distribution of technical data to U.S. persons and carve out a wide exemption for "public domain" data that helps ensure their reach is appropriately limited. *See* 22 C.F.R. § 120.10(b)(5). Accordingly, Plaintiffs' overbreadth claim is without merit. *See Chi Mak*, 683 F. 3d at 1136 (rejecting overbreadth challenge); *Karn v. Dep't of State*, 925 F. Supp. at 13 (D.D.C. 1996) ("plaintiff's overbreadth concerns [about the ITAR's 'technical data' provision] are not genuine").

> D.   ITAR's Export Controls Are Not An Unconstitutional Prior Restraint.

Plaintiffs' repeated references to the regulations as a "prior restraint," *e.g.*, SAC ¶¶ 17-22, 40-45, 54-57, do not advance their First Amendment claim. As this Court previously explained, the Fifth Circuit has recognized that "judicial decisions analyzing prior restraints have applied different standards of review depending on the restraint at issue." *DD I*, 121 F Supp. 3d at 692 (quoting *Catholic Leadership Coal. of Tex. v. Reisman*, 764 F.3d 409, 438 (5th Cir. 2014)). For example, while a prior restraint involving "a facially content-based restriction on political speech in a public forum" is subject to strict scrutiny, "a prior restraint on speech in a non-public forum at a school is constitutional if reasonably related to legitimate pedagogical goals." *Milwaukee Police Ass'n v. Jones*, 192 F.3d 742, 749 (7th Cir. 1999) (citing *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 273 (1988)), cited in *Catholic Leadership Coal.*, 764 F.3d at 438.

The licensing scheme at issue here could not plausibly give rise to the sort of censorship that has caused courts to invalidate prior restraints on news publications or public rallies. Heightened concerns about prior restraints arise when "a licensing law gives a government official or agency substantial power to discriminate based on the content or viewpoint of speech by suppressing disfavored speech or disliked speakers." *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 759 (1988). For such concerns to arise, the "law must have a close enough nexus to expression, or to conduct commonly associated with expression, to pose a real and substantial threat of . . . censorship risks." *Id.* By contrast, "laws of general application that are not aimed at conduct commonly associated with expression and do not permit licensing determinations to be made on the basis of ongoing expression or the words about to be spoken[] carry with them little danger of

10

censorship." *Id.* at 760-61. The provisions at issue fall squarely in this latter category. The AECA and ITAR are part of a scheme designed to curtail the spread of defense articles to foreign nationals, in this case, CAD files that directly facilitate the 3-D printing of firearms. Far from being aimed at restricting expression, the regulations "specifically carve out exceptions to the law for the types of information that are subject to the highest levels of First Amendment protection, for example, published scholarly works." *Chi Mak*, 683 F.3d at 1136; *see* 22 C.F.R. § 120.11(a).

While computer files could, in some circumstances, be distributed for expressive purposes, it nonetheless stands in obvious contrast to activities such as parading, posting signs, distributing handbills, or publishing newspapers, which are always (or almost always) done for expressive purposes. Cases involving restrictions on those activities are inapposite here. *See, e.g.*, *New York Times Co. v. United States*, 403 U.S. 713 (1971) (publication of Pentagon Papers in the newspaper); *Near v. Minnesota ex rel. Olson*, 283 U.S. 697 (1931) (publication of charges of official misconduct in newspaper); *Forsyth Cty. v. Nationalist Movement*, 505 U.S. 123 (1992) (permit for protest march). Thus, Plaintiffs' attempt to shoehorn the AECA and ITAR into the classic prior restraint framework is unpersuasive. *Chi Mak*, 683 F.3d at 1136 (rejecting similar prior restraint argument); *see also Edler Indus.*, 579 F.2d at 521 (same). *Cf. Capital Cities/ABC, Inc. v. Brady*, 740 F. Supp. 1007, 1013 (S.D.N.Y. 1990) (upholding against First Amendment challenge licensing strictures for international television broadcasts without concluding such a licensing system constituted a prior restraint).

The ITAR's focus on the activity of exporting also mitigates two of the principal concerns raised by classic prior restraint on expression. First, "[b]ecause the censor's business is to censor," when the government establishes a censorship board like that in *Freedman* and requires it to determine whether a film is "moral and proper," it is likely that the institutional bias of the censors will lead to the suppression of speech that should be permitted. *Freedman v. Md.*, 380 U.S. 51, 52, 57 (1965). In contrast, "laws of general application that are not aimed at conduct commonly associated with expression" do not raise the same concerns about censorship because it will only be a "rare occasion [when] an opportunity for censorship will exist." *Lakewood*, 486 U.S. at 760-61. Second, laws directing determinations about, e.g., "moral" expression raise concern about whether such discretion is unreviewable. *See City of Littleton v. Z.J. Gifts D-4*, 541 U.S. 774, 782-83 (2004)

(upholding licensing scheme that relied on less-subjective criteria than *Freedman*). But where the statute in question regulates general conduct, these concerns are mitigated because "application of the statute to areas unrelated to expression will provide the courts a yardstick with which to measure the licensor's occasional speech-related decision." *Lakewood*, 486 U.S. at 761. Here, regulation of the export of 3-D printing files in furtherance of national security and foreign policy does not focus on the content of expression, moral or otherwise. Nor have Plaintiffs sufficiently alleged that licensing applications are denied at a rate demonstrating an "institutional bias of a censor" here. *See id.*[9]

In addition, Plaintiffs are mistaken in suggesting that the State Department's processing times render the scheme an impermissible prior restraint. *See* SAC ¶¶ 40-43. To begin with, that argument depends on the incorrect conclusion that the licensing scheme is a classic prior restraint subject to *Freedman*'s rigorous procedural requirements. Moreover, on its face, the licensing determination appropriately involves considerations of numerous difficult questions of national security or foreign policy. *See* 22 U.S.C. § 2778(a)(2) (requiring consideration of "whether the export of an article would contribute to an arms race, aid in the development of weapons of mass destruction, support international terrorism, increase the possibility of an outbreak or escalation of conflict, or prejudice the development of bilateral or multilateral arms control or nonproliferation agreements or other arrangements."). Given the stakes and the complexity of the issues involved, there is no basis for Plaintiffs' apparent view that such determinations must be made hastily. Further, there is no legal obligation to obtain a CJ determination before exporting items or data that are not subject to the regulations. As a technical matter, the availability of such determinations thus does not impose a prior restraint. As a practical matter, such determinations will be sought (and may be time consuming) only in difficult cases that require extensive review. And to reiterate, no license, and therefore no determination, is required for domestic distribution to U.S. persons. *Cf. Oller v. Roussel*, 609 F. App'x 770, 774 (5th Cir. 2015) ("To the extent [plaintiff's] First Amendment claims

---

[9] While prior restraints are disfavored in substantial part because it is presumed that after-the-fact punishment is available in the absence of a prior restraint, *see Near v. Minn.*, 283 U.S. 697, 718-19 (1931); *Se. Proms. v. Conrad*, 420 U.S. 546, 558-59 (1975), here, such after-the-fact punishment cannot suffice because of the possible irreversible harm to national security and foreign policy that could not be remedied by later punishment. *See Chi Mak*, 683 F.3d at 1136 ("national security concerns may be more sharply implicated by the export abroad of military data than by domestic disclosure").

arise from a 'prior restraint' on his speech, we find that he fails to show evidence that Defendants have prohibited him from stating his beliefs or censored his speech [given] . . . [t]hat Defendants have allowed Oller to use his textbook as secondary material, discuss his views during class, and publish and speak about his views outside the classroom.").

Finally, Plaintiffs cannot advance their argument by relying on opinions from the Office of Legal Counsel ("OLC") in the Justice Department. SAC ¶ 18. These opinions necessarily analyzed the issues at a relatively high level of generality, and do not address the particular application or circumstances presented here. For example, in one opinion the Justice Department cited the Government's "compelling interest in suppressing the development and use of sensitive technologies abroad," and concluded that the provision of "technical advice" was "an integral part of conduct that the government has a compelling interest in suppressing by appropriate means." Constitutionality of the Proposed Revision of the International Traffic in Arms Regulations, 5 Op. O.L.C. 202, 208 (1981), ECF No. 8-2, App. 123. Written in 1981, the opinion understandably did not analyze the First Amendment implications of the dissemination of computer files on the Internet. Instead, the examples of applications that would raise constitutional concern involved "communications of unclassified information by a technical lecturer at a university" or "the conversation of a United States engineer who meets with foreign friends at home to discuss matters of theoretical interest." *Id.* at 212 (App. 127). This case, however, does not involve university lectures or discussions of matters of theoretical interest at a dinner party. Rather, the regulation's application in this case involves the dissemination of computer files to foreign nationals that can be used to automatically generate firearms, parts, or components that are on the U.S. Munitions List.

Plaintiffs have therefore failed to state a claim for relief under the First Amendment.

## II.   **Plaintiffs' Second Amendment Claims Should Be Dismissed.**

A.   Plaintiffs Lack Standing to Bring a Second Amendment Challenge.

Plaintiffs' Second Amendment claims are based on two collateral constitutional guarantees Defendants allegedly infringe: "the right to acquire arms, and the right to make arms." SAC ¶ 59; *see Ezell v. City of Chi.*, 651 F.3d 864, 704 (7th Cir. 2011); *Teixeira v. Cty of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017). Yet the SAC is deficient in allegations of injury to support these claims,

notwithstanding the principle that "if the plaintiff does not carry his burden 'clearly to allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute,' then dismissal for lack of standing is appropriate." *Hotze v. Burwell*, 784 F.3d 984, 993 (5th Cir. 2015) (quoting *FW/PBS v. City of Dallas*, 493 U.S. 215, 231 (1990)); *see Spokeo, Inc. v. Robins,* 136 S. Ct. 1540, 1547 (2016) ("at the pleading stage, the plaintiff must clearly . . . allege facts demonstrating" standing").[10]

     1.  <u>Defense Distributed Has Not Suffered a Harm to Second Amendment Interests.</u>

     To establish standing, "a plaintiff must show: (1) it has suffered, or imminently will suffer, a concrete and particularized injury-in-fact; (2) the injury is fairly traceable to the defendant's conduct; and (3) a favorable judgment is likely to redress the injury." *Miss. State Democratic Party v. Barbour*, 529 F.3d 538, 544 (5th Cir. 2008). The SAC alleges no injury to Defense Distributed associated with any Second Amendment claims: Plaintiffs have not set forth any facts describing how Defense Distributed is limited in its "right to acquire arms" or its "right to make arms." As the Court recognized in the context of Plaintiffs' equally-deficient original Complaint, "Defense Distributed is in full possession of the computer files at issue and thus cannot argue it is being prevented from exercising its rights under the Second Amendment." *DD I* at 696-97. Nor should Defense Distributed be permitted to assert Second Amendment claims on behalf of would-be downloaders of its files: although courts have recognized a right to "firearms retailers to sue on behalf of their potential customers," *Second Amendment Arms v. City of Chi.*, 135 F. Supp. 3d 743, 751 (N.D. Ill. 2015), such standing has not been recognized for a non-profit entity making its services available for free. *See, e.g., id.* (would-be firearms retailer); *Teixeira*, 873 F.3d at 677 (same); *Ezell*, 651 F.3d 704.

     Defense Distributed would also fail to meet the generally-applicable test for standing on behalf of a third-party: it has not, nor could it plausibly, allege the existence of "a close relation" with unnamed, likely-anonymous, and non-paying website visitors, nor has it identified any obstacle to those visitors asserting their own Second Amendment interests. *See Bonds v. Tandy*, 457 F.3d 409, 416 n.11 (5th Cir. 2006) (requiring these elements for a third-party standing claim). Defense Distributed has therefore failed to set forth specific facts indicating that its Second Amendment

---

[10] In reviewing a motion to dismiss for lack of standing, "[t]he court must evaluate each plaintiff's Article III standing for each claim; 'standing is not dispensed in gross.'" *Fontenot v. McCraw*, 777 F.3d 741, 746 (5th Cir. 2015) (quoting *Lewis v. Casey*, 518 U.S. 343, 358 n.6 (1996)).

rights have been injured in fact. *See Pub. Citizen, Inc. v. Bomer*, 274 F.3d 212, 218 (5th Cir. 2001).

> 2. SAF and Conn Williamson Have Failed to Plead Sufficient Allegations of Injury and Any
> Second Amendment Injury is Not Traceable to Defendants' Acts.

Associational standing is available for Second Amendment claims under the same standards as for other claims, *see Nat'l Rifle Ass'n of America v. Bureau of Alcohol, Tobacco, Firearms and Explosives*, 700 F.3d 185, 191 (5th Cir. 2012) ("*NRA*"), but this requires that the organization demonstrate that "its members would otherwise have standing to sue in their own right,"[11] including by pleading that they have suffered a concrete, specific injury sufficient to confer Article III standing. *Id.*

Here, SAF and Mr. Williamson have failed to sufficiently plead an injury. Even if their alleged "keen interest" in Defense Distributed's files and vague claim that they would "access" such files, SAC ¶ 45, were sufficient to demonstrate a First Amendment injury, their further suggestion that, after doing so, they would "use the files for . . . the manufacture of firearms . . . that they would keep operable and use for self-defense" is a "hypothetical and conjectural" allegation about the usage of these files that is insufficient to satisfy the obligation to plead injury. *Compare Brown v. Livingston*, 524 F. App'x. 111, 114-15 (5th Cir. 2013). It is true that this Court previously held that Mr. Williamson, and by implication, SAF as an organization, <u>had</u> demonstrated injury. *See DD I* at 698. But the Court recognized this standard had been met not by the original Complaint, but by supplementary "affidavit testimony." *Id.* Plaintiffs have added a bare sentence of conclusory allegations to reinforce the pleaded allegations in the SAC. *Compare* SAC at ¶ 45 *with* Compl., ECF No. 1 at ¶ 38. Thus, because Plaintiffs have now been on notice that their pleadings are defective as to standing and have failed to cure this defect through two amended complaints, the Court should dismiss the Second Amendment claims for failure to allege a sufficient injury. *See Mather v. Cent. Pac. Bank*, 2014 WL 5580963 at *3 (D. Haw. 2014) (dismissal after "failure to cure the defects identified" as to standing); *cf. S. Utah Wild. All. v. Palma*, 2011 WL 2565198 (D. Utah 2011) (similar).

Further, given the passage of nearly three years since the filing of those affidavits, the Court

---

[11] Associational standing also requires that a plaintiff organization establish that "the interests it seeks to protect are germane to the organization's purpose; and [that] . . . the participation of individual members" in the lawsuit is not required. *Ass'n of Am. Physicians & Surgeons, Inc. v. Tex. Med. Bd.*, 627 F.3d 547, 550 (5th Cir. 2010). Defendants are not aware of any reason to believe that the Second Amendment Foundation's purpose is not "germane" to the Second Amendment interests at issue here or that participation of SAF's members would be required in this action.

should not continue to credit the injuries alleged therein as ongoing. *Cf. Equal Rights Ctr. v. Post Properties, Inc.*, 633 F.3d 1136, 1141 (D.C. Cir. 2011) (questioning validity of claims of injury based on lapse of time between complaint and affidavit). To the extent Mr. Williamson or SAF's other members seek to acquire and make arms based on Defense Distributed's 3-D printing files, they have had ample opportunity to seek access to those files via offline means, given that the ITAR governs only exports and would not limit the ability of Defense Distributed or SAF to provide 3-D printing files directly to Americans within United States borders. For similar reasons, the evident lack of action on the part of SAF and Mr. Williamson to obtain the files they insist are needed to exercise their Second Amendment rights should be treated as "incurred voluntarily," and thus, no longer "fairly can be traced to the challenged action." *See Petro-Chem Processing v. EPA*, 866 F.2d 433, 438 (D.C. Cir. 1989) (quoting *Valley Forge Christian Coll. v. Ams. United*, 454 U.S. 464, 472 (1982)).

    B.   <u>Plaintiffs' Second Amendment Challenge Fails on the Merits</u>.

    In *Mance v. Sessions*, the Fifth Circuit set forth the governing approach for Second Amendment analysis of regulations that restrict the access of prospective firearms owners and users to firearms protected by the Second Amendment. *See* 880 F.3d 183 (5th Cir. 2018). Applying the analysis set forth in *Mance* here establishes that Defendants may, consistent with the Second Amendment, limit the international distribution of electronic files which enable the 3-D printing of firearms. Thus, even if the Court concludes that one or more Plaintiffs have standing to assert a Second Amendment claim, that claim should be dismissed.

    The Second Amendment "guarantee[s] the individual right to possess and carry weapons in case of confrontation." *District of Columbia v. Heller*, 554 U.S. 570, 592 (2008). Conducting an "extensive analysis of the historical context of the Second Amendment, the Court concluded 'that the Second Amendment, like the First and Fourth Amendments, codified a pre-existing right' to keep and bear arms . . . [for which] self-defense . . . was the central component." *Mance*, 880 F.3d at 187 (quoting *Heller*, 554 U.S. at 592, 599). To determine whether a federal statute is consonant with this right, the Fifth Circuit requires a "two-step approach. . . . [T]he first step is to determine whether the challenged law impinges upon a right protected by the Second Amendment . . . ; the second step is . . . to determine whether the law survives the proper level of scrutiny." *NRA*, 700

16

F.3d 194. Here, just as pleading deficiencies leave doubt as to Plaintiffs' standing, they leave unclear the extent of the "encroach[ment] on the core of the Second Amendment." *Id.* at 195. Although the "core Second Amendment right . . . wouldn't mean much without the ability to acquire arms," *Teixeira*, 873 F.3d at 677, including through their manufacture, the pleadings do not establish the extent to which that core is infringed here.

Under these circumstances, the Fifth Circuit's approach in *Mance* may guide the Court's inquiry. There, the Fifth Circuit first addressed whether "the laws and regulations at issue withstand strict scrutiny," before examining whether "the strict, rather than intermediate, standard of scrutiny is applicable," and the same approach is permissible here. *Mance*, 880 F.3d at 188; *see id.* at 196 (Owen, J., concurring) ("it is prudent first to apply strict scrutiny," and, if the Court concludes that the challenged law "satisfies that heightened standard, it is unnecessary to resolve whether strict scrutiny is *required*"). For a firearms restriction to satisfy strict scrutiny, "the Government 'must specifically identify an actual problem in need of solving,' and the 'curtailment of the constitutional right must be actually necessary to the solution.'" *Mance*, 880 F.3d at 188 (quoting *Brown v. Entm't Merchs. Ass'n*, 564 U.S. 786, 799 (2011)).

Applying this standard, the Fifth Circuit in *Mance* reversed and vacated a district court decision enjoining the enforcement of two federal statutory provisions and a regulation that "generally prohibit the direct sale of a handgun by a federally licensed firearms dealer (FFL) to a person who is not a resident of the state in which the FFL is located." *Mance*, 880 F.3d at 185. Emphasizing that "current burdens on constitutional rights 'must be justified by current needs,'" the Fifth Circuit first assessed the nature of the government interest served by the restrictions, and recognized that "there is a compelling government interest in preventing circumvention of the handgun laws of various states." *Id.* at 189-90 (quoting *Shelby Cty. v. Holder*, 133 S. Ct. 2612, 2619 (2013)). Likewise here, there is an equally compelling interest in preventing the circumvention of laws restricting the export of firearms, particularly to hostile foreign state and non-state adversaries.

As noted above, Plaintiffs have previously conceded the compelling nature of the interest in regulating the export of arms, and that interest encompasses the export of the 3-D printing files at issue here. For this reason, Congress did not limit the scope of the AECA merely to the regulation

of exports of physical weapons like firearms or bombs, but recognized that the transfer of ideas, expertise, and knowledge beyond the borders of the United States can be just as inimical to the national interest as the transfer of objects: hence the inclusion of "defense services," alongside "defense articles" in the AECA's coverage. 22 U.S.C. § 2778(a)(1).

As explained above, the ITAR restrictions here are narrowly tailored to this concededly compelling interest. *See* Part I.B, *supra*. Defense Distributed explicitly promotes "global" use of its ideas, SAC ¶ 1, so the compelling interest in limiting the transfer of arms abroad requires that the ITAR be applied to Defense Distributed. And, applying the approach the Fifth Circuit employed in *Mance* where "[a]ll concede[d] there is a compelling government interest," a review of the available alternatives shows none that would effectively protect the interests at issue. *See* 880 F.3d at 190-92.

The claims set forth in the SAC suggest two alternatives by which Defendants could act to reduce the alleged burden on the Second Amendment rights of SAF, Mr. Williamson, and others. As with the alternatives considered in *Mance*, however, neither would effectively satisfy Defendants' interest in preventing persons from circumventing export controls for munitions technology. First, Plaintiffs, like the Fifth Circuit dissent described above, *see DD II*, 838 F.3d at 470-71, suggest that the distribution of technical data over the Internet could be exempted from ITAR's export controls. But the Internet does not have separate parts, "domestic" and "foreign." *Prometheus Radio*, 373 F.3d at 469. If Mr. Williamson and SAF could access Defense Distributed's "files on the Internet," so too could innumerable foreign persons or entities, and thus, the United States' efforts to regulate the export of firearms and of firearms technical data would alike be rendered nullities.[12] The other alternative suggested by Plaintiffs' pleadings is for Defendants to permit Defense Distributed to place its files into the public domain, in which case they would not be subject to ITAR's restrictions

---

[12] The Government previously stated that there may be means of limiting access to files posted on the Internet to assure that such postings are distributed only domestically. *See* 7/6/2015 Tr. at 32-34, ECF No. 50. But in its narrow-tailoring analysis in *Mance*, the Fifth Circuit made clear that it is "unrealistic to expect" that a compelling public interest can be protected by "expecting . . . each of [hundreds of thousands of private parties to] become, and remain knowledgeable about" a wide variety of subjects necessary to protect the public interest. *See Mance*, 880 F.3d at 190. In *Mance*, that subject was "the handgun laws of the 50 states and the District of Columbia." *Id.* Here, that subject would be the means of identifying U.S. persons who are the residents of the 50 states and D.C., a comparable subject, and the means of falsely identifying one's self over the Internet as a U.S. person, a subject area that is likely to be intricately complex and ever-changing.

on the export of technical data. *See* 22 C.F.R. § 120.10. Yet this would be even less effective at protecting the public interest in export control as the 3-D printing plans for firearms—and thus, the ability to make export-controlled firearms—could then be taken abroad using all sorts of means, not just by transmission over the Internet. Given that the available alternatives clearly would be ineffective at preventing the broad circumvention of export controls for munitions technology, and that the ITAR is narrowly constructed to regulate only the transfer abroad of arms or the equivalent,[13] the Court should find the challenged restriction to be narrowly tailored to a compelling interest, and therefore, permitted by the Second Amendment. *See Mance*, 880 F.3d at 192. And for the same reasons, the challenged restriction would also satisfy intermediate scrutiny. *See id.* at 196.

## III.    Plaintiffs' Other Claims Should Also Be Dismissed on the Merits.

The SAC contains two additional claims, each of which the Court analyzed in depth in its Order denying Plaintiffs' 2015 motion for a preliminary injunction. First, Plaintiffs seek to enjoin application of the ITAR to Defense Distributed as an *ultra vires* action by the State Department. Second, Plaintiffs assert that the ITAR's limits on the export of technical data are unconstitutionally vague. The Court should now apply its prior analysis to dismiss these claims.

Plaintiffs first allege that application of the ITAR is *ultra vires* in light of a "1985 ITAR amendment." SAC ¶ 52; *see id.* ¶ 17 (describing this amendment as having removed "Footnote 3 to former ITAR Section 125.11"). This Court previously found there was no "likelihood of success" as to this claim, given that the AECA authorizes the regulation of exports and that Defense Distributed's stated purpose of "facilitating global access to firearms" falls squarely within the conduct Congress has authorized the ITAR to regulate. *See DD I* at 690-91. The Court should apply this analysis and dismiss the *ultra vires* claim. Further, even beyond the Court's prior analysis, Plaintiffs' allegation that a licensing requirement for exports of technical data exceeds the "authority conferred by Congress," *id.* ¶ 52, is inconsistent with the plain text of the AECA. Section 2778 authorizes regulation of "technical data," and it provides for "export licenses" to be required,

---

[13] *See* 22 C.F.R. § 120.17(a), supplying relevant definitions of exports, including § 120.17(a)(1) ("[s]ending or taking a defense article out of the United States in any manner"); § 120.17(a)(2) ("transferring technical data to a foreign person in the United States); § 120.17(a)(4), "transferring a defense article to an embassy . . . in the United States").

explicitly recognizing "technical data" as within the scope of the licensing requirement. 22 U.S.C. §§ 2778(b)(2); 2778(f)(2)(A). In short, Defendants' actions could only be *ultra vires* by exceeding constitutional limitations, not statutory limits.[14]

Plaintiffs' final claim is that the ITAR's regulation of the export of technical data is unconstitutionally vague under the Due Process Clause of the Fifth Amendment. SAC ¶¶ 63-65. As the Court previously observed, this challenge is "hampered because [Plaintiffs] have not made precisely clear which portion of the ITAR language they believe is unconstitutionally vague," ECF No. 43 at 23, a shortcoming Plaintiffs have not rectified in the SAC. *Compare* SAC ¶¶ 11-15 *with* Compl. ¶¶ 12-15. As the Court recognized, "persons of ordinary intelligence are clearly put on notice by the language of the regulations" that "post[ing], on the Internet, . . . directions for the 3D printing of firearms" falls within the scope of the ITAR. *DD I* at 700-01 (quoting *United States v. Williams*, 553 U.S. 285, 304 (2008) (a statutory term is vague only if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement")). The ITAR's "carefully crafted regulatory scheme," *Zhen Zhou Wu*, 711 F.3d at 13, which defines the terms "defense articles" and "technical data" at length, provides fair notice and is not susceptible to a vagueness challenge. *See DD I* at 701 (describing 22 C.F.R. §§ 120.6 (defining "defense articles"), 120.10(a) (defining technical data) & 121.1 (Munitions List)). Equally, the term "export" is explicitly defined to include "[a]n actual shipment or transmission out of the United States," or "a release in the United States of technical data to a foreign person." 22 C.F.R. § 120.17. For this reason, this Court found no likelihood of success as to Plaintiffs' vagueness challenge, and this Court should now dismiss consistent with its previous analysis. *See DD I* at 700-01 (citing *Zhen Zhou Wu*, 711 F.3d at 13; *U.S. v. Hsu*, 364 F.3d 192 (4th Cir. 2004)).

## CONCLUSION

For the foregoing reasons, Plaintiffs' Second Amended Complaint should be dismissed.

---

[14] Indeed, Plaintiffs acknowledge that the 1985 amendment, on which their *ultra vires* claim hinges, *see* SAC ¶ 52, was enacted not because of limitations imposed by the Congress in the AECA, but "to address First Amendment concerns." *Id.* ¶ 20. This further confirms that no *ultra vires* claim survives dismissal of the constitutional claims.

Dated: April 6, 2018

Respectfully submitted,

CHAD A. READLER
Acting Assistant Attorney General
Civil Division

JOHN F. BASH
United States Attorney

ANTHONY J. COPPOLINO
Deputy Branch Director
Federal Programs Branch

*/s/ ERIC J. SOSKIN*
ERIC J. SOSKIN
Pennsylvania Bar No. 200663
STUART J. ROBINSON
California Bar No. 267183
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., NW, Room 7116
Washington, DC 20530
Phone: (202) 353-0533
Fax: (202) 616-8470
Email: Eric.Soskin@usdoj.gov

*Attorneys for U.S. Government Defendants*

## CERTIFICATE OF SERVICE

I certify that on April 6, 2018, I electronically filed this document with the Clerk of Court using the CM/ECF system, which will send notification to

Alan Gura, alan@gurapllc.com
William B. Mateja, mateja@polsinelli.com
William T. "Tommy" Jacks, jacks@fr.com
David S. Morris, dmorris@fr.com
Matthew A. Goldstein, matthew@goldsteinpllc.com
Joshua M. Blackman, joshblackman@gmail.com
*Attorneys for Plaintiffs*

/s/ Eric J. Soskin
ERIC J. SOSKIN
Senior Trial Counsel

Exhibit 5

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| DEFENSE DISTRIBUTED, et al. | § | Case No. 15-CV-372-RP |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | |
| | § | |
| U.S. DEPARTMENT OF STATE, et al., | § | |
| | § | |
| Defendants. | § | |
| | § | |

PLAINTIFFS' UNOPPOSED MOTION TO STAY PROCEEDINGS
TO COMPLETE SETTLEMENT

The parties have reached a tentative settlement agreement in the above-captioned matter, subject to formal approval by Government officials with appropriate approval authority. Accordingly, Plaintiffs Defense Distributed, Second Amendment Foundation, Inc., and Conn Williamson move for a stay of proceedings to permit sufficient time for formal Government approval of the settlement agreement.

Pursuant to Local Rule CV-7(i), counsel for Plaintiffs has conferred with counsel for the Defendants, who stated the Defendants do not oppose this motion.

A proposed form of order is attached.

Dated: April 30, 2018                        Respectfully submitted,

                                            */s/ Matthew Goldstein*
Alan Gura                                    Matthew Goldstein
Virginia Bar No. 68842*                      D.C. Bar No. 975000*
Gura PLLC                                    Matthew A. Goldstein, PLLC
916 Prince Street, Suite 107                 1875 Connecticut Ave NW, 10th Floor
Alexandria, Virginia 22314                   Washington, DC 20009
703.835.9085/Fax 703.997.7665                202.550.0040 / Fax 202.683.6679
alan@gurapllc.com                            matthew@goldsteinpllc.com

Josh Blackman
Virginia Bar No. 78292
1303 San Jacinto Street
Houston, Texas 77002
202.294.9003/Fax: 713.646.1766
joshblackman@gmail.com

William T. "Tommy" Jacks
Texas State Bar No. 10452000
David S. Morris
Texas State Bar No. 24032877
FISH & RICHARDSON P.C.
111 Congress Avenue, Suite 810
Austin, Texas 78701
512.472.5070 / Fax 512.320.8935
jacks@fr.com
dmorris@fr.com

*Admitted pro hac vice

<span style="font-variant: small-caps;">Certificate of Service</span>

The undersigned certifies that the foregoing document was filed electronically in compliance with Local Rule CV-5(a) on April 30, 2018, and was served on all counsel who are deemed to have consented to electronic service. Local Rule CV-5(b)(1).

*/s/ Matthew Goldstein*
Matthew Goldstein

# Exhibit 6



**U.S. Department of Justice**

Civil Division
Federal Programs Branch

450 Golden Gate Ave.
Suite 7-5395
San Francisco, CA 94102

---

Stuart Robinson                                                                  Tel:  (415) 436-6635
Trial Attorney                                                                   Fax:  (415) 436-6632
                                                                                 stuart.j.robinson@usdoj.gov

August 2, 2018

<u>Via Electronic Mail</u>

Jeff Sprung
Assistant Attorney General
Washington Attorney General's Office
800 5th Ave.
Suite 2000
Seattle, WA 98104

> **Re:** ***State of Washington, et al. v. U.S. Department of State, et al.*, No. 2:18-cv-1115**
> **(W.D. Wash.)**

Dear Mr. Sprung:

This letter is in response to your correspondence dated July 31, 2018, in which you "request that the federal government advise us of the steps it has taken to achieve" compliance with the Court's Order granting Plaintiffs' Emergency Motion for Temporary Restraining Order, ECF No. 23 (July 31, 2018). As you are aware, the Court enjoined the Government "from implementing or enforcing the 'Temporary Modification of Category I of the United States Munitions List' and the letter to Cody R. Wilson, Defense Distributed, and Second Amendment Foundation issued by the U.S. Department of State on July 27, 2018," and required that the Government "preserve the status quo *ex ante* as if the modification had not occurred and the letter had not been issued." *Id.* at 7.  The Court did not require the Government to provide any status reports to the Court or Plaintiffs regarding compliance with the Order.  *See id.*

The Government has fully complied with the Court's Order, and Plaintiffs have provided no basis to conclude otherwise.  On July 31, 2018, the Department of State, Directorate of Defense Trade Controls ("DDTC"), removed from its website its announcement temporarily modifying Category I of the United States Munitions List to exclude technical data identified in the Settlement Agreement for the matter of *Defense Distributed, et al., v. U.S. Department of State, et al.*, Case No. 15-cv-372 (W.D. Tex.).  Additionally, on July 31, 2018, my colleague Eric Soskin informed Josh Blackman, counsel for Defense Distributed, that the Government considers the aforementioned letter to Mr. Wilson a nullity during the pendency of the Order entered by the Court.  And on August 2, 2018, DDTC added the following to its website: "As of July 31, 2018, and in compliance with the Temporary Restraining Order

issued by the United States District Court for the Western District of Washington, in *Washington v. U.S. Dep't of State*, No. C18-1115RSL, the Directorate of Defense Trade Controls (DDTC) is not implementing or enforcing the 'Temporary Modification of Category I of the United States Munitions List' that was posted to the DDTC website on July 27, 2018, and has since been removed."

      If you have any questions related to these matters, please contact me or Mr. Soskin.

                             Sincerely,

                             s/ *Stuart Robinson*

                             Stuart Robinson
                             (415) 436-6635

cc:     Eric Soskin
        Senior Counsel
        U.S. Department of Justice

        Jeffrey Rupert
        Assistant Attorney General
        Washington Attorney General's Office

        Josh Blackman
        Josh Blackman LLC

        Joel Ard
        Attorney
        Immix Law Group

Exhibit 7

# Exhibit A



**United States Department of State**
*Bureau of Political-Military Affairs*
*Directorate of Defense Trade Controls*
*Washington,* D.C. 20522-0112

July 27, 2018

Mr. Cody R. Wilson, Defense Distributed, and Second Amendment Foundation, Inc.
c/o Mr. Matthew A. Goldstein
Snell & Wilmer
One South Church Avenue
Suite 1500
Tucson, AZ 85701-1630

RE:   Directorate of Defense Trade Controls Approval of Certain Files for Public Release

Dear Mr. Wilson, Defense Distributed, and Second Amendment Foundation, Inc.:

This letter is provided in accordance with section 1(c) of the Settlement Agreement in the matter of *Defense Distributed, et al., v. U.S. Department of State, et al.,* No. 15-cv-372-RP (W.D. Tx.) (hereinafter referred to as "*Defense Distributed*").  As used in this letter,

- The phrase "Published Files" means the files described in paragraph 25 of Plaintiffs' Second Amended Complaint in *Defense Distributed*.
- The phrase "Ghost Gunner Files" means the files described in paragraph 36 of Plaintiffs' Second Amended Complaint in *Defense Distributed*.
- The phrase "CAD Files" means the files described in paragraph 40 of Plaintiffs' Second Amended Complaint in *Defense Distributed*.

The Department understands that Defense Distributed submitted the Published Files, Ghost Gunner Files, and CAD Files to the Department of Defense's Defense Office of Prepublication and Security Review (DOPSR) in 2014 to request review for approval for public release pursuant to International Traffic in Arms Regulations (ITAR) § 125.4(b)(13).  It is our further understanding that DOPSR did not make a determination on the eligibility of these files for release, but instead referred you to the Directorate of Defense Trade Controls (DDTC) regarding public release of these files.

I advise you that for the purposes of ITAR § 125.4(b)(13), the Department of State is a cognizant U.S. government department or agency, and DDTC has authority to issue the requisite approval for public release. To that end, I approve the Published Files, Ghost Gunner Files, and CAD Files for public release (i.e., unlimited distribution). As set forth in ITAR § 125.4(b)(13), technical data approved for public release by the cognizant U.S. government department or agency is not subject to the licensing requirements of the ITAR.

Sincerely,

Acting Deputy Assistant Secretary for the
Directorate of Defense Trade Controls

2

Exhibit 8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

DEFENSE DISTRIBUTED, et al.,  §
    Plaintiffs,  §
                  §
v.  §        No. 1:15-cv-372-RP
                  §
U.S. DEPARTMENT OF STATE, et al.,  §
    Defendants.  §

### STIPULATION OF DISMISSAL WITH PREJUDICE

Pursuant to Federal Rule of Civil Procedure 41(a)(1)(A)(ii) and 41(a)(1)(B), and a

settlement agreement among Plaintiffs (Defense Distributed, Second Amendment Foundation,

Inc., and Conn Williamson) and Defendants (the United States Department of State, the

Secretary of State, the Directorate of Defense Trade Controls, the Deputy Assistant Secretary,

Defense Trade Controls, and the Director, Office of Defense Trade Controls Policy), the

Plaintiffs and the Defendants hereby stipulate to the dismissal with prejudice of this action.

Dated: June 29, 2018               Respectfully submitted,

_____
Matthew Goldstein
D.C. Bar No. 975000*
Snell & Wilmer LLP
One South Church Ave., Ste. 1500
Tucson, Arizona 85701
520.882.1248 / Fax 520.884.1294
mgoldstein@swlaw.com

Alan Gura
Virginia Bar No. 68842*
Gura PLLC
916 Prince Street, Suite 107
Alexandria, Virginia 22314

CHAD A. READLER
Acting Assistant Attorney General
Civil Division

ANTHONY J. COPPOLINO
Deputy Branch Director
Federal Programs Branch

_____
ERIC J. SOSKIN
Pennsylvania Bar No. 200663
Senior Trial Counsel

1

703.835.9085/Fax 703.997.7665

alan@gurapllc.com
William T. "Tommy" Jacks
Texas State Bar No. 10452000
David S. Morris
Texas State Bar No. 24032877
FISH & RICHARDSON P.C.
111 Congress Avenue, Suite 810
Austin, Texas 78701
512.472.5070 / Fax 512.320.8935
jacks@fr.com
dmorris@fr.com

Josh Blackman
Virginia Bar No. 78292
1303 San Jacinto Street
Houston, Texas 77002
202.294.9003/Fax: 713.646.1766
joshblackman@gmail.com

*Attorneys for Plaintiffs*

*Admitted pro hac vice

STUART J. ROBINSON
California Bar No. 267183
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., NW, Room 7116
Washington, DC 20530
Phone: (202) 514-1500
Fax: (202) 616-8470
Email: Eric.Soskin@usdoj.gov

*Attorneys for Defendants*

Exhibit 9

BOB CORKER, TENNESSEE, CHAIRMAN

JAMES E. RISCH, IDAHO
MARCO RUBIO, FLORIDA
RON JOHNSON, WISCONSIN
JEFF FLAKE, ARIZONA
CORY GARDNER, COLORADO
TODD YOUNG, INDIANA
JOHN BARRASSO, WYOMING
JOHNNY ISAKSON, GEORGIA
ROB PORTMAN, OHIO
RAND PAUL, KENTUCKY

ROBERT MENENDEZ, NEW JERSEY
BENJAMIN L. CARDIN, MARYLAND
JEANNE SHAHEEN, NEW HAMPSHIRE
CHRISTOPHER A. COONS, DELAWARE
TOM UDALL, NEW MEXICO
CHRISTOPHER MURPHY, CONNECTICUT
TIM KAINE, VIRGINIA
EDWARD J. MARKEY, MASSACHUSETTS
JEFF MERKLEY, OREGON
CORY A. BOOKER, NEW JERSEY

# United States Senate

COMMITTEE ON FOREIGN RELATIONS

WASHINGTON, DC 20510–6225

August 8, 2018

Honorable Robert W. Ferguson
Attorney General of Washington
800 Fifth Avenue, Suite 2000
Seattle, WA 98104

Dear Attorney General Ferguson:

I write regarding the U.S. Department of State's temporary modification of the International Traffic in Arms Regulation (ITAR), and to express my grave concern about the Department's decision to permit Defense Distributed and its associates to publish on the Internet computer code for the printing of 3D firearms, particularly without providing the statutorily-required notice to Congress.

Section 38(f) of the Arms Export Control Act, 22 U.S.C. § 2778(f), prohibits the Department from removing any item from the U.S. Munitions List (USML) without providing 30 days' notice to the House Committee on Foreign Affairs and the Senate Committee on Foreign Relations (the Committee). However, the Department failed to provide the Committee the required notice before issuing the temporary modification to ITAR and before sending the letter approving for public release the computer blueprints for printing 3D guns.

On July 25, 2018, I wrote to the Secretary of State expressing my disapproval of the Department's actions and its failure to notify Congress as required by § 2778(f). I called on the Secretary to immediately review and reconsider the Department's position, and in particular, expressed my concern that the Department's "temporary" suspension allowing Internet publication of export-controlled technical information, and therefore distribution worldwide, was tantamount to a permanent removal of an item from the USML. I also expressed my concern that allowing computer code for 3D printing of firearms to be distributed around the world would make the work of U.S. and international law enforcement and counter-terrorism agencies more difficult, and would heighten the risk to innocent Americans, particularly in light of school, church, public park and other mass shootings.

The Arms Export Control Act provides a legal oversight role for Congress regarding proposed removals from the USML. The required notices enable Congress to exercise its constitutional oversight authority and ensure national security.

Historically, the Department typically accords the Committee more deference in the review process than even 22 U.S.C. § 2778(f) provides. Often, the Department gives additional time beyond the 30 days' notice to the Committee when it proposes to remove items from the USML, frequently up to 60 days. During this period, the Department is in close contact with Congress to explain the rationale for the removal and address any questions. It meets regularly with

appropriate staff, explains what it is seeking to remove from the list and why, and details the reasons the removal will not endanger national security or U.S. interests. The Department would also inform the Committee if the Department of Defense concurred with a proposed removal. In contrast, there was no such consultation or explanation regarding the Department's actions at issue in this case. This is especially alarming given the intense level of interest and scrutiny that my colleagues and I have demonstrated regarding the pending regulatory proposal to move the regulation of small arms and other light weapons from the Department of State's jurisdiction to the Department of Commerce. *See* Proposed Rule, ITAR: USML Categories I, II, and III, 83 Fed. Reg. 24,198; 83 Fed. Reg. 24,166 (May 24, 2018). I and other colleagues have filed public comments lodging our concerns with that proposal, and in particular the fact that it would result in reduced oversight over the export of these firearms. *See* Comment on Proposed Rule, ITAR: USML Categories I, II, and III (July 9, 2018). Had we received notice of the Department's proposal to exempt the computer code for 3D printing of firearms from the ITAR, I certainly would have voiced my vociferous public opposition much earlier, and would have worked to prevent it from occurring.

The Department's failure to comply with 22 U.S.C. § 2778(f) deprived us of the opportunity to conduct effective oversight before approving public release of these blueprints. Given the grave national security considerations at issue, I find the Department's decision and process to allow the release of these blueprints very concerning. The Department's actions not only circumvented the statutory notice requirement but diverged from established practice when items are proposed for removal from the USML.

I remain alarmed at the prospect that these 3D gun blueprints could still make their way into the hands of terrorist groups around the world who are seeking easier access to guns, and I continue to appeal to the Department to reverse this misguided and dangerous decision.

Sincerely,

Robert Menendez
Ranking Member

CC:
Gurbir S. Grewal
Attorney General of New Jersey

George Jepsen
Attorney General of Connecticut

Brian E. Frosh
Attorney General of Maryland

Barbara D. Underwood
Attorney General of New York

Maura Healey
Attorney General of Commonwealth of Massachusetts

Josh Shapiro
Attorney General of Commonwealth of Pennsylvania

Karl A. Racine
Attorney General for the District of Columbia

Exhibit 10

BOB CORKER, TENNESSEE, CHAIRMAN

JAMES E. RISCH, IDAHO
MARCO RUBIO, FLORIDA
RON JOHNSON, WISCONSIN
JEFF FLAKE, ARIZONA
CORY GARDNER, COLORADO
TODD YOUNG, INDIANA
JOHN BARRASSO, WYOMING
JOHNNY ISAKSON, GEORGIA
ROB PORTMAN, OHIO
RAND PAUL, KENTUCKY

ROBERT MENENDEZ, NEW JERSEY
BENJAMIN L. CARDIN, MARYLAND
JEANNE SHAHEEN, NEW HAMPSHIRE
CHRISTOPHER A. COONS, DELAWARE
TOM UDALL, NEW MEXICO
CHRISTOPHER MURPHY, CONNECTICUT
TIM KAINE, VIRGINIA
EDWARD J. MARKEY, MASSACHUSETTS
JEFF MERKLEY, OREGON
CORY A. BOOKER, NEW JERSEY



**United States Senate**

COMMITTEE ON FOREIGN RELATIONS

WASHINGTON, DC 20510–6225

July 25, 2018

The Honorable Michael Pompeo
Secretary of State
U.S. Department of State
2201 C Street NW
Washington, DC 20520

Dear Secretary Pompeo:

The Department of State is about to permit the public, worldwide release of dangerous information on the 3D printing of functional firearms that are undetectable by standard security measures. Such a release would allow any foreign or domestic person, including arms traffickers, terrorists, transnational criminals, and domestic abusers to effectively "download" a gun, making it much easier to evade security measures and obtain a weapon. This decision is not only alarming and irresponsible, but one that appears to evade statutory requirements and skirts an ongoing regulatory review process.

Recently, the Department settled a lawsuit by a U.S. firm seeking to post blueprints and other information on the Internet that would allow anyone with a 3D printer to create plastic firearms. Based on reports of the terms of the settlement, the Department has now agreed that the information can be exempt from the export licensing requirements of the International Trafficking in Arms Regulations (ITAR). Even more troubling, the Department also agreed to temporarily suspend the relevant ITAR restrictions to allow this otherwise prohibited dissemination.

Yet this "temporary" suspension will effectively allow a permanent and continuing export. Once posted on the Internet, these files will be shared, downloaded, and used to create firearms. As such, this action is tantamount to a permanent removal of an item from the United States Munitions List, but without the 30-day notice to the Senate Foreign Relations Committee and House Foreign Affairs Committee as required by the Arms Export Control Act.

It is hard to see how making it easier for criminal and terrorist organizations to obtain untraceable weapons is in the foreign policy and national security interests of the United States. This action by the State Department makes the work of U.S. and international law enforcement and counter-terrorism agencies—and the U.S. Transportation Security Agency—all the more difficult and heightens the risk to innocent Americans and others from terrorist and extremist attacks. Moreover, the domestic risk cannot be understated, especially with the high rates of gun violence in our schools, churches, clubs and public gathering places. The release of these blueprints permits anyone, even those banned from gun ownership due to a criminal

conviction, to build their own gun.  These "ghost guns" also pose a problem for law enforcement as such firearms lack a serial number and are thus untraceable.

Given the far-reaching and dangerous consequences of this decision, I urge you to immediately review and reconsider the Department's position, and to ensure that this and any other decision regarding arms export control complies fully with the letter and spirit of the Arms Export Control Act.  Further, any release should not occur until the Department, Congress, and the public have ample time to review the consequences of this action.

Sincerely,

Robert Menendez
Ranking Member

Exhibit 11

# United States Senate
WASHINGTON, DC 20510

July 26, 2018

The Honorable Mike Pompeo
Secretary of State
U.S. Department of State
2201 C Street N.W.
Washington, DC 20520

Dear Secretary Pompeo:

We write with great alarm regarding the decision last month by the Department of Justice (DOJ) to settle the lawsuit brought against the State Department by the gun rights advocacy groups Defense Distributed and the Second Amendment Foundation. We urge the State Department not to allow Defense Distributed to publish online blueprints for undetectable, three-dimensional ("3-D") printable firearms.

In 2015, Defense Distributed and the Second Amendment Foundation sued the State Department, challenging the State Department's determination that Defense Distributed violated federal export controls and its demand that Defense Distributed remove from the internet its blueprints for 3-D printable firearms. Throughout the course of the lawsuit, the government maintained that its position was well-supported under the Arms Export Control Act and the International Traffic in Arms Regulations (ITAR). Indeed, as recently as April 2018, the Trump administration filed a motion to dismiss the suit in which it argued that "[w]hatever informational value there may be in the process by which 3-D printing occurs," Defense Distributed's Computer Aided Design files "are indispensable to a [3-D] printing process used to create firearms and their components," and "are also functional, directly facilitate the manufacture of weapons, and may properly be regulated for export."[1]

Despite the court's twice siding with the government's position, in a stunning reversal of course last month, DOJ settled the suit and agreed to allow for the public release of Defense Distributed's 3-D firearm printing blueprints in any form. Specifically, the State Department has agreed to allow Defense Distributed to publish its blueprints by July 27, 2018 — by making a "temporary modification" of the United States Munitions List (USML) and granting Defense Distributed an "exemption" from ITAR regulations. The administration also made the puzzling decision to pay nearly $40,000 in legal fees to the plaintiffs using taxpayer dollars.

This settlement is inconsistent with the administration's previous position and is as dangerous as it is confounding. The settlement will allow these blueprints to be posted online for unlimited distribution to anyone — including felons and terrorists — both here in the United States and

---

[1] *Defense Distributed v. U.S. Dep't of State*, Case 1:15-cv-00372-RP, Defs.' Mot. Dismiss Second Am. Compl., at 1 (W.D. Tex. Apr. 6, 2018).

Secretary Pompeo
Page 2 of 4

abroad. It also sets a dangerous precedent in defending against challenges to other legally sound determinations made by the State Department under the Arms Export Control Act and ITAR.

Yesterday, in response to questioning by Senator Markey before the Senate Foreign Relations Committee, you committed to reviewing the decision to allow Defense Distributed to publish its blueprints online. In accordance with this commitment, we ask that you suspend the special treatment given to Defense Distributed while you undertake this review.

In addition to suspending these actions, we ask that, prior to August 1, 2018, the State Department provide us with a written explanation and briefing on the reasoning behind the decision to settle this litigation in the manner it did. The American people have a right to know why their government agreed to such a dangerous outcome.

Specifically we request a response to the following questions:

1. Does the State Department no longer believe that the online publication of blueprints for the 3-D printing of firearms is a violation of federal export controls? If so, when did this reversal of opinion occur and why? Was there a change in the law or the facts that prompted this change? If so, please explain the change in either the law or facts that prompted the change.

2. On May 24, 2018, the State and Commerce Departments published proposed rules to amend Categories I, II, and III of the USML and transfer from the State Department to the Commerce Department oversight over export of certain firearms, ammunition, and related items. What role did the Defense Distributed litigation play in deciding to publish these proposed rules? What analysis, if any, did the State and Commerce Departments undertake to evaluate the potential risks of the proposed rules changes on export controls on the online publication of blueprints for 3-D printed firearms? If the State Department did evaluate the risks, what risks were identified? Please identify the individuals involved in that analysis.

3. If these proposed rules are finalized and jurisdiction over technical data related to the design, production, or use of semi-automatic or military-style firearms is transferred to the Commerce Department, the release into the public domain of instructions for printing 3-D firearms will be permissible. Does the State Department have concerns about the dangerous consequences of this rules change? Did the State Department make the Commerce Department aware of the litigation between it and Defense Distributed and the Second Amendment Foundation, the terms of the settlement, or the consequences of online publication of blueprints for 3-D printed firearms? If so, please identify to whom and how that information was conveyed.

4. Given the risks of the government abdicating control over the online publication of blueprints for 3-D printed firearms, why did the State Department agree to move forward with the rulemaking? How does the State Department plan to mitigate these risks?

Secretary Pompeo
Page 3 of 4

5. The settlement agreement resolving the lawsuit brought by Defense Distributed and the Second Amendment Foundation obligates the State Department to "draft and fully pursue . . . the publication in the Federal Register of a notice of proposed rulemaking and final rule, revising USML Category I to the technical data that is the subject of the" litigation. Why did the State Department agree to this relief?

6. The settlement agreement resolving the lawsuit brought by Defense Distributed and the Second Amendment Foundation obligates the State Department, "while the above-referenced final rule is in development," to announce "a temporary modification, consistent with the International Traffic in Arms Regulations (ITAR), 22 C.F.R. § 126.2, of USML Category I to exclude the technical data that is the subject of the" litigation, and to publish the announcement on the website of the Directorate of Defense Trade Controls on or before July 27, 2018. Why did the State Department agree to this relief? What will this temporary modification likely entail? Will the State Department put any restrictions on the types of 3D technical data that can be released to the public without prior U.S. government approval, including types of firearms, 3D printing, and materials, among other possible issues? Why did the State Department fail to provide 30 days' notice to the relevant congressional committees of its intention to remove Defense Distributed's "technical data" from the USML, as required by 22 U.S.C. § 2278(f)(1)?

7. The settlement agreement resolving the lawsuit brought by Defense Distributed and the Second Amendment Foundation obligates the State Department to issue "a letter to Plaintiffs on or before July 27, 2018 signed by the Deputy Assistant Secretary for Defense Trade Controls, advising that [the 3-D printing files at issue in the litigation] are approved for public release (i.e., unlimited distribution) in any form and are exempt from the licensing requirements of ITAR because they satisfy the criteria of 22 C.F.R. § 125.4(b)(13)." Why did the State Department agree to this relief?

8. The settlement agreement resolving the lawsuit brought by Defense Distributed and the Second Amendment Foundation obligates the State Department to "acknowledg[e] and agree[] that the temporary modification of USML Category I permits any United States person . . . to access, discuss, use, reproduce, or otherwise benefit from the technical data that is the subject of the Action, and that the letter to Plaintiffs permits any such person to access, discuss, use, reproduce[,] or otherwise benefit from the" 3-D printing files at issue in the litigation. Why did the State Department agree to this relief?

9. The settlement agreement resolving the lawsuit brought by Defense Distributed and the Second Amendment Foundation obligates the State Department to pay the Plaintiffs $39,581.00, reported to be for a portion of their legal fees. Please identify what funding source within the government this payment was drawn from. Additionally, please provide information regarding why the State Department agreed to this relief.

We are concerned about the immediate impact of publishing these 3-D gun blueprints: Once the State Department allows them to circulate freely online, the threats to U.S. and international security will be irreversibly increased. We urge you not to grant this special treatment to Defense

Secretary Pompeo
Page 4 of 4

Distributed — but rather to postpone this action while you fulfill your commitment to review this decision, and until the above questions can be adequately addressed.

Thank you for your prompt attention to this matter. Should you have any questions about this request, please contact Callan Bruzzone of Senator Markey's staff at 202-224-2742.

Sincerely,

Edward J. Markey
United States Senator

Bill Nelson
United States Senator

Richard Blumenthal
United States Senator

Christopher S. Murphy
United States Senator

Dianne Feinstein
United States Senator

Elizabeth Warren
United States Senator

Patrick Leahy
United States Senator

Richard J. Durbin
United States Senator

Benjamin L. Cardin
United States Senator

Exhibit 12

EDWARD R. ROYCE, CALIFORNIA
CHAIRMAN

AMY PORTER        THOMAS SHEEHY
CHIEF OF STAFF    STAFF DIRECTOR

ELIOT L. ENGEL, NEW YORK
RANKING DEMOCRATIC MEMBER

JASON STEINBAUM
DEMOCRATIC STAFF DIRECTOR



**One Hundred Fifteenth Congress**
**U.S. House of Representatives**
**Committee on Foreign Affairs**
2170 Rayburn House Office Building
Washington, DC 20515
www.foreignaffairs.house.gov

July 31, 2018

The President
The White House
Washington, DC 20500

Dear Mr. President:

I am encouraged by your tweet this morning regarding 3D-printed guns, and urge your Administration to act swiftly to keep Americans safe and protect our vital national interests abroad.

As you know, the State Department recently reached an agreement with Defense Distributed that will allow the Texas-based company to publish blueprints for making 3D-printed guns on its website. This settlement requires the government to change export restrictions that have long been in place to prevent this sensitive technical data from getting into the hands of those overseas that would do us harm.

I am very concerned that the distribution of these blueprints could allow terrorists and international criminal organizations to manufacture guns that can't be detected at current security checkpoints in airports, schools, and public buildings. These weapons will not be tagged by serial numbers, making them challenging to trace. This also could undermine U.S. laws that seek to stop the flow of weapons into war-torn countries, and other places where regimes use violence to retain power.

It is critical that our laws keep pace with technology. We can't give terrorists or violent criminals an easier path to obtaining deadly weapons. I stand ready to help support your Administration in efforts to bolster our national security.

Sincerely,

EDWARD R. ROYCE
Chairman

Exhibit 13

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | |
|---|---|
| DEFENSE DISTRIBUTED, SECOND AMENDMENT FOUNDATION, INC., and CONN WILLIAMSON, §<br><br>Plaintiffs, §<br><br>v. §<br><br>U.S. DEPARTMENT OF STATE; REX TILLERSON, in his official capacity as Secretary of State; DIRECTORATE OF DEFENSE TRADE CONTROLS, Department of State Bureau of Political Military Affairs; MIKE MILLER, in his official capacity as Acting Deputy Assistant Secretary, Defense Trade Controls, Bureau of Political Military Affairs, Department of State; and SARAH J. HEIDEMA, in her official capacity as Acting Director, Office of Defense Trade Controls Policy, Bureau of Political Military Affairs, Department of State; <br><br>Defendants. | Case No. 15-CV-372-RP<br><br>SECOND AMENDED COMPLAINT |

§ § § § § § § § § § § § § § § § § § § § § § §

SECOND AMENDED COMPLAINT

Plaintiffs Defense Distributed, Second Amendment Foundation, Inc., and Conn

Williamson, by and through undersigned counsel, complain of Defendants as follows:

INTRODUCTION

"Any system of prior restraints of expression comes to this Court bearing a heavy

presumption against its constitutional validity." *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70

(1963). The prior restraint system challenged here cannot overcome its presumption of

invalidity.

Contrary to the Justice Department's warning that such actions are unconstitutional,

Defendants unlawfully apply the International Traffic in Arms Regulations, 22 C.F.R. Part 120

*et seq.* ("ITAR") to prohibit and frustrate Plaintiffs' public speech, on the Internet and other open

forums, regarding arms in common use for lawful purposes. Defendants' censorship of

Plaintiffs' speech, and the ad hoc, informal and arbitrary manner in which that scheme is

applied, violate the First, Second, and Fifth Amendments to the United States Constitution.

Plaintiffs are entitled to declaratory and injunctive relief barring any further application of this

prior restraint scheme, and to recover money damages to compensate for the harm such

application has already caused.

*The Parties*

1.      Plaintiff Defense Distributed is a Texas corporation organized under the laws of

the State of Texas, whose headquarters are located in Austin, Texas, and whose principal place

of business is located in Austin, Texas. Defense Distributed was organized and is operated for

the purpose of defending the civil liberty of popular access to arms guaranteed by the United

States Constitution through facilitating global access to, and the collaborative production of,

information and knowledge related to the three-dimensional ("3D") printing of arms; and to

publish and distribute, at no cost to the public, such information and knowledge on the Internet

in promotion of the public interest.

2.      Plaintiff Second Amendment Foundation, Inc. ("SAF") is a non-profit

membership organization incorporated under the laws of Washington with its principal place of

business in Bellevue, Washington. SAF has over 650,000 members and supporters nationwide,

including in Texas. The purposes of SAF include promoting, securing, and expanding access to

the exercise of the right to keep and bear arms; and education, research, publishing and legal

2

action focusing on the constitutional right to privately own and possess firearms, and the consequences of gun control. SAF brings this action on behalf of its members.

3. Conn Williamson is a natural person and a citizen of the United States and the State of Washington.

4. Defendant the United States Department of State is an executive agency of the United States government responsible for administering and enforcing the ITAR under the authority of the Arms Export Control Act of 1976, 22 U.S.C. § 2778, *et seq*. ("AECA").

5. Defendant Rex W. Tillerson is sued in his official capacity as the Secretary of State. In this capacity, he is responsible for the operation and management of the United States Department of State, and this includes the operation and management of the Directorate of Defense Trade Controls ("DDTC") and administration and enforcement of the ITAR.

6. Defendant DDTC is a subordinate unit within the Department of State Bureau of Political and Military Affairs responsible for administering and enforcing the ITAR.

7. Defendant Mike Miller is sued in his official capacity as the Acting Deputy Assistant Secretary of State for Defense Trade Controls in the Bureau of Political-Military Affairs. In his official capacity, Miller is responsible for the operation and management of DDTC, and this includes administration and enforcement of the ITAR.

8. Defendant Sarah Heidema is sued in her official capacity as the Acting Director of the Office of Defense Trade Controls Policy Division. In her official capacity, she is responsible for administration of the ITAR, including ITAR's commodity jurisdiction procedures; implementation of regulatory changes as a result of defense trade reforms; and providing guidance to industry on ITAR requirements.

3

JURISDICTION AND VENUE

9.      This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C.

§§ 1331, 1343, 2201, and 2202.

10.     Venue lies in this Court pursuant to 28 U.S.C. § 1391(e)(1)(B) and (C), as a

substantial part of the events and omissions giving rise to the claim occurred, and Plaintiff

Defense Distributed resides, within the Western District of Texas.

STATEMENT OF FACTS

*Broad and Vague Scope of the ITAR*

11.     The AECA affords the President limited control over the export of "defense

articles." 22 U.S.C. § 2778(a)(1).

12.     Although the AECA does not expressly authorize control over "technical data,"

the ITAR, which implements the Act, includes "technical data" within its definition of "defense

articles." 22 C.F.R. § 120.6.

13.     The ITAR broadly defines "technical data" as information "required for the

design, development, production, manufacture, assembly, operation, repair, testing, maintenance

or modification of defense articles." 22 C.F.R. § 120.10. This includes "information in the form

of blueprints, drawings, photographs, plans, instructions or documentation" and "software"

"directly related to defense articles." *Id.*

14.     The ITAR requires advance government authorization to export technical data.

Criminal penalties for unauthorized exports of technical data and other violations of the ITAR

include, inter alia, prison terms of up to twenty (20) years and fines of up to $1,000,000 per

violation. 22 U.S.C. § 2778(c). Civil penalties include fines of over $1,000,000 per violation. 22

U.S.C. § 2778(e); 83 Fed. Reg. 234, 235 (Jan. 3, 2018).

15.      The scope of technical data subject to ITAR control, as described on the U.S.

Munitions List ("USML"), 22 C.F.R. § 121.1, is vague, ambiguous, and complex. Defendants

constantly change, often without notice, their views of what this scope entails.

16.      Americans have submitted thousands of written requests, known as "commodity

jurisdiction requests," to DDTC for official determinations as to the ITAR's scope.

*History of Defendants' Prior Restraint Scheme*

17.      From 1969 to 1984, Footnote 3 to former ITAR Section 125.11 implied that the

ITAR imposed a prepublication approval requirement on publications of privately generated

ITAR-controlled technical data, stating that "[t]he burden for obtaining appropriate U.S.

Government approval for the publication of technical data falling within the definition in §

125.01, including such data as may be developed under other than U.S. Government contract, is

on the person or company seeking publication."

18.      Beginning in 1978, the U.S. Department of Justice's Office of Legal Counsel

issued a series of written opinions advising Congress, the White House, and the Department of

State that the use of the ITAR to impose a prior restraint on publications of privately generated

unclassified information into the public domain violated the First Amendment of the United

States Constitution (the "Department of Justice memoranda").

19.      In 1980, the Department of State Office of Munitions Control, the predecessor to

Defendant DDTC, issued official guidance providing that "[a]pproval is not required for

publication of data within the United States as described in Section 125.11(a)(1). Footnote 3 to

Section 125.11 does not establish a prepublication review requirement."

20.      Thereafter, the Department of State removed Footnote 3 from the ITAR,

expressly stating its intent to address First Amendment concerns. *See* 49 Fed. Reg. 47,682 (Dec.

6, 1984). As such, to the extent the ITAR imposed any prepublication approval requirement on private, non-classified speech, the requirement was ostensibly removed in 1984.

21.     In 1995, Defendant the United States Department of State conceded in federal court that reading the ITAR as imposing a prior restraint "is by far the most **un**-reasonable interpretation of the provision, one that people of ordinary intelligence are <u>least</u> likely to assume is the case." *Bernstein v. United States Department of State, et. al.*, No. C-95-0582, 1997 U.S. Dist. Lexis 13146 (N.D. Cal. August 25, 1997).

22.     Prior to May 2013, Defendant the United States Department of State had not only disavowed the prior restraint in public notices and in federal court, it had never publicly enforced a prior restraint under the ITAR.

*The Published Files*

23.     Posting technical data on the Internet is perhaps the most common and effective means of creating and disseminating information. A cursory search on Google and other Internet search engines evidences that ITAR-controlled technical data is freely published in books, scientific journals, and on the Internet.

24.     Plaintiff Defense Distributed publishes files on the Internet as a means of fulfilling its primary missions to promote the right to keep and bear arms and to educate the public.

25.     Defense Distributed privately generated technical information regarding a number of gun-related items, including a trigger guard, grips, two receivers, a magazine for AR-15 rifles, and a handgun (the "Published Files").

6

26.     In December 2012, Defense Distributed began posting the Published Files on the

Internet for free, at no cost to the public. That publication inherently advanced Defense

Distributed's educational mission.

27.     At the time Defense Distributed posted the Published Files, there was no publicly

known case of Defendants enforcing a prepublication approval requirement under the ITAR.

28.     Notwithstanding the Department of Justice memoranda, the 1980 guidance, the

1985 ITAR amendment, Defendant the United States Department of State's representations to a

federal court in *Bernstein v. United States*, and Defendants' failure to previously enforce a

prepublication approval requirement under the ITAR, on May 8, 2013, DDTC sent Defense

Distributed a letter that warned:

> DTCC/END is conducting a review of technical data made publicly available by
> Defense Distributed through its 3D printing website, DEFCAD.org, the majority
> of which appear to be related to items in Category I of the USML. Defense
> Distributed may have released ITAR-controlled technical data without the
> required prior authorization from the Directorate of Defense Trade Controls
> (DDTC), a violation of the ITAR.

29.     At the time it posted the Published Files, Defense Distributed did not know that

DDTC would demand pre-approval of public speech. Defense Distributed believed, and

continues to believe, that the United States Constitution guarantees a right to share truthful

speech—especially speech concerning fundamental constitutional rights—in open forums.

Nevertheless, for fear of criminal and civil enforcement, Defense Distributed promptly complied

with DDTC's demands and removed all of the Published Files from its servers.

30.     The DDTC letter further directed Defense Distributed to submit the Published

Files to DDTC for review using the DDTC "commodity jurisdiction" procedure, the ITAR

procedure "used with the U.S. Government if doubt exists as to whether an article or service is

covered by the U.S. Munitions List." 22 C.F.R. § 120.4(a).

7

31.     Defense Distributed complied with DDTC's request and filed ten (10) commodity

jurisdiction requests covering the Published Files on June 21, 2013.

32.     On June 4, 2015 — nearly two years from the date of Defense Distributed's

commodity jurisdiction requests and six days before their first responsive pleading was due in

this case — Defendants issued a response to the ten commodity jurisdiction requests. They

determined that six of the Published Files, including the handgun files, were ITAR-controlled.

*The "Ghost Gunner" Files*

33.     DDTC identifies the Department of Defense Office of Prepublication Review and

Security ("DOPSR") as the government agency from which private persons must obtain prior

approval for publication of privately generated technical information subject to ITAR control.

34.     Neither the Code of Federal Regulations nor any other public law establishes a

timeline for decision, standard of review, or an appeals process for DOPSR public release

determinations.

35.     Worsening this situation, DOPSR refuses to review information that it deems is

not clearly subject to the ITAR.

36.     On September 25, 2014, Defense Distributed sent DOPSR a request for

prepublication approval for public release of files containing technical information on a machine,

named the "Ghost Gunner," that can be used to manufacture a variety of items, including gun

parts (the "Ghost Gunner Files").

37.     On October 1, 2014, DOPSR sent Defense Distributed a letter stating that it

refused to review Defense Distributed's request for approval because DOPSR was unsure

whether the Ghost Gunner was subject to the ITAR. Also in its letter, DOPSR recommended that

Defense Distributed submit another commodity jurisdiction request to DDTC.

38.     Defense Distributed submitted another commodity jurisdiction request for the Ghost Gunner to DDTC on January 2, 2015.

39.     On April 13, 2015, DDTC responded to the Ghost Gunner commodity jurisdiction request. It determined that the Ghost Gunner machine is not subject to ITAR, but that "software, data files, project files, coding, and models for producing a defense article, to include 80% AR-15 lower receivers, are subject to the jurisdiction of the Department of State in accordance with [the ITAR]." Defense Distributed did not seek a determination with respect to such files, but it did seek a determination as to whether the software necessary to build and operate the Ghost Gunner machine is ITAR-controlled. DDTC subsequently clarified that such software is, like the machine itself, not subject to ITAR controls, but reiterated its ruling with respect to files related to the production of a "defense article."

*Prior Restraint on CAD Files*

40.     Since September 2, 2014, Defense Distributed has made multiple requests to DOPSR for prepublication review of certain computer-aided design ("CAD") files.

41.     On December 31, 2014, nearly four months after Defense Distributed submitted the first of the CAD review requests, DOPSR sent Defense Distributed two letters dated December 22, 2014, stating that it refused to review the CAD files. DOPSR's decision was made, in whole or in part, with specific direction from DDTC.

42.     The DOPSR letter directed Defense Distributed to the DDTC Compliance and Enforcement Division for further questions on public release of the CAD files. However, because this is not the DDTC division responsible for issuing licenses or other forms of DDTC authorization, on January 5, 2015, Defense Distributed sent a written request to DDTC for guidance on how to obtain authorization from DDTC Compliance for release of the CAD files.

9

43.     To date, DDTC has not responded to Defense Distributed's request for guidance on how to obtain authorization from DDTC Compliance for release of the CAD files.

*Prior Restraint on Other Files*

44.     Defense Distributed has and will continue to create and possess other files that contain technical information, to include design drawings, rendered images, written manufacturing instructions, and other technical information that Defense Distributed intends to post to public forums on the Internet. Many of these files are described in the USML.

45.     Plaintiff SAF's members, including, e.g., Conn Williamson and Peter Versnel, have a keen interest in accessing, studying, sharing, modifying, and learning from Defense Distributed's various files, as well as similar 3D printing files related to firearms that they or others have created. They would access and share these files on the Internet, and use the files for various purposes, including the manufacture of firearms of the kind in common use that they would keep operable and use for self-defense, but cannot do so owing to the prepublication approval requirement. But for DDTC's prepublication approval requirement on such files, SAF would expend its resources to publish and promote, on the Internet, the distribution of Defense Distributed's various files, and similar files generated by its members and others.

*High Price Tag for Public Speech Licenses*

46.     The ITAR requires that any person who engages in the United States in the business of exporting technical data to register with the DDTC. *See* 22 C.F.R. § 122.1(a). For the purpose of the ITAR, engaging in such a business requires only one occasion of exporting technical data. *Id.*

47.     DDTC Registration is a precondition to the issuance of any license or other approval under the ITAR. *See* 22 C.F.R. § 122.1(c).

48.     The base fee for DDTC registration is $2,250.00 a year. *See* 22 C.F.R. § 122.3(a). This fee increases based on the number of licenses requested in the previous year.

*Great, Irreparable, and Continuing Harm*

49.     But for DDTC's impositions upon the distribution of the Published Files, Ghost Gunner Files, CAD Files, and Defense Distributed's other files (collectively, the "Subject Files"), Plaintiffs would freely distribute the Subject Files. Plaintiffs refrain from distributing the Subject Files because they reasonably fear that Defendants would pursue criminal and civil enforcement proceedings against Plaintiffs for doing so.

50.     DDTC's acts have thus caused irreparable injury to Plaintiffs, their customers, visitors, and members, whose First, Second, and Fifth Amendment rights are violated by DDTC's actions.

COUNT ONE

ULTRA VIRES GOVERNMENT ACTION

51.     Paragraphs 1 through 50 are incorporated as though fully set forth herein.

52.     The Defendants' imposition of the prepublication requirement, against any non-classified privately-generated speech, including on (but not limited to) the Subject Files, lies beyond any authority conferred upon them by Congress under the AECA, as confirmed by the 1985 ITAR amendment. Accordingly, Defendants' imposition of the prepublication approval requirement is ultra vires and Plaintiffs are entitled to injunctive relief against Defendants' application of the prepublication approval requirement.

## COUNT TWO

### RIGHT OF FREE SPEECH—U.S. CONST. AMEND. I

53.     Paragraphs 1 through 52 are incorporated as though fully set forth herein.

54.     Defendants' prepublication approval requirement is invalid on its face, and as applied to Plaintiffs' public speech, as an unconstitutional prior restraint on protected expression.

55.     Defendants' prepublication approval requirement is invalid on its face, and as applied to Plaintiffs' public speech, as overly broad, inherently vague, ambiguous, and lacking adequate procedural protections.

56.     Defendants' prepublication approval requirement is invalid as applied to Defense Distributed's posting of the Subject Files, because Defendants have selectively applied the prior restraint based on the content of speech and/or the identity of the speaker.

57.     Defendants' interruption and prevention of Plaintiffs from publishing the subject files, under color of federal law, violates Plaintiffs' rights under the First Amendment to the United States Constitution, causing Plaintiffs, their customers, visitors and members significant damages. Plaintiffs are therefore entitled to injunctive relief against Defendants' application of the prior restraint.

## COUNT THREE

### RIGHT TO KEEP AND BEAR ARMS—U.S. CONST. AMEND. II

58.     Paragraphs 1 through 57 are incorporated as though fully set forth herein.

59.     The fundamental Second Amendment right to keep and bear arms inherently embodies two complimentary guarantees: the right to acquire arms, and the right to make arms.

60.     If one cannot acquire or create arms, one cannot exercise Second Amendment rights. Infringing upon the creation and acquisition of arms of the kind in common use for

traditional lawful purposes violates the Second Amendment. *District of Columbia v. Heller*, 554 U.S. 570, 627 (2008).

61.     By maintaining and enforcing the prepublication approval requirement and forbidding Plaintiffs from publishing the subject files, which enable the lawful manufacture of firearms, Defendants are violating the Second Amendment rights of Plaintiffs, their customers, members, and visitors. Plaintiffs are therefore entitled to injunctive relief against Defendants' application of the prior restraint.

COUNT FOUR

RIGHT TO DUE PROCESS OF LAW— U.S. CONST. AMEND. V

62.     Paragraphs 1 through 61 are incorporated as though fully set forth herein.

63.     The Due Process Clause of the Fifth Amendment to the United States Constitution requires the Government to provide fair notice of what is prohibited, prohibits vague laws, and prevents arbitrary enforcement of the laws.

64.     On its face, Defendants' prepublication approval requirement is overly broad, vague, arbitrary, and lacks adequate procedural safeguards. Plaintiffs are therefore entitled to injunctive relief against Defendants' application of the prior restraint.

65.     As applied to Defense Distributed, Defendants' imposition of the prepublication approval requirement, failure to clearly describe the information subject to the prior restraint, and failure to provide a process for timely review of Defense Distributed's speech have deprived Defense Distributed of its right to fair notice of what is required under the law and adequate process, in violation of the Fifth Amendment. Defense Distributed is therefore entitled to injunctive relief against Defendants' application of the prior restraint.

PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that judgment be entered in their favor and against

Defendants as follows:

1.      A declaration that Defendants' prepublication approval requirement for privately

generated unclassified information is, on its face and as applied to Plaintiffs' public speech, null

and void, and of no effect, as an unconstitutional Ultra Vires government action.

2.      A declaration that Defendants' prepublication approval requirement for privately

generated unclassified information, on its face and as applied to Plaintiffs' public speech, to

include Internet postings of the Subject Files, violates the First Amendment to the United States

Constitution;

3.      A declaration that Defendants' prepublication approval requirement for privately

generated unclassified information, on its face and as applied to public speech, to include the

Internet posting of files used in the production of arms of the kind in common use for traditional

lawful purposes, including but not limited to the Subject Files, violates the Second Amendment

to the United States Constitution;

4.      A declaration that Defendants' prepublication approval requirement for privately

generated unclassified information, on its face and as applied to Plaintiffs' public speech, to

include Internet postings of the Subject Files, violates the Fifth Amendment to the United States

Constitution;

5.      An order permanently enjoining Defendants, their officers, agents, servants,

employees, and all persons in active concert or participation with them who receive actual notice

of the injunction, from enforcing the prepublication approval requirement against public speech

on privately generated unclassified information;

6.      An order permanently enjoining Defendants, their officers, agents, servants,

employees, and all persons in active concert or participation with them who receive actual notice

of the injunction, from enforcing the prepublication approval requirement against Plaintiffs'

public speech, to include Internet postings of the Subject Files;

7.      Attorney fees and costs pursuant to 28 U.S.C. § 2412; and

8.      Any other further relief as the Court deems just and appropriate.

Dated: January 31, 2018                         Respectfully submitted,

/s/ Alan Gura
Alan Gura
Virginia Bar No. 68842*
Gura PLLC
916 Prince Street, Suite 107
Alexandria, Virginia 22314
703.835.9085/Fax 703.997.7665
alan@gurapllc.com


/s/ Matthew Goldstein
Matthew Goldstein
D.C. Bar No. 975000*
Matthew A. Goldstein, PLLC
1875 Connecticut Avenue, N.W.
10th Floor
Washington, DC 20009
202.550.0040/Fax 202.683.6679
matthew@goldsteinpllc.com


/s/ David S. Morris
William T. "Tommy" Jacks
Texas State Bar No. 10452000
David S. Morris
Texas State Bar No. 24032877
FISH & RICHARDSON P.C.
One Congress Plaza, Suite 810
111 Congress Avenue
Austin, Texas 78701
512.472.5070/Fax 512.320.8935
jacks@fr.com
dmorris@fr.com

/s/ William B. Mateja
William B. Mateja
Texas State Bar No. 13185350
POLSINELLI P.C.
2950 N. Harwood, Suite 2100
Dallas, Texas 75201
214.397.0030/Fax 214.397.0033
Mateja@polsinelli.com


/s/ Josh Blackman
Josh Blackman
Virginia Bar No. 78292
1303 San Jacinto Street
Houston, Texas 77002
202.294.9003/Fax: 713.646.1766
joshblackman@gmail.com

*Admitted pro hac vice

Exhibit 14

Startups

Apps

Gadgets

Events

Videos

Crunchbase

More

# Court victory legalizes 3D-printable gun blueprints

**Devin Coldewey**  @techcrunch  /  Jul 10, 2018

Search

Tesla

Amazon

Facebook

Disrupt SF 2018



A multi-year legal battle over the ability to distribute computer models of gun parts and replicate them in 3D printers has ended in defeat for government authorities who sought to prevent the practice. Cody Wilson, the gunmaker and free speech advocate behind the lawsuit, now intends to expand

**Login** / **Sign up**

his operations, providing printable gun blueprints to all who desire them.

The longer story of the lawsuit is well told by Andy Greenberg over at Wired, but the decision is eloquent on its own. The fundamental question is whether making 3D models of gun components available online is covered by the free speech rights granted by the First Amendment.

This is a timely but complex conflict because it touches on two themes that happen to be, for many, ethically contradictory. Arguments for tighter restrictions on firearms are, in this case, directly opposed to arguments for the unfettered exchange of information on the internet. It's hard to advocate for both here: restricting firearms and restricting free speech are one and the same.

That at least seems to be conclusion of the government lawyers, who settled Wilson's lawsuit after years of court battles. In a copy of the settlement provided to me by Wilson, the U.S. government agrees to exempt "the technical data that is the subject of the Action" from legal restriction. The modified rules should appear in the Federal Register soon.

What does this mean? It means that a 3D model that can be used to print the components of a working firearm is legal to own and legal to distribute. You can likely even print it and use the product — you just can't sell it. There are technicalities to the law here (certain parts are restricted, but can be sold in an incomplete state, etc.), but the implications as regards the files themselves seems clear.

Startups
Apps
Gadgets
Events
Videos
___

Advertisement

More

Search

Tesla
Amazon
Facebook
Disrupt SF 2018

Login / Sign up

Case 2:18-cv-01115-RSL   Document 44-1   Filed 08/09/18   Page 183 of 266



Startups

Apps

Gadgets

Events

Videos

—

Crunchbase

More

Search

Tesla

Amazon

Featured DEFCAD,

Disrupt SF 2018

Wilson's original vision, which he is now pursuing free of legal obstacles, is a repository of gun models, called DEFCAD, much like any other collection of data on the web, though naturally considerably more dangerous and controversial.

"I currently have no national legal barriers to continue or expand DEFCAD," he wrote in an email to TechCrunch. "This legal victory is the formal beginning to the era of downloadable guns. Guns are as downloadable as music. There will be streaming services for semi-automatics."

The concepts don't map perfectly, no doubt, but it's hard to deny that with the success of this lawsuit, there are few legal restrictions to speak of on the digital distribution of firearms. Before it even, there were few *technical* restrictions: certainly just as you could download MP3s on Napster in 2002, you can download a gun file today.

**Login / Sign up**

Gun control advocates will no doubt argue that greater availability of lethal weaponry is the opposite of what is needed in this country. But others will point out that in a way this is a powerful example of how liberally free speech can be defined. It's important to note that both of these things can be true.

This court victory settles one case, but marks the beginnings of many another. "I have promoted my values for years with great care and diligence," Wilson wrote. It's hard to disagree with that. Those whose values differ are free to pursue them in their own way; perhaps they too will be awarded victories of this scale.

Startups

Apps

Gadgets

Events

Videos

—

Crunchbase

More

**Search**

Tesla

Amazon

Facebook

Disrupt SF 2018

**View Comments (13)**

# Disrupt SF 2018
# Save up to $500

**San Francisco**
Sep 5 - 7

**Get Passes Now**



Login / Sign up

AdChoices ▷

https://tcrn.ch/2uoztBC    Copy

Startups

Apps

Gadgets

Events

Videos

—

Crunchbase

More

**Tags**

Gadgets

Lawsuit

3d printing

Government

Security

guns

**Search** 🔍

## Amazon launches grocery pickup at select Whole Foods

20 minutes ago   Sarah Perez

Tesla

Amazon

Facebook

Disrupt SF 2018

## Slack is raising $400M+ with a post-money valuation of $7B or more

1 hour ago   Ingrid Lunden, Josh Constine



## Twitter defends its decision to keep the Alex Jones conspiracy factory around

2 hours ago   Taylor Hatmaker



## Salesforce promotes COO Keith Block to co-CEO alongside founder Marc Benioff

2 hours ago   Jon Russell



**Login / Sign up**

## Apple's response to Congressional privacy inquiry is mercifully free of horrifying revelations

3 hours ago    **Devin Coldewey**



Startups

Apps

Gadgets

## AT&T is now the sole owner of Otter Media

5 hours ago    **Anthony Ha**



Events

Videos

—

Crunchbase

## Otto co-founder Lior Ron is back at Uber

6 hours ago    **Sarah Buhr**



More

**Search**

Tesla

Amazon

## Baobab Studios CEO Maureen Fan to speak at TechCrunch AR/VR Sessions

6 hours ago    **Lucas Matney**

Facebook

Disrupt SF 2018



## Autonomous drones could herd birds away from airports

7 hours ago    **Devin Coldewey**



## Don't fear the big company 'kill zones'

7 hours ago    **Ed Byrne**



## Snapchat gets $250M investment from Saudi prince for 2.3%

**Login / Sign up**

7 hours ago  **Josh Constine**



Startups

Apps

Gadgets

Events

Videos

—

Crunchbase

More

### Coinbase adds instant trading, and increases daily limits

8 hours ago  **Taylor Hatmaker**



Search

Tesla

Amazon

Facebook

Disrupt SF 2018



### Snapchat shrinks by 3M users to 188M despite strong Q2

8 hours ago  **Josh Constine**

### Oracle launches autonomous database for online transaction processing

8 hours ago  **Ron Miller**



**Login** / Sign up

## Elon Musk explains why taking Tesla private is 'the best path forward'

8 hours ago   **Megan Rose Dickey**



Startups

Apps

Gadgets

Events

Videos

—

Crunchbase

More

Search ⌕

Tesla

Amazon

Facebook

Disrupt SF 2018



## Net neutrality activists, not hackers, crashed the FCC's comment system

8 hours ago   **Devin Coldewey**



**Login** / **Sign up**

# June's Second-Gen Oven Starts At $599

8 hours ago  **TC Video**

# Apple Music users spot 'Friends Mix,' a new personalized playlist of friends' tunes

9 hours ago  **Sarah Perez**

Startups

Apps

Gadgets

Events

Videos

—

Crunch

More

Search 🔍



# CrunchMatch is open for business at Disrupt SF 2018

9 hours ago  **Emma Comeau**

# MailChimp bans Alex Jones for hateful conduct

9 hours ago  **Natasha Lomas**

Tesla

Amazon

Facebook

Disrupt SF 2018

**Privacy Policy (Updated)**    **About Our Ads**    **Code of Conduct**    **Terms of Service (Updated)**

© 2013-2018 Oath Tech Network. All rights reserved. Powered by WordPress VIP. Fonts by TypeKit.

**Login / Sign up**

Exhibit 15



# The battle to stop 3D-printed guns, explained

**Policymakers are trying to stop the spread of firearms that could bypass federal and state laws.**

By **German Lopez** | **@germanrlopez** | **german.lopez@vox.com** | Updated Aug 1, 2018, 11:44am EDT



**A 3D-printed gun.** | Keith Beaty/Toronto Star via Getty Images

With 3D printers, getting a gun could be as easy as downloading it. A person could find a schematic for a firearm online, plug it into a 3D printer with the right materials, and boom — a gun is created on the spot. No background check required, no serial number to trace the gun if it's used in a crime.

Some policymakers, however, are trying to prevent 3D-printed guns from going mainstream. On Tuesday, they landed a big victory: US District Judge

Robert Lasnik in Seattle issued a restraining order that effectively halted a company's plans to release 3D-printed gun designs online, arguing, "There is a possibility of irreparable harm because of the way these guns can be made."

The order followed President Donald Trump's comments raising concerns about 3D-printed guns. Trump had tweeted on Tuesday morning, "I am looking into 3-D Plastic Guns being sold to the public. Already spoke to NRA, doesn't seem to make much sense!"

The wide release of the 3D-printed gun blueprints, however, has only become an issue now in large part due to the Trump administration.

The previous administration, under President Barack Obama, had forced libertarian Cody Wilson to stop publishing these blueprints on his website, Defcad.com. Wilson sued the administration in hopes of republishing his schematics. The case seemed like an easy win for the government, with multiple courts initially ruling in the government's favor.

But once the Trump administration came in, with its gun-friendly politics, the Justice Department abruptly agreed to a settlement — giving Wilson and his nonprofit, Defense Distributed, "essentially everything they wanted," Andy Greenberg reported for Wired. The deal allowed Wilson to publish his blueprints starting in August, *and* paid him $40,000 for his legal costs.

A court, however, put Wilson's plans on hold.

Yet even if the court order holds up, there's a question of just how much this is delaying the inevitable. As 3D printing technology improves, experts are worried that these guns will become cheap, accessible, and, crucially for would-be criminals, untraceable. And as much as any government may try, it's very hard to stop the flow of information on the internet — and, in fact, some of these 3D-printed gun designs are already available online right now.

## Why 3D-printed guns are getting attention now

Concerns about 3D-printed guns have been around since the dawn of 3D printing, which essentially lets anyone plug in a blueprint and, with the right materials, the product is, well, printed out. (Mashable has a **good explainer on 3D printers**.)

But a few things have held back the fears from becoming reality. For one, 3D printing is fairly expensive. The most robust printers, which would likely be required for a demanding product like a gun, can cost thousands of dollars. And even if someone has a 3D printer, the quality of the printed product can be shoddy, and that person may not have the knowhow or blueprints to actually design and print out a functioning gun.

Some of those problems — cost and quality — will be solved over time, as 3D printing technology inevitably becomes cheaper and better.

The remaining problem is what Cody Wilson was interested in solving on his own: In 2013, Wilson created what, **according to Wired**, is believed to be the first fully 3D-printed gun. Once Wilson successfully tested it, he uploaded the blueprint to his website.

That's when the Obama administration stepped in. Leveraging rules in the International Trade in Arms Regulations, the State Department essentially accused Wilson of exporting weapons without a license. This forced Wilson to take Defcad offline, and he faced the possibility of fines and jail time.

Wilson, however, did not give up. He sued the Obama administration, arguing that barring him from publishing the blueprints inhibited his First Amendment rights. Many outside observers believed Wilson would lose, with courts in preliminary rulings coming out against him.

For Wilson, this was not just a business opportunity — it was a political crusade. To get an idea of Wilson's politics here, consider that he expected Hillary Clinton would win the White House in 2016 and, when she did, she would begin a mass-scale crackdown on firearms in the US. That would force Wilson, in his view, to take a stand, **Wired reported**:

> If that happened, as Wilson tells it, he was ready to launch his Defcad
> repository, regardless of the outcome of his lawsuit, and then defend it in an
> armed standoff. "I'd call a militia out to defend the server, Bundy-style," Wilson
> says calmly, in the first overt mention of planned armed violence I've ever heard
> him make. "Our only option was to build an infrastructure where we had one final
> suicidal mission, where we dumped everything into the internet," Wilson says.

But Wilson never had to make his stand. Clinton did not win the presidency.
And, in fact, the new administration, led by Trump, backed off its legal
threats to Wilson entirely — letting him move forward with publishing his
3D-printed gun blueprints on Wednesday, August 1.

The upcoming publication terrified lawmakers around the country. State
attorneys general across the country pushed for courts to block the release
of the blueprints. They succeeded, at least temporarily, on Tuesday, hours
before the designs' release.

It's unclear what comes next. Will the restraining order hold upon appeals?
Will the Trump administration take any action on its own?

## Experts are seriously worried about 3D-printed guns

So how worried should people be? To answer this, I asked four gun policy
experts about 3D-printed guns. All of them said they are seriously
concerned about these firearms' potential.

Cassandra Crifasi, from the Johns Hopkins Center for Gun Policy and
Research, captured the general sentiment: "It's bad enough that in the
majority of states you can purchase a traditional firearm without undergoing
a background check to ensure you are not prohibited. The availability of 3D-
printed guns creates yet another loophole through which prohibited
individuals could more easily obtain firearms."

In short, 3D-printed guns make it easy to bypass a host of state and federal
laws. Printing a gun doesn't require a background check or any

documentation, offering a workaround for people who are legally prohibited from buying a gun now due to, say, a criminal record or history of mental illness. A 3D-printed gun can also be easily made without a serial number or anything that would make these firearms easily traceable if they're used in a crime.

This, experts predict, will make the guns very attractive to criminals. "My guess is that the first movers will be terrorists and insurrectionists who are determined to destroy our current system of government," Philip Cook, a gun policy expert at Duke University, told me. "Over the longer term, if this form of manufacturing becomes cheap enough, it may become a major source of supply for street gangs and other criminals."

Guns are already pretty available in the US, with estimates suggesting that there are more firearms in America than there are people. And the country has much looser gun laws than comparable nations like the UK, Canada, and Japan. The concern is that 3D-printed guns will make firearms even more available by creating a means to bypass the US's already weak gun laws with little effort.

There's good reason to believe that will lead to more gun deaths: A broad body of research has found that where there are more guns, there are more gun deaths.

As a breakthrough analysis by UC Berkeley's Franklin Zimring and Gordon Hawkins in the 1990s found, it's not even that the US has more crime than other developed countries. This chart, based on data from Jeffrey Swanson at Duke University, shows that the US is not an outlier when it comes to overall crime:

**CRIME in 15 industrialized countries**
*12-month prevalence rates for 11 index-crimes (year 2000)*









SOURCE: Jeffrey Swanson. International Crime Victims Survey. Gallup Europe.

*Vox*

**Instead, the US appears to have more *lethal* violence — and that's driven in large part by the prevalence of guns.**

**"A series of specific comparisons of the death rates from property crime and assault in New York City and London show how enormous differences in death risk can be explained even while general patterns are similar," Zimring and Hawkins wrote. "A preference for crimes of personal force and the willingness and ability to use guns in robbery make similar levels of property crime 54 times as deadly in New York City as in London."**



SOURCE: Jeffrey Swanson and OECD

*Vox*

This is in many ways intuitive: People of every country get into arguments and fights with friends, family, and peers. But in the US, it's much more likely that someone will get angry during an argument and be able to pull out a gun and kill someone.

The mass availability of 3D-printed guns would only exacerbate this problem by making it easier for someone to have a firearm to pull out in the first place, whether in the course of an argument or the commission of a crime.

Wilson, for his part, said his intent is not to make it easier for criminals to get guns or to enable more gun violence. But he sees 3D-printed guns as a means to counter the movement, particularly after the Parkland, Florida, mass shooting, to enact stricter gun laws in the US.

As Wilson told Wired, "All this Parkland stuff, the students, all these dreams of 'common sense gun reforms'? No. The internet will serve guns, the gun is downloadable. No amount of petitions or die-ins or anything else can change that."

## Stopping 3D-printed guns in the long term will be very hard, if not impossible

For all the worry about 3D-printed guns, it's not clear how much good any of the worrying will do.

The reality is that 3D printers are becoming better and cheaper over time. A few years back, 3D printers were inaccessible for the typical consumer. Nowadays, people can buy them for hundreds of dollars. These printers often aren't very good — not good enough to build a gun, anyway — but the increasing availability shows where this is all going.

Meanwhile, the government can try as hard as it wants to stop 3D-printed gun schematics from ending up on the internet, but the reality is these blueprints will likely become public on a large scale at some point. Think about how much governments have struggled to stop websites like Pirate

Bay, which make it easy to illegally download music, movies, video games, books, and much more. It's just extremely easy to share information and data on the internet.

In fact, there already are websites hosting 3D printer designs for guns, and sites dedicated to hosting Wilson's files, despite court battles holding up Wilson's own ability to republish the documents.

That doesn't mean governments are totally helpless here.

One federal law already addresses *some* of the concerns: The Undetectable Firearms Act bans guns that can't be spotted by walk-through metal detectors. This means all-plastic 3D-printed guns are technically illegal, although there are workarounds, such as adding a metal piece to the firearm.

The government could take further steps. Chelsea Parsons, the vice president of gun violence prevention policy at the left-leaning Center for American Progress, drew a comparison to counterfeit currency: "I think the next step is to work with the technology industry to find solutions to deter promulgation of these blueprints. An analogy is the approach taken by software programs like Adobe Photoshop to prevent people from creating counterfeit currency. We should engage with the 3D printer manufacturers to have this type of blocking software installed in all 3D printers sold in the US to prevent this technology from being used to produce guns."

Jon Stokes, a tech journalist and gun enthusiast, argued at TechCrunch that this will likely prove a fruitless endeavor because "it will be hard for these machines to reliably tell what's a gun-related file and what isn't," and, more importantly, "open-source firmware will quickly become available for the most popular printing and milling machines, so that determined users can 'jailbreak' them and use them however they like."

Stokes suggested that the government may ultimately try to regulate other parts of the gun trade, particularly ammo, and eventually focus on possession — by, for example, requiring a license to carry a firearm.

"The focus will shift to vetting and permits for simple possession, much like the gun owner licensing scheme I outlined in Politico," Stokes predicted. "We'll give up on trying to trace guns and ammunition, and focus more on authorizing people to possess guns, and on catching and prosecuting unauthorized possession. You'll get the firearm equivalent of a marijuana card from the state, and then it won't matter if you bought your gun from an authorized dealer or made it yourself at home."

Whatever the government does, it will require rethinking how it currently enforces gun laws. Duke's Cook explained: "The only hope that I see is to clarify the legal boundaries — and in particular establish that it is illegal to manufacture, sell, or carry guns that violate the standards in state and federal law. The success of this effort would depend on law enforcement effort, including both police and courts. But that would require a reorientation of our current priorities."

This won't stop 3D-printed guns altogether, just as governments have not been able to stop counterfeit currency or online piracy entirely. But it will make the process of printing out a gun and possessing it a bit more difficult and perhaps more expensive — and perhaps delay the technology from becoming widespread.

"A lot of bad things could happen in the not-distant future that are, to a large extent, very difficult or near impossible to control," Daniel Webster, the director at the Johns Hopkins Center for Gun Policy and Research, told me. "I favor more years with fewer 3D-printer-made ghost guns. But prepare for what you think is inevitable and pass laws with stiff penalties for making or possessing guns outside of US laws and regulations."

Still, I'm skeptical. I can't say with full confidence where this is all going. But if the recent history of the internet is any guide, stopping people from

Case 2:18-cv-01115-RSL   Document 44-1   Filed 08/09/18   Page 200 of 266

sharing just about anything — whether it's pirated music or a 3D-printed gun blueprint — is going to be very hard, if not impossible. And that may lead to a future with more gun deaths.

Exhibit 16


GET YOUR SMOKEY ON — LEARN HOW ›
ONLY YOU CAN PREVENT WILDFIRES.    Ad

SUBSCRIPTIONS          SIGN IN

POLICY —

# "Download this gun": 3D-printed semi-automatic fires over 600 rounds

And the Department of Justice says there's nothing illegal about it, either.

CYRUS FARIVAR - 3/1/2013, 6:00 AM



The white portion of this AR-15, known as the "lower," was manufactured using 3D printing.

*Defense Distributed*

Cody Wilson, like many Texan gunsmiths, is fast-talkin' and fast-shootin'—but unlike his predecessors in the Lone Star State, he's got 3D printing technology to help him with his craft.

Wilson's nonprofit organization, Defense Distributed, released a video this week showing a gun firing off over 600 rounds—illustrating what is likely to be the first wave of semi-automatic and automatic weapons produced by the additive manufacturing process.

Last year, his group famously demonstrated that it could use a 3D-printed "lower" for an AR-15 semi-automatic rifle—but the gun failed after six rounds. Now, after some re-tooling, Defense Distributed has shown that it has fixed the design flaws and a gun using its lower can seemingly fire for quite a while. (The AR-15 is the civilian version of the military M16 rifle.)

The lower, or "lower receiver" part of a firearm, is the crucial part that contains all of the gun's operating parts, including the trigger group and the magazine port. (Under American law, the lower is what's defined as the firearm itself.) The AR is designed to be modular, meaning it can receive different types of "uppers" (barrels) as well as different-sized magazines.

"This is the first publicly printed AR lower demonstrated to withstand a large volume of .223 without structural degradation or failure," Wilson wrote on Wednesday. "The actual count was 660+ on day 1 with the SLA lower. The test ended when we ran out of ammunition, but this lower could easily withstand 1,000 rounds."

Already, he says, over 10,000 people have downloaded the lower CAD file, and more have downloaded it through BitTorrent.



DefDist Printed AR Lower - Part III

## "I just made an AK-47 magazine—I've got it printing as we speak"

While it may be easy to paint Wilson as a 2nd Amendment-touting conservative, the 25-year-old second-year law student at the Univeristy of Texas, Austin told Ars on Thursday that he's actually a "crypto-anarchist."

"I believe in evading and disintermediating the state," he said. "It seemed to be something we could build an organization around. Just like Bitcoin can circumvent financial mechanisms. This means you can make something that is contentious and politically important—not just a multicolored cookie cutter—but something important. It's more about disintermediating some of these control schemes entirely and there's increasingly little that you can do about it. That's no longer a valid answer."

He added, "The message is in what we're doing—the message is: download this gun."

And he practices what he preaches. The group's entire set of design files are made available, for free, on DEFCAD, an online library for everything from grips to lowers to magazines.

"I just made an AK-47 magazine—I've got it printing as we speak," he added. "[I've got a] Glock 17, we got a bunch coming, man. We've got a library of magazines."

Wilson's group was founded last year on similar principles:

The specific purposes for which this corporation is organized are: To defend the civil liberty of popular access to arms as guaranteed by the United States Constitution and affirmed by the United States Supreme Court, through facilitating global access to, and the collaborative production of, information and knowledge related to the 3D printing of arms;

and to publish and distribute, at no cost to the public, such information and knowledge in promotion of the public interest.



Here are .223 Remington bullets loaded into a 3D-printed magazine.

## Totally legal

So that raises the question: is this legal? For now, it would appear so.

"There are no restrictions on an individual manufacturing a firearm for personal use," a Bureau of Alcohol, Tobacco, and Firearms (ATF) spokesperson told Ars. "However, if the individual is engaged in business as a firearms manufacturer, that person must obtain a manufacturing license."

Wilson said that he's applied for a federal firearms license in his own name with the ATF in October, and he expects to hear a response "any day now." The ATF did not respond to our request for confirmation of Wilson's claims.

Specifically, Wilson said he's looking to become a Class 2 Special Occupational Taxpayer, as licensed under federal law (PDF), which would allow him to become a dealer under the National Firearms Act.

The law student said that anyone with the same type of 3D printer ("SLA resin and P400 ABS on a used Dimension") could replicate his efforts with "9 to 12 hours" of print time and "$150 to $200" in parts. "We've proven that you can build one for $50," he said, presuming the builder is using lower quality materials. (Dimensions typically sell in the $30,000 range—but Wilson says his results could be duplicated using the less-expensive Ultimaker ($1,500) or Reprap.")

Assuming Defense Distributed's AR-15 lower costs around $150 to print, it likely won't end up being price-competitive with other, commercially available polymer AR-15 lowers—a few minutes of Google searching turned up options priced at $135 to $170, depending on the manufacturer.

Of course, lots of 3D printing enthusiasts extol the fact that the price of the technology is rapidly falling—as we reported previously, a California company announced a $600 model last year.

Some experts who have been following the world of 3D printing for a while say that from a policy perspective, not much has changed in terms of firearm production, even if the parts are cheaper to make.

"When you're thinking about it from a policy standpoint [the question is], was this possible before 3D printing? If the answer is yes, what was the existing policy response?" said Michael Weinberg, a staff attorney at Public Knowledge.

"Has this fundamentally changed the dynamic in a way that we need to revisit the response? The answer strikes me as no. It's amazing. You can imagine a world where the 3D printer is accessible to people—I am not convinced that we need a 3D printing-specific solution."



An earlier model of the 3D-printed AR-15 lower resulted in a crack by the rear takedown pin.

## "The guns that will be"

Since December 2012, Wilson and his team have been hard at work on two problems. The first was the fact that the lower's "buffer tower" (the circular ring part jutting upward that the "upper" fits into) kept breaking—that's what caused the initial failure that prevented the gun from firing more than six rounds of 5.7x28FN bullets.

To fix that, the group re-engineered the buffer tower so it had increased exterior thickness. "We doubled or tripled the thickness," Wilson said.

With that fix under their belt, the modern gunsmiths tried firing with .223 Remington bullets (standard in an AR-15), which raised the firing range to about 20 rounds before a failure—but that wasn't good enough.

By the end of the month, there was a different failure, this time on the "rear takedown pin," where a metal pin fits between the upper and the lower, connecting them together solidly. There, the 3D-printed plastic was cracking around the pin, making the gun less safe to use.

"There was so much force concentrating around it that that was the failure place," Wilson said. "At first we started using bigger bosses and using longer pins and realized that it's still a cross-sectional area. We changed the dimensions of the rear takedown pins."

He explained that they've changed pin design entirely, adding "more surface area around these pins," as well as an "internal" 90-degree angle, along with various curves and "steps and risers" that take advantage of the fact that the housing is made of plastic, not metal.

"The thing was still built like it would be made out of metal," he said. "This is about plastic, and everything needs to be curves. It has to act like more of a spring."

And that, he points out, is the ultimate lesson in gun manufacturing.

“The idea is not to print components for guns that are, but the guns that will be,” he said.

For now, though, Wilson said that Defense Distributed has essentially taken over the bulk of his time, and he’s effectively become a part-time amateur engineer.

“I don’t go to [law school] class, but I do pass the exams—here’s looking at you [American Bar Association]!” he told Ars.

Defense Distributed, Wilson says, receives “around $100” in daily donations, and he has an operating budget of about $2,400 monthly. He says that the next phase will be to publish “primers” teaching people specifically how to make such weapons.

“I don’t consider myself a tech guy, but I do consider myself a crypto-anarchist,” he said.

“I mean the philosophy that Tim May expressed, he predicted WikiLeaks and digital currency. [What I mean is] that the Internet and cryptography are these anarchic tools that can allow for the expanse of citizen action. We like the idea of the market becoming completely black and starving the nation-state from all the money they claim.”

(Thanks to Ars editor Sean Gallagher, a Navy veteran, for helping me with all my gun questions.)

READER COMMENTS    687                                                                    SHARE THIS STORY

---

**CYRUS FARIVAR**

Cyrus is a Senior Tech Policy Reporter at Ars Technica, and is also a radio producer and author. His latest book, *Habeas Data*, about the legal cases over the last 50 years that have had an outsized impact on surveillance and privacy law in America, is out now from Melville House. He is based in Oakland, California.

**EMAIL** cyrus.farivar@arstechnica.com // **TWITTER** @cfarivar

---



WATCH
The Air Force’s Senior Citizen Chopper Can’t Retire Yet

The Air Force’s Senior Citizen Chopper Can’t Retire Yet

Some of the Air Force’s most important missions depend on aircraft that were flying, and systems that were built long before all but the most senior airmen were even born.

The Air Force’s Senior Citizen Chopper Can’t Retire Yet

Ars Live #23: The History and Future

⊕ More videos

---

← PREVIOUS STORY                                                            NEXT STORY →

## Related Stories

### Sponsored Stories

Powered by



**60 Jarring Nature Photos**

History Daily



**Discover Products for a Life Well Lived**

FabFitFun



**[Pics] Man Builds A 500 sq Dream House For Only $9,000, Wait Until You Look Inside**

Ice Pop



**[Pics] Firefighters Rescue Litter Of Puppies From A Storm Drain Only To Learn They're Not Dogs**

Nocartridge



**Section 199A of New Tax Code Offers New Hope for American Seniors**

Daily Reckoning



**World Cup Ranks: Only The Top Player On This List Can Beat Messi**

New Arena

## Today on Ars

RSS FEEDS
VIEW MOBILE SITE
ABOUT US
SUBSCRIBE

CONTACT US
STAFF
ADVERTISE WITH US
REPRINTS

NEWSLETTER SIGNUP

Join the Ars Orbital Transmission mailing list to get weekly updates delivered to your inbox.

Email address        SUBSCRIBE

ﾐ
oup
ast. All rights reserved. Use of and/or registration on any portion of this site constitutes acceptance of our User Agreement (updated 5/25/18) and Privacy Policy and Cookie Statement (up
Privacy Rights
this site may not be reproduced, distributed, transmitted, cached or otherwise used, except with the prior written permission of Condé Nast.

Exhibit 17



**722** shares

| 4 |
| SHARES |

645    66    11



The Transportation Security Administration claims to have found a 3D printed gun in a passenger's carry-on bag at Reno Airport.

The TSA website revealed a revolver, together with .22 bullets, but it seems to raise more questions than it answers.

It appears the gun wasn't functional, as even the TSA describes it as a replica and it had no firing pin, but it was



loaded with live ammunition.

One of 68 guns seized this week

The border agency claimed it was one of 68 firearms found in carry-on bags in just one week. 60 of them were loaded, while 21 had a round chambered and were ready to fire, which is perhaps a bigger issue. The presence of a 3D printed gun in any capacity, though, is a worrying development for all of us.

While 3D printed guns have been in the press for a long time, this design just isn't in the public domain. So this casual announcement as part of the TSA's weekly blog advising travelers about carrying firearms has piqued the interest of the 3D printing community.



Back to 'that' 3D printed gun

Of course, the most famous 3D printed gun is The Liberator, which was a clunky affair made from ABS plastic with a metal firing pin. There were serious doubts about its safety, but nobody can deny the impact the design had on the wider world. Since then a number of different designs have surfaced.

Solid Concepts recently printed a .45 caliber handgun with a magazine and there have even been calls for people to register their 3D printers simply because they could use





| | 688K Likes |
| --- | --- |
| | 99.3K Followers |
| | 549K Fans |
| | 7K Followers |



RELATED ARTICLES

the hardware to produce their own gun. This seizure could provide valuable ammunition for those that say a 3D printer is potentially a deadly weapon in the making.

It's illegal to make gun parts

It is already illegal to make firearm components that an X-Ray machine cannot detect after the Undetectable Firearms Modernization Act came into force last year.

It was introduced in 2013, but it was reintroduced and driven through last year when the Department of Homeland Security showed that TSA officers failed to intercept 95% of contraband.

It comes just weeks after a renewed push for registration for 3D printers, so the timing is a little convenient. The fact that this gun is not in the public domain also raises further doubts, although it is possible that someone could have scanned the constituent parts of a revolver and intended to fit the firing pin at a later time.

3D printed guns have come a long way

While the original ABS handgun was massively overbuilt to cope with the stresses that tended to destroy most of the early 3D printed guns after just a few shots, the guns have improved over time. Hexen's Reprringer, another .22 revolver, could reportedly withstand a number of shots.



For the 3D printing industry, not all publicity is good publicity. This fascination with 3D printed guns, from the TSA, the regulators and the general public, could bring a new wave of legislation that affects the whole community.

What is this gun?

Unfortunately, the TSA hasn't released too much information about the gun that was found. It could be an ambitious plan by an amateur that was destined to blow up in their hand the first time they fitted a pin. It could also be a prototype for a company that intended to produce the gun legally. We cannot tell for sure.

All we really know is that 3D printed guns are in the news again and that is not good for any of us.

TAGS

3D PRINT    3D PRINTED GUN    GUNS    REPORT    REPORTS

SOUTH AMERICA    SPORT    SPORTS    TSA



## Nick Hall

Nick is a freelance journalist who has covered the cut and thrust of Formula One and the technical side of the supercar industry for the likes of The Sunday Times, Automobile and Penthouse on these shores, Tatler and The National in Dubai. After finally driving an F1 car there was nowhere left to go, so now he is here!

☐

SHARE THIS    0    0    0    0

MORE ON THIS TOPIC

AUTODESK LEADS DONATION OF 750 3D PRINTED PROSTHESIS TO KIDS

MORE ON THIS TOPIC

TURN OLD JUNK INTO COOL STUFF WITH 3DP UPCYCLING

0 Comments                                    Sort by    Oldest ▾



f  Facebook Comments Plugin

Exhibit 18



News    Voices    Sports    Culture    Indy/Life    Video    Daily Edition


Don't take away my Planned Parenthood

DONATE NOW



News › World › Australasia

# 3D printed guns seized by Australian police during raid

Authorities believe plastic weapons would have been capable of being fired

Tom Barnes | @thomas_barnes | Thursday 19 July 2018 14:32 |

Click to follow
The Independent Online

Calling a
and rebel

6 influenc
backgrou
that is Re

Sponsored



Police recovered various firearm designs that appeared to have been produced using a 3D printer ( *Queensland Police* )

Police in Australia have seized a number of handguns thought to
have been manufactured using a 3D printer.



INDEPENDENT

News    Voices    Sports    Culture





Three firearms and various other weapon parts were discovered during the search of a property in Mudjimba, Queensland, on Wednesday.

The weapons found at the scene were produced using a 3D printer over the last two months and were capable of being fired, Queensland Police said.

An unnamed 27-year-old Mudjimba man was arrested and later charged with 12 offences including possessing dangerous weapons and manufacture of weapons without a licence.



German police test the threat posed by 3D-printed guns by printing

READ MORE

He had been due to appear at Maroochydore Magistrates Court on Thursday.

Detective Senior Sergeant Daren Edwards told Queensland-based newspaper *The Courier-Mail* the find had been an alarming find and a first for the area.

He said the weapons appeared close to completion and only a handful of metal parts, including a firing pin, would have been necessary in order for them to be used.

None of the handguns found at the scene were identical, leading investigators to suggest the suspects may have been experimenting to find the most effective design.

"This is something you read about, but we have not seen around here before, so it's rare for sure," DSS Edwards added.

Several fake drivers' licences and credit cards, also allegedly made using printers and scanning equipment, were seized at the property, along with methylamphetamines and MDMA capsules.

Earlier in July, the US Department of Justice ruled blueprints to 3D print and build guns could be re-uploaded to the internet.

The judgement followed a four-year legal battle between the State Department and the company who had designed the firearm in question, Defense Distributed.

World news in pictures

**MOST POPULAR**

**SPONSORED FEATURES**



News  Voices  Sports  Culture


Joanna Lumley surprises commuters
Video  Daily Edition


Which endangered animal are you?


5 Love Island replacements


Rewilding: how it's helping the UK's most endangered species flourish


New book by Vitaly Malkin questioning religion

**POPULAR VIDEOS**

Plans created by the firm for a handgun called "The Liberator" were downloaded more than 100,000 times in the two days after they appeared online in May 2013, before the US government ordered their removal.



The Second Amendment Foundation, a gun rights organisation which brought the lawsuit on behalf of Defense Distributed founder and crypto-anarchist Cody Wilson, described the ruling as a "victory for free speech".

The Liberator has been tested across the world with varying degrees of success. In 2014, a Japanese man was arrested after building five copies of the gun, only two of which authorities said possessed "lethal power".

However, Defense Distributed's website will allow users from 1 August to download from a library of gun parts, which includes components for semi-automatic rifles such as the AR-15, used in a number of recent mass shootings.

More about: | Queensland | Australia | 3d printing | guns

Reuse content

**Independent News Email**

Enter your email address                          Continue

register with your social account
or click here to log in

**COMMENTS**

Log in  or  register  to comment

Refresh • Subscribe • RSS



**News** Voices Sports Culture Indy/Life Video Daily Edition

**Follow us:**

| | | |
|---|---|---|
| User Policies | Archive | Novaya Gazeta |
| Privacy Notice | Newsletters | Install our Apps |
| Cookie Policy | Jobs | Voucher Codes |
| Code of Conduct and Complaints | Subscriptions | |
| Contact Us | Advertising Guide | |
| Contributors | Syndication | |
| All Topics | Evening Standard | |

Exhibit 19



Loaded Issue

NEWS    PRINTABLES    REVIEWS    DEALS    GUIDES    FEATURES

# 2018 3D Printed Gun Report – All You Need to Know



*by Tyler Koslow*
*1 week ago*

## 1 | 9mm vs .40 vs .45 Debate Ended - Must See C

Get Your Free "Jgl Caliber Myths" Video & See if Your Handgun Choice Survives  concealedcar

**905**
SHARES

*Should you fear 3D printed guns? Read our 2018 3D printed gun report to learn about the* [latest news](#)*, laws and actual threats to help you sort facts from fears.*

Both makers and lawmakers around the world have taken notice of 3D printed guns. Regardless of intention, their efforts

This website or its third-party tools use cookies, which are necessary to its functioning and required to achieve the purposes illustrated in the Privacy Policy.

Should someone with the files for a 3D printed gun be charged with the same crime as someone that actually has the gun? Has the media sensationalized the rise of 3D printed guns? What's the best way to regulate 3D printed weapons? And most importantly, **should you fear 3D printed guns?**

To answer these questions, we will examine the reasons why you should and shouldn't fear the 3D printed gun, explain the history, and then go over the laws that have been put in place to stop them.

TABLE OF CONTENTS

- The Latest News on 3D Printed Guns

- Reasons to Fear & Not to Fear 3D Printed Guns

- A Brief History of the 3D Printed Gun

- State of 3D Printed Guns in United States of America

- State of 3D Printed Guns in Australia

- State of 3D Printed Guns in Europe and United Kingdom

- State of 3D Printed Guns in Asia and the Middle East

- 3D Printed Guns on the Dark Net

- The 3D Printed Gun: Conclusion



Exhibit A: The Liberator

# The Latest on 3D Printed Guns in 2018

**UPDATE (8/01/2018) – Federal Judge Blocks Release of 3D Printable Gun Models**

On Tuesday, a federal judge in Seattle delivered a temporary restraining order to stop Defense Distributed from releasing the 3D printable gun files. US district judge Robert Lasnik, who issued the restraining order, shared his concerns about the matter:

"There is a possibility of irreparable harm because of the way these guns can be made."

Shortly after, Defense Distributed took the downloadable models off of the website and issued its own statement on the homepage:

> *"This site, after legally committing its files to the public domain through a license from the U.S. Department of State, has been ordered shut down by a federal judge in the Western District of Washington."*

Although Wilson initially appeared to accept the judge's ruling and take the blueprints down, it turns out that the models were just moved from the Defense Distributed website to a new home: CodeIsFreeSpeech.com.

The organization released a statement explaining the concept behind the new platform. The website includes various download links for the Liberator and other 3D gun models, a list of pro-gun rights organizations and excerpts from the United States Constitution.

The organization originally agreed to publish the files on August 1, 2018, but a handful of DIY firearm blueprints appeared on the Defense Distributed website five days early. According to Pennsylvania Attorney General Josh Shapiro, it's estimated that more than 1,000 people had already downloaded 3D plans for AR-15 semi-automatic assault rifles.

Sen. Edward Markey (D-Massachusetts) and Richard Blumenthal (D-Connecticut) filed legislation to attempt to prohibit 3D printable digital firearm files publication from going

online. They also submitted another bill that would require all guns to have at least one non-removable component made of metal. The latter is intended to stop undetectable weapons from being slipped past metal detectors and other security measures.

The Ministry of Public Safety in Canada also stated that citizens who make their own 3D printed guns without a license will face mandatory jail time. "It is illegal to manufacture or possess a firearm without the appropriate licence and applicable registration certificate," said Jean-Philippe Levert, a spokesperson for Public Safety Canada.

**UPDATE (7/31/2018) – Nine States File Joint Lawsuit Against Trump Administration for 3D Printed Gun Settlement**

Nine different states have joined together to file a lawsuit against the Trump administration for its decision to allow 3D printable guns back onto the internet. The suit aims to block

the distribution of plans for 3D printed weapons by Wilson and Defense Distributed, and was signed on by the state of Washington, Massachusetts, Connecticut, New Jersey, Pennsylvania, Oregon, Maryland, New York and the District of Columbia.

"I have a question for the Trump Administration: Why are you allowing dangerous criminals easy access to weapons? These downloadable guns are unregistered and very difficult to detect, even with metal detectors, and will be available to anyone regardless of age, mental health or criminal history," Washington state Attorney General Bob Ferguson said in a statement released on Monday.

The newly filed legal complaint argues that once the 3D printed weapon blueprints are online, it will become "a bell that cannot be un-rung." Wilson has already responded to the proposed lawsuit on Twitter, stating "I am now being sued by at least 21 state attorneys general. If you want your Second Amendment online, THIS is the fight" and asking people to join his organization to fight back.

In addition to the lawsuit, 21 different Attorney General from various states have sent a letter to the US State Department and the Department of Justice, asking for an immediate block on sharing 3D printed gun plans. You can read the full letter here.

Although the firearm designs were scheduled to go up on the Defense Distributed starting on August 1, the organization's website already contains around 10 3D models for different weapons and firearm parts. Since the blueprints leaked early, thousands of people have already started downloading the plans for the AR-15 rifle, causing some states to block the website completely.

On Tuesday, U.S. President Donald Trump came out with a statement (via Twitter) about the controversy surrounding 3D printed guns:

*I am looking into 3-D Plastic Guns being sold to the public. Already spoke to NRA, doesn't seem to make much sense!*

*— Donald J. Trump ( @realDonaldTrump) July 31, 2018*

Whether the joint lawsuit will be successful or not remains to be seen, but Wilson and Defense Distributed are clearly intent to move along with their plan to make DIY weapons accessible for all. It seems odd that Defense Distributed decided to undercut the August 1 start date and upload the models a few days early. Perhaps the multi-state lawsuit and global criticism has caused Wilson and his organization to jump the gun?

Defense Distributed is already sharing CAD models of 3D printable guns

## TRUMP ADMINISTRATION ALLOWS CODY WILSON AND DEFENSE DISTRIBUTED TO PUT

## 3D GUN MODELS BACK ONLINE

Concerns surrounding the rise of 3D printed guns have been brewing for around five years now, but 2018 seems to be the new boiling point for this issue. The initial threat of DIY firearms had initially simmered down once the US government forced crypto-anarchist and guns right activist Cody Wilson and his organization Defense Distributed (more about them in our History of the 3D Printed Gun section) to take down 3D gun models from their website in 2013. However, a recent court settlement between Wilson and the Trump administration has created a new legal precedent for the blueprints to legally go back online.

The court settlement states that the ban on these CAD files was in violation of the First Amendment and that the government has been unlawfully censoring Defense Distributed's right to expression. It was also decided that "non-automatic firearms up to .50-caliber" are "not inherently military," opening the door for DIY firearms like the popular Liberator to return to the public eye.

"Not only is this a First Amendment victory for free speech, it also is a devastating blow to the gun prohibition lobby. For years, anti-gunners have contended that modern semi-automatic sport-utility rifles are so-called 'weapons of war,' and with this settlement, the government has acknowledged they are nothing of the sort," Alan Gottlieb, founder and Executive Vice President of the Second Amendment Foundation, said in a press release on the matter.

Shortly after the settlement, Defense Distributed announced that they would relaunch its 3D firearm model repository on August 1, 2018. The website will host the designs of the Liberator pistol, AR-15 frames, and other DIY semi-automatic weapons. Wilson also hopes that the platform will eventually become a space for other users to upload their own gun blueprints. Defense Distributed is also responsible for manufacturing the Ghost Gunner, which is a desktop CNC

milling machine capable of turning 80-percent lower receivers into functional and untraceable weapons.

Despite the initial victory for Wilson and Defense Distributed, it could be cut short by Democratic members of U.S. Congress and gun control activist groups that are pushing back on the court's decision. The first public retort from the Senate came from Sen. Chuck Schumer (NY- D), who denounced the settlement and raised concerns about how DIY firearms are both untraceable and undetectable. He was also joined by a handful of other Democratic Senators in a call for an extension to prevent the 3D gun models from going online.

"We are looking at a world in which anyone with a little bit of cash can bring an undetectable gun that can fire multiple bullets anywhere — including planes, government buildings, sporting events, and schools. 3D printers are a miraculous technology that has the potential to revolutionize manufacturing, but we need to make sure they are not being used to make deadly, undetectable weapons," Sen. Schumer

said during the press conference.

The settlement has also received pushback by gun safety groups, some of which have banded together to stop Defense Distributed. In July, the Brady Center to Prevent Gun Violence, Everytown for Gun Safety and the Giffords Law Center to Prevent Gun Violence announced that they are planning to take legal action to prevent the U.S. State Department from allowing the 3D printed gun models online.

"[T]his settlement is far from ordinary. It is dangerous, irreparable and – as the government itself has emphatically argued for years – raises issues of national defense and national security of the highest order. It is also, we believe, illegal," the gun safety organizations wrote in a joint amicus letter.

As the world waits for Defense Distributed to upload and share the 3D gun models to the public, each country will be tasked with figuring out how to tackle the issue. While gun laws are

more lax in the United States, these files could likely be accessed in regions with stricter gun control laws, such as Europe, Australia, and Asia.

We'll be sure to continue updating our 2018 3D Printed Gun Report as more news comes to light. So stay tuned…

*Prior to the court settlement between Wilson and the U.S. Government was reached, the debate on whether we should fear 3D printed guns or not has been a heated source of debate. To help get you up to speed with the history regarding Wilson and Defense Distributed, DIY weapons, the criminals who have been caught with them and laws that have been created to combat the rise of 3D printed guns, be sure to scroll on through the rest of our extensive 2018 3D Printed Gun Report.*

# Reasons to Fear & Not to Fear 3D Printed Guns

There are valid arguments for why you should and shouldn't fear 3D printed guns, making this quite the loaded issue. To offer a fair and balanced view on this controversial topic, we'll offer reasons on both sides of the 3D printed gun debate to help you decide for yourself.

## Why You Should Fear

From CNN to Gizmodo, mainstream media outlets have focused more on 3D printed firearms than any other innovative application of this wide-ranging technology. But where does this fear stem from?

Perhaps what stirs this fear isn't the functionality of these homemade weapons, but the ease of creating one without anyone knowing. Many states in the U.S. and other countries throughout the world have strict gun control laws. Generally speaking, those who are allowed to own a firearm must have it registered. But with 3D printed guns, people fear that criminals and other unstable people will be able to produce firearms at home and commit crimes with it.

The commonly used term for a 3D printed firearm is "Ghost Gun", which refers to the fact that these firearms are 3D printed without serial numbers and are virtually untraceable by the government.

Although the current state of desktop 3D printing doesn't necessarily allow high-quality firearms to be manufactured at home, this could also change as the technology advances. For instance, as metal 3D printing becomes more affordable and accessible, the potential to create higher-grade weapons could grow.

Another valid fear is that 3D printing could lead to cheap firearm factories for criminals. But again, having a gun 3D printed in metal would cost thousands of dollars, making it more convenient for criminals to wade through other illegal channels to find one.

Needless to say, it's not a 3D printed gun that should be feared. If anything, it's the *idea* of being able to manufacture firearms unchecked that really drives this frenzy forward.

## Why You Shouldn't be Concerned

It's quite easy to produce a plastic firearm with the proper 3D files and desktop printer. But this homemade 3D printed gun is far from reliable when it comes to functionality. In fact, police testing has proven that a 3D printed gun could endanger the shooter as much as anyone else.

A firearm produced with ABS material could break apart or

even potentially explode in the hands of the user when fired. Softer PLA will likely cause the parts to bend or deform after firing.

Realistically, neither ABS or PLA is ideal for producing firearms. While most plastic 3D printed guns are made using ABS, chances are only a single shot will be able to be fired before it either breaks or fails. The reason for this is because the act of firing a bullet simply exerts too much power for most thermoplastics to withstand.

Some gun enthusiasts have created hybrid 3D printed guns, consisting of traditional metal components and thermoplastics. In theory, these firearms should offer much better functionality than an ABS-based weapon. But again, building a hybrid 3D printed gun seems counterproductive to just finding an actual one.

Lastly, metal 3D printing can and has been used to produce a fully functional firearm. There's no denying this. But, these type of prints are extremely costly, and it makes no sense for a criminal to go to a metal 3D printing service instead of finding a cheaper and more discreet way on the black market.

This also helps to quell the fear that a 3D printed gun would be able to slip through a metal detector, seeing that at least a metal firing pin would be needed to make the makeshift firearm functional. 3D printed guns that are comprised primarily of thermoplastic are extremely ineffective and thus aren't worth the trouble of manufacturing cases where they will be used in a menacing way.

Essentially, there is no reason to fear a 3D printed gun any more than you would a traditionally manufactured one. In fact, in many regions of the United States, these firearms are easier to get and are much more lethal. There are approximately 300 million firearms spread across the U.S., making the fears of a potential 3D printing gun epidemic pretty baseless.

As you will see later in this article, the threat level of a 3D printed gun is much higher in places with strict gun control, especially in Australia.

# A Brief History of the 3D Printed Gun

The 3D printed gun components that make up the Liberator.

The world's first functional 3D printed gun was designed back in 2013 by Cody Wilson, a crypto-anarchist and the founder of the Texas open source gunsmith organization Defense Distributed. The 3D files for this one-shot pistol were the first to be released into the world. They sparked an unprecedented controversy that still looms over the 3D printing community to this very day.

After the files for the Liberator were downloaded over 100,000 times in two days, the US Department of State

compelled Defense Distributed into taking the model down.
This demand has sparked an ongoing legal battle between the
techno-anarchist and government.

Most of the 3D printed guns that have surfaced thus far are in
the form of a pistol. But 3D printable parts for semi-automatic
weapons have been released by Defense Distributed – and
confiscated by police.

As 3D printed gun blueprints are distributed by the internet,
they have been found across the world, from Australia to
Japan, Europe to the Americas. These makeshift firearms
have found their way into the hands of police, criminals, and
libertarians alike.

Since the release of the Liberator, many government bodies
have been scrambling to impose laws that would strictly
prohibit 3D printed guns, and in some cases even 3D models
of firearms.

Nowadays, additively manufactured weapons remain an
unknown threat, but countries like Australia and the United
States are not wasting any time in fear-mongering and passing
laws.

Most 3D printed guns are based off previously existing
designs. Most of them are freely available to download, but
also hard to find due to increasing illegality. But when Defense
Distributed's Liberator first hit the scene, it proved that a
firearm could be produced almost entirely out of thermoplastic
material.

Every component of Wilson's Liberator was 3D printed except for the metal firing pin and the actual bullet. The Defense Distributed founder has also created an automatic weapon that is not fully 3D printed but is equipped with additively manufactured components, in the past.

Since then, Wilson has continued on his campaign to put DIY firearms in the spotlight. After his 3D model was forced off the internet, Defense Distributed released the Ghost Gunner, a desktop CNC milling machine designed to manufacture guns. At first, the machine was only capable of producing the lower receiver component for an AR-15. However, Wilson has since upgraded the Ghost Gunner software to make it capable of creating the aluminum frame of an M1911 handgun.

While Wilson believes that he is advocating for gun rights by making firearm production more accessible and undetectable, others have grown worried about this technology getting into the wrong hands. Across the world, countries are passing laws that equate 3D printed guns with traditional firearms. In some places, even having the 3D model for a firearm would be considered possession of an illegal weapon.

Nevertheless, the recent court settlement between Wilson the U.S. Government could make it difficult for other countries to prevent 3D printable guns from being produced within their borders. Now that we've shared a brief history of 3D printed

guns with you, let's take a look at the laws that have been drawn up to prevent people from 3D printing their own firearms.

Defense Distributed wants the 3D printed gun to be treated the same as regular weapons in the US (image: Marisa Vasquez)

# State of 3D Printed Guns in the United States of America

Prior to the settlement victory for Wilson, the U.S. Government had pushed back hard against 3D printable gun models.  After the Liberator was deemed in violation of the International Traffic in Arms Regulations (ITAR), Wilson filed a federal civil suit against the State Department.

In September 2016, the United States Court of Appeals for the Fifth Circuit rejected his preliminary injunction request, claiming that national security concerns outweigh Defense

Distributed's First Amendment right to freedom of speech.

Even though the State Department has succeeded to keep 3D gun files illegal in court, Wilson's design and a handful of others have seeped through the cracks of the internet. There have been a number of instances where 3D printed guns have been confiscated by police the US.

In August 2016, Transportation Security Administration (TSA) at the Reno–Tahoe International Airport found a 3D printed gun and five .22-caliber bullets in a passenger's carry-on bag. The year prior, two felons in Oregon were caught with an assault rifle that had a 3D printed lower receiver attached to it.

It is illegal under the Undetectable Firearms Act to manufacture any firearm that cannot be detected by a metal detector. 3D printed guns are usually made from PLA or ABS and are therefore not allowed in the US, as legal designs for firearms require a metal plate to be inserted into the printed body.

Some states that allow firearm ownership have taken up the issue of 3D printed guns themselves. For example, California passed a law that requires a 3D printed gun to be properly approved and registered. But with relatively lax gun laws already exisiting in a number of US states, 3D printed guns have proven to be more of a glaring problem in Australia, which has much stricter anti-gun legislation.

3D printing isn't the only manufacturing method being used to create gun parts under the radar. In February 2017, a California man known as "Dr. Death" was arrested and sentenced to three and a half years in prison for using CNC milling to manufacture and sell firearms. This traditionally industrial technology has also become more accessible over the years and is considerably more of a threat due to its ability to work with metal.

Now that Defense Distributed is legally allowed bringing their

DIY firearm blueprints back online, it will be interesting to see how each state decides to handle the situation.

All in all, when it comes to producing or obtaining weapons in an unlawful manner, 3D printing is far from preferable, at least in the current state of the technology. Criminal organizations may look towards 3D printing more often as the technology advances, but for now, most of the fear seems unjustified. At the end of the day, where there's a will, there's a way.

## State of 3D Printed Guns in Australia

Exhibit B: A haul by the New South Wales Police in Australia

No country has encountered as much legal trouble with 3D printed guns as Australia has. Their strict firearm legislation has limited the access to traditional weapons. So some have turned to 3D printing to help circumvent the law.

In November 2016, Gold Coast police discovered a highly sophisticated weapons production facility that used 3D printers to produce machine guns. A month later, a collection of 3D printed firearms were seized in Tasmania, but the manufacturer was let off with a warning. Perhaps Australia's most concerning case, police recently linked the discovery of 3D printed guns in Melbourne to the Calabrian mafia.

To combat the rise of 3D printed guns, New South Wales passed a law equating possession of 3D gun files to actual possession of a 3D printed gun. Some of Australia's Senate members have their doubts about 3D printed guns being an imminent threat, and that further restrictions would hinder 3D printing innovation overall. The country's Green Party has been a staunch opponent to 3D printed guns, citing the growth of the technology as proof that 3D printing will be capable of producing more dangerous weapons soon.

In 2013, New South Wales police tested out a 3D printed gun. With this handgun, they were able to fire a bullet 17 centimeters into a standard firing block, but the plastic exploded when the bullet was discharged.

In 2015, the county amended its firearms act to include a clause that says "A person must not possess a digital blueprint for the manufacture of a firearm on a 3D printer or on an electronic milling machine… [or face a] Maximum penalty: imprisonment for 14 years."

But the situation in Australia is trickier than most. The glaring amount of confiscated 3D printed weapons seems to be linked to the country's strict laws, making traditional metal firearms much more difficult to come across than they are in the US. It's important to note that while a plastic 3D printed gun poses a minimal risk, most Australian legislators fear the increasing accessibility and affordability of metal 3D printers will come back to haunt them.

# State of 3D Printed Guns in Europe and United Kingdom

Contrary to Australia, the strict gun control laws in Europe have reduced the threat of 3D printed guns. Still, when you look at the regions that downloaded the Liberator files the most, you'll find that most of the leading countries are located in Europe. During the two initial days Wilson's infamous 3D printed gun was available online, it was downloaded the most in Spain, followed by the US, Brazil, Germany, and the United Kingdom.

The United Kingdom has been particularly concerned with the rise of 3D printed guns, calling them a threat to national security. In 2013, the UK Home Office introduces stricter regulations on 3D printed guns or gun parts, making it highly

illegal to create, buy, or sell them in Great Britain.

Thus far, the threat of 3D printed guns in Europe has mostly been confined to television. In the recent past, the Italian crime TV series Gomorra has depicted a RepRap 3D printer being used to create a 3D printed gun.

# State of 3D Printed Guns in Asia and the Middle East

The ZigZag pistol from Yoshitomo Imura.

The 3D printed gun controversy isn't just restrained to the western world. Shortly after Wilson's design surfaced, Japanese citizen Yoshitomo Imura designed and printed a six-shot revolver known as the ZigZag. The government ended up sentencing him to two years in prison for 3D printing guns and

also instructing others.

In Singapore, possession of a 3D printed gun is punishable by death, even if it's an air pistol.

China has also taken extreme measures to monitor and prevent 3D printed guns and other weapons from surfacing. Police in Chongqing are requiring all companies with 3D printers to register themselves as "special industries", asking for the equipment in use, the security measures they have in place, and even information on all employees.

While police in China certainly fear the potential rise of the 3D printed gun, other citizens feel that the law is an overreaction. According to Kwok Ka Wai, assistant professor in the mechanical engineering department at the University of Hong Kong, there are practical limitations on using 3D printing to manufacture weapons or other items protected by copyright.

"There are a lot of tools that you can use to make bad things, but they are not tailor-made for that purpose," he says.

Although they're the most focused on, 3D printed guns are far from the only weapon that 3D printing can potentially be used to manufacture. Concerns have also mounted in the Middle East over the possibility that ISIS is using 3D printing to produce bombs.

# 3D Printed Guns on the Darknet

With the distribution of 3D gun models illegal across the world, these 3D gun models have found a home on the darknet. Sold alongside traditionally manufactured firearms and other black market weapons, 3D printable gun designs are being distributed more and more through the deep web.

A recent study from the non-profit research organization RAND Corporation discovered a startling rise in 3D gun models. While looking at the entire darknet market for weapons, the researchers found that 11 of the for-sale items were CAD files for firearms.

**Read More:** 3D Printed Gun Designs Surface on Dark Web for $12

Now, it's clear that CAD models are still way less threatening than the physical firearms sold on the black market, but the mere presence hints at a potentially dangerous situation in the future. What stood out the most to the RAND research team is the average cost of 3D gun models. While the average gun costs $1,200 on the darknet, a price for a 3D printable gun design averages out to $12.

Not only is the cost for these CAD models extremely low, but such files can be sold over and over again. Therefore, if and when the day comes where metal 3D printers become more affordable, it's possible that this minor issue could start to loom larger.

# The 3D Printed Gun: Conclusion

There's no denying that 3D printed guns are being discovered in different parts of the world. They are getting more popular in Australia and the U.S. But are these makeshift weapons really the treat the media portrays them to be? Ultimately, the answer seems to be yes, but more so no.

The current lack of access to affordable metal 3D printing makes producing a functional 3D printed gun *solely* with plastic difficult. But for most firearm components, this emerging technology could soon become a viable option for gunsmiths, gun advocates, and even criminal organizations. Also, the materials you can 3D print with are getting better and better.

At this point, there have been no violent crimes attributed to a 3D printed gun. But still, a more realistic threat will likely arise when access to metal 3D printing increases in the near future.

It might seem easy to dismiss anti-3D printed gun legislation as overreaching and embellished. But that doesn't mean the various laws preventing the production and sharing of 3D printed guns don't have any merit. Just as with any other youthful technology, 3D printing will continue to advance and become more affordable. If you couple this with recent court settlement allowing Wilson and Defense Distributed to upload 3D printed gun models online, there certainly a slight reason to be concerned about the future of Ghost Guns.

However, for the time being, the fear-mongering campaign on 3D printed guns is a bit overblown. While this emerging technology is providing incredible benefits to the medical, industrial, and consumer sectors, the mainstream media only

seems interested in 3D printing when it seems like weapons
are falling out of your 3D printer's extruder.

At the end of the day, there's no reason to fear a 3D printed
gun any more than you would a conventionally manufactured
or CNC milled firearm. Most desktop 3D printers are not
capable of creating a lethal and fully functional weapon on
their own, and metal 3D printed guns are far too expensive to
appeal to the average criminals.

There's a reason that no violent crimes involving 3D printed
guns have been reported. They're unreliable, difficult to
produce, and in most places, are harder to come across than
black market firearms. But, recent developments in both 3D
printing technology and the law could make 3D printed guns a
more imminent threat in the near future, so it's pertinent that
we keep an eye on this space to see how things change.

License: The text of "2018 3D Printed Gun Report – All You Need to Know" by All3DP is
licensed under a Creative Commons Attribution 4.0 International License.



a native DWG & DXF 2D Drafting & 3D Modeling

CAD Software

RECOMMENDED FOR YOU

**TOPICS**

**3D PRINTED GUNS**

BACK TO TOP

# All3DP

World's Leading 3D Printing Magazine with Compelling Content. For Beginners and Pros. Useful, Educational, and Entertaining.

## Information

- ABOUT US
- PRIVACY POLICY
- TERMS OF USE
- IMPRINT

## Links

- 3D PRINTING SERVICES
- NEWSLETTER
- CONTENT ACADEMY
- ADVERTISE WITH US

## Follow us

- FACEBOOK
- TWITTER
- GOOGLE+
- REDDIT

Exhibit 20

# EXHIBIT G

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

———————————————————————

DICK ANTHONY HELLER, *et al.*,   )
                                )
                 Plaintiffs,    )
                                )
        v.                      )   Civil Action No. 08-01289 (JEB)
                                )
DISTRICT OF COLUMBIA, *et al.*, )
                                )
                 Defendants.    )
———————————————————————         )

## DECLARATION OF CATHY L. LANIER

Pursuant to 28 U.S.C. § 1746, I, Cathy L. Lanier, declare and state as follows:

1.    I am over the age of eighteen (18) years, competent to testify to the matters contained herein, and testify based on my personal knowledge and information, including information provided to me by other District of Columbia employees in the course of my official duties.

2.    I submitted an expert report in this matter on April 19, 2013, and was deposed by plaintiffs' counsel on June 12, 2013. The views I state herein are drawn from my professional experience, my previous report, and deposition testimony.

3.    I testified before the Council of the District of Columbia Committee on the Judiciary in 2008 and 2012 concerning Bill 17-843 (the "Firearms Amended Act of 2008") and Bill 19-614 (the "Firearms Amendment Act of 2012"), respectively, and before the United States House of Representatives Committee on Oversight & Government Accountability in 2008 concerning H.R. 6691 (the "Second Amendment Enforcement Act").  My opinions in this case elaborate and expand upon the above-referenced testimony.

## BACKGROUND AND QUALIFICATIONS

4.      I am the Chief of Police of the Metropolitan Police Department of the District of Columbia ("MPD"), a position I have held since 2007.  I have worked in the MPD for my entire law enforcement career, dating back to 1990.

5.      During my tenure as Chief, I have overseen MPD's efforts to develop and implement better strategies to prevent gun violence, and arrest and prosecute violent criminal offenders.  In November 2007, I reinstituted the Gun Recovery Unit, which had been disbanded in the 1990s, and staffed it with officers with enhanced training on identifying and recovering illegal guns.  In March 2008, the District began a collaborative information-sharing process among local criminal justice agencies, including police, prosecutors, Superior Court, and the Court Services and Offender Supervision Agency ("CSOSA") and the D.C. Pretrial Services Agency.  The collaboration tracks gun cases from arrest to prosecution, allowing these agencies to identify repeat offenders, follow trends, and create law-enforcement strategies to prevent gun-related crimes.  During my tenure as Chief, MPD has continued its long-running efforts to get illegal guns off of the street, and, as of early October, 2013, has successfully recovered more than 13,000 illegal firearms since 2007.

6.      Prior to serving as Chief, I served in a number of positions within MPD that gave me extensive experience analyzing terrorist threats in and to the District and developing ways to combat them.  Between 2002 and 2006, I served as Commander of MPD's Special Operations Division ("SOD"), where I managed the Special Events/Dignitary Protection Branch, Emergency Response Team, Aviation and Harbor Units, Horse Mounted and Canine Units, and Civil Disturbance Units. During my tenure as SOD Commander, I established the agency's first

2

Homeland Security/Counter-Terrorism Branch and created an agency-wide chemical, biological, radiological response unit known as the Special Threat Action Team.

7. In 2006, I was named the first Commanding Officer of MPD's Office of Homeland Security and Counter-Terrorism ("OHSCT"). In this role, I worked extensively with a multi-agency taskforce of local and federal law enforcement agencies to plan and implement security for critical events like the Presidential Inaugural. In addition, I took the lead role in developing and implementing coordinated counter-terrorism strategies for all units within the MPD and launched Operation TIPP ("Terrorist Incident Prevention Program").

8. Prior to these positions, I served in uniformed patrol, including as Commander of the Fourth District, one of the largest and most diverse residential patrol districts in the city. I have also served as the Commanding Officer of the Department's Major Narcotics Branch and Vehicular Homicide Units.

9. I am a graduate of the FBI National Academy and the federal Drug Enforcement Administration's Drug Unit Commanders Academy. I have Bachelor's and Master's Degrees in Management from Johns Hopkins University, and a Master's Degree in National Security Studies from the Naval Postgraduate School in Monterey, California.

## MATERIALS REVIEWED

10. In preparing to present my opinions here, I reviewed the following materials:

a. Plaintiffs' Third Amended Complaint (For Declaratory Judgment, Injunctive Relief, and Writ of Mandamus) July 31, 2012.

b. The parties' written responses and documents provided in discovery in this case.

c. D.C. Official Code §§ 7-2501.01 *et seq.* (2012 Supp.), as amended.

d. Title 24, D.C. Municipal Regulations, Ch. 23, as amended.

e. The materials found at the Metropolitan Police Department's website regarding firearms registration, *http://mpdc.dc.gov/service/firearm-registration-district-columbia*, including the Online Firearms Safety Training Course and "Firearms

3

Registration: General Requirements and Study Guide" (available at *http://mpdc.dc.gov/sites/default/files/dc/sites/mpdc/publication/attachments/firearms_reg_req.pdf*).

f. Steven A. Sumner, *et al*., "Firearm Death Rates and Association with Level of Firearm Purchase Background Check," Am. J. Prev. Med. (July 2008); 35(1) 1-6.

g. Metropolitan Police Department, *Annual Report 2011*, available at http://mpdc.dc.gov/sites/default/files/dc/ sites/mpdc/publication/attachments/ar_2011_0.pdf.

h. D. WEIL, R. KNOX, *Effects of Limiting Handgun Purchases on Interstate Transfer of Firearms*, 275:22 JAMA 1759-1761 (1996).

## EXPERT FINDINGS

### *The District Presents Unique Law Enforcement Challenges*

11.    Washington, D.C., poses unique security challenges for law enforcement given its status as the Nation's Capital. Protecting government officials and infrastructure is a challenge for every city in the United States, but in the District – where the likelihood of terrorist attack is higher – the challenges to law enforcement are even greater.

12.    The District's high concentration of iconic structures – such as the national monuments, the White House, and the Capitol – provide obvious targets for would-be terrorists, both foreign and domestic. In addition, the District hosts 187 foreign embassies with facilities at more than 500 locations, as well as the headquarters of many international organizations, trade unions, non-profit organizations, lobbying groups, and professional associations. As we have learned from the bombing of the Murrah Federal Building in Oklahoma City and the 1993 shootings outside of CIA headquarters at Langley, Virginia, any Federal building or career public servant can be a potential target. Indeed, just since I've been a member of MPD, there have been no less than three incidents in which multiple shots have been fired at the White House (in 1994, 2001, and 2011), at least two of which involved a semi-automatic rifle.

4

13.     Further, the District offers no shortage of high-profile human targets, including the President, members of Congress, and Supreme Court justices.  In addition to members of the U.S. government, approximately 3,000 foreign dignitaries spend time in the District each year, including more than 400 who make official visits each year.  Moreover, approximately 8,000 delegates come to Washington from around the world each Fall for a meeting of the Boards of Governors of the International Monetary Fund and World Bank.  Indeed, the sheer volume of secure motorcades traveling in Washington on any given day – including the daily movement of the President, Vice President, and their families – present a substantial security challenge, distinct from other American cities.

14.     In addition to assisting in the secure movement of government officials and protecting foreign dignitaries, MPD also provides security support for more than 4,000 special events annually, including the Fourth of July celebration on the National Mall, the National and Marine Corps Marathons, large demonstrations involving hundreds of thousands of participants and frequently counter protests, and the Presidential Inauguration.

15.     As a law enforcement officer, my immediate concern is to protect the public.  In the District, where a terrorist incident, no matter how small, would garner world-wide attention and could have significant international implications, the stakes are even higher. Moreover, as Chief, the safety of the men and women of MPD serving this city and country are my responsibility, and I take this responsibility very seriously.

16.     In my professional opinion, the District's firearms-registration laws significantly aid MPD's efforts to prevent violent crime, ensure the security of the Nation's Capital, and protect the safety of law enforcement officers and members of the public.

5

*The District's Firearms Registration Laws Aid MPD's Law Enforcement Efforts*

17.     The District's firearm-registration process serves four key objectives: (i) verifying the eligibility of the owner to legally possess the firearm; (ii) ensuring that owners have a common body of knowledge of firearms laws, responsibilities, and safety; (iii) providing law enforcement with the information necessary to readily identify legal firearms and their rightful owners; and (iv) preventing the illegal trafficking of firearms into or out of the District.

*Verifying Eligibility*

18.     The first objective of the District's firearms regulations is to keep firearms out of the hands of individuals who, experience has shown, pose the greatest threat to the public, such as felons and the mentally ill. For example, the assault on Congresswoman Gabrielle Gifford in January 2011, in Arizona, during which six individuals were killed, the Virginia Tech massacre, during which 33 people were killed, and the 2012 shooting at a movie theater in Aurora, Colorado, during which 12 were killed, were all committed by individuals with a history of mental illness.  In the District, an attempt was made on the life of the President as recently as 2011 by a man with a history of mental illness who used a high-powered rifle to shoot at the White House.  More famously, John Hinkley – whose mental health issues are now well known – nearly succeeded in assassinating President Reagan outside of the Washington, D.C., Hilton in 1981.

In-Person Registration and Fingerprinting

19.     In my professional opinion, the District's requirement of an initial in-person registration and background check, which includes a local-level check of the applicant's criminal and mental health history, is the best means to verify an applicant's eligibility to possess a firearm.  Indeed, a 2008 study found that states that use local-level agencies—such as local

police or sheriff's departments—to perform background checks for firearms have lower rates of homicide and suicide than states that simply rely on a federal background check.[1]

20.    Further, the criminal background check performed by MPD, which is based on fingerprints, is more effective than that performed by a gun dealer, which is merely based on a social security number. Identity theft is rampant, and gun dealers are not necessarily well trained in identifying false documents. The use of fingerprints provides MPD with a means of biometric identification, which ensures that the applicant is who he says he is and that MPD is performing a background check on the correct person.

Registration

21.    In addition to verifying eligibility at the time of registration, law enforcement has a strong interest in ensuring that a registrant does not become ineligible to possess a firearm over time. For example, if a registrant is convicted of a felony or domestic violence, or is committed by the court for mental health treatment, the District needs to know where the firearm is so that, if the registrant does not voluntarily surrender the firearm as required by law, police can take possession of it.

22.    MPD currently is in the process of finalizing its procedures with respect to the re-registration requirement, and expects to implement those procedures in January 2014.

*Ensuring a Common Body of Knowledge*

23.    Anyone who possesses and registers a firearm should be aware of the laws and requirements for responsible gun ownership, as well as key safety principles. Even if a firearm is only kept in the home, the government has an interest in reducing accidental discharges, ensuring that guns are safely stored, and ensuring that owners are aware of the laws governing firearms.

---

[1] Steven A. Sumner, *et al.*, "Firearm Death Rates and Association with Level of Firearm Purchase Background Check," Am. J. Prev. Med. (July 2008); 35(1) 1-6, *available at* http://download.journals.elsevierhealth.com/pdfs/journals/0749-3797/PIIS0749379708003103.pdf.

Training with respect to the safe handling and storage of a firearm is a requirement in most every law enforcement profession that requires the carrying of a firearm. Safe handling is one of the very first components of training, to reduce accidental discharges by police, who handle firearms every day.

24.     Moreover, in order to make registrants more clearly accountable under the law, it is important to be able to demonstrate that they were taught and aware of the requirements. These are common-sense requirements that have been adopted elsewhere. Currently, California, Connecticut, Hawaii, Massachusetts, and Michigan all have laws requiring some sort of training or safety certification as part of the registration process, and other jurisdictions are considering instituting similar requirements.

25.     The District's requirement that an applicant provide evidence of the completion of a firearms training and safety class, which can be completed online, and demonstrate knowledge of the District's laws pertaining to firearms, "in particular, the safe and responsible use, handling, and storage of the same" is, in my opinion, a reasonable and effective means of reducing gun-related accidents.

*Providing Law Enforcement Officers With Critical Information*

26.     More law enforcement officers are killed by firearms than any other single cause. In 2011, 71 officers were fatally shot, the highest single-year total in the past decade. The District's firearms-registration requirements also serve to provide law enforcement officers with critical information needed to protect their safety and the safety of the public.

27.     For example, a registration certificate with photo identification, as required by District law, is critical to protecting the safety of police officers and the public. Individuals who legally register their firearms are much less likely to use those firearms for criminal purposes. As

8

a result, an individual with a legally registered firearm may pose less danger to an officer than someone with an illegal firearm. A certificate with a photo helps to quickly and safely communicate a registrant's legal status to a law enforcement officer. Without this, in many instances it would be far more difficult for officers to readily distinguish between a registered owner legally transporting a firearm, and someone transporting an illegal firearm. This photo identification, in turn, helps to keep both the officer and the registrant safe.

28.     In addition, the requirement that a registrant notify the Chief when a registered weapon is lost, stolen, sold, transferred, or otherwise disposed of, provides law enforcement officers with important information. The notification provides law enforcement with the opportunity to investigate and potentially recover the weapon before it is used in a crime. At the very least, the notification requirement can help protect the registrant from being associated with a crime that is later committed with that firearm.

*Preventing Gun Trafficking*

29.     In addition to tracing legal guns used in crime, the District has a strong interest in preventing the trafficking of illegal firearms into or out of the District. Firearms recovered in the District are traced overwhelmingly to neighboring states, such as Maryland or Virginia. In 2011, these two neighboring states accounted for 63% of the total number of successful traces.[2] Studies have shown that laws restricting the registration or purchase of multiple firearms in a given period are effective in disrupting illegal interstate trafficking of firearms.[3]

---

[2] Metropolitan Police Department, *Annual Report 2011*, at 27, available at http://mpdc.dc.gov/sites/default/files/dc/sites/mpdc/publication/attachments/ar_2011_0.pdf.

[3] *See* D. WEIL, R. KNOX, *Effects of Limiting Handgun Purchases on Interstate Transfer of Firearms*, 275:22 JAMA 1759-1761 (1996).

30.     In my opinion, the District's prohibition on registering more than one newly acquired handgun per month provides important benefits in terms of deterring and controlling the trafficking of firearms into or out of the District.

### *Long guns v. Handguns*

31.     In my professional opinion, the objectives of the District's firearm registration laws are just as applicable to long guns as they are to handguns. Particularly in light of the District's unique security concerns, I believe that long guns in the District should be subject to the same regulations as handguns.

32.     Historically, high-powered rifles have been the preferred tool of political assassins, as they typically are more accurate over a longer range. Indeed, as discussed above, a high-powered rifle was used by Oscar Ortega in 2011 to make an attempt on the life of the President by shooting at the White House from the National Mall. Also, in 2009, a man used a .22 caliber rifle in a fatal shooting at the Holocaust Museum.

33.     Although handguns may be a more frequent weapon of choice for criminals on the street (and for homeowners), for their easier use and concealability, long guns can also be used with deadly precision. And if an assailant is traveling by vehicle, as the shooters in the above examples were, there is no need to try to hide a gun in a pocket.

34.     It is not just "lone-wolf" gunmen who use long guns. Although they are less commonly used in the commission of crimes in the District than handguns, they are used, and in this urban environment, their longer range can make them even more dangerous than a handgun. In the city, when you miss your target with a long gun, it is very likely to hit an unintended target. For example, the March 2010 South Capitol Street shooting, in which 10 young people

were wounded and four were killed, was committed with an AK-47 shot from within a moving vehicle.

35.    There are few, if any, areas of the city that have the open space for which long guns are typically used in more rural areas, such as for recreational target shooting. Moreover, hunting has been illegal in the District since 1906. While fewer criminals may choose to use long guns as opposed to handguns, they are still dangerous and potentially deadly weapons, and should be regulated accordingly.

36.    In summary, I think that the District's firearm-registration process is vital to MPD's efforts to secure the Nation's Capital, and it clearly enhances the safety of both law enforcement and the public.

_____

Cathy L. Lanier
Chief of Police
Metropolitan Police Department

OCT – 7 2013
_____
DATE

11

Exhibit 21



BREAKING NEWS   Republican holds narrow lead in high-stakes Ohio election that's still too close to call   ⊕ Read Story

# Plastic 3D guns printed at home will raise threat level for everyone, especially Congress

**Terrance Gainer, Opinion contributor**   Published 3:29 p.m. ET Aug. 1, 2018 | Updated 4:47 p.m. ET Aug. 1, 2018



Guns made with 3D printers are just as lethal, but aren't traceable, don't require background checks and won't be detected by metal detectors. USA TODAY

*A judge has temporary blocked online instructions for 3D printed guns. We need a permanent ban before tragedy strikes at the Capitol and elsewhere.*

CONNECT   TWEET   LINKEDIN   💬 23 COMMENT   EMAIL   ⬆ MORE

It's difficult to imagine, but last Friday the federal



*(Photo: USA TODAY via Department of Justice)*

government made it easier for anyone with internet access to download designs for creating a 3D-printed plastic firearm in their homes. This decision would allow individuals with dangerous histories to access online blueprints, evade state and federal gun laws and print an untraceable weapon without even obtaining a background check. Many of these downloadable guns would circumvent the federal law banning plastic guns and can be printed entirely in plastic.

As a former Chief of U.S. Capitol Police and Senate Sergeant at Arms, I know that a failure to permanently stop downloadable guns will increase the challenges of protecting the security of members of Congress, their staff and visitors to the Capitol.

To enter a building on the Capitol complex, visitors and staff must pass through a screening checkpoint run by Capitol Police. Any kind of deadly weapon — including guns — is prohibited in the complex to ensure that members can conduct their official business without the threat of violence from those who might wish to do them harm. Unfortunately, even the most technologically advanced security cannot neutralize all possible threats

## Rising threat level from plastic guns

Last week, the Capitol community paused in a moment of silence to recognize the lives of Detective John Gibson and Officer Jacob Chestnut, who were killed by a deranged gunman in 1998. That shooting changed security at the Capitol forever, but it hasn't stopped the threats to members and visitors. Last month, we recognized the one-year mark of the congressional baseball practice shooting in Alexandria, Virginia, where members, staff, and friends were shot and injured. Two years ago, another individual brandished a BB gun in the Capitol Visitor Center full of tourists.

The Capitol Police is constantly re-evaluating the threats facing the Capitol and the people it protects. But it's difficult to imagine how much worse these threats would be if plastic firearms were readily available.

**More:** De(ja)Vos: Education chief's decision to ignore guns' role in shootings echoes Bush debacle

Would the Founders want our kids to die in school shootings like Santa Fe? I doubt it.

On guns, we're as paralyzed as I was the day my nephew was shot: Montana governor

Last weekend, because of special treatment from the State Department, a Texas company made downloadable instructions for 3D printing firearms readily available online. Anyone with access to a computer, an internet connection, and a capable 3D printer — including terrorists, felons, and others with dangerous histories — was able to make a variety of untraceable handguns, rifles, and assault weapons.

This type of capability increases the challenges for law enforcement, especially at the Capitol. We already have a wealth of intelligence that shows terrorists want to inflict at least symbolic damage to the Capitol because it represents freedom and American democracy. Just last year, an Islamic State propaganda magazine stressed the use of easily available guns in the U.S. to commit terrorist acts. With widely available downloadable instructions, the ingenuity of potential offenders who wish to do harm at the Capitol will challenge the technology of detection and defense, even in a secure



Share your feedback to help improve our site experience!

POPULAR STORIES



## The horror I saw at an immigration shelter

usatoday.com | 9 hours ago



Noah to Trump: 'Why do you ignore me?'

usatoday.com | 10 hours ago

It's Mueller time: Our view

usatoday.com | 5 hours ago



The next step in criminal justice reform

usatoday.com | 18 hours ago



Making a martyr of Alex Jones: Today's Talker

usatoday.com | 10 hours ago

facility protected by Capitol Police.

## 3D guns are a unique threat to our leaders

While I strongly support the Second Amendment and appreciate the fundamental right of American citizens to keep and bear arms, our elected leaders must recognize the unique threat downloadable firearms pose to public safety. Protecting visitors, staff, and members in the Capitol from harm is an obligation not just for Capitol Police, but it is a responsibility for all of our elected officials.

On Tuesday night, a federal court in Washington State issued a nationwide order that temporarily stopped the company's publication of the blueprints online. But this injunction only lasts until Aug. 10. We can sit by and wait for Aug. 11 to end up in the same place as we were before the courts rightfully stepped in. Or, our leaders can permanently stop downloadable guns before tragedy strikes.

President Trump's State Department must reverse the temporary modification to the United States Munitions List and withdraw the special exemption granted to the company immediately. And as the State Department finalizes a proposed rule about exporting guns that have already been built by manufacturers, it must keep gun schematics on the U.S. Munitions List and continue prohibiting the posting of these blueprints online.

Congress does not need to wait for the State Department and should pass legislation that will stop downloadable guns from being available online. Protecting the Capitol is not a partisan issue and I urge all members to support common sense proposals that will keep us safe.

Inaction on this important issue of public safety and national security is unacceptable.



3-D printers make guns and more

| 1 of 18 | | | | |

*Terrance Gainer is a former law enforcement officer, Chief of the United States Capitol Police and was the 38th Sergeant at Arms of the United States Senate, serving in that position from January 4, 2007 to May 2, 2014.*

*You can read diverse opinions from our Board of Contributors and other writers on the Opinion front page, on Twitter @usatodayopinion and in our daily Opinion newsletter. To respond to a column, submit a comment to letters @usatoday.com.*

     

CONNECT  TWEET  LINKEDIN  23 COMMENT  EMAIL  MORE

**AD CONTENT**

Sponsored Links by Taboola 



**Lacey, Washington: This Tiny, Unknown Company Is Disrupting A $200 Bil...**
EverQuote Insurance Quotes



**Early Signs And Treatments For Diabetic Nerve Pain**
Yahoo Search



**Patrick Swayze's Son Is A Spitting Image Of Him**
Refinance Gold



**Celine Dion: "He Is The Love Of My Life"**
DomesticatedCompanion

**How to Stop Dog Barking in Seconds?**
PetGentle

**15 Discounts Seniors Get Only If They Know**
Improve Budget

