# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WASHINGTON
### AT SEATTLE

STATE OF WASHINGTON, *et al.*,

    Plaintiffs,

  v.

UNITED STATES DEPARTMENT OF STATE, *et al.*,

    Defendants.

No. 2:18-cv-1115-RSL

**Brief of Amicus Curiae Everytown for Gun Safety in Support of Plaintiffs' Motion for a Preliminary Injunction**

DEEPAK GUPTA (*pro hac vice*)
DANIEL TOWNSEND
Gupta Wessler PLLC
1900 L Street, NW, Suite 312
Washington, DC 20036
(202) 888-1741
*deepak@guptawessler.com*

TOBY J. MARSHALL
BETH E. TERRELL
Terrell Marshall Law Group PLLC
936 N. 34th Street, Suite 300
Seattle, WA 98103-8869
(206) 816-6603
*tmarshall@terrellmarshall.com*
*bterrell@terrellmarshall.com*

LAURENCE H. TRIBE
Carl M. Loeb University Professor
and Professor of Constitutional Law
Harvard Law School*
1575 Massachusetts Avenue
Cambridge, MA 02138
(617) 495-1767

ERIC TIRSCHWELL
WILLIAM J. TAYLOR, JR.
Everytown for Gun Safety Support Fund
132 E. 43rd Street, #657
New York, NY 10017

*Affiliation noted for identification purposes only

*Counsel for Amicus Curiae Everytown for Gun Safety*

BRIEF OF AMICUS CURIAE EVERYTOWN FOR
GUN SAFETY IN SUPPORT OF PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION
No. 2:18-cv-1115-RSL

GUPTA WESSLER PLLC
1900 L Street, NW Washington, DC 20036
(202) 888-1741

# TABLE OF CONTENTS

Table of authorities ............................................................................................... ii

Introduction and interest of amicus curiae ........................................................ 1

Argument ................................................................................................................ 4

    I.      Because downloadable guns are a form of computer code that is purely functional, they lack any expressive value for the First Amendment to protect. ............................................................................................ 4

    II.     Downloadable guns are also excluded from First Amendment protection because their purpose and effect is to cause widespread violations of federal and state law.................................................................................. 9

    III.   Assuming that the requested injunction would restrain protected speech, that restraint would be, at most, subject to intermediate scrutiny................. 13

    IV.   The Ninth Circuit has repeatedly held that the law's restriction on distribution of technical data survives intermediate scrutiny. ....................... 15

Conclusion ............................................................................................................ 17

i

BRIEF OF AMICUS CURIAE EVERYTOWN FOR
GUN SAFETY IN SUPPORT OF PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION
No. 2:18-cv-1115-RSL

GUPTA WESSLER PLLC
1900 L Street, NW Washington, DC 20036
(202) 888-1741

# TABLE OF AUTHORITIES

**Cases**

*Bernstein v. U.S. Department of Justice,*
    176 F.3d 1132 (9th Cir.) ........................................................................... 5

*Brown v. Entertainment Merchants Association,*
    564 U.S. 786 (2011) ................................................................................. 6

*Commodity Futures Trading Commission v. Vartuli,*
    228 F.3d 94 (2d Cir. 2000) ................................................................... 6, 9

*DVD Copy Control Association, Inc. v. Bunner,*
    75 P.3d 1 (Cal. 2003) ............................................................................. 14

*Giboney v. Empire Storage & Ice Co.,*
    336 U.S. 490 (1949) ............................................................................... 10

*Hill v. Colorado,*
    530 U.S. 703 (2000) ............................................................................... 15

*Junger v. Daley,*
    209 F.3d 481 (6th Cir. 2000) ............................................................. 5, 14

*Reed v. Town of Gilbert,*
    135 S. Ct. 2218 (2015) ........................................................................ 1, 14

*Rice v. Paladin Enterprises, Inc.,*
    128 F.3d 233 (4th Cir. 1997) ........................................................... 10, 12

*Sorrell v. IMS Health Inc.,*
    564 U.S. 552 (2011) ............................................................................. 5, 6

*Spence v. State of Washington,*
    418 U.S. 405 (1974) ................................................................................. 6

*United States v. Aguilar,*
    883 F.2d 662 (9th Cir. 1989) ................................................................. 10

*United States v. Alvarez,*
    567 U.S. 709 (2012) ................................................................................. 9

*United States v. Barnett,*
    667 F.2d 835 (9th Cir. 1982) ................................................................. 10

BRIEF OF AMICUS CURIAE EVERYTOWN FOR
GUN SAFETY IN SUPPORT OF PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION
No. 2:18-cv-1115-RSL

GUPTA WESSLER PLLC
1900 L Street, NW Washington, DC 20036
(202) 888-1741

*United States v. Chi Mak,*
    683 F.3d 1126 (9th Cir. 2012)..............................................2, 16, 17

*United States v. Edler Industries, Inc.,*
    579 F.2d 516 (9th Cir. 1978)...................................................16

*United States v. Freeman,*
    761 F.2d 549 (9th Cir. 1985)...................................................10

*United States v. Mendelsohn,*
    896 F.2d 1183 (9th Cir. 1990)...........................................10, 11, 12

*United States v. O'Brien,*
    391 U.S. 367 (1968)...........................................................17

*United States v. Osinger,*
    753 F.3d 939 (9th Cir. 2014)...............................................10, 11

*United States v. Posey,*
    864 F.2d 1487 (9th Cir. 1989).................................................16

*United States v. Progressive,*
    *Inc.,* 467 F. Supp. 990 (W.D. Wis. 1979).......................................9

*Universal City Studios, Inc. v. Corley,*
    273 F.3d 429 (2d Cir. 2001)..............................................*passim*

**Statutes**

18 U.S.C. § 922(b)(1)............................................................12

Undetectable Firearms Act, 18 U.S.C. § 922(p)...................................12

Arms Export Control Act, 22 U.S.C. § 2778......................................15

International Traffic in Arms Regulations, 22 C.F.R. §§ 120–30..................15

**Other authorities**

Zusha Elinson,
    *Eight States Sue to Block Release of Plans for 3D-Printed Firearms,* The Wall Street
    Journal, July 31, 2018, available at https://on.wsj.com/2OwJRk7..............13

iii

BRIEF OF AMICUS CURIAE EVERYTOWN FOR
GUN SAFETY IN SUPPORT OF PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION
No. 2:18-cv-1115-RSL

GUPTA WESSLER PLLC
1900 L Street, NW Washington, DC 20036
(202) 888-1741

Cyrus Farivar,
*"Download this gun": 3D-printed semi-automatic fires over 600 rounds*,
Ars Technica, March 1, 2013, available at https://bit.ly/2KHJ78u ............................7

Andy Greenberg,
*A Landmark Legal Shift Opens Pandora's Box for DIY Guns*, Wired,
July 18, 2018, available at https://bit.ly/2uaCAOj ................................................. 7, 13

Marty Lederman,
*What's the deal with 3-D plastic guns—and what's the Freedom of Speech got to do with it?*,
Balkanization, Aug. 1, 2018, available at https://perma.cc/D8KS-3CCW ...............13

Mark McDaniel,
*Guns, Code, and Freedom*, Reason, Apr. 2018,
available at https://perma.cc/3WES-4XWF ............................................................3

Laurence Tribe,
*American Constitutional Law* (2d ed. 1988) ..........................................................9

Eugene Volokh,
*Free Speech and Computer Code—3-D Printer Gunmaking Files and Beyond*, The Volokh
Conspiracy, Aug. 2, 2018, available at https://perma.cc/3R2P-6DQP........................8

Eugene Volokh,
*Speech as Conduct: Generally Applicable Laws, Illegal Courses of Conduct,*
*"Situation–Altering Utterances," and the Uncharted Zones,*
90 Cornell L. Rev. 1277 (2005)........................................................................... 10, 11

iv

BRIEF OF AMICUS CURIAE EVERYTOWN FOR
GUN SAFETY IN SUPPORT OF PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION
No. 2:18-cv-1115-RSL

GUPTA WESSLER PLLC
1900 L Street, NW Washington, DC 20036
(202) 888-1741

# INTRODUCTION AND INTEREST OF AMICUS CURIAE

"The age of the downloadable gun formally begins." So says defendant Defense Distributed's website, announcing the settlement with the federal government that the state plaintiffs challenge in this case. Under the terms of that settlement, the federal government—in a dramatic about-face—now permits the company to globally distribute computer-aided design (CAD) files that, when inputted into a 3-D printer, will automatically construct all the components of an undetectable, untraceable plastic gun. So long as the user does not add any metal components, these "downloadable guns" are invisible to metal detectors and can easily be smuggled into airports, prisons, courtrooms, movie theaters, stadiums, and other public places. If Defense Distributed follows through with its plan to post the files on its website, anyone in the world—including terrorists, dangerous felons, and domestic abusers—will immediately be able to obtain dangerous illegal weapons on demand, without any communication taking place.

Defense Distributed claims that the First Amendment gives it the unrestricted right to globally distribute the tools to automatically produce these downloadable guns. Any attempt to limit distribution, it argues, is a content-based restriction on protected speech that, under the Supreme Court's decision in *Reed v. Town of Gilbert*, 135 S. Ct. 2218 (2015), is subject to strict scrutiny. The company goes so far as to claim that distributing downloadable guns is *core political speech* because the code is "expressive content about the right to keep and bear arms." On that basis, it claims that the injunction the plaintiffs seek against the settlement's authorization of downloadable guns would be unconstitutional.

Although Defense Distributed couches its argument in the traditional language of the First Amendment, its unprecedented and far-reaching theory rests on what amounts to a serious category error—treating something as "speech" simply because it employs digital or alphanumeric characters to achieve its objective. Unsurprisingly, no court has held that

BRIEF OF AMICUS CURIAE EVERYTOWN FOR
GUN SAFETY IN SUPPORT OF PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION
No. 2:18-cv-1115-RSL

1

GUPTA WESSLER PLLC
1900 L Street, NW, Washington, DC 20036
(202) 888-1741

computer code that automatically constructs a physical object is "speech" at all, much less speech entitled to the *highest* level of constitutional protection. Such code is functional, not expressive. When deployed by its recipient or user, this immediately implementable code directly performs a series of physical operations. Unlike speech, its impact is not mediated by the mind of a reader, listener, or viewer. It asserts and expresses nothing and advocates nothing. It is not "about" anything. On the contrary, code that automatically builds a gun is, constitutionally speaking, indistinguishable from the gun itself. Whether a downloadable gun is printed by Defense Distributed and physically shipped to a consumer or downloaded and printed by the consumer directly, the result is the same: The consumer acquires not an idea or emotion but a physical gun. In the words of Defense Distributed's founder, Cody Wilson, "the code *is* a gun."

The company's position that downloadable guns are protected speech is especially far-fetched where the physical guns produced are themselves illegal (unless a user decides to add a sufficient quantity of metal). No sensible legal regime would allow the government to freely prohibit dangerous weapons while applying strict scrutiny to restrictions on code that automatically produces those same weapons. That is precisely the reason that the regulations at issue in this case restrict the export not only of military equipment, but also of technical data for the construction of that equipment, and that the Ninth Circuit has recognized the constitutionality of that restriction. *See United States v. Chi Mak*, 683 F.3d 1126, 1136 (9th Cir. 2012). This situation is clearer still: unlike data that does not *do* anything, the code involved here itself performs the gun-making process when inputted into an appropriate device.

Everytown for Gun Safety is the largest gun-violence-prevention organization in the country, with nearly five million supporters. The organization works in all 50 states and in Congress to support the passage and enforcement of gun-safety laws. It files this brief to

BRIEF OF AMICUS CURIAE EVERYTOWN FOR
GUN SAFETY IN SUPPORT OF PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION
No. 2:18-cv-1115-RSL

GUPTA WESSLER PLLC
1900 L Street, NW, Washington, DC 20036
(202) 888-1741

respond directly to Defense Distributed's flawed First Amendment theory—a theory that, if accepted by the courts, would seriously undermine the cause of gun safety. Indeed, Wilson's avowed purpose for providing downloadable guns is to render gun-safety laws unenforceable. "All this Parkland stuff, the students, all these dreams of 'common sense gun reforms'? No." he says. "The internet will serve guns, the gun is downloadable. . . . No amount of petitions or die-ins or anything else can change that."

It is hard to overstate the dangerousness of Wilson's strategy. The company is already prepared to distribute code for creating an undetectable plastic pistol and semiautomatic rifles like the AR-15, the gun used to murder seventeen students in Parkland. And 3-D printing is still in its early days. As the technology improves, even more dangerous and illegal weapons—such as fully automatic machine guns and bomb components—will likely become practical to produce. Since the federal government forced Wilson to stop distributing downloadable guns in 2013, he has continued to actively experiment with new 3-D printing technology and materials. *See* Mark McDaniel, *Guns, Code, and Freedom*, Reason, Apr. 2018, available at https://perma.cc/3WES-4XWF. He darkly hints at what is ready to share with the world if he prevails in his legal battle: "I've printed stuff, man, that takes it to a level you're not quite ready for." *Id.* "I'm never just going to say what's going to happen," he said. "I'm going to try to do it, and try to already be there before anyone can stop me." *Id.*

The application of strict scrutiny under the First Amendment to restrictions on the dissemination of downloadable weapons would leave the federal and state governments largely powerless to fight the threat posed by those weapons. As explained below, the Court should thus hold that restrictions on downloadable guns do not implicate the First Amendment, or are at most subject to, and satisfy, an intermediate standard of review. Either way, the Court should grant the injunction requested by the plaintiffs.

BRIEF OF AMICUS CURIAE EVERYTOWN FOR
GUN SAFETY IN SUPPORT OF PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION
No. 2:18-cv-1115-RSL

GUPTA WESSLER PLLC
1900 L Street, NW, Washington, DC 20036
(202) 888-1741

Defense Distributed claims a First Amendment right to distribute on the internet what it describes as "downloadable guns"—CAD files that, when inputted into a 3-D printer, automatically construct all the components of an undetectable, untraceable plastic weapon. The company's position is flawed for four reasons. *First*, code for automatically creating guns is not a form of expression entitled to First Amendment protection because it is functional and operational in nature. Because the code "talks" directly to a 3-D printer, producing gun components without intercession by a human mind, the code is less like a book on gun-crafting (which is undoubtedly expressive) and more like a physical gun (which is not). *Second*, even assuming that the code has some expressive value, the First Amendment would not protect it because both its purpose and effect would be to cause the widespread violation of gun-safety laws. The code is thus integral to criminal conduct and, for that reason, categorically excluded from the First Amendment's protection. *Third*, if the First Amendment protects the code at all, it requires only an intermediate standard of review, and the injunction that the plaintiffs request against enforcement of Defense Distributed's settlement would easily meet that standard. *Fourth*, the Ninth Circuit has already repeatedly upheld the constitutionality of the federal government's restrictions on exporting technical weapons data such as the CAD files here. Such restrictions, the court has explained, are merely incidental to the government's undoubted authority to regulate the export of weapons. For all of these reasons, the injunction should be granted.

## I. Because downloadable guns are a form of computer code that is purely functional, they lack any expressive value for the First Amendment to protect.

As a threshold matter, Defense Distributed's First Amendment argument fails because the company has no protected speech interest in the distribution of downloadable guns. Downloadable guns are a form of directly performable computer code—a set of

BRIEF OF AMICUS CURIAE EVERYTOWN FOR GUN SAFETY IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION No. 2:18-cv-1115-RSL

4

GUPTA WESSLER PLLC
1900 L Street, NW, Washington, DC 20036
(202) 888-1741

instructions intended not to affect the mind of anyone who perceives it but to be "read"—using the verb "to read" in what amounts to a metaphorical sense borrowed from the human analogue—and executed by a computer. *See Universal City Studios, Inc. v. Corley*, 273 F.3d 429, 446 (2d Cir. 2001). "[C]omputer code can instantly cause a computer to accomplish tasks." *Id.* at 451. Courts therefore recognize that code, though capable of "convey[ing] information comprehensible to human beings," also has a significant functional (that is, nonspeech) element. *Id.* at 450; *see also Junger v. Daley*, 209 F.3d 481, 484 (6th Cir. 2000) (holding that computer code can have "both an expressive feature and a functional feature"). "These realities of what code is and what its normal functions are require a First Amendment analysis that treats code as combining nonspeech and speech elements"—that is, code may have elements that are "functional," "expressive," or both. *Corley*, 273 F.3d at 451. Functional code—that is, code that communicates only to a computer—is "never protected." *Id.* at 449.[1]

That conclusion is not altered by the Supreme Court's holding in *Sorrell* that "information is speech." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 571 (2011). The information at issue in *Sorrell*—data about drug prescriptions—was in plain language and intended for use by humans who wished to communicate with other humans; it was not functional code intended for use by a computer. And the data communicated facts, which the court recognized as "the beginning point for much of the speech that is most essential to advance

---

[1] In a now-withdrawn opinion, the Ninth Circuit in *Bernstein v. U.S. Department of Justice* similarly declined to hold "that all software is expressive," concluding that "[m]uch of it surely is not." 176 F.3d 1132, 1145 (9th Cir.), *reh'g granted, opinion withdrawn*, 192 F.3d 1308 (9th Cir. 1999). As in *Corley*, the court concluded that source code at issue was "meant to be read and understood by humans" and was thus protected expression under the First Amendment. *Id.* at 1142. It suggested, however, that it might have reached a different conclusion if the code had been designed primarily to be read by a computer. *Id.* at 1141 n.15, 1142, 1147. *Bernstein*, although no longer precedential, thus proposes an approach similar to that followed by the Second Circuit in *Corley*.

BRIEF OF AMICUS CURIAE EVERYTOWN FOR GUN SAFETY IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION No. 2:18-cv-1115-RSL

GUPTA WESSLER PLLC 1900 L Street, NW, Washington, DC 20036 (202) 888-1741

human knowledge and to conduct human affairs." *Id.* at 570. Similarly, in holding that video games are entitled to First Amendment protection in *Brown v. Entertainment Merchants Association*, the Supreme Court did not rest on the mere fact that video games are made of data. 564 U.S. 786, 790 (2011). Instead, the Court stressed that "video games communicate ideas—and even social messages—through many familiar literary devices (such as characters, dialogue, plot, and music) and through features distinctive to the medium." *Id.* at 790.

Determining the protection due to computer code thus requires, as in other contexts that combine expressive and non-expressive elements, an initial determination of whether the code is "sufficiently imbued with elements of communication to fall within the scope of the First . . . Amendment[]." *Spence v. State of Wash.*, 418 U.S. 405, 409 (1974). Courts find expression to be protected when "[a]n intent to convey a particularized message [is] present, and in the surrounding circumstances the likelihood [is] great that the message [will] be understood by those who view[] it." *Id.* at 410–11. In *Commodity Futures Trading Commission v. Vartuli*, for example, the Second Circuit approached this question by examining the "manner in which the [software owner] marketed the software and intended that it be used." *Corley*, 273 F.3d at 449 (citing *Vartuli*, 228 F.3d 94 (2d Cir. 2000)). The software at issue there was designed to automatically instruct users when to buy and sell futures contracts. *Vartuli*, 228 F.3d at 99. Users were expected to follow those instructions "mechanically," without any "second-guessing." *Id.* at 111. The Second Circuit held that, because the software was thus designed to "induce action without the intercession of the mind or the will of the recipient," the software implicated "[n]one of the reasons for which speech is thought to require protection above and beyond that accorded to non-speech behavior." *Id.* The software was accordingly not entitled to *any* First Amendment protection. *Id.*

Similarly, Defense Distributed's public statements about the files it intends to distribute make clear that the value of those files arises exclusively from their functional

elements. The company's avowed purpose is to promote "popular access to arms" by distributing "downloadable guns" on the internet. Cyrus Farivar, *"Download this gun": 3D-printed semi-automatic fires over 600 rounds*, Ars Technica, March 1, 2013, available at https://bit.ly/2KHJ78u; *see also* Andy Greenberg, *A Landmark Legal Shift Opens Pandora's Box for DIY Guns*, Wired, July 18, 2018, available at https://bit.ly/2uaCAOj ("The internet will serve guns, the gun is downloadable."). Those files, the company has explained, are "essentially blueprints that can be *read by CAD software*" as "a means of creating *physical* 3D models of objects." Pls.' Mot. Prelim. Inj. at App. 208, *Def. Distributed v. U.S. Dep't of State*, 121 F. Supp. 3d 680 (W.D. Tex. 2015) (No. 15-cv-00372) (emphasis added). As Cody Wilson has explained it: "The message is in what we're doing—the message is: download this gun." Farivar, *"Download this gun."*

The purpose of Defense Distributed's distribution of downloadable guns thus appears to be a purely functional one: the widespread distribution of physical guns. Such distribution bears no genuine resemblance, for example, to the distribution of a message *urging* that 3-D guns be made available or *arguing* that they should be treated as though they were speech. Indeed, the distribution of such code is, for all practical purposes, indistinguishable from the distribution of the guns themselves or their component parts. In an exchange of a downloadable gun, the parties' interests are the same as if they were exchanging a physical one; neither the person distributing the code, nor the person receiving it, has any additional interest in the code's expressive value. Functionally speaking, the "code *is* a gun." Greenberg, *A Landmark Legal Shift* (emphasis added).

Like the software in *Vartuli*, Defense Distributed's code, "in the form … marketed" to the public, is intended for use "without the intercession of the mind or the will of the recipient." 228 F.3d at 111. That is true even though a human must of course load the code into a computer and choose to send it to a 3-D printer before a gun can be produced. All

BRIEF OF AMICUS CURIAE EVERYTOWN FOR
GUN SAFETY IN SUPPORT OF PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION
No. 2:18-cv-1115-RSL

GUPTA WESSLER PLLC
1900 L Street, NW, Washington, DC 20036
(202) 888-1741

"[c]omputer code, . . . no matter how functional, causes a computer to perform the intended operations only if someone uses the code to do so." *Corley*, 273 F.3d at 451. But that "momentary intercession of human action does not diminish the nonspeech component of code." *Id.*

The possibility that a few people with specialized knowledge of gun engineering may be able to study essentially functional code to learn about, or even improve, Defense Distributed's gun designs does not change the code's fundamental nature. Engineers could do the same by inspecting an actual gun, but that does not turn the gun into a form of speech. As one First Amendment scholar has noted, the functional nature of downloadable guns makes them analogous to a hardware device that, when attached to a 3-D printer, automatically produces the parts of a working gun. *See* Eugene Volokh, *Free Speech and Computer Code—3-D Printer Gunmaking Files and Beyond*, The Volokh Conspiracy, Aug. 2, 2018, available at https://perma.cc/3R2P-6DQP. Just as they could study a software file, engineers could study such a hardware device—they could "look at the object, take it apart, fiddle with it, figure out its flaws, understand how to improve it, and better understand engineering more generally." *Id.* That the device, though functionally equivalent to Defense Distributed's code, would clearly enjoy no First Amendment protection strongly suggests that the code is not entitled to such protection either.

The analysis might be different if Defense Distributed, rather than distributing code that automatically builds the necessary components of guns, instead provided instructions or images intended to teach *people* how to build guns using a 3-D printer. Unlike downloadable guns, "a blueprint or a recipe … cannot yield any functional result without human comprehension of its content, human decision-making, and human action." *Corley*, 273 F.3d at 451. Providing such instruction, regardless of one's view on the ethics of doing so, may well be expressive. For the same reason, this case is also distinguishable from *United States v.*

BRIEF OF AMICUS CURIAE EVERYTOWN FOR
GUN SAFETY IN SUPPORT OF PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION
No. 2:18-cv-1115-RSL

GUPTA WESSLER PLLC
1900 L Street, NW, Washington, DC 20036
(202) 888-1741

*Progressive, Inc.*, where a district court granted the federal government's request for an injunction against publication of an article explaining the science and design of the hydrogen bomb. 467 F. Supp. 990, 993 (W.D. Wis. 1979). That article—which, notably, the court found did not "provide a 'do-it-yourself' guide for the hydrogen bomb," *see infra* Point II—was undoubtedly expressive and entitled to First Amendment protection, even if, as the court concluded, the author's constitutional interest was outweighed by the government's compelling interest in national security. *Id.* at 993, 996.[2]

Unlike the article at issue in *Progressive*, Defense Distributed's code lacks any expressive value beyond its function. Thus, "the values served by the First Amendment [would not be] advanced" by affording the code First Amendment protection. *Corley*, 273 F.3d at 449. Such protection would serve "[n]one of the reasons for which speech is thought to require protection above and beyond that accorded to non-speech behavior—the pursuit of truth, the accommodation among interests, the achievement of social stability, the exposure and deterrence of abuses of authority, personal autonomy and personality development, or the functioning of a democracy." *Vartuli*, 228 F.3d 94, 111. Accordingly, there is no reason to treat the code as protected speech. *See id.*

## II. Downloadable guns are also excluded from First Amendment protection because their purpose and effect is to cause widespread violations of federal and state law.

Even if downloadable guns were to be deemed speech, they would be a form of speech categorically excluded from the First Amendment's protection. The Supreme Court has long recognized "speech integral to criminal conduct" as one of the "few historic and traditional categories of expression" for which the First Amendment freely permits even content-based restrictions. *United States v. Alvarez*, 567 U.S. 709, 717 (2012) (citing *Giboney v.*

---

[2] *See* Laurence Tribe, *American Constitutional Law* 837, 1053–54, 1322 & n.7 (2d ed. 1988) (discussing this same point).

BRIEF OF AMICUS CURIAE EVERYTOWN FOR
GUN SAFETY IN SUPPORT OF PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION
No. 2:18-cv-1115-RSL

9

GUPTA WESSLER PLLC
1900 L Street, NW, Washington, DC 20036
(202) 888-1741

1 *Empire Storage & Ice Co.*, 336 U.S. 490 (1949)). Because the avowed purpose and inevitable

2 effect of Defense Distributed's intended distribution is the widespread violation of gun-

3 safety laws, they are not protected by the First Amendment.

4 In *Giboney*, the Court held that the First Amendment does not "extend[] its immuni-

5 ty to speech or writing used as an integral part of conduct in violation of a valid criminal

6 statute." *Id.* at 498. "[I]t has never been deemed an abridgment of freedom of speech or

7 press," the Court wrote, "to make a course of conduct illegal merely because the conduct

8 was in part initiated, evidenced, or carried out by means of language, either spoken,

9 written, or printed." *Id.* at 502. Following *Giboney*, the Ninth Circuit has held that the First

10 Amendment does not protect the publishing of instructions for placing illegal bets, *United*

11 *States v. Mendelsohn*, 896 F.2d 1183 (9th Cir. 1990), for illegally entering the country, *United*

12 *States v. Aguilar*, 883 F.2d 662, 685 (9th Cir. 1989), for filing false tax returns, *United States v.*

13 *Freeman*, 761 F.2d 549, 552–53 (9th Cir. 1985), or for producing illegal drugs, *United States v.*

14 *Barnett*, 667 F.2d 835 (9th Cir. 1982). Although the exception is thus well-established, its

15 "boundaries … have not been clearly defined," and thus its "precise scope" remains

16 "unsettled." *United States v. Osinger*, 753 F.3d 939, 950 (9th Cir. 2014) (Watford, J., concur-

17 ring) (*citing* Eugene Volokh, *Speech as Conduct: Generally Applicable Laws, Illegal Courses of Conduct,*

18 *"Situation–Altering Utterances," and the Uncharted Zones*, 90 Cornell L. Rev. 1277, 1311–26

19 (2005)). At the exception's outer edges, some courts have applied it to "speech that would

20 otherwise be entitled to First Amendment protection" on the ground that the speech led to

21 commission of a crime. *Osinger*, 753 F.3d at 954 (Watford, J., concurring). In *Rice v. Paladin*

22 *Enterprises, Inc.*, for example, the Fourth Circuit held that a published book was not entitled

23 to protection under the First Amendment where the book's instructions were followed in

24 the commission of a double murder. 128 F.3d 233, 267 (4th Cir. 1997).

25 This Court need not explore the limits of the speech-integral-to-criminal-conduct

26

BRIEF OF AMICUS CURIAE EVERYTOWN FOR
GUN SAFETY IN SUPPORT OF PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION
No. 2:18-cv-1115-RSL

10

GUPTA WESSLER PLLC
1900 L Street, NW, Washington, DC 20036
(202) 888-1741

exception in order to apply it in this case. The exception extends at least to cases where a course of conduct integral to a crime includes not just pure speech, as in *Rice*, but also some form of "unprotected non-speech conduct." *Osinger*, 753 F.3d at 953–54 (Watford, J., concurring). That is because "[e]xpression can generally be regulated to prevent harms that flow from its noncommunicative elements … but not harms that flow from what the expression expresses." Volokh, *Speech As Conduct*, 90 Cornell L. Rev. at 1284. The unprotected conduct justifying application of the exception could consist of non-expressive activities, other communications that are "categorically unprotected" by the First Amendment, or "non-communicative aspects" of otherwise protected speech. *Osinger*, 753 F.3d at 953–54 (Watford, J., concurring). In this case, the unprotected conduct is supplied by the functional (and thus "non-communicative") elements of Defense Distributed's code.

The Ninth Circuit in *Mendelsohn* demonstrates how the exception applies in these circumstances. The defendants there were convicted of transporting gambling paraphernalia for mailing computer software designed "for recording and analyzing bets on sporting events." 896 F.2d at 1184. Like Defense Distributed, the defendants in *Mendelsohn* argued that their software was "speech protected by the first amendment." *Id.* at 1185. But although the Ninth Circuit acknowledged that "a computer program under other circumstances might warrant first amendment protection," it held that the defendants' program was not entitled to such protection. *Id.* at 1186. The defendants, the court wrote, "did not use [the software]" for communicative purposes—to, for example, "instruct bookmakers in legal loopholes or to advocate gambling reform." *Id.* at 1185. Rather, they knowingly provided it as "computerized directions for *functional* use … as an integral part of a bookmaker's illegal activity, helping the bookmaker record, calculate, analyze, and quickly erase illegal bets." *Id.* at 1185 (emphasis added). Because the functional aspects of the software were "instrumental in and intertwined with the performance of criminal activity," the court

BRIEF OF AMICUS CURIAE EVERYTOWN FOR
GUN SAFETY IN SUPPORT OF PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION
No. 2:18-cv-1115-RSL

GUPTA WESSLER PLLC
1900 L Street, NW, Washington, DC 20036
(202) 888-1741

1   held, the software was not entitled to First Amendment protection. *Id.* at 1186.

2       As in *Mendelsohn*, the functional aspects of Defense Distributed's CAD files—that is,

3   the code's automatic creation of undetectable, untraceable plastic guns—would directly aid

4   in committing numerous illegal acts. Most importantly, the files would allow the creation of

5   illegal guns, including plastic guns that violate the federal Undetectable Firearms Act (UFL),

6   18 U.S.C. § 922(p). One of Defense Distributed's files, for example, allows 3-D printing of

7   the plastic "Liberator" pistol. Decl. Lisa V. Aguirre ¶ 35(a) & n.9, *Def. Distributed v. U.S. Dep't*

8   *of State*, 121 F. Supp. 3d 680 (W.D. Tex. 2015) (No. 15-cv-00372). The files would also allow

9   children, felons, people subject to restraining orders, and the mentally ill to easily bypass

10  state and federal laws prohibiting the purchase or possession of guns. *See, e.g.,* 18 U.S.C.

11  § 922(b)(1) (prohibiting the sale of handguns to children); (d) (prohibiting sale of guns to

12  felons and other groups); (g) (prohibiting possession of guns by the same groups).  Indeed,

13  Defense Distributed's settlement agreement with the federal government expressly states,

14  without exception, that "any United States person" may "access, use, reproduce, or

15  otherwise benefit" from these files—which Defense Distributed has stated to this Court

16  means "*all* Americans." (Dkt. No. 11 at 3).

17      What matters under this analysis is the avowed purpose and principal effect of the

18  distribution—not the slim possibility that a user might render an otherwise illegal firearm

19  legal by attaching a small steel block to the gun's plastic frame, as Defense Distributed

20  publicly advises. *See Rice*, 128 F.3d at 263 nn.9–10 (holding that the criminal-conduct

21  exception is not limited to circumstances in which there is "*no* purpose or value other than

22  to facilitate a specific wrongful act," and that insincere disclaimers cannot overcome the

23  exception). Such a steel block, for one thing, cannot be produced using a typical 3-D

24  printer. Given that the gun is operable without such a steel block—and, most importantly,

25  that attaching it would eliminate the gun's defining feature and main selling point (its

26

BRIEF OF AMICUS CURIAE EVERYTOWN FOR
GUN SAFETY IN SUPPORT OF PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION
No. 2:18-cv-1115-RSL

GUPTA WESSLER PLLC
1900 L Street, NW, Washington, DC 20036
(202) 888-1741

undetectability)—few users are likely to go to the trouble of acquiring one. *See* Marty Lederman, *What's the deal with 3-D plastic guns—and what's the Freedom of Speech got to do with it?*, Balkanization, Aug. 1, 2018, available at https://perma.cc/D8KS-3CCW (observing that "there's not much of a reason to go to the time and expense of making a 3-D plastic firearm (which is more fragile and less reliable than ordinary weapons) *other than* to escape metal detector-detection").

Indeed, the circumvention of gun-safety laws is Defense Distributed's avowed purpose for distributing its CAD files: the company's founder, Cody Wilson, has repeatedly bragged that distribution of downloadable guns will make effective gun regulation impossible. *See* Greenberg, *A Landmark Legal Shift*. In response to Defense Distributed's settlement with the federal government, for example, Wilson tweeted a picture of a tombstone engraved with the words "AMERICAN GUN CONTROL." Zusha Elinson, *Eight States Sue to Block Release of Plans for 3D-Printed Firearms*, The Wall Street Journal, July 31, 2018, available at https://on.wsj.com/2OwJRk7.

This is not a difficult case at the margins of the crime exception, as it would be if a purely expressive work—for example, a book like *The Anarchist's Cookbook*—were being accused of inspiring crimes. Downloadable guns are not purely expressive. They are functional. And both the purpose and effect of Defense Distributed's distribution is to *directly* aid people in violating of those laws. Accordingly, that distribution is not entitled to First Amendment protection—a conclusion that would follow even if one were to reject the crime exception altogether, contrary to Ninth Circuit precedent.

### III.  Assuming that the requested injunction would restrain protected speech, that restraint would be, at most, subject to intermediate scrutiny.

Even if the court were to conclude that downloadable guns have some expressive value entitled to First Amendment protection, that protection would not rise to the level of

BRIEF OF AMICUS CURIAE EVERYTOWN FOR
GUN SAFETY IN SUPPORT OF PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION
No. 2:18-cv-1115-RSL

GUPTA WESSLER PLLC
1900 L Street, NW, Washington, DC 20036
(202) 888-1741

strict scrutiny, as Defense Distributed and the federal government have claimed. "[T]he scope of protection for speech generally depends on whether the restriction is imposed because of the content of the speech." *Corley*, 273 F.3d at 450. The strict-scrutiny standard set forth in *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2226 (2015), which the government now claims to be the applicable standard, applies only to *content-based* speech restrictions—laws "that target speech *based on its communicative content*." *Id.* (emphasis added). The injunction requested by the plaintiffs, however, is based not on the communicative value of Defense Distributed's code, if any, but on the code's *functional* elements. *See Corley*, 273 F.3d at 456 (holding that the standard of review turns on whether the restriction targets the code's functional or expressive aspects). A restriction targeted solely at code's functional elements is subject to, at most, intermediate scrutiny. *See id.*; *see also DVD Copy Control Ass'n, Inc. v. Bunner*, 75 P.3d 1, 11 (Cal. 2003) (holding that content-neutral restrictions on code are subject only to intermediate scrutiny).

In *Corley*, for example, the Second Circuit applied intermediate scrutiny to a district court's injunction against the public posting of computer software designed to decrypt DVD movies. 273 F.3d at 452. The court acknowledged that, because expert computer programmers could have read the code to learn about circumvention of DVD encryption, the software had a protectible "speech component." *Id.* at 454. The district court's injunction, however, was justified not based on that protected expression, but "solely on the basis of the [the software's] *functional* capability … to instruct a computer to decrypt [DVDs]." *Id.* (emphasis added). Because "[t]hat functional capability [was] not speech within the meaning of the First Amendment," the Second Circuit held that the injunction was justified "without reference to the content of the regulated speech" and thus subject only to the intermediate-scrutiny standard of review. *Id.*; *see also Junger*, 209 F.3d at 485 (holding that "[t]he functional capabilities of source code" justify intermediate scrutiny).

BRIEF OF AMICUS CURIAE EVERYTOWN FOR GUN SAFETY IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION No. 2:18-cv-1115-RSL

GUPTA WESSLER PLLC 1900 L Street, NW, Washington, DC 20036 (202) 888-1741

Like the injunction in *Corley*, the injunction sought by the plaintiffs here would pro-

hibit posting computer code to the internet based on the code's functional capabilities—

here, the capability to "easily manufacture firearms that can evade metal detectors, are

untraceable because they carry no markings, and shoot bullets that cannot be forensically

linked to the gun." FAC ¶ 70. In support of their requested injunction, the plaintiffs rely on

the fact that the easy availability of such guns on the internet would enhance the risk of

terrorist attacks, threaten safety in public buildings and prisons, and make solving crimes

more difficult. *Id.* ¶¶ 17–18. The plaintiffs also argue that availability of the guns would

undermine their ability to enforce laws regulating who may own guns, the types of guns

permitted, and the permissible uses of those guns. *Id.* ¶ 17. It would, for example, make it

impossible for states to keep "guns out of the hands of those who should not possess them—

minors, convicted felons, the mentally ill, and those subject to protective and no-contact

orders." *Id.* ¶ 67.

Every one of the harms cited by the plaintiffs flows from the functional capacity of

Defense Distributed's CAD files to produce working guns. None flows from the capacity of

those files to "convey[] information to a human being." *Corley*, 273 F.3d at 454. As in *Corley*,

the requested injunction is thus "'justified without reference to the content of regulated

speech'" and is subject, at most, to an intermediate-scrutiny standard of review. *Id.* at 450–

51 (quoting *Hill v. Colorado*, 530 U.S. 703, 720 (2000)).

## IV. The Ninth Circuit has repeatedly held that the law's restriction on distribution of technical data survives intermediate scrutiny.

Defense Distributed's settlement with the federal government purports to authorize

the company's distribution of downloadable guns by temporarily modifying the Interna-

tional Traffic in Arms Regulations (ITAR), 22 C.F.R. §§ 120–30—the implementing

regulations for the Arms Export Control Act (AECA), 22 U.S.C. § 2778. By seeking to

enjoin the settlement's *modification* of ITAR, the plaintiffs are thus seeking only to require the

BRIEF OF AMICUS CURIAE EVERYTOWN FOR
GUN SAFETY IN SUPPORT OF PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION
No. 2:18-cv-1115-RSL

GUPTA WESSLER PLLC
1900 L Street, NW, Washington, DC 20036
(202) 888-1741

1  federal government to enforce the *pre-existing* regulations, as they were written and enforced

2  before the settlement was reached. And the fact that ITAR prohibits Defense Distributed

3  from posting downloadable guns on the internet could not possibly violate the First

4  Amendment given that the Ninth Circuit has "repeatedly rejected First Amendment

5  challenges to the AECA, its implementing regulations, and its predecessor" statute. *United*

6  *States v. Chi Mak*, 683 F.3d 1126, 1136 (9th Cir. 2012); *see also United States v. Posey*, 864 F.2d

7  1487 (9th Cir. 1989); *United States v. Edler Indus., Inc.*, 579 F.2d 516, 520 (9th Cir. 1978).

8  In those cases, the Ninth Circuit correctly rejected the same argument that Defense

9  Distributed effectively raises here—that ITAR's prohibition on the export of technical data

10  restricted the defendant's speech in violation of the First Amendment. *Chi Mak*, 683 F.3d at

11  1136. As the court observed, the purpose of the regulations—"to control the import and

12  export of defense articles and defense services"—primarily regulates conduct "unrelated to

13  the suppression of expression." *Id.* at 1134–35; *see also Edler Indus.*, 579 F.2d at 520–21

14  (holding that the law regulates "the *conduct* of assisting foreign enterprises to obtain military

15  equipment and related technical expertise" (emphasis added)). And, in "regulating conduct,

16  the Government may pursue its legitimate objectives even though incidental limitations

17  upon expression may result." *Id.* at 520. The restrictions on technical data are just such

18  incidental limitations. *See Chi Mak*, 683 F.3d 1135. As the court has pointed out, the federal

19  government's undeniable "authority to regulate arms traffic would be of negligible practical

20  value if it encompassed only the exportation of particular military equipment but not the

21  exportation of blueprints specifying the construction of the very same equipment." *Id.* Thus,

22  to argue that the law's restrictions on technical data unconstitutionally restricts speech is to

23  "mistakenly focus on the nature of the content incidentally restricted, and not the nature of

24  the statute" as a whole. *Id.* at 1134.

25  The Ninth Circuit thus applied the intermediate-scrutiny standard set forth by the

BRIEF OF AMICUS CURIAE EVERYTOWN FOR
GUN SAFETY IN SUPPORT OF PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION
No. 2:18-cv-1115-RSL

GUPTA WESSLER PLLC
1900 L Street, NW, Washington, DC 20036
(202) 888-1741

Supreme Court in *United States v. O'Brien*, 391 U.S. 367 (1968), under which the government must show that the speech restriction "substantially advance[s] important governmental interests unrelated to the suppression of expression." *See Chi Mak*, 683 F.3d at 1135. The court concluded that "[t]he AECA and its implementing regulations satisfy *O'Brien*" because they advance "the Government's important interest in regulating the international dissemination of military information." *Chi Mak*, 683 F.3d at 1135. Moreover, the court observed that "ITAR makes a point to specifically exclude numerous categories from designation, such as general scientific, mathematical, or engineering papers," and, for that reason, "the restrictions do not burden speech more than is necessary to further the Government's interest." *Id.*

ITAR's prohibition on posting downloadable guns to the internet is thus constitutional, and an injunction against the settlement's modifications to the regulation cannot violate Defense Distributed's First Amendment rights.

## CONCLUSION

The Court should reject Defense Distributed's theory that the First Amendment gives it the unrestricted right to globally distribute the tools to automatically produce downloadable guns.

Dated: August 9, 2018

/s/Deepak Gupta

DEEPAK GUPTA (*pro hac vice*)
DANIEL TOWNSEND
Gupta Wessler PLLC
1900 L Street, NW, Suite 312
Washington, DC 20036
(202) 888-1741
*deepak@guptawessler.com*

BRIEF OF AMICUS CURIAE EVERYTOWN FOR
GUN SAFETY IN SUPPORT OF PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION
No. 2:18-cv-1115-RSL

GUPTA WESSLER PLLC
1900 L Street, NW, Washington, DC 20036
(202) 888-1741

LAURENCE H. TRIBE
Carl M. Loeb University Professor
and Professor of Constitutional Law
Harvard Law School*
1575 Massachusetts Avenue
Cambridge, MA 02138
(617) 495-1767

ERIC TIRSCHWELL
WILLIAM J. TAYLOR, JR.
Everytown for Gun Safety Support Fund
132 E. 43rd Street, #657
 New York, NY 10017

TOBY J. MARSHALL, WSBA #32726
BETH E. TERRELL, WSBA # 26759
Terrell Marshall Law Group PLLC
936 N. 34th Street, Suite 300
Seattle, WA 98103-8869
(206) 816-6603
*tmarshall@terrellmarshall.com*
*bterrell@terrellmarshall.com*

* Affiliation noted for identification purposes only

*Counsel for Amicus Curiae*
*Everytown for Gun Safety*

BRIEF OF AMICUS CURIAE EVERYTOWN FOR
GUN SAFETY IN SUPPORT OF PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION
No. 2:18-cv-1115-RSL

18

GUPTA WESSLER PLLC
1900 L Street, NW, Washington, DC 20036
(202) 888-1741

# CERTIFICATE OF SERVICE

I hereby certify that on August 9, 2018, I electronically filed the foregoing brief with the Clerk of the Court using the CM/ECF system, which will serve a copy of this document upon all counsel of record.

Dated: August 9, 2018

*/s/Deepak Gupta*
Deepak Gupta

BRIEF OF AMICUS CURIAE EVERYTOWN FOR
GUN SAFETY IN SUPPORT OF PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION
No. 2:18-cv-1115-RSL

19

GUPTA WESSLER PLLC
1900 L Street, NW, Washington, DC 20036
(202) 888-1741