# Exhibit A

268

Ast. Get Attorney General
United States District Court

Department of Justice
Washington, D.C. 20530

*/ 1-May 78*
*/ / / / / · · · ·    9*

MEMORANDUM TO DR. FRANK PRESS
Science Advisor to the President

Re: Constitutionality Under the First Amendment
of ITAR Restrictions on Public Cryptography

The purpose of this memorandum is to discuss the con-
stitutionality under the First Amendment of restrictions
imposed by the International Traffic in Arms Regulation
(ITAR), 22 C.F.R. § 121 et seq. (1977), the regulation imple-
menting § 38 of the Arms Export Control Act, 22 U.S.C.A.
§ 2778 (1977), on dissemination of cryptographic informa-
tion developed independent of government supervision or
support by scientists and mathematicians in the private
sector.1/ Our discussion is confined to the applicability
of the regulation to the speech elements of public cryptography,
and does not address the validity of the general regulatory
controls over exports of arms and related items. We have
undertaken our review of the First Amendment issues raised
by the ITAR as an outgrowth of our role in implementing
Presidential Directive NSC-24.2/

―――――――――――

1/·  The cryptographic research and development of scientists
     and mathematicians in the private sector is known as
"public cryptography." As you know, the serious concern ex-
pressed by the academic community over government controls
of public cryptography, see, e.g., 197 Science 1345 (Sept.
30, 1977), led the Senate Select Committee on Intelligence
to conduct a recently concluded study of certain aspects of
the field.

2/   Our research into the First Amendment issues raised by
     government regulation of public cryptography led tan-
gentially into broader issues of governmental control over
dissemination of technical data.  Those questions are numerous,
complex, and deserving of extensive study, but are beyond
the scope of this memorandum.

269

participation in briefings and symposia) and dis-
closed to foreign nationals in the United States
(including plant visits and participation in
briefings and symposia).

Thus ITAR requires licensing of any communication of crypto-
graphic information,4/ whether developed by the government
or by private researchers, which reaches a foreign national.5/

The standards governing license denial are set out in
§ 123.05.  The Department of State may deny, revoke, suspend
or amend a license:

whenever the Department deems such action to be
advisable in furtherance of (1) world peace;
(2) the security of the United States; (3) the
foreign policy of the United States; or (4) when-
ever the Department has reason to believe that
section 414 of the Mutual Security Act of 1954,
as amended, or any regulation contained in this
subchapter shall have been violated.

Upon any adverse decision, the applicant may present addi-
tional information and obtain a review of the case by the

4/   The ITAR does exempt from the licensing requirement un-
classified technical data available in published form.
22 C.F.R. § 125.11(a).  The scope of that exemption is some-
what unclear, although it does appear that the burden of
ascertaining the ITAR status of possibly exempt information
is on the individual seeking publication.  See 22 C.F.R.
§ 125 n.3.  In order to claim the exemption, an "exporter"
must comply with certain certification procedures.  22 C.F.R.
§ 125.22.

5/   For example, in one instance the Office of Munitions
Control, the office in the State Department which ad-
ministers the ITAR, refused to issue licenses to a group of
scientists preparing to address a conference on space technology
in Madrid.  The scientists, who had already arrived in Spain,
were refused permission to deliver papers at the symposium
on the subject of rocket propulsion and re-entry problems of
space vehicles.  Note, Arms Control-State Department Regu-
lation of Exports of Technical Data Relating to Munitions
Held to Encompass General Knowledge and Experience, 9 N.Y.U.
Int'l Law J. 91, 101 (1976).

- 3 -

270

ITAR Provisions and Statutory Authority

Under the ITAR, exports of articles designated on the United States Munitions List as "arms, ammunition, and implements of war" must be licensed by the Department of State. 22 C.F.R. §§ 123, 125.  Cryptographic devices are included on the list, 22 C.F.R. § 121.01, Category XIII, as are related classified and unclassified technical data, Category XVII, Category XVIII.  It is this control over the export of unclassified technical data which raises the principal constitutional questions under the ITAR.3/

The broad definition of the term technical data in the ITAR includes:

> Any unclassified information that can be used, or
> be adapted for use, in the design, production,
> manufacture, repair, overhaul, processing, en-
> gineering, development, operation, maintenance,
> or reconstruction of arms, ammunition and imple-
> ments of war on the U.S. Munitions List.

22 C.F.R. § 125.01.  The definition of the term "export" is equally broad.  Under § 125.03 of the ITAR an export of technical data takes place:

> Whenever technical data is inter alia, mailed or
> shipped outside the United States, carried by
> hand outside the United States, disclosed through
> visits abroad by American citizens (including

_____

3/   Unclassified technical data would generally encompass
     only privately developed, nongovernmental cryptographic
research.  It is our understanding that government-sponsored
cryptographic research traditionally has been classified.
The only unclassified government cryptographic information
of which we are aware is the Data Encryption Standard (DES)
algorithm.  The DES was developed for public use by IBM with
National Security Agency assistance and published in the
Federal Register by the National Bureau of Standards.

- 2 -

271

Department.  § 123.05(c).  No further review is provided.

Nearly all of the present provisions of the ITAR were originally promulgated under § 414 of the Mutual Security Act of 1954 (former 22 U.S.C. § 1934).  That statute gave the President broad authority to identify and control the export of arms, ammunition, and implements of war, including related technical data, in the interest of the security and foreign policy of the United States.  Congress recently substituted for that statute a new § 38 of the Arms Export Control Act, 22 U.S.C.A. § 2778 (1977), as amended, 22 U.S.C.A. § 2778 (Supp. 3 1977).  This statute substitutes the term "defense articles and defense services" for the term "arms, ammunition, and implements of war."6/  The President delegated his authority under both statutes to the Secretary of State and Secretary of Defense.  Exec. Order No. 11,958, 42 Fed. Reg. 4311 (1977), reprinted in 22 U.S.C.A. § 2778 (Supp. 1 1977); Exec. Order No. 10,973, 3 C.F.R. 493 (Supp. 1964).  A willful violation of § 38 of the Arms Export Control Act or any regulation thereunder is punishable by a fine up to $100,000, imprisonment up to two years, or both.  22 U.S.C.A. § 2778(c).7/

_____

6/   The ITAR has not yet been amended to reflect the statu-
     tory change.  We understand, however, that the Depart-
ment of State has nearly completed a draft revision of the
ITAR.  It is our understanding that the revision is not in-
tended to make any major substantive changes in the ITAR,
but rather to update and clarify the regulatory language.

7/   Although the focus of this memorandum is on the First
     Amendment issues raised by the ITAR, we feel that one
comment about the breadth of the two statutes is in order.
It is by no means clear from the language or legislative
history of either statute that Congress intended that the
President regulate noncommercial dissemination of informa-
tion, or considered the problems such regulation would en-
gender.  We therefore have some doubt whether § 38 of the
Arms Export Control Act provides adequate authorization for
the broad controls over public cryptography which the ITAR
imposes.

- 4 -

272

## The First Amendment Issues

The ITAR requirement of a license as a prerequisite to "exports" of cryptographic information clearly raises First Amendment questions of prior restraint.8/ As far as we have been able to determine, the First Amendment implications of the ITAR have received scant judicial attention.

The Ninth Circuit presently has a case under consideration which squarely presents a First Amendment challenge to the ITAR and could serve as a vehicle for the first comprehensive judicial analysis of its constitutionality. In that case, United States v. Edler, No. 76-3370, the defendants, Edler Industries, Inc. and Vernon Edler its president, were charged with exporting without a license technical data and assistance relating to the fabrication of missile components. Although the State Department had denied defendants an export license to provide technical data and assistance to a French aerospace firm, the government alleged that defendants nonetheless delivered data and information to the French during meetings in both France and the United States. Defendants were tried before a jury and found guilty. The trial court, the United States District Court for the Central District of California, did not issue an opinion in the case. On appeal, the defendants contend that the ITAR is both overbroad and establishes an unconstitutional prior restraint. The government's rejoinder to those claims is that the ITAR licensing provisions involve conduct not speech and that any effect upon First Amendment freedoms is merely incidental

---

8/    In addition, the regulatory provisions present questions of overbreadth and vagueness. "Overbreadth" is a First Amendment doctrine invalidating statutes which encompass, in a substantial number of their applications, both protected and unprotected activity. The "vagueness" concept, on the other hand, originally derives from the due process guarantee, and applies where language of a statute is insufficiently clear to provide notice of the activity prohibited. The same statute or regulation may raise overlapping questions under both doctrines.

- 5 -

273

and therefore valid.  We anticipate that the resolution of
these issues by the Ninth Circuit may provide substantial
guidance as to the First Amendment implications of the ITAR.9/

The only published decision addressing a First Amend-
ment challenge to the ITAR of which we are aware is United
States v. Donas-Botto, 363 F.Supp. 191 (E.D. Mich. 1973),
aff'd sub nom. United States v. Van Hee, 531 F.2d 352 (6th
Cir. 1976).  The defendants in that case were charged with
conspiracy to export technical data concerning a Munitions
List item without first obtaining an export license or
written State Department approval.  The exports by the
defendants both of blueprints and of their technical knowledge
concerning an armored amphibious vehicle were alleged to
be in violation of § 414 of the Mutual Security Act and
the ITAR.  In a motion to dismiss the indictments, defendants
contended that inclusion of technical knowledge within the
statute violated the First Amendment.   The trial court dis-
posed of that contention summarily, stating:

> [W]hen matters of foreign policy are involved
> the government has the constitutional authority
> to prohibit individuals from divulging "technical
> data" related to implements of war to foreign
> governments.

363 F. Supp. at 194.  The Sixth Circuit upheld the conviction
of one of the defendants without reaching any First Amend-
ment questions since none was presented on appeal.10/

The First Amendment analysis of the ITAR in the case
thus is limited to a paragraph in the district court's
opinion.  In reaching the conclusion that the prosecutions
did not violate the First Amendment, that court relied upon
two Espionage Act decisions, Gorin v. United States, 312 U.S.

---

9/   We understand that the case was argued this past March.

10/  The court did agree with the trial judge that the ample
     scope of the term "technical data" in the ITAR encom-
     passed unwritten technical knowledge.  531 F.2d at 537.

- 6 -

274

19 (1941), and United States v. Rosenberg, 195 F.2d 583
(2d Cir.), cert. denied, 344 U.S. 838 (1952). While those
cases establish that the First Amendment does not bar prose-
cutions for disclosing national defense information to a
foreign country, they by no means resolve the prior restraint
question.11/

A decision in a somewhat analogous area, the use of
secrecy agreements by government agencies as a means of
protecting against the unauthorized disclosure of informa-
tion by present or former employees, while not directly
applicable to the First Amendment questions we confront
under the ITAR, is helpful for its discussion of government's
power to control the dissemination of government information.
That case, United States v. Marchetti, 466 F.2d 1309 (4th
Cir.), cert. denied, 409 U.S. 1063 (1972), after remand,
Alfred A. Knopf, Inc. v. Colby, 509 F.2d 1362 (4th Cir.),
cert. denied, 421 U.S. 992 (1975), involved an action for
an injunction brought by the United States to prevent a
former CIA agent from publishing certain information he had
obtained as a result of his CIA employment.  The court held
that the particular secrecy agreement was valid and enforce-
able in spite of Marchetti's First Amendment objections,
but observed that:

> The First Amendment limits the extent to which
> the United States, contractually or otherwise,
> may impose secrecy agreements upon its employees
> and enforce them with a system of prior censor-
> ship.  It precludes such restraints with respect
> to information which is unclassified or officially
> disclosed.

Id. at 1313.  The general principle we derive from the case
is that a prior restraint on disclosure of information
generated by or obtained from the government is justifiable
under the First Amendment only to the extent that the infor-
mation is properly classified or classifiable.

_____

11/ It is not clear from reading the district court's opinion
on what First Amendment ground or grounds the defendants
based their unsuccessful motion to dismiss.

- 7 -

275

    Our research into areas in which the government has restricted disclosure of nongovernmental information provided little additional guidance. Perhaps the closest analogy to controls over public cryptography are the controls over atomic energy research.12/ Under the Atomic Energy Act of 1954, 42 U.S.C. § 2011 et seq. (1970), all atomic energy information, whether developed by the government or by private researchers, is automatically classified at its creation and subjected to strict nondisclosure controls.13/ Although neither the Atomic Energy Act nor its accompaning regulations establish formal procedures for prior review of proposed atomic energy publications, the Atomic Energy Commission (whose functions are now divided

---

12/   Atomic energy research is similar in a number of ways
    to cryptographic research.  Development in both fields has been dominated by government.  The results of government created or sponsored research in both fields have been automatically classified because of the imminent danger to national security flowing from disclosure.  Yet meaningful research in the fields may be done without access to government information.  The results of both atomic energy and cryptographic research have significant nongovernmental uses in addition to military use.  The principal difference between the fields is that many atomic energy researchers must depend upon the government to obtain the radioactive source materials necessary in their research.  Cryptographers, however, need only obtain access to an adequate computer.

13/   See Green, Information Control and Atomic Power Develop-
    ment, 21 Law and Contemporary Problems 91 (1956); Newman, Control of Information Related to Atomic Energy, 56 Yale L.J. 769 (1947).  The Atomic Energy Act uses the term "Restricted Data" to describe information which the government believes requires protection in the interest of national security. "Restricted data" is defined in 42 U.S.C. § 2014(4).  The information control provisions of the Act are set out at 42 U.S.C. §§ 2161-2164.

- 8 -

276

between the Nuclear Regulatory Commission and the Department of Energy) has been empowered to maintain control over publications through threat of injunction or of heavy criminal penalties, two potent enforcement tools provided under the Act. 42 U.S.C. §§ 2271-2277, 2280. It does not seem, however, that the broad information controls of the Atomic Energy Act have ever been challenged on First Amendment grounds. Our search for judicial decisions in other areas in which the government has imposed controls over the flow of privately generated information was equally unavailing.14/

In assessing the constitutionality of the ITAR restrictions on the speech elements of public cryptography we therefore have turned to Supreme Court decisions enunciating general First Amendment principles. It is well established that prior restraints on publication are permissible only in extremely narrow circumstances and that the burden on the government of sustaining any such restraint is a heavy one. See, e.g., Nebraska Press Association v. Stuart, 427 U.S. 539 (1976); New York Times Co. v. United States, 403 U.S. 713 (1971); Organization for a Better Austin v. Keefe, 402 U.S. 415 (1971); Carroll v. Princess Anne, 393 U.S. 175 (1968); Near v. Minnesota, 283 U.S. 697 (1931). Even in those limited circumstances in which prior restraints have been deemed constitutionally permissible, they have been circumscribed by specific, narrowly drawn standards for deciding whether to prohibit disclosure and by substantial procedural protections. Erznoznik v. City of Jacksonville, 422 U.S. 205 (1975); Blount v. Rizzi, 400 U.S. 410 (1971); Freedman v. Maryland, 380 U.S. 51 (1965); Niemotko v. Maryland,

---

14/   For example, it does not appear that the broad controls over exports of technical data and related information under the Export Administration Act of 1969, 50 U.S.C. App. § 2401 et seq. (1970), and accompanying regulations have been judicially tested on First Amendment grounds. Nor have the provisions of the patent laws restricting patentability of inventions affecting national security, 35 U.S.C. § 181 et seq. (1970), nor governmental restrictions on communications with Rhodesia, 22 U.S.C. § 287c (1970); Exec. Order No. 11,322

- 9 -

277

340 U.S. 268 (1951); Kunz v. New York, 340 U.S. 290 (1951)
Hague v. C.I.O., 307 U.S. 496 (1939).15/

Even if it is assumed that the government's interest
in regulating the flow of cryptographic information is
sufficient to justify some form of prior review process,
the existing ITAR provisions we think fall short of satis-
fying the strictures necessary to survive close scrutiny
under the First Amendment.  There are at least two funda-
mental flaws in the regulation as it is now drawn:  first,
the standards governing the issuance or denial of licenses
are not sufficiently precise to guard against arbitrary
and inconsistent administrative action; second, there is
no mechanism established to provide prompt judicial review
of State Department decisions barring disclosure.  See, e.g.,
Blount v. Rizzi, supra; Freedman v. Maryland, supra; Hague
v. C.I.O., supra.  The cases make clear that before any
restraint upon protected expression may become final it
must be subjected to prompt judicial review in a proceeding
in which the government will bear the burden of justifying
its decisions.  The burden of bringing a judicial proceed-
ing cannot be imposed upon those desiring export licenses
in these circumstances.  The ITAR as presently written fails
to contemplate this requirement.16/

---

15/  In Freedman, 380 U.S. at 58-59, the Court summarized
     the procedural protections necessary to sustain a scheme
of prior review:
     1.  A valid final restraint may be imposed only upon
a judicial determination;
     2.  The administrator of a licensing scheme must act
within a specified brief period of time;
     3.  The administrator must be required either to issue
a license or go to court to seek a restraint;
     4.  Any restraint imposed in advance of a final judicial
determination on the merits must be limited to preservation
of the status quo for the shortest period compatible with
sound judicial resolution;
     5.  The licensing scheme must assure a prompt final
judicial decision reviewing any interim and possibly erroneous
denial of a license.

16/  The government's argument to the Ninth Circuit in Edler,
     that the impact of the ITAR upon protected communications
is merely incidental, and that the ITAR should be viewed as

(Cont. on p. 11)

- 10 -

278

For these reasons it is our conclusion that the present ITAR licensing scheme does not meet constitutional standards. There remains the more difficult question whether a licensing scheme covering either exports of or even purely domestic publications of cryptographic information might be devised consistent with the First Amendment.  Recent Supreme Court decisions certainly suggest that the showing necessary to sustain a prior restraint on protected expression is an onerous one.  The Court held in the Pentagon Papers case that the government's allegations of grave danger to the national security provided an insufficient foundation for enjoining disclosure by the Washington Post and the New York Times of classified documents concerning United States activities in Vietnam.  New York Times Co. v. United States, supra. 17/  The Court also invalidated prior restraints when justified by such strong interests as the right to fair trial, Nebraska Press Ass'n, supra, and the right of a homeowner to privacy, Organization for a Better Austin v. Keefe, supra.  Such decisions raise a question whether a

---

16/  (Cont.)
a regulation of conduct not speech, deserves note.  According to that argument, the less rigorous constitutional standard of United States v. O'Brien, 391 U.S. 367 (1968), would govern the validity of the ITAR.  Although that may be true with respect to certain portions of the ITAR, even a cursory reading of the technical data provisions reveals that those portions of the ITAR are directed at communication.  A more stringent constitutional analysis than the O'Brien test is therefore mandated.

17/  The Pentagon Papers case produced a total of ten opinions from the Court, a per curiam and nine separate opinions. All but Justices Black and Douglas appeared willing to accept prior restraints on the basis of danger to the national security in some circumstances.  There was, however, no agreement among the Justices on the appropriate standard.  Justice Brennan stated his view that a prior restraint on publication was justified only upon:

> "proof that publication must inevitably, directly, and immediately cause the occurrence of an event kindred to imperiling the safety of a transport already at sea. . . ."

(Cont. on p. 12)

- 11 -

279

generalized claim of threat to national security from publica-
tion of cryptographic information would constitute an adequate
basis for establishing a prior restraint.  Nonetheless, it
is important to keep in mind that the Court has consistently
rejected the proposition that prior restraints can never be
employed.  See, e.g., Nebraska Press Ass'n, supra at 570.
For example, at least where properly classified government
information is involved, a prior review requirement may be
permissible.  United States v. Marchetti, supra.

     In evaluating the conflicting First Amendment and national
security interests presented by prior restraints on public
cryptography, we have focused on the basic values which the
First Amendment guarantees.  At the core of the First Amend-
ment is the right of individuals freely to express political
opinions and beliefs and to criticize the operations of
government.  See, e.g., Landmark Communications v. Virginia,
46 U.S.L.W. 4389, 4392 (May 1, 1978); Buckley v. Valeo, 424
U.S. 1, 14 (1976); Mills v. Alabama, 384 U.S. 214, 218 (1966).
Adoption of the Amendment reflected a "profound national
commitment to the principle that debate on public issues
should be uninhibited, robust, and wide-open," New York
Times v. Sullivan, 376 U.S. 254, 270 (1964), and was in-
tended in part to prevent use of seditious libel laws to
stifle discussion of information embarrassing to the govern-
ment.  New York Times Co. v. United States, supra at 724
(concurring opinion of Mr. Justice Douglas).

     Prior restraints pose special and very serious threats
to open discussion of questions of public interest.  "If it
can be said that a threat of criminal or civil sanctions
after publication 'chills' speech, prior restraint 'freezes' it
at least for the time."  Nebraska Press Ass'n, supra at 559.

17/  (Cont.)
403 U.S. at 726-27.  Justice Stewart, with whom Justice White
concurred, suggested that a prior restraint would be permissible
only if disclosure would "surely result in direct, immediate
and irreparable damage to our Nation or its people."  Id. at
730.  Several other Justices declined, given the facts and
procedural posture of the case, to formulate a standard.

- 12 -

280

Since views on governmental operations or decisions often must be aired promptly to have any real effect, even a temporary delay in communication may have the effect of severely diluting "uninhibited, robust, and wide-open" debate.  And protection of any governmental interest may usually be accomplished by less restrictive means.  One avenue generally available to the government, and cited by Supreme Court as the most appropriate antedote, is to counter public disclosures or criticisms with publication of its own views.  See, e.g., Whitney v. California, 274 U.S. 357, 375 (1927) (concurring opinion of Mr. Justice Brandeis).

The effect of a prior restraint on cryptographic information, however, differs significantly from classic restraints on political speech.  Cryptography is a highly specialized field with an audience limited to a fairly select group of scientists and mathematicians.  The concepts and techniques which public cryptographers seek to express in connection with their research would not appear to have the same topical content as ideas about political, economic or social issues. A temporary delay in communicating the results of or ideas about cryptographic research therefore would probably not deprive the subsequent publication of its full impact.

Cryptographic information is, moreover, a category of matter "which is both vital and vulnerable to an almost unique degree."18/  Once cryptographic information is disclosed, the damage to the government's interest in protecting

18/  New York Times Co. v. United States, 403 U.S. 713, 736
n. 7 quoting H.R. Rep. No. 1895, 81st Cong., 2d Sess.,
1 (1950).  That report pertains to the bill which became 18
U.S.C. § 798, the criminal statute prohibiting disclosure
of information concerning the cryptographic systems and
communications intelligence activities of the United States.
Section 798 does not reach disclosure of information pub-
lished by public cryptographers, as its coverage is restricted
to classified information.  Classified information by defini-
tion is information in which the government has some proprietary
interest.  See  § 1(b) of the May 3, 1978 draft of the Executive
Order on national security proposed to replace Executive
Order 11,652; cf. 22 C.F.R. § 125.02.

281

national security is done and may not be cured.  Publication
of cryptographic information thus may present the rare
situation in which "more speech" is not an alternative
remedy to silence.19/ See Whitney v. California, supra at
376 (concurring opinion of Mr. Justice Brandeis).

Given the highly specialized nature of cryptographic
information and its potential for seriously and irremediably
impairing the national security, it is our opinion that a
licensing scheme requiring prepublication submission of
cryptographic information might overcome the strong consti-
tutional presumption against prior restraints.  Any such
scheme must, as we have said, provide clear, narrowly defined
standards and procedural safeguards to prevent abuse.

While a detailed discussion of the specific provisions
and procedures of a valid scheme of prior review of crypto-
graphic information or of its practical and political
feasibility is beyond the scope of this memorandum, some

_____

19/  In stressing the differences between cryptographic
       information and other forms of expression we do not
mean to imply that the protections of the First Amendment
are not applicable to cryptographic information or that
they are confined to the exposition of ideas.  See Winters
v. New York, 333 U.S. 507, 510 (1948).  We recognize that
the scope of the amendment is broad.  It encompasses, for
example, purely commercial speech, Virginia State Board of
Pharmacy v. Virginia Citizens Consumer Council, Inc. 425
U.S. 748 (1976), and communicative conduct, Cohen v. California
403 U.S. 15 (1971).  We believe, however, that the extent
of First Amendment protection may vary depending upon the
nature of communication at issue.  It is established in
the area of commercial speech that greater governmental regu-
lation may be tolerated due to the special attributes of
that form of speech.  Virginia State Board of Pharmacy v.
Virginia Citizens Consumer Council, supra at 770-71 and n.24.
Speech in the labor context also presents special First Amend-
ment considerations.  See, e.g., N.L.R.B. v. Gissel Packing
Co., 395 U.S. 575 (1969).  And obscene communications have
received specialized treatment from the courts.  See, e.g.,
Roth v. United States, 354 U.S. 476 (1957).

- 14 -

282

general observations are in order.  First, we wish to emphasize
our doubts that the executive branch may validly provide
for licensing or prior review of exports of cryptographic
information without more explicit Congressional authoriza-
tion.  The scope of the existing delegation of authority
from Congress to the President, as we note above, is some-
what unclear.  Before imposing a prior restraint on exports
of public cryptographic information, we believe that a more
clear cut indication of Congressional judgment concerning
the need for such a measure is in order.  See United States
v. Robel, 389 U.S. 248, 269 (1967) (concurring opinion of
Mr. Justice Brennan); cf. Yakus v. United States, 321 U.S.
414 (1944).

Second, further Congressional authorization would ob-
viously be necessary in order to extend governmental controls
to domestic as well as foreign disclosures of public crypto-
graphic information.  Such an extension might well be necessary
to protect valuable cryptographic information effectively.
Indeed, limiting controls to exports while permitting unregulated
domestic publication of cryptographic research would appear
to undermine substantially the government's position that
disclosure of cryptographic information presents a serious
and irremediable threat to national security.20/

20/  A question which would arise from complete governmental
     control over cryptographic information is whether the
government would be required under the Fifth Amendment to
pay just compensation for the ideas it had effectively "con-
demned."  For example, the patent and invention provisions
of the Atomic Energy Act require the government to pay for
patents which it revokes or declares to be affected with the
public interest.  42 U.S.C. §§ 2181-2190.  A cryptographic
algorithm, however, would not appear to be a patentable
process.  See Gottschalk v. Benson, 409 U.S. 63 (1972).  And
it is unresolved whether copyright protection is available
for computer software.  See Nimmer on Copyright, § 13.1
(Supp. 1976).  We are therefore uncertain as to the status
of cryptographic ideas under the Fifth Amendment.

- 15 -

283

Third, no final restraint on disclosure may be imposed without a judicial determination. We recognize that a requirement of judicial review presents substantial problems. The proof necessary in order to demonstrate to a judge that highly technical cryptographic information must be withheld from publication because of the overriding danger to national security might be burdensome and might itself endanger the secrecy of that information. It is our opinion, however, that any system which failed to impose the burden on government of seeking judicial review would not be constitutional.21/ See, e.g., Blount v. Rizzi, supra.

Finally, any scheme for prior review of cryptographic 'nformation should define as narrowly and precisely as possible both the class of information which the government must review to identify serious threats to the national security and the class of information which the government must withhold.22/ The scheme clearly should exempt from a

_____

21/  The threat to national security posed by a judicial review procedure could be reduced substantially by conducting the review in camera. See Alfred A. Knopf, Inc. v. Colby, 509 F.2d 1362 (4th Cir.), cert. denied, 421 U.S. 992 (1975); cf. 5 U.S.C. 552(a)(4)(B) (Supp. 1975) (in camera review provision of the Freedom of Information Act). The Supreme Court, in any event, has been unimpressed by arguments that disclosure of sensitive national security information to a court raises such serious problems of public dissemination that exemption from constitutional requirements is appropriate. See United States v. U.S. District Court, 407 U.S. 297 (1972).

22/  In other words, we assume that the information submitted under the scheme would not be coextensive with the information withheld. We note, however, that the authority of the government to require prepublication submission of information which is neither classified nor classifiable is unsettled. That issue is posed in the suit recently filed by the Department of Justice in the United States District Court for the Eastern District of Virginia against former CIA employee Frank Snepp for breach of his secrecy agreement. United States v. Snepp, Civil Action No. 78-92-A.

- 16 -

284

submission requirement any information, such as that which
is publicly available or which poses no substantial security
threat, that the government has no legitimate interest in
keeping secret.23/  Failure to draft provisions narrowly
might well invite overbreadth challenges for inclusion of
protected communication. See, e.g., NAACP v. Alabama, 357
U.S. 449 (1958). And a precisely drawn scheme is also
necessary to avoid objections of vagueness. See, e.g.,
Smith v. Goguen, 415 U.S. 566 (1974).24/

In conclusion, it is our view that the existing provisions
of the ITAR are unconstitutional insofar as they establish
a prior restraint on disclosure of cryptographic ideas and
information developed by scientists and mathematicians in
the private sector. We believe, however, that a prepublica-
tion review requirement for cryptographic information might
meet First Amendment standards if it provided necessary
procedural safeguards and precisely drawn guidelines.

John M. Harmon
Assistant Attorney General
Office of Legal Counsel

23/  As we noted above, at n.4, supra, the present ITAR pro-
     visions attempt to exempt publicly available information.
But the scope of that exemption and the procedures for invok-
ing it, particularly with respect to oral communications,
are somewhat clear.

24/  Although we mention questions of overbreadth and vague-
     ness raised by the technical data provisions of the
ITAR previously in this memorandum, we have not attempted
to identify and analyze particular problems for several
reasons.  First, our opinion that a prior restraint on public
cryptography might survive First Amendment scrutiny is a
limited one and does not purport to apply to the many other
types of technical data covered by the ITAR.  Second, we
believe that public cryptography presents special considera-
tions warranting separate treatment from other forms of
technical data, and that a precise and narrow regulation
or statute limited to cryptography would be more likely to
receive considered judicial attention.  Finally, we are
uncertain whether the present legislative authority for the
technical data provisions of the ITAR is adequate.

- 17 -

# Exhibit B

# Constitutionality of the Proposed Revision of the International Traffic in Arms Regulations

Proposed revision of the "technical data" provision of the International Traffic in Arms Regulations (ITAR) redefines and narrows the class of transactions that are subject to a licensing requirement under the Arms Export Control Act of 1976, in an attempt to avoid imposing a prior restraint on speech protected by the First Amendment; however, even as revised the ITAR can have a number of constitutionally impermissible applications.

The licensing requirement in the ITAR may constitutionally be applied to transactions involving arrangements entered into by exporters to assist foreign enterprises in the acquisition or use of technology; it may also be applied to transactions involving the dissemination of technical data for the purpose of promoting the sale of technical data or items on the Munitions List, since the prior restraint doctrine has only limited applicability to "commercial speech." However, insofar as it could be applied to persons who have no connection with any foreign enterprise, who disseminate technical data in circumstances in which there is no more than a belief or a reasonable basis for believing that the data might be taken abroad by foreign nationals and used there in the manufacture of arms, the licensing requirement is presumptively unconstitutional as a prior restraint on speech protected by the First Amendment.

It is not certain whether a court would find that the revised ITAR are so substantially overbroad as to be void and unenforceable in all their applications, or decide to save the regulations through a narrowing construction. The best legal solution is for the Department of State, not the courts, to narrow the ITAR so as to make it less likely that they will apply to protected speech in constitutionally impermissible circumstances.

July 1, 1981

## MEMORANDUM OPINION FOR THE OFFICE OF MUNITIONS CONTROL, DEPARTMENT OF STATE

The views of this Office have been requested concerning the constitutionality of a proposed revision of the "technical data" provisions of the International Traffic in Arms Regulations (ITAR). 45 Fed. Reg. 83,970 (December 19, 1980). On the basis of the analysis set forth below, we conclude that from a constitutional standpoint, the revised ITAR is a significant improvement over the prior version, but that even as revised, it can have a number of unconstitutional applications. We recommend that the proposed revision be modified to minimize or eliminate the number of impermissible applications. Our views are set forth in more detail below.

## I. Background

The ITAR are promulgated pursuant to the Arms Export Control Act of 1976 (the Act). 22 U.S.C. § 2778. The Act authorizes the President "to control the import and export of defense articles and defense services and to provide foreign policy guidance to persons of the United States involved in the export and import of such articles and services" and to "designate those items which shall be considered as defense articles and defense services . . . and to promulgate regulations for the import and export of such articles and services." § 2778(a). Items so designated are placed on the United States Munitions List. Every person engaging in the business of "manufacturing, exporting, or importing" designated defense articles or services must register with the Office of Munitions Control. § 2778(b). No such articles or services may be exported or imported without a license issued in accordance with regulations promulgated under the Act. § 2778(b)(2). Violation of the statute or the regulations promulgated thereunder is a criminal offense. Pursuant to its authority to regulate the export of "defense articles and services," the Office of Munitions Control has traditionally undertaken to regulate the export of technical *information* relating to the manufacture or use of items on the Munitions List. The "technical data" provisions are the embodiment of that undertaking.

The proposed revision defines technical data to include unclassified information not in the public domain and relating directly to, *inter alia,* the performance of defense services; training in the operation or use of a defense article; and design, production, or manufacture of such an article.[1] In general, the relevant provisions require the issuance of a license for the export of any unclassified technical data. A license is not, however, required for the export of unclassified technical data included within certain specified categories of exemption. Among those categories are exports of data published or generally available to the public,[2] exports in furtherance of a manufacturing license agreed to by.

---

[1] Under § 121 315, "technical data" means
    (a) Unclassified information not in the public domain relating directly to:
        (1) The design, production, manufacture, processing, engineering, development, operation, or reconstruction of an article; or
        (2) Training in the operation, use, overhaul, repair or maintenance of an article; or
        (3) The performance of a defense service (see § 121.32);
    (b) Classified information relating to defense articles or defense services, and
    (c) Information covered by a patent secrecy order
45 Fed. Reg. 83,976 (1980)

[2] The ITAR exempts technical data if they "are published or otherwise generally available to the public".
    (i) Through sales at newsstands and bookstores;
    (ii) Through subscription, unrestricted purchase, or without cost;
    (iii) Through second class mailing privileges granted by the U S. Government; or,
    (iv) Are freely available at public libraries.
45 Fed. Reg. 83,985 (1980)

the State Department, and exports related to firearms not in excess of caliber .50. Most importantly for present purposes, the revised provisions exempt technical data which:

> consists of information which is not designed or intended to be used, or which could not reasonably be expected to be used, in direct application in the design, production, manufacture, repair . . . of defense articles (for example, general mathematical, engineering, or statistical information not purporting to have or not reasonably expected to be given direct application to defense articles.) An advisory opinion may be sought in case of doubt as to whether technical data is exempt under this category.

45 Fed. Reg. 83,985 (1980).

With reference to technical data, the proposed revision defines the term "export" to include both the sending, transmitting, or removal of technical data from the United States, and the transfer of such data to a foreign national when the transferor knows or has reason to know that the transferred data will be sent, transmitted, or taken out of the United States. Disclosure to a foreign national of technical data relating to "significant military equipment," whether in the United States or abroad, is also an "export." Finally, the proposed revision expressly provides that an "export" occurs when (1) technical data are disclosed to a foreign national abroad or (2) technical data are disclosed to a foreign national in the United States when the transferor knows or has reason to know that the disclosed technical data will be disclosed outside the United States.

## II. Discussion

The constitutionality of the ITAR was considered and questioned in a memorandum prepared by this Office in 1978 at the request of Dr. Frank Press, Science Advisor to the President. *See* Memorandum of May 11, 1978, for Dr. Frank Press, Science Advisor to the President, from John M. Harmon, Assistant Attorney General, Office of Legal Counsel entitled "Constitutionality Under the First Amendment of ITAR Restrictions on Public Cryptography." On their face, the previous regulations appeared to establish a general administrative rule that required persons subject to United States jurisdiction to apply to the Department of State for a license before communicating technical data to foreign nationals. The regulations were drafted in such a way that this rule could have been applied not only to persons who undertook to transmit technical data during the sale of arms or technical services abroad, but also to virtually any person involved in a presentation or discussion, here or abroad, in which technical data could reach a foreign national. In all such circumstances, anyone who proposed to

discuss or transmit technical data was, under the ITAR, an "exporter"; and he was therefore required by the ITAR to apply in advance for an administrative license, unless the technical data in question fell within the limited exemptions from regulation.

In the memorandum to Dr. Press, this Office concluded that the ITAR cast such a broad regulatory net that it subjected a substantial range of constitutionally protected speech to the control of the Department of State. Because this control was exercised through a system of administrative licensing—a system of "prior restraint"—we concluded that the relevant regulations were presumptively unconstitutional. We also concluded, however, with particular reference to cryptographic information, that the constitutional difficulties presented by this system of prior restraint might be overcome without limiting the range of transactions to which the ITR purported to apply. The difficulties might be overcome if: (1) the standards governing the issuance or denial of an administrative license were defined more precisely to guard against arbitrary and inconsistent administrative action; and (2) a procedural mechanism was established to impose on the government the burden of obtaining prompt judicial review of any State Department decision barring the communication of cryptographic information.

The present proposal for revision of the ITAR does not attempt to satisfy the second condition described in the previous memorandum. It does, however, redefine the class of transactions that are subject to the licensing requirement. It is therefore necessary to determine whether the redefinition of coverage is sufficiently responsive to the constitutional objections raised by our previous opinion concerning the issue of prior restraint to require a different conclusion. If the redefinition of coverage ensures that the licensing requirement can no longer apply to speech that is constitutionally protected against prior restraint, the concerns expressed in our previous opinion will no longer be relevant to the constitutional analysis. On the other hand, if the redefinition does not significantly contract the coverage, the prior restraint doctrine must be taken into account. We adhere to the positions regarding constitutional limits in this area articulated in the memorandum to Dr. Press. If the revised technical data provisions are drafted so broadly that they impinge on speech that is protected against prior restraint, they are presumptively unconstitutional in their application to the speech. Moreover, if their overbreadth is substantial, they may be void and unenforceable in all their applications, although we cannot fully assess that possibility without examining the constitutional status of the entire range of transactions to which they may apply.

The revised technical data provisions may apply to three general categories of transactions: (1) transactions involving the direct transmission of technical data by an exporter to a foreign enterprise under a contract or other arrangement entered into by the exporter for the

purpose of assisting the foreign enterprise in the acquisition of use of technology; (2) transactions involving the dissemination of technical data for the purpose of promoting or proposing the sale of technical data of items on the Munitions List; and (3) transactions in which an "exporter" who is not otherwise connected or concerned with any foreign enterprise transmits technical data knowing, or having reason to know, that the data may be taken abroad and used by someone there in the manufacture or use of arms.

We have concluded that the application of the revised technical data provisions to transactions in the first two categories described above will not violate the First Amendment prohibition against prior restraint. However, the application of these provisions to transactions in the third category will raise serious constitutional questions. Our ultimate conclusions about the constitutionality of the technical data provisions are set forth, together with our recommendations for revision, in section III below.

(1) *Transactions involving arrangements entered into by exporters to assist foreign enterprises in the acquisition or use of technology.* At its core, the ITAR is designed to control United States firms and individuals who undertake to assist foreign enterprises in the acquisition and use of arms. The purpose of the technical data provisions is to extend that control to transactions in which assistance takes the form of technical advice. Perhaps the most common example of a transaction of that kind is a straightforward commercial arrangement in which an American firm agrees to provide technical information or advice to a foreign firm engaged in the manufacture of an item or items on the Munitions List.[3]

The leading case involving the constitutionality of the ITAR arose in precisely that context. *See United States* v. *Edler Industries, Inc.,* 579 F.2d 516 (9th Cir. 1978). In *Edler,* an American firm specializing in aerospace technology, Edler Industries, agreed to provide a French firm with technical assistance and data relating to a tape wrapping program. The Office of Munitions Control denied Edler's application for export licenses on the ground that exportation of the information in question would violate United States policy as established by the Act. During the pendency of the license applications, and after the denial, Edler proceeded to perform the contract and transmitted the information to the French firm. Edler was then prosecuted under the Act. Edler defended on the ground, among others, that the transmission of technical information under the contract with the French firm was constitutionally protected "speech" and that the government could not require such "speech" to be licensed in advance. The trial court rejected that contention and Edler was convicted.

---

[3] We can imagine more exotic examples that would proceed upon essentially the same legal footing, *e.g.,* a transaction in which an American agent (an "industrial spy") transmits sensitive technical information to his foreign principal.

On appeal, the Ninth Circuit upheld Edler's defense in part. The court concluded that the definition of "technical data" then appearing in 22 CFR § 125.01 (1977) should be interpreted narrowly in light of the applicable constitutional limitations, § 1934 of the Act,[4] and the relevant legislative history. Under the Act, the regulations should be construed to bar "only the exportation of technical data significantly and directly related to specific articles on the Munitions List." *Id.* at 521. Moreover, if the information in question "could have both peaceful and military applications," the regulations should be construed to apply only in cases in which the defendant knew or had reason to know that the information was "intended for the prohibited use." *Id.* That construction was necessary "to avoid serious interference with the interchange of scientific and technological information." *Id.* If the regulations and the statute were construed to apply only in the case of knowledge or reason to know of an intended prohibited use, they would not "interfere with constitutionally protected speech." *Id.* They would merely control "the conduct of assisting foreign enterprises to obtain military equipment and related technical expertise," and for that reason they would not impose an unconstitutional prior restraint on speech. *Id.* Finally, although the district court had correctly rejected certain elements of the defendant's First Amendment defense, it had adopted an impermissibly broad construction of the regulations, and therefore the case was ordered retried in accordance with the narrower construction.

On the facts presented, the essential holding of *Edler*—that the previous ITAR could be applied constitutionally to an exporter who had agreed to assist a foreign firm in the development of a new technology, having reason to know that the foreign firm intended to use the technology to manufacture items on the Munitions List—was consistent with the traditional principles the courts have applied in the interpretation of the First Amendment. Indeed, the novelty of *Edler* lay not in that holding, but in the defendant's claim that the transmission of technical information under the agreement with the French firm was constitutionally protected "speech." The courts have consistently held that whenever speech is an "integral part" of a larger transaction involving conduct that the government is otherwise empowered to prohibit or regulate, the First Amendment does not immunize that speech; nor does it bar prior restraint. *See, e.g., Ohralik* v. *Ohio State Bar Assn.,* 436 U.S. 447, 456 (1978), and cases cited therein; *Giboney* v. *Empire Storage & Ice Co.,* 336 U.S. 490 (1949). That principle comes into play in a number of contexts: most importantly, where speech is joined with conduct by an agreement or special relationship between

[4] This provision was repealed in 1976 and replaced by the current provision, 22 U.S.C. § 2778. For purposes of the interpretation adopted by the *Edler* court, however, the changes in § 1934 are not material.

the speaker and the actor. For example, under the law of conspiracy, when one individual enters into an agreement with another to rob a bank or to restrain trade and provides the other with the information which facilitates that action, neither the agreement nor the transmission of the information is constitutionally protected. *See id.*

To be sure, there is a doctrinal difficulty in applying this traditional analysis to international transactions of the kind involved in *Edler.* When the defendant in *Edler* agreed to assist the French firm in the development and use of sensitive technology, it was not undertaking to aid that firm in conduct that was itself illicit or unauthorized as a matter of domestic law. Our nation has a compelling interest in suppressing the development and use of sensitive technologies abroad, but it has no general power to "outlaw" the development of technology by foreign enterprises or to require them to apply here for a license before making or using arms. As a matter of domestic law, the government's only recourse is to control persons subject to United States jurisdiction who would undertake to aid and abet those foreign endeavors.

We believe that the absence of a direct domestic prohibition against the foreign conduct in question here—the foreign manufacture or use of items on the Munitions List—does not create a constitutional barrier to domestic regulation of persons who combine with foreign enterprises to assist them in the development and use of sensitive technology. Even though such assistance may take the form of technical advice, it is, in the *Edler* context, an integral part of conduct that the government has a compelling interest in suppressing by appropriate means. As the *Edler* court held, such assistance is not constitutionally protected speech; and it is not protected by the constitutional prohibition against prior restraint.

We have one further observation concerning the *Edler* case. *Edler* held that the licensing requirement of the previous ITAR could be enforced where: (1) the foreign recipient of technical data intended to use it in the manufacture or use of items on the Munitions List; and (2) the exporter had "reason to know" of that intention. Given the nature of the transaction that was involved in *Edler,* those requirements imposed what the Ninth Circuit considered to be necessary limitations on the power of the government to license the transmission of sensitive technical information under international contracts and combinations.[5]

---

[5]There is room to doubt whether the concise and somewhat ambiguous language adopted by the *Edler* court in the statement of the applicable rule, *see* 579 F.2d at 521, completely captures the relevant constitutional standard. The *Edler* rule presupposes that the foreign enterprise intends to use technical data in the manufacture or use of arms, and it suggests that the licensing requirement can be enforced only where the exporter has reason to know of that intention. But a respectable argument can be made that the constitutional power of the government to license persons who combine with foreign enterprises to assist directly in the development of sensitive technology abroad is not limited to cases in which the foreign enterprise has a present intention of using that technology in the manufacture of arms. The present intention of the foreign actor is constitutionally relevant, of course, but the actual source of the danger is the technical capacity that his action creates. That capacity is created on
Continued

They should be read in that context. We believe they cannot be read as implicitly authorizing the imposition of a general licensing requirement in every circumstance in which a speaker may have known or had reason to know that his speech could be used for a dangerous purpose by someone abroad. Beyond the *Edler* context—a context in which "speech" is joined with dangerous conduct by an actual agreement or combination between speaker and actor—constitutional principles far more favorable to the speaker come into play. We will discuss those principles in part (3) below.

(2) *Transactions involving the dissemination of technical data for the purpose of promoting or proposing the sale of technical data or items on the munitions list.* In this section, we consider the dissemination of technical data for the purpose of promoting or proposing the sale of technical data or items on the Munitions List.[6] The Supreme Court has given special consideration to promotional materials in a series of recent decisions. Under the rubric of "commercial speech," information that proposes or promotes a commercial transaction has been accorded some constitutional protection. *See Virginia State Bd. of Pharmacy* v. *Virginia Citizens Consumer Counsel, Inc.,* 425 U.S. 748 (1976); *Friedman* v. *Rogers,* 440 U.S. 1 (1979); *Central Hudson Gas* v. *Public Service Comm'n,* 447 U.S. 557 (1980); *Linmark Associates, Inc.* v. *Willingboro,* 431 U.S. 85 (1977). Commercial speech is protected because it "assists consumers and furthers the societal interest in the fullest possible dissemination of information." *See Central Hudson Gas, supra,* at 561–62. At the same time, it has been suggested by the Court that commercial speech is in some circumstances entitled to a "lower level" of protection than that accorded to other forms of protected speech. The courts have said that a "lower level" of protection is justified because "commercial speakers have extensive knowledge of both the market and their products" and are thus "well situated to evaluate the accuracy of their messages and the lawfulness of the underlying activity," and because "commercial speech, the offspring of economic self-interest, is a hardy breed of expression that is not 'particularly susceptible to being crushed by overbroad regulation.'" *Id.* at 564 n.6 (citation omitted). These factors have led the Supreme Court to conclude that the govern-

---

foreign soil, beyond the legislative jurisdiction of the United States, and our government may have no adequate means of controlling its subsequent use in a way that will protect against a change of circumstance or intention. Accordingly, one could argue that our nation has a substantial interest in suppressing the creation of technical capacity in the first instance, whatever the present intentions of the foreign enterprise may be; and if a United States technical expert, knowing of the potential danger, combines with the foreign enterprise to create that capacity, that is arguably enough. An analogous principle is operative in the law of espionage. The transmission of sensitive information by a domestic agent to his foreign principal is not constitutionally protected even where the purpose of the transaction is merely to benefit the foreign capacity, not to injure the United States. As the Supreme Court noted in the leading case, the status of foreign governments may change; no advantage can be given to them without creating a potential for injury to us *See Gorin* v. *United States,* 312 U.S. 19, 30 (1941).

[6] We are advised by the Federal Bureau of Investigation that technical data are sometimes disseminated in international conferences or meetings for the purpose of promoting the sale of sensitive technology.

ment may ban false or misleading commercial speech, *see Friedman* v. *Rogers, supra,* at 13, 15–16, and, in at least some contexts, commercial speech relating to illegal activity, *Pittsburgh Press Co.* v. *Pittsburgh Comm'n on Human Relations,* 413 U.S. 376, 388 (1973). Similar considerations have led the Court to suggest in dicta that the ordinary First Amendment prohibitions against overbreadth and prior restraint may not be fully applicable to commercial speech. *See Virginia State Bd. of Pharmacy, supra,* at 772 n.24.

For purposes of the present discussion, we need not determine whether the prior restraint doctrine is inapplicable to all commercial speech in all circumstances. In the present context, we believe that a licensing requirement for promotional speech that contains technical data would probably be held constitutional. There are four reasons for this conclusion. First, the governmental interest in preventing the development of military equipment by foreign countries is a significant one. That interest may justify prior restraint against the promotion of foreign technical sales in the same way that the national interest in truth and fair dealing justifies prior restraint against false and deceptive promotions in the ordinary commercial context. *See Donaldson* v. *Read Magazine,* 333 U.S. 178, 189–91 (1948); *FTC* v. *Standard Education Society,* 302 U.S. 112 (1937). Second, a licensing requirement for promotional materials containing technical data will not delay the transmission of information that the public has a strong interest in receiving immediately. In that respect, technical promotions are unlike political speech, for the public will not generally suffer if technical data are suppressed during a licensing period. *Compare New York Times* v. *United States, supra.* Third, the protection accorded to commercial speech is largely designed to protect the rights of listeners and consumers. *See Virginia State Bd., supra.* Those rights are not directly implicated here. Foreign enterprises engaged in the manufacture or use of arms abroad generally have no right under the Constitution to receive information from persons in this country. Finally, the Court has indicated that deference to the political branches is most appropriate in the area of military affairs. *Cf. Rostker* v. *Goldberg,* 453 U.S. 57 (1981); *Brown* v. *Glines,* 444 U.S. 348 (1980).[7] On the basis of these factors, and the intimation in *Virginia State Bd.* that the strong presumption against prior restraints may not be fully operable in the commercial context, we believe that the courts would, in general, uphold a licensing requirement for promotional speech that contains technical data.

Whether the "commercial speech" doctrine has any other bearing upon the constitutionality of the technical data provisions is not entirely

---

[7] Because Congress' determinations are of special importance here, it would be useful to obtain clear and specific legislative authority for the technical data regulations. In addition, it may be advisable to provide remedies other than criminal penalties for violation of the ITAR provisions, such as civil sanctions.

clear. The Court has given little guidance concerning the meaning of the operative term. In *Ohralik* v. *Ohio State Bar Ass'n*, 436 U.S. 447, 455–456 (1978), the Court indicated that "commercial speech" is "speech proposing a commercial transaction." *See also Virginia Pharmacy Board, supra.* In *Central Hudson Gas*, by contrast, the Court described "commercial speech" as "expression related solely to the economic interests of the speaker and its audience." 447 U.S. at 561. This characterization prompted a separate opinion from Justice Stevens, joined by Justice Brennan, suggesting that such a definition was far too broad: "Neither a labor leader's exhortation to strike, nor an economist's dissertation on the money supply, should receive any lesser protection because the subject matter concerns only the economic interests of the audience. Nor should the economic motivation of a speaker qualify his constitutional protection; even Shakespeare may have been motivated by the prospect of pecuniary reward." *Id.* at 579–80.

The contours of the "commercial speech" concept are suggested by the facts of the cases that have recognized the commercial speech doctrine. As we have said, speech that promotes a commercial transaction falls within the category. *See id.* (advertisements promoting purchase of utility services and sales of electricity); *Virginia State Bd., supra* (advertisements for pharmaceutical products); *Linmark Associates, supra* (advertisements for real estate); *Friedman* v. *Rogers, supra* (use of trade name by optometrists). Thus far, the characterization as "commercial speech" has been largely confined to speech that merely promotes the sale or purchase of a product or service; in no case has it been applied to nonpromotional material simply because the speaker or writer is motivated by an economic interest, or because he is selling the information for a profit. We do not believe that the Court would hold that the transmission of technical data is "commercial speech" merely because the exporter charges a fee for its disclosure. Such a holding would prove far too much. It would sweep a broad range of fully protected expression into the commercial speech category. Writers of all varieties—political, literary, scientific, philosophical—often charge a fee for the books or articles they produce. There is no authority for the proposition that, simply by virtue of the fact that the documents are transferred for a fee, they are not protected by the First Amendment.

On the other hand, as we have suggested, the dissemination of technical data for the purpose of promoting the sale of a defense article or service would appear to be "commercial speech," and the constitutional barriers to prior restraints may well have a diminished applicability to the dissemination of technical data in that context. As applied to such speech, the ITAR may well be constitutional, given the substantial governmental interest in suppressing the technical data and the qualified nature of the First Amendment protection that is accorded to promotional materials.

(3) *Transactions in which an exporter, unconnected with any foreign enterprise, disseminates technical data knowing or having reason to know that the data may be taken abroad and used there in the manufacture or use of arms.* Read in light of the relevant exemptions and definitions, the revised technical data provisions can be applied to any person who proposes to disseminate technical data in circumstances in which he knows or has reason to know that the information will be transmitted or taken abroad and used in the manufacture or use of arms. This coverage is so broad that the revised provisions could be applied in a number of factual settings to persons who are not directly connected or concerned in any way with any foreign conduct carrying dangerous potential for the United States. They could be applied, for example, to communications of unclassified information by a technical lecturer at a university or to the conversation of a United States engineer who meets with foreign friends at home to discuss matters of theoretical interest.

On the basis of the *Edler* decision, we believe that the technical data provisions may be applied constitutionally to persons or firms who combine (with the requisite *scienter*) with foreign enterprises to assist them in the development of sensitive technological capacities. In the absence of special circumstances,[8] however, there is a critical constitutional difference between direct and immediate involvement in potentially dangerous foreign conduct, as in *Edler,* and the speech of the lecturer or the engineer in the examples given above. The difference is a factual one—the difference between conspiracy and assembly, incitement and informing—but it is no less important for constitutional purposes. *See Whitney* v. *California,* 274 U.S. 357, 376–77 (1927) (Brandeis, J., concurring). On the far side of that critical line, speech is not protected when it is brigaded with conduct; on the near side, it is at least arguably protected. Speech does not lose its protected character solely because the circumstances of the case give rise to a reasonable fear that persons other than the speaker may be moved or enabled by the speech to do dangerous things at remote times and places. *See Brandenburg* v. *Ohio,* 395 U.S. 444 (1969).[9] Finally, if speech is arguably protected by the First Amendment, it may not be subjected to prior restraint except in the most extraordinary cases. Prior restraint against arguably protected speech is presumptively unconstitutional. *See Pittsburg Press Co.* v. *Pittsburgh Comm'n on Human Relations, supra.*

---

[8] Special circumstances would include a grave and immediate threat to national security, as where important military information is being communicated to an adversary for current use against the United States. *See New York Times* v. *United States,* 403 U.S. 713 (1971).

[9] In *Brandenburg,* the Court held that speech would not be protected if it was both "directed to inciting or producing imminent lawless action" and "likely to incite or produce such action." 395 U.S. at 447. The "directed to inciting" language at least arguably requires a showing of intent. Accordingly, when intent is absent, speech is—again at least arguably—protected by the First Amendment and may not, therefore, be suppressed by means of a prior restraint. A different conclusion may be appropriate, however, if very grave harm would definitely result from the disclosure. *See New York Times* v. *United States, supra.*

In accordance with these principles, we conclude that, in general, the revised technical data provisions cannot constitutionally be applied to the dissemination of technical data by persons having no direct connection with foreign conduct in settings in which there is no more than belief or a reasonable basis for believing (1) that a foreign national may take the technical data abroad and (2) that the data could be used by someone there in the manufacture or use of items on the Munitions List.[10] In the absence of special circumstances that would justify prior restraint, such speech is arguably protected and, as a general rule, cannot be subjected constitutionally to the revised licensing requirement.

### III. Conclusion and Recommendation

We have concluded that the revised technical data provisions can have constitutional and unconstitutional applications. As a matter of constitutional doctrine, that conclusion would require a court to consider whether the provisions are so substantially overbroad that they are void and unenforceable in all their applications. *See Broadrick* v. *Oklahoma,* 413 U.S. 601 (1973). For the present, however, we will forgo that inquiry in favor of three more pragmatic considerations.

First, *Edler* itself demonstrates that the problems presented by facial overbreadth do not necessarily prevent the enforcement of a licensing requirement in cases in which such a requirement can otherwise be constitutionally enforced. The *Edler* court saw its task as one of saving a necessary system of regulation, and it therefore chose to "construe" the statute and the applicable regulations narrowly to avoid the overbreadth problem and to preserve the possibility of enforcing the system against a criminal defendant (Edler) whose "speech" may not have been constitutionally protected. That approach was consistent with the approach that the Supreme Court itself has taken in some First Amendment cases. *See Civil Service Commission* v. *Letter Carriers,* 413 U.S. 548 (1972). It is an approach that may be taken when new cases arise under the revised technical data provisions.

Second, there is no absolute guarantee that other courts will be as concerned with saving the regulations as the *Edler* court was. The decision whether to enforce the overbreadth doctrine or to save the regulation through narrow "construction" is in part a matter of judicial discretion; and we cannot exclude the possibility that a court would

---

[10] As *Edler* suggests, a different conclusion may be appropriate if the data have only military applications, or if the defendant knows such an application is intended. Even in such contexts, however, there may be situations in which the First Amendment bars a prior restraint consider, for example, a lecture on technical data having exclusively military uses when nationals of American allies are in the audience We do not, however, conclude that the ITAR is unconstitutional with respect to all transactions falling within this category; we merely suggest it has a number of unconstitutional applications.

hold the technical data provisions substantially overbroad, and therefore void.

For obvious reasons, the best legal solution for the overbreadth problem is for the Department of State, not the courts, to narrow the regulations. In our judgment, the regulations should be narrowed to make it less likely that they will apply, or be seen to apply, to protected speech falling within the general category described in part 3 of section II above. We would respectfully recommend that an effort be undertaken along that line.[11]

THEODORE B. OLSON
*Assistant Attorney General*
*Office of Legal Counsel*

---

[11] We also recommend the legislative changes referred to in note 7, *supra.*

214

# Exhibit C



**U.S. Department of Justice**

Office of Legal Counsel

---

Office of the
Deputy Assistant Attorney General

*Washington, D.C. 20530*

JUL 5 - 1984

MEMORANDUM FOR DAVIS R. ROBINSON
LEGAL ADVISER
DEPARTMENT OF STATE

Re:   Revised Proposed International Traffic in
Arms Regulations (ITAR)

This responds to a memorandum of June 5, 1984, from Mr.
Cummings of your Office, requesting the views of this Office
on a proposed revision of the International Traffic in Arms
Regulations (ITAR), recently prepared by the Department of
State (hereinafter "current draft").  This Office has previously
provided extensive comments on an earlier proposed revision
of the ITAR (hereinafter "prior draft").  1/  See Memorandum for
William B. Robinson, Office of Munitions Control, Department
of State, from Theodore B. Olson, Assistant Attorney General,
Office of Legal Counsel (July 1, 1981) (hereinafter "1981 ITAR

---

1/  This Office first addressed constitutional issues related
to the ITAR in 1978 in a memorandum for Dr. Frank Press, the
Science Adviser to President Carter.  That opinion considered
the constitutionality of the restrictions on the dissemination
of cryptographic information developed by scientists and
mathematicians in the private sector independent of government
supervision or support.  We concluded that the ITAR's prohibi-
tion of disclosure of these "public" cryptographic ideas and
information amounted to an unconstitutional prior restraint.
See Memorandum for Dr. Frank Press, Science Adviser to the
President, from John M. Harmon, Assistant Attorney General,
Office of Legal Counsel (May 11, 1978) (attached).

Memorandum").  2/  For reasons set forth in detail below, we
believe that the current draft is an improvement over the
prior draft, but that the application of the ITAR to a
significant class of conduct continues to raise serious
constitutional questions, which should be resolved prior
to promulgation of the revised ITAR.


### I.  BACKGROUND

In our 1981 memorandum, we discussed primarily the
restrictions on, and the exemptions allowed for, the "export"
of "technical data."  Under the ITAR, the "export" of "technical
data" is subject to a licensing requirement unless it falls
within one of the exemptions.  We concluded that the prior
draft of the ITAR had a number of unconstitutional applications,
specifically with regard to transactions in which an exporter,
unconnected with any foreign enterprise, disseminated technical
data knowing or having reason to know that the data may be
taken abroad and used there in the manufacture or use of arms.
We noted that the coverage of the technical data provisions was
so broad that they

> could be applied in a number of factual
> settings to persons who are not directly
> connected or concerned in any way with any
> foreign conduct carrying dangerous poten-
> tial for the United States.  They could be
> applied, for example, to communications of
> unclassified information by a technical

_____

2/  In 1981, we also issued an opinion which addressed the
constitutionality of proposed regulations under the Export
Administration Act (EAA) regarding the export of technical
data relating to items on the Department of Commerce's Commodi-
ties Control List.  These regulations proposed generally the
same definitions, prohibitions, and licensing requirements with
respect to technical data associated with commodities as the
ITAR proposed for technical data associated with munitions.
We concluded that the proposed EAA regulations also amounted
to an unconstitutional prior restraint on the disclosure of
a wide variety of protected speech.  See Memorandum for Henry
D. Mitman, Director, Capital Goods Production Materials
Divisions, Department of Commerce, from Theodore B. Olson,
Assistant Attorney General, Office of Legal Counsel (July 28,
1981) (attached).

-2-

> lecturer at a university or to the conversa-
> tion of a United States engineer who meets
> with foreign friends at home to discuss
> matters of theoretical interest.

1981 ITAR Memorandum at 13.

Relying on the decision in United States v. Edler Indus-tries, Inc., 579 F.2d 516 (9th Cir. 1978), we concluded in 1981 that the technical data provisions could be constitu-tionally applied to persons or firms who assisted foreign enterprises in the development of sensitive technological capacities. We also concluded, however, that in the absence of special circumstances, such as a grave and immediate threat to national security, the difference between direct and immediate involvement in potentially dangerous conduct, such as in the Edler case, and the speech of a lecturer or engineer in the hypothetical posed above, could be critical for consti-tutional purposes. Thus, the technical data provisions could not constitutionally be applied to the dissemination of technical data by persons having no direct connection with foreign conduct in settings in which there is no more than a belief or a reasonable basis for believing: (1) that a foreign national may take technical data abroad; and (2) that the data could be used by someone there in the manufacture or use of items on the controlled munitions list. In the absence of special circumstances that would justify a prior restraint on such speech, the speech was presumptively protected and therefore could not constitutionally be subjected to a licensing requirement.

The 1981 ITAR Memorandum did not purport to determine the constitutionality of all possible applications of the ITAR. We merely advised that there were a number of unconstitutional applications which would make the regulations overbroad. We suggested that the regulations be narrowed to make it less likely that they would apply, or might be thought by a court to apply, to protected speech.

## II.   SUBSEQUENT LEGAL DEVELOPMENTS

Since we wrote our 1981 ITAR Memorandum, the Supreme Court has decided two commercial speech cases. In both cases, the Court has continued the extent of protection of commercial speech recognized in the earlier cases, upon which our previous memorandum relied. The details of the two more recent cases are not relevant to our analysis here, but it is

-3-

important to note that, in our judgment, the constitutional
principles upon which we relied remain intact. 3/

### III.   DISCUSSION

The current draft of the ITAR circulated by your Office
was apparently intended to remedy the constitutional defects

---

3/ In Metromedia, Inc. v. San Diego, 453 U.S. 490 (1981)
(plurality opinion), the Court considered a city ordinance
which permitted onsite commercial advertising but prohibited
offsite commercial advertising and noncommercial advertising
with limited exceptions.  The plurality opinion concluded that
the ordinance was constitutional as applied to commercial
speech because it satisfied the standards of Central Hudson
Gas & Electric Corp. v. Public Service Comm'n, 447 U.S. 557
(1981), upon which we relied in our prior opinion.  The
substantial government interests in improved traffic safety
and appearance of the city were directly served by the ordi-
nance, which was no broader than necessary to accomplish those
ends.  (The ban was invalidated as applied to noncommercial
speech, however, because the Government's asserted interests
were insufficient to justify the ban, given that commercial
advertising was permitted.)  In Bolger v. Youngs Drug Products
Corp., 103 S. Ct. 2875 (1983), the Court struck down a federal
statute which prohibited unsolicited mailing of contraceptive
advertisements.  The Court held that the statute was an
unconstitutional restriction on commercial speech because the
Government's interests in shielding recipients from unwanted
mail which they might find offensive and aiding parents in
controlling the information which their children received
about birth control were insufficient to overcome the protec-
tion afforded to speech that was truthful and related to
activity protected from unwanted state interference and also
to important social issues.  City of Los Angeles v. Taxpayers
for Vincent, No. 82-975, 52 U.S.L.W. 4594 (U.S. May 15, 1984),
is a sort of sequel to Metromedia, although it is not a
commercial speech case.  In Taxpayers, the Court upheld a
city ordinance which prohibited the posting of signs on public
property.  The Court held that the content-neutral prohibition
was justified by the city's substantial esthetic interests,
even as applied to signs which carried political messages.
Of course, the ordinance was directed against--and prohibited
--only the use of the signs.  Speech itself was not regulated
and could be continued to be conveyed on public property by a
speaker or distributor of leaflets.

existing in the prior draft.  The summary of the current
draft notes that the list of exemptions from the licensing
requirement of the ITAR was one of the provisions which
received the most comments and that concerns were expressed
about the relationship between that licensing requirement and
the First Amendment.  The summary states that the revision
"seeks to reflect these concerns, and certain new exemptions
are provided."  Prior draft at p. 10.  We have examined the
new exemptions as well as the revised definitions of "export"
and "technical data," and we offer the following comments.
For convenience, the relevant provisions of the prior and
current drafts are set out in full as an appendix to this
opinion.

A.   "EXPORT"

     The definition of export with regard to technical data
has been changed.  4/  The prior draft described four general
ways in which technical data could be exported:

          (1) sending, transmitting, or taking defense articles
          and defense services, including technical data, out of
          the United States in any manner, see §121.34(a)(1);

          (2) the disclosure to a foreign national of technical
          data relating to significant military equipment in
          the United States; see §121.34(b), first sentence 5/;

_____

4/  The definitions of export in the current draft with regard
to "defense articles" and "defense services" seem to be
substantively unchanged from the prior draft, at least for
purposes of constitutional evaluation.  These provisions were
not within the scope of our 1981 ITAR Memorandum, and they
are not relevant here.

5/  This sentence describes a narrower category than category
(4), see p. 6, infra, because it applies only to technical data
relating to significant military equipment, not all technical
data, but this category is also broader than category (4)
because, as applied to technical data relating to significant
military equipment, this provision does not require that the
transferor know or have reason to know that the technical
data will be disclosed outside the United States.

-5-

(3) the disclosure of technical data to a foreign national abroad, see id., second sentence 6/; and

(4) the disclosure of technical data to a foreign national in the United States when the transferor knows or has reason to know that the disclosed technical data will be disclosed outside the United States, see id., third sentence. 7/

Travel abroad by a U.S. national or permanent resident with personal knowledge of technical data was excluded from the definition of export. See id., fourth sentence.

Under the current draft, these four categories appear to be consolidated into two:

(1) sending or taking technical data outside the United States in any manner except for travel by a person with personal knowledge of technical data, see § 121.20(c); and

(2) disclosing or transferring technical data to a foreign person, whether in the United States or abroad, unless an exemption is applicable. See § 121.20(d).

It appears to us that the first category of export under both the prior and current drafts is substantively identical, although in slightly different form. Under the prior draft, travel abroad was also exempted, although the exemption was contained in the subsection relating to disclosure and did not specifically refer to sending or taking technical data out of the United States.

The difference between the two drafts is that the second, third, and fourth categories of exports in the prior draft have

_____

6/ As drafted, the first sentence of § 121.34(b) referred also to disclosures of technical data relating to significant military equipment abroad. Given that this second sentence refers to disclosure of any technical data abroad, the reference in the first sentence to disclosure abroad of technical data relating to significant military equipment seems superfluous.

7/ This provision seems duplicative of § 121.34(a)(2), which refers to the transfer of technical data to a foreign national in the United States in circumstances in which the transferor knows or has reason to know that the technical data will be sent, transmitted, or taken out of the United States.

been condensed into the second category in the current draft.
On its face, and without regard to the exemptions, the scope
of coverage of the current draft is broader because it applies
to all disclosures and transfers of technical data to a foreign
person in the United States and abroad, unless exempted,
whereas the prior draft seemed to require that the transferor
know or have reason to know that technical data other than that
relating to significant military equipment would be disclosed
outside the United States.  Thus, whether the coverage of the
current draft is narrower for constitutional purposes than the
prior draft depends on the scope of the exemptions provided in
the current draft.  We examine those exemptions in detail below,
although we will discuss the definition of "technical data"
first in order to complete the background for our inquiry.

B.   "TECHNICAL DATA"

     Both the prior and the current drafts describe generally
three types of technical data.  Two are substantially identical:

     (1) classified information relating to defense articles
     and defense services, see § 121.315(b) (prior draft)
     and § 121.30(a) (current draft); and

     (2) information covered by a patent secrecy order, see
     § 121.315(c) (prior draft), or an invention secrecy
     order, see § 121.30(b) (current draft).

     The third category is described in the prior draft as
"unclassified information not in the public domain relating
directly to" various categories of information.  See § 121.315(a).
The current draft is phrased in terms of "information which is
not classified pursuant to U.S. laws and regulations and which
is directly related to" generally the same kinds of information.
See § 121.30(c).  Essentially, this information relates to the
"design, engineering, development, production, processing, manu-
facture, operation, overhaul, repair, maintenance, or recon-
struction of defense articles."  The current draft specifically
includes "information which advances the state of the art of
articles on the U.S. Munitions List."  See § 121.30(c).  8/

------------------------------

8/  The prior draft differs by referring to information which
is related to "training" in the operation, use, overhaul,
repair, or maintenance of an article.  This difference does
not appear to be a substantive change.  The current draft
also included "performance of a defense service" within the
definition of technical data.  Performance of a defense
service is now specifically covered in § 121.18.

-7-

Two changes have been made in the definition of technical
data in the current draft, which specifically excludes informa-
tion in the "public domain" and "general mathematical and
engineering information which is only and [sic] indirectly
useful in the defense field."  Information in the public domain
is defined to include information which is published and
generally accessible or available to the public at newsstands
and bookstores, through certain subscriptions, through certain
mailing privileges, and at public libraries.  In the prior
draft, these same types of information were exempt by general
exemptions from the licensing requirement, rather than through
exclusions from the definition of technical data.  See
§ 125.11(a)(1) and (10).  Thus, although the definitions of
technical data in the prior and current drafts differ because
of the exclusion in the current draft of information in the
public domain and general mathematical or engineering informa-
tion, we do not believe that this difference amounts to a sub-
stantive change in the coverage of the regulations.  If the
scope of the application of the licensing scheme under the
current draft is narrower, it would be only if the scope of
the exemptions were broader.  We turn therefore to an exami-
nation of the exemptions.

C.  EXEMPTIONS

The prior draft contained ten exemptions.  The current
draft contains thirteen.  Of the ten exemptions provided in
the prior draft, the first related to technical data which was
published or otherwise generally available to the public.
The last related to "information which was not designed or
intended to be used, or which could not reasonably be expected
to be used, in direct application in the design, production,
[etc.], of defense articles (for example, general mathematical,
engineering, or statistical information not purporting to have
or not reasonably expected to be given direct application to
defense articles)."  As noted above, these categories of
information are generally covered in the current draft by
exclusions from the definition of technical data.  Thus, there
are eight exemptions contained in the prior draft which must
be compared to the current draft, and four additional exemp-
tions provided in the current draft to examine.

Six of the exemptions appear to be substantively identical
to, if not verbatim repetitions from, the prior draft.  These
provisions are identified in the footnote below and are not

-8-

relevant to our discussion. 9/  The two remaining exemptions
contained in the prior draft have been narrowed in the current

| 9/ Category of Exemption | Prior Draft | Current Draft |
|---|---|---|
| Export in furtherance of a manufacturing license or technical assistance agreement approved by the Department of State. | § 125.11(a)(3) | § 125.4(b)(2) |
| Export in furtherance of a contract between the exporter and the U.S. Government which provides for the export of certain technical data. | § 125.11(a)(4) | § 125.4(b)(3) |
| Export of manuals and aids relating to lawfully exported articles to the same recipient. | § 125.11(a)(5) | § 125.4(b)(5) |
| Export of additional copies or certain revised copies of technical data previously exported or authorized to be exported to the same recipient. | § 125.11(a)(6) | § 125.4(b)(4) |
| Export of data relating to firearms and ammunition not in excess of .50 caliber. | § 125.11(a)(7) | § 125.4(b)(6) |
| Export of data directly relating to classified information previously exported to the same recipient. | § 125.11(a)(9) | § 125.4(b)(8) |

draft.  The revision does not appear to raise any constitu-
tional issues. 10/

   The current draft contains five new exemptions.  (For
convenience, we will refer to these five exemptions by the
subsection number of § 125.4(b) of the current draft.)  Two
of the exemptions, subsections (1) and (11), do not alleviate
the effect of the licensing requirement as a prior restraint
on the export of technical data as defined in the regulations.
Subsection (1) exempts information which relates to defense
articles but does not qualify as technical data pursuant to
the definition in § 121.30.  Because we are concerned in this
memorandum only with information which is defined as technical
data and subject to export restrictions because of that defini-
tion, subsection (1), although useful for purposes of clarity,

---

10/ The prior draft contained an exemption, § 125.11(a)(2),
for information approved for public release by any U.S. Govern-
ment department or agency having authority to classify informa-
tion and material which did not disclose details relating to
articles on the munitions list.  The corresponding provision in
the current draft, § 125.4(b)(13), exempts information approved
for public release by the federal department or agency which
originated or developed the information.  We understand that the
purpose of this change was to make clear that only the depart-
ment or agency which generated the information could confer the
exemption for export by prior approval of the information for
public release.  This change was designed to prevent a situation
in which the action by one agency of releasing to the public
information of another agency, even if not authorized to do so,
would have the consequence of not only putting that information
into the public domain but also triggering the exemption and
thereby allowing export of that information without a license.
We must caution, however, that we are not sure that this revi-
sion will have the intended effect.  If the information is
publicly released by any agency of the Government, we do not
know how that information could be "recaptured" by the Govern-
ment.  Once the information is in the public domain, we cannot
conceive of circumstances in which its export could be consti-
tutionally restricted.

   The second change relates to technical data which is being
returned to the original source of import.  In the prior draft,
the exemption applied to all technical data.  See § 125.11(a)(8).
The current draft is limited to information which is not
classified technical data.  See § 125.4(b)(7).  We understand
that the purpose of this change is to withdraw the exemption
allowed under the prior version for the export of classified
information without a license.

does not affect our consideration of the scope of the prohibi-
tion of the export of technical data without a license or
without an exemption from the licensing requirement.

Subsection (11) exempts the export of technical data
pursuant to an arrangement with the Department of Defense or
NASA which requires such exports if the exporter has been
granted an exemption in writing from the licensing provisions
by the Office of Munitions Control.  In our view, the require-
ment of obtaining an exemption in writing is no different for
purposes of First Amendment analysis from the requirement
of obtaining the license itself.  Both operate as a prior
restraint, and both can be subject to the discretion of the
executive officer from whom each must be sought. 11/  We do
not believe, therefore, that this exemption significantly
affects the scope of the licensing requirement under the ITAR.

Two of the new exemptions do provide greater freedom from
prior restraint on the export of technical data, although they
apply only in narrow factual circumstances.  Subsection (9)
exempts an export by a U.S. corporation to a U.S. person employed
by that corporation overseas, subject to two conditions:  that
the information must be used solely by U.S. persons and the U.S.
person must be directly employed by the U.S. corporation and not
by a foreign subsidiary.  The exemption is further subject to
the limitations found in § 125.1(b) of the current draft, which
precludes use of the license for export of technical data for
foreign production purposes or technical assistance unless
approved in advance by the Department of State.

Subsection (12) exempts any exports specifically exempted
under Part 126 of the subchapter of the ITAR, which includes
shipments by or for federal agencies, certain exemptions for
unclassified technical data exported to and for use in Canada,
and certain exports under the foreign military sales program.
With the exception of the exemption for exports to Canada,
these exemptions do not significantly narrow the scope of the
licensing requirement as applied to private persons.

By expanding the exemptions to the licensing requirement,
these two exemptions, subsections (9) and (12), do improve
the constitutional status of the ITAR, which, as our prior

---

11/  We understand from Mr. Cummings that this written consent
may actually take the form of a license or, for reasons
relating to customs or possibly other laws, it may take the
form of a letter granting consent.

-11-

opinion concluded, suffered from overbreadth because of the number of unconstitutional applications which we believed the ITAR to have. To the extent that the exemptions are expanded, the overbreadth is reduced. Our concern, however, is that neither of these exemptions addresses the specific examples of unconstitutional prior restraint identified in our prior opinion, that is, "communications of unclassified information by a technical lecturer at a university or to the conversation of a United States engineer who meets with foreign friends at home to discuss matters of theoretical interest." See 1981 ITAR Memorandum at 13.

The remaining exemption, subsection (10), appears to be an effort to address these types of situations, although this exemption is also insufficient to eliminate the licensing requirement in the two specific factual settings posed in the hypothetical above, as well as other situations which may be easily suggested. Subsection (10) exempts disclosure of unclassified information by U.S. corporations or academic institutions to foreign persons who are their bona fide and full time regular employees 12/ if an employee's permanent abode is in the United States; an employee is not a national of a country to which exports are specifically prohibited by the ITAR 13/; and the corporation or institution informs that employee in writing that the technical data may not be transferred to other foreign persons without the written

---

12/  As we understand from Mr. Cummings, this exemption was intended to be exercised by the employment office of the corporation or the university, which would have the responsibility for informing its employees of the extent of their rights to disclosure to other employees without the prior written consent of the Office of Munitions Control.

13/  Pursuant to § 126.1 of the current draft, these countries are:  Albania, Bulgaria, Cuba, Czechoslovakia, East Germany, Estonia, Hungary, Kampuchea, Latvia, Lithuania, North Korea, Outer Mongolia, Poland, Rumania, the Soviet Union, Vietnam, and any other country or area with respect to which the United States maintains an arms embargo or "whenever an export would not otherwise be in furtherance of world peace and the security and foreign policy of the United States." We assume that these other countries are publicly announced, from time to time, according to some objective criteria, so that their identity and the basis for the prohibition of exports to that country may be known to potential exporters.

consent of the Office of Munitions Control.  Under this sub-
section, an exemption would be provided for full time, regular
employees of a single corporation or university to discuss
technical data among themselves.  What is not exempt, however,
without the prior written consent of the Office of Munitions
Control, is a disclosure of the information by an employee of
a corporation or university to a foreign national who is a
part-time or temporary employee of that corporation or univer-
sity; a full time employee of another corporation or univer-
sity; another professional person attending a conference or
a seminar at the corporation or university; a student; or a
friend.

We recognize the attempt made to address the concerns
raised in our prior opinion, and, as we stated with regard to
the new exemptions provided in subsections (9) and (12), to the
extent that subsection (10) constricts the area of application
of the licensing requirement, the additional exemption reduces
the area of potential unconstitutional application of that
requirement.  We have identified, however, a number of circum-
stances in which the prior written consent of the Office of
Munitions Control would be required for disclosure of the
technical data.  As noted above, with regard to subsection
(11), which requires the written consent of that Office for
export of certain technical data pursuant to an arrangement
with the Department of Defense or NASA, we do not believe
that there is a constitutionally significant distinction
between the requirement of obtaining prior written consent
and obtaining a license.  See note 11, supra.  In some of
these circumstances, as well as others, we believe that the
ITAR may still be read to operate as a prior restraint on the
speech of "persons having no direct connection with foreign
conduct in settings in which there is no more than belief or
a reasonable basis for believing (1) that a foreign national
may take the technical data abroad and (2) that the data
could be used by someone there in the manufacture or use of
items on the Munitions List."  1981 ITAR Memorandum at 14.
As we concluded in that memorandum, "[i]n the absence of
special circumstances that would justify prior restraint,
such speech is arguably protected and, as a general rule,
cannot be subjected constitutionally to the . . . licensing
requirement."  Id.

We are aware of the case law interpreting 22 U.S.C. § 2778,
the statutory authority for the ITAR, which requires a specific
intent willfully to export particular goods on the Munitions
List without a license.  See, e.g., United States v. Hernandez,
662 F.2d 289, 292 (5th Cir. 1981) ("statute's requirement of
willfulness connote[s] a voluntary and intentional violation

-13-

of a known legal duty," that is, "that the defendant knew
that he was unlawfully exporting weapons on the Munitions
List"); United States v. Beck, 615 F.2d 441, 449-50 (7th Cir.
1980) (conviction requires "proof that the defendants (1)
exported or attempted to export (2) goods on the United
States Munitions List (3) without first having obtained a
license for the export (4) willfully"); and United States v.
Wieschenberg, 604 F.2d 326, 331 (5th Cir. 1979) (to sustain a
conviction for conspiracy to violate the statute, "government
must prove that the defendants agreed to and specifically
intended to export without a license particular property
that is restricted by the Munitions List").   It may be that
the standard of knowledge and intent that is imposed by these
cases with regard to the export of defense articles might,
as applied to technical data, be sufficient to broaden, in
effect, the scope of the exemption under subsection (10)
to the extent consistent with the constitutional standard
articulated in our previous memorandum and reaffirmed here.

We remain of the opinion, however, that on their face,
the ITAR still present some areas of potentially unconstitu-
tional application, and, moreover, that we cannot be certain
whether existing case law would be sufficient to narrow the
range of application to a constitutionally sufficient extent.
In any event, as we advised in our 1981 Memorandum with
regard to the overbreadth present in the prior draft, we
believe that "the best legal solution . . . is for the Depart-
ment of State, not the courts, to narrow the regulations."
See 1981 ITAR Memorandum at 15.


## IV.   CONCLUSION

We have carefully examined the definitions of "export"
and of "technical data," as well as the exemptions provided
from the licensing requirement, under the current draft of
the ITAR, and we believe that the scope of the exemptions is
broader, and the coverage of the licensing requirement there-
fore narrower, in at least three specific areas of importance
to private persons:  exports by disclosures to certain
employees of U.S. corporations overseas (subsection (9));
certain exports to Canada (subsection (12)); and exports by
disclosure of technical data by U.S. corporations and academic
institutions to foreign nationals who are their full time,
regular employees, subject to certain conditions (subsection
(10)).  Notwithstanding these additional exemptions, however,
we have identified certain areas which still appear to us to

-14-

present sensitive constitutional issues.  As we previously
recommended, this remaining overbreadth should be eliminated
by more narrowly drafted regulations.

Larry D. Simms
Deputy Assistant Attorney General
Office of Legal Counsel

Attachments:

  Appendix of regulations
  Memorandum of May 11, 1978, for Dr. Frank Press
  Memorandum of July 28, 1981, for Henry D. Mitman

# Exhibit D

This web site was copied prior to January 20, 2005. It is now a Federal record managed by the National Archives and Records Administration. External links, forms, and search boxes may not function within this collection. Learn more.    [hide]



# 1997 REPORT ON THE AVAILABILITY OF BOMBMAKING INFORMATION



PREPARED BY THE UNITED STATES DEPARTMENT OF JUSTICE
AS REQUIRED BY SECTION 709(a) IF THE
ANTITERRORISM AND EFFECTIVE DEATH PENALTY ACT OF 1996

SUBMITTED TO:

THE UNITED STATES HOUSE OF REPRESENTATIVES
AND THE UNITED STATES SENATE

APRIL 1997

## TABLE OF CONTENTS

INTRODUCTION AND SUMMARY

BACKGROUND

I.   THE PUBLIC AVAILABILITY OF INFORMATION ON THE MANUFACTURE
     OF BOMBS, DESTRUCTIVE DEVICES, AND WEAPONS OF MASS DESTRUCTION

     A.   Books, Pamphlets and Other Printed Material

     B.   The Internet

     C.   Summary

II.  THE EXTENT TO WHICH PUBLISHED BOMBMAKING INFORMATION HAS
     FACILITATED THE MANUFACTURE AND USE OF EXPLOSIVES IN ACTS OF
     TERRORISM AND OTHER CRIMINAL ACTIVITY

III. THE LIKELIHOOD THAT PUBLISHED BOMBMAKING INFORMATION WILL
     CONTINUE TO BE USED TO FACILITATE ACTS OF TERRORISM AND OTHER
     CRIMINAL ACTIVITY

IV.  APPLICABILITY OF CURRENT FEDERAL LAW TO THE PUBLICATION AND DISSEMINATION OF BOMBMAKING INFORMATION

    A.  Conspiracy

    B.  Solicitation

    C.  Aiding and Abetting

        1.  18 U.S.C. § 2

        2.  AEDPA Section 323

    D.  18 U.S.C. § 231(a)(1)

V.  THE NEED FOR ADDITIONAL LAWS RELATING TO THE DISSEMINATION OF BOMBMAKING INFORMATION

VI.  CONSTITUTIONALITY OF RESTRICTING OR PENALIZING THE PUBLICATION OR DISSEMINATION OF BOMBMAKING INFORMATION

    A.  First Amendment Principles

        1.  Advocacy of Unlawful Action

        2.  Disclosure or Publication of Lawfully Obtained Information

        3.  "Speech Acts," such as Aiding and Abetting

    B.  Application of First Amendment Principles To Dissemination of Bombmaking Information

        1.  Dissemination with the "Intent" to Facilitate Unlawful Conduct

        2.  Dissemination with the "Knowledge" that a Particular Recipient of the Information Intends to Use it in Furtherance of Unlawful Conduct

    C.  Proposed Modification of the Feinstein Amendment

## INTRODUCTION AND SUMMARY

In section 709(a) of the Antiterrorism and Effective Death Penalty Act of 1996 ["the AEDPA"], Pub. L. No. 104-132, 110 Stat. 1214, 1297 (1996), Congress provided that, in consultation with such other officials and individuals as she considers appropriate, the Attorney General shall conduct a study concerning --

    (1) the extent to which there is available to the public material in any medium (including print, electronic, or film)

that provides instruction on how to make bombs, destructive devices, or weapons of mass destruction;

(2) the extent to which information gained from such material has been used in incidents of domestic

or international terrorism;

(3) the likelihood that such information may be used in future incidents of terrorism;

(4) the application of Federal laws in effect on the date of enactment of this Act to such material;

(5) the need and utility, if any, for additional laws relating to such material; and

(6) an assessment of the extent to which the first amendment protects such material and its private and commercial distribution.

Section 709(b) of the AEDPA, in turn, requires the Attorney General to submit to the Congress a report containing the results of the study, and to make that report available to the public.

Following enactment of the AEDPA, a committee was established within the Department of Justice ["the DOJ Committee"], comprised of departmental attorneys as well as law enforcement officials of the Federal Bureau of Investigation and the Treasury Department's Bureau of Alcohol, Tobacco and Firearms. The committee members divided responsibility for undertaking the tasks mandated by section 709. Some members canvassed reference sources, including the Internet, to determine the facility with which information relating to the manufacture of bombs, destructive devices and other weapons of mass destruction could be obtained. Criminal investigators reviewed their files to determine the extent to which such published information was likely to have been used by persons known to have manufactured bombs and destructive devices for criminal purposes. And legal experts within the Department of Justice reviewed extant federal criminal law and judicial precedent to assess the extent to which the dissemination of bombmaking information is now restricted by federal law, and the extent to which it may be restricted, consistent with constitutional principles. This Report summarizes the results of these efforts.

As explained in this Report, the DOJ committee has determined that anyone interested in manufacturing a bomb, dangerous weapon, or a weapon of mass destruction can easily obtain detailed instructions from readily accessible sources, such as legitimate reference books, the so-called underground press, and the Internet. Circumstantial evidence suggests that, in a number of crimes involving the employment of such weapons and devices, defendants have relied upon such material in manufacturing and using such items. Law enforcement agencies believe that, because the availability of bombmaking information is becoming increasingly widespread (over the Internet and from other sources), such published instructions will continue to play a significant role in aiding those intent upon committing future acts of terrorism and violence.

While current federal laws -- such as those prohibiting conspiracy, solicitation, aiding and abetting, providing material support for terrorist activities, and unlawfully furthering civil disorders -- may, in some instances, proscribe the dissemination of bombmaking information, no extant federal statute provides a satisfactory basis for prosecution in certain classes of cases that Senators Feinstein and Biden have identified as particularly troublesome. Senator Feinstein introduced legislation during the last Congress in an attempt to fill this gap. The Department of Justice agrees that it would be appropriate and beneficial to adopt further legislation to address this problem directly, if that can be accomplished in a manner that does not

impermissibly restrict the wholly legitimate publication and teaching of such information, or otherwise violate the First Amendment.

The First Amendment would impose substantial constraints on any attempt to proscribe indiscriminately the dissemination of bombmaking information. The government generally may not, except in rare circumstances, punish persons either for advocating lawless action or for disseminating truthful information -- including information that would be dangerous if used -- that such persons have obtained lawfully. However, the constitutional analysis is quite different where the government punishes speech that is an integral part of a transaction involving conduct the government otherwise is empowered to prohibit; such "speech acts" -- for instance, many cases of inchoate crimes such as aiding and abetting and conspiracy -- may be proscribed without much, if any, concern about the First Amendment, since it is merely incidental that such "conduct" takes the form of speech.

Accordingly, we have concluded that Senator Feinstein's proposal can withstand constitutional muster in most, if not all, of its possible applications, if such legislation is slightly modified in several respects that we propose at the conclusion of this Report. As modified, the proposed legislation would be likely to maximize the ability of the Federal Government -- consistent with free speech protections -- to reach cases where an individual disseminates information on how to manufacture or use explosives or weapons of mass destruction either (i) with the intent that the information be used to facilitate criminal conduct, or (ii) with the knowledge that a particular recipient of the information intends to use it in furtherance of criminal activity.

## BACKGROUND

In order fully to understand the issues we have been asked to address, it is helpful first to describe the legislative proceedings that prompted enactment of section 709 of the AEDPA.

On May 11, 1995, less than one month after the Oklahoma City terrorist bombing, in testimony before the Subcommittee on Terrorism, Technology and Government Information of the Senate Judiciary Committee, Deputy Assistant Attorney General Robert Litt, of the Justice Department's Criminal Division, explained that "how to" guides for the manufacture of explosives are readily available on the Internet, in bookstores and even in public libraries[1]. To illustrate the point, he observed that, according to a news article, only hours after the Oklahoma City bombing, someone posted on the Internet directions -- including a diagram -- explaining how to construct a bomb of the type that was used in that tragic act of terrorism. Another Internet posting offered not only information concerning how to build bombs, but also instructions as to how the device used in the Oklahoma City bombing could have been improved.

Mr. Litt explained that "expansion of the scope of federal criminal laws dealing with the violent, terrorist activity will permit the Department of Justice to prosecute those who engage in efforts to assist violence and terrorism over the Internet." Mr. Litt observed, however, that despite the dangers posed by the dissemination of such information and the callous disregard of human life shown by those who are responsible for such action, the First Amendment imposes significant constraints on the ability of the federal government to proscribe and penalize such activity.

On June 5, 1995, Senator Feinstein proposed an amendment to a bill (S. 735) that later became the AEDPA. 141 Cong. Rec. S7682 (daily ed. June 5, 1995). The purpose of the amendment was to address the problem of the increasingly widespread "distribution of bombmaking information for criminal purposes." Id. Following some debate in the Senate, Senator Feinstein's amendment was slightly modified, and the full Senate unanimously approved it by voice vote. Id. at S7686. The Senate passed S. 735 on June 7, 1995. 141

Cong. Rec. S7857 (daily ed.).  As passed by the Senate, the Feinstein amendment would have amended 18 U.S.C. § 842 to add a new prohibition:

It shall be unlawful for any person to teach or demonstrate the making of explosive materials, or to distribute by any
means information pertaining to, in whole or in part, the manufacture of explosive materials, if the person intends or
knows, that such explosive materials or information will likely be used for, or in furtherance of, an activity that
constitutes a Federal criminal offense or a criminal purpose affecting interstate commerce.

Id. at S7875.  In conference committee, this prohibition ["the Feinstein Amendment"] was removed from the bill and was replaced with section 709 of the AEDPA -- the requirement for the Attorney General's study and report, quoted above.  142 Cong. Rec. H3336 (daily ed. Apr. 15, 1996).  Senator Biden then moved to recommit the conference report to the conference committee with instructions to the Senate managers to insist on insertion of the Feinstein Amendment.  142 Cong. Rec. S3448 (daily ed. Apr. 17, 1996).  Senator Hatch moved to table Senator Biden's motion, and Senator Hatch's motion was agreed to by a vote of 51 to 48.  Id. at S3450.

Two months later, Senator Feinstein revived her proposal, and the Senate unanimously agreed to include it as an amendment to a bill that later became the National Defense Authorization Act for Fiscal Year 1997.  142 Cong. Rec. S7271-74 (daily ed. June 28, 1996).  Once again, however, the Feinstein Amendment was removed in conference.  142 Cong. Rec. H9303 (daily ed. July 30, 1996).

## I.
## THE PUBLIC AVAILABILITY OF INFORMATION ON THE MANUFACTURE OF BOMBS, DESTRUCTIVE DEVICES, AND WEAPONS OF MASS DESTRUCTION

The first question that section 709 required the Attorney General to study concerns the availability of instructional information describing the fabrication of explosives, destructive devices and other weapons of mass destruction.  Our study confirms that any member of the public who desires such information can readily obtain it.

**A**.  Books, Pamphlets and Other Printed Material.  Most strikingly, a cursory search of the holdings of the Library of Congress located at least 50 publications substantially devoted to such information, all readily available to any member of the public interested in reading them and copying their contents.  The titles of a number of these publications are indicative of their contents.[2]  They include:

-- Guerrilla's Arsenal: Advanced Techniques For Making Explosives and Time-  delay Bombs (Paladin Press, 1994);

-- The Anarchist Arsenal (Harber, 1992);

-- Deadly Brew: Advanced Improvised Explosives (Paladin Press, 1987);

-- The Anarchist's Handbook (J. Flores, 1995);

-- Improvised Explosives:  How To Make Your Own (Paladin Press, 1985); and

-- Ragnar's Guide to Home and Recreational Use of High Explosives (Paladin Press, 1988).

Other texts, intended for military training, agricultural and engineering use, contain information equally useful to individuals bent upon constructing bombs and other dangerous weapons.  Publications in this category include:

    -- Explosives In Roadworks:  User's Guide (Assoc. of Australian State Road Authorities, 1982);

    -- Explosives and Blasting Procedures Manual (U.S. Bureau of Mines, 1982);

    -- Military Chemical and Biological Agents: Chemical and Toxicological Properties (Telford Press, 1987); and

    -- Clearing Land Of Rocks for Agricultural and Other Purposes (Institute of Makers of Explosives, 1918).

   Another collection of some 48 different "underground publications" dealing with bombmaking, contained in the library of the FBI Explosives Unit, reflects a similar diversity of such published material.  All of this literature was easily obtainable from commercial sources.

   The ready accessibility of such literature is further illustrated by reference to a single page in a recent 70-page catalog of Delta Press, Ltd., of El Dorado, Arizona, captioned "Homemade Explosives."   Among the texts featured on that page are Improvised Shape Charges, Two Component High Explosive Mixtures, Improvised Radio Detonation Techniques, and the Anarchists Handbook Series.  Another page, captioned "poisons," advertises The Poisoner's Handbook, which it touts as "a complete handbook of poisons, both natural and manmade," including poisonous gases, lethal drugs, poisonous explosive compounds and a "list of sources and some additional chemistry."   A number of the titles featured in this publication are commonly featured, along with firearms publications, at local gun shows.

   With respect to weapons of mass destruction, there are a number of readily available books, pamphlets, and other printed materials that purport to provide information relating to the manufacture, design and fabrication of nuclear devices.  The Department is aware of many publications that claim to provide some fundamentals necessary for the understanding of nuclear weapons, e.g., physics, design, manufacture, or fabrication.  They include:

-- The Curve of Binding Energy (J. McPhee, 1974);

-- U.S. Nuclear Weapons: The Secret History (C. Hansen, 1966); and

-- The Swords of Armageddon (C. Hansen, 1986).[3]

   Stories of crimes contained in popular literature and magazines also constitute a rich source of bombmaking information.  For example, the August 1993 edition of Reader's Digest contains an account of efforts by law enforcement officers to track down the killer of United States Court of Appeals Judge Robert S. Vance and attorney Robert Robinson.  That article contained a detailed description of the explosive devices used by the bomber in committing the murders, including such information as the size of the pipe bombs, how the bombs were constructed, and what type of smokeless powder was used in their construction.[4]  According to the Arson and Explosives Division of the Bureau of Alcohol, Tobacco and Firearms, in a bombing case originating in Topeka, Kansas, the devices were patterned after the bomb used to

kill Judge Vance.  Upon questioning, the suspect admitted to investigators that he constructed the bomb based on information contained in the <u>Reader's Digest</u> article.

**B.**  <u>The Internet</u>.  Bombmaking information is literally at the fingertips of anyone with access to a home computer equipped with a modem.[5] To demonstrate such availability, a member of the DOJ Committee accessed a single website on the World Wide Web and obtained the titles to over 110 different bombmaking texts, including "Calcium Carbide Bomb," "Jug Bomb," "How To Make a CO2 Bomb," "Cherry Bomb," "Mail Grenade," and "Chemical Fire Bottle."  The user could access and print the text of each of the listed titles.[6]

One of the texts, captioned "Nifty Things That Go Boom," appears to be a computer adaptation of <u>The Terrorist's Handbook</u> (purportedly edited at Michigan State University).  The publication contains chapters that describe and address the procurement (legal and otherwise) of necessary explosives, chemicals and other ingredients, the preparation of chemicals, techniques for transforming such substances into bombs and explosives, and the manufacture of fuses and other ignition systems.

Another of the accessed texts purports to consist of the "Bomb Excerpts" from <u>Anarchy Cookbook</u>.  This text explains in minute detail how to construct dozens of different types of bombs and explosive devices, including fertilizer bombs, dynamite and other explosives made with chemicals and other substances that "can be bought at Kmart, and various hardware supply shops."  The text also details the ways that such devices can be employed following their fabrication.  For example, discussing the use of a bomb constructed from a CO2 cartridge and black powder, it explains:

> Insert a fuse. . . .  Now, light it and run like hell!   It does wonders for a row of mailboxes (like the ones in apartment
> complexes), a car (place under the gas tank), a picture window (place on window sill), a phone booth (place right under
> the phone), or any other devious place.  This thing throws shrapnel, and can make quite a mess!

Similarly, after explaining how to build a thermite bomb, the manual explains:

> Now when you see your victim's car, pour a fifty-cent sized pile onto his hood, stick the [magnesium] ribbon in it,
> and light it with a blow torch.  Now chuckle as you watch it burn through the hood, the block, and axle, and the
> pavement.  BE CAREFUL!  The ideal mixtures can vaporize CARBON STEEL!  Another idea is to use thermite
> to get into pay phone and cash boxes.  HAVE FUN!

And, in discussing how to construct a thermite letter bomb using an insulated, padded mailing envelope, the author explains that, when the detonating "explosive is torn or even squeezed hard it will ignite the powdered magnesium . . . and then it will burn the mild thermite.  If the thermite didn't blow up, it would at least burn the fuck out of your enemy (it does wonders on human flesh!)."[7]

Our review of material accessible on the Internet also reveals the frequent use of "Usenet" newsgroups to facilitate the exchange of information concerning the fabrication and use of explosives and other dangerous

weapons. For example, on August 28, 1996, one participant of a Usenet newsgroup inquired whether anyone had a recipe for C-4 and detonation techniques. The following day, someone responded to the inquiry by posting a detailed formula, explaining that "[t]he production of C-4 is probably beyond what can [be] done in the kitchen, but here is something to get you started." On August 16, 1996, another Usenet participant complained that he had "recently attempted to follow the recipe [for an explosive] posted earlier . . . and nearly blew my arms off!" This prompted the following response:

> So what do you want, sympathy? Let me clue you in here. Actually building any of this stuff is illegal, immoral,
>     anti-social, and just plain wrong. But then, so are a lot of other fun things. The point is, if you do it, and you blow
>     yourself up, it's your own fault. So quit sniveling. [N]ext time, don't cook at home.

**C.** Summary. It is readily apparent from our cursory examination that anyone interested in manufacturing a bomb, dangerous weapon or weapon of mass destruction can easily obtain detailed instructions for fabricating and using such a device. Available sources include not only publications from the so-called underground press but also manuals written for legitimate purposes, such as military, agricultural, industrial and engineering purposes. Such information is also readily available to anyone with access to a home computer equipped with a modem.

## II.
## THE EXTENT TO WHICH PUBLISHED BOMBMAKING INFORMATION
## HAS FACILITATED THE MANUFACTURE AND USE OF EXPLOSIVES
## IN ACTS OF TERRORISM AND OTHER CRIMINAL ACTIVITY

Recent law enforcement experience demonstrates that persons who attempt or plan acts of terrorism often possess literature that describes the construction of explosive devices and other weapons of mass destruction (including biological weapons). Although in some cases there is no hard evidence demonstrating that such individuals actually employed such information in furtherance of their crimes, possession of such information often is strong circumstantial evidence from which such usage can be inferred.

During the execution of a search warrant at the Rex, Georgia residence of Walter Leroy Moody, Jr., the convicted bombing murderer of Judge Robert S. Vance and attorney Robert Robinson, investigators discovered a copy of the Anarchist's Cookbook.

In November 1995, Oklahoma residents Ray and Cecilia Lampley, along with one John "J.D." Baird, began construction of an ammonium nitrate bomb, utilizing a manual for the making of "Homemade C-4," a military plastic explosive. The group intended to destroy either the Jewish Anti-Defamation League building in Houston, Texas, or the Southern Poverty Law Center in Birmingham, Alabama. Following the recipe from the manual, the Lampleys "cooked" the ammonium nitrate, and obtained accelerants, such as nitromethane and powdered aluminum. Additionally, Ray Lampley learned that he needed an initial detonating charge to properly detonate the "homemade C-4," and attempted to make a triacetone triperoxide detonator utilizing instructions from Ragnar's Big Book of Explosives. When the three co-conspirators were arrested by the FBI, law enforcement agents recovered the Anarchist's Cookbook and Homemade Weapons, in addition to the "homemade C-4" text, from the Lampley residence.[8]

Following the February 26, 1993, terrorist bombing of the World Trade Center in New York City, investigators discovered bombmaking manuals in the possession of individuals connected with that crime. Although it is believed that those individuals brought those particular manuals into the United States from a foreign country, the manuals had been copied from books written and printed in the United States and available for purchase from publishers like Paladin Press. The presence of these manuals suggests that the conspirators consulted them in effecting their deadly terrorist scheme.

Between January 1994 and January 1996, a string of some 18 bank robberies occurred across the Midwest. The robberies were committed by individuals brandishing automatic weapons, wearing disguises, and using hoax-bomb devices, apparently to delay pursuit and investigation. Following the arrests of two individuals linked to the series of robberies, investigators conducted searches of safehouses and other locations used by the defendants. Execution of the search warrants resulted in the discovery of numerous weapons, explosives, grenades, and components for manufacturing improvised explosive devices. Additionally, the investigators discovered a library of literature describing neo-guerrilla techniques, including the manufacture and use of explosives.

Beginning in 1991, four members of the "Patriots Council," a Minnesota tax protest group, began to develop a castor-bean derivative known as "ricin," which is one of the most toxic known substances. The members involved learned the process of manufacturing ricin from a mail-order pamphlet. The group planned to suspend the substance in a toxic gel capable of transmission through a skin barrier, and then to place the impregnated gel on doorknobs, handles, and steering wheels. They were considering whether to target IRS agents, U.S. Marshals, or local sheriffs for ricin attacks when the FBI arrested them.[9]

In 1993, Thomas Lavy attempted to cross the Canadian border carrying 130 grams of ricin -- an amount that, if administered in individual doses, would be sufficient to kill over 32,000 people -- as well as four guns and $89,000 in cash. Canadian officials returned Lavy to the United States because of the amount of cash he was carrying. A search of Lavy's cabin by law enforcement officers revealed that he possessed mail-order books, such as The Poisoner's Handbook, Silent Death, and Get Even: The Complete Book of Dirty Tricks, which, among other things, describe how to make and use ricin. Lavy committed suicide before he could be tried.

To the Department's knowledge, no devices producing a nuclear yield have been constructed based on published bombmaking information. However, the Department is aware of approximately 117 threats since 1970 involving detonations of nuclear devices. Approximately half of these nuclear extortion threats have been accompanied by sketches, information, or descriptive phrases gleaned from information in the public domain, including technical reference materials and fictional nuclear "thrillers."

In addition to the incidents recounted above, reported federal cases involving murder, bombing, arson, and related crimes, reflect the use of bombmaking manuals by defendants and the frequent seizure of such texts during the criminal investigation of such activities. See, e.g., United States v. Prevatte, 66 F.3d 840, 841 (7th Cir. 1995) (bombmaker read Anarchist's Cookbook); United States v. Johnson, 9 F.3d 506, 510 (6th Cir. 1993) (search of bombmaker's residence revealed presence of books on explosive devices), cert. denied, 512 U.S. 1212 (1994); United States v. Talbott, 902 F.2d 1129, 1131 (4th Cir. 1990) (execution of search warrant at residence of bombmaker revealed presence of books on bombmaking); United States v. Michael, 894 F.2d 1457, 1459 (5th Cir. 1990) (bombmaker bought books at gun shows to determine how to make bombs, booby traps and silencers); United States v. Levasseur, 816 F.2d 37, 41 (2d Cir. 1987) (execution of search warrant at bomber's residence revealed presence of bombmaking instructions); United States v. Arocena, 778 F.2d

943, 947 (2d Cir. 1985) (members of "Omega 7" group, who conducted terrorist bombings in New York metropolitan area, possessed bombmaking manuals), cert. denied, 475 U.S. 1053 (1986); United States v. Williams, 775 F.2d 1295, 1298 (5th Cir. 1985) (bomb murderer used Marine Corps training manual to construct "mouse trap" bomb), cert. denied, 475 U.S. 1089 (1986); United States v. Bergner, 800 F. Supp. 659, 663 (N.D. Ind. 1992) (bomber consulted Anarchist's Cookbook and other bombmaking texts available at police academy library).

Finally, information furnished by the Bureau of Alcohol, Tobacco and Firearms reveals that such literature is frequently used by individuals bent upon making bombs for criminal purposes. ATF statistics reflect that, between 1985 and June 1996, the investigations of at least 30 bombings and four attempted bombings resulted in the recovery of bombmaking literature that the suspects had obtained from the Internet. Most recently, on August 6, 1996, ATF investigators participated in the investigation of two North Attleboro, Massachusetts, juveniles, aged 11 and 14, who were injured while attempting to make an improvised explosive device. The youths had retrieved from the Internet information on how to make napalm, and were badly burned when a mixture being heated on a kitchen stove ignited.[10]

In sum, it is fair to conclude from scenarios such as those we have described that the availability of bombmaking literature may play a significant role in aiding those intent on using explosives and other weapons of mass destruction for criminal purposes, including acts of terrorism. Moreover, the availability of this information might contribute to youthful experimentation with explosive devices, which could result in serious injury.


## III.
## THE LIKELIHOOD THAT PUBLISHED BOMBMAKING INFORMATION WILL CONTINUE TO BE USED TO FACILITATE ACTS OF TERRORISM AND OTHER CRIMINAL ACTIVITY

It is, of course, impossible to prognosticate with any measure of certainty the extent to which persons wishing to engage in acts of terrorism and other criminal activity will rely upon printed and computer-based information instructing them how to manufacture bombs, other dangerous weapons, and weapons of mass destruction. A statistical survey conducted by the FBI concerning bombing incidents occurring in the United States shows that between 1984 and 1994, the frequency of such incidents has increased almost four-fold. The study, however, did not attempt to correlate the trend with the increased availability of bombmaking information. Therefore, we have no empirical data on what percentage, if any, of the recent increase in the number of bombings is attributable to the increased availability of bombmaking information. However, based upon the recent experiences recounted above, both the FBI and ATF expect that because the availability of such information is becoming increasingly widespread, such bombmaking instructions will continue to play a significant role in aiding those intent upon committing future acts of terrorism and violence.


## IV.
## APPLICABILITY OF CURRENT FEDERAL LAW TO THE PUBLICATION AND DISSEMINATION OF BOMBMAKING INFORMATION

Presently there are four basic ways in which dissemination of bombmaking information could be punished under federal criminal law, depending on the circumstances of the case.[11]  The first three bases for culpability -- federal statutes prohibiting (i) conspiracy, (ii) solicitation, and (iii) aiding and abetting -- do not single out information concerning bombmaking for special treatment.  The fourth basis for culpability -- 18 U.S.C. § 231 -- is directed specifically at the "teaching or demonstrating" of techniques related to the use or manufacture of firearms and explosives.[12]

**A.**  Conspiracy.  A conspiracy to use an explosive to commit "any felony which may be prosecuted in a court of the United States," 18 U.S.C. § 844(h), is explicitly proscribed under 18 U.S.C. § 844(m); and a conspiracy to commit any offense defined in Chapter 40 of Title 18, U.S. Code -- entitled "Importation, Manufacture, Distribution, and Storage of Explosive Materials" -- is prohibited by 18 U.S.C. § 844(n).  In addition, the general federal criminal conspiracy statute, 18 U.S.C. § 371 -- which prohibits conspiring "to commit any offense against the United States" -- makes it unlawful to conspire to commit other federal crimes involving explosives.  A person may not, as part of a conspiracy to commit an independently defined criminal offense, transmit information to a coconspirator concerning how to make or use explosive devices.[13]  Indeed, such transmission of information could be an overt act in support of a conspiracy.[14]

In order to prove that a person disseminating bombmaking information did so as part of a conspiracy to commit a substantive offense, the government need not prove that the substantive offense occurred; however, the government must show, at the very least, that the disseminator (i) knew of the intended unlawful use of the information and (ii) agreed with other conspirators that an offense would be committed.[15]  And, as a general matter, the requisite agreement cannot be proved simply by demonstrating that a person has provided a product to another person knowing that the product would be used in the commission of a crime, where the provider of the product is indifferent to its subsequent use.[16]  "[A] conspiracy requires agreement, and there is a difference between knowing that something will occur [by virtue of one's sale of a product] -- even as an absolute certainty -- and agreeing to bring that same `something' about."  United States v. Lechuga, 994 F.2d 346, 362 (7th Cir.) (Cudahy, J., concurring in pertinent part), cert. denied, 510 U.S. 982 (1993).  It follows that "an isolated sale is not the same thing as enlisting in the venture."  United States v. Blankenship, 970 F.2d 283, 287 (7th Cir. 1992).[17]

**B.**  Solicitation.  The federal criminal solicitation statute, 18 U.S.C. § 373, provides in pertinent part:

> Whoever, with intent that another person engage in conduct constituting a felony that has as an element the use,
> attempted use, or threatened use of physical force against property or against the person of another in violation
> of the laws of the United States, and under circumstances strongly corroborative of that intent, solicits, commands,
> induces, or otherwise endeavors to persuade such other person to engage in such conduct, shall be imprisoned not
> more than one-half the maximum term of imprisonment or (notwithstanding section 3571) fined not more than one-half
> of the maximum fine prescribed for the punishment of the crime solicited, or both; or if the crime solicited is punishable
> by life imprisonment or death, shall be imprisoned for not more than twenty years.

Id. § 373(a). Solicitation proscribed by this statute often will take the form of speech, including written speech.[18] Indeed, Congress intended that the statutory phrase "otherwise endeavors to persuade" be construed broadly to cover any situation "`where a person seriously seeks to persuade another person to engage in criminal conduct.'" United States v. Buckalew, 859 F.2d 1052, 1054 (1st Cir. 1988) (Breyer, J.) (quoting S. Rep. No. 307, 97th Cong., 1st Sess. 183-84 (1982)) (emphasis added). In the prototypical solicitation case, the "persuasion" is accompanied by some form of inducement, such as a money payment, or a threat. Such a case raises no First Amendment issues, for reasons we explain infra at 35-38.[19] However, insofar as Congress also intended § 373 to cover cases of "persuasion" taking the form of mere advocacy or urging of unlawful action -- without any threat or inducement -- many such cases could be subject to significant First Amendment constraints under the Brandenburg doctrine. See infra at 29-30 (discussing Brandenburg v. Ohio, 395 U.S. 444 (1969)).[20] Therefore, for purposes of this discussion, we will assume that § 373 would be used principally in the case of "persuasion" accompanied by an inducement (e.g., murder for hire[21]) or an explicit or implicit threat or "command" (e.g., an organized crime boss "asking" an associate to commit a crime).

In such cases, the solicitation itself would not likely be in the form of a transmission of bombmaking information. However, as part of a solicitation scheme, it is conceivable that the solicitor would transmit such information so as to facilitate the crime being solicited. Indeed, such facilitation could provide circumstances that "strongly corroborate" a solicitor's improper intent, thereby satisfying § 373's scienter requirement: Congress indicated that it would be "highly probative" of improper intent if the solicitor "acquired . . . information suited for use by the person solicited in the commission of the offense, or made other apparent preparations for the commission of the offense by the person solicited." S. Rep. No. 307, 97th Cong., 1st Sess. 183 (1982).

Although § 373 does not require either actual agreement (like conspiracy), nor that the crime be committed (like aiding and abetting), it nonetheless could provide a means of addressing dissemination of bombmaking information in only a limited set of cases. For one thing, the statute requires more than mere dissemination of information: there must be some solicitation, command, inducement or other endeavor to persuade. (And the First Amendment might exclude cases of "persuasion" absent any threat, command or inducement.) More importantly, the government must prove "circumstances strongly corroborative" of the solicitor's intent that another person engage in conduct constituting a felony.

C. Aiding and Abetting. Two different "aiding and abetting" statutes might have some application in cases where bombmaking information is disseminated: (i) the general federal aiding and abetting statute, 18 U.S.C. § 2, and (ii) section 323 of the AEDPA, which concerns provision of material support or resources for use in certain crimes of terrorism.

1. 18 U.S.C. § 2. In 1909 Congress enacted what is now 18 U.S.C. § 2, a general aiding and abetting statute applicable to all federal criminal offenses. That statute in essence provides that "those who provide knowing aid to persons committing federal crimes, with the intent to facilitate the crime, are themselves committing the crime." Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A., 511 U.S. 164, 181 (1994) (citing Nye & Nissen v. United States, 336 U.S. 613, 619 (1949)).[22] Not infrequently, aiding and abetting can take the form of speech, including providing instructions on how to commit a crime to a particular person or to a discrete audience.[23] Section 2 nonetheless is somewhat ineffectual as a tool to address dissemination of information on how to manufacture explosives, for three reasons.

First, there is some question whether aiding and abetting culpability ever can rest solely on the basis of general publication of instructions on how to commit a crime, or undifferentiated sale to the public of a product that some purchaser is likely to use for unlawful ends, or whether, at a minimum, the person supplying the aid must know that a particular recipient thereof will use it in commission of a crime.[24]

Second, even assuming that aiding and abetting could under some circumstances be established by virtue of a publisher's knowledge that unknown recipients of generally published information would use it to commit crimes, § 2 requires that the accomplice have engaged in intentional wrongdoing, rather than mere recklessness. Central Bank of Denver, 511 U.S. at 190. That is to say, the aider must not only know that her assistance is in the service of a crime; she also must share in the criminal intent. The defendant must "`participate in [the venture] as in something that he wishes to bring about, that he seek by his action to make it succeed.'" Nye & Nissen, 336 U.S. at 619 (quoting United States v. Peoni, 100 F.2d 401, 402 (2d Cir. 1938)).[25] As Judge Hand explained in the seminal Peoni case, the intent standard for criminal aiding and abetting is not the same as the "natural consequences of one's act" test that is the touchstone for "intent" in the civil tort context; criminal intent to aid the crime has "nothing whatever to do with the probability that the forbidden result [will] follow upon the accessory's conduct." Peoni, 100 F.2d at 402. Rather, the aider must have a "purposive attitude" toward the commission of the offense. Id.[26]

Finally, under the plain terms of § 2, the underlying offense must in fact be committed (though the government need not prove by whom it was committed); section 2 merely makes aiders and abettors culpable for their principals' commission of an offense.[27] There is no federal statute generally proscribing an attempt to aid and abet a federal offense (though the Model Penal Code recommended that such a prohibition be codified).[28] Therefore, if a crime has not been committed, the general federal aiding and abetting statute cannot be invoked.

**2.** AEDPA Section 323. Section 323 of the AEDPA, 110 Stat. at 1255 (to be codified as amended section 2339A(a) of Title 18) makes it unlawful to provide "material support or resources" to another person, "knowing or intending that they are to be used in preparation for, or in carrying out," various federal offenses relating to terrorism, or in preparation for, or in carrying out, the concealment from the commission of any such violation. Id. (to be codified at 18 U.S.C. § 2339A(a)).[29] Notably, the statute defines the term "material support or resources" to include, inter alia, "training, . . . and other physical assets." Id. (to be codified at 18 U.S.C. § 2339A(b)).[30]

Section 323 essentially is a prohibition on certain forms of knowing or intentional facilitation of particular terrorist crimes. In two respects, it is broader in scope than the general aiding and abetting statute. First, the facilitator can be culpable even if the underlying offense is not in fact committed. Second, the scienter provision is a bit broader than the "intent" requirement in 18 U.S.C. § 2. Under AEDPA section 323, specific intent to facilitate the underlying offense is not necessary:[31] the person providing the support or resources can be culpable so long as he "know[s]" that the resources provided "are to be used" to prepare for or commit a specified offense. In effect, however, this "knowledge" provision will rarely be of use to a prosecutor, because where -- as in section 323 -- the element of "knowledge" refers to a possible future result of a defendant's conduct, typically the government must prove that the defendant was "aware `that that result is practically certain to follow from his conduct.'" United States v. Bailey, 444 U.S. 394, 404 (1980) (emphasis added) (quoting United States v. United States Gypsum Co., 438 U.S. 422, 445 (1978) (internal citation omitted)).[32]

Furthermore, whatever the scope of the "knowledge" provision, the use of section 323 to address distribution of bombmaking information might nonetheless be limited, for two other reasons.  First, section 323 covers facilitation of only certain enumerated crimes.  See supra note 29.  Second, it is not clear whether courts would find that information on how to manufacture or use explosives is "material support or resources."  In the case of an actual physical demonstration of the techniques in question, or a one-to-one sale of printed information to someone who purports to be planning a crime, transfer of such information might constitute "training."  Otherwise, it is open to question whether a manual on explosives would constitute a "physical asset[]" under § 2339A.[33]

**D.**   18 U.S.C. § 231(a)(1).  For the most part, the federal statutes discussed in the previous sections are not directed at dissemination of information, as such.  Instead, they are general prohibitions on conduct that can, in particular cases, be violated by providing information to another person.

By contrast, 18 U.S.C. § 231(a)(1) -- like the proposed Feinstein Amendment -- arguably could be characterized as a prohibition on certain forms of speech.  Section 231(a)(1) provides that:

> Whoever teaches or demonstrates to any other person the use, application, or making of any firearm or explosive or
> incendiary device, or technique capable of causing injury or death to persons, knowing or having reason to know or
> intending that the same will be unlawfully employed for use in, or in furtherance of, a civil disorder which may in any
> way or degree obstruct, delay, or adversely affect commerce or the movement of any article or commodity in
> commerce or the conduct or performance of any federally protected function . . . [s]hall be fined under this title or
> imprisoned not more than five years, or both.

"Civil disorder," in turn, is defined as "any public disturbance involving acts of violence by assemblages of three or more persons, which causes an immediate danger of or results in damage or injury to the property or person of any other individual."  18 U.S.C. § 232(1).

This prohibition applies, not to all forms of speech that could cause a civil disorder, but solely to a discrete type of conduct involving expression -- namely, the "teach[ing]" or "demonstrat[ion]" of the use, application, or making of any firearm or explosive or incendiary device, or technique capable of causing injury or death to persons.[34]

It appears that this statute has been used sparingly; there are only two reported decisions involving it.[35]  In those two cases, the courts of appeals narrowly construed the scienter provisions of § 231(a)(1) so as to avoid serious constitutional questions.  National Mobilization Comm. to End the War in Viet Nam v. Foran, 411 F.2d 934 (7th Cir. 1969); United States v. Featherston, 461 F.2d 1119 (5th Cir.), cert. denied, 409 U.S. 991 (1972).  In both cases, the persons charged under § 231(a)(1) were alleged to have instructed discrete groups of students on techniques of violence, with the intent that such techniques would be used in furtherance of civil disorders.  The defendants nonetheless complained that the statute was impermissibly vague or overbroad, because its plain terms are not limited to cases of bad intent.  Read literally, § 231(a)(1) also could be construed to prohibit well-intentioned persons from teaching techniques of self-defense and sporting activities where such persons have a "reason to know" that some pupils might put the skills they acquire to

unlawful use.  The defendants in <u>Foran</u> and <u>Featherston</u> argued that this apparent reach of § 231(a)(1) rendered the statute facially invalid under the First Amendment.

In order to avoid the substantial constitutional questions raised by the "reason to know" language, both courts of appeals construed the scienter element of § 231(a)(1) narrowly.  The Seventh Circuit, somewhat cryptically, concluded that "[t]he requirement of <u>intent</u> of course `narrows the scope of the enactment by exempting innocent or inadvertent conduct from its proscription." <u>Foran</u>, 411 F.2d at 937 (citation omitted). The Fifth Circuit, relying upon the Supreme Court's narrowing construction of similar language in an espionage statute, held that proof of "`bad faith'" is required under § 231(a)(1). <u>Featherston</u>, 461 F.2d at 1121 (quoting <u>Gorin v. United States</u>, 312 U.S. 19, 27-28 (1941)).  The court concluded that "the statute does not cover mere inadvertent conduct.  It requires those prosecuted to have acted with <u>intent or knowledge</u> that the information disseminated would be used in furtherance of a civil disorder." <u>Id</u>. at 1122 (emphasis added).

The potential use of § 231(a)(1) to reach cases involving dissemination of bombmaking information is limited in three ways.  First, as construed in <u>Featherston</u> and <u>Foran</u>, § 231(a)(1) can apply only where the person doing the teaching or demonstrating either (i) intends that the information will be used in furtherance of a civil disorder or (ii) "knows" that the information will be so used.  As explained <u>supra</u> at 21, as a practical matter the "or knows" prong will rarely be useful:  since the knowledge in question is of a possible future result of a defendant's conduct, the government must prove that the defendant was "aware `that that result is <u>practically certain</u> to follow from his conduct.'" <u>Bailey</u>, 444 U.S. at 404 (citations omitted) (emphasis added).[36]  Accordingly, the vast majority of cases in which § 231(a)(1) could successfully be invoked will involve defendants who intend that their teaching be used to facilitate or assist in a civil disorder.

Second, it is questionable whether the operative verbs -- "teaches or demonstrates" -- could be read to cover an arms-length sale of a manual to an anonymous or unknown customer.  Finally, the intended or known use of the information conveyed must be "in, or in furtherance of, a civil disorder which may in any way or degree obstruct, delay, or adversely affect commerce or the movement of any article or commodity in commerce or the conduct or performance of any federally protected function."  And a "civil disorder" requires a public disturbance involving violence by assemblages of three or more persons.  Section 231(a)(1) would not, therefore, apply to uses of the information by merely one or two felons.

V.
### THE NEED FOR ADDITIONAL LAWS RELATING TO
### THE DISSEMINATION OF BOMBMAKING INFORMATION

During the Senate debate on the Feinstein Amendment, Senators Feinstein and Biden identified two sets of circumstances in which the dissemination of bombmaking information ideally should be prohibited:

(i) where the person disseminating the information intends that it be used for unlawful ends;[37] and

(ii) where the person disseminating the information has good reason to know that a particular potential recipient thereof

plans to use that information to engage in unlawful activities.[38]

On the other hand, Senator Feinstein made it plain that she did not wish to prohibit the "legitimate" publication of information about explosives contained in, for instance, the Encyclopedia Britannica (despite the fact that such information certainly could be used by persons who wished to commit violent crimes);[39] and Senator Hatch indicated that any prohibition that is enacted should be drafted carefully, so as not to subject to criminal sanctions, for example, legitimate explosives manufacturers who teach customers and other persons how to manufacture, and make legitimate use of, explosives.[40]

The Department of Justice agrees that it would be salutary if the federal criminal law prohibited dissemination of bombmaking information in the two circumstances described above, while still permitting the "legitimate" publication of information about explosives in the manner described by Senators Feinstein and Hatch. As the discussion in Part IV demonstrates, however, the present federal criminal code is less than completely effective in accomplishing these objectives:

**1.** Federal law would in certain cases prohibit or punish the dissemination of bombmaking information where the person disseminating the information intends that it be used for unlawful ends. For example:

-- If the disseminator enters into an agreement with another person to commit a federal crime, dissemination of bombmaking

information as a means of furthering that crime would be an overt act in furtherance of a conspiracy. Similarly, if the

disseminator solicits another person to commit a federal crime of violence -- for example, by offering a reward for its

commission -- conveyance of the bombmaking information would be evidence "strongly corroborating" an improper intent,

thereby satisfying the scienter requirement of 18 U.S.C. § 373.

-- If the disseminator provides the information to a particular person with the specific purpose of assisting the recipient in the

commission of a federal crime, and if the recipient thereafter does commit such an offense, the disseminator would be

culpable for aiding and abetting that offense. And, even if the offense is not in fact committed, the disseminator might still

be culpable for a violation of AEDPA section 323, provided (i) that the offense that he intended to advance was one of

those enumerated in the statute; and (ii) a court finds that bombmaking information can be considered "material support

or resources."

-- If the disseminator provides the information to a person or persons in order to prepare for or further a "civil disorder," he

will have violated 18 U.S.C. § 231(a)(1), assuming that provision of such information constitutes the "teach[ing] or

demonstrat[ion]" of the making of explosives or incendiary devices.

However, except where the particular requirements of AEDPA section 323 or 18 U.S.C. § 231(a)(1) are met, federal law presently does not provide a ground for prosecution where a disseminator of bombmaking information does not conspire with or solicit another to commit a federal crime, but nevertheless intends to aid the recipients of the information in commission of such criminal conduct, and where no federal crime is in fact committed. Further, federal law does not presently reach the person who disseminates bombmaking information intending that it be used to aid the commission of a state or local criminal offense, notwithstanding the utilization of interstate or foreign commerce to achieve such dissemination and notwithstanding the actual or potential impact of the underlying violation on such commerce.

**2.** If a disseminator of bombmaking information does not have the specific purpose of facilitating a crime, but nonetheless is aware that (i) an enumerated terrorist crime or (ii) a "civil disorder" were <u>practically certain</u> to follow from dissemination of the information to a particular person or persons, then the disseminator might be culpable under AEDPA section 323, or 18 U.S.C. § 231(a)(1), respectively. However, absent such a high degree of "knowledge" of the facilitation of future crimes, current federal law generally would not prohibit or punish the dissemination of bombmaking information in the case where the disseminator does not have the specific purpose of facilitating a crime but nevertheless knows that a particular recipient thereof intends to use it for unlawful ends.

In sum, current federal law does not specifically address certain classes of cases that Senators Feinstein and Biden identified. Accordingly, the Department of Justice agrees with those Senators that it would be appropriate and beneficial to adopt further legislation to address this problem directly, in a manner that does not impermissibly restrict the wholly legitimate publication and teaching of such information, or otherwise violate the First Amendment.

# VI.
## CONSTITUTIONALITY OF RESTRICTING OR PENALIZING
## THE PUBLICATION OR DISSEMINATION OF BOMBMAKING INFORMATION

Before identifying what further steps Congress can take to address this problem, it is necessary to discuss whether and to what extent the First Amendment limits the government's power to impose criminal culpability on persons publishing or disseminating bombmaking information. In this regard, it should be noted that in <u>Rice v. Paladin Enterprises</u>, Inc., 940 F. Supp. 836 (D. Md. 1996), <u>appeal docketed</u>, No. 96-2412 (4th Cir.), a district court recently held that the First Amendment substantially protects the right of persons to publish such information, regardless of the publishers' intent.

The defendant in that case, publisher Paladin Enterprises, Inc., has (for many years) offered for public sale (principally through a mail-order catalogue) a book entitled <u>Hit Man</u>, which describes in great detail specific methods and techniques of, and strategies for, murder for hire. James Perry ordered and received <u>Hit Man</u> from Paladin. Thereafter, Perry followed a number of instructions in <u>Hit Man</u> in planning, executing, and attempting to hide the evidence of, his contract killing of three people in Montgomery County, Maryland. Perry was convicted of murder, after which the survivors of the victims sued Paladin in federal court for wrongful death, alleging that Paladin had aided and abetted the murders by selling <u>Hit Man</u> to Perry. Paladin moved for summary judgment on the ground that the First Amendment barred recovery. For the purposes of the motion, the parties stipulated the following:

**1.** Paladin had no contact with Perry (or the person who hired him to commit the murders) other than to

sell him <u>Hit Man</u>
   and another book.  Paladin had no "specific knowledge" that Perry planned to commit a crime, or that he had been
   retained to kill anyone.  940 F. Supp. at 839.

   **2.**  In planning, committing, and concealing his crimes, Perry followed certain descriptions and instructions in <u>Hit Man</u>,
   including:  (a) Hit Man's recommendation that a "beginner" hit man use an AR-7 rifle; (b) <u>Hit Man</u>'s instructions on how
   to disassemble the AR-7; (c) <u>Hit Man</u>'s detailed instructions on how to drill out the serial number on the rifle; (d) <u>Hit Man</u>'s detailed instructions on how to create a silencer to use on an AR-7; (e) <u>Hit Man</u>'s detailed instructions on how to
   murder victims from close range; and (f) <u>Hit Man</u>'s detailed instructions on how to file the AR-7 so that it would not be
   traceable. <u>Id</u>. at 839-40.<u>41</u>

   **3.**  Paladin engaged in a marketing strategy intended to maximize sales to the public, including sales to the following targeted
   audiences:  authors who desire information for the purpose of writing books about crime and criminals; law enforcement
   officers and agencies who desire information concerning the means and methods of committing crimes; persons who
   enjoy reading accounts of crimes and the means of committing them for purposes of entertainment; persons who
   fantasize about committing crimes but do not thereafter commit them; criminologists and others who study criminal
   methods and mentality; and "<u>criminals and would-be criminals who desire information and instructions on how to commit
   crimes</u>."  In particular, the parties stipulated that "[i]n publishing, marketing, advertising and distributing <u>Hit Man</u> . . . ,
   Paladin <u>intended and had knowledge</u> that their publications would be used, upon receipt, by criminals and would-be
   criminals to plan and execute the crime of murder for hire, in the manner set forth in the publications." <u>Id</u>. at 840.<u>42</u>

   The district court granted Paladin summary judgment.  The court seemed to rely upon two distinct rationales for its decision:  First, the court concluded that the State of Maryland has not "extend[ed] the tort of aiding and abetting to the circumstances of this case," and that "[a] federal court sitting in diversity cannot create new causes of action." <u>Id</u>. at 842.  Accordingly, the court seemed to conclude that plaintiffs had failed to state a claim under Maryland tort law. <u>Id</u>.  Second, the court held that, even if an aiding and abetting tort theory were cognizable, Paladin's publication and dissemination of the book was entitled to constitutional protection, and "the First Amendment acts as a bar to liability in the instant case," <u>id</u>. at 843, despite defendants' stipulation that they "intended and had knowledge that their publications would be used, upon receipt, by criminals and would-be criminals to plan and execute the crime of murder for hire, in the manner set forth in the publications."  <u>See also id</u>. at 843-49 (First Amendment analysis).

This recent decision suggests that it is necessary to consider carefully the First Amendment questions that a statute like the Feinstein Amendment would raise.[43]

## A. First Amendment Principles

Other than the cursory analysis in the Featherston and Foran cases, discussed supra at 22-23, and the district court's recent decision in Rice v. Paladin, discussed supra at 27-28, there is little in the way of judicial analysis directly addressing the First Amendment questions that a statute like the Feinstein Amendment would raise.[44]    However, the courts have substantially addressed the scope of the Free Speech Clause in three related factual contexts that serve to put the constitutional question in perspective:  (i) where the government seeks to restrict the advocacy of unlawful action; (ii) where the government (or a private party using tort law) seeks to restrict or punish the general disclosure or publication of lawfully obtained information; and (iii) where the government punishes conveyance of information as part of a "speech act," such as speech that aids and abets another person's commission of a crime.

**1.** Advocacy of Unlawful Action.  In the landmark case of Brandenburg v. Ohio, 395 U.S. 444 (1969) (per curiam), the Supreme Court held that "the constitutional guarantees of free speech and free press do not permit a State to forbid or proscribe advocacy of the use of force or of law violation except where such advocacy is directed to inciting or producing imminent lawless actions and is likely to incite or produce that action." Id. at 447 (footnote omitted).  This test, in other words, requires both an intent and a likelihood that the expression in question -- "advocacy of the use of force or of law violation " -- will incite or produce imminent unlawful action.

A few years later, the Court made clear how demanding the Brandenburg test is.  In Hess v. Indiana, 414 U.S. 105 (1973) (per curiam), the defendant was arrested for loudly stating, at an anti-war rally, "We'll take the fucking street later."  The Court held that Brandenburg prohibited the State from punishing this alleged advocacy of illegality, principally because the defendant's statement "amounted to nothing more than advocacy of illegal action at some indefinite future time." Id. at 108.  Furthermore, the Court reasoned that " [s]ince the uncontroverted evidence showed that Hess' statement was not directed to any person or group of persons, it cannot be said that he was advocating, in the normal sense, any action." Id. at 108-09.

In light of these precedents,[45] it is doubtful that general publication of written materials advocating illegality can ever be proscribed under the Brandenburg test.[46]  Many of the bombmaking manuals discussed by Congress and identified in this Report could plausibly be said to advocate -- either explicitly or implicitly -- the illegal use of explosives and other weapons.  Insofar as publication of such manuals were criminalized on account of those manuals' advocacy of unlawful conduct, such a prohibition almost certainly could not pass constitutional muster.[47]

**2.** Disclosure or Publication of Lawfully Obtained Information.  The Brandenburg test, by its terms, applies to advocacy of unlawful conduct.  But the government's principal concern with respect to bombmaking manuals is not their advocacy, but the instructional information they contain.  That information is (at least for the most part) a matter of public record.  As demonstrated elsewhere in this Report, anyone interested in manufacturing a bomb, dangerous weapon or weapon of mass destruction can easily obtain detailed instructions for manufacturing and using such a device, both from legitimate publications and from so-called "underground" publications.  And, presumably, most if not all of the writers and publishers of such

publications do not obtain the information unlawfully, or from classified sources. The First Amendment imposes significant constraints on the ability of the government to restrict publication of such information.

Although the Supreme Court has been careful never to hold categorically that publication of lawfully obtained truthful information "is automatically constitutionally protected," The Florida Star v. B.J.F., 491 U.S. 524, 541 (1989), nonetheless the Court has, on several occasions, held that "the government may not generally restrict individuals from disclosing information that lawfully comes into their hands in the absence of a `state interest of the highest order.'" United States v. Aguilar, 115 S. Ct. 2357, 2365 (1995) (quoting Smith v. Daily Mail Pub. Co., 443 U.S. 97, 103 (1979)). See also Butterworth v. Smith, 494 U.S. 624, 632 (1990). And even if the state has such an interest, "punishment may lawfully be imposed, if at all, only when narrowly tailored to a state interest of the highest order." Florida Star, 491 U.S. at 541.[48]

We can assume that there is a "state interest of the highest order" in keeping information on how to make explosives out of the hands of persons who want -- or who would be likely -- to use that information in furtherance of violent crime.[49] What is more, it is "foreseeable," in the tort-law sense, that some readers will use such information for unlawful ends if the information is made publicly available. As explained in Part II of this Report, strong circumstantial evidence demonstrates that persons bent upon committing acts of terrorism often rely upon literature for guidance in the construction of explosive devices and other weapons of mass destruction. Therefore, chances are that even "legitimate" publication of bombmaking information -- such as that found in government-issued manuals and in encyclopedias -- will facilitate some degree of unlawful conduct.

Nevertheless, even where it is foreseeable that widely disseminated information will be used unlawfully, or in a negligent and dangerous manner, courts uniformly have found that the Constitution prohibits imposing culpability or civil liability for distributing or publishing that information. For example, a number of courts have held that the First Amendment prohibits imposing tort liability on publishers, producers and broadcasters for the foreseeable consequences of their speech where viewers or readers mimicked unlawful or dangerous conduct that had been depicted or described, even if the standards for tortious negligence or recklessness were otherwise satisfied.[50] Similarly, a number of courts have held that the First Amendment bars recovery for allegedly foreseeable injuries suffered by persons who were following "how-to" instructions.[51] In a third, related category of cases, courts have held that the Constitution does not permit imposition of criminal penalties or civil liability for written or visual depictions

-- including depictions of "factual" events -- that are likely to alter (or that have in fact changed) persons' attitudes such that those persons are more likely to engage in criminal, dangerous or otherwise undesirable behavior.[52]

Florida Star explicitly leaves open the possibility that, in rare circumstances, the First Amendment might not bar sanctions for the publication of true, lawfully obtained information.[53] Nevertheless, such an exception almost certainly would not be recognized where, as here, the information is already in the public domain. The Court's stringent First Amendment test for restrictions on publication of lawfully obtained information, in other words, almost certainly would not permit the government to proscribe the publication or widespread dissemination of bombmaking manuals. Where similar or equivalent information is widely available elsewhere, the Court has been unwilling to find that a restriction on publication of that information is "narrowly tailored" to address a state interest: no "meaningful public interest" can be served by further restriction under such circumstances. Florida Star, 491 U.S. at 535. "`[O]nce the truthful information [is]

"publicly revealed" or "in the public domain,"" its dissemination cannot constitutionally be restrained. Id. (quoting Smith, 443 U.S. at 103 (internal citation omitted)). See also id. at 539 (one critical problem with the rape-shield statute at issue in Florida Star was that it punished publication of rape victims' identities "regardless of whether the identity of the victim is already known throughout the community").[54] Congress presumably would not be willing to ban the publication and teaching of all information concerning the manufacture of explosives -- including, for example, information exchanged among professional explosives manufacturers, or contained in the Encyclopedia Britannica and in government manuals. See supra at 24. As long as this is the case, it is hard to imagine that the First Amendment would permit culpability or liability for publication of other bombmaking manuals that have a propensity to be misused by some unknown, unidentified segment of the readership, since sources of the same information inevitably will remain in the public domain, readily available to persons who wish to manufacture and use explosives.

**3.** "Speech Acts," such as Aiding and Abetting. On the other hand, the constitutional analysis is radically different where the publication or expression of information is "brigaded with action,"[55] in the form of what are commonly called "speech acts." If the speech in question is an integral part of a transaction involving conduct the government otherwise is empowered to prohibit, such "speech acts" typically may be proscribed without much, if any, concern about the First Amendment, since it is merely incidental that such "conduct" takes the form of speech. "`[I]t has never been deemed an abridgement of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed.'" Ohralik v. Ohio State Bar Ass'n, 436 U.S. 447, 456 (1978) (quoting Giboney v. Empire Storage & Ice Co., 336 U.S. 490, 502 (1949)). For example, as the Court in Ohralik explained, there are "numerous examples" of communications -- including communications that convey information -- that are subjected to economic or commercial regulation without implicating the First Amendment, such as: exchange of securities information; corporate proxy statements; exchange of information among competitors; and employers' threats of retaliation for employees' labor activities. Id. (citations omitted).[56]

Similarly, many inchoate crimes often or always are effected through speech "acts." Such crimes include conspiracy, facilitation, solicitation, bribery, coercion, blackmail, and aiding and abetting.[57] Punishing speech -- including the dissemination of information -- when it takes the form of such criminal conduct typically does not even raise a First Amendment question. As Justice (then-Judge) Kennedy explained, "where speech becomes an integral part of the crime, a First Amendment defense is foreclosed even if the prosecution rests on words alone." United States v. Freeman, 761 F.2d 549, 552 (9th Cir. 1985), cert. denied, 476 U.S. 1120 (1986).[58]

In particular, "[t]hat `aiding and abetting' of an illegal act may be carried out through speech is no bar to its illegality." National Org. for Women v. Operation Rescue, 37 F.3d 646, 656 (D.C. Cir. 1994).[59] What is more, aiding and abetting a crime often consists of providing factual information to another person. The role of a lookout at a burglary is to inform confederates that someone is coming. An accomplice of a bank robbery might abet the operation by telling the principal the combination of a safe, or how to evade detection. The First Amendment is simply inapposite in such cases.[60] Nor is the situation necessarily different where the information conveyed is already publicly available. For example, there may be many lawful -- and constitutionally protected -- circumstances in which a person (say, a professor of architecture) may provide the blueprint of a bank to other persons (say, architecture students); but if such blueprints are transferred for the purpose of assisting others in a bank robbery, and if that robbery occurs, the person providing the information is subject to accomplice culpability, even if he obtained the blueprint from a

textbook, from city hall, or from the newspaper. See also United States v. Edler Industries, Inc., 579 F.2d 516, 521 (9th Cir. 1978) (though the dissemination and export of technological information on how to manufacture military equipment otherwise might generally be protected by the First Amendment, there is no constitutional protection for export of such information as part of "the conduct of assisting foreign enterprises to obtain military equipment"); Constitutionality of the Proposed Revision of the International Traffic in Arms Regulations, 5 Op. O.L.C. 202, 206-09 (1981) (discussing Edler Industries).

In a number of cases, persons have been convicted of aiding and abetting violations of the tax laws by providing explicit instructions to a discrete group of listeners on techniques for avoiding disclosure of tax liability. See supra notes 23-24. Defendants in such cases often have invoked the First Amendment; but that constitutional guarantee has rarely, if ever, been a bar to accomplice culpability. The courts correctly have rejected defendants' reliance on Brandenburg; and, in particular, have refused to accept defendants' arguments that the "imminence" requirements of the Brandenburg test apply to such aiding and abetting cases. If a defendant has aided and abetted a crime through the dissemination of information -- rather than simply by urging or "advocating" that the crime be committed -- then the government should not need to demonstrate that the speech was intended or likely to "incite" imminent unlawful conduct. The reasons the strict requirements of the Brandenburg test must be applied to cases of advocacy are that (i) abstract advocacy of unlawful conduct usually is closely aligned with (or sometimes part of) political and ideological speech entitled to the strongest constitutional solicitude; and (ii) the danger the speech will in fact lead to unlawful behavior often is remote and speculative. These concerns are rarely, if ever, implicated, in cases involving conduct constituting intentional and material aid to the criminal conduct of particular persons. It follows that the question of whether criminal conduct is "imminent" is relevant for constitutional purposes only where, as in Brandenburg itself, the government attempts to restrict advocacy, as such. But the tax-avoidance aiding and abetting cases are not subject to Brandenburg because culpability in such cases is premised, not on defendants' "advocacy" of criminal conduct, but on defendants' successful efforts to assist others by detailing to them the means of accomplishing the crimes.[61]

If it were otherwise -- that is, if the Brandenburg test applied to crimes implemented through the use of informative speech -- there would, for example, be no way for the government to prohibit the aiding and abetting of a crime that is intended to occur weeks or months after its planning. But in fact, if someone in October teaches another person how to cheat on their tax forms to be filed the following April, the person doing the teaching nonetheless can be culpable of aiding and abetting tax fraud. "The fact that the aider and abettor's counsel and encouragement is not acted upon for long periods of time does not break the actual connection between the commission of the crime and the advice to commit it." United States v. Barnett, 667 F.2d 835, 841 (9th Cir. 1982).

Just as advocacy of unlawful conduct is entitled to greater constitutional protection than the act of using speech to aid and abet such conduct, Brandenburg itself recognizes another, related distinction that is of equal significance for present purposes. As we explained above, the Court in Brandenburg held that the First Amendment renders invalid statutes that "forbid or proscribe advocacy of the use of force or of law violation except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action." 395 U.S. at 447. Immediately after stating this constitutional requirement, however, the Court drew a sharp distinction between "`the mere abstract teaching . . . of the moral propriety or even moral necessity for a resort to force and violence'" and "`preparing a group for violent action and steeling it to such action.'" Id. at 448 (quoting Noto v. United States, 367 U.S. 290, 297-98 (1961)).

As the Court made plain in Noto and in related cases, the latter category of conduct -- "preparing a group

for violent action and steeling it to such action" -- is not entitled to First Amendment protection, even though advocacy ("the mere abstract teaching . . . of the moral propriety") of such violence is protected. Indeed, even Justice Douglas -- in the course of urging strong constitutional protection for the <u>advocacy</u> of illegality -- freely acknowledged that "[t]he freedom to speak is not absolute; the <u>teaching of methods of terror</u> . . . should be beyond the pale." <u>Dennis v. United States</u>, 341 U.S. 494, 581 (1951) (Douglas, J., dissenting) (emphasis added).

The distinction recognized in <u>Brandenburg</u> between advocacy of, and preparation for, unlawful conduct, was exemplified in <u>Scales v. United States</u>, 367 U.S. 203 (1961), a case in which the Court carefully distinguished between the teaching of abstract doctrine -- punishment of which is subject to substantial constitutional constraints -- and the teaching of the <u>techniques</u> of unlawful conduct, which can much more easily be proscribed. <u>Id</u>. at 233-34. As to the former, the Court has developed the <u>Brandenburg</u> test, which asks whether the danger is intended, likely and "imminent." But the constraints of the First Amendment do not apply when the "teaching" goes "beyond the theory itself" to "an explanation of `basic strategy.'" Scales, 367 U.S. at 244. At that point, the teaching -- if it is done with the purpose of preparing a group for unlawful action -- is not much different than the information conveyed in a typical aiding and abetting case; accordingly, the Brandenburg protections should largely be inapposite. See Yates v. United States, 354 U.S. 298, 331-33 (1957) ("systematic teaching" in classes to "develop in the members of [a] group a readiness to engage [in unlawful conduct] at the crucial time," could be punished, even if that conduct was to occur only "when the time was ripe").[62]

This critical distinction -- between advocacy of unlawful conduct, on the one hand, and "instructions" for unlawful conduct, on the other -- was recognized by Professor Thomas Emerson in his seminal treatise on the First Amendment:

[C]onduct that amounts to "advice" or "persuasion" [sh]ould be protected; conduct that moves into the area of
"instructions" or "preparations" [sh]ould not. The essential task would be to distinguish between simply conveying an
idea to another person, which idea he may later act upon, and actually participating with him in the performance of an
illegal act. It is true that the distinction does not offer automatic solutions and that courts could easily disagree on any
particular set of facts. But this process of decision making is related to the nature of "expression" and the functions and
operations of a system of freedom of expression. It is therefore a rational method of approaching the problem.

Thomas Emerson, <u>The System of the Freedom of Expression</u> 75 (1970).[63]

## B. <u>Application of First Amendment Principles to Dissemination of Bombmaking Information</u>

Having reviewed the role of the First Amendment in these three related contexts, we now can address specifically the circumstances under which Senators Feinstein and Biden would seek to proscribe dissemination of bombmaking information.

**1.** <u>Dissemination with the "Intent" to Facilitate Unlawful Conduct</u>. The Feinstein Amendment would make it unlawful, <u>inter alia</u>, for any person to "teach or demonstrate" the making of explosive materials, or to distribute by any means information pertaining to, in whole or in part, the manufacture of explosive materials, where the person "intend[ed]" that such information would be used for, or in furtherance of, an activity that "constitutes a Federal criminal offense or a criminal purpose affecting interstate commerce." In light of the foregoing discussion in Part VI-A, two things about the constitutionality of this "intent" prohibition are clear:

First, the First Amendment almost certainly would require that the "intent" scienter provision in such a statute be construed to mean an actual, conscious purpose to bring about the specified result. "Intent" may not be construed as "constructive intent," as in the civil tort context; that is to say, "intent" could not constitutionally be inferred solely by virtue of the fact that criminal offenses were a foreseeable result -- a "natural consequence" -- of the general distribution of bombmaking information. Anyone who teaches or publishes bombmaking information -- including those who do so for wholly legitimate reasons, such as explosives manufacturers, the military, and encyclopedia publishers -- could foresee that <u>some</u> unknown recipient of the teaching or information will use it for unlawful ends; but the First Amendment would not permit culpability on that basis. <u>See</u> <u>supra</u> at 30-34. Instead, an "intent" element must be construed to reach only the person who disseminates the information for the <u>purpose</u> of facilitating criminal conduct.[64]

Second, a prosecution relying upon an "intent" requirement plainly would be constitutional where the teacher intends that a <u>particular</u> student -- or a discrete group of students -- use the information for criminal conduct. Indeed, if there is such an intent, and a receiver of the information thereafter <u>does</u> use that information to commit a crime, the person who assisted him by showing him how to do so would be culpable as an aider and abettor, and the First Amendment would not bar such accomplice culpability. <u>See</u> <u>supra</u> at 36-39. The constitutional analysis should be the same, as in the <u>Featherston</u> case, where the teacher intends that particular students use the information for unlawful ends, but the crime is never committed (such as when the scheme is foiled by detection). This would be, in essence, a form of "attempted aiding and abetting." Although presently there is no general federal statute prohibiting "attempted aiding and abetting," <u>see</u> <u>supra</u> at 20, that is not because of any constitutional bar: application of such a statute to the provision of information would not transgress the First Amendment. Therefore, a statute like the Feinstein Amendment could constitutionally be applied to a case where the person supplying the critical training or information has the intent thereby to assist a particular recipient thereof in unlawful activity, whether or not the crime eventually occurs.[65] As the Court emphasized in <u>Brandenburg</u> and in earlier cases, the Constitution does not protect the conduct of "preparing a group for violent action" by <u>teaching</u> the techniques of unlawful conduct. <u>See</u> <u>Noto</u>; <u>Scales</u>; <u>Dennis</u>, 341 U.S. at 581 (Douglas, J., dissenting); Emerson, <u>System of Freedom</u>, <u>supra</u>, at 75; Greenawalt, <u>Speech</u>, <u>Crime</u>, <u>supra</u> note 20, at 244-45.[66]

The more difficult question is whether criminal culpability can attach to <u>general publication</u> of explosives information, when the writer, publisher or seller of the information has the purpose of generally assisting unknown and unidentified readers in the commission of crimes. This is, in essence, the situation alleged in the recent <u>Rice v. Paladin</u> case. <u>See</u> <u>supra</u> at 27-28. To be sure, such a "generalized" attempt to aid crime through publication is "not the same as <u>preparing a group</u> for violent action." <u>Noto</u>, 367 U.S. at 298. The "joint participation" in a crime that is the hallmark of conspiracy or aiding and abetting is absent here: the speech is not, in any direct sense, "brigaded with action." What is more, the danger to the public in such a case is not necessarily greater than that caused by the same exact publication that is made solely for permissible purposes. The constitutional question is, therefore, more difficult than in the case of intentional <u>concerted</u> action discussed above.

There are few, if any, cases directly on point.[67]  However, in <u>Haig v. Agee</u>, 453 U.S. 280 (1981), the Court suggested that otherwise privileged publication of information can lose its First Amendment protection when the publisher has an impermissible motive.  In <u>Agee</u>, a former CIA employee had his passport revoked as a result of his campaign to publish the names of (and otherwise publicly identify) intelligence agents working in foreign countries, a course of conduct that undermined intelligence operations and endangered agents.  In the context of this serious threat to American national security, the Court held that the First Amendment did not protect Agee's publication of the agents' names.  In so ruling, the Court stressed the following:

> Agee's disclosures, among other things, have the declared <u>purpose</u> of obstructing intelligence operations and the
> recruiting of intelligence personnel.  They are clearly not protected by the Constitution.  The mere fact that Agee is
> also engaged in criticism of the Government does not render his conduct beyond the reach of the law.

<u>Id</u>. at 308-09 (emphasis added).  The Court did not indicate whether Agee's bad intent was, in and of itself, sufficient to strip his speech of its constitutional protection.  In particular, the Court had no occasion to determine whether the First Amendment analysis would be the same if the information Agee published was already in the public domain and/or if the government's interests were not as significant as the protection of intelligence sources.

Nonetheless, in the absence of contrary authority, this passage in <u>Haig v. Agee</u> supports the argument that the government may punish publication of dangerous instructional information where that publication is motivated by a desire to facilitate the unlawful use of explosives.[68]  At the very least, publication with such an improper intent should not be constitutionally protected where it is foreseeable that the publication will be used for criminal purposes; and the <u>Brandenburg</u> requirement that the facilitated crime be "imminent" should be of little, if any, relevance.[69]  Accordingly, we believe that the district court in <u>Rice v. Paladin</u>, <u>see</u><u>supra</u> at 27-28, erred insofar as it concluded that <u>Brandenburg</u> bars liability for dissemination of bombmaking information <u>regardless</u> of the publisher's intent.  <u>See</u> <u>also</u> <u>infra</u> note 71.

Having said that, we should note that where there is no concerted action between the publisher and any particular recipient of the information, there might be a significant problem in proving that the person publishing the information has done so with an impermissible purpose.  Most publishers of the bombmaking materials in question will argue that their publication is well-intentioned.  For example, in <u>Rice</u>, the publisher of <u>Hit Man</u> has asserted that its intended audience includes:  authors who desire information for the purpose of writing books about crime and criminals; law enforcement officers and agencies who desire information concerning the means and methods of committing crimes; persons who enjoy reading accounts of crimes and the means of committing them for purposes of entertainment; persons who fantasize about committing crimes but do not thereafter commit them; and criminologists and others who study criminal methods and mentality. <u>See</u> <u>supra</u> at 28.

Nevertheless, proof of improper intent might be possible in certain types of cases.  In many cases the manuals themselves might have "the <u>declared</u> purpose," <u>Agee</u>, 453 U.S. at 309, of facilitating crime. Although, under <u>Brandenburg</u>, culpability cannot attach merely because the manuals advocate unlawful action, such advocacy could constitutionally be used as probative evidence that the disseminator of accompanying information on the techniques of bombmaking intended by such dissemination to facilitate criminal conduct.  <u>See</u> <u>supra</u> note 47.  What is more, if a publisher of such communications engages in a marketing strategy intended to maximize sales to, <u>inter alia</u>, "criminals and would-be criminals who desire

information and instructions on how to commit crimes," as the publisher of Hit Man allegedly did, and if that publisher's economic success evidently depends upon stimulating a high volume of unlawful use of his product -- i.e., the publisher's fortunes substantially rise or fall depending on the degree to which his product facilitates unlawful conduct -- there might be sufficient evidence of improper intent.  See Direct Sales, 319 U.S. at 712-13 (where seller of dangerous drugs -- which could be used both for proper and improper purposes -- engaged in marketing strategy to stimulate sales to would-be criminals, and where seller had a "stake in the venture," it was permissible to infer intent to assist criminal operation).  As Justice Holmes explained in a related context, it is fair to assume that items are "designed for" unlawful use where they are "offered for sale in such a mode as purposely to attract purchasers who wanted them for the unlawful [use]." Danovitz v. United States, 281 U.S. 389, 397 (1930).

Finally, if, as Senator Feinstein believed, some of the information contained in the bombmaking manuals has no use other than to facilitate unlawful conduct,[70] that fact, too, would be evidence of an intent to facilitate crime (at least with respect to that particular information).  Publishers of such information undoubtedly would argue that such information has uses other than to facilitate unlawful conduct -- such as to educate law enforcement officials and would-be murder-mystery writers, and simply to entertain persons who enjoy reading accounts of the workings of the criminal mind. See supra at 28 (describing claims made by publisher of Hit Man).  But that assertion would only raise, rather than resolve, the critical question of fact regarding a publisher's intent; it would remain an issue for the trier of fact to determine whether one of the publisher's purposes was to facilitate criminal conduct.

We acknowledge that in many cases, there may be a broad and diverse audience for such communications, including persons who would not use the information as a blueprint for crime, and the communications might have substantial value other than to facilitate crimes.  In such cases, courts might agree that "a strict rule about finding intent is especially important, lest a jury convict because of outrage over the facts someone has chosen to disclose.  A person should not be punished for encouraging a general crime like murder by publicly disclosing facts unless the prosecution's evidence leaves no possible doubt that his purpose has been to aid or cause that criminal result."  Greenawalt, Speech, Crime, supra note 20, at 273.  But where such a purpose is proved beyond a reasonable doubt, as it would have to be in a criminal case, the First Amendment should be no bar to culpability.[71]

**2.  Dissemination with the "Knowledge" that a Particular Recipient of the Information Intends to Use It in Furtherance of Unlawful Conduct**.  The Feinstein Amendment also would have made it unlawful, inter alia, for any person to "teach or demonstrate" the making of explosive materials, or to distribute by any means information pertaining to, in whole or in part, the manufacture of explosive materials, if the person "knows" that such information will be used for, or in furtherance of, "an activity that constitutes a Federal criminal offense or a criminal purpose affecting interstate commerce."  As Senator Biden explained, this "knowledge" provision was intended to address the case where the person disseminating the information has evidence that a particular potential recipient plans to use that information to engage in unlawful activities -- for example, when the person requesting the information expressly indicates that he plans to use the information to learn how to commit violent crimes.  See supra note 38.

It is questionable whether the statutory scienter requirement ("knows") in the Feinstein Amendment would suffice to cover such a situation.  As explained above, supra at 21 & note 32, where a statutory element of "knowledge" refers to a possible future result of a defendant's conduct, the government typically must prove that the defendant was "aware `that that result is practically certain to follow from his conduct.'"  United States v. Bailey, 444 U.S. 394, 404 (1980) (citations omitted).  Thus, even where someone expressly states

that he desires to purchase a product in order to plan a crime, it might be difficult to persuade the trier of fact that it was "practically certain" that the crime would be committed (particularly if, as it turned out, the crime was <u>not</u> in fact committed).  It would, therefore, be helpful to identify a more carefully tailored mens rea requirement in order to address Senator Biden's hypothetical situation.

   The scenario Senator Biden describes brings to mind other types of "facilitation" statutes, such as state statutes making it a crime to "provide" a person with "means or opportunity" to commit a crime, "believing it probable that he is rendering aid to a person who intends to commit a [crime]."  N.Y. Penal Law § 115.05 (McKinney 1996).[72]  Such statutes, however, are of general applicability:  they do not single out a particular <u>form</u> of facilitation, such as facilitation involving conveyance of information, for especially harsh treatment. And what is more, conviction under such statutes -- as under the federal aiding and abetting statute, 18 U.S.C. § 2 -- requires that the facilitation actually result in the commission of a crime.[73]

   A closer analogy, therefore, might be another section of the AEDPA itself.  Section 706 of the AEDPA makes it a felony to "knowingly transfer[] any explosive materials, knowing <u>or having reasonable cause to believe</u> that such explosive materials will be used to commit a crime of violence . . . or drug trafficking crime."  110 Stat. at 1295-96 (to be codified at 18 U.S.C. § 844(o)).[74] The "reasonable cause to believe that [the item] will be used [for the unlawful purpose]" standard would seem to address directly the case where the recipient of the product indicates an intent to use it to commit or to facilitate a crime.  The constitutional question then becomes whether such a standard can be used where the item being transferred is not "explosive materials," as in AEDPA section 706, but instead <u>information</u> on how to manufacture or use such materials.

   There is little case law directly on point.  As Professor Greenawalt points out, however, this case is not quite as easy from a First Amendment perspective as "attempted aiding and abetting," which can constitutionally be proscribed because it requires a specific purpose to actually assist in the commission of the crime:

        It is only a minor impairment of freedom to tell people they cannot provide information they want to be used for a
        crime.  It is somewhat more serious to tell them that, even if they have no such purpose, they must keep their mouths
        shut.  A speaker may conceivably think a communication has significant value for the listener beyond the listener's
        immediate purpose, but, even if the speaker does not think that, perhaps a recognition of the speaker's autonomy
        should include allowing him ordinarily to say what he believes to be true to his acquaintances, regardless of the use he
        thinks they plan to make of it.

        A further argument against such liability is the problem of determining facts accurately and the effect of the resulting
        uncertainty on people who speak.  If people become aware that they can be treated as criminal for providing
        information they believe will aid a crime, they may hesitate to give information when they think there is some modest
        chance of criminal use, not trusting that prosecutors and jurors will always be discerning about

perceptions of relevant
        probabilities.

        The implications for free speech are serious enough to warrant careful attention to the problem of
communications that
        facilitate.

Greenawalt, Speech, Crime, supra note 20, at 86-87.

    There are two principal reasons why a "facilitation through speech" prohibition without an "intent"
requirement would raise serious First Amendment problems.  First, such a facilitation prohibition would be
directed specifically and uniquely at facilitation effected by way of conveying information.  In other words, it
would not prohibit facilitation, as such, but only a speech-related subset of such conduct.  "The text of the
First Amendment makes clear that the Constitution presumes that attempts to regulate speech are more
dangerous than attempts to regulate conduct."  44 Liquormart, Inc. v. Rhode Island, 116 S. Ct. 1495, 1512
(1996) (plurality opinion).  The constitutionality of the prohibition therefore is not as clear as it would be if
"facilitation through speech" were just one form -- i.e., one application -- of a generally applicable facilitation
statute that did not refer specifically to speech. SeeCohen v. Cowles Media Co., 501 U.S. 663, 669-71 (1991)
(whereas First Amendment is not implicated by application of "generally applicable laws" to violations
involving speech or the press, there is a greater constitutional problem where, as in Florida Star, the "State
itself define[s] the content of publications that would trigger liability").

    Second, as explained above, supra at 30-34, the First Amendment traditionally has been understood to
prohibit the use of the criminal or tort law to punish the dissemination of lawfully obtained factual
information absent an impermissible purpose for such dissemination; and this is so even where such
publication has a "propensity" to be misused by someone in a criminal or tortious manner.  Yet that is, in a
sense, precisely what a facilitation prohibition would do in Senator Biden's scenario:  it would punish
distribution of lawfully obtained information because the disseminator had reason to believe that such
distribution would result in some harm.

    Although the matter is far from certain, in the end we think these First Amendment concerns can be
overcome, and that such a facilitation prohibition could be constitutional, if drafted narrowly.  To be sure, the
prohibition would be "speech-specific."  But, as with respect to 18 U.S.C. § 231(a)(1), see supra at 21-23,
Congress would be singling out "teaching" and "informational" facilitation of crime not because of any
hostility to speech itself, but because those are the forms of facilitation that are the most apparent threats to
safety not already addressed by accomplice and conspiracy prohibitions and by the facilitation prohibitions
found in sections 323 and 706 of the AEDPA.  Congress arguably would simply be filling in a statutory gap,
rather than expressing a general hostility to any particular viewpoint.  Accordingly, the constitutional
problems should be minimized.  See Edler Industries, 579 F.2d at 520-22 (whereas First Amendment would
prohibit export restrictions dealing with general "interchange of scientific and technological information," it
is constitutional to restrict such export where the exporter knows or has reason to know that the recipient of
the information will use it to produce or operate munitions).  See also Constitutionality of the Proposed
Revision of the International Traffic in Arms Regulations, 5 Op. O.L.C. 202, 207-08 (1981).

    Furthermore, such a prohibition could be, in constitutionally significant respects, less problematic than a
statute or tort that punishes speech having a propensity to be misused by some unknown recipient.  In the
latter type of tort and criminal cases, the practical effect of a penalty would be to deter altogether the
dissemination of the information, since there is always a chance that some reader, listener or viewer will turn

the information to bad use, and the only way to avoid this risk is to cease speaking altogether.  Indeed, even where there would in fact be only a slim likelihood that the information would be misused, a jury might be expected to find the requisite degree of "recklessness," particularly if -- as is likely in such cases -- the jury is hostile to the message conveyed in the information and does not believe that it serves any social utility to distribute such information.  The risk of such an outcome effectively could chill the "legitimate" dissemination of bombmaking information even if there is but a slight risk of its misuse.[75]  By contrast, a facilitation prohibition tailored to particular recipients who are likely to make criminal use of the information would not have such a broad chilling effect on such speech.  The person conveying the information would be required only to withhold its distribution to particular persons who pose an apparent risk, and otherwise would be able to continue general publication, distribution or sales.  In other words, such a prohibition would only restrict or deter certain particular transactions, but would not impede general publication.

    In drafting a constitutional facilitation statute, we think the safest strategy would be to address Senator Biden's scenario directly -- for example, by barring dissemination of bomb-making information to a particular person, where the disseminator knows that such person intends to use the information for an unlawful purpose.  Under such a statute, the requisite "knowledge" would not be of a future event, but instead, of someone else's present intent.  Therefore, the government would not be required to prove that the disseminator was "practically certain" of the recipient's intent.  See supra at 21 (discussing "practical certainty" standard for "knowledge" of future events).  Instead, it should suffice to prove that the person providing the information was aware of a "high probability" that the recipient had an intent to use the information to commit a crime.  See, e.g., Barnes v. United States, 412 U.S. 837, 845 (1973); Turner v. United States, 396 U.S. 398, 416 & n.29 (1970); Leary v. United States, 395 U.S. 6, 46 n.93 (1969).[76]  That "knowledge" typically should be found where, as in the cases hypothesized by Senator Biden, the recipient clearly indicates to the disseminator a desire to use the information for criminal purposes.[77]

    Alternatively, Congress could decide to track the language of section 706 of the AEDPA, such as the following:

        It shall be unlawful for any person to teach or demonstrate to any particular person the making of explosive materials,
        or to distribute to any particular person, by any means, information pertaining to, in whole or in part, the manufacture of
        explosive materials, with reasonable cause to believe that such particular person will use such teaching, demonstration
        or information for, or in furtherance of, an activity that constitutes a Federal criminal offense or a criminal offense
        affecting interstate commerce.

That formulation would almost certainly cover the case where the recipient of the information expressly indicates an intent to use such information to commit or to facilitate a crime, and would likely be constitutional as applied to such a case.  However, such a "reasonable cause to believe" standard might also deter widespread, general publication of such information where a publisher is aware that certain suspicious persons are in the "audience."[78]  Because of this risk of chilling substantial publication of such information to persons who will not use it unlawfully, such a statute would run a greater risk of constitutional invalidation than a statute (such as that described above) that is more narrowly tailored to the particular hypothetical described by Senator Biden.[79]

## C. Proposed Modification of the Feinstein Amendment

For the reasons discussed in the preceding sections, the Feinstein Amendment would be more likely to reach all of the fact situations that Senators Feinstein and Biden wished to address, and would be more likely to pass constitutional muster in most or all of its applications, if it were modified to read as follows:

It shall be unlawful for any person --

(a) to teach or demonstrate the making or use of an explosive, a destructive device, or a weapon of mass destruction, or to

distribute by any means information pertaining to, in whole or in part, the manufacture or use of such an explosive, device or

weapon, intending that such teaching, demonstration or information be used for, or in furtherance of, an activity that

constitutes a Federal criminal offense or a State or local criminal offense affecting interstate commerce;[80] or

(b) to teach or demonstrate to any particular person the making or use of an explosive, a destructive device, or a weapon of

mass destruction, or to distribute to any particular person, by any means, information pertaining to, in whole or in part, the

manufacture or use of such an explosive, device or weapon, knowing that such particular person intends to use such

teaching, demonstration or information for, or in furtherance of, an activity that constitutes a Federal criminal offense or State

or local criminal offense affecting interstate commerce.

For purposes of this section, the term "explosive" has the meaning set out in 18 U.S.C. § 844(j).  The term "destructive

device" has the meaning set out in 18 U.S.C. § 921(a)(4).  The term "weapon of mass destruction" has the meaning set out in

18 U.S.C.A. § 2332a(c)(2).

The principal differences between this proposal and the Feinstein Amendment itself are the following:

**1.**  The Feinstein Amendment could be construed to impose culpability if the person disseminating the information has reason to know that some unidentified, unspecified recipient thereof will use the information for an unlawful purpose, or if such an outcome is the "natural consequence" of publication of the information.  Because that construction could cover virtually all public dissemination of such information, it would raise serious constitutional questions.  The alternative formulation specifies that the person who disseminates the information must either have the specific purpose of facilitating criminal conduct, or must have knowledge that a particular recipient intends to make improper use of the material.  This should, for example, address Senator Biden's example of a sale of a bombmaking manual to a purchaser who has requested it for the express purpose of using such information to accomplish an unlawful end.  In such a case, a well-intentioned distributor of the information will be prohibited from providing the information to the requesting party, but may otherwise freely offer the item for sale.

**2.**  Under the Feinstein Amendment, it would be unclear whether criminal culpability would attach where

someone disseminates dangerous information about explosives with a conscious purpose of facilitating unlawful conduct by unknown recipients of the information. The alternative formulation would make clear that dissemination with such a specific purpose would be proscribed. While the constitutionality of particular applications of such a prohibition might be somewhat uncertain (depending on whether the evidence truly demonstrates the improper intent beyond a reasonable doubt), we believe that the "intent" prohibition would be facially constitutional.[81]

3. The alternative formulation would make clear that the "intent" or "knowledge" element refers to the use made of the information that the person disseminates. Accordingly, it does not include the Feinstein Amendment's language regarding "such explosive materials," because that phrase did not have a clear referent: the prohibition should involve dissemination or teaching of information, not dissemination of the explosive materials themselves (which is independently addressed elsewhere in Title 18 and in the AEDPA).

4. The alternative formulation would broaden the Feinstein Amendment to bring within its ambit teaching and information concerning not only explosives (as defined in 18 U.S.C.§ 844(j)), but also all destructive devices (as defined in 18 U.S.C. § 921(a)(4)) and other weapons of mass destruction (as defined in 18 U.S.C.A. § 2332a(c)(2)).

5. The alternative formulation would broaden the Feinstein Amendment to cover information about the "use" of explosives, in addition to the manufacture thereof. In the wrong hands, information on how to use explosives (such as the information in Hit Man that was used to commit a multiple homicide, discussed in Rice v. Paladin) can be every bit as dangerous as information on how to create such explosives.

6. For purposes of clarification and simplicity, the alternative formulation refers to a "State or local criminal offense affecting interstate commerce," rather than to a "criminal purpose affecting interstate commerce." It is unclear how a "criminal purpose" could "affect" interstate commerce.

## ENDNOTES:

[1] See Statement of Robert S. Litt, Deputy Assistant Attorney General, Criminal Division, U.S. Department of Justice, in Mayhem Manuals and the Internet: Hearings Before the Subcomm. on Terrorism, Technology and Government Information of the Senate Comm. on the Judiciary, 104th Cong., 1st Sess. (1995).

[2] The DOJ Committee considered carefully the question whether the inclusion in this Report of titles of, and illustrative excerpts from, bombmaking texts would enhance the availability of such information to persons bent upon fabricating bombs and other destructive devices. The Committee concluded that such information already is so readily available to such individuals that its publication in a Report to Congress will create no additional risk. Nevertheless, except as specifically noted, the mention of any particular source of bombmaking information in this Report should not be taken as validation or acknowledgement of the accuracy or value of that information.

[3] See also infra note 54 (discussing publication by various periodicals, including the Progressive, of articles describing technical processes of thermonuclear weapons).

[4] See "Hunt for a Mad Bomber," Reader's Digest 77, 79 (August 1993).

[5] Much of the information available in print pertaining to nuclear weapons also can be found on the Internet. A number of websites, for example, have included compilations of nuclear weapons information gleaned from literature elsewhere in the public domain.

[6] The list, captioned "Bombs: All About Things that Go Boom," includes a warning that the compiler does "not endorse, nor check for

the safety, or validity of these bomb making procedures.  Makers of these devices take all responsibility. . . .  [A]ll of these devices do or can pose a risk to the creators and other individuals."  The compiler further suggests that "[f]or [the reader's] safety please read the recipes carefully two and three times over before attempting."

   It is important to note that, even if a user of the World Wide Web does not know the specific location of a website containing bombmaking information, such data can easily be located with a search engine.

[7] In a colloquy during the Senate's consideration of the Feinstein Amendment, see supra at 3-4, Senators Biden and Feinstein described similar material that members of their staffs had obtained over the Internet.  Senator Biden referred to one item that instructed readers how to manufacture a "baby food bomb" from shotgun shells and "other materials that can be obtained by anyone" that are so "powerful that they can destroy a car."  142 Cong. Rec. S3448 (daily ed. Apr. 17, 1996) (statement of Sen. Biden).  Senator Feinstein observed that The Terrorist's Handbook is available by mail order and on the Internet.  She observed that this book begins by stating that "[w]hether you are planning to blow up the World Trade Center, or merely explode a few small devices on the White House lawn, the `Terrorist's Handbook' is an invaluable guide to having a good time."  It then goes on to explain, among other things, how to steal the chemicals necessary for making an explosive from a college laboratory.  142 Cong. Rec. S7272 (daily ed. June 28, 1996) (statement of Sen. Feinstein).

[8] All three defendants were convicted by jury on April 24, 1996, on charges that included conspiracy to make a destructive device to be used to destroy a building used in interstate commerce.

[9] In 1995, all four members were subsequently tried, convicted and sentenced for violating 18 U.S.C. § 175 (unlawful possession of biological weapons).  Although the Patriot Council members only possessed 0.7 grams of ricin, this minute amount constitutes more than 100 lethal doses.

   We note that, on November 1, 1995, a senior official of the FBI, testifying before the Senate Permanent Subcommittee on Investigations, apprised the Subcommittee members of the ricin plot, including the use by the conspirators of a publicly available instruction manual describing manufacture of the toxic poison.  See Statement of John P. O'Neill, Chief, Counterterrorism Section, FBI, in Global Proliferation of Weapons of Mass Destruction:  Hearings Before the Permanent Subcomm. on Investigations of the Senate Comm. on Governmental Affairs, 104th Cong., 1st Sess. 236 (1995).  Another senior FBI official furnished identical information to the House Subcommittee on Military Research and Development.  See Statement of Robert M. Blitzer, Chief, Domestic Terrorism/Planning Section, FBI, in Chemical-Biological Defense Program and Response to Urban Terrorism:  Hearings Before the Subcomm. on Military Research and Development of the House Comm. on National Security, published at 1996 WL 7136609 (Mar. 12, 1996).

[10] See also Department of the Treasury, Bureau of Alcohol, Tobacco and Firearms, Arson and Explosives -- Incidents Report 1994, at 41-51 (1995).

[11] This Report deals almost exclusively with the ability of the government to prohibit or restrict the dissemination by private persons of bombmaking information that has not been classified.  The Report does not discuss in any detail the separate, broader authority of the government to impose "reasonable restrictions" on its own employees' activities to ensure that those employees do not disclose classified information belonging to the government itself.  See generally Snepp v. United States, 444 U.S. 507 (1980).

[12] With respect to information concerning atomic weapons in particular, there is another restriction in federal law that also should be mentioned.  The Atomic Energy Act imposes certain restrictions on the dissemination of "Restricted Data," which is defined to include, inter alia, "all data concerning design, manufacture, or utilization of atomic weapons," 42 U.S.C. § 2014(y)(1), unless such information has been expressly "declassified or removed from the Restricted Data category," id.  In particular, it is unlawful to communicate, transmit or disclose such "Restricted Data" to any person either (i) with intent to injure the United States or with intent to secure an advantage to any foreign nation, 42 U.S.C. § 2274(a), or (ii) with "reason to believe such data will be utilized to injure the United States or to secure an advantage to any foreign nation," id. § 2274(b).  In addition, the Attorney General may apply to a court for an injunction prohibiting impermissible dissemination of such Restricted Data by persons who are "about to engage" in such conduct.  42 U.S.C. § 2280.

   Insofar as Restricted Data includes simply information produced by or for the government -- such as the government's self-generated, classified information -- the extent to which the government may prohibit dissemination of such data by those who are granted access to it is a matter outside the principal scope of this Report.  See supra note 11; infra note 44.  However, there is a serious

question whether Restricted Data also includes information developed or compiled by private citizens who have not had access to classified government documents. See generally Mary M. Cheh, The Progressive Case and the Atomic Energy Act: Waking to the Dangers of Government Information Controls, 48 Geo. Wash. L. Rev. 163, 180-88 (1980). The position of the Department of Energy is that such "privately generated" information concerning nuclear weapon design can be Restricted Data subject to the statutory restrictions on dissemination, see 62 Fed. Reg. 2252, 2254, 2261 (Jan. 15, 1997) (proposing new 10 C.F.R. § 1045.21, which would make this point explicitly); and the only court to opine on the matter has confirmed this statutory construction, see United States v. Progressive, Inc., 467 F. Supp. 990, 998-1000 (W.D. Wis.), rehearing denied, 486 F. Supp. 5 (W.D. Wis.), appeal dismissed, 610 F.2d 819 (7th Cir. 1979). Insofar as the Restricted Data provisions do encompass certain privately generated information concerning nuclear weapons, see 62 Fed. Reg. at 2253-54 (discussing the types of information that the Department of Energy presently considers Restricted Data), the Atomic Energy Act would provide another statutory means of limiting the dissemination of such forms of bombmaking information. However, because Senator Feinstein's initiative in the last Congress was not directed specifically to information about such nuclear weapons, we will limit our discussion of Restricted Data to this footnote, except to note the following: As discussed infra at 30-34 & note 54, any attempt by the government to restrict or punish the dissemination of Restricted Data that was already in the public domain would run up against significant First Amendment constraints, absent an intent by the disseminator to injure the United States or to secure an advantage to any foreign nation.

[13] Cf., e.g., United States v. Rowlee, 899 F.2d 1275, 1278 (2d Cir.) (defendant properly convicted of conspiracy to defraud United States based on having provided instruction and assistance to others in avoiding income tax liability), cert. denied, 498 U.S. 828 (1990); United States v. Daly, 756 F.2d 1076, 1081-82 (5th Cir. 1985) (defendant properly convicted of conspiracy to defraud United States based on having disseminated information to members of church on how to file tax returns so as to hamper IRS investigation).

[14] See, e.g., United States v. Donner, 497 F.2d 184, 192 (7th Cir. 1972) (speech, including otherwise constitutionally protected speech, can constitute overt act in furtherance of conspiracy), cert. denied, 419 U.S. 1047 (1974).

[15] See generally Direct Sales Co. v. United States, 319 U.S. 703 (1943); United States v. Falcone, 311 U.S. 205 (1940); United States v. Pinckney, 85 F.3d 4, 8 (2d Cir. 1996).

[16] See Direct Sales; Falcone; United States v. Blankenship, 970 F.2d 283 (7th Cir. 1992).

[17] See also Lechuga, 994 F.2d at 349-50 (opinion for four judges of 11-member en banc panel); id. at 362-63 (opinion of three other judges, concurring on this point). However, where the commodity in question has an "inherent capacity" to be used unlawfully, and where the provider of the product has a stake in the success of the illegal venture for which that product is used, a regular course of conduct involving such sales may support proof of a conspiracy. Direct Sales, 319 U.S. at 711-13.

[18] See, e.g., United States v. McNeill, 887 F.2d 448, 450-52 (3d Cir. 1989), cert. denied, 493 U.S. 1087 (1990).

[19] Similarly, the First Amendment does not protect an offer to engage in an unlawful transaction or activity. See, e.g., Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 496 (1982); Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations, 413 U.S. 376, 388 (1973); Braun v. Soldier of Fortune Magazine, Inc., 968 F.2d 1110, 1116-21 (11th Cir. 1992), cert. denied, 506 U.S. 1071 (1993); Norwood v. Soldier of Fortune Magazine, Inc., 651 F. Supp. 1397, 1398-1402 (W.D. Ark. 1987).

[20] See District of Columbia v. Garcia, 335 A.2d 217, 224 (D.C.) (distinguishing between constitutionally protected advocacy and "the act of enticing or importuning on a personal basis for personal benefit or gain"), cert. denied, 423 U.S. 894 (1975). See also People v. Rubin, 158 Cal. Rptr. 488, 491 (Cal. Ct. App. 1979) (discussing distinction between "general advocacy of crime" and solicitation of crime accompanied by "offer of reward"), cert. denied, 449 U.S. 821 (1980). Professor Kent Greenawalt has argued that the Brandenburg requirements (such as the requirement of "imminent" criminal conduct) should be relaxed in the case of private, nonideological solicitations to crime, even where there is no inducement or threat, but only persuasion. Kent Greenawalt, Speech, Crime, and the Uses of Language 261-65 (1989). While this argument has some force, we are not aware that any court has yet endorsed it.

[21] See, e.g., United States v. Razo-Leora, 961 F.2d 1140, 1147 (5th Cir. 1992).

[22] Subsection 2(a) reads: "Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission is punishable as a principal." This statute does not create a distinct federal offense; rather, it merely abolishes

the common-law distinction between principals and accessories. United States v. Superior Growers Supply, Inc., 982 F.2d 173, 177-78 (6th Cir. 1992).

[23] See, e.g., United States v. Kelley, 769 F.2d 215, 216-17 (4th Cir. 1985) (defendant aided and abetted tax fraud by instructing others on how to prepare false forms); United States v. Buttorff, 572 F.2d 619, 623 (8th Cir.) (same), cert. denied, 437 U.S. 906 (1978).

[24] The law is unsettled on the question of how much contact, or "proximity," is required between the principals and the accomplice -- that is to say, to what extent the accomplice must "know" who it is he is aiding. In a series of cases similar to those cited supra note 23, courts have found that defendants could be held culpable for aiding and abetting tax-code violations merely by virtue of having provided instruction on unlawful tax-fraud techniques to a discrete group of listeners who had indicated a specific interest in violating the law. See also, e.g., United States v. Rowlee, 899 F.2d 1275 (2d Cir.), cert. denied, 498 U.S. 828 (1990); United States v. Freeman, 761 F.2d 549 (9th Cir. 1985), cert. denied, 476 U.S. 1120 (1986); United States v. Daly, 756 F.2d 1076 (5th Cir. 1985); United States v. Moss, 604 F.2d 569 (8th Cir. 1979), cert. denied, 444 U.S. 1071 (1980). manufacture phencyclidine. The facts alleged in the search warrant established that Barnett provided essential information for the specific purpose of assisting Hensley in the commission of a crime.

    A harder question is whether aiding and abetting can be established with even less direct connection between the aider and the principals. In Buttorff, the court of appeals held that the aiding and abetting "joint participation" test was satisfied by virtue of tax-evasion instructions that defendants had provided at "large public gatherings," presumably to persons whom they did not personally meet. 572 F.2d at 622-23. United States v. Barnett, 667 F.2d 835 (9th Cir. 1982), suggests that this same theory of aiding and abetting could be applied to written instructions sent by mail to a customer whom the publisher had never met. In that case, the defendant allegedly advertised in a magazine that it was making available for mail-order purchase a catalog of instructions for manufacture of phencyclidine, and sent such instructions -- along with the name of a "reliable" chemical supplier -- to a person who submitted the required $10 purchase price. Id. at 840. In the context of determining whether there was probable cause for a warrant to search the seller's premises, the court held that these allegations were sufficient to allege that the publisher had aided and abetted the recipient's manufacture of phencyclidine. The court reasoned that:

> [I]t is unnecessary for the government to show that Barnett [the seller of the instructions] ever met with Hensley [the buyer] in order to
>
> prove that he aided and abetted him in his attempt to manufacture phencyclidine. The facts alleged in the search warrant established
>
> that Barnett provided essential information for the specific purpose of assisting Hensley in the commission of a crime.

Id. at 843. (The opinion does not indicate whether the "facts alleged" in the search warrant included more than what is described above.)

    By contrast, part of the aiding-and-abetting rationale in Buttorff and Barnett may have been implicitly questioned in Superior Growers. In that case, the Sixth Circuit held that an indictment had not adequately charged conspiracy to aid and abet marijuana possession against proprietors of a garden-supply store. The indictment alleged, inter alia, that the defendants "occasionally provided information and advice on how to grow marijuana to various customers"; but there was no allegation that any particular customer in fact used such advice to commit a crime. The court held that the "providing information" allegation "ultimately falls short" of alleging the requisite intent to aid and abet, "because it does not state that the publications or information were given with defendants' knowledge that a particular customer was planning to grow marijuana, and with defendants' intent to assist that customer in the endeavor." 982 F.2d at 178. According to the court, in other words, it was insufficient for the government merely to demonstrate that the proprietors intended to aid and abet their customers; it was essential to prove that the proprietors had knowledge that their customers were manufacturing marijuana "or intended to manufacture marijuana." Id. at 175.

[25] This standard applies even where the federal crime being assisted involves the unlawful use of explosives. See, e.g., United States v. Hewitt, 663 F.2d 1381, 1385 (11th Cir. 1981) (describing elements of aiding and abetting a violation of 18 U.S.C. § 844(h)).

[26] Judge Hand's view of the intent required for criminal aiding and abetting was not shared by all courts, some of which argued that it was sufficient that the aider and abettor knew of the purpose of the principal -- i.e., that the crime was a natural consequence of the assistance. The classic statement of this position is found in Backun v. United States, 112 F.2d 635, 636-37 (4th Cir. 1940). The Supreme Court, in Nye & Nissen, nominally resolved the debate by adopting Judge Hand's view. But see United States v. Ortega, 44 F.3d 505, 508 (7th Cir. 1995) (defendant could be culpable of aiding and abetting even in the absence of evidence that he wanted the

unlawful act to succeed, if defendant "rendered assistance that he believed would (whether or not he cared that it would) make the principal's success more likely"); United States v. Zafiro, 945 F.2d 881, 887-88 (7th Cir. 1991) (dicta) (aiding and abetting should be established even absent intent to assist illegal activity, if abettor "knowingly provides essential assistance" that cannot readily be obtained from other sources), aff'd on other grounds, 506 U.S. 534 (1993).

27 See, e.g., Superior Growers, 982 F.2d at 177-78; United States v. Campa, 679 F.2d 1006, 1013 (1st Cir. 1982).

28 See United States v. Giovannetti, 919 F.2d 1223, 1227 (7th Cir. 1990) (citing American Law Institute, Model Penal Code § 2.06(3)(a)(ii)). Although attempted aiding and abetting is not a crime, the converse is not true: it is unlawful to aid and abet an attempted crime, provided the underlying attempt is itself an unlawful act.

29 The substantive crimes that may not be "support[ed]" under section 323 are: 18 U.S.C. §§ 32, 37, 81, 175, 351, 831, 842(m) and (n), 844(f) and (i), 956, 1114, 1116, 1203, 1361, 1362, 1363, 1366, 1751, 2155, 2156, 2280, 2281, 2332, 2332a, 2332b, and 2340A, and 49 U.S.C. § 46502.

30 The full definition of "material support or resources" is: "currency or other financial securities, financial services, lodging, training, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel, transportation, and other physical assets, except medicine or religious materials." Id.

31 See H.R. Conf. Rep. No. 482, 103d Cong., 2d Sess. 232 (1994) (noting that, under the original version of 18 U.S.C. § 2339A, it would not be necessary to prove that the facilitator had a "specific intent to commit the underlying action").

32 Accord Model Penal Code § 2.02(2)(b)(ii) (Official Draft and Revised Comments, 1985); id., Explanatory Note on § 2.02, at 236-37 n.13; United States v. Meling, 47 F.3d 1546, 1558 (9th Cir.), cert. denied, 116 S. Ct. 130 (1995); United States v. Powell, 929 F.2d 724, 726, 728 (D.C. Cir. 1991). The government need not prove that the defendant had this level of knowledge with respect to all of the particular details of the future result, such as the identity of those who are harmed. Meling, 47 F.3d at 1558. Thus, under section 323, for example, if a defendant was virtually certain that particular recipients would in fact use the provided resources to commit a terrorist crime, it would be immaterial whether the defendant knew precisely when or where the criminal conduct would occur.

33 Insofar as it can be argued that Congress intended that "training" be considered a "physical asset" for purposes of the statute, a strong argument could be made that a book containing the substance of such "training" also should be considered a "physical asset." But it is unclear whether a court would adopt this reasoning with respect to a book containing information otherwise readily available in the public domain.

34 It is notable that Congress did not prohibit all knowing or intentional facilitation of civil disorders -- it focused principally on such facilitation accomplished by way of teaching or demonstration. Teaching was not Congress's sole focus, however: Subsection 231(a)(2) makes it unlawful to "transport[] or manufacture[] for transportation in commerce any firearm, or explosive or incendiary device, knowing or having reason to know or intending that the same will be used unlawfully in furtherance of a civil disorder." It appears that Congress simply addressed those forms of facilitation -- teaching (§ 231(a)(1)) and the transport of weapons (§ 231(a)(2)) -- that were the most apparent threats to civil order not already addressed adequately by accomplice and conspiracy prohibitions.

35 In addition, the United States Attorney for the District of Arizona recently brought an indictment under § 231(a)(1) against six members of the "Viper" Militia who allegedly had been engaged in, or had conspired to engage in, substantial and detailed training of others in the means by which explosives could be used in civil disorders. United States v. Nelson, et al., Cr-96-280-PHX-EHC (D. Ariz.). In December 1996, all six defendants admitted their guilt. Three defendants pled guilty to a substantive violation of § 231(a)(1), and three others pled guilty to conspiracy to violate § 231(a)(1).

36 Although this is a demanding standard, nonetheless a person teaching the use of explosives cannot avoid culpability by deliberately ignoring facts that would lead him to be aware that the recipient of the teaching is "practically certain" to use it in furtherance of a civil disorder. See generally 1 E. Devitt, C. Blackmar, M. Wolff & K. O'Malley, Federal Jury Practice and Instructions § 17.09 (4th ed. 1992).

37 See, e.g., 141 Cong. Rec. S7685 (daily ed. June 5, 1995) (statement of Sen. Feinstein); 142 Cong. Rec. S7273 (daily ed. June 28, 1996) (statement of Sen. Feinstein). See also 141 Cong. Rec. S7684-85 (daily ed. June 5, 1996) (statement of Sen. Hatch) (agreeing to

inclusion of "intent" requirement in Feinstein Amendment).

[38] See, e.g., 141 Cong. Rec. S7685 (daily ed. June 5, 1995) (statement of Sen. Biden) (describing situation where information is sent to a particular person who has expressly indicated that he desires such information so that he can make unlawful use of it); 142 Cong. Rec. S3449 (daily ed. Apr. 17, 1996) (statement of Sen. Biden) (same); 142 Cong. Rec. S7274 (daily ed. June 28, 1996) (statement of Sen. Biden) (same).

[39] 141 Cong. Rec. S7683 (daily ed. June 5, 1995) (statement of Sen. Feinstein).

[40] Id. at S7684-85 (statement of Sen. Hatch); see also id. at S7685 (statement of Sen. Biden) (agreeing with Senator Hatch that explosives manufacturers should not be subject to culpability simply because there is a chance that some persons who receive information from the manufacturers might use that information for unlawful purposes). Senator Hatch apparently was concerned about whether the statute would deter manufacturers from providing lessons on the manufacture and use of explosives. But it should be noted that the Feinstein Amendment would only have restricted the dissemination of information concerning the "making" or "manufacture" of explosive materials, and not the use of such materials.

[41] In addition, Perry followed instructional references from Hit Man in planning and executing the murders, including information about: how to solicit and obtain prospective clients in need of murder-for-hire services; requesting up-front money for expenses; registering at a motel in the vicinity of the crime, paying with cash and using a fake license tag number; committing the murders at the victims' home; how to make the crime scene look like a burglary; cleaning up and carrying away the ejected shells; breaking down the gun and discarding the pieces along the roadside after the murders; and using a rental car with a stolen tag. Id. at 840.

[42] As explained infra note 71, there was some dispute between the parties as to the meaning of this "intent" stipulation, and the court's resolution of that dispute affected its ultimate constitutional analysis.

[43] As we explain infra at 39 n.62, 43, 44-45 n.71, we think that the district court's First Amendment analysis in Rice is, in some respects, open to question. Plaintiffs have appealed the district court decision to the United States Court of Appeals for the Fourth Circuit. Rice v. Paladin Enterprises, Inc., No. 96-2412.

[44] The Feinstein Amendment was addressed to the dissemination by private persons of bombmaking information that has not been classified. Accordingly, our discussion of the First Amendment is limited to situations in which the government seeks to restrict the dissemination of such privately generated, unclassified information. This Report does not discuss in any detail the constitutionality of governmental restrictions on its own employees' activities to ensure that those employees do not disclose classified information belonging to the government itself. See supra note 11. As the Supreme Court explained in Snepp v. United States, 444 U.S. 507, 509 n.3 (1980), such restrictions on employee conduct generally will not violate the First Amendment so long as they are a "reasonable means" of protecting the government's "compelling interest in protecting . . . the secrecy of information important to our national security." See also, e.g., United States v. Morison, 844 F.2d 1057 (4th Cir.), cert. denied, 488 U.S. 908 (1988); McGehee v. Casey, 718 F.2d 1137 (D.C. Cir. 1983).

[45] See also NAACP v. Claiborne Hardware, Inc., 458 U.S. 886, 927-28 (1982).

[46] See High Ol' Times, Inc. v. Busbee, 456 F. Supp. 1035, 1040 (N.D. Ga. 1978) (no instance in which the written word alone has ever met the Brandenburg test), aff'd, 621 F.2d 141 (5th Cir. 1980). See also Herceg v. Hustler Magazine, Inc., 814 F.2d 1017, 1023 (5th Cir. 1987) (questioning, but not deciding, whether the Brandenburg test could ever be satisfied by written materials), cert. denied, 485 U.S. 959 (1988). In the early days of the Supreme Court's First Amendment jurisprudence, by contrast, the Court repeatedly held that the Constitution did not protect published, written advocacy of unlawful conduct. See, e.g., Fox v. Washington, 236 U.S. 273 (1915); Schenck v. United States, 249 U.S. 47 (1919); Frohwerk v. United States, 249 U.S. 204 (1919); Abrams v. United States, 250 U.S. 616 (1919); Gitlow v. New York, 268 U.S. 652 (1925). The reasoning of these cases does not in any significant sense survive Brandenburg. See Brandenburg, 395 U.S. at 449 (expressly overruling Whitney v. California, 274 U.S. 357 (1927)).

[47] The First Amendment would not, however, prohibit the evidentiary use of such advocacy to demonstrate a disseminator's intent in conveying bombmaking information. See Wisconsin v. Mitchell, 508 U.S. 476, 489 (1993). Therefore, insofar as criminal culpability for dissemination of such information depends upon the distributors' intent -- for example, upon whether a disseminator of bombmaking manuals had the conscious purpose of helping others to use the information to engage in unlawful conduct, see infra at

40-44 -- the substance of the advocacy in such manuals could be used as material evidence of such intent.

[48] On occasion, the Court has indicated that this demanding standard applies only to information concerning "`a matter of public significance.'"  See, e.g., Florida Star, 491 U.S. at 533 (quoting Smith, 443 U.S. at 103). See alsoDun & Bradstreet, Inc. v. Greenmoss Builders, Inc., 472 U.S. 749, 759-61 (1985) (plurality opinion) (speech on matters of "purely private concern" entitled to less First Amendment protection in defamation cases); id. at 764 (Burger, C.J., concurring in pertinent part); id. at 773-74 (White, J., concurring in pertinent part). But see Florida Star, 491 U.S. at 541 (omitting the "matter of public significance" standard in the Court's ultimate holding, quoted in the text above).  However, even if speech of "purely private concern" is entitled to a lesser degree of protection, the Court in Florida Star was willing to conclude that the identity of a rape victim is a "matter of public significance."  If that is so, it is safe to assume the Court would find that information on how to construct explosives likewise concerns a "matter of public significance."

[49] In Florida Star, the Court noted that the state's interest in "the physical safety of [rape] victims, who may be targeted for retaliation if their names become known to their assailants," was a "highly significant" interest.  491 U.S. at 537.  Presumably, the governmental interest in preventing the havoc caused by explosive-related crimes is at least as, if not more, significant.

[50] See, e.g., Herceg v. Hustler Magazine, Inc., 814 F.2d 1017 (5th Cir. 1987) (First Amendment bars liability against magazine where reader accidentally committed suicide while attempting technique of autoerotic asphyxiation described therein), cert. denied, 485 U.S. 959 (1988); Yakubowicz v. Paramount Pictures Corp., 536 N.E.2d 1067 (Mass. 1989) (First Amendment bars liability against producer of motion picture where viewers killed a youth while allegedly imitating the violence depicted therein); DeFilippo v. NBC, Inc., 446 A.2d 1036 (R.I. 1982) (First Amendment bars liability against television network where viewer accidentally committed suicide while attempting hanging stunt he saw on the "Tonight Show"); Olivia N. v. NBC, Inc., 126 Cal. App. 3d 488 (Cal. Ct. App. 1981) (First Amendment bars liability against television network where viewers raped a minor with a bottle while allegedly imitating such a rape depicted in television drama).  See generally Greenawalt, Speech, Crime, supra note 20, at 284-85 (1989):

Certain artistic depictions and portrayals may lead some members of the audience to commit crimes, and that possibility exists in

connection  with work that undeniably constitutes expression as well as work whose status is more arguable. Sex and violence, and

particularly violent sex, are the main subjects of concern. . . .  These asserted connections are plainly an inadequate basis for holding

the communicators criminally liable for the crimes that may be committed after exposure to the communication.  In any real instance, the

most that can be said is that the communicator disregarded a risk that what he said would cause criminal behavior, a risk of which he

was aware or should have been aware.  Given the extreme difficulty of estimating that in any particular instance the person who receives

the communication, or even one of an audience of millions, will commit a crime as a consequence, demonstrating a substantial and

unjustifiable risk of the sort needed to establish recklessness or negligence would be very hard.  In any event, the First Amendment

would preclude liability on those theories because courts and jurors should not be in the business of assessing the unjustifiability of

risks by engaging in ad hoc weighing of the expressive value of a particular program or communication against the dangers it creates. . . .

The dangers of interference with forms of expression are grave enough also to bar civil recovery when victims of crimes by consumers

sue those responsible for communications on a theory of reckless or negligent causation.  For example, if a viewer "acts out" a violent

scene from a television drama, the victim cannot recover against the company that has shown the program. . . .  If portrayals in literature,

movies, television, photography, and the fine arts may ever be forbidden or made the subject of civil liability because of a propensity to

cause crimes, the great danger of a particular sort of communication must be powerfully shown, and the proscribed communications must

be very clearly defined.

51 See, e.g., Smith v. Linn, 563 A.2d 123 (Pa. Super. Ct. 1989) (First Amendment barred liability against publisher of diet book after reader died as result of following diet), aff'd mem., 587 A.2d 309 (Pa. 1991); Alm v. Van Nostrand Reinhold Co., 480 N.E.2d 1263 (Ill. App. Ct. 1985) (First Amendment barred liability against publisher of "how-to" book where reader had been injured while following instructions therein); Walt Disney Productions, Inc. v. Shannon, 276 S.E.2d 580 (Ga. 1981) (First Amendment barred liability against producer and broadcaster of television program where child sustained injuries while seeking to reproduce a sound effect demonstrated for children on "Mickey Mouse Club"). Cf. Winter v. G.P. Putnam's Sons, 938 F.2d 1033 (9th Cir. 1991) ("[g]uided by the First Amendment and the values embodied therein," id. at 1036, court held that mere negligence could not form the basis of liability against book publisher where mushroom enthusiasts became ill from eating mushrooms that the book had described as safe to eat).

52 See, e.g., American Booksellers Ass'n v. Hudnut, 771 F.2d 323, 328-29 (7th Cir. 1985) (statute permitting civil liability against producers of depictions of sexually explicit subordination of women is unconstitutional, even accepting the premises that "[m]en who see women depicted as subordinate are more likely to treat them so" and that people are likely to "act in accordance with the images and patterns" they find in such expression), aff'd mem., 475 U.S. 1001 (1986); Video Software Dealers Ass'n v. Webster, 968 F.2d 684 (8th Cir. 1992) (invalidating on constitutional grounds state statute prohibiting the sale or rental to minors of videos "depicting violence"); Eclipse Enterprises v. Gulotta, 942 F. Supp. 801 (E.D.N.Y. 1996) (invalidating on constitutional grounds local law criminalizing sale to minors of trading cards depicting a "heinous crime, an element of a heinous crime, or a heinous criminal"); Zamora v. CBS, 480 F. Supp. 199 (S.D. Fla. 1979) (First Amendment bars liability against television networks to recover damages where television violence allegedly caused viewer to become addicted and desensitized to violent behavior, resulting in his killing an 83-year-old woman). See also Watters v. TSR, Inc., 715 F. Supp. 819 (W.D. Ky. 1989) (First Amendment bars liability against manufacturer of "Dungeons and Dragons" game for failure to warn, where "mentally fragile" person committed suicide after having become consumed with the role-playing nature and fantasy of the game), aff'd on other grounds, 904 F.2d 378 (6th Cir. 1990). Cf. Winters v. New York, 333 U.S. 507, 519 (1948) (invalidating as unconstitutionally vague a criminal law that had been construed to prohibit circulation of publications depicting violence that "influence generally persons to commit crimes of violence against the person").

    The results of the First Amendment analysis do not change if these cases are alternatively viewed as involving implied advocacy of undesirable or unlawful conduct. For example, in Kingsley Int'l Pictures Corp. v. Regents of the Univ. of New York, 360 U.S. 684 (1959), the State refused to grant a license for exhibition of the film "Lady Chatterley's Lover," because that film allegedly "present[s] . . . adultery as a desirable, acceptable and proper pattern of behavior." Id. at 685. The Court characterized the State as having "prevent[ed] the exhibition of a motion picture because that picture advocates an idea -- that adultery under certain circumstances may be proper behavior." Id. at 688. Even ten years prior to Brandenburg, the Court held that the Constitution "protects advocacy of the opinion that adultery may sometimes be proper, no less than advocacy of socialism or the single tax." Id. at 689.

53 491 U.S. at 541. For example, although Florida Star strongly suggests that the government cannot impose "categorical prohibitions," id. at 539, on the dissemination of a prescribed type of information -- without regard to scienter, the reasonableness of the disclosure, the efficacy of the restriction, and the manner in which the State otherwise can prevent the information's disclosure -- the Court nevertheless implied in Florida Star that the First Amendment might permit liability under the common law tort of invasion of privacy for dissemination of true, lawfully obtained information, where the government has not facilitated the disclosure of the information, the information had not previously been publicized, a reasonable person would find the disclosure of the information "highly offensive," and some scienter requirement is satisfied. Id. at 538-40.

54 See also Oklahoma Pub. Co. v. District Court, 430 U.S. 308, 311-12 (1977) (per curiam); Nebraska Press Ass'n v. Stuart, 427 U.S. 539, 595-96 (1976) (Brennan, J., concurring):

    Much of the information that the Nebraska courts enjoined petitioners from publishing was already in the public domain, having been

    revealed in open court proceedings or through public documents. Our prior cases have foreclosed any serious contention that further

    disclosure of such information can be suppressed before publication or even punished after publication.

An infamous case in which this principle was put to the test involved the prior restraint imposed upon publication by the periodical

the Progressive of an article describing technical processes of thermonuclear weapons. See United States v. Progressive, Inc., 467 F. Supp. 990 (W.D. Wis.), rehearing denied, 486 F. Supp. 5 (W.D. Wis.), appeal dismissed, 610 F.2d 819 (7th Cir. 1979). While there is, to this day, substantial debate about whether the prior restraint violated the First Amendment, the district judge in that case acknowledged that such a restraint could be imposed, if at all, only because significant and dangerous information in the article was not "in the public realm." 467 F. Supp. at 993, 999. "[N]owhere in the public domain is there a correct description of the type of design used in United States thermonuclear weapons." Id. at 999. (The information at issue in that case had been classified as "Restricted Data," id. at 998, although the author of the article had not had access to any classified documents. See supra note 12 (discussing "Restricted Data" under the Atomic Energy Act).) The magazine moved for rehearing on the ground that the information was in fact in the public domain; but the district court once more found that the article "contains a comprehensive description of radiation coupling, along with [two] other . . . key concepts, that is not found in the public realm." 486 F. Supp. at 9. The plain import of the district court's decisions is that the prior restraint could not be imposed if the critical information were, in fact, "in the public realm." The government seemed to concede this point: During pendency of the Progressive's appeal of the prior restraint, the substance of the article was published in other journals, see L.A. Powe, Jr., The H-Bomb Injunction, 61 U. Colo. L. Rev. 55, 70 (1990), at which time the government moved for dismissal of the appeal, see 610 F.2d 819. Thereafter, the Progressive published the article, and the government never attempted to prosecute anyone for publication of the information after such information was in the public domain.

55 Brandenburg, 395 U.S. at 456 (Douglas, J., concurring).

56 A related principle is that generally applicable common-law causes of action typically will not offend the First Amendment in cases where they are applied to expressive conduct such as publication or broadcast. See, e.g., Cohen v. Cowles Media Co., 501 U.S. 663 (1991) (First Amendment does not bar liability for breach of contract where defendant newspaper published confidential source's name); Zacchini v. Scripps-Howard Broadcasting Co., 433 U.S. 562 (1977) (First Amendment does not bar liability for tort of unlawful appropriation of "right to publicity" where television station broadcast "human cannonball" act in its entirety). However, it should be noted that the First Amendment does impose significant limits on the use of a "generally applicable" cause of action where an element of that cause of action inevitably (or almost always) depends on the communicative impact of speech or expression. See, e.g., Hustler Magazine, Inc. v. Falwell, 485 U.S. 46 (1988) (First Amendment generally does not permit liability, under the generally applicable tort of intentional infliction of emotional distress, for publication of a parody of a public figure). See also Cohen, 501 U.S. at 671 (distinguishing Hustler).

57 See generally Greenawalt, Speech, Crime, supra note 20.

58 Accord United States v. Mendelsohn, 896 F.2d 1183, 1186 (9th Cir. 1990) ("No first amendment defense need be permitted when words are more than mere advocacy, `so close in time and purpose to a substantive evil as to become part of the crime itself.'") (citation omitted); United States v. Barnett, 667 F.2d 835, 842 (9th Cir. 1982) ("The first amendment does not provide a defense to a criminal charge simply because the actor uses words to carry out his illegal purpose. Crimes . . . frequently involve the use of speech as part of the criminal transaction."). This rationale applies, for instance, to conspiracies and other unlawful agreements. See Brown v. Hartlage, 456 U.S. 45, 55 (1982): "The fact that . . . an [unlawful] agreement necessarily takes the form of words does not confer upon it, or upon the underlying conduct, the constitutional immunities that the First Amendment extends to speech." See also United States v. Rowlee, 899 F.2d 1275, 1278 (2d Cir.) (First Amendment does not protect speech acts constituting an illegal conspiracy), cert. denied, 498 U.S. 828 (1990); United States v. Fleschner, 98 F.3d 155, 158-59 (4th Cir. 1996) (First Amendment does not protect speech acts in furtherance of an illegal conspiracy).

59 Accord Barnett, 667 F.2d at 842-43; United States v. Buttorff, 572 F.2d 619, 623-24 (8th Cir.), cert. denied, 437 U.S. 906 (1978).

60 See Greenawalt, Speech, Crime, supra note 20, at 85:

Much more commonly than people commit noncommunicative crimes "purely" by communication, they cooperate, by talking, in the

commission of crimes that involve noncommunicative acts. . . . The reasons of ordinary penal policy for covering communicative

to carry out ordinary crimes are obvious, and the criminal law sensibly draws no distinction between communicative and other acts.

Although assertions of fact generally fall within a principle of freedom of speech, what these sorts of factual statements

contribute to

    the general understanding of listeners is minimal, and the justifications from free speech that apply to speakers do not reach communications that are simply means to get a crime successfully committed.  The relevance of free speech is so slight in respect

    to such highly specific information related to an immediate practical purpose that it can be disregarded here.

[61] For cases recognizing this distinction, see, e.g., United States v. Johnson, 952 F.2d 565, 578 n.13 (1st Cir. 1991), cert. denied, 506 U.S. 816 (1992); Rowlee, 899 F.2d at 1279-80; Freeman, 761 F.2d at 552; Buttorff, 572 F.2d at 624 (defendants went "beyond mere advocacy:  they "explained how to avoid withholding"); People v. Bohmer, 120 Cal. Rptr. 136, 144 n.1 (Cal. Ct. App.), cert. denied, 423 U.S. 990 (1975).  See also Greenawalt, Speech, Crime, supra note 20, at 247 n.13.  In Freeman, for example, Justice (then Judge) Kennedy concluded that, because some of the counts of the indictment arguably were premised on the defendant's abstract advocacy of tax evasion, a Brandenburg-like jury instruction was appropriate for such counts.  Id. at 551-52.  But where the defendant directly counseled someone on how to file false tax returns, "a First Amendment defense is foreclosed even if the prosecution rests on words alone."  Id. at 552.  Conversely, advocacy of unlawful conduct is entitled to the protection of the Brandenburg test, which cannot be circumvented merely by labeling such advocacy as "aiding and abetting."  See, e.g., Gay Lesbian Bisexual Alliance v. Sessions, 917 F. Supp. 1548, 1556 (M.D. Ala. 1996).  See also Bond v. Floyd, 385 U.S. 116, 133 (1966).  In this regard, it is worth noting that the general federal aiding and abetting statute -- 18 U.S.C. § 2 -- punishes as a principal whoever "counsels" a federal offense.  See supra note 22.  We are not aware of any modern case in which culpability under § 2 was premised solely on "counseling" in the form of encouragement (or advocating that a crime be committed), without any actual aid or assistance to the principal.  Insofar as § 2 were construed to permit culpability in such a "pure" advocacy situation, it is likely -- at least absent special circumstances, such as implicit coercion or a fiduciary relationship between the pertinent parties -- that the prosecution would be required to satisfy the Brandenburg standards.  See also supra note 20.

[62] The district court in Rice v. Paladin, see supra at 27-28, thus erred in concluding that the Brandenburg standard applies to speech "which advocates or teaches lawless activity."  940 F. Supp. at 845 (emphasis added).  As we explain in the text, the constitutional analysis can differ quite a bit depending on whether a case involves the "advocacy" or the "teaching" of lawless activity.

[63] As Professor Emerson suggests, there may not always be a bright line between "advising" a group of persons that they should engage in criminal conduct and "teaching" that same group specific techniques that the teacher intends for the group to use in such crimes:  in particular factual circumstances, these are likely to be two points on a fluid continuum of conduct.  Whether a particular instance of teaching will fall outside the Brandenburg protections for advocacy likely will depend on the "explicitness and concreteness" of the teaching.  Scales, 367 U.S. at 253.  Teaching "in the abstract" the philosophical or political beliefs of a certain author is constitutionally protected, see id. at 252 n.27; while, on the other end of the scale, instruction on how to use a pencil to kill a person in the case of an uprising, see id. at 250-51, is not protected (at least insofar as the teacher intends for the students to make use of such a technique).  Somewhere in the middle are cases having aspects both of advocacy and of "teaching."  For instance, exhorting a crowd of young men to "avoid the draft by feigning insanity (or burning your draft cards)" in some sense "teaches" the audience a method of unlawful conduct; but it does not really provide the audience any information it does not already know, and thus probably should more appropriately be viewed as a form of advocacy entitled to some constitutional solicitude (albeit not as much as that to which "pure" advocacy is entitled).

[64] See also Gorin v. United States, 312 U.S. 19, 27-28 (1941) (in order to avoid a serious constitutional question, Court construes "intent" requirement in espionage statute dealing with dissemination of information to "require[] those prosecuted to have acted in bad faith") (emphasis added).

[65] Perhaps the First Amendment would impose a requirement that there be some realistic risk that the crime will occur.  For example, if the information is conveyed to persons who would not under any circumstances use it for unlawful ends, the threat of danger is so remote that the speech arguably should not be punished regardless of bad intent.  Courts might find, for example, that culpability can attach only where the defendant both intended and had reason to believe that the information could or would be unlawfully used.  Cf. United States v. Dworken, 855 F.2d 12, 19 & n.6 (1st Cir. 1988).

[66] It is important once again to distinguish training with bad intent from advocacy with bad intent.  Though a purpose to facilitate a crime is sufficient to permit punishment of the former, such a bad purpose is necessary but not sufficient when it comes to restrictions on pure advocacy; in the latter case, Brandenburg imposes the additional requirements (i) that the speech be directed to inciting imminent crime, and (ii) that such imminent wrongdoing is likely to occur, in fact.

[67] For example, the cases where a private party has sought to impose tort liability on the basis of "negligent" or "reckless" publication or broadcast, see supra at 31-33 & notes 50-53, have not involved situations where the publisher or broadcaster had the purpose of fomenting criminal conduct.  Such intent is present in aiding-and-abetting and conspiracy cases, but in those cases, the person providing the information is, in a much more direct sense, actually participating with the recipient of the information in the performance of an illegal act.

The precedents that come closest to the situation described in the text are the aiding-and-abetting decisions in Buttorff and Barnett.  See supra note 24.  In Buttorff, the court of appeals rejected a First Amendment argument where the "joint participation" consisted of tax-evasion instructions that defendants provided at "large public gatherings," presumably to persons they did not personally meet.  572 F.2d at 622-23.  In Barnett, a First Amendment argument was rejected (albeit in the context of determining whether there was probable cause for a warrant to search premises) where the only contact between the accomplice and the principal was that the latter received from the former mail-order instructions for the manufacture of phencyclidine, along with the name of a "reliable" chemical supplier, in exchange for the $10 purchase price.  667 F.2d at 840.  As explained in note 24, supra, there is some question whether aiding and abetting can be established by virtue of arms-length transactions such as those in Buttorff and (especially) Barnett.  But that is quite a different question than whether the Constitution would bar such culpability.  Insofar as those cases hold that there is no First Amendment defense for transmission of information with the intent to facilitate crimes, they are consistent with the conclusion we reach in the text above.

[68] The recent case of United States v. Aguilar, 115 S. Ct. 2357 (1995), provides further support for permitting prohibition of improperly motivated publication of dangerous instructional information.  The defendant in that case urged a narrow construction of a statute banning disclosure of wiretap authorizations, on the ground that a broad reading of the statute would threaten to violate the principle that "the government may not generally restrict individuals from disclosing information that lawfully comes into their hands in the absence of a `state interest of the highest order.'"  Id. at 2365 (quoting Smith, 443 U.S. at 103).  The Court, while endorsing that basic principle, nonetheless rejected defendants' argument, in part on the ground that "the statute here in question does not impose such a restriction generally, but only upon those who disclose wiretap information `in order to [ob]struct, impede, or prevent'" a wiretap interception. Id. (quoting 18 U.S.C.
§ 2232(c)).

There are many other contexts, as well, in which First Amendment protection depends upon whether a speaker has some "bad" intent, rather than on the degree of harm that the speech might cause.  For example, advocacy of unlawful action will be treated very differently under Brandenburg depending on whether it is "directed to" inciting imminent unlawful conduct, even though such a bad intent does not ordinarily increase the threat to public safety.  Similarly, under the earlier Smith Act cases, the Court, in order to avoid serious constitutional questions, strained to construe the Act to require bad intent, even though such intent should not have been relevant if, as the Court insisted, the touchstone for constitutional analysis was the risk of a "clear and present danger."  See, e.g., Scales, 367 U.S. at 221-22, 229-30; Dennis, 341 U.S. at 499-500 (plurality opinion).  See alsoid. at 516 (defendants' intent and their "power to bring about the evil" were separate necessary elements of the offense).  And, most famously, the First Amendment prohibits imposition of liability for publication of a false and defamatory statement about a public figure, unless the publisher acts with "actual malice," i.e., with knowledge that the statement was false or with reckless disregard of whether it was false or not. See, e.g., Masson v. New Yorker Magazine, Inc., 501 U.S. 496, 510 (1991); New York Times Co. v. Sullivan, 376 U.S. 254, 279-80 (1964).  Similarly, the Court in Florida Star suggested that, whereas the categorical prohibition on the publication of rape victims' names at issue in that case was unconstitutional, the constitutional calculus might be different if the statute included a scienter requirement.  491 U.S. at 539.

[69] See Greenawalt, Speech, Crime, supra note 20, at 273:  "The constitutional standard here should be that a person intend that the crime be committed and that it be reasonably likely that it will be committed in the `near future.'"  See also supra note 65.

[70] See 141 Cong. Rec. S7683 (daily ed. June 5, 1995) (statement of Sen. Feinstein) (describing instructions from the Terrorist Handbook for construction of items -- such as "toilet paper roll booby traps" and "baby food bombs" --- the sole purpose for which allegedly is "to kill somebody").  Cf. Posters 'n' Things, Ltd. v. United States, 511 U.S. 513, 521 & n.11 (1994) (construing statutory prohibition on sale of items "primarily intende. . . for use" with drugs to cover "multiple-use" items for which the "likely use" by "customers generally" is drug-related).

[71] In a civil case, on the other hand, Professor Greenawalt's concern about constraining juries' discretion would be more directly implicated, but the First Amendment should be no bar where an improper intent is proved by clear and convincing evidence. See, e.g., Masson, 501 U.S. at 510; Gertz v. Robert Welch, Inc., 418 U.S. 323, 342 (1974).  In Rice v. Paladin itself, the publishers of Hit Man had no specific knowledge that they had sold the book to particular persons who planned to commit a crime.  Therefore, for reasons

discussed in this Report, the First Amendment would permit liability to attach only if defendants had the requisite "intent" that Hit Man be used to facilitate crimes.  For purposes of summary judgment, defendants stipulated that they "intended" that "their publications would be used, upon receipt, by criminals and would-be criminals to plan and execute the crime of murder for hire, in the manner set forth in the publications."  Joint Statement of Facts ¶ 4b (referenced at 940 F. Supp. at 840).  That concession would, for purposes of summary judgment, seem to foreclose a constitutional defense, except for the fact that defendants argued (in their briefs) that all they meant by this stipulation of "intent" was that they "knew" the information contained in Hit Man would be read and used by an audience that includes criminals.  See Memorandum of Points and Authorities in Support of Defendant Paladin Enterprises, Inc.'s Motion for Summary Judgment, at 14; Reply Memorandum of Points and Authorities in Support of Defendant Paladin Enterprises, Inc.'s Motion for Summary Judgment, at 14-15.  In other words, defendants argued that they had stipulated to "intent" only in the sense that that concept is understood in the civil tort context:  i.e., one "intends" the natural consequences of one's acts.  Accordingly, defendants argued, they only "intended" that Hit Man would be used for unlawful purposes in the same way that Stephen King "intends" his novels will be used for unlawful purposes:  in both cases, the publisher allegedly "knows" that publication likely will "produce" unlawful conduct by some, unknown, reader or readers.  Reply Memorandum of Points and Authorities in Support of Defendant Paladin Enterprises, Inc.'s Motion for Summary Judgment, at 15.  As we have explained in this memorandum, the First Amendment does not permit a publisher of factual information to be subject to liability merely on the basis of this type of "intent."  See supra at 30-34.  Invoking this principle, the district court in Rice granted Paladin's motion for summary judgment, but only because the court accepted Paladin's representation that the stipulation of "intent" meant only that Paladin "knew" that some readers would misuse the book's information.  940 F. Supp. at 846.

However, even assuming arguendo that the defendants' own construction of the "intent" stipulation were correct, that still would not justify the grant of summary judgment, since it would leave unanswered the question whether Paladin also had the specific purpose of facilitating murder.  Paladin stipulated (for purposes of summary judgment) that it engaged in a marketing strategy intended to maximize sales to the public, including to "criminals and would-be criminals who desire information and instructions on how to commit crimes."  As we explain in the text, if Paladin in effect encourages unlawful use of its product so that it can increase its profits -- for instance, if Hit Man is "offered for sale in such a mode as purposely to attract purchasers who want[] [it] for the unlawful [use]," Danovitz, 281 U.S. at 397 -- or if there is other evidence that Paladin publishes Hit Man with the actual purpose of furthering criminal conduct, the publisher might be found to have sold Hit Man for the purpose of facilitating murder.  If the finder of fact determined that that "intent" was proved by clear and convincing evidence, the First Amendment should not bar liability.  We also should note, however, that, wholly apart from the First Amendment question, it is not clear whether the plaintiffs in Rice alleged a cognizable "aiding and abetting" tort claim under Maryland law, a question that we have no occasion to address.  But see supra note 24 (discussing whether, under federal criminal law, aiding and abetting can be established by virtue of arms-length transactions with anonymous purchasers).

[72] See also Ariz. Rev. Stat. Ann. § 13-1004 (1996); Ky. Rev. Stat. Ann. § 506.080 (Baldwin 1996); N.D. Cent. Code § 12.1-06-02 (1995).

[73] As far as we can tell, there are no published opinions concerning the use of such statutes to prosecute facilitation committed by way of conveying information, nor have such statutes ever been the subject of a First Amendment challenge.

[74] Similar prohibitions using a "reasonable cause to believe that the product will be unlawfully used" standard are found in statutes dealing with chemicals and equipment that can be used to produce controlled substances.  See, e.g., 21 U.S.C. §§ 841(d)(2) (distribution of chemicals), 843(a)(7) (distribution and export of chemicals, equipment, and other products), 960(d)(3),(4) (export of chemicals).

[75] See supra note 50 (quoting Greenawalt, Speech, Crime, supra note 20, at 284-85).

[76] See also, e.g., United States v. Hayden, 64 F.3d 126, 133 (3d Cir. 1995) (citing United States v. Caminos, 770 F.2d 361, 365-66 (3d Cir. 1985)); United States v. Honeycutt, 8 F.3d 785, 787 (11th Cir. 1993), cert. denied, 511 U.S. 1024 (1994); United States v. Feroz, 848 F.2d 359, 360 (2d Cir. 1988); United States v. Corral-Martinez, 592 F.2d 263, 269-70 (5th Cir. 1979).  This standard is derived from § 2.02(7) of the Model Penal Code:

When knowledge of the existence of a particular fact is an element of an offense, such knowledge is established if a person is aware of a
high probability of its existence, unless he actually believes that it does not exist.

The Ninth Circuit recently held that the § 2.02(7) "aware of a high probability" standard is appropriate "only in situations where the evidence justifies an argument of willful blindness," and that absent a willful blindness situation the government must prove that the defendant had "actual knowledge or awareness" of the existence of the fact constituting an element of an offense.  United States v. Aguilar, 80 F.3d 329, 332 (9th Cir. 1996) (en banc).  We take issue with this holding.  The Model Penal Code definition of "knowledge" conforms to the common understanding of knowledge, and that definition should be used regardless of whether a case involves an issue of "willful blindness."  See Jonathan L. Marcus, Note, Model Penal Code Section 2.02(7) and Willful Blindness, 102 Yale L.J. 2231 (1993).  To require that a criminal defendant achieve certainty before he can be said to "know" an operative fact would preclude conviction in virtually any case in which a defendant has committed an offense in reliance on information supplied by others.  But most of what we "know" as historical fact has been related to us orally or in writing.  Indeed, as Justice (then Judge) Kennedy explained in a case involving a related question:

> [W]e commonly act on less than complete information and in this world may never know one-hundred-percent certainty.
> "`Absolute
> knowledge can be had of very few things,' said the Massachusetts court, and the philosopher might add `if any.'  For most practical
> purposes, "knowledge" `is not confined to what we have personally observed or to what we have evolved by our own cognitive faculties.'"

United States v. Jewell, 532 F.2d 697, 706 n.6 (Kennedy, J., dissenting) (9th Cir.) (quoting Rollin M. Perkins, Criminal Law 775 (2d ed. 1969) (internal citations omitted)), cert. denied, 426 U.S. 951 (1976).

[77] See, e.g., Leary, 395 U.S. at 47 (defendant's "knowledge" that marijuana was imported can be established if supplier told defendant the source of the drugs).

[78] For example, persons who, with no bad intent, post information to certain Usenet newsgroups on the Internet may have reason to know that a certain subscriber to that service often expresses intense hatred of the government.  While it is uncertain whether a fact-finder would conclude that such knowledge constitutes "reasonable cause to believe that [that subscriber] will use such information for, or in furtherance of," a crime, the chill caused by the risk of such a finding would raise significant First Amendment questions, because, unless there were a way to prevent access to the suspicious person, the content-provider might have little choice but to cease her "postings" altogether.  Similarly, a person demonstrating the proper use of explosives to a classroom full of well-intentioned students (or purchasers of the product) may sense that a particular student seems suspicious, or may discover that one listener asks questions that might subtly suggest an improper motive for wanting to learn the techniques in question.  The possible application of a facilitation prohibition to such a case might well cause the teacher to cease instruction (or, at the very least, exclude the suspicious-looking persons, where that is feasible).  Because of this possibility, courts might be more inclined to question the constitutionality of the prohibition.

[79] Moreover, as Professor Greenawalt argues, it is unlikely that the First Amendment would permit criminal culpability to attach on a "facilitation" theory absent the speaker's knowledge of a substantial risk that the communication will facilitate a crime:

> My own sense is that a legislature may appropriately accept whatever curtailment of expression is involved in a prohibition on facilitation that the actor believes is likely . . . .  However, a principle of free speech provides a powerful reason why liability should not
> extend to all negligent or reckless acts of communication, that is, to situations where the speaker is wholly unaware of the use to be
> made of what he says or thinks there is only some modest risk it will be used for a criminal purpose.

Greenawalt, Speech, Crime, supra note 20, at 87.

[80] In order to be sustained under the First Amendment, the "intent" scienter requirement in this prohibition must be understood to refer to cases where the person disseminating the information has a "conscious purpose" that it be used unlawfully, or (at the very least) a material stake in seeing that it be used for such purposes.  "Intent" should not be construed to encompass cases where criminal activity is not in fact the intended result, but is merely a "foreseeable" result, or a "natural consequence," of the publication of the information in question. See supra at 30-34, 40.

[81] In order to avoid a chilling effect on protected speech, courts might construe such a prohibition as limited to cases where it is reasonably likely that the information will in fact facilitate such criminal conduct.  See supra at 43 & note 69.


Return to . . .  **CCIPS home page**  ‖  **Justice Department home page**

---

*Updated page March 22, 1999*
*usdoj-crm/mis/mdf*

---

# Exhibit E

Print :: Workspace Webmail                                                                                          1/28/15, 3:25 PM

# Re: MTAC PDWG White Paper

**Matthew Goldstein** [matthew@goldsteinpllc.com]

**Sent:** 9/11/2014 5:34 PM

**To:**  HandelmanKB@state.gov, "CenturyLink Customer" <gssevier@q.com>

**Cc:**  PeartreeCE@state.gov, Kevin.Wolf@bis.doc.gov, "Alexander Lopes" <Alexander.Lopes@bis.doc.gov>, "Kimberly Orr"
        <Kimberly.Orr@bis.doc.gov>, "Bruce Ruscio" <bar49@cox.net>, HeidemaSJ@state.gov, "Clara J. Zahradnik"
        <Clara.J.Zahradnik@dupont.com>, "Manger, Dave" <DManger@toraycompam.com>, Thomas.L.May@boeing.com

---

Attached please find the relevant DOJ memos.

Thanks.

-Matt


Matthew A. Goldstein | Counsel
1012 14th Street, NW, Suite 620
Washington, DC 20005
C: +1.202.550.0040
www.GoldsteinPLLC.com

This message may contain information that is privileged and/or confidential. As such, it is solely intended for disclosure to the
recipient named above. Access by anyone other than the intended recipient is unauthorized. If you have received this electronic
transmission in error, please immediately reply that you have received the message and delete the message. Note that if you are
not the intended recipient, any copying, disclosure, distribution, or other unauthorized use of the information contained in this
message is prohibited and may be unlawful. Thank you.

---

**Attachments:**    DOJ Ltr PD State First Amendment 1978 (Harmon Letter).pdf

                                                                                        DOJ Ltr PD State First Amendment 1984.pdf

   DOJ PD EAR Opinion 1981.pdf      DOJ PD State First Amendment 1981.pdf
   ART DOJ PD AEDPA Report First Amendment 1997.pdf

---

Copyright © 2003-2015. All rights reserved.

# Exhibit F

Certain browser plug-ins or extensions, such as Grammarly, may interfere with submitting comments on the comment form. If you have issues, please disable browser plugins and extensions and try submitting your comment again. If you need additional assistance, please contact the Help Desk at 1-877-378-5457.



# Amendment to the International Traffic in Arms Regulations: Revision of U.S. Munitions List Categories I, II, and III

**Docket Folder Summary**      📩 **View all documents and comments in this Docket**

**Docket ID:** DOS-2017-0046
**Agency:** U.S. Department of State (DOS)

## Summary:

This rule will revise Categories I, II, and III of the United States Munitions List to include those items that provide the United States with a critical military or intelligence advantage or otherwise warrant control at the highest level. Removed from Category I and III are commercially available firearms and ammunition, which in most cases are available for purchase at retail establishments across the United States and around the world. The firearms and ammunition, as well as other items, removed from the United States Munitions List, will continue to be controlled for export under the Commerce Control List of the Bureau of Industry and Security at the Department of Commerce. Transition from control under the United States Munitions List to the Commerce Control List will result in a net reduction in regulatory burden for the affected manufacturing and export community. Under the International Traffic in Arms Regulations, U.S. manufacturers and exporters of defense articles on the United States Munitions List are required to register with the Department of State's Directorate of Defense Trade Controls and pay an annual registration fee. Under the Export Administration Regulations, there is no comparable registration requirement or fee for items on the Commerce Control List. Therefore manufacturers and exporters of only items transitioned from the United States Munitions List to the Commerce Control List, such as most commercially available firearms and ammunition, will no longer be required to register or pay a fee as part of compliance with U.S. export controls.

**RIN:** 1400-AE30

**CFR Citation:** None

+ View More UA and Regulatory Plan Information and Docket Details

**Priority:** Other Significant

**Major Rule:** No

**Legal Authorities:** 2778

**Legal Deadlines:** None

**Government Levels Affected:** Federal

**Applicable:**

**Agenda Stage:** Spring 2018

**Implications:** No

**Unfunded Mandates:** No

**Regulatory Flexibility Analysis:** No

**Affected:** Business

**International Impacts:** Yes

**Energy Effects:** No

---

Take a Tour!

🔔 **Sign up for Email Alerts**

### 3,181
**Comments Received** *

## Regulatory Timeline

**Pre Rule**

**Proposed Rule**
Current Stage

**Final Rule**

## Agency Contact

**Robert Monjay**
*DOS*

monjayr@state.gov
202 663-2817

**Included in Regulatory Plan:** No

Washington, DC

Washington, DC

## Primary Documents
**Timetable**    <u>View All</u>  (1)

| Action | Date | FR Citation |
|--------|------|-------------|
| NPRM | 06/00/2018 | |

## Docket Details ℹ️

**Related RINs:** None
**Related Dockets:** None
**Organization:** Department of State
**Category:** Public Notices - None Rule Related

**Keyword(s):** DOSAR, 60 Day Information Collection, Counsular Affairs, African Affairs, 30 Day Information Collection, Aliens, Arms Export, Counterterrorism, Arms Control
**Type:** Rulemaking
**Subtype:** Political-Military Affairs

<u>International Traffic in Arms Regulations: U.S. Munitions List Categories I, II, and III</u>

**Proposed Rule**
**Posted:** 05/24/2018
**ID:** DOS-2017-0046-0001

Comment Period Closed

Jul 09, 2018 11:59 PM ET

*This count refers to the total comment/submissions received on this *docket*, as of 11:59 PM yesterday. Note: Agencies review all submissions, however some agencies may choose to redact, or withhold, certain submissions (or portions thereof) such as those containing private or proprietary information, inappropriate language, or duplicate/near duplicate examples of a mass-mail campaign. This can result in discrepancies between this count and those displayed when conducting searches on the Public Submission document type. For specific information about an agency's public submission policy, refer to its website or the Federal Register document.

## Supporting Documents

*No documents available.*

## Comments    <u>View All</u>  (3,181)

*I am opposed to loosening regulations related to the export of firearms. This is so dangerous, who could be for this, except those who are in the gun..."*
<u>View Comment</u>
**Submitter Name:** Fran Carroll
**Posted:** 07/10/2018
**ID:** DOS-2017-0046-3154

*I oppose transferring regulation of firearms
exports from the State Dept to the Commerce
Dept. The political and humanitarian
consequences of arms sales are far..."*

<u>View Comment</u>
**Submitter Name:** Ann Grover
**Posted:** 07/10/2018
**ID:** DOS-2017-0046-3164

---

*The US arms makers are a major source of small
arms originally designed for and supplied to our
military. Since 1970 or so they have hit the
civilian market in..."*

<u>View Comment</u>
**Submitter Name:** Anonymous Anonymous
**Posted:** 07/10/2018
**ID:** DOS-2017-0046-2985

---

*See attached file(s)"* 📎

<u>View Comment</u>
**Submitter Name:** Michael Faucette
**Posted:** 07/10/2018
**ID:** DOS-2017-0046-3078

---

*I am against this rule. It would make the U.S. and
the world a more dangerous place."*

<u>View Comment</u>
**Submitter Name:** Amy Thompson
**Posted:** 07/10/2018
**ID:** DOS-2017-0046-3165

# Exhibit G

DOW JONES, A NEWS CORP COMPANY

-0.18% ▼          0.06% ▲          2.971% ▲          -3.41% ▼          0.12% ▲

U.S.

# White House Efforts to Relax Gun Exports Face Resistance

*By Adam Entous And Evan Perez*
Updated May 1, 2012 9:57 p.m. ET

U.S. homeland-security and law-enforcement agencies have objected to Obama administration proposals to relax export restrictions on high-powered firearms, threatening a centerpiece of the president's trade and national-security agenda.

**TO READ THE FULL STORY**

SUBSCRIBE

SIGN IN

THE WALL STREET JOURNAL.

Continue reading your article with a WSJ membership

$12 FOR 12 WEEKS

VIEW MEMBERSHIP OPTIONS

http://online.wsj.com/article/SB10001424052702304868004577378421787264242.html

White House Efforts to Relax Gun Exports Face Resistance
**Article**
**Video**
**Comments (94)**

MORE IN US »

● ARTICLE FREE PASS
Enjoy your free sample of exclusive subscriber content.
GET ALL OF WSJ.COM: SUBSCRIBE NOW - GET 4 WEEKS FREE

smaller
Larger

By ADAM ENTOUS And EVAN PEREZ



Homeland Security and Justice Department officials are privately objecting to elements of a loosening of export controls that President Obama has proposed as a way to boost exports and generate jobs. Adam Entous has details on The News Hub. Photo: AP.

U.S. homeland-security and law-enforcement agencies have objected to Obama administration proposals to relax export restrictions on high-powered firearms, threatening a centerpiece of the president's trade and national-security agenda.

The agencies, in internal memos viewed by The Wall Street Journal, warn the changes could help arm drug cartels and terrorists and make it harder for the U.S. to crack down on gun-trafficking.

The arms proposal is part of a broader overhaul of U.S. export rules sought by Mr. Obama, with the goal of helping domestic manufacturers compete in global markets, as well as improving U.S. national security by focusing controls on higher-risk items and

enhancing the capabilities of allies.

Enlarge Image



Close

Mr. Obama has said he wants to double U.S. exports of all types by the end of 2014, a policy push that also includes bilateral free-trade agreements and a plan to reorganize government agencies that promote trade.

The proposed changes to weapons now subject to strict export regulation would cover a range of goods from firearms to drones, satellites and tanks, as well as civilian equipment with military uses.

Foreign sales of all U.S.-made weapons topped $34 billion last year, according to the Pentagon. That doesn't include such restricted items as high-performance computers and electronics.

Industry officials said the relaxation of export controls could help domestic arms makers and other firms boost sales by tens of billions of dollars.

Objections by some security agencies, along with congressional skepticism, could diminish chances that Mr. Obama can secure these changes, especially in an election year, according to people familiar with the matter.

The strongest objections were raised by the Homeland Security Department. In a recent internal memorandum to the White House and government agencies, the department said the proposed changes risked hindering the ability of its immigration and customs agents "to prevent or deter the illegal export/transfer of lethal items such as advanced firearms to criminal groups, terrorist organizations, or enemy combatants."

The memo added: "This increased likelihood of the illegal export of lethal advanced firearms may put U.S. military, law enforcement or civilian personnel at increased risk."

Similar objections have been raised by the Justice Department and intelligence officials, according to documents and officials familiar with the matter.

Some law-enforcement and intelligence officials say the proposals could invite a sequel to "Fast and Furious," a gun-trafficking enforcement program in which federal agents allowed suspected smugglers to buy about 2,000 firearms, hoping they would lead agents to smuggling bosses. Many of the weapons ended up at crime scenes along the U.S.-Mexico border, triggering a congressional probe.

Behind the current dispute are proposals from the State and Commerce departments that would ease the way for sales of semi-automatic firearms of up to .50 caliber to 36 countries deemed "trusted parties," said officials briefed on the matter. These include North Atlantic Treaty Organization members such as the U.K. and Turkey, as well as non-NATO allies in Latin America and Asia.

An Obama administration official said the rules were a work in progress and concerns raised by government agencies were "being addressed." The official said the effort was designed to enhance security by relaxing regulations for civilian equipment with military

applications deemed safe for export, while "bolstering enforcement" and oversight of defense equipment that pose a more serious threat.

The overhaul of U.S. export controls is a long-standing goal. Former presidents Bill Clinton and George W. Bush made it a top priority. In 2010, then-Defense Secretary Robert Gates called U.S. restrictions a "Byzantine amalgam of authorities, roles and missions scattered around different parts of the federal government."

Weapons subject to stiff restrictions appear on a so-called Munitions List, run by the State Department, and require all parties in a proposed transaction to register with the U.S. They must be licensed sales with tracking required to ensure the arms are only used as intended, officials and experts say.

Under the proposed rules, close-assault weapons, sniper rifles, combat shotguns and ammunition would be moved from the "strict controls" of the Munitions List to a "lesser controlled" Commerce list, according to a Homeland Security memo.

On the Commerce list, certain firearms could be exported, and re-exported, among 36 eligible countries, in some cases without advance U.S. approval, according to documents and congressional officials briefed on the proposals. Critics say the weapons would have less stringent disclosure and tracking rules, along with broad exceptions from license requirements.

The proposed changes worry lawmakers in both parties, aides say. Rep. Ileana Ros-Lehtinen, (R., Fla.), who leads the House Foreign Affairs Committee, which oversees this area, said the changes would "create vulnerabilities that will likely be exploited by rogue exporters, front companies, foreign intelligence services and extremists."

The administration official said the White House was consulting regularly with Congress.

Industry groups have long complained about export rules and have pressed successive administrations for changes. Many say law-enforcement concerns are overblown because security protections would be built into the new rules.

Lawrence Keane, general counsel for the National Shooting Sports Foundation, said the current system was anticompetitive and cost U.S. jobs. Mr. Keane, whose group represents firearms manufacturers, sits on an advisory committee helping draft the new rules.

U.S. manufacturers exported 195,000 firearms in 2009, the most recent year the federal government has statistics. That is down from 1993, the last peak, when more than 431,000 were exported. Imports spiked to 2.8 million firearms in 2009, from about 892,000 a decade earlier.

Remy Nathan, vice president for the Aerospace Industries Association, a trade group that also supports the initiative, said foreign markets are increasingly important to defense

companies as the Pentagon cuts spending.

Homeland Security warned in its memo that many eligible countries in Europe have "considerable government corruption, significant underground economies and no border controls for exports allowing these countries to serve as transshipment points for diversion of small arms and light weapons." No country was named.

Under the proposed rules, the memo said, the job of investigating suspicious exports would shift from the U.S. to countries importing the equipment. The department said the ability of U.S. customs and border agents to enforce proposed regulations would be "severely weakened or nonexistent," creating loopholes for traffickers.

A separate March 2012 Justice Department memo, also reviewed by The Wall Street Journal, cautioned against making any changes that could undermine the authorities of the Bureau of Alcohol, Tobacco, Firearms and Explosives to block weapons sales to countries subject to U.S. embargoes.

A Homeland Security official sought to play down the objections raised in the memo, saying the agency "strongly supports the president's export control reform initiative" and was "confident that consensus will be reached."

# Exhibit H

ISSN 0276-8275

WTTLonline.com

# Washington Tariff & Trade Letter®

A Weekly Report for Business Executives on U.S. Trade Policies, Negotiations, Legislation, Trade Laws and Export Controls

Editor & Publisher: Samuel M. Gilston • P.O. Box 5325, Rockville, MD 20848-5325 • Phone: 301.570.4544 Fax: 301.570.4545

**Vol. 35, No. 18**        **May 4, 2015**

## Administration Ready to Move on USML Categories I, II, III

After more than a two-year delay, the Obama administration reportedly is ready to try again to propose transfer regulations for U.S. Munitions List (USML) Categories I (firearms), II (guns and armament) and III (ammunition).  The decision to go forward with proposals to revamp the three categories and move some products to the Commerce Control List (CCL) was reportedly made at an interagency meeting the week of April 20.

According to sources, the proposals will be nearly identical to draft versions that were ready for publication in December 2012 but pulled back after the tragic shootings at the Newtown, Conn., elementary school.  The White House sidelined the proposals because of concern that they might face criticism as the administration launched an effort to tighten gun controls in the wake of the killing of 20 children and six teachers and staff at the school.

Administration officials are expected to brief stakeholders on the proposals before they are published in the Federal Register.  After the proposal and comment period, it may be a year before a final rule is issued.  In March, State and Commerce officials calmed industry fears about rumors that they were considering a reversal of reforms by moving some CCL rifles and scopes to the USML (see **WTTL**, March 30, page 3).

With the planned publication of reform proposals for USML Category XII (optical range finders) the week of May 4 and the coming publication of changes to Category XIV (toxins), categories I, II and III were the last major rules needed to complete the cornerstone of export control reform and the effort to convert the USML into a positive list and move thousands of items from the USML to the CCL (see related story page 2).

## Nose Counting on Fast-Track Legislation Intensifies

Both supporters and opponents of fast-track trade promotion authority (TPA) are keeping the number of votes they have in the House and Senate on the legislation close to their vests to avoid losing votes from members who think their vote won't count.  Every vote will count.  In the House, the vote is likely to be as close as the one for U.S.-Central America Free Trade Agreement (U.S.-CAFTA), which passed by only a two-vote margin in 2005.  The expected tight vote in the House is one reason the Senate may vote first on

© Copyright 2015 Gilston-Kalin Communications LLC. All rights reserved.  Reproduction, photocopying or redistribution in any form without written approval of publisher is prohibited by law.

WTTL is published weekly 50 times a year except last week in August and December. Subscriptions are $697 a year. Additional subscriptions with full-priced subscriptions are $100 each.  Site and corporate licenses also available.

# Exhibit I





| Home | About | Archives | Terms of Use | Contact |

**EXPORTLAW BLOG**

### Aug 1



# Federal Court Incorrectly Says DDTC Jumped the Gun on Gun Printing Plans

Posted by Clif Burns at 1:29 pm on August 1, 2018
Category: Arms Export • BIS • DDTC • USML



Just hours before Defense Distributed, pursuant to a Settlement Agreement with the Department of State's Directorate of Defense Trade Controls, planned to upload plans to allow anyone who can afford a 3-D printer to make their own plastic guns, a federal district court in Seattle entered a temporary restraining order prohibiting the uploading of those plans. The temporary restraining order was entered at the request of attorneys general from eight states and the District of Columbia. In entering the order, the court stated that the plaintiffs were likely to prevail on the merits for two reasons — both, frankly, fairly questionable.

The first reason the court thought that plaintiffs would likely prevail is that, in the court's view, the Settlement Agreement effectively removed items from the United States Munitions List ("USML") without the prior thirty-day notice to Congress as required by section 38(f) of the Arms Export Control Act, 22 U.S.C. § 2278(f). As you probably recall, DDTC and BIS so far have only issued proposed rules. As noted early on in the export control process, State and Commerce indicated that they would provide the section 38(f) notices to Congress 30 days prior to publishing the final rule. ==At this point, only the proposed rules have been issued and the comment period ended on July 9, so it is likely that no section 38(f) notices have been sent to Congress as the court states. Certainly they would not have been sent thirty days prior to the execution of the Settlement Agreement on June 29 as the Court said should have been done.==

The problem with this argument is that the Settlement Agreement did not remove Category I (or any other) items from the USML. The Settlement Agreement is quite clear that DDTC was not removing anything from the list but, rather, was granting an exemption under ITAR section 125.4(b)(13). Under that section, an export of technical data does not require a license if that data has been "approved for public release" by DDTC. All that DDTC did in the Settlement Agreement was approve public release of specified Defense Distributed plans making their export eligible for the exemption in section 125.4(b)(13). ==Nothing has been removed from the USML by the Settlement Agreement, and, thus, no section 38(f) notice was required as a result of the Settlement Agreement.==

## Search Site

Google Cust

## Links

DDTC
BIS
OFAC
Foreign Trade Division
SIA
Export Practitioner
ABA Export Controls & Economic Sanctions Committee

## Resources

Get Global Presentation
ITAR
EAR
SDN List
Entity List
Debarred List

## Categories

Agricultural Exports
Anti-Boycott
Armenia
Arms Export
BIS
Burma Sanctions
CCL



ExportLawBlog » Federal Judge Bars 3-D Gun Files Until the Whole Country Plan...

Case 2:18-cv-01115-RSL Document 48-1 Filed 08/09/18 Page 111 of 111

8/9/18, 7:04 AM

The other reason relied on by the district court in temporarily blocking the Settlement Agreement was the requirement in Executive Order 11958 that any removal of any item from the USML by DDTC would need the concurrence of the Department of Defense. The court stated:

> *When the President delegated his authority under the AECA to the Secretary of State, he also imposed a requirement that any changes in designations of defense articles and defense services subject to export control had to have the concurrence of the Secretary of Defense. There is no indication that the federal government followed the prescribed procedures*

Apparently, the district court had not bothered to read the initial notice from the Department of Commerce on the proposed removal of Category I firearms from the United States Munitions List to the Commerce Control List. That notice clearly states:

> *The changes described in this proposed rule and in the State Department's companion proposed rule on Categories I, II, and III of the USML are based on a review of those categories by the Department of Defense, which worked with the Departments of State and Commerce in preparing the amendments.*

Oops. So even if the Settlement Agreement effectively removed certain Article I items from the USML, which it did not, the DOD had already agreed to that prior to the publication of the initial notices proposing removal of those items.

The problem here is that if states or the federal government want to regulate 3-D gun plans, the export laws are not the way to do it because the policy driving these decisions has nothing to do with exports at all but rather with purely domestic considerations such as detectability and traceability. The states attorneys general presumably don't really care whether these gun plans and the plastic guns made from them wreak havoc in Croatia; they are worried about the consequences right at home in their own states. Moreover, there is already a law on the books — the Undetectable Firearms Act of 1988, 18 U.S.C. § 922(p) — which makes it illegal to manufacture undetectable weapons. So, rather than try to shoehorn these issues into the Arms Export Control Act, lawmakers and officials should confront any issues with these plans directly.

G+ ⬇Permalink

SHARE ...

Copyright © 2018 Clif Burns. All Rights Reserved.
*(No republication, syndication or use permitted without my consent.)*

## Leave a Reply

| Name (required) |

| Mail (will not be published) (required) |

| Website |

Comments are moderated, so your comment may take a little while to appear.

Don't like the default "blank face" gravatar in your comment? Pick your very own gravatar here.

CFIUS
China
Criminal Penalties
Cuba Sanctions
Customs
DDTC
Deemed Exports
DoJ
Economic Sanctions
Encryption
Entity List
EPA
Eritrea Sanctions
EU
Export Control Proposals
Export Reform
FCPA
FDA
Foreign Countermeasures
Foreign Export Controls
General
ICE
INCOTERMS
India
Iran Sanctions
ITAR
ITAR Creep
Libya Sanctions
MTCR
NASA
Niger
Night Vision
Nonproliferation
North Korea Sanctions
NRC
OECD
OFAC
Part 122
Part 129
Piracy on the High Seas
Russia Designations
Sanctions
SDN List
SEC
SEDs
Somalia Sanctions
Sudan
Syria
Technical Data Export
Technology Exports
TSRA
U.N. Sanctions
USMIL
USML
Venezuela
Wassenaar