HONORABLE ROBERT S. LASNIK

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| STATE OF WASHINGTON, *et al.,*<br><br>        Plaintiffs,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF STATE, *et al.,*<br><br>        Defendants. | No.: 2:18-cv-1115-RSL<br><br>**[PROPOSED] BRIEF OF *AMICUS CURIAE* ELECTRONIC FRONTIER FOUNDATION IN SUPPORT OF DEFENDANTS** |

**focal** PLLC
900 1st Avenue S., Suite 201
Seattle, WA 98134
206.529.4827

1

## <u>TABLE OF CONTENTS</u>

2

INTRODUCTION ....................................................................................................1

3

INTEREST OF AMICUS .........................................................................................2

4

FACTUAL BACKGROUND ....................................................................................2

5

    I.    Instructions to Manufacture Guns Are Common and Easy to Follow....................2

6

    II.   Defense Distributed Published Well-Known Designs for Firearms. .......................4

7

ARGUMENT ............................................................................................................5

8

    I.    The Design Files Are Speech Protected by the First Amendment..........................5

9

        A.    Technical Information Is Protected Speech. ...................................................5

10

        B.    Computer-Readable Documentation and Designs Are Protected Speech. .....6

11

    II.   The Government Has Not Proven That a Prior Restraint Is Permissible in this Case.....................................................................................................................7

12

13

        A.    The Government Must Meet a Steep Burden to Suppress Publication...........7

14

        B.    The Requested Injunction Against Defense Distributed Will Be Ineffective and Likely Would Not Address Any Imminent Harm Because the Design Files Have Been Public for Years. ................................9

15

16

        C.    The Government Must Prove That Alternative Measures Cannot Address the Harm. ......................................................................................10

17

18

    III.  The Export Controls Requirement for Pre-Publication Review Is an Unconstitutional Speech-Licensing Regime and May Not Be Used to Suppress Speech................................................................................................11

19

20

        A.    The Export Controls That Were Applied to Defense Distributed Are Sweeping and Lack Definite Standards, Deadlines, and Judicial Review....11

21

22

        B.    ITAR's Prepublication Review of Technical Data Is an Unlawful Prior Restraint on Speech.....................................................................................13

23

24

            1.    Speech-Licensing Regimes that Lack Definite Standards and Procedural Safeguards Are Invalid. ..................................13

25

            2.    ITAR's Prepublication Review Scheme Lacks the Required Safeguards.................................................................................14

26

27

[PROPOSED] BRIEF OF AMICUS CURIAE ELECTRONIC FRONTIER FOUNDATION
NO. 2:18-cv-1115-RSL - ii

**focal** PLLC
900 1st Avenue S., Suite 201
Seattle, WA 98134
206.529.4827

1

3.      The Only Appellate Judge to Consider ITAR's Speech-Licensing Regime Found That It Violates the First Amendment. ................................................................................16

CONCLUSION ...........................................................................................................17

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

[PROPOSED] BRIEF OF AMICUS CURIAE ELECTRONIC FRONTIER FOUNDATION
NO. 2:18-cv-1115-RSL - iii

**focal** PLLC
900 1st Avenue S., Suite 201
Seattle, WA 98134
206.529.4827

1

# TABLE OF AUTHORITIES

2

## CASES

3

*Alexander v. United States,*
    509 U.S. 544 (1993) ................................................................................................................7

4

*Associated Press v. U.S. Dist. Court for C.D. Cal.,*
    705 F.2d 1143 (9th Cir. 1983) ...............................................................................................10

5

*Bartnicki v. Vopper,*
    532 U.S. 514 (2001) ...............................................................................................................5

6

*Bd. of Trs. of Leland Stanford Jr. Univ. v. Sullivan,*
    773 F. Supp. 472 (D.D.C. 1991) ...........................................................................................6

7

8

*Bernstein v. U.S. Dep't of Justice,*
    176 F.3d 1132 (9th Cir.),
    *reh'g granted, opinion withdrawn,*
    192 F.3d 1308 (9th Cir. 1999) ...............................................................................................16

9

10

*Bernstein v. U.S. Dep't of State,*
    922 F. Supp. 1426 (N.D. Cal. 1996) ......................................................................................6

11

12

*Bernstein v. U.S. Dep't of State,*
    945 F. Supp. 1279 (N.D. Cal. 1996) ..........................................................................2, 14, 17

13

*Bernstein v. U.S. Dept. of State,*
    974 F. Supp. 1288, 1308 (N.D. Cal. 1997) ...........................................................................14

14

*Burch v. Barker,*
    861 F.2d 1149 (9th Cir. 1988) ...............................................................................................8

15

16

*Carroll v. President and Commissioners of Princess Anne,*
    393 U.S. 175 (1968) ...............................................................................................................8

17

*CBS Inc. v. Davis,*
    510 U.S. 1315 (1994) .........................................................................................................9, 10

18

*CBS Inc. v. U.S. Dist. Court for C.D. Cal.,*
    729 F.2d 1174 (9th Cir. 1984) ...............................................................................................8

19

20

*Craig v. Harney,*
    331 U.S. 367 (1947) ...............................................................................................................8

21

22

*Def. Distributed v. United States Dep't of State,*
    838 F.3d 451, 473 (5th Cir. 2016),
    *cert. denied sub nom. Def. Distributed v. Dep't of State,*
    138 S. Ct. 638 (2018) .............................................................................................................16

23

24

*Defense Distributed v. U.S. Dep't of State,*
    Case No. 15-50759, App. Br. (Dec. 10, 2015) .....................................................................15

25

*Domingo v. New England Fish Company,*
    727 F.2d 1429 (9th Cir. 1984) ...............................................................................................8

26

27

[PROPOSED] BRIEF OF AMICUS CURIAE ELECTRONIC FRONTIER
FOUNDATION
NO. 2:18-cv-1115-RSL - iv

**focal** PLLC
900 1st Avenue S., Suite 201
Seattle, WA 98134
206.529.4827

*Fernandes v. Limmer,*
  663 F.2d 619 (5th Cir. 1981) ........................................................15

*Freedman v. Maryland,*
  380 U.S. 51 (1965) ......................................................13, 14, 15, 17

*FW/PBS, Inc. v. City of Dallas,*
  493 U.S. 215 (1990) ...............................................................13, 14

*Herceg v. Hustler Magazine, Inc.,*
  814 F.2d 1017 (5th Cir. 1987) ........................................................6

*Hunt v. NBC,*
  872 F.2d 289 (9th Cir. 1989) ..........................................................8

*In re Nat'l Sec. Letter,*
  863 F.3d 1110 (9th Cir. 2017) ........................................................9

*Junger v. Daley,*
  209 F.3d 481 (6th Cir. 2000) ......................................................6, 7

*Lakewood v. Plain Dealer Pub. Co.,*
  486 U.S. 750 (1988) ...............................................................13, 14

*Landmark Commc'ns Inc. v. Virginia,*
  435 U.S. 829 (1978) ........................................................................8

*Nebraska Press Ass'n v. Stuart,*
  427 U.S. 539 (1976) ...............................................................7, 8, 9

*New York Times Co. v. U.S.,*
  403 U.S. 713 (1971) ........................................................................8

*Riley v. Nat'l Fed'n of Blind of N.C., Inc.,*
  487 U.S. 781 (1988) ......................................................................15

*Se. Promotions, Ltd. v. Conrad,*
  420 U.S. 546, 553 (1975) .........................................................7, 13

*Shuttlesworth v. City of Birmingham, Ala.,*
  394 U.S. 147 (1969) ......................................................................13

*Sorrell v. IMS Health Inc.,*
  131 S. Ct. 2653 (2011) ..............................................................5, 6

*U.S. v. U.S. Dist. Court for C.D. Cal.,*
  858 F.2d 534 (9th Cir. 1988) ..........................................................6

*United States v. Chi Mak,*
  683 F.3d 1126 (9th Cir. 2012) ..................................................16, 17

*United States v. Edler Indus., Inc.,*
  579 F.2d 516 (9th Cir. 1978) ........................................................17

*United States v. Quattrone,*
  402 F.3d 304 (2d Cir. 2005) .........................................................10

*Universal City Studios, Inc. v. Corley,*
  273 F.3d 429 (2d Cir. 2001) ...........................................................6

**focal** PLLC
900 1st Avenue S., Suite 201
Seattle, WA 98134
206.529.4827

## STATUTES

18 U.S.C. 922 ..................................................................................................4

## REGULATIONS

22 C.F.R. § 120.10 ..........................................................................................12

22 C.F.R. § 120.11 ..........................................................................................16

22 C.F.R. § 120.17 ..........................................................................................11

22 C.F.R. § 120.4 ............................................................................................12

22 C.F.R. § 121.1 ............................................................................................12

22 C.F.R. § 123.1 ............................................................................................12

22 C.F.R. § 126.7 ...........................................................................12, 13, 14, 15

22 C.F.R. § 127.1 ............................................................................................11

22 C.F.R. § 128.1 ...............................................................................13, 15, 17

22 U.S.C. § 2778 .................................................................................11, 12, 17

## LEGISLATIVE MATERIALS

Undetectable Firearms Modernization Act, H.R. 3643, 113th Cong. (2013) ..........................11

Undetectable Firearms Reauthorization Act, S.1774, 113th Cong (2013). .............................11

## OTHER AUTHORITIES

"0% Billet AR-15 Lower Receiver," 80 Percent Arms,
    https://www.80percentarms.com/collections/80-lowers/products/0-billet-ar-
    15-lower-receiver ....................................................................................4

"2018 3D Printed Gun Report – All You Need to Know," All3DP, https://all3dp.com/3d-
    printed-gun-firearm-weapon-parts/ ...........................................................3

"3D Printable Files for Cody Wilson's Liberator Gun are Now Available to All on
    3DShare," Whitney Hipolite, https://3dprint.com/73842/download-3d-printed-gun/ .........10

"3D-Printing Firm Makerbot Cracks Down On Printable Gun Designs," Forbes,
    https://www.forbes.com/sites/andygreenberg/2012/12/19/3d-printing-startup-makerbot-
    cracks-down-on-printable-gun-designs/#9c6323134255 ..................................................10

"80% Lower – AR-15 and .308 80% Lower Receivers," 80% Arms,
    https://www.80percentarms.com/collections/80-lowers ....................................................2

"ATF Answers Questions on 80 percent lower receivers," AmmoLand,
    https://www.ammoland.com/2014/11/atf-answers-questions-on-80-receiver-blanks/ ..........4

"Cody Wilson Takes Gun Plans Offline After Judge Issues Restraining Order," Reason,
    https://reason.com/blog/2018/08/01/breaking-cody-wilson-takes-gun-plans-off.............2, 9

[PROPOSED] BRIEF OF AMICUS CURIAE ELECTRONIC FRONTIER
FOUNDATION
NO. 2:18-cv-1115-RSL - vi

**focal** PLLC
900 1st Avenue S., Suite 201
Seattle, WA 98134
206.529.4827

"Cryptography/Technical Data", *Munitions Control Newsletter*, U.S. Dep't of State (Feb. 1980)..........................................................................................................16

"Deadly Weapons on Thingiverse," Bre Pettis, https://web.archive.org/web/20111007192104/http://blog.thingiverse.com/2011/10/03/deadly-weapons-on-thingiverse/........................................................................10

"Does an individual need a license to make a firearm for personal use?", Federal Bureau of Alcohol, Tobacco, Firearms & Explosives, https://www.atf.gov/firearms/qa/does-individual-need-license-make-firearm-personal-use ........................................2

"FOSSCAD MEGA PACK v4.8 (Ishikawa) Album," maduece, https://imgur.com/a/qwBVv ...............................................................9

"Free 3D models, Rendering images and CAD files," Autodesk, https://gallery.autodesk.com/ ...................................................................5

"Free Open Source Software and Computer Aided Design," FOSSCAD, fosscad.org ...........9

"Ghost Gunner 2 – Deposit," Ghost Gunner, https://ghostgunner.net/product/ghost-gunner-2-deposit/................................................................................................4

"Gun 8mm printable.", ooscar8, https://3dsha.re/product/gun-8-mm-printable/?id=16110....10

"How to Convert STL to G-Code: Prepare 3D Files for Printing," Tech Advisor, https://www.techadvisor.co.uk/how-to/printing/stl-gcode-3679488/. ...................5

"International Traffic in Arms: Revisions to Definitions of Defense Services, Technical Data, and Public Domain; Definition of Product of Fundamental Research; Electronic Transmission and Storage of Technical Data; and Related Definitions," U.S. Dep't of State, 80 Fed. Reg. 31,525-01, 31,526 (June 3, 2015).......................................17

"Legally Make Your Own Gun. 80 Percent Lower," Maine Clune, https://www.youtube.com/watch?v=9O4RixIqYDQ.....................................4

"Product Manuals", 80% Arms, https://www.80percentarms.com/pages/manuals...................2

"Slic3r – G-code generator for 3D printers," slic3r.org.........................................................3

Amendments to the International Traffic in Arms Regulations, U.S. Dep't of State, 58 Fed. Reg. 39,280 (July 22, 1993)...............................................................17

Kasie Hunt & Carrie Dann, *Senate Extends Ban on Undetectable Guns But Nixes Tighter Restrictions*, NBC News, Dec. 9, 2013, http://www.nbcnews.com/news/other/senate-extends-ban-undetectable-guns-nixes-tighter-restrictions-f2D11717122 ..........................11

Narayan, K. Lalit; *Computer Aided Design and Manufacturing*; New Delhi: Prentice Hall of India, 3-4 (2008); https://books.google.com/books?id=zXdivq93WIUC .......................3

Policy on Review Time for License Applications, 74 Fed. Reg. 63,497 (Dec. 3, 2009) ...........................................................................................12, 13, 15

Stephanie Condon, "Plastic guns ban extended," CBS News, https://www.cbsnews.com/news/senate-passes-extension-of-plastic-gun-ban/...................11

[PROPOSED] BRIEF OF AMICUS CURIAE ELECTRONIC FRONTIER FOUNDATION
NO. 2:18-cv-1115-RSL - vii

**focal** PLLC
900 1st Avenue S., Suite 201
Seattle, WA 98134
206.529.4827

**INTRODUCTION**

Our Constitution does not permit the government to suppress speech based on the fear that it will lead to harmful acts. A strict legal test governs the issuance of a prior restraint on speech, and the Supreme Court has warned that courts must not abandon these legal requirements even when other branches of government assert that grave consequences will result.

Rather, the courts' role is to put the government to its proof, in order to prevent speech from being repressed where suppression is not necessary, or not even helpful, or where the harm has not been proven, or where the causal link between publication and harm is too attenuated.

Defense Distributed, like many others, published the Design Files at issue on the Internet. It alone was singled out by the Department of State under an export control law that gave State total discretion to block the publication of technical information.

Now, Defense Distributed is the focus of efforts by numerous states to obtain an injunction barring it – but not others – from republishing the Design Files. This effort should fail.

First, the information is in the public domain and cannot be clawed back via court proceedings in any manner that would be consistent with the First Amendment.

Second, there been no attempt by the government to limit this speech via tailored regulations that recognize the sensitive Constitutional context and requirements of settled First Amendment law. Instead, the Department of State originally shoehorned the matter into an export regulation and claimed a fully discretionary power to ban online publication of information. The plaintiffs here seek to force the government to use that power to prevent publication by Defense Distributed. Yet, to the extent Congress has been concerned about undetectable weapons, it has already directly banned their manufacture and transfer rather than seeking to ban the publication of facts related to their creation, and it has declined to outlaw personal gunsmithing of weapons that have sporting uses.

The plaintiffs cannot establish that a prior restraint may issue in this case consistent with the First Amendment.

[PROPOSED] BRIEF OF AMICUS CURIAE ELECTRONIC FRONTIER FOUNDATION
NO. 2:18-cv-1115-RSL - 1

**focal** PLLC
900 1st Avenue S., Suite 201
Seattle, WA 98134
206.529.4827

**INTEREST OF AMICUS**

The Electronic Frontier Foundation ("EFF") is a non-profit, member-supported civil liberties organization that works to protect free speech, innovation, and privacy in the online world. With more than 40,000 dues-paying members, EFF represents the interests of technology users in court cases and broader policy debates regarding the application of law in the digital age. EFF frequently participates, either as counsel of record or amicus, in cases involving the First Amendment and new technologies. When export controls were applied to block publication of encryption code in the 1990s, EFF successfully established that computer instructions are protected speech and that the regulations constituted an unlawful speech-licensing regime in the case of *Bernstein v. U.S. Dep't of State*, 945 F. Supp. 1279 (N.D. Cal. 1996) ("*Bernstein II*").

**FACTUAL BACKGROUND**

**I.    Instructions to Manufacture Guns Are Common and Easy to Follow.**

There are many tutorials available both offline and online for making guns, as well as multiple sources for designs that could be used with a 3D printer to do so.[1] Federal law and many states permit a person to engage in gunsmithing, creating an unlicensed, unregistered gun for their own use.[2] The materials are generally not difficult to buy, either.[3]

Importantly, the law recognizes the potential dangers in personal gunsmithing – it is generally unlawful to *sell* or *distribute* unmarked firearms without a license.[4]

Most of the Design Files at issue in this case are "Computer Aided Design" (CAD) files, a

[1] *E.g.*, "Product Manuals", 80% Arms, available at https://www.80percentarms.com/pages/manuals; "Cody Wilson Takes Gun Plans Offline After Judge Issues Restraining Order,"  Reason, https://reason.com/blog/2018/08/01/breaking-cody-wilson-takes-gun-plans-off. All web pages cited in this brief were last visited on August 14, 2018.

[2] "Does an individual need a license to make a firearm for personal use?", Federal Bureau of Alcohol, Tobacco, Firearms & Explosives, https://www.atf.gov/firearms/qa/does-individual-need-license-make-firearm-personal-use (citing 18 U.S.C. 922(o), (p) and (r); 26 U.S.C. 5822; 27 CFR 478.39, 479.62 and 479.105).

[3] *See, e.g.*, "80% Lower – AR-15 and .308 80% Lower Receivers," 80% Arms, https://www.80percentarms.com/collections/80-lowers.

[4] "Does an individual need a license to make a firearm for personal use?", Federal Bureau of Alcohol, Tobacco, Firearms & Explosives, https://www.atf.gov/firearms/qa/does-individual-need-license-make-firearm-personal-use (citing 18 U.S.C. 922(o), (p) and (r); 26 U.S.C. 5822; 27 CFR 478.39, 479.62 and 479.105).

[PROPOSED] BRIEF OF AMICUS CURIAE ELECTRONIC FRONTIER FOUNDATION
NO. 2:18-cv-1115-RSL - 2

**focal** PLLC
900 1st Avenue S., Suite 201
Seattle, WA 98134
206.529.4827

type of file that engineers use to visualize, design, and communicate about three-dimensional objects.[5] Commonly-available programs like "Slic3r" can interpret these shapes and determine the path that a 3D printer would have to move its nozzle, or a milling machine would have to move its cutter, to form that object.[6] Slic3r creates a 3D print file that can then be understood by the machine itself and used by its operator to create an object.[7] A 3D print file is a sequence of instructions that tells the 3D printer exactly how to move its print head – a nozzle that squeezes out melted plastic. The file describes each layer of a device, and the coordinates that the nozzle has to move to, along with the amount of plastic to squeeze out. In a sense, it's like a complex connect-the-dots image, a set of instructions that allows the recipient to draw out the image being communicated, but in three dimensions instead of just two.

Once a person obtains a 3D printer or milling machine, as well as the software to run it, raw materials, and the design files, they can tell the machine to make whatever shapes they want, including shapes that can be assembled into a gun. One cannot print bullets, of course – a person must buy them or acquire gunpowder to make them.

Following all these steps, it is possible to 3D print or CNC mill the components of a gun, assemble those components, acquire bullets, and fire the gun.

A 3D-printed gun will likely be made of plastic. This is not an ideal material for a gun, because it is weak and it melts or breaks easily, but plastic guns are capable of firing.[8]  The plastic part will not be detectable by metal detectors, but would be detectable by the scanners at airport security. It's illegal under the Undetectable Firearms Act to manufacture an entirely plastic gun

---

[5] Narayan, K. Lalit; *Computer Aided Design and Manufacturing*; New Delhi: Prentice Hall of India, 3-4 (2008); available at https://books.google.com/books?id=zXdivq93WIUC

[6] "Slic3r – G-code generator for 3D printers," slic3r.org.

[7] *Id.*

[8] "2018 3D Printed Gun Report – All You Need to Know," All3DP, https://all3dp.com/3d-printed-gun-firearm-weapon-parts/ ("chances are only a single shot will be able to be fired before it either breaks or fails. The reason for this is because the act of firing a bullet simply exerts too much power for most thermoplastics to withstand.").

[PROPOSED] BRIEF OF AMICUS CURIAE ELECTRONIC FRONTIER FOUNDATION
NO. 2:18-cv-1115-RSL - 3

**focal** PLLC
900 1st Avenue S., Suite 201
Seattle, WA 98134
206.529.4827

unless one inserts a bar of metal that can be detected by a metal detector,[9] something the printable designs typically accommodate.

A CNC-milled gun can be made of metal, which is more suitable for guns and is commonly used in traditional gunsmithing. Most of the parts of guns are unregulated, so a person could buy the unregulated parts, print the regulated ones, and then assemble the weapon. A CNC mill that can generate the regulated lower receiver of an AR-15, for instance, costs about $2000.[10] The raw metal for the lower receiver costs under $30.[11]

Neither CNC nor 3D printing is needed to make guns, however. As a simpler alternative to milling the entire shape oneself, a person can purchase an unregulated lower receiver that is not quite finished for about $75 and drill some simple holes and a trough into it with an inexpensive drill press, without the need for an automatic milling machine.[12] These unfinished lower receivers are called "80 percent lower receivers" because they are only 80 percent finished and therefore do not qualify as regulated firearms under federal law.

If someone wants to use the more complex, more expensive 3D printing or CNC process to make a gun, however, the files that describe the gun shapes one would need to print are available in many places on the Internet, both inside and outside the U.S. Some of these designs have been available for over seven years.

## II.   Defense Distributed Published Well-Known Designs for Firearms.

Defense Distributed learned about gun designs in various locations on the Internet, invented one new design (the Liberator pistol), and became a one-stop republisher of the Design Files. These files describe both traditional firearm components and experimental designs that can

---

[9] 18 U.S.C. 922(p).

[10] "Ghost Gunner 2 – Deposit," Ghost Gunner, https://ghostgunner.net/product/ghost-gunner-2-deposit/.

[11] "0% Billet AR-15 Lower Receiver," 80 Percent Arms, https://www.80percentarms.com/collections/80-lowers/products/0-billet-ar-15-lower-receiver.

[12] "ATF Answers Questions on 80 percent lower receivers," AmmoLand, https://www.ammoland.com/2014/11/atf-answers-questions-on-80-receiver-blanks/; "Legally Make Your Own Gun. 80 Percent Lower," Maine Clune, https://www.youtube.com/watch?v=9O4RixIqYDQ.

[PROPOSED] BRIEF OF AMICUS CURIAE ELECTRONIC FRONTIER FOUNDATION
NO. 2:18-cv-1115-RSL - 4

**focal** PLLC
900 1st Avenue S., Suite 201
Seattle, WA 98134
206.529.4827

1    be manufactured out of plastic.

2         Like a picture or a blueprint, CAD files are used to communicate the precise physical

3 properties of an object. They are the language used by engineers to share knowledge about the

4 structure of all sorts of items, from smartphone cases to medical prosthetics to entire buildings.[13]

5 As discussed above, the software that allows a person to translate a CAD blueprint into 3D print

6 instructions is readily available and widely used.

7         Both CAD files and 3D print files can be understood by human recipients, typically with

8 the aid of visualization software. It's important for the operator of a 3D printer to understand the

9 shape they are about to make, to ensure that it will fit in their print area and they have adequate

10 plastic spooled up for the printing process. The software typically presents an image of the print

11 that is about to be manufactured for the operator's approval before printing begins.[14]

12         In sum, the Design Files describe shapes and, using commonly available software, can be

13 used to generate instructions for a process to make shapes in plastic. Those descriptions can be,

14 and generally are, understood by computers and humans alike.

15 **ARGUMENT**

16 **I.     The Design Files Are Speech Protected by the First Amendment.**

17       **A.     Technical Information Is Protected Speech.**

18         The First Amendment plainly applies to the Design Files.

19         First, there's no question that publishing factual information is protected by the First

20 Amendment. The Supreme Court has repeatedly explained that creating and publishing

21 information constitutes protected speech. *E.g.*, *Sorrell v. IMS Health Inc.*, 131 S. Ct. 2653, 2667

22 (2011) (collecting cases); *Bartnicki v. Vopper*, 532 U.S. 514, 527 (2001).

23         This protection encompasses factual information such as technical data and designs:

24 "Facts, after all, are the beginning point for much of the speech that is most essential to advance

25

26      [13] *See* "Free 3D models, Rendering images and CAD files," Autodesk, https://gallery.autodesk.com/.

27      [14] "How to Convert STL to G-Code: Prepare 3D Files for Printing," Tech Advisor,
https://www.techadvisor.co.uk/how-to/printing/stl-gcode-3679488/.

[PROPOSED] BRIEF OF AMICUS CURIAE ELECTRONIC FRONTIER
FOUNDATION
NO. 2:18-cv-1115-RSL - 5

**focal** PLLC
900 1st Avenue S., Suite 201
Seattle, WA 98134
206.529.4827

1  human knowledge and to conduct human affairs." *Sorrell*, 131 S. Ct. at 2667. Scientific, technical

2  information is just as protected as political or artistic speech. *Bd. of Trs. of Leland Stanford Jr.*

3  *Univ. v. Sullivan*, 773 F. Supp. 472, 474 (D.D.C. 1991); *see U.S. v. U.S. Dist. Court for C.D. Cal.*,

4  858 F.2d 534, 542 (9th Cir. 1988).

5        **B.**    **Computer-Readable Documentation and Designs Are Protected Speech.**

6        The First Amendment is also not set aside merely because information can be processed

7  by a computer to achieve a function. The Design Files are informational documents that directly

8  communicate technical ideas such as the dimensions and specifications of objects. Their speech

9  content is not eliminated just because those ideas can then be read and implemented by a computer.

10  Courts have consistently explained that the function served by speech is no bar to protection.

11  *Junger v. Daley*, 209 F.3d 481, 484-85 (6th Cir. 2000) (discussing computer source code);

12  *Bernstein v. U.S. Dep't of State*, 922 F. Supp. 1426, 1435-36 (N.D. Cal. 1996) ("*Bernstein I*")

13  (same). Computer software consistently receives First Amendment protection because code, like

14  a written musical score, "is an expressive means for the exchange of information and ideas."

15  *Junger*, 209 F.3d at 485; *see Universal City Studios, Inc. v. Corley*, 273 F.3d 429, 449 (2d Cir.

16  2001) (decryption software).

17        Even instructions on how to conduct potentially dangerous activities are protected speech.

18  *Herceg v. Hustler Magazine, Inc.*, 814 F.2d 1017, 1019 (5th Cir. 1987). In *Herceg*, the First

19  Amendment shielded Hustler Magazine from liability for the death of a young man who engaged

20  in "autoerotic asphyxiation" after reading how to do it in the magazine. *Id.* The Fifth Circuit

21  explained that "first amendment protection is not eliminated simply because publication of an idea

22  creates a potential hazard." *Id.* at 1020.

23        The publication of the Design Files is thus protected by the First Amendment regardless of

24  how others process the information they contain. The Constitution does not vanish simply because

25  a person can use the shape of a CAD file to generate a 3D print file, or can use the instructions in

26  a 3D print file to control a 3D printer. After all, every idea having the slightest value is protected

27  by the First Amendment. *Junger*, 209 F.3d at 485. Courts have considered the utility of the

[PROPOSED] BRIEF OF AMICUS CURIAE ELECTRONIC FRONTIER
FOUNDATION
NO. 2:18-cv-1115-RSL - 6

**focal** PLLC
900 1st Avenue S., Suite 201
Seattle, WA 98134
206.529.4827

information in a computer file when assessing whether laws are adequately tailored to their purpose, *see id.*, but utility is no bar to First Amendment protection, and provides no basis to evade the typical First Amendment analysis applied to prior restraints.

To hold otherwise would mean that the scope of First Amendment protection would shrink as computers become more and more able to understand plain English and follow instructions described in ordinary language. Such an interpretation of the Constitution would be as troubling as one holding that that the availability of player pianos reduces the First Amendment protection available to musical scores. This proposition is neither sound law nor sound policy in a world where computers are ever more able to understand human communications.

The Design Files, therefore, are speech entitled to the well-settled protections of the First Amendment.

## II.   The Government Has Not Proven That a Prior Restraint Is Permissible in this Case.

### A.   The Government Must Meet a Steep Burden to Suppress Publication.

When the government demands the suppression of information, asserting that serious harms will result from publication, the requirements of the First Amendment are strict. Without exception, the Supreme Court has required that prior restraints survive exacting substantive scrutiny and include procedural protections unique to prior restraints. *See Se. Promotions Ltd. v. Conrad*, 420 U.S. 546, 559 (1975) ("In order to be held lawful, [a prior restraint] first, must fit within one of the narrowly defined exceptions to the prohibition against prior restraints, and, second, must have been accomplished with procedural safeguards that reduce the danger of suppressing constitutionally protected speech.")

An injunction barring publication is a prior restraint. "The term prior restraint is used to describe administrative and judicial orders forbidding certain communications when issued in advance of the time that such communications are to occur." *Alexander v. United States*, 509 U.S. 544, 550 (1993) (quotations and citation omitted, emphasis original); *see Nebraska Press Ass'n v. Stuart*, 427 U.S. 539 (1976) (finding a temporary gag order for purposes of empaneling a jury to be a prior restraint).

[PROPOSED] BRIEF OF AMICUS CURIAE ELECTRONIC FRONTIER FOUNDATION
NO. 2:18-cv-1115-RSL - 7

**focal** PLLC
900 1st Avenue S., Suite 201
Seattle, WA 98134
206.529.4827

1    The Ninth Circuit has characterized the strict scrutiny to which prior restraints are subjected

2    as "extraordinarily exacting." *CBS Inc. v. U.S. Dist. Court for C.D. Cal.*, 729 F.2d 1174, 1178 (9th

3    Cir. 1984); *see also Hunt v. NBC*, 872 F.2d 289, 295 (9th Cir. 1989) (applying "exacting" standard

4    from *Nebraska Press*). "[P]rior restraints, if permissible at all, are permissible only in the most

5    extraordinary of circumstances." *CBS*, 729 F.2d at 1183.

6    One seeking a prior restraint must demonstrate its "necessity." *Domingo v. New England*

7    *Fish Company*, 727 F.2d 1429, 1440 n.9 (9th Cir. 1984). And "the substantive evil" the prior

8    restraint seeks to prevent "must be extremely serious and the degree of imminence extremely

9    high." *Landmark Commc'ns Inc. v. Virginia*, 435 U.S. 829, 845 (1978); *see also Burch v. Barker*,

10   861 F.2d 1149, 1155 (9th Cir. 1988) ("Prior restraints are permissible in only the rarest of

11   circumstances, such as imminent threat to national security.").

12   The Ninth Circuit has cited with approval Justice Brennan's similar Pentagon Papers

13   concurrence requiring "proof that publication must inevitably, directly, and immediately cause the

14   occurrence of" a serious harm to national security). *CBS*, 729 F.2d at 1184 (*quoting New York*

15   *Times Co. v. U.S.*, 403 U.S. 713, 726-27 (1971) (Brennan, J., concurring)).

16   A "'solidity of evidence' is necessary to make the requisite showing of imminence."

17   *Domingo*, 727 F.2d at 1440 n.9 (*quoting Landmark*, 435 U.S. at 845). "Moreover '[t]he danger

18   must not be remote or even probable; it must immediately imperil.'" *Id.* (*quoting Craig v. Harney*,

19   331 U.S. 367, 376 (1947) (alterations in original).

20   The Supreme Court has also demanded "pin-pointed" precision for prior restraints. The

21   Court commanded that prior restraints "must be couched in the narrowest terms that will

22   accomplish the pin-pointed objective permitted by constitutional mandate and the essential needs

23   of the public order . . . . In other words, the order must be tailored as precisely as possible to the

24   exact needs of the case." *Carroll v. President and Commissioners of Princess Anne*, 393 U.S. 175,

25   183-84 (1968) (emphasis added).

26   Consequently, the Supreme Court has required that courts "assess the probable efficacy of

27   prior restraint on publication," so that freedom of speech is not abridged where doing so will not

[PROPOSED] BRIEF OF AMICUS CURIAE ELECTRONIC FRONTIER
FOUNDATION
NO. 2:18-cv-1115-RSL - 8

**focal** PLLC
900 1st Avenue S., Suite 201
Seattle, WA 98134
206.529.4827

cure the threatened harm. *Nebraska Press*, 427 U.S. at 565.

No alleged government interest is so compelling that the government may bypass this analysis and order a prior restraint where the test has not been met. *CBS Inc. v. Davis*, 510 U.S. 1315, 1317 (1994) ("Even where questions of allegedly urgent national security or competing constitutional interests are concerned … we have imposed this most extraordinary remedy only where the evil that would result from the reportage is both great and certain and cannot be mitigated by less intrusive measures.") (quotations and citations omitted). [15]

The states have not attempted to meet the required standard for the issuance of a prior restraint, and cannot show, *inter alia*, the required necessity, imminence, or efficacy based on the facts of this case.

### B.   The Requested Injunction Against Defense Distributed Will Be Ineffective and Likely Would Not Address Any Imminent Harm Because the Design Files Have Been Public for Years.

The Design Files and others like them have been published and republished for years by many people, meaning that an injunction would not be effective at preventing access and meaning that the supposed harms are not likely to manifest.

Reason magazine recently posted an article identifying some of the many places where the Design Files at issue here have been available online.[16]

For example, FOSSCAD has provided access to a 'mega pack' of dozens of 3D printable firearm designs for years.[17] The collection includes designs for AR-10, AR-15, 10/22, and other firearms.[18]

As long ago as 2011, a printable lower receiver for the AR-15 was available on the popular

---

[15] A panel of the Ninth Circuit has questioned whether a statute imposing a prior restraint must do more than satisfy strict scrutiny, failing to address the bulk of the caselaw discussed in this section. *In re Nat'l Sec. Letter*, 863 F.3d 1110, 1127 n.21 (9th Cir. 2017). To the extent this opinion survives further review, or could be extended to the present context, it cannot overrule prior 9th Circuit decisions or the Supreme Court.

[16] "Cody Wilson Takes Gun Plans Offline After Judge Issues Restraining Order," Reason, https://reason.com/blog/2018/08/01/breaking-cody-wilson-takes-gun-plans-off.

[17] "Free Open Source Software and Computer Aided Design," FOSSCAD, fosscad.org.

[18] "FOSSCAD MEGA PACK v4.8 (Ishikawa) Album," maduece, https://imgur.com/a/qwBVv.

---

[PROPOSED] BRIEF OF AMICUS CURIAE ELECTRONIC FRONTIER FOUNDATION
NO. 2:18-cv-1115-RSL - 9

**focal** PLLC
900 1st Avenue S., Suite 201
Seattle, WA 98134
206.529.4827

design-sharing website Thingiverse and remained online for over a year.[19]

Likewise, the Liberator pistol has been hosted at 3Dshare since 2015, and has been downloaded over 15,000 times.[20]

The longstanding presence of the Design Files at issue here, and other firearm design files like them, means that barring Defense Distributed and Cody Wilson from republishing the files will restrict their First Amendment freedom without a countervailing benefit. *See Associated Press v. U.S. Dist. Court for C.D. Cal.*, 705 F.2d 1143, 1146 (9th Cir. 1983) (restraint would likely be ineffective where similar information was already available to the press); *United States v. Quattrone*, 402 F.3d 304, 312 (2d Cir. 2005) (efficacy of a prior restraint was doubtful where the information could have been heard in open court).

Second, if the Design Files and others like them have been freely available for years, it is unlikely that the harms warned of by the states will materialize when Defense Distributed republishes the designs. There is no logical reason why imminent, inevitable harm would result from publication by Defense Distributed, or anyone else, when it has not occurred in the past seven years.

The First Amendment does not permit speech to be suppressed in these circumstances.

C.   **The Government Must Prove That Alternative Measures Cannot Address the Harm.**

To establish that a prior restraint is necessary, the states must prove that alternative measures, such as the Undetectable Firearms Act, cannot address the alleged harms. *See, e.g., CBS*, 510 U.S. at 1317.

---

[19] "Deadly Weapons on Thingiverse," Bre Pettis, available at https://web.archive.org/web/20111007192104/http://blog.thingiverse.com/2011/10/03/deadly-weapons-on-thingiverse/; "3D-Printing Firm Makerbot Cracks Down On Printable Gun Designs," Forbes, https://www.forbes.com/sites/andygreenberg/2012/12/19/3d-printing-startup-makerbot-cracks-down-on-printable-gun-designs/#9c6323134255.

[20] "3D Printable Files for Cody Wilson's Liberator Gun are Now Available to All on 3DShare," Whitney Hipolite, https://3dprint.com/73842/download-3d-printed-gun/; "Gun 8mm printable.", ooscar8, https://3dsha.re/product/gun-8-mm-printable/?id=16110.

[PROPOSED] BRIEF OF AMICUS CURIAE ELECTRONIC FRONTIER FOUNDATION
NO. 2:18-cv-1115-RSL - 10

**focal** PLLC
900 1st Avenue S., Suite 201
Seattle, WA 98134
206.529.4827

Congress is of the view that the Undetectable Firearms Act is an adequate response to the potential of 3D printed firearms. It renewed that law, and in doing so it considered and declined to adopt additional restrictions on 3D-printed weaponry.[21] The Act requires that a weapon have a certain amount of metal content, so that it will trigger a metal detector. Printable designs, such as the Liberator, include a cavity so that a metal bar can be inserted to comply with the law. Senator Schumer proposed that the law be changed so that a firearm would no longer comply if its metal content were removable, but that proposal was rejected.[22]

Both the Undetectable Firearms Act and the proposed amendment demonstrate that protected speech need not be burdened to vindicate a government interest in preventing the use of certain weaponry.

**III.    The Export Controls Requirement for Pre-Publication Review Is an Unconstitutional Speech-Licensing Regime and May Not Be Used to Suppress Speech.**

   **A.    The Export Controls That Were Applied to Defense Distributed Are Sweeping and Lack Definite Standards, Deadlines, and Judicial Review.**

The International Traffic in Arms Regulations (ITAR) criminalize "[d]isclosing (including oral or visual disclosure) or transferring technical data to a foreign person, whether in the United States or abroad" without a license. 22 C.F.R. §§ 120.17(a)(4), 127.1; 22 U.S.C. § 2778(c). Violations carry massive penalties: up to 20 years imprisonment and a $1,000,000 fine. 22 U.S.C. § 2778(c).

Because the government considers electronic publication to be an "export," it requires that Internet users submit publications for review by agency officials before they may electronically publish information that is considered "technical data." 22 C.F.R. § 127.1. Technical data includes "[i]nformation . . . which is required for the design, development, production, manufacture,

---

[21] Kasie Hunt & Carrie Dann, *Senate Extends Ban on Undetectable Guns But Nixes Tighter Restrictions*, NBC News, Dec. 9, 2013, http://www.nbcnews.com/news/other/senate-extends-ban-undetectable-guns-nixes-tighter-restrictions-f2D11717122; Undetectable Firearms Modernization Act, H.R. 3643, 113th Cong. (2013); Undetectable Firearms Reauthorization Act, S.1774, 113th Cong (2013).

[22] Stephanie Condon, "Plastic guns ban extended," CBS News, https://www.cbsnews.com/news/senate-passes-extension-of-plastic-gun-ban/.

[PROPOSED] BRIEF OF AMICUS CURIAE ELECTRONIC FRONTIER FOUNDATION
NO. 2:18-cv-1115-RSL - 11

**focal** PLLC
900 1st Avenue S., Suite 201
Seattle, WA 98134
206.529.4827

assembly, operation, repair, testing, maintenance or modification of defense articles. This includes information in the form of blueprints, drawings, photographs, plans, instructions or documentation." 22 C.F.R. § 120.10(a)(1). Technical data also includes software. § 120.10 (a)(4). "Defense articles" refers to a list of technologies designated at the discretion of the Department of State in consultation with the Department of Defense, listed at 22 C.F.R. § 121.1 (the "United States Munitions List" or USML). In addition to firearms, the USML includes a range of medical, chemical, electronic, and mechanical engineering categories, and the open-ended provision that "[a]ny article not enumerated on the U.S. Munitions List may be included in this category" by the Director of the Office of Defense Trade Controls Policy. Category XXI(a).

Those who desire to publish information relating to controlled technologies must determine whether a license is needed for their disclosure. The scope of the regulation is sufficiently ambiguous that several hundred to several *thousand* "commodity jurisdiction" requests are made each year to clarify whether a particular technology would require a license for export (or for publication, under the prepublication review requirement).[23] These determinations are made "on a case-by-case basis, taking into account" nonbinding considerations such as "the nature, function and capability" of the civil and military applications of items. 22 C.F.R. § 120.4(d). There are no firm deadlines for a final determination or resolution of an administrative appeal. 22 C.F.R. §§ 120.4(e), (g). The decision "shall not be subject to judicial review." 22 U.S.C. § 2778(h).

If the government decides that information is subject to ITAR, then the speaker must apply for a license to publish online. 22 C.F.R. § 123.1(a). No firm standards govern this process: "Any application for an export license or other approval under this subchapter may be disapproved . . . whenever: (1) The Department of State deems such action to be in furtherance of *world peace, the national security or the foreign policy* of the United States, *or is otherwise advisable*." 22 C.F.R. § 126.7(a) (emphasis added). Broad and open-ended exceptions to the review deadline swallow the rule. Policy on Review Time for License Applications, 74 Fed. Reg. 63,497 (Dec. 3, 2009).

---

[23] *Commodity Jurisdiction Final Determinations*, U.S. Dep't of State, Dir. of Def. Trade Controls, https://mary.dtas-online.pmddtc.state.gov/commodity_jurisdiction/determination2014.html.

[PROPOSED] BRIEF OF AMICUS CURIAE ELECTRONIC FRONTIER FOUNDATION
NO. 2:18-cv-1115-RSL - 12

**focal** PLLC
900 1st Avenue S., Suite 201
Seattle, WA 98134
206.529.4827

Adjudication may be indefinitely delayed whenever "[t]he Department of Defense has not yet completed its review" or "a related export policy is under active review and pending final determination by the Department of State." *Id.* If a license is denied, an applicant may request reconsideration, but there is *no firm deadline* for action. *See* 22 C.F.R. § 126.7(c). There is also no opportunity for judicial review. 22 C.F.R. § 128.1.

**B.    ITAR's Prepublication Review of Technical Data Is an Unlawful Prior Restraint on Speech.**

**1.    Speech-Licensing Regimes that Lack Definite Standards and Procedural Safeguards Are Invalid.**

A requirement of pre-publication review for protected speech is unconstitutional unless the review process is bounded by stringent procedural safeguards. *Freedman v. Maryland*, 380 U.S. 51, 58–59 (1965). A scheme making the "freedoms which the Constitution guarantees contingent upon the uncontrolled will of an official—as by requiring a permit or license which may be granted or withheld in the discretion of such official—is an unconstitutional censorship or prior restraint upon the enjoyment of those freedoms." *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 226 (1990) (plurality opinion) (quoting *Shuttlesworth v. Birmingham*, 395 U.S. 147, 151 (1969)); *see also Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 553 (1975). Human nature creates an unacceptably high risk that excessive discretion will be used unconstitutionally, and such violations would be very difficult to prove on a case-by-case basis. *Lakewood v. Plain Dealer Pub. Co.*, 486 U.S. 750, 758 (1988). Furthermore, "[b]ecause the censor's business is to censor, there inheres the danger that he may well be less responsive than a court—part of an independent branch of government—to the constitutionally protected interests in free expression." *Freedman*, 380 U.S. at 57-58.

A speech-licensing regime is unconstitutional when it lacks "narrow, objective, and definite standards." *Shuttlesworth v. City of Birmingham, Ala.*, 394 U.S. 147, 150-51 (1969); *accord Lakewood*, 486 U.S. at 770-72. The Supreme Court warned in *Lakewood*, where a license could be denied for not being in the "public interest," that "[t]o allow these illusory 'constraints' to constitute the standards necessary to bound a licensor's discretion renders the guaranty against censorship little more than a high-sounding ideal." *Lakewood*, 486 U.S. at 769-70; *see also*

[PROPOSED] BRIEF OF AMICUS CURIAE ELECTRONIC FRONTIER FOUNDATION
NO. 2:18-cv-1115-RSL - 13

**focal** PLLC
900 1st Avenue S., Suite 201
Seattle, WA 98134
206.529.4827

*Bernstein v. U.S. Dept. of State*, 974 F. Supp. 1288, 1308 (N.D. Cal. 1997) ("*Bernstein III*") (holding that "national security and foreign policy interests" are "illusory constraints").

Speech licensing schemes are also invalid when they lack certain procedural protections:

1) the licensing decision must be prompt;

2) there must be prompt judicial review; and

3) when a censor denies a license, it must go to court to obtain a valid gag order and once there bears the burden to prove the gag is justified.

*See Freedman*, 380 U.S. at 58-60.

Even content-neutral licensing schemes are unconstitutional if they lack these safeguards. *Lakewood*, 486 U.S. at 763-64; *see FW/PBS*, 493 U.S. at 227 (plurality opinion) (city did not pass judgment on content of protected speech, but impermissibly had indefinite amount of time to issue license). Licensing schemes create a heightened risk of discriminatory application; the newsrack permitting scheme in *Lakewood* was neither facially content-based nor justified in terms of content, but it was still struck down because it could be applied discriminatorily. *Lakewood*, 486 U.S. at 757-59.

## 2. ITAR's Prepublication Review Scheme Lacks the Required Safeguards.

The prepublication review process lacks *every single one* of the required safeguards. *See Bernstein II*, 945 F. Supp. 1279 ("The ITAR scheme, a paradigm of standardless discretion, fails on every count.").

First, the regulatory scheme fails to provide binding standards. A license may be denied whenever the Department of State deems it "advisable." 22 C.F.R. § 126.7(a)(1). The regime is even more egregious than those that purport to be bounded by "illusory constraints," *Lakewood*, 486 U.S. at 769, such as "national security and foreign policy interests." *Bernstein III*, 974 F. Supp. at 1307. It is even more vague than the one rejected by in *Fernandes v. Limmer*, where the agency could refuse permission to speak "when there is good reason to believe that the granting of the permit will result in a direct and immediate danger or hazard to the public security, health, safety

[PROPOSED] BRIEF OF AMICUS CURIAE ELECTRONIC FRONTIER FOUNDATION
NO. 2:18-cv-1115-RSL - 14

**focal** PLLC
900 1st Avenue S., Suite 201
Seattle, WA 98134
206.529.4827

1  or welfare." 663 F.2d 619, 631 (5th Cir. 1981). Rather than putting the public on notice of what is

2  prohibited, ITAR's prepublication review regime invites the public to ask on a case-by-case basis

3  and reserves the right of governmental officials to deny a license at the pleasure of the agency.

4      Second, the scheme does not guarantee prompt adjudication. There are no binding

5  deadlines for adjudication of a commodity jurisdiction request, and while Presidential guidance

6  requires that license applications be adjudicated within 60 days, the deadline is swallowed by broad

7  exemptions and does not require that administrative appeals adhere to any deadline. Policy on

8  Review Time for License Applications, 74 Fed. Reg. 63,497 (Dec. 3, 2009); *see* 22 C.F.R.

9  § 126.7(c). For Defense Distributed, the most preliminary part of the process – a commodity

10 jurisdiction decision – took nearly two years. *Defense Distributed v. U.S. Dep't of State*, Case No.

11 15-50759, App. Br. at 23 (Dec. 10, 2015). The Supreme Court has not specified precisely when a

12 final judicial decision must come, but it must be faster than the four months for initial judicial

13 review and six months for appellate review in *Freedman*, 380 U.S. at 55, 61. The regime it cited

14 with approval required "a hearing one day after joinder of issue; the judge must hand down his

15 decision within two days after." *Id* at 60. A two-year delay is beyond the pale.

16     Third, the ITAR regime fails to provide for prompt *judicial* review of licensing

17 determinations: because an ITAR determination "is highly discretionary, it is excluded from

18 review under the Administrative Procedure Act." 22 C.F.R. § 128.1. The complete lack of judicial

19 safeguards means that the ITAR speech-licensing scheme cannot satisfy *Freedman's* requirements

20 that such a regime provide for prompt judicial review and "that the licensor will, within a specified

21 brief period, either issue a license or go to court." *Riley v. Nat'l Fed'n of Blind of N.C., Inc.*, 487

22 U.S. 781, 802 (1988) (*quoting Freedman,* 380 U.S. at 59).

23     The executive branch may not create a speech-licensing regime independent of judicial

24 checks and balances.

25     Whatever an appropriately-tailored export control regime may be, it cannot involve, as

26 ITAR does, a broad prior restraint against Internet publication, subject to unbounded agency

27 discretion lacking any judicial review.

[PROPOSED] BRIEF OF AMICUS CURIAE ELECTRONIC FRONTIER FOUNDATION
NO. 2:18-cv-1115-RSL - 15

**focal** PLLC
900 1st Ave S., Suite 201
Seattle, WA 98134
206.529.4827

1

### 3. The Only Appellate Judge to Consider ITAR's Speech-Licensing Regime Found That It Violates the First Amendment.

2

The only appellate judge to have addressed the First Amendment issues inherent in ITAR's

3

prepublication review regime wrote the dissent at the Fifth Circuit, explaining in detail how "the

4

Government's scheme vests broad, unbridled discretion to make licensing decisions and lacks the

5

requisite procedural protections." *Def. Distributed v. United States Dep't of State*, 838 F.3d 451,

6

473 (5th Cir. 2016), *cert. denied sub nom. Def. Distributed v. Dep't of State*, 138 S. Ct. 638

7

(2018)(Jones, Cir. J., *dissenting*). She also correctly explained that the underlying law was a

8

content-based restriction on speech that did not satisfy strict scrutiny, either, an independent basis

9

for rejecting the regime. *Id.* at 468-72.

10

The two judges in the majority at the Fifth Circuit avoided the First Amendment issues,

11

taking "no position" on the issue and issuing the startling pronouncement that they could ignore

12

such concerns because "Even a First Amendment violation does not necessarily trump the

13

government's interest in national defense." *Def. Distributed*, 838 F.3d at 460. This position would

14

no doubt have alarmed the Supreme Court Justices who articulated the procedural and substantive

15

First Amendment safeguards to be observed even when the government asserts a national interest

16

of the highest order, not to mention the drafters of the Bill of Rights.

17

The Ninth Circuit also has not considered the speech-licensing regime applied to the

18

Design Files. Until the federal government sought a method to suppress the Design Files, it had

19

*disavowed* any prepublication review requirement for technical data, giving the Ninth Circuit no

20

occasion to consider it.[24] *Chi Mak* does not even mention the *Freedman* standards, let alone find

21

that they are met. *United States v. Chi Mak*, 683 F.3d 1126, 1136 (9th Cir. 2012). The government

22

also had not asserted that the "public domain" exception of § 120.11(a) excludes publication on

23

---

24

[24] *Def. Distributed*, 838 F.3d 451 at 466 (Jones, C.J., *dissenting*); U.S. Dep't of State, "Cryptography/Technical Data", *Munitions Control Newsletter*, No. 80 (Feb. 1980) ("Approval is not required for publication of data within the United States as described in Section 125.11(a)(1). Footnote 3 to Section 125.11 does not establish a prepublication review requirement."). When a Ninth Circuit panel did consider such export controls as a speech-licensing regime (in a decision that was withdrawn pending *en banc* review that did not occur), the majority also found it unconstitutional. *Bernstein v. U.S. Dep't of Justice*, 176 F.3d 1132, 1145 (9th Cir.), *reh'g granted, opinion withdrawn*, 192 F.3d 1308 (9th Cir. 1999).

25

26

27

[PROPOSED] BRIEF OF AMICUS CURIAE ELECTRONIC FRONTIER FOUNDATION
NO. 2:18-cv-1115-RSL - 16

**focal** PLLC
900 1st Avenue S., Suite 201
Seattle, WA 98134
206.529.4827

the Internet, now the nation's dominant medium for speech. In *Chi Mak*, the court relied on that public domain exception to protect First Amendment rights. 683 F.3d at 1136. Indeed, half of the provisions of the public domain exception were enacted in response to concern over the constitutionality of ITAR,[25] and it was not until 2015 that the government issued a new interpretation reversing the understanding that one could publish into the public domain without government approval.[26] An earlier case considering export controls, *Edler*, was also decided before the regime was changed to eliminate judicial review for ITAR, and before the bulk of Supreme Court caselaw elaborating *Freedman*. *United States v. Edler Indus., Inc.*, 579 F.2d 516, 521 (9th Cir. 1978); 22 C.F.R. § 128.1 (effective Sept. 17, 1996); 22 U.S.C. § 2778(h). Even the Justice Department found that *Edler* did not resolve the First Amendment issues of which it had warned, and would continue to warn, the State Department until the prepublication review requirement was disavowed. *See Bernstein II*, 945 F. Supp. at 1292 n.12.

No court faithfully applying the *Freedman* standards could endorse the prepublication review scheme the government deployed to suppress the Design Files. That regime is not a permissible means to govern speech and should not be used to do so.

## CONCLUSION

For the forgoing reasons, the Court should deny the government's request for a prior restraint barring publication of the Design Files and should not command the Federal Defendants to use ITAR's flawed regime to suppress speech.

---

[25] Amendments to the International Traffic in Arms Regulations, U.S. Dep't of State, 58 Fed. Reg. 39,280 (July 22, 1993).

[26] "International Traffic in Arms: Revisions to Definitions of Defense Services, Technical Data, and Public Domain; Definition of Product of Fundamental Research; Electronic Transmission and Storage of Technical Data; and Related Definitions," U.S. Dep't of State, 80 Fed. Reg. 31,525-01, 31,526 (June 3, 2015) (proposed rule including requirement that "Prior to making available "technical data" or software subject to the ITAR, the U.S. government must approve the release…"). The State Department insisted this was merely a clarification of a preexisting requirement, but common prior understanding was that publication into the public domain was a safe harbor, *not* that the public domain exception only applied when *re*publishing existing public domain material. The government did not point to any previous enforcement of the supposed requirement and *amicus* is not aware of any prior enforcement *except* against Defense Distributed. (Even *Bernstein* involved the classification of encryption as 'defense articles,' which do not benefit from the public domain exception that applies to 'technical data.' *Bernstein II*, 945 F. Supp. at 1284).

[PROPOSED] BRIEF OF AMICUS CURIAE ELECTRONIC FRONTIER FOUNDATION
NO. 2:18-cv-1115-RSL - 17

**focal** PLLC
900 1st Avenue S., Suite 201
Seattle, WA 98134
206.529.4827

1   DATED: August 15, 2018                    */s/ Venkat Balasubramani*
2                                             Venkat Balasubramani, WSBA #28269
                                              FOCAL PLLC
3                                             900 1st Avenue S., Suite 201
                                              Seattle, WA  98134
4                                             Telephone:  (206) 529-4827
                                              Facsimile:  (206) 260-3966
5                                             venkat@focallaw.com

6                                             Kit Walsh (*pro hac* admission pending)
7                                             ELECTRONIC FRONTIER
                                              FOUNDATION
8                                             815 Eddy Street
                                              San Francisco, CA 94109
9                                             Telephone:  (415) 436-9333
                                              Facsimile:  (415) 436-9993
10                                            kit@eff.org

11                                            *Attorneys for Amicus Curiae*
12                                            *Electronic Frontier Foundation*

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

[PROPOSED] BRIEF OF AMICUS CURIAE ELECTRONIC FRONTIER
FOUNDATION
NO. 2:18-cv-1115-RSL - 18

**focal** PLLC
900 1st Avenue S., Suite 201
Seattle, WA 98134
206.529.4827

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

### CERTIFICATE OF SERVICE

I hereby certify that on this Wednesday, August 15, 2018 I caused copies of the foregoing Brief of *Amicus Curiae*, Electronic Frontier Foundation, to be served by electronic means via the Court's CM/ECF system on all counsel registered to receive electronic notices.

*/s/ Venkat Balasubramani*
Venkat Balasubramani

[PROPOSED] BRIEF OF AMICUS CURIAE ELECTRONIC FRONTIER
FOUNDATION
NO. 2:18-cv-1115-RSL - 19

**focal** PLLC
900 1st Avenue S., Suite 201
Seattle, WA 98134
206.529.4827