EXHIBIT 1

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | | |
|---|---|---|
| STATE OF WASHINGTON, et al., Plaintiff, | § § § | |
| v. | § | No. 2:18-cv-1115-RSL |
| U.S. DEPARTMENT OF STATE, et al., Defendants. | § § § | |

**DECLARATION OF SARAH J. HEIDEMA**

I, Sarah J. Heidema, pursuant to 28 U.S.C. § 1746, hereby declare and say as follows:

1. I am the Director of the Office of Defense Trade Controls Policy, within the Directorate of Defense Trade Controls (DDTC), in Bureau of Political-Military Affairs at the Department of State (the "Department"). I have held this position since April 2018, and my responsibilities include maintaining the International Traffic in Arms Regulations and providing policy guidance on the export of defense articles. I previously served as the Division Chief for Regulatory and Multilateral Affairs within the Office of Defense Trade Controls Policy and prior to that I held a variety positions covering export control issues within the Directorate of Defense Trade Controls and at the Department of Commerce, Bureau of Industry and Security. My varied positions afford me extensive knowledge of the Arms Export Control Act (AECA) and the International Traffic in Arms Regulations (ITAR) as it relates to DDTC activities.

2. I submit this declaration in support of the Federal Defendants' opposition to the motion for a preliminary injunction filed by Plaintiffs in the above-captioned case. The information contained herein is based on my personal knowledge and on information provided to me in my official capacity.

**Relevant Statutory and Regulatory Framework: AECA and ITAR**

3. The AECA authorizes the President "in furtherance of world peace and the security and

foreign policy of the United States . . . to control the import and the export of defense articles and defense services and to provide foreign policy guidance to persons of the United States involved in the export and import of such articles and services." 22 U.S.C. § 2778(a)(1). The AECA also authorizes the President "to designate those items which shall be considered as defense articles and defense services . . . and to promulgate regulations for the import and export of such articles and services. The items so designated shall constitute the "United States Munitions List" (USML). *Id.* The President delegated this authority to the Department with respect to exports, temporary imports, and brokering, and the Department has promulgated the ITAR to implement those portions of the statute. *See* Executive Order 13637(n)(i); 22 C.F.R. parts 120-130.

4. Within the Department, DDTC administers the ITAR, including part 121, which contains the USML. The items enumerated on the USML are those that "provide a critical military or intelligence advantage." 22 C.F.R. § 120.3(b). The AECA prohibits the export or import of defense articles and defense services without a license, except as specifically provided in regulations. *See* 22 U.S.C. § 2778(b)(2).

5. The USML comprises twenty-one categories that enumerate items including, for example: certain "[r]ockets, space launch vehicles (SLVs), missiles, bombs, torpedoes, depth charges, mines, and grenades," *see* 22 C.F.R. § 121.1 Category IV(a); "[a]ttack helicopters," *see* 22 C.F.R. § 121.1 Category VIII(a)(4); spacecraft meeting described characteristics, *see* 22 C.F.R. § 121.1 Category XV(a); and "[b]iological agents and biologically derived substances specifically developed, configured, adapted, or modified for the purpose of increasing their capability to produce casualties in humans . . . ." 22 C.F.R. § 121.1 Category XIV(b).

6. The USML also includes "technical data" "required for the design, development, production, manufacture, assembly, operation, repair, testing, maintenance or modification of

defense articles," such as "blueprints, drawings, photographs, plans, instructions or documentation." 22 C.F.R. § 120.10(a)(1); *see e.g.*, 22 C.F.R. § 121.1 Category XI(d). "Technical data" does not include information concerning general scientific, mathematical, or engineering principles commonly taught in schools, colleges, and universities, or information that is in the public domain. *See* 22 C.F.R. § 120.10. ITAR § 120.11 defines "public domain," in relevant part, as information which is published and generally accessible or available to the public, and provides a list of information that has been made available to the public, including "[t]hrough sales at . . . bookstores" and "[t]hrough public release (*i.e.*, unlimited distribution) in any form (e.g., not necessarily in published form) after approval by the cognizant U.S. government department or agency . . . ."

7. As required by the AECA, the Department periodically reviews the items—classes of hardware, technical data, and services described on the USML—to determine what items, if any, no longer warrant control under the ITAR and conveys the results of such reviews to Congress. *See* 22 U.S.C. § 2778(f). The review process begins with Department engagement with the Departments of Defense and Commerce to determine the categories most appropriate for review, and this consultation is informed by inquiries received from the general public, internal feedback from licensing officers and Commodity Jurisdiction analysts, and the period of time since the categories under consideration were reviewed previously. At the onset of the review process the Department publishes a Notice of Inquiry in the *Federal Register* to announce the categories under consideration for review and to solicit comment on potential improvements to those categories. If warranted, based on the feedback received, the Department will then initiate an ordinary rulemaking process, beginning with the publication of a Notice of Proposed Rulemaking (NPRM).

8. The Department continuously engages with its interagency partners and industry to evaluate the USML. For example, in 2015 the Department published a Notice of Inquiry requesting comments to inform its review, in part, of USML Categories VIII and XIX, Aircraft and Related Articles and Gas Turbine Engines and Associated Equipment, respectively. *See* 80 Fed. Reg. 11,313 (Mar. 2, 2015). In 2016, the Department published an NPRM proposing to revise the categories, *see* 81 Fed. Reg. 6,797 (Feb. 9, 2016), and a final rule implementing revisions later that year, *see* 81 Fed. Reg. 83,126 (Nov. 21, 2016). The Department also recently published a Notice of Inquiry requesting comments from the public to inform, in part, its review of the controls on Categories V, X, and XI implemented in 2014. *See* 83 Fed. Reg. 5,970 (Feb. 12, 2018); 79 Fed. Reg. 34 (Jan. 2, 2014) (final rule revising, in part, Categories V and X); 79 FR 37,535 (Jul. 1, 2014) (final rule revising, in part, Category XI). The Department and its interagency partners are reviewing the public comments submitted in response to the 2018 Notice of Inquiry, and the Department intends to publish an NPRM for public comment implementing any revisions to the categories that are warranted.

9. The AECA states that the Department "may not remove any item from the [USML] until 30 days after the date on which the President has provided notice of the proposed removal to the Committee on International Relations of the House of Representatives and to the Committee on Foreign Relations of the Senate." 22 U.S.C. § 2778(f). Since at least 2011, the Department has interpreted "item" within the meaning of this provision to refer to the specifically enumerated text of the USML. For example, the "item" controlled in Category VII(a)(1) is "(a) Armored combat ground vehicles as follows: (1) Tanks." 22 C.F.R. 121.1, in Category VII(a)(1). The Department would notify as required under 22 U.S.C. § 2778(f) prior to removing armored combat tanks from the USML, or otherwise circumscribing the text of this entry in a way that

would remove a class of tanks from the USML, *e.g.*, by revising the control only to cover those tanks that meet defined performance criteria. The Department formalized its adoption of this interpretation in 2011 after considering the statutory context, AECA legislative history, agency past practice, and the impracticality of notifying removal of every individual model, part, or component that might be impacted by a regulatory change. The Department informed Congress in 2011 that the Department would provide a formal 30-day notification, pursuant to 22 U.S.C. § 2778(f), for the removal of "items" from the USML related to category revisions. At that time the Department also volunteered to provide an informal review of removals of items from the USML beginning 30 days prior to the formal notification.

10. The Department also makes commodity jurisdiction (CJ) determinations, following a procedure described in the ITAR, to identify the export control jurisdiction of specific goods, services, and information. *See* 22 C.F.R. § 120.4. The purpose of the process is to determine whether—for purposes of export controls—specific goods, services, or information are subject to the ITAR and therefore under the jurisdiction of the Department or are subject to the Export Administration Regulations (EAR) and therefore under the jurisdiction of the Department of Commerce. The vast majority of all jurisdictional determinations are self-determined either by the original equipment manufacturer (OEM) or via a third party. The Department makes CJ determinations upon request by persons, most often the OEM, unable to self-determine the jurisdiction of a specific good, service, or information. The CJ process typically takes 45-55 business days. If after 45 days the Department has not provided a final CJ, the applicant may request in writing that the determination be given expedited processing. *See* 22 C.F.R. § 120.4(e).

11. The ITAR authorizes the Deputy Assistant Secretary for Defense Trade Controls to

"order a temporary suspension or modification of any or all of the [ITAR] in the interest of the security and foreign policy of the United States." 22 C.F.R. § 126.2.

**Relevant Statutory and Regulatory Framework: Licenses and Authorizations**

12. The ITAR requires a license, in relevant part, for the *export* of "technical data." *See* 22 C.F.R. § 123.1(a). Although revealing "technical data" to a foreign person, including through oral or visual disclosures, is an export under the ITAR, disclosing or transferring "technical data" to U.S. persons in the United States is not an export and is not governed by the ITAR. *See* 22 C.F.R. § 120.17. Consequently, forums in the United States where "technical data" is discussed normally limit participants to U.S. persons.[1] Because there are no unauthorized foreign persons in attendance, presenting "technical data" at such a conference would not result in an "export" within the meaning of the ITAR, and would not require a license from the Department. Similarly, while releasing "technical data" electronically to foreign persons is an ITAR-controlled export, posting "technical data" on a website that prevents access by foreign persons or sharing "technical data" between U.S. persons in the United States using a USB drive would not be ITAR-controlled exports.

13. ITAR § 125.4(b)(13) reinforces the public domain provision by exempting from the ITAR licensing requirements "[t]echnical data approved for public release (i.e., unlimited distribution) by the cognizant U.S. Government department or agency or Office of Freedom of Information and Security Review." Thus, when the U.S. government authorizes the public

[1] For example, the admittance policy for the American Institute of Aeronautics and Astronautics 2013 Propulsion and Energy Event provided: "If you plan to attend any presentations restricted by ITAR, you must bring proof of citizenship . . . . Please note that only U.S. Citizens and U.S. Resident Aliens can be considered for attendance at these restricted presentations. Admittance to restricted sessions and access to restricted technical papers is implemented and controlled by the rules of ITAR." https://www.aiaa.org/Secondary.aspx?id=14287 (last visited Jul. 11, 2018).

release of "technical data," that information does not require a license from DDTC for export.

14. The AECA provides for criminal and civil penalties for violations involving controls imposed on the export of defense articles and defense services, including for unauthorized exports. *See* 22 U.S.C. § 2778(c), (e); 22 C.F.R. § 127.1. ITAR enforcement decisions are made on a case-by-case basis depending on the particular facts of a case. Civil penalties may include a monetary penalty or debarment from participating in activities subject to the ITAR. *See* 22 CFR §§ 127.3, 127.10, 127.7.

**Interagency Review of the USML**

15. Since 2010, the Department of State has been engaged in an interagency effort to revise the USML so that its scope is limited to those defense articles that provide the United States with a critical military or intelligence advantage. In the specific case of the Department's proposed revisions to USML Categories I-III, the Department interpreted this standard to focus on whether the defense articles at issue are inherently for military end-use. *See* 83 Fed. Reg. 24,198, 24,198 (Jul. 9, 2018). This ongoing effort is intended to create a simpler, more robust export control system that simplifies industry compliance, supports interoperability with allies and partners, and focuses the Department's resources on those technologies most critical to U.S. national security. In connection with this effort, the Department has published 26 final, or interim final, rules revising eighteen of the twenty-one USML categories,[2] removing less sensitive items from the USML, that are concurrently added by the Department of Commerce (DOC) to the Commerce

[2] *See e.g.,* 79 Fed. Reg. 27,180 (May 13, 2014) ("Amendment to the International Traffic in Arms Regulations: Revision of U.S. Munitions List Category XV"); 79 Fed. Reg. 37,535 (Jul. 1, 2014) ("Amendment to the International Traffic in Arms Regulations: United States Munitions List Category XI (Military Electronics), and Other Changes"); 81 Fed. Reg. 49,531 (Jul. 28, 2016) ("Amendment to the International Traffic in Arms Regulations: Revision of U.S. Munitions List Categories XIV and XVIII"); 81 Fed. Reg. 70,340 (Oct. 12, 2016) ("Amendment to the International Traffic in Arms Regulations: Revision of U.S. Munitions List Category XII"); 81 Fed. Reg. 83,126 (Nov. 21, 2016) ("Amendment to the International Traffic in Arms Regulations: Revision of U.S. Munitions List Categories VIII and XIX"); 82 Fed. Reg. 2,889 (Jan. 10, 2017) ("International Traffic in Arms Regulations: Revision of U.S. Munitions List Category XV").

Control List (CCL).

16. To implement these changes, the Department works collaboratively with its interagency partners to evaluate and revise categories of items on the USML. While a wide range of interagency stakeholders review and clear the *Federal Register* notices that revise the USML, the Department works particularly closely with the Departments of Defense and Commerce to solicit their views on the appropriate composition of the USML. The engagement with the DOC is further intended to ensure that the jurisdictional posture of a given item is clear, and the application of ITAR or EAR controls to that item can be discerned and understood by the public. Additionally, the Department coordinates with the DOC to publish rules in parallel where updates to the USML require conforming changes to the CCL to ensure the appropriate level of control.

17. With respect to the Department of Defense (DoD), as required by Executive Order 13637, the Department obtains concurrence of the Secretary of Defense for designations, including changes in designations, of items or categories of items that are defense articles and defense services enumerated on the USML. *See* Executive Order 13637(n)(i). Throughout this effort to revise the USML, which began in 2010,[3] the Department has followed a consistent process for revising the USML categories and obtaining DoD concurrence. This process begins with an internal national security review conducted by the DoD[4] to assess which items in the category continue to warrant control on the USML. The DoD presents the results of this review

[3] The interagency effort to revise the USML began in 2010. *See* 75 Fed. Reg. 76,935 (Dec. 10, 2010) (publishing advanced notice of proposed rulemaking, "Revisions to the United States Munitions List," seeking public comment on "revisions to the United States Munitions List (USML) that would make it a 'positive list' of controlled defense articles"). The Department published its first final rule revising the USML as part of this effort in 2013. *See* 78 Fed. Reg. 22,740 (Apr. 16, 2013) ("Amendment to the International Traffic in Arms Regulations: Initial Implementation of Export Control Reform").

[4] Within the DoD, the Defense Technology Security Administration (DTSA) has the lead in engaging with the Department and the interagency on this effort.

in an interagency meeting, and, if warranted by interagency discussion, will conduct and report on further internal national security assessments. The iterative process generates rules for publication in the *Federal Register*.

18. The Department has long taken the position that controlling the temporary import and export of defense articles and services is a foreign affairs function of the U.S. government, and that rules implementing this function are exempt from sections 553 (rulemaking) and 554 (adjudications) of the Administrative Procedure Act (APA). *See* 22 C.F.R § 128.1. The Department, nevertheless, accepted public comment through a notice of proposed rulemaking prior to adding, removing, or amending the description of any item on the USML.

19. As part of the most recent review of the USML, the Department has not published final rules revising Categories I, II, or III, which enumerate respectively: firearms, close assault weapons and combat shotguns; guns and armament; and ammunition/ordnance. Through the interagency review process described above, in which the Department coordinated principally with the Departments of Defense and Commerce to develop revisions to the USML and CCL, the Department determined that certain items now controlled by USML Categories I-III do not provide the United States with a critical military or intelligence advantage, and therefore do not warrant control on the USML. This decision was informed by DoD's assessment that the items proposed for transfer are already commonly available and not inherently for military end-use, such as semi-automatic firearms under .50 caliber currently described in Category I(a). As an example, a specific make and model meeting the description of this subparagraph is the Beretta M9 pistol, which is available for sale at sporting goods stores and other retailers throughout the United States, and has been licensed by the Department for export to commercial retailers and militaries around the world. The assessment that the items proposed for removal pose little

national security concern is highlighted by the fact that DoD does not generally review export license applications for the physical items described in Category I, as DoD does for license applications in other categories.

20. The Department briefed the outcome of this review to the staff of the Senate Foreign Relations Committee, Senate Committee on Banking, Housing, and Urban Affairs, and House Foreign Affairs Committee on May 14, 2018. Subsequently, on May 24, 2018, the Department published in the *Federal Register* a NPRM (May 2018 NPRM), 83 Fed. Reg. 24,198, proposing to transfer oversight from the Department of State to the DOC certain articles in these categories, including firearms widely available for commercial sale.

21. As part of the May 2018 NPRM, the Department proposed to revise USML Category I, covering firearms and related articles, to control only defense articles that are inherently military or that are not otherwise widely available for commercial sale. In particular, if the rule is finalized as contemplated in the NPRM, the revised Category I will not include non-automatic and semi-automatic firearms to caliber .50 (12.7mm) inclusive, currently controlled under paragraph (a), and all of the components, parts, accessories, and attachments for those articles. If finalized as contemplated in the NPRM, technical data related to the firearms that are removed from the USML will no longer be subject to the ITAR.

22. The May 2018 NPRM proposed that the Department would retain jurisdiction of certain firearms considered to provide a critical military or intelligence advantage, such as: firearms that fire caseless ammunition; fully automatic firearms to caliber .50 (12.7mm) inclusive; and firearms specially designed to integrate fire control, automatic tracking, or automatic firing systems.

23. The comment period on the May 2018 NPRM closed on July 9, 2018. The Department

received more than 3,500 comments in response to the NPRM, including comments related to 3D-printed firearms. The Department is reviewing these public comments and will respond if it publishes a final rule. None of the Plaintiff States submitted comments in response to the NPRM.

24. The Department has not withdrawn the May 2018 NPRM and is actively preparing a final rule for publication. The national security determination that informed the NPRM—that certain items now controlled by USML Categories I-III do not provide the United States with a critical military or intelligence advantage, and therefore do not warrant continued control on the USML—remains the Department's position with respect to the items proposed for transfer. The Department intends to notify Congress, in accordance with 22 U.S.C. § 2778(f), at least 30 days in advance of any final rule removing items from USML Categories I-III.

**Defense Distributed Settlement Agreement**

25. In early May 2013, the Department became aware that Defense Distributed had placed on an unrestricted website executable Computer-Aided Design (CAD) files enabling the manufacture of plastic firearm components, accessories, and attachments with a 3D printer. The Department informed Defense Distributed that, as a result of this unrestricted posting, Defense Distributed may have released ITAR-controlled technical data to foreign persons without the required authorization. Defense Distributed removed the published files and, with the Second Amendment Foundation, eventually brought a lawsuit against, *inter alia*, the Department claiming that the requirement to obtain authorization prior to publishing the files on the website violated the plaintiffs' rights under the First, Second, and Fifth Amendments.

26. I understand that the various files, including those that were the subject of the *Defense Distributed* litigation, were downloaded repeatedly while available on the Defense Distributed

website.[5] I also understand that internationally hosted websites continued to make those files available for download during the pendency of the *Defense Distributed* litigation. Any restrictions imposed by the Department on the technical data that was the subject of the action were limited to the export of that technical data; the Department has no jurisdiction over sharing technical data between U.S. persons in the United States, unless such sharing also provides access to foreign persons.

27. The parties entered into a settlement agreement on June 29, 2018, a true and correct copy of which is attached hereto as Exhibit A, in which the Government agreed, in relevant part, to:

> (a) [D]raft and to fully pursue, to the extent authorized by law (including the Administrative Procedure Act), the publication in the Federal Register of a notice of proposed rulemaking and final rule, revising USML Category I to exclude the technical data that is the subject of the Action.
>
> (b) [Announce], while the above-referenced final rule is in development, of a temporary modification, consistent with the . . . (ITAR), 22 C.F.R. § 126.2, of USML Category I to exclude the technical data that is the subject of the Action. The announcement will appear on the DDTC website, www.pmddtc.state.gov, on or before July 27, 2018.
>
> (c) [Issue] a letter to Plaintiffs on or before July 27, 2018, signed by the Deputy Assistant Secretary for Defense Trade Controls, advising that the Published Files, Ghost Gunner Files, and CAD Files are approved for public release (i.e., unlimited distribution) in any form and are exempt from the export licensing requirements of the ITAR because they satisfy the criteria of 22 C.F.R. § 125.4(b)(13). For the purposes of 22 C.F.R. § 125.4(b)(13) the Department of State is the cognizant U.S. Government department or agency, and the Directorate of Defense Trade Controls has delegated authority to issue this approval.

28. The settlement agreement was not an admission by the Department of any fault, or of any

---

[5] For example, Forbes reported in 2013 that "[i]f gun control advocates hoped to prevent blueprints for the world's first fully 3D-printable gun from spreading online, that horse has now left the barn about a hundred thousand times. That's the number of downloads of the 3D-printable file for the so-called 'Liberator' gun that the high-tech gunsmithing group Defense Distributed has seen in just the last two days . . . ." Forbes, *3D-Printed Gun's Blueprints Downloaded 100,000 Times in Two Days (With Some Help from Kim Dotcom)*, available at https://www.forbes.com/sites/andygreenberg/2013/05/08/3d-printed-guns-blueprints-downloaded-100000-times-in-two-days-with-some-help-from-kim-dotcom/ (last visited Aug. 3, 2018).

omission in any act or failure to act, and the Department denied, and continues to deny, any *ultra vires* actions, as well as any violation of the First, Second, or Fifth Amendments of the United States Constitution.

29. The Department complied with the actions required by the settlement agreement, and the case was dismissed on July 30, 2018.

30. In accordance with longstanding Department policy in effect since at least 2011, the temporary modification of the ITAR pursuant to ITAR § 126.2, described in paragraph 1(b) of the settlement agreement, was not notified to Congress under 22 U.S.C. § 2778(f). During the effort to revise the USML, described in paragraph 15 above, the Department has provided 30-day notice to Congress prior to modifying the USML text to remove classes of hardware, technical data, and services described on the USML. These revisions of USML text announced the transfer to the CCL of groups or categories of articles meeting broad descriptions, rather than specific models, types or specific parts and components that may be captured within the groups or categories. Here, the temporary modification did not propose to remove, even temporarily, classes of hardware or technical data from the USML within the Department's interpretation of "item" for 22 U.S.C § 2778(f) purposes. Consequently, if the Department removes classes of hardware, technical data, or services described on the USML, such as in connection with the May 2018 NPRM, Congress will receive the necessary notifications. The Department's interpretation of "item" makes practical sense because it would be difficult, if not impossible, to comprehensively identify and enumerate each article or commodity captured by the regulatory text.

31. Similarly, the Department obtains concurrence from the Secretary of Defense when the Department makes changes in designations of items—classes of hardware, technical data, and

services described on the USML—such as for the proposed removal of certain non-automatic and semi-automatic firearms to caliber .50 inclusive, described in USML Category I(a), and the associated technical data, as described in USML Category I(h). The Department requested and received concurrence from DoD in the policy decision to remove all non-automatic and semi-automatic firearms, and associated technical data, from the United States Munitions List, as described in detail in the May 2018 NPRM. Furthermore, the Department requested and received concurrence from DoD, through the Defense Technology Security Administration, before sending the letter, described in paragraph 1(c) of the settlement agreement, advising Defense Distributed that the Published Files, Ghost Gunner Files, and CAD Files are approved for public release (i.e., unlimited distribution) in any form and are exempt from the export licensing requirements of the ITAR.

32. The ITAR contemplates release of technical data into the public domain and provides an exemption from the licensing requirements for technical data that cognizant U.S. government agencies or departments have approved for public release. *See* 22 C.F.R §§ 120.11, 125.4(b)(13). In accordance with the Department's interpretation of 22 U.S.C. § 2778(f) described in paragraphs 9 and 30, the Department does not consider the release of information into the public domain to be the removal of an "item" from the USML requiring notification. As such, the Department does not notify Congress when such release is authorized, such as occurred with the letter that the Department sent to Defense Distributed pursuant to paragraph 1(c) of the settlement agreement.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 15, 2018.

Sarah J. Heidema

# Exhibit A

**SETTLEMENT AGREEMENT**

Defense Distributed ("DD"), Second Amendment Foundation, Inc. ("SAF"), and Conn Williamson (collectively, "Plaintiffs,") and the United States Department of State ("State"), the Secretary of State, the Directorate of Defense Trade Controls ("DDTC"), the Deputy Assistant Secretary, Defense Trade Controls, and the Director, Office of Defense Trade Controls Policy (collectively, "Defendants"), out of a mutual desire to resolve all of the claims in the case captioned *Defense Distributed, et al. v. Dep't of State, et al.*, Case No. 15-cv-372-RP (W.D. Tex.) (the "Action") without the need for further litigation and without any admission of liability, hereby stipulate and agree as follows:

Plaintiffs and Defendants do hereby settle all claims, issues, complaints, or actions described in the case captioned, and any and all other claims, complaints, or issues that have been or could have been asserted by Plaintiffs against Defendants in accordance with the following terms and conditions:

1. *Consideration*: In consideration of Plaintiffs' agreement to dismiss the claims in the Action with prejudice as described in paragraph 2, below, Defendants agree to the following, in accordance with the definitions set forth in paragraph 12, below:

(a) Defendants' commitment to draft and to fully pursue, to the extent authorized by law (including the Administrative Procedure Act), the publication in the Federal Register of a notice of proposed rulemaking and final rule, revising USML Category I to exclude the technical data that is the subject of the Action.

(b) Defendants' announcement, while the above-referenced final rule is in development, of a temporary modification, consistent with the International

Traffic in Arms Regulations (ITAR), 22 C.F.R. § 126.2, of USML Category I to exclude the technical data that is the subject of the Action. The announcement will appear on the DDTC website, www.pmddtc.state.gov, on or before July 27, 2018.

(c) Defendants' issuance of a letter to Plaintiffs on or before July 27, 2018, signed by the Deputy Assistant Secretary for Defense Trade Controls, advising that the Published Files, Ghost Gunner Files, and CAD Files are approved for public release (i.e., unlimited distribution) in any form and are exempt from the export licensing requirements of the ITAR because they satisfy the criteria of 22 C.F.R. § 125.4(b)(13). For the purposes of 22 C.F.R. § 125.4(b)(13) the Department of State is the cognizant U.S. Government department or agency, and the Directorate of Defense Trade Controls has delegated authority to issue this approval.

(d) Defendants' acknowledgment and agreement that the temporary modification of USML Category I permits any United States person, to include DD's customers and SAF's members, to access, discuss, use, reproduce, or otherwise benefit from the technical data that is the subject of the Action, and that the letter to Plaintiffs permits any such person to access, discuss, use, reproduce or otherwise benefit from the Published Files, Ghost Gunner Files, and CAD Files.

(e) Payment in the amount of $39,581.00. This figure is inclusive of any interest and is the only payment that will be made to Plaintiffs or their counsel by Defendants under this Settlement Agreement. Plaintiffs' counsel will provide Defendants'

counsel with all information necessary to effectuate this payment.

The items set forth in subparagraphs (a) through (e) above constitute all relief to be provided in settlement of the Action, including all damages or other monetary relief, equitable relief, declaratory relief, or relief of any form, including but not limited to, attorneys' fees, costs, and/or relief recoverable pursuant to 2 U.S.C. § 1302, 2 U.S.C. § 1311, 2 U.S.C. § 1317, 22 U.S.C. § 6432b(g), 28 U.S.C. § 1920, Fed. R. Civ. P. 54(d), and the Local Rules.

2. *Dismissal with Prejudice:* At the time of the execution of this Settlement Agreement, Plaintiffs agree to have their counsel execute and provide to Defendants' counsel an original Stipulation for Dismissal with Prejudice pursuant to Fed. R. Civ. P. 41(a)(1)(A)(ii) and 41(a)(1)(B). Counsel for Defendants agree to execute the stipulation and file it with the Court in the Action, no sooner than 5 business days after the publication of the announcement described in Paragraph 1(b) of this Settlement Agreement and issuance of the letter described in Paragraph 1(c) of this Settlement Agreement. A copy of the Stipulation for Dismissal with Prejudice is attached hereto.

3. *Release:* Plaintiffs, for themselves and their administrators, heirs, representatives, successors, or assigns, hereby waive, release and forever discharge Defendants, and all of their components, offices or establishments, and any officers, employees, agents, or successors of any such components, offices or establishments, either in their official or

individual capacities, from any and all claims, demands and causes of action of every kind, nature or description, whether currently known or unknown, which Plaintiffs may have had, may now have, or may hereafter discover that were or could have been raised in the Action.

4. *No Admission of Liability:* This Settlement Agreement is not and shall not be construed as an admission by Defendants of the truth of any allegation or the validity of any claim asserted in the Action, or of Defendants' liability therein. Nor is it a concession or an admission of any fault or omission in any act or failure to act. Nor is it a concession or admission as to whether the monetary or equitable relief, attorneys' fees, costs, and expenses sought by Plaintiffs in the Action, are reasonable or appropriate. None of the terms of the Settlement Agreement may be offered or received in evidence or in any way referred to in any civil, criminal, or administrative action other than proceedings permitted by law, if any, that may be necessary to consummate or enforce this Settlement Agreement. The terms of this Settlement Agreement shall not be construed as an admission by Defendants that the consideration to be given hereunder represents the relief that could be recovered after trial. Defendants deny that they engaged in *ultra vires* actions, deny that they violated the First Amendment, Second Amendment, or Fifth Amendment of the United States Constitution, and maintain that all of the actions taken by Defendants with respect to Plaintiffs comply fully with the law, including the United States Constitution.

5.    *Merger Clause:* The terms of this Settlement Agreement constitute the entire agreement of Plaintiffs and Defendants entered into in good faith, and no statement, remark, agreement or understanding, oral or written, which is not contained therein, shall be recognized or enforced. Plaintiffs acknowledge and agree that no promise or representation not contained in this Settlement Agreement has been made to them and they acknowledge and represent that this Settlement Agreement contains the entire understanding between Plaintiffs and Defendants and contains all terms and conditions pertaining to the compromise and settlement of the disputes referenced herein. Nor does the Parties' agreement to this Settlement Agreement reflect any agreed-upon purpose other than the desire of the Parties to reach a full and final conclusion of the Action, and to resolve the Action without the time and expense of further litigation.

6.    *Amendments:* This Settlement Agreement cannot be modified or amended except by an instrument in writing, agreed to and signed by the Parties, nor shall any provision hereof be waived other than by a written waiver, signed by the Parties.

7.    *Binding Successors*: This Settlement Agreement shall be binding upon and inure to the benefit of Plaintiffs and Defendants, and their respective heirs, executors, successors, assigns and personal representatives, including any persons, entities, departments or agencies succeeding to the interests or obligations of the Parties.

8. *Consultation with Counsel:* Plaintiffs acknowledges that they have discussed this Settlement Agreement with their counsel, who has explained these documents to them and that they understand all of the terms and conditions of this Settlement Agreement. Plaintiffs further acknowledge that they have read this Settlement Agreement, understand the contents thereof, and execute this Settlement Agreement of their own free act and deed. The undersigned represent that they are fully authorized to enter into this Settlement Agreement.

9. *Execution:* This Settlement Agreement may be executed in one or more counterparts, each of which shall be deemed an original, and all of which together constitute one and the same instrument, and photographic copies of such signed counterparts may be used in lieu of the original.

10. *Jointly Drafted Agreement:* This Settlement Agreement shall be considered a jointly drafted agreement and shall not be construed against any party as the drafter.

11. *Tax and Other Consequences:* Compliance with all applicable federal, state, and local tax requirements shall be the sole responsibility of Plaintiffs and their counsel. Plaintiffs and Defendants agree that nothing in this Settlement Agreement waives or modifies federal, state, or local law pertaining to taxes, offsets, levies, and liens that may apply to this

Settlement Agreement or the settlement proceeds, and that Plaintiffs are executing this Settlement Agreement without reliance on any representation by Defendants as to the application of any such law.

12. *Definitions*: As used in this Settlement Agreement, certain terms are defined as follows:

- The phrase "*Published Files*" means the files described in paragraph 25 of Plaintiffs' Second Amended Complaint.
- The phrase "*Ghost Gunner Files*" means the files described in paragraph 36 of Plaintiffs' Second Amended Complaint.
- The phrase "*CAD Files*" means the files described in paragraph 40 of Plaintiffs' Second Amended Complaint.
- The phrase "*Other Files*" means the files described in paragraphs 44-45 of Plaintiffs' Second Amended Complaint.
- The phrase "*Military Equipment*" means (1) Drum and other magazines for firearms to .50 caliber (12.7 mm) inclusive with a capacity greater than 50 rounds, regardless of jurisdiction of the firearm, and specially designed parts and components therefor; (2) Parts and components specially designed for conversion of a semi-automatic firearm to a fully automatic firearm; (3) Accessories or attachments specially designed to automatically stabilize aim (other than gun rests) or for automatic targeting, and specially designed parts and components therefor.
- The phrase "*technical data that is the subject of the Action*" means: (1) the Published Files; (2) the Ghost Gunner Files; (3) the CAD Files; and (4) the Other Files insofar as those files regard items exclusively: (a) in Category I(a) of the United States Munitions List (USML), as well as barrels and receivers covered by Category I(g) of the USML that are components of such items; or (b) items

covered by Category I(h) of the USML solely by reference to Category I(a), excluding Military Equipment.

Dated: June 29, 2018

Dated: June 29, 2018

Matthew A. Goldstein
Snell & Wilmer LLP
One South Church Ave. Ste. 1500
Tucson, Arizona 85701
*Counsel for Plaintiffs*

Dated: June 29, 2018

Eric J. Soskin
Stuart J. Robinson
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., N.W.
Washington, D.C. 20001
Tel. (202) 353-0533

*Counsel for Defendants*