The Honorable Robert S. Lasnik

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON
## AT SEATTLE

| | |
|---|---|
| STATE OF WASHINGTON, et al.<br><br>            Plaintiffs,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF STATE, et al.,<br><br>            Defendants. | No. 2:18-cv-01115-RSL<br><br>**PRIVATE DEFENDANTS' RESPONSE TO PLAINTIFF STATES' MOTION TO COMPEL DISCOVERY RESPONSES** |

1

**Summary of the Argument**

2

The Private Defendants should not be a "party" to this action. Instead, they should have

3

been dismissed because no one pleads a claim for relief against them and because their presence

4

is not necessary to ensure consistency of obligations or to ensure complete relief amongst the

5

Plaintiff States and Government Defendants. *See* Dkts. 114, 125. Yet they remain.

6

The Private Defendants acknowledge that the Court kept them as "parties" by denying the

7

motion to dismiss. Dkt. 130. But even as that decision is taken for granted (the Private Defendants

8

reserve their right to challenge it on appeal), the Private Defendants' "party" status does *not* make

9

it open season on discovery against them. The Court's bestowal of "party" status rests upon two

10

slender justifications—neither of which entails subjecting the Private Defendants to any discovery.

11

The critical points to begin with are the "party" properties that the Private Defendants *lack*.

12

Their "party" status does *not* entail any actual claim for relief by or against the Private Defendants.

13

The order on the motion to dismiss held this: "Plaintiffs do not seek any relief directly from the

14

private defendants." Dkt. 130 at 2. Nor does "party" status rest upon the preliminary injunction

15

that speaks only to the "federal defendants." Dkt. 95 at 25. Instead, the Court's order denying the

16

motion to dismiss makes the Private Defendants' "party" status rest upon two justifications:

17
18
19
20
21

> First, the private defendants will have a chance to be heard and make their best arguments. Second, the Court's findings will bind all of the interested parties and preclude collateral challenges to the APA determination (such as an action for specific performance of the settlement agreement) that would raise the possibility of inconsistent rulings and obligations for the parties.

22

Dkt. 130 at 4. Even if these two justifications are valid and enough to warrant "party" status

23

(conclusions that the Private Defendants continue to respectfully disagree with), they do *not*

24

warrant discovery. The Private Defendants can "be heard and make their best arguments" without

25

having to meet the Plaintiff States' discovery demands, and the Court's "APA determination"

26

likewise does not require the Private Defendants' participation in discovery.

Private Defendants' Response to
Plaintiff States' Motion to
Compel Discovery Responses
No 2:18-cv-01115-RSL

- 1 -

Beck Redden LLP
1221 McKinney Street, Suite 4500
Houston, Texas 77010
(713) 951-3700

1    In this respect, the Court's order denying the motion to dismiss rightly concludes that "this

2    litigation focuses on *the procedural correctness* of the federal government's actions in issuing the

3    temporary modification and the July 27, 2018, letter." Dkt. 130 at 3 (emphasis added).  The parties

4    also agree that this procedural determination will depend upon *the administrative record* that was

5    before the Government Defendants at the time of the decisions.  Dkt. 34 at 1-5; Dkt. 49 at 4-5;

6    Dkt. 110 at 2-5.  Because of this, the "APA determination" that supposedly justifies the Private

7    Defendants' "party" status does *not* necessitate discovery against the Private Defendants.

8    Rule 26 allows for discovery only of "matter that is relevant to any party's claim or

9    defense." Fed. R. Civ. P. 26(b)(1) (emphasis added).  But even in light of the *sui generis* "party"

10   status now held by the Private Defendants, the Plaintiff States' requested discovery is still not

11   "relevant to any party's claim or defense."  This alone warrants denying the motion in full.

12   Additionally, the Plaintiff States' motion should be denied because granting it would

13   constitute a "trespasses upon fundamental freedoms protected by the Due Process Clause of the

14   Fourteenth Amendment." *NAACP v. Ala. ex rel. Patterson*, 357 U.S. 449, 461 (1958).  Under

15   decades of well-established Supreme Court precedent, the Private Defendants possess a First

16   Amendment privilege against discovery, under which government entities like the Plaintiff States

17   have no right to rifle through the Private Defendants' papers, no right to demand disclosure of the

18   Private Defendants' membership lists, and no right to demand disclosure of who the Private

19   Defendants have been talking to, who they plan to talk to, and how they carry out their

20   constitutionally protected advocacy.  An order requiring the Private Defendants to comply with

21   such demands would violate their First Amendment privilege and warrant immediate mandamus

22   relief.  *See, e.g.*, *Perry v. Schwarzenegger*, 591 F.3d 1147, 1156 (9th Cir. 2010) (granting

23   mandamus).

Private Defendants' Response to
Plaintiff States' Motion to
Compel Discovery Responses
No 2:18-cv-01115-RSL

- 2 -

Beck Redden LLP
1221 McKinney Street, Suite 4500
Houston, Texas 77010
(713) 951-3700

1

**Argument**

2          The Private Defendants have already disclosed far more than what the Federal Rules of

3   Civil Procedure and Constitution require.  In response to the Plaintiff States' requests for disclosure

4   and production, the Private Defendants revealed the following (among other things):

5              After July 31, 2018, the Private Defendants did not post any Subject Files online or
6              otherwise make them publicly available via the internet, and did not assist or
7              facilitate any other person in posting any Subject Files online or otherwise making
8              them publicly available via the internet. After August 27, 2018, Defense Distributed
9              distributed the Subject Files via United States Postal Service mail.
10

11   Dkt. 149-3 at 9.  The Court should deny motion's demand for discovery of anything more than

12   what the Private Defendants have already volunteered.[1]

13   **I.       The motion should be denied as to SAF and Conn Williamson.**

14          The motion's best arguments are essentially restricted to Defense Distributed.  No serious

15   case is made that SAF or Conn Williamson should be compelled to produce any discovery, and

16   for good reason.  The case for discovery against them is weaker than the one against Defense

17   Distributed in every respect, and to the extent that discovery is warranted as to Defense Distributed,

18   it would be unnecessarily duplicative to also mandate it as to SAF and Conn Williamson.

19   **II.      None of the requested discovery is "relevant to any party's claim or defense."**

20          Rule 26 imposes a firm relevance requirement: "Parties may obtain discovery regarding

21   any nonprivileged matter that is relevant to any party's claim or defense . . . ."  Fed. R. Civ. P.

22   26(b)(1).  Contrary to what the motion says, Dkt. 148 at 7, the Private Defendants do not have to

23   disprove relevance.  As movants, the Plaintiff States bear the burden of establishing relevance as

24   to every item at issue.  *See, e.g.*, *Holmes v. Nova*, No. C16-1422RSL, 2018 WL 1911182, at *1

25   (W.D. Wash. Apr. 23, 2018) (Lasnik, J.).  They have not satisfied that burden in any respect.

---

[1] The Private Defendants object to the chart attached as the motion's Exhibit 12.  The chart is not evidence.  It is an additional part of the motion.  It should not be considered because the Plaintiff States used up all of LCR 7's allotted pages with the motion itself.

Private Defendants' Response to
Plaintiff States' Motion to
Compel Discovery Responses
No 2:18-cv-01115-RSL                                    - 3 -                     Beck Redden LLP
1221 McKinney Street, Suite 4500
Houston, Texas 77010
(713) 951-3700

A.     **The requested discovery is not relevant to the preliminary injunction.**

Mainly, the motion argues that concerns regarding preliminary injunction compliance warrant the requested discovery.  Dkt. 148 at 8.  This is wrong for multiple reasons.

First, the injunction-compliance argument is wrong because the injunction does not tell the Private Defendants to do or not do anything.  The Government Defendants are the only ones that this injunction issues commands to, and the Private Defendants are not suspected of having done anything whatsoever to impede the Government Defendants' actual compliance therewith.

If the Plaintiff States wanted to enjoin the Private Defendants' conduct, they should have requested such an injunction.  But they failed to do so, as the Court confirmed at the hearing on the TRO: "I'm not being asked to enjoin your client directly. I'm being asked to enjoin the federal defendants from putting on the OK list the production of these weapons." Ex. A at 44:15-23.  The motion acknowledges that "the Private Defendants are not directly enjoined" as though there is such as thing as being "indirectly enjoined."  There is not.

An injunction's scope is defined by its text —not by the Plaintiff States' divined idea of its "purpose and spirit."  Dkt. 148 at 10.  Rule 65 defeats the motion's "purpose and spirit" point by mandating that every injunction "state its terms specifically" and "describe in reasonable detail . . . the act or acts restrained or required." Fed. R. Civ. P. 65 (d)(1)(C).  Since "basic fairness requires that those enjoined receive explicit notice of precisely what conduct is outlawed," *Schmidt v. Lessard*, 414 U.S. 473, 476 (1974), textual ambiguities are *never* construed to broaden an injunction; they are always construed in favor of narrowing the injunction.  *See, e.g.*, *Portland Feminist Women's Health Ctr. v. Advocates for Life, Inc.*, 859 F.2d 681, 685 (9th Cir. 1988).

Because of this rule, the motion is wrong to say that "encouraging, inciting, causing, or failing to take all reasonable steps to prevent the posting of the files on the internet or otherwise export them would violate the purpose and spirit of the injunction." Dkt. 148 at 10.  The

Private Defendants' Response to
Plaintiff States' Motion to
Compel Discovery Responses
No 2:18-cv-01115-RSL

- 4 -

Beck Redden LLP
1221 McKinney Street, Suite 4500
Houston, Texas 77010
(713) 951-3700

1    injunction's "spirit" cannot outrun its text, and the text clearly imposes obligations upon no one

2    but the Government Defendants.

3         Second, the injunction-compliance argument is wrong because, even as to the parties that

4    it directs, the injunction does not decide (1) whether and how the Government Defendants must

5    perform the Settlement Agreement in the future, or (2) whether the Private Defendants have a

6    constitutional right to engage in the speech at issue.  Instead, it addresses the discrete issue of

7    whether the Government Defendants' July 2018 Temporary Modification and/or license violated

8    the Administrative Procedure Act or Tenth Amendment.  This is perfectly consistent with the

9    position that the Private Defendants have taken in the Section 1983 action before Judge Pitman:

10        The regulatory changes and license that resulted from *Defense Distributed*
11   *I* may be *sufficient* to establish the Plaintiffs' right to share the digital firearms
12   information at issue here.  But as a matter of law, they are not *necessary*. The
13   Constitution guarantees the Plaintiffs' right to engage in the speech at issue. The
14   Plaintiffs can legally do so now regardless of whether the State Department
15   acknowledges that right with a regulatory modification and/or license.
     . . . .
16        In *State of Washington v. United States Department of State*, No. 2:18-cv-
17   1115-RSL (W.D. Wash.), New Jersey and other states are suing the State
18   Department to invalidate the regulatory modification and license issuance that
19   occurred in July 2018. The case concerns whether the State Department complied
20   with the Administrative Procedure Act in performing those actions. The case's
21   preliminary injunction applies only to the State Department; it does not order
22   Defense Distributed to do or not do anything. Ex. 20 at 25. Even if the states in that
23   case ultimately prevail, the State Department will not be barred from complying
24   with the Settlement Agreement. Success for the states in the Washington action
25   means only that the State Department can simply re-perform the regulatory
26   modification and license issuance in accordance with the APA. Indeed, the
27   Settlement Agreement requires the government to perform its obligations
28   thereunder in a manner "authorized by law (including the Administrative Procedure
29   Act)." Ex. 14 ¶ 1(a).

30   *Defense Distributed v. Grewal*, No. 1:18-cv-00637-RP, Dkt. 67 at 5& n.3 (W.D. Tex.) (Ex. C).[2]

---

[2] To the extent that prior filings espoused a different view of the TRO or preliminary injunction's
nature, the Private Defendants have now made their permanent position in the matter clear.  Dkt.
125 at 1-2; *see id.* at 2 ("Of course the Private Defendants made prophylactic arguments initially
to ensure that, *if* this action adjudicated the latter issues, they would be accounted for properly. But
the Court decided not to adjudicate those issues, and it did so at the Plaintiffs States' behest.").

Private Defendants' Response to
Plaintiff States' Motion to                    - 5 -
Compel Discovery Responses
No 2:18-cv-01115-RSL

Beck Redden LLP
1221 McKinney Street, Suite 4500
Houston, Texas 77010
(713) 951-3700

1    In light of this point, the motion's definition of the preliminary injunction's effect is wrong.

2    The motion says that the preliminary injunction's effect was to "preserve the status quo in which

3    it is a violation of federal law to post on the internet, or otherwise export, files that can be used to

4    automatically manufacture firearms and other weapons using a 3D printer." Dkt. 148 at 2. But

5    the "federal law" being referred to is the State Department's ITAR regime, which only controls

6    exports, does not control domestic speech that does not involve an export, and could in no event

7    override the First Amendment. No matter what the preliminary injunction concluded with respect

8    to the State Department's ITAR regime of export control regulations, it rendered no holding

9    whatsoever about the superseding federal constitutional right to distribute the files at issue.

10   Similarly, the motion is wrong to say that a YouTube video "encourage[ed] third parties to

11   host the files online *in violation of federal law as established by the TRO*." Dkt. 148 at 1 (emphasis

12   added). Nothing in the video tells anyone to act "in violation of federal law," and even after the

13   TRO and preliminary injunction were issued, it was not necessarily illegal for anyone that might

14   see this video to "host the files."[3] So long as the Private Defendants do not interfere with the

15   Government Defendants' suspension of the Temporary Modification and license—no such

16   interference has ever been suggested—their compliance with the injunction is unquestionable. [4]

17   Finally, the motion argues that Defense Distributed's efforts to mail the files at issue "raise

18   serious questions about potential ongoing harm and the Private Defendants' efforts to undermine

19   the injunction." Dkt. 148 at 1. This represents a complete reversal of position that the Plaintiff

---

[3] Among other reasons, it is not necessarily illegal for a person to "host the files" because (1) the Constitution of the United States guarantees the right of entities like Defense Distributed to "host the files" at issue notwithstanding the absence of State Department preclearance, (2) the Plaintiff States concede that it would be legal to "host the files" at issue after obtaining State Department preclearance, which all of the videos' viewers were perfectly free to do, and (3) it is legal for international persons beyond ITAR's jurisdictional reach to "host the files" at issue.

[4] The Private Defendants further submit that, even if there was a violation of federal export control laws, the Plaintiff States have no standing to perform discovery into this matter or to otherwise investigate and enforce federal export control laws because, pursuant to Executive Order 13637, the Government Defendants have exclusive authority to interpret and enforce the ITAR. *See United States v. Morton Salt Co.*, 338 U.S. 632, 643 (1950).

Private Defendants' Response to
Plaintiff States' Motion to                    - 6 -
Compel Discovery Responses
No 2:18-cv-01115-RSL

Beck Redden LLP
1221 McKinney Street, Suite 4500
Houston, Texas 77010
(713) 951-3700

1   States are estopped from engaging in.  *See New Hampshire v. Maine*, 532 U.S. 742, 742–43 (2001).

2          To obtain the very preliminary injunction that they now say might be "undermine[d]" by

3   mailing the files at issue, the Plaintiff States took a position that contradicts their current motion.

4   They represented that, if their requested preliminary injunction about internet publication were

5   entered, Defense Distributed would retain a right to distribute the digital firearms information at

6   issue via the mail or otherwise "hand them around domestically" without violating any law:

7          Finally, there are alternative avenues to produce this information. But here, notably,
8          it only applies to Internet posting. They can hand them around domestically. And
9          also there's a wide exception in the statute for general scientific, mathematical or
10         engineering papers.

11  Ex. B at 23:5-9.  The Government Defendants agreed: "To be clear, even if the Court were to grant

12  plaintiffs every ounce of relief that they seek in this case, Defense Distributed could still mail every

13  American citizen in the country the files that are at issue here."  *Id.* at 27:12-15.  And most

14  importantly, so did the Court: "Regulation under the AECA means that the files cannot be uploaded

15  to the internet, but they can be emailed, mailed, securely transmitted, or otherwise published within

16  the United States." Dkt. 95 at 15.  The Plaintiff States cannot now contradict that position as a

17  means of justifying discovery requests.

18         **B.      The requested discovery is not relevant to the action's claims for relief.**

19         No claim for relief is asserted by or against the Private Defendants.  The Court's most

20  recent order correctly says so in no uncertain terms: "Plaintiffs do not seek any relief directly from

21  the private defendants." Dkt. 130.  That critical point should defeat this motion without more.

22         Instead, though, the motion argues that "[i]t does not matter that no claims are asserted

23  against the Private Defendants, for this case would not even exist without them." Dkt. 148 at 7.

24  That argument has no basis in Rule 26 or any precedent.  No case has ever held that evidence is

25  relevant if—apart from a "claim" or "defense"—it comes from a person that the case "would not

26  even exist without."  That idea's absurdly broad reach proves its invalidity.

Private Defendants' Response to
Plaintiff States' Motion to
Compel Discovery Responses
No 2:18-cv-01115-RSL

- 7 -

Beck Redden LLP
1221 McKinney Street, Suite 4500
Houston, Texas 77010
(713) 951-3700

1   The motion makes a similar mistake in arguing that Defense Distributed's conduct is

2   "central to the States' complaint and their requests for injunctive relief." Dkt. 148 at 7.  By the

3   complaint's own definition, it is the Government Defendants' conduct—not the Private

4   Defendants'—that is "central to the States' complaint and their requests for injunctive relief."

5   Remedial issues do not warrant the requested discovery.  The motion says so by arguing

6   the requested discovery is "highly relevant" because it "may provide evidence of harm to support

7   the States' ultimate request for permanent injunctive relief." Dkt. 148 at 8.  Not so.  This is a false

8   projection of what the inquiry about permanent injunctive relief would actually entail.

9   If the Plaintiffs succeed in establishing that the State Department violated the APA by

10   issuing the regulation and/or license at issue, discovery about what the Private Defendants have

11   been doing lately would *not* matter to the request for a permanent injunction.  Instead, the request

12   for a permanent injunction would be controlled by the statutory direction that, if the predicate

13   holding of an APA violation occurs, the "court shall . . . set aside" the agency action at issue.  5

14   U.S.C. ¶ 706(2).  The requested discovery will have no role at all to play in this inquiry.

15   **C.    The motion's request for further fishing expeditions is invalid.**

16   "Federal judicial power itself extends only to adjudication of cases and controversies and

17   it is natural that its investigative powers should be jealously confined to these ends." *United States*

18   *v. Morton Salt Co.*, 338 U.S. 632, 641–42 (1950).  Hence, the Plaintiff States have no right to

19   conduct "fishing expeditions into private papers on the possibility that they may disclose evidence

20   of crime." *FTC v. Am. Tobacco Co.*, 264 U.S. 298, 306 (1924).  But the motion does just that.

21   For example, the motion says that "responses to all of the disputed Requests will reveal

22   whether there is an ongoing threat of harm that *may require further action* by the States."  Dkt.

23   148 at 8 (emphasis added).  By "further action," the motion reveals that it seeks evidence *not* of

24   conduct relating to an existing "claim or defense," Fed. R. Civ. P. 26(b)(1), but of conduct that

Private Defendants' Response to
Plaintiff States' Motion to                                          - 8 -
Compel Discovery Responses
No 2:18-cv-01115-RSL

Beck Redden LLP
1221 McKinney Street, Suite 4500
Houston, Texas 77010
(713) 951-3700

might supply the basis for a *new* claim that is not part of the existing case.  Such an attempt to uncover "other wrongdoing, as yet unknown" is the definition of an impermissible fishing expedition.  *In re Sealed Case (Admin. Subpoena)*, 42 F.3d 1412, 1419 (D.C. Cir. 1994).

## III.   Overbreadth, undue burden, and proportionality.

Even if all of the foregoing arguments fail, the motion still cannot be granted because the requests at issue are not, as the motion tries to establish, "narrowly tailored."  Dkt. 148 at 2.  They are overbroad and unduly burdensome for the precise reasons that the Private Defendants' Supplemental Answers set forth.  Dkt. 149-3.

Interrogatory Number 1, for example, is overly broad and unduly burdensome "because, even if the identity of *some* persons affiliated with Defense Distributed were relevant to a party's claim or defense, the interrogatory demands identification if 'all persons. . .affiliated with . . . or who have authority to act on behalf of Defense Distributed' without any limitations regarding subject matter, place, or time."  *Id.* at 4.  This critique goes unanswered by the motion.

Likewise for Interrogatory Numbers 4, 5, 6, and 9, and Request for Production Numbers 1, 2, 3, 4, 5, and 6.  The Private Defendants made particularized overbreadth, undue burden, and proportionality arguments regarding each of these items.  But the motion never responds, except to call these arguments "boilerplate."  Dkt. 148 at 1.  But by "boilerplate," all the motion means to say is that similar objections appear repeatedly.  That is not an error.  The presence of repeated objections simply signifies that the Plaintiff States have overreached repeatedly.

## IV.   Granting the motion would violate the First Amendment privilege.

The "freedom to engage in association for the advancement of beliefs and ideas is an inseparable aspect of the 'liberty' assured by the Due Process Clause of the Fourteenth Amendment, which embraces freedom of speech."  *NAACP v. Ala. ex rel. Patterson*, 357 U.S. 449, 460-61 (1958). "Freedoms such as these are protected not only against heavy-handed frontal

Private Defendants' Response to
Plaintiff States' Motion to
Compel Discovery Responses
No 2:18-cv-01115-RSL

- 9 -

Beck Redden LLP
1221 McKinney Street, Suite 4500
Houston, Texas 77010
(713) 951-3700

attack, but also from being stifled by more subtle governmental interference." *Bates v. City of Little Rock*, 361 U.S. 516, 523 (1960).  Hence, the First Amendment supplies a privilege that protects litigants from discovery efforts that have the "practical effect 'of discouraging' the exercise of constitutionally protected political rights." *NAACP*, 357 U.S. at 461.

In scope, the privilege undoubtedly covers the disclosure of who an organization's members are and who chooses to otherwise affiliate with them.  *See, e.g.*, *NAACP*, 357 U.S. at 459.  In other words, it protects the right to engage in both expression and association *anonymously*.  *See, e.g.*, *In re Anonymous Online Speakers*, 661 F.3d 1168, 1173 (9th Cir. 2011). And yet the Plaintiff States demand disclosure of, among other things, all "individuals who are affiliated with or have authority to act on behalf of Defense Distributed." Dkt. 148.

The privilege also covers the disclosure of how an organization formulates and executes the strategy of their associational and expressive activities.  *See, e.g.*, *Bates*, 361 U.S. at 525.  And yet the Plaintiff States demand disclosure of not just of whether certain speech occurred, but the granular details of *how* it takes place ("the manner" files were "distributed," "steps the Private Defendants took," "information they collected," etc.), Dkt. 148 at 4, as well as "all documents and communications concerning or relating to" both "any party or non-party's posting of any Subject Files online" and "any party or non-party's sale or distribution of any Subject Files to any persons via mail or courier, email, secure download, or any other method." Dkt 149-1.

It blinks reality for the motion to call these efforts "targeted" and "narrowly tailored."  Dkt. 148 at 1.  They are extraordinarily sweeping, and they undoubtedly implicate the First Amendment.

Procedurally, the party asserting the privilege must first make a "prima facie showing of arguable first amendment infringement" in the form of "(1) harassment, membership withdrawal, or discouragement of new members, or (2) other consequences which objectively suggest an impact on, or 'chilling' of, the members' associational rights." *Perry v. Schwarzenegger*, 591 F.3d

Private Defendants' Response to
Plaintiff States' Motion to
Compel Discovery Responses
No 2:18-cv-01115-RSL

- 10 -

Beck Redden LLP
1221 McKinney Street, Suite 4500
Houston, Texas 77010
(713) 951-3700

1147, 1160-61 (9th Cir. 2010).  On this record, the First Amendment privilege undoubtedly applies to the Private Defendants' associational activities and expressions regarding the distribution of digital firearms information.  Proof shows that all of the Plaintiff States' discovery requests chill participation in the Private Defendants' associations and mute the free exchange of ideas—both internally and externally—that is essential to their success.  *Compare* Ex. D, *and* Ex. E, *with Perry*, 591 F.3d at 1160-65, *and Dow Chem. Co. v. Allen*, 672 F.2d 1262, 1274-76 (7th Cir. 1982).

That being so, strict scrutiny applies and "the evidentiary burden will then shift to the government ... [to] demonstrate that the information sought through the [discovery] is rationally related to a compelling governmental interest ... [and] the 'least restrictive means' of obtaining the desired information." *Perry*, 591 F.3d at 1161.  *Id.*  "Importantly, the party seeking the discovery must show that the information sought is highly relevant to the claims or defenses in the litigation—a more demanding standard of relevance than that under Federal Rule of Civil Procedure 26(b)(1)." *Id.*  "The request must also be carefully tailored to avoid unnecessary interference with protected activities, and the information must be otherwise unavailable." *Id.*

The Plaintiff States have not attempted to satisfy strict scrutiny.  Nor could they do so in light of *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 253 (2002) ("The mere tendency of speech to encourage unlawful acts is not a sufficient reason for banning it."), *Bartnicki v. Vopper*, 532 U.S. 514, 529 (2001) ("The normal method of deterring unlawful conduct is to impose an appropriate punishment on the person who engages in it."), and *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 908 (1982) (the "right to associate does not lose all constitutional protection merely because some members of the group may have participated in conduct or advocated doctrine that itself is not protected").  No part of this motion to compel survives strict scrutiny.

Private Defendants' Response to
Plaintiff States' Motion to
Compel Discovery Responses
No 2:18-cv-01115-RSL

- 11 -

Beck Redden LLP
1221 McKinney Street, Suite 4500
Houston, Texas 77010
(713) 951-3700

1    In the event that this motion is granted despite the First Amendment privilege, the Private

2    Defendants request that the Court stay the decision until the Private Defendants have an

3    opportunity to complete an appeal or original appellate proceeding challenging that decision.  *See*

4    A stay pending appeal entails the same governing factors as an injunction, *see, e.g.*, *Hilton v.*

5    *Braunskill*, 481 U.S. 770, 776 (1987), and the test is met here.  *See In re United States*, 138 S. Ct.

6    443, 445 (2017); *Perry*, 591 F.3d at 1157-58.[5]

7    **V.      Rule 37 expenses should be awarded to the Private Defendants.**

8    The motion's Rule 37 expense request should be denied because the Plaintiff States'

9    motion should not be granted at all, and because the Private Defendants' opposition was

10   "substantially justified." Fed. R. Civ. P. 37(a)(5)(A)(ii).  If the motion is denied, the Court should

11   require the Plaintiff States to pay the Private Defendants' reasonable expenses incurred in opposing

12   the motion, in an amount to be determined later, *see* Fed. R. Civ. P. 37(a)(5)(B); and if the motion

13   is granted in part and denied in part, the Court should require the Plaintiff States to pay no less

14   than half of Private Defendants' reasonable expenses incurred in opposing the motion, including

15   attorney's fees, in an amount to be determined later, *see* Fed. R. Civ. P. 37(a)(5)(C).

16                                   **Conclusion**

17   The motion should be denied in full and the Private Defendants awarded their expenses.

18   Alternatively, to the extent that the motion is granted, the Court should stay the decision until the

19   Private Defendants have received an adequate opportunity to seek appellate review.

---

[5] The Private Defendants have not waived this argument.  They preserved it by asserting it in both the instant filing and their December 3, 2018 responses, Dkt. 149-3.  To the extent that the December 3 filing was arguably untimely, the Plaintiff States have acquiesced in its consideration by relying upon it throughout their motion. *See, e.g.*, Dkt. 148 at 3.  Moreover, there is good cause to set aside any timeliness technicalities and consider the December 3 responses because the Court's Rule 12 decision substantially altered the Private Defendants' role in the case, because the Plaintiff States suffer no harm from the timing of this argument's assertion, and because of the privilege's fundamental constitutional nature.

Private Defendants' Response to
Plaintiff States' Motion to
Compile Discovery Responses
No 2:18-cv-01115-RSL

- 12 -

Beck Redden LLP
1221 McKinney Street, Suite 4500
Houston, Texas 77010
(713) 951-3700

Date: December 17, 2018.

BECK REDDEN LLP

FARHANG & MEDCOFF

/s/Charles Flores
Charles Flores
cflores@beckredden.com
Beck Redden LLP
1221 McKinney, Suite 4500
Houston, TX 77010
Phone: (713) 951-3700
*Admitted Pro Hac Vice

/s/Matthew Goldstein
Matthew Goldstein
Farhang & Medcoff
4801 E. Broadway Blvd., Suite 311
Tucson, AZ 85711
Phone: (202) 550-0040
mgoldstein@fmlaw.law
*Admitted Pro Hac Vice

Attorneys for Defendants
Defense Distributed

ARD LAW GROUP PLLC
/s/Joel B. Ard
Joel B. Ard, WSBA # 40104
joel@ard.law
Ard Law Group PLLC
P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243


Attorneys for Defendants
Defense Distributed, Second Amendment
Foundation, Inc., and Conn Williamson


## CERTIFICATE OF SERVICE

I certify that on December 17, 2018, I used the CM/ECF system to file this document with the Clerk of the Court and serve it upon all counsel of record.

/s/Charles Flores
Charles Flores
cflores@beckredden.com
Beck Redden LLP
1221 McKinney, Suite 4500
Houston, TX 77010
Phone: (713) 951-3700
*Admitted Pro Hac Vice

Attorney for Defendants
Defense Distributed

Private Defendants' Response to
Plaintiff States' Motion to
Compel Discovery Responses
No 2:18-cv-01115-RSL

- 13 -

Beck Redden LLP
1221 McKinney Street, Suite 4500
Houston, Texas 77010
(713) 951-3700

**Exhibit A**

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT SEATTLE

---

STATE OF WASHINGTON; STATE OF          )
CONNECTICUT; STATE OF                  )
MARYLAND; STATE OF NEW JERSEY;         ) CASE NO. C18-1115-RSL
STATE OF NEW YORK; STATE OF            )
OREGON; COMMONWEALTH OF                ) SEATTLE, WASHINGTON
MASSACHUSETTS; COMMONWEALTH OF         ) July 31, 2018
PENNSYLVANIA; and the DISTRICT         )
OF COLUMBIA,                           ) MOTION FOR TEMPORARY
                                       ) RESTRAINING ORDER
                   Plaintiffs,         )
                                       )
v.                                     )
                                       )
UNITED STATES DEPARTMENT OF            )
STATE; MICHAEL R. POMPEO, in           )
his official capacity as               )
Secretary of State;                    )
DIRECTORATE OF DEFENSE TRADE           )
CONTROLS; MIKE MILLER, in his          )
official capacity as Acting            )
Deputy Assistant Secretary of          )
Defense Trade Controls; SARAH          )
HEIDEMA, in her official               )
capacity as Director of                )
Policy, Office of Defense              )
Trade Controls Policy; DEFENSE         )
DISTRIBUTED; SECOND AMENDMENT          )
FOUNDATION, INC.; and CONN             )
WILLIAMSON,                            )
                                       )
                   Defendants.         )
                                       )

---

VERBATIM REPORT OF PROCEEDINGS
BEFORE THE HONORABLE ROBERT S. LASNIK
UNITED STATES DISTRICT JUDGE

---

```
APPEARANCES:

  For the Plaintiffs:      JEFFREY GEORGE RUPERT
                           Attorney General's Office
                           PO Box 40110
                           Olympia, WA 98504

                           TODD RICHARD BOWERS
                           KRISTIN BENESKI
                           JEFFREY TODD SPRUNG
                           Attorney General's Office
                           800 5th Avenue, Suite 2000
                           Seattle, WA 98104-318


  For the Defendants       JOSH BLACKMAN (telephonically)
  Defense Distributed,     Josh Blackman LLC
  Second Amendment         1303 San Jacinto Street
  Foundation, and          Houston, TX 77063
  Conn Williamson:

                           JOEL B. ARD
                           Immix Law Group PC
                           701 5th Avenue, Suite 4710
                           Seattle, WA 98104


  For the Defendant        ERIC SOSKIN (telephonically)
  U.S. Department          TONY COPPOLINO (telephonically)
  of Justice:              United States Department of
                           Justice Civil Division,
                           Federal Programs Branch
                           20 Massachusetts Ave. NW
                           Washington, DC 20002


  Reported by:             NANCY L. BAUER, CCR, RPR
                           Federal Court Reporter
                           700 Stewart Street, Suite 17205
                           Seattle, WA 98101
                           (206) 370-8506
                           nancy_bauer@wawd.uscourts.gov
```

```
 1   July 31, 2018                                1:08 p.m.
                           PROCEEDINGS
 2   _____

 3            THE CLERK:  Case C18-1115, State of Washington, et

 4   al. v. United States Department of State, et al.

 5        Counsel, please make your appearances for the record.

 6            THE COURT:  Let's start with the plaintiffs, please.

 7            MR. BOWERS:  Good afternoon, Your Honor.  I'm Todd

 8   Bowers.  I'm the deputy attorney general with the Washington

 9   Attorney General's Office.

10            MS. BENESKI:  Kristin Beneski, Assistant Attorney

11   General, representing the State of Washington.

12            MR. RUPERT:  Jeff Rupert, Division Chief of the

13   Complex Litigation Division for the Attorney General's

14   Office.

15            THE COURT:  And you'll be making the argument,

16   Mr. Rupert?

17            MR. RUPERT:  I will, Your Honor.  Thank you.

18            THE COURT:  Great.  And then Mr. Sprung?

19            MR. SPRUNG:  I'm Jeff Sprung, Assistant Attorney

20   General at the AG's office.

21            THE COURT:  Okay.  Thank you.

22        And then Mr. Ard?

23            MR. ARD:  Yes.  Joel Ard of Immix Law Group for

24   Defense Distributed, Second Amendment Foundation, and Conn

25   Williamson.  I'm joined telephonically by Josh Blackman, who
```

1    will be arguing.

2              THE COURT:  Mr. Blackman, can you hear us okay?

3              MR. BLACKMAN:  Yes, Your Honor.  I appreciate you

4    letting me participate by phone, with the short notice.

5              THE COURT:  Sure.  And did you stand up when I came

6    into the room?

7              MR. BLACKMAN:  I was tempted to.

8              THE COURT:  That's all right.

9         And then from the United States Department of Justice?

10             MR. SOSKIN:  Good afternoon, Your Honor.  This is

11   Eric Soskin from the U.S. Department of Justice, representing

12   the United States Government defendants.

13             THE COURT:  And you have with you Mr. Coppolino, but

14   you're doing the argument, correct, Mr. Soskin?

15             MR. SOSKIN:  That is correct, Your Honor.

16             THE COURT:  Okay.  Can you hear us okay also?

17             MR. SOSKIN:  I can hear you just great, Your Honor.

18   The plaintiffs' counsel were a little scratchy when they were

19   introducing themselves.

20             THE COURT:  Yeah.  They'll be making the argument --

21   Mr. Rupert will be at the podium, so I think -- and he'll be

22   speaking into the microphone, so I think it will work better.

23        But if at any point either you or Mr. Blackman is having

24   difficulty hearing, please interrupt and let us know so we

25   can correct it.  Okay?

```
 1              MR. SOSKIN:  Will do, Your Honor.

 2              THE COURT:  All right.  Thanks, Mr. Soskin.

 3         Okay.  Well, we're here on very short notice to the

 4    parties, and I appreciate your presence here, and very short

 5    notice to the court, which only got the case in the last 24

 6    hours.  I've been reading, reading, reading, and I am fairly

 7    certain that I have everything that has been filed in this

 8    case, including today's letter from Josh Blackman, on his

 9    stationery, indicating his position; the government's

10    opposition; and then the opposition from the Immix Law Group

11    that was filed, and all attachments thereon; and the most

12    recent filing from the State, which just highlighted a

13    Presidential tweet from this morning on the subject matter.

14         So I know that I have all the material that's been filed

15    in the case.  I've looked at Judge Pitman's orders in the

16    Texas matter, and I think I'm ready for oral argument.  And,

17    Mr. Rupert, I'm going to give each of the parties about 20

18    minutes, so go ahead.

19              MR. RUPERT:  Thank you, Your Honor.  And when I

20    entered my appearance, I mentioned I was for the State of

21    Washington, but, obviously, there are a good number of other

22    states involved here, which I'm happy to list for the record,

23    if you'd like.

24              THE COURT:  It's not necessary.  But you also have

25    your boss, Attorney General Bob Ferguson, in the courtroom.
```

1   So we'll acknowledge his presence.  Today he is wearing a

2   tie.  The last time I saw him, he wasn't even wearing a tie

3   when he addressed the Court, but it wasn't a courtroom, it

4   was Seattle U Law School.  I appreciate the tie,

5   Mr. Ferguson.

6       All right.  Go ahead, Mr. Rupert.

7           MR. RUPERT:  Thank you, Your Honor.

8           MR. BLACKMAN:  Your Honor -- Your Honor, I'm getting

9   some really bad feedback right now.

10          THE COURT:  Yeah, we're not sure why that was, but it

11  went away here.  If it comes up again, let us know.

12      Okay.  Go ahead, Mr. Rupert.

13          MR. RUPERT:  Thank you.

14          MR. BLACKMAN:  I still hear it.  Maybe everyone could

15  mute their phones?  I can barely hear.

16          THE COURT:  Does anyone have a cell phone on in the

17  courtroom?  Please turn them off, because even if you have

18  the sound off, they still sometimes interfere.  So if you

19  could please turn them off, that would be great.

20          MR. BLACKMAN:  It went away.

21          MR. RUPERT:  I may have been the culprit, Your Honor.

22      To begin, then, the U.S. State Department has voluntarily

23  entered into a settlement with an organization whose stated

24  mission is to globally distribute open-source instructions on

25  how to print 3-D ghost guns.

1          The State Department has chosen to give access to

2     potentially untraceable and undetectable firearms to any

3     terrorist, felon, domestic abuser with a laptop and a 3-D

4     printer.

5          As Your Honor just mentioned, not even the President seems

6     to agree with this.  He tweeted earlier today, "I'm looking

7     into 3-D plastic guns being sold to the public.  Already

8     spoke to the NRA.  Doesn't seem to make much sense."

9          Nonetheless, we're here today because of the State

10    Department's unprecedented actions that have profound effects

11    on Washington law, as well as the other states that are out

12    there, on public safety issues.

13         We have a number of challenges or opposition by the other

14    side, which I'll go through in order here, but I do want to

15    emphasize the public safety dangers that this creates.

16         We have a comprehensive scheme of background checks,

17    registrations; some states limit manufacturing; domestic

18    abusers have to do certain things; there's serial numbers for

19    tracing; moreover, being a border state, as we are,

20    terrorists can come in as well, so we face a harm there.  And

21    it is not imaginary harm in any way.  I cite to the

22    government's own documents, throughout the litigation with

23    Defense Distributed, where they repeatedly emphasize the

24    grave national security issues at stake, and submitted

25    declarations from, for instance, Lisa Aguirre, that discuss

1    the potential assassinations that could occur with these type

2    of guns.

3        This is a public safety issue.  We don't want to have an

4    incident happen that then leads us all to go, "Why didn't we

5    do something then?"  We want to slow this down and get some

6    temporary relief.

7        And if the government is going to make this change, they

8    have to follow the procedures that are in place.

9        But let me address some preliminary issues first.

10       There's been a challenge by the federal government on

11   standing grounds, saying that there's no injury-in-fact

12   that's traceable to them.  Now, we, obviously, disagree with

13   that, and we've briefed that issue somewhat as well.  But at

14   the end of the day, it's a public safety issue.  And as I

15   just said, we don't need to let -- to have the crime occur

16   before we take action.

17       Again, with a border state, people could easily come in

18   here or anywhere with these type of weapons because of the

19   untraceable nature of them.  They're plastic.  And, frankly,

20   in talking to one expert, I was surprised to hear you could

21   even, apparently, make it out of frozen water, if -- I think

22   I have that right.  But there's all different methods of

23   doing this.  And we're all learning a lot of things real fast

24   about these guns that, for years, the federal government had

25   taken the position -- were on the military USML -- the

1   munitions list -- excuse me -- and were not permissible.  So

2   suddenly we have this covert action where we need to go in

3   and figure out what's going on, and we're looking at that

4   injury.

5        Going back to standing, what is the injury here?  It's

6   injury to our registration laws; our background checks;

7   manufacturing registrations by certain states, highlighting

8   Massachusetts and New Jersey that have those; serial numbers

9   for tracing.  Now, the nature of this technology makes it

10  easy to evade all of these laws.  And the government knows

11  that.  I mean, their point is, "Well, wait a minute" --

12            THE COURT:  Well, counsel --

13            MR. RUPERT:  Sure.

14            THE COURT:  -- are you saying it's illegal to have a

15  plastic gun anywhere in the United States, or are you saying

16  the export or sending the information across international

17  borders, which might come back to the states, is the issue

18  here?

19            MR. RUPERT:  It's all one and the same for one very

20  good reason, Your Honor.  It's the Internet.  As the

21  government itself said in its brief just -- I believe in

22  April, so how many months ago was that?  I've lost which

23  month we're in -- the Internet, there's no domestic Internet

24  and international Internet, it's all one Internet.  Once it

25  goes on the Internet, it's all one and the same, and it makes

 1    it much more easy to access.

 2           THE COURT:  When you say "the Internet," what about

 3    the website that Defense Distributed has, which already

 4    includes links to some of these things?

 5           MR. RUPERT:  That's exactly what I'm referring to.

 6    Once it goes on their website, it's accessible to anybody.

 7    And that's what drew the letter from the government back in

 8    2013, is posting it online and making it accessible to

 9    everyone.

10        Now, in 2013, the government took that position and kept

11    that position all the way through, you know, repeated

12    filings.  First there was the letter; then they filed a CJ

13    request, which was denied in 2015; there was a lawsuit that

14    was filed; a preliminary injunction; government opposed that,

15    which they prevailed on; up to the Fifth Circuit, they

16    prevailed again; and then they filed a motion to dismiss in

17    April of this year, again all taking the position that this

18    is covered by the ITAR.  It's on the munitions list.  There's

19    a grave danger out there.  And now we suddenly hear this idea

20    that there's no potential injury to the states or to the

21    nation.  Because the states are part of the nation, it's all

22    one and the same.  It's just baffling to us, as we try to

23    look at the potential harm.  And we've got a number of

24    declarations in there, from the King County Sheriff, Chief

25    Best from the Seattle PD, just talking about the grave harm

1   and concern that they have for these.

2      So we believe we've met the injury-in-fact standard, and

3   there's some case law cited in the brief that goes through

4   that.

5      I'm going to move on, unless you have some questions on

6   standing.

7      Moving to the TRO, we've got the traditional elements.  As

8   we look to the success on the merits, one of the issues I

9   felt I have to address is this reviewability issue, which

10  some of the parties we've named just as necessary parties

11  have raised; this idea that certain actions of the State

12  Department are outside the subject of a court to review.  And

13  we did address this in our brief, so I'm not going to spend a

14  lot of time on that, unless you have some questions.

15     But some issues, typically with foreign policy, are

16  unreviewable because of the balancing of complex concerns

17  involving security and diplomacy, and there is a case cite

18  for that, I believe, in the brief.  But here, we're not

19  talking about that.  There are mandatory, nondiscretionary

20  federal issues at play.  And we cited some cases in the brief

21  that, when that is at issue, this idea of non-reviewability

22  is not at issue at all.  I mean, it's something the court can

23  go -- and you get into the issue of whether the APA has been

24  violated.

25     If you have any questions on that, or, if not, I'll move

1    on to --

2            THE COURT:  You can move on.

3            MR. RUPERT:  -- the heart of the issues here, which

4    is the likelihood of success.

5        First, to emphasize, the items that this company wants to

6    distribute -- certainly some are identified, but some may be

7    unknown that we'll only learn about later, if the way this

8    order is written -- are all on the United States Munitions

9    List.  The government took that position in 2013 when it sent

10   a letter that said, "Treat the above technical data as ITAR

11   controlled until a final CJ ruling is issued."  Well, the CJ

12   rulings were issued in 2015; still ITAR controlled.

13       And, again, as I said before, we go through numerous court

14   filings where the government is taking that position.  It's

15   only in the settlement agreement where they seek to remove

16   these items from the ITAR list.

17       Now, the government does have the ability to change what's

18   on the ITAR, but there are steps that must occur, and that's

19   the heart of our claim right here.

20       One of those steps, if you're going to remove an item from

21   the ITAR, is that you must notify Congress.  There's two

22   congressional committees that must be notified, and that

23   didn't occur.  Now, that's in the statute, that requirement,

24   and it's 2778(f)(1), not removing it.

25       Now, the end-around for that was -- excuse me.  Let me go

1   to other requirement, too.  The other requirement is the

2   concurrence of the Secretary of Defense, and there's no

3   evidence that that happened at all.  In fact, the last time

4   that Defense weighed in on this was in the CJ hearing back in

5   2015, where it was found to be on the ITAR list.

6        Now, the government has attempted to evade these clear

7   requirements by two methods.  The first is a temporary

8   modification, which they tried to do under 22 CFR 126.2.

9   They're trying to say, "Well, just temporarily we're

10  modifying it."  But the language of that letter gives it

11  away.  "We're temporarily modifying it," it even says, "to

12  remove items from the list."  There is no statutory authority

13  to do that.  The statute clearly says if you're going to

14  remove something, you need to give Congress 30 days' notice.

15       In the executive order giving authority to State as well

16  as Defense, it says the Defense must concur, and that wasn't

17  done, either.

18       And, moreover, I mean, given President Trump's tweet this

19  morning, it's not clear that the Executive even agrees with

20  this.  Now, it's difficult to say what that tweet means, but

21  that just causes further confusion here.  If the President is

22  tweeting that this doesn't seem right, why is the State

23  Department doing this without following the established

24  procedures?

25       We also have some other issues in there about just the

1    arbitrary and capricious nature of this, particularly if you

2    did a CJ hearing before, you know, if you're going to reverse

3    that, you certainly need to do another one, because that

4    statute talking about the CJ talks about whether there's --

5    there's a certain question -- let me get my correct phrase

6    here -- if doubt exists, you should do another CJ.  And given

7    the five years of one position, if you want to change it, I

8    humbly submit that doubt exists about whether they should be

9    on there at a minimum, we believe it's clear they should be

10   on there.

11       And then the final thing about the arbitrary and

12   capricious, there's no evidence that any -- any documents

13   were prepared, any study was done to merit this, what we

14   believe to be a significant change.

15       Finally, I'll spend the bulk of my time on irreparable

16   harm.  That was the other challenge that the federal

17   government made to us -- there was numerous ones, but that's

18   one of the ones they focused on.

19       And, again, similar to the standing issue, our big concern

20   is public safety.  Now, the government says, oh, it's too

21   speculative out there.  Well, I humbly submit that we don't

22   have to wait for a crime to happen.  We don't have to wait

23   for this, was it, MS-13 gang to come across our border with a

24   weapon.  We don't have to wait for some domestic abuser to

25   print one of these off and go shoot somebody.  This is a

1   clear and present danger, and we've got declarations in the

2   record describing that.

3        Now, we do have some laws that may come into play here.

4   There's no doubt about that.  But this makes it so much

5   easier for bad actors to evade those laws.

6        Now, these laws have been out there for -- at least this

7   part of it.  We've all known about this for five years.

8   People, as they build their regulatory schemes, have

9   expectations about what it is.  And when the government seeks

10  to change those, it has to follow the procedure, to give the

11  states time to react, first of all, and also to look at the

12  harm to us here.  What's going to happen if some of these

13  things come out here and people start printing these off at

14  home?  And it's not just speculation.  We've seen on the

15  news, just the last day as this has come into play, numerous

16  stories about this.  And as we all learn more about this, we

17  all go back to, "Why are you doing this?"

18       And I keep going back to the government's past positions

19  for five years and their declarations in that prior case

20  where they're talking about assassinations, they're talking

21  about the harm that could occur.  And I humbly submit that

22  that is irreparable harm.  There's irreparable harm in that

23  all the states -- what the states have done to limit who can

24  get weapons, traceability, limits on manufacturing.  Now it

25  can be much more easily evaded if this is allowed to go

1    through.

2           THE COURT:  Well, the government seems to be taking

3    the position that, previously, it misconstrued the

4    applicability of the export portion and said, well, really

5    this isn't about export of firearms, plastic or otherwise,

6    and that's where the mistake was.

7        What is your reaction to that?

8           MR. RUPERT:  Well, first of all, they disagreed with

9    that in numerous court filings, I would highlight, but if

10   they want to do that, they have to follow the established

11   procedure.

12          THE COURT:  And if they follow the established

13   procedure under the Administrative Procedure Act and, under

14   what you mentioned, ITAR requires, and the result is the

15   same, then what for the states?

16          MR. RUPERT:  Well, then it's a much tougher case for

17   us.  I will freely admit.  I mean, we are here on some

18   mandatory nondiscretionary obligation, which they haven't

19   done.  Now, if they complete those, we have a much tougher

20   case.  Now, I'm not saying we can't challenge that, but

21   there's more complexity to it.  But here, the reason we're

22   here on temporary relief is how clear and present the danger

23   is, as well as how clear the violation is.  If you're going

24   to take something off the list, you have to give notice to

25   Congress, and you have to get the Department of Defense to

1   concur.

2       And who knows what the government will ultimately do.

3   That tweet kind of suggests that, you know, perhaps it didn't

4   go to the right levels here, and the government may change

5   its position as the President is out there saying that it

6   doesn't make much sense.

7       The one final thing to address is that, I think there's

8   been a suggestion that, well, it's -- apparently this person,

9   they posted it already here, so there have been a few

10  downloads of this, and I'm not quite sure what the current

11  count is.  But I can't believe that that stops irreparable

12  harm.  I mean, if we have a thousand downloads out there,

13  well, yeah, that's very unfortunate, but we're here as fast

14  as we can.  Let's stop the next hundred thousand downloads of

15  this.  It becomes much more prevalent and more easily --

16  easy -- easy to obtain.  So I think that's a red herring to

17  raise that element.

18      I'll wrap up as we kind of go through the elements for a

19  TRO about the balancing of the equities.

20      Again, we think it is quite clear that the equities tip

21  highly in favor of the states.  This is a public safety issue

22  that even the President has concerns about.  The states must

23  be heard on this, and to protect our citizens, the concern

24  about these people coming over our borders, these gangs, this

25  MS-13 or even abusers or parolees who shouldn't be having

1    guns now having the ability to print one off without a serial

2    number on it that we're never going to be able to trace.  We

3    don't need to let somebody get shot and die before we

4    recognize an irreparable harm or -- we look at the equities

5    here, they tip highly in favor of the State.

6        On the other side, you have the government.  We're asking

7    just go back to the status quo that you were, just while we

8    figure this out here.  I mean, a temporary restraining order

9    isn't going to last that long.  Let's put this on pause here.

10   Let's go back to that, we'll file our PI motion, and we can

11   all be heard on a little more orderly pace.

12       Do you have any questions, Your Honor?

13            THE COURT:  No.  Thanks very much, Mr. Rupert.

14            MR. RUPERT:  Thank you, Your Honor.

15            THE COURT:  Mr. Soskin for the Department of Justice,

16   you're up now.

17            MR. SOSKIN:  Thank you, Your Honor.

18       There is a severe disconnect here between -- now we can

19   see where the feedback was coming from, Your Honor.  It

20   appears to be my phone.  Let me take you off the speaker

21   here.  Is this any better for those listening on the other

22   end?

23            THE COURT:  Much better.

24            MR. SOSKIN:  Okay.

25       There is a severe disconnect here between plaintiffs'

1    claims and the actions they want the government to take and

2    the federal statutes at issue, under which those actions

3    would be taken.

4         The State Department regulates exports and temporary

5    imports under the Arms Export Control Act and its delegated

6    authority as implemented in the ITAR.

7         At issue in the previous litigation between the United

8    States, Defense Distributed, and others, was whether, in

9    regulating the technical data describing how to make certain

10   arms, whose export of the arms themselves was controlled,

11   whether the government had gone too far in its regulation of

12   the technical data, and regulated Defense Distributed's

13   domestic, what they allege to be, speech at the same time.

14        And the history of that litigation, Your Honor is familiar

15   with.  I understand you read the filings or, at least, the

16   orders in that case in our filing.

17        As part of a process running back to 2009, the United

18   States has been reforming its export control system, in part

19   to focus regulation of exports on actual munitions or to

20   focus the State Department's regulation of export on actual

21   munitions, meaning weapons and other items that are useful

22   in war by our adversaries.  And as part of that process,

23   which has gone through every single category on the United

24   States munitions list, the United States has determined that

25   the kind of guns that you can go to any gun store and buy are

1   not so important to restrict in the interest of national

2   security, and in the terms of the State Department's notice

3   of proposed rule-making on this, arms that you can buy in a

4   gun store do not confer a, quote, military advantage,

5   unquote, on our adversaries, and, thus, as part of the Export

6   Control Reform Initiative, should be removed from the U.S.

7   Munitions List.

8       Well, with that decision, there's a necessary corollary

9   for a regulation of technical data, which is regulated under

10  the ITAR only when the underlying firearms, in this case

11  sub .50 caliber, nonautomatic weapons of the kind that are

12  routinely in common use in the United States, when those

13  firearms are deregulated and removed from the U.S. Munitions

14  List, the technical data associated with them also will be

15  deregulated.

16      And so when confronted with a First Amendment lawsuit and

17  a lawsuit in which the court -- the district court had ruled

18  the First Amendment was implicated and that the government

19  had to survive First Amendment scrutiny in order to prevail,

20  the determination that the underlying arms did not create a

21  military advantage, you know, left the government in a

22  difficult position regarding how it could justify, in the

23  face of a First Amendment lawsuit, a continued restriction on

24  the dissemination of plaintiff's technical data.  And that --

25  that is the story of the settlement in the initial action,

1    the *Defense Distributed* case in the Western District of

2    Texas.

3         Plaintiffs here have alleged that in order to settle this

4    lawsuit on the terms that the State Department did, there was

5    application of a couple of statutory requirements.  But as

6    our brief on the merit section explains, those do not apply

7    here.

8         There is a plain provision of the ITAR -- it's 22 CFR

9    126.2 -- that permits the temporary suspension or

10   modification of listing of all the regulations under the

11   ITAR, including listings of a particular set of technical

12   data associated with items on the MSL, and that is all that

13   has been done here, and with that temporary suspension, the

14   30-day notice requirement does not apply.

15        This is not the type of circumstances where the commodity

16   jurisdiction procedure is appropriate.  The commodity

17   jurisdiction procedure is invoked when a party wants to

18   know -- when a regulated party wants to know whether or not

19   its product is controlled by the ITAR.

20        But here, where what we have done is determine that we are

21   moving towards the release of these items from the ITAR, they

22   are not submitting a commodity jurisdiction to us, and so we

23   cannot just carry out a commodity jurisdiction in some

24   freestanding process untethered from the governing statute

25   and the governing regulations.

1           THE COURT:  And do you take the position that the

2    approval of the Defense Department does not apply to the

3    temporary modification, either?

4           MR. SOSKIN:  That's right.  That's part of the

5    provision that is associated with removing categories from

6    the U.S. Munitions List.  And that process, though, will be

7    undertaken as part of the rule-making that we have cited in

8    our document.  That's the temporary -- I'm sorry -- that's

9    the permanent transition of items from being USML regulated

10   under the ITAR to being regulated by other portions of the

11   U.S. government.

12      And the notification provision to Congress, the

13   concurrence provision that plaintiffs referred to, that's

14   what those are applicable to.  And if the United States,

15   through the Department of State and the Department of

16   Commerce, through the rule-making process, determine that

17   they are going to issue final rules, they will comply with

18   the governing procedures of the administrative law in that

19   process.

20           THE COURT:  But if you go this route, which you've

21   undertaken with the temporary release, everything will be out

22   there, and you can't just bring it back, right, in terms of

23   Internet?

24           MR. SOSKIN:  Your Honor, I think this question of

25   bringing things back is something of a red herring here.

1        As the pleadings in the *Defense Distributed* case in the

2   Western District of Texas make clear, many of Defense

3   Distributed's files were, in fact, posted for six months on

4   the Internet back in 2012 and 2013.  And I believe

5   plaintiffs' pleadings here acknowledge that they are

6   available in a wide variety of places.

7        When we are regulating exports, that is, of course,

8   continuing activity.  It's an effort to send something

9   abroad, and we can turn on and off the export spigot as is

10  determined by the State Department pursuant to its

11  procedures.

12       But just as we explained in our brief, Defense Distributed

13  has been free to send CDs filled with these plans or hand

14  them out in states, at least subject to other governing

15  principles and other governing laws at the state and federal

16  and local level, all of which are still in force.

17       Your Honor, we have no idea whether Defense Distributed,

18  pursuant to what we said is lawful to do, has engaged in

19  domestic distribution of these files in the interim.

20            THE COURT:  They were certainly entitled to do so.

21            MR. SOSKIN:  They were certainly entitled to do so.

22  They remain entitled to do so.  The State Department does not

23  have authority, under the Arms Export Control Act, to prevent

24  Defense Distributed or anyone else from distributing

25  ITAR-controlled technical data to U.S. persons in the United

1   States.  It's an export control statute, not a general public

2   safety statute.

3          THE COURT:  And, counsel, I think part of what jumps

4   out as difficult to understand is, you know, how the

5   Department of State changed its position so dramatically from

6   spring of 2018 to summer of 2018, or from April to June.

7   And, you know, you've said, well, it's a recognition that it

8   was a First Amendment issue and we didn't think we could meet

9   a certain standard.  But wasn't that clear already back in

10  2015 with the ruling from the district court, or at least

11  from the Fifth Circuit?

12         MR. SOSKIN:  Your Honor, if I understand your

13  question, the question is what changed between April of 2018

14  and June of 2018.  And what occurred was the culmination of

15  the executive branch process to determine whether firearms,

16  like the ones for which Defense Distributed is providing the

17  plans of, constituted the kind of national security or

18  military-regulated equipment that needed to remain regulated.

19     And so during that time, I believe on May twenty- -- I'm

20  sorry, I don't have the date in front of me -- but in May of

21  2018, that's when the process came to a conclusion.  And the

22  State Department and the Department of Commerce and all of

23  the stakeholders in the executive branch, the executive

24  branch as a whole, made that determination and made it public

25  and said these types of weapons, the underlying weapons here,

1    are not the type that are useful for warfare that we need to

2    regulate the export of.  And once we made that determination,

3    that has consequences for what would the harms be of telling

4    people how to make the same kind of -- or permitting someone

5    to export the plans for how to make the same kind of gun.

6              THE COURT:  But the actual --

7              MR. SOSKIN:  It was decided --

8              THE COURT:  But the actual settlement agreement was

9    not made public until July 10th, right?

10             MR. SOSKIN:  Your Honor, the -- yes, the settlement

11   agreement was, I believe, signed on June 29th.  It still took

12   some time after we made -- after the notice of proposed

13   rule-making was made.

14      I mean, as you're familiar with, Your Honor, settlements

15   take time.  It still took more than a month for us to

16   finalize the terms of the settlement.  And once the

17   settlement was reached, consistent with Department of Justice

18   and executive branch policies, the settlement was not a

19   secret settlement.  It became public, I believe, shortly

20   thereafter, when Defense Distributed and their co-plaintiff

21   in Texas made it public.  The settlement agreement provided

22   us -- provided the State Department with time to carry out

23   its obligations under the settlement, because the wheels of

24   the United States Government do not turn instantaneously,

25   and, you know, it did take a number of weeks for us to be

1  able to write a letter and write a website posting of our own

2  and make those available.  Those things all were completed on

3  Friday, and that is the date at which our obligations under

4  the settlement were complete.  With that complete, the case

5  in the Western District of Texas was dismissed pursuant to

6  the agreement of the parties.

7          THE COURT:  Okay.  Thanks, Mr. Soskin.  Any other

8  points you want to make?

9          MR. SOSKIN:  Just one, Your Honor, and that's the

10  disconnect here that we began talking about, between the

11  scope of our clients' authority to regulate exports and the

12  nature of plaintiffs' claims.  We think it is easily

13  explainable.

14      It's that the plaintiffs here, the states are interested

15  in regulating a private party and what that private party can

16  do, Defense Distributed and the other defendants here.  And

17  nothing in the State Department's export control decisions

18  affects their ability to regulate those private parties.

19      I understand you'll probably hear from the other

20  defendants next, but, really, we think the executive -- the

21  federal government's role in this now is as a bystander to

22  the question -- or should be as a bystander to the question

23  of how the plaintiffs here, who obviously have laid out good

24  reasons why they want to regulate the other defendants'

25  behavior, how they should go about and do that.

 1              THE COURT:  Okay.  Thanks very much, Mr. Soskin.

 2        Mr. Blackman, you now have the floor.

 3              MR. BLACKMAN:  Thank you, Your Honor, and may it

 4     please the court.

 5        I think it would be helpful to get a brief history of

 6     litigation in the last week.  It's been a little bit of a

 7     blitz.

 8        So around last Wednesday, when we were on the cusp of

 9     finalizing a settlement in Judge Pitman's court in Boston, an

10     emergency motion to intervene was filed by the Brady

11     Campaign, Every Town for Gun Violence, and the Gifford

12     Organization.  Notably, none of the member states tried to

13     intervene.  After a frantic two days of briefing, Judge

14     Pitman ruled from the bench and denied the motion to

15     intervene, it being [inaudible] mandamus.  At that point --

16              THE COURT:  Are you on -- excuse me, Mr. Blackman.

17     Are you talking on a cell phone, too?

18              MR. BLACKMAN:  Yes, I am.  Hold on.

19              THE COURT:  If you have a --

20              MR. BLACKMAN:  Is that better?

21              THE COURT:  Yes, much better.

22              MR. BLACKMAN:  I'll stick with this one.  Sorry.

23        So on Friday afternoon around four o'clock, Judge Pitman

24     ruled from the bench, and with that, we voluntarily entered a

25     stipulation of dismissal.  The government granted us three

1    documents.  First, they granted us a license to publish

2    certain technical data, so subject to litigation; second,

3    they posted on the State Department website a temporary

4    modification, which allowed the publication of other files in

5    addition to the technical data without any prior restraint.

6    And that temporary modification cross-referenced the

7    settlement agreement, which we've included in our papers.

8    And, importantly, the settlement agreement didn't just apply

9    to Defense Distributed.  It applied to any United States

10   person, any United States person.

11       That brings us to Friday evening.  At that point,

12   Mr. Wilson uploaded a series of files to a server.  He

13   uploaded nine CAD files and one 3-D printable file.  And let

14   me briefly explain the difference, Your Honor.

15       A CAD file is merely a graphical representation of an item

16   on the screen.  You can't print from a CAD file.  So, for

17   example, the AR-15 file that's online right now and has been

18   there since Friday, it's a CAD file.  You cannot print that.

19       The only printable file at this point is the Liberator,

20   the original pistol, the one-shot pistol that started this

21   entire saga some years ago.

22       At that point, Cody uploaded the files on Friday.  My

23   co-counsel and I anticipated that there would be legal

24   action, so we filed first.  We brought a lawsuit in the

25   federal district court in Austin, and we named the party

 1    Attorney General Grewal from New Jersey, as well as the L.A.

 2    City Attorney.  We fully expected other parties to sue us,

 3    and we anticipate adding them, in due course, in our

 4    litigation, and I can, perhaps, get into that a little bit

 5    later why this is not the correct venue.

 6        But that brings us to Saturday -- Sunday afternoon.

 7    Attorney General Shapiro of Pennsylvania filed for a TRO

 8    against us, and on, basically, one hour's notice, Judge

 9    Diamond, in the Eastern District of Philadelphia, held an

10    emergency hearing.

11        A couple of things happened that are relevant.  First,

12    Pennsylvania's complaint is not sufficient.  There is no

13    subject matter jurisdiction.  They asked them to refile,

14    which they've done.  But, second, I made a representation on

15    behalf of my client that we would do a couple of things.

16    First, we would not post any new files until Judge Diamond

17    had a chance to rule, and he'd not done that, said let's

18    maintain the status quo.  And, second, I said we would

19    undertake what's called IP blocking, and let me explain what

20    this means.

21        We can actually use technology to block IP addresses from

22    certain jurisdictions.  And I can tell you, Judge, this is

23    pretty cutting edge.  Usually this is done on a countrywide

24    basis; for example, North Korea or China.  But we're actually

25    looking at a statewide case, and we found a good way of doing

1   this.  We also blocked mobile IP addresses.  We found that

2   when people use their Verizon or AT&T phones, they're often

3   connecting with towers in other jurisdictions.  So we've got

4   a pretty good blockage rate.

5       So we told Judge Diamond that we would voluntarily block

6   access from the Commonwealth of Pennsylvania.  We also

7   blocked the state of New Jersey.  And Judge Diamond denied

8   the TRO at that point as moot and asked us to come back later

9   this week.  That's Sunday evening.

10      Then later, on Monday, we were sued in several places.

11  Attorney General Grewal sued us in state court -- I'll get to

12  that in a minute -- and the Attorney General of Washington

13  sued us in your court yesterday.  We're almost to the

14  present.

15      About two hours ago, I held an emergency TRO hearing by

16  phone with Judge Koprowski in Essex County, New Jersey.  It's

17  a chancery court, a court of equity.  And the Attorney

18  General of New Jersey asked Judge Koprowski to enter an ex

19  parte temporary restraining order.  And truthfully, Your

20  Honor, it's a global injunction.  They didn't just seek to

21  limit the access of the files in New Jersey; they asked us to

22  take down the website in its entirety.  And I can report that

23  after a very lengthy hearing, Judge Koprowski, after I had a

24  chance to present, he denied the global injunction.  He

25  denied it, and he expressed severe concerns for the prior

1    restraint and the First Amendment, something that my friends

2    on the other side haven't even mentioned yet.

3        I made the similar proffer to Judge Koprowski that I made

4    to Judge Diamond:  That we would stipulate to block all IP

5    addresses in New Jersey and also would not post any new files

6    for a period of 30 days.  And I'm going to make the same

7    proffer to this court.  We have no intent to post any new

8    files, under our representation to Judge Koprowski, for 30

9    days.  And if any of the blue states, for this piece, on this

10   list would like to sign up, I'd be happy to add you to the

11   block list.  And we've gotten pretty good at it.  We've

12   really improved our technology to do this.

13       The reason I mention this history, Your Honor, is it's

14   twofold.  First, the risk of irreparable harm, we argue,

15   slight.  First, these files have been on the Internet for

16   years.  For years.  As far as we know, the Attorney General

17   of Washington has never sued Grab CAD or any other site that

18   hosts these files.  They've only sued us.  If this was truly

19   such an irreparable injury, they'd be filing lawsuits all

20   over the place, and they simply haven't.  So I question

21   whether it's irreparable.

22       But second, we moved first.  We uploaded before the suit

23   was filed.  And the status quo is what it is right now.  The

24   files are available online.  And we think it would be a

25   serious prior restraint to change the status quo and order us

1    to remove it, which is why I make the same proffer to you

2    that I made to Judge Koprowski.  I will maintain the status

3    quo.  Whatever files are there now, I'll keep, and for a

4    period of 30 days, we promise we will not upload anything

5    new.

6        I suspect there will be a lot of pleadings and motions and

7    venue, things that will be happening next month, but we'll

8    give enough time, and we'll be flexible on that deadline.

9        But I do want to focus Your Honor on one question of

10   jurisdiction, and we submitted a letter to the court somewhat

11   late.  I apologize.  It only came to us a couple of hours

12   ago.  But their Ninth Circuit precedent suggesting that you

13   cannot challenge a settlement after it's been finalized, the

14   court lacks jurisdiction, we see this, at bottom, as a

15   collateral attack on the settlement, which Judge Pitman

16   approved of and already the case was dismissed.  For sure

17   Judge Pitman will lack the authority to reopen it.  I don't

18   see how this court has the authority to do anything for it.

19       Moreover, Your Honor, I think we're in a position now

20   where the risk of irreparable harm is largely exaggerated

21   because of the fact these files are already available online.

22       One other point on the brief piece, Your Honor.  This is

23   not only affecting the rights of Mr. Wilson and Defense

24   Distributed, the settlement refers to any U.S. person.  That

25   means every U.S. person is now going to be subject to a prior

 1    restraint if a temporary restraining order is issued.

 2        I echo the government's argument on standing.  I think

 3    they're correct that these things are not subject to review.

 4    Nothing has been removed from the list yet; therefore, there

 5    is no congressional notification.

 6        At bottom, I think we have settled law, Your Honor.  If

 7    Washington was really upset about the settlement, they could

 8    have intervened with the Brady Campaign down in Texas.  They

 9    failed to do it.  I think that constitutes waiver.  And also

10    I'm putting notice that we will probably intend to try to

11    move this case down to the Western District of Texas, or if

12    not, add a party separately because of the actions taken

13    here.  But this is not the right place.

14        The states have shown they can come after us in state

15    court for nuisance claims and the like.  There's no need to

16    waste the federal court's time with these APA claims based on

17    what I think has no ground for review.

18        If Your Honor has any more questions, I'd be happy to

19    answer them; otherwise, I will yield the balance of my time

20    and reiterate that my proffer is on the table for the parties

21    to consider.

22            THE COURT:  Okay.  And just for the record,

23    Mr. Blackman, you do represent each of the three defendants

24    here, correct, including the Second Amendment Foundation?

25            MR. BLACKMAN:  Yes, Your Honor.  And I've cleared

 1   this with my client, and they're okay with it, this proffer.

 2              THE COURT:  Okay.  I appreciate it.

 3              MR. BLACKMAN:  In fact, I'm already bound -- I'm

 4   already bound by it.  There's not much -- there's not much

 5   new.  I'm just adding different states via the

 6   already-existing arrangement.

 7              THE COURT:  And where are you speaking to us from?

 8              MR. BLACKMAN:  I'm in Houston, Texas, at the moment.

 9              THE COURT:  But you've been all over the country?

10              MR. BLACKMAN:  Your Honor, I think I billed 80 hours

11   in the last four or five days, so it's been a pretty hectic

12   time.  I've been sued by Pennsylvania twice, I've been sued

13   by New Jersey twice.  We'll have a change of venue in due

14   time.  But I've had a very good time litigating this issue,

15   and I'm grateful you didn't make me fly to Seattle for the

16   war.

17              THE COURT:  Okay.  Thanks very much, Mr. Blackman.

18       All right.  Let me turn back to Mr. Rupert to address the

19   offer here, which has happened in other districts, where the

20   indication is no new files will be posted, and they'll use

21   this blockage of specific jurisdictions in terms of IP

22   addresses, and even mobile access.

23              MR. RUPERT:  We don't believe that's sufficient, Your

24   Honor.  In fact, we're not even requesting any relief from

25   this party we just named as a necessary defendant.

1          Our issue is with the federal government and their failure

2     to comply with the required -- the requirements.

3          I would note that the munitions list is one of the big

4     issues here.  While we have one group of defendants here that

5     wants to post files, if it's off the munitions list, anybody

6     can post them.  That's the big issue here.

7          And we go back to the public safety concern that we have.

8     With all the press this is getting, it's going -- there's

9     going to be stuff posted.  There's no doubt about it, with

10    all the news stories we have.  That's why we don't believe

11    that this offer, if it's even technically possible, is

12    sufficient.

13         I would note I have grave concerns about whether it's

14    technically possible in the first place.  Because if it were,

15    I mean, it would have been made to the federal government in

16    that litigation, which went on for five years, about trying

17    to limit where the material could go, and it wasn't.  So we'd

18    have to consult with technical experts, but I'm highly

19    skeptical it's even possible, but if it were, it's not the

20    relief that we're seeking.  We're interested in enjoining the

21    federal government as opposed to the defendants.

22              THE COURT:  So when you say you want to enjoin the

23    federal government, you're saying you don't want them to

24    change their regulations that are there, but if somebody were

25    to violate those regulations and get ahold of the information

1    that the defendants have, and go ahead and post it, you would

2    rely on the federal defendants to do something about it,

3    wouldn't you?

4         MR. RUPERT:  In part.  There may be state laws that

5    are -- criminal laws that are at issue.  I mean, there is an

6    intent element we're going to have to do there.

7         But we believe if the federal government enforces these

8    laws, or, I mean, just -- has the laws on the book -- excuse

9    me -- that that alone will prevent this material from going

10   to the Internet because, frankly, it has for the past five

11   years.

12        Now, there are some dark websites.  I mean, I'm not saying

13   that -- you know, that for every -- you can't find something

14   that -- whatever the dark web is.  I admit, I don't know --

15   fully know what the dark web is, other than, you know, as we

16   all read about it in spy novels.

17        But when we're talking about easily accessible websites,

18   that's the concern here.  Once you put it up there, anybody

19   can download it.

20        And while there may have been some downloads, you know,

21   because -- you know, the settlement agreement had indicated

22   that it was going to be finalized five days after certain

23   actions happened, but they quickly went ahead and dismissed

24   it anyway, but, you know, let's stop the -- the overwhelming

25   majority of folks that are going to download it, you know,

 1  that's the concern, and we believe if it goes back on the

 2  munitions list, that will do that.

 3          THE COURT:  What about the government's argument that

 4  the --

 5          MR. BLACKMAN:  Your Honor, may I be heard briefly,

 6  please, on this part?

 7          THE COURT:  This is Mr. Soskin?

 8          MR. BLACKMAN:  Mr. Blackman.

 9          THE COURT:  Okay.  Go ahead, Mr. Blackman.

10          MR. BLACKMAN:  Thank you, Your Honor.  I --

11  interrupting on the phone is always risky, so I appreciate

12  you hearing me.

13          THE COURT:  Take yourself off speakerphone again.

14          MR. BLACKMAN:  Oh, that's right, that's right.  I'm

15  sorry.

16      The plaintiffs have argued, at several points, that we're

17  necessary parties.  They are seeking to take action to revoke

18  a property interest we have.  We have a property interest in

19  certain licenses, and they are trying to deprive us.

20      And to the extent that the government is enjoined, we are

21  enjoined.  We're not merely necessary parties, which is why I

22  think that this is probably not the correct venue for this

23  case.  But I will reject the idea that we're simply

24  bystanders.  The government thinks -- they're bystanders.  We

25  think they're bystanders.  I think we're in bed together.  I

1    think we rise together, we fall together.  We're both parties

2    to this agreement, as it were, and to the extent one party is

3    enjoined, then we're also enjoined, and we lose an interest

4    that we currently have, which is why I think the proffer we

5    made is necessary.

6        To the extent that the plaintiffs want a TRO, it will be

7    affecting something, and I think the offer we made is

8    something to assuage their concerns about irreparable injury.

9        Thank you for letting me be heard, Your Honor.

10            THE COURT:  Yes, Mr. Blackman.  It's very interesting

11   to see how the anarchist and the government are aligned from

12   time to time.

13            MR. BLACKMAN:  Judge -- Judge, it's hilarious.  I

14   called Mr. Soskin before, I said, "Ha, we're on the same side

15   now, aren't we?"  It was a very strange phone call.

16            THE COURT:  Okay.  Back to Mr. Rupert.

17            MR. RUPERT:  I'm not sure where we left off here.

18            THE COURT:  Well, what I was going to ask you about

19   is, is the temporary modification under the ITAR something

20   that implicates the 30-days' notification and the concurrence

21   of the defense, or is that only the later action?

22            MR. RUPERT:  The temporary modification clearly does.

23   We have to go back and look at the statute.  The statute says

24   that if you remove an item from the munitions list, then you

25   need to give 30 days' notice.  And what they're trying to do,

```
 1    using an administrative rule, is to modify it but remove it.
 2        I mean, if we go back to the statute, the statute doesn't
 3    have an exception for a temporary removal.  It says if you
 4    remove it, there's, again, no distinction between temporary
 5    or permanent, you need to give required notice.
 6        And then we look to the executive order, it says if there
 7    is -- I believe, a substantive change -- I'd have to look at
 8    the exact language here.  I'll get it here -- "a change in
 9    designations, the Department of Defense needs to concur."
10        Again, this idea that you can temporarily do things
11    doesn't change the fact that you still have to make these
12    statutory; an executive order, meet those requirements; an
13    executive order for the defense and the statute for
14    notification of Congress.
15            THE COURT:  But the actual CFR, Section 126.2, says
16    that it may order the temporary suspension or modification of
17    any or all of the regulations of this subchapter in the
18    interest of the security and foreign policy of the United
19    States.
20        It doesn't talk about those other factors there.  You read
21    that into it as --
22            MR. RUPERT:  No.  I'm going back to the statute.  I
23    mean, you know, the administrative rules can only go as far
24    as the statute allows, and if the statute says you need 30
25    days, you can't make a rule that totally abrogates that.
```

1          THE COURT:  Another flip-flop here where the deep

2    state is on the side of the anarchists and --

3          MR. RUPERT:  One thing about this whole thing, you

4    know, we don't agree with President Trump very much, but when

5    he tweeted, "This doesn't make much sense," that's one thing

6    we do agree with.

7          THE COURT:  Okay.  Great.

8      Anything else, Mr. Rupert, you wanted to say?  Why don't

9    you address the issue of how can various attorneys general

10   disrupt the settlement agreement that's reached in a separate

11   lawsuit involving separate parties.

12         MR. RUPERT:  Sure.

13     Again, we're not attacking the settlement agreement

14   directly.  We are attacking the Department's ability to do

15   certain things required by the agreement.  But I do believe

16   there's a distinction to that.

17     Now, it may put the government in breach of that

18   settlement agreement, and they'll have to remedy that as best

19   they can.  But if you're going to do a settlement or make any

20   change, you need to follow the rules.  That's all we're

21   asking that they do.  If they can go ahead and get Defense's

22   concurrence and, you know, have a record to support this so

23   it's not arbitrary and capricious, and then give Congress

24   notice, they can do this.  They can, but they haven't done

25   it.  That's the nature of the APA and an APA claim.  So you

 1    can make changes, but the rules must be followed.

 2        Did you want me to address -- I don't mean to distract

 3    from the point there, but there was an argument by, I

 4    believe, the government attorney about this idea of, "Well,

 5    hey, we're changing the rules, some other rules so we didn't

 6    have to -- so we did this temporary modification."  I would

 7    just point out, and I think Your Honor highlighted the

 8    interesting timing they had with that, where the notice and

 9    comment closed on July 9th, and this is announced on July

10    10th, and if it goes public, well, then, the new rules would

11    say that commerce can't challenge this.

12        But all that being said, if you want -- the government can

13    make changes to the ITAR, but you have to follow the rules.

14    And even if you're going to do rule-making in the future, I

15    mean, that rule is not final in any way, and there may be

16    litigation over that, too.

17        If you're going to try to do something, you have to follow

18    the statute, and the statute says 30 days' notice to

19    Congress, executive order says Defense has to concur, and we

20    just don't have that here.

21        Any other questions you have, Your Honor?

22            THE COURT:  No.  Thank you very much.

23        Well, we're operating under tremendous time duress in the

24    sense that the court has to -- if it is going to grant a

25    temporary restraining order, it must do so today in order to

1   stop the matter, in terms of anyone being able to post, on

2   the Internet, the files that would allow for the printing of

3   these various weapons.

4       Now, defendant Defense Distributed has offered to say,

5   "We'll hold off for 30 days.  We won't post any new files on

6   our website.  We'll block," but this case has gotten so

7   much -- not just this case but this issue has become so

8   prominent in the national dialogue, that it goes beyond just

9   what Defense Distributed or the Second Amendment Foundation

10  can control.  And I think that, under the circumstances here,

11  I am going to grant the temporary restraining order.  I think

12  that the plaintiffs have established a likelihood of success,

13  at least on some of their Administrative Procedure Act

14  claims, that there is a possibility of irreparable harm in

15  the absence of preliminary relief because of the way these

16  things -- these guns can be made on 3-D printers.  And

17  there's some question about, well, they're not really good

18  guns and they're not going to perform well and too expensive

19  and people don't have access to 3-D printers, but there are

20  3-D printers in college campuses and publicly available

21  places.  I believe there is standing on the part of the

22  attorneys general here and a likelihood of potential

23  irreparable harm in these untraceable weapons with no serial

24  numbers ending up in the hands of people who should never be

25  allowed to possess firearms because of prior felony

1    convictions, prior domestic violence convictions, being

2    adjudicated as mentally unstable or involuntarily committed

3    for some reason, and, under the circumstances, I believe the

4    balance of equities tip in favor of the plaintiffs, and the

5    injunction is in the public interest.

6        Now, to be sure, there are First Amendment issues at play

7    here, which are very serious and will need to be looked at

8    very closely as we move to the next phase on preliminary

9    injunction.  But given the kind of timing duress that the

10   court is under here, I am making the finding that we are

11   going to maintain what I consider to be the status quo, which

12   is no posting of instructions on how to produce 3-D guns on

13   the Internet from the defendants or from anyone else, without

14   running afoul of the federal law.  So I am going to enter a

15   temporary restraining order, the actual language of which I

16   may have not completely done today, but I'll have something

17   written in the next hour.

18       And I believe I would like to set a follow-up hearing for

19   Friday, August 10th, at 9:00 a.m., here, and that -- at that

20   stage, we'll have a better picture of where we're headed and,

21   perhaps, even where the federal government might in some way

22   modify its position, given the Presidential tweet this

23   morning.  But even setting that aside, I believe there are

24   serious issues that the court needs to address more carefully

25   at the preliminary injunction hearing on Friday, August 10th,

1    at 9:00 a.m., here in Seattle.

2        So I want to thank all of the attorneys --

3            MR. BLACKMAN:  Your Honor -- Your Honor, may I be

4    heard?  This is Mr. Blackman.  I just want to make sure I

5    have the correct remedy.

6        Are you issuing an order for my client to take down his

7    website immediately?

8            THE COURT:  Not to take down the website immediately

9    because that's not the relief that the plaintiffs requested;

10   isn't that right, Mr. Rupert?

11           MR. RUPERT:  That's correct, Your Honor.  Our request

12   is for the federal defendant.

13           THE COURT:  Your client is not ordered to take down

14   his website immediately, no.

15           MR. BLACKMAN:  But the effect of your order is to

16   render my client's actions now illegal under federal law,

17   just to be clear?

18           THE COURT:  That's right, which anarchists do all the

19   time.  So if that's the path he wants to take, knowing the

20   consequences, that's fair.  But I'm not being asked to enjoin

21   your client directly.  I'm being asked to enjoin the federal

22   defendants from putting on the OK list the production of

23   these weapons.

24           MR. BLACKMAN:  Your Honor, I note my client, though

25   an anarchist, complies with all court orders, and he has for

```
 1   years.

 2           THE COURT:  I'm using shorthand, Mr. Blackman.  You

 3   understand.

 4       Okay.  Thanks very much, counsel.  I want to thank you for

 5   the excellent briefing, and we'll be adjourned.

 6           MR. BLACKMAN:  Your Honor --

 7           THE COURT:  Sorry, we're adjourned.

 8              (The proceedings concluded at 3:07 p.m.)

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

C E R T I F I C A T E


        I, Nancy L. Bauer, CCR, RPR, Court Reporter for

the United States District Court in the Western District of

Washington at Seattle, do hereby certify that I was present

in court during the foregoing matter and reported said

proceedings stenographically.

        I further certify that thereafter, I have

caused said stenographic notes to be transcribed under my

direction and that the foregoing pages are a true and

accurate transcription to the best of my ability.



        Dated this 2nd day of August 2018.



                        /S/  Nancy L. Bauer

                        Nancy L. Bauer, CCR, RPR
                        Official Court Reporter

**Exhibit B**

```
 1              UNITED STATES DISTRICT COURT

 2          WESTERN DISTRICT OF WASHINGTON AT SEATTLE

 3    _____

 4                                )
      STATE OF WASHINGTON, et al., )  C18-1115-RSL
 5                                )
                    Plaintiffs,   )  SEATTLE, WASHINGTON
 6                                )
      v.                          )  August 21, 2018
 7                                )
      UNITED STATES DEPARTMENT OF )  MOTION HEARING
 8    STATE, et al.,              )
                                  )
 9                  Defendants.   )

10    _____

11             VERBATIM REPORT OF PROCEEDINGS
           BEFORE THE HONORABLE ROBERT S. LASNIK
12             UNITED STATES DISTRICT JUDGE
      _____
13


14

      APPEARANCES:
15


16


17    For the Plaintiffs:     Jeffrey G. Rupert
                              Attorney General's Office
18                            PO Box 40110
                              Olympia, WA  98504
19
                              Jeffrey T. Sprung
20                            Kristin Beneski
                              Zachary P. Jones
21                            Attorney General's Office
                              800 5th Avenue
22                            Suite 2000
                              Seattle, WA  98104
23
                              Scott J. Kaplan
24                            Oregon Department of Justice
                              100 SW Market Street
25                            Portland, OR  97201
```

```
 1      For the Defendant      Steven A. Myers
        United States          US Department of Justice
 2      Defendants:            20 Massachusetts Avenue NW
                               Washington, DC  20530
 3
        For the Defendant      Charles R. Flores
 4      Defense Distributed:   Daniel Hammond
                               Beck Redden LLP
 5                             1221 McKinney Street
                               Suite 4500
 6                             Houston, Texas  77010

 7      For the Defendants     Matthew Goldstein
        Defense Distributed;   Farhang & Medcoff
 8      Second Amendment       4901 East Broadway Blvd.
        Foundation, Inc.;      Suite 311
 9      and Conn Williamson:   Tucson, AZ  85711

10                             Joel B. Ard
                               Immix Law Group PC
11                             701 5th Avenue
                               Suite 4710
12                             Seattle, WA  98104

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          THE CLERK:  Case C18-1115-L, State of Washington,

2     et al, versus United States Department of State, et al.

3     Counsel, would you please make your appearances.

4          MR. RUPERT:  Jeff Rupert, Assistant Attorney General

5     for plaintiff, states.

6          MR. SPRUNG:  And Jeff Sprung, Assistant Attorney

7     General.

8          MS. BENESKI:  Kristin Beneski, Assistant Attorney

9     General for the State of Washington.

10          MR. JONES:  Zach Jones, Assistant Attorney for the

11     State of Washington.

12          MR. KAPLAN:  Scott Kaplan, Assistant Attorney General

13     for the State of Oregon.

14          THE COURT:  Who is also a member of the bar of the

15     State of Washington.

16          MR. KAPLAN:  Yes, Your Honor.

17          THE COURT:  Great.

18          MR. MYERS:  Good morning, Your Honor, Steven Myers on

19     behalf of the federal defendants.

20          THE COURT:  Mr. Myers, are you all alone representing

21     the entire United States of America?

22          MR. MYERS:  I am, Your Honor, yes.

23          THE COURT:  We appreciate that.

24          MR. ARD:  Good morning, Your Honor, Joel Ard for the

25     defendants Second Amendment Foundation, Defense Distributed,

1   and Conn Williamson.

2          MR. GOLDSTEIN:  Your Honor, Matthew Goldstein for the

3   private parties Conn Williamson, Defense Distributed and

4   Second Amendment Foundation.

5          THE COURT:  Sure.

6          MR. HAMMOND:  Dan Hammond for Defense Distributed.

7          MR. FLORES:  Your Honor, my name is Chad Flores.  I'm

8   representing Defense Distributed.  And I will be giving the

9   argument for all of the private defendants.

10          THE COURT:  Welcome, Mr. Flores.  Thank you.

11      All right.  Well, we are here for the follow-up of the

12   temporary restraining order, and arguing today whether the

13   Court should issue a preliminary injunction in this case.

14   And I believe we will start with Mr. Rupert.

15      And there was an indication that, Mr. Sprung, you would

16   address a Second Amendment issue if it came up; is that

17   right?

18          MR. SPRUNG:  Yes, Your Honor.

19          THE COURT:  Okay.  I think I might save that for

20   rebuttal.  So thanks for letting me know.

21      So, Mr. Rupert, you have the floor.

22          MR. RUPERT:  Thank you, Your Honor.

23      Your Honor, the State Department voluntarily entered into

24   a settlement agreement with an organization run by a crypto

25   anarchist.  The State Department has chosen to give access to

1    potentially untraceable and undetectable firearms to any

2    terrorist, felon, or domestic abuser, with a laptop and 3D

3    printer.  This Court granted a temporary restraining order,

4    and we're now asking the Court to convert that to a

5    preliminary injunction.

6         We have procedural claims, the 30-day notice to Congress

7    and the Department of Defense concurrence, as well as an

8    arbitrary and capricious claim.  The order I was going to

9    address it in, unless Your Honor wanted me to go in a

10   different order, is I was going to address irreparable harm

11   first, since that seems to be the main challenge by the

12   government; then likelihood of success on the merits;

13   standing; and --

14              THE COURT:  That's fine.

15              MR. RUPERT:  -- then First Amendment.

16              THE COURT:  Um-hum.

17              MR. RUPERT:  As far as irreparable harm, the

18   government's chief contention is that the harms that the

19   states have identified in their many declarations cannot be

20   traced to the government's actions.  I think that's

21   thoroughly rebutted by the evidence in the record; in fact,

22   by the government's own prior filings in the Texas

23   litigation.

24        Notably, in the April 2018 brief, the government argued

25   that the Internet does not have separate parts, domestic and

1   foreign, it's all one Internet.  So once this information

2   goes online, it's going to be available.  And as the Court

3   noted in its prior temporary restraining order decision, the

4   proliferation of these firearms will have many of the

5   negative impacts on the state level that the federal

6   government once feared on an international stage.

7       The Court then quoted a number of the government's own

8   words against them -- or not against them, excuse me, just as

9   illustrative from the briefing.  But I'd also highlight the

10  declaration of Lisa Aguirre, or Aguirre, I'm not sure how you

11  pronounce her name.  But she talked about the potential for

12  terrorist groups using such weapons against the United

13  states.

14      Well, the states are a part of the United States.  So we

15  believe that the government's own evidence demonstrates that

16  the government is well aware that significant harm could

17  occur to the states if its rulings are permitted to stand

18  here.

19      One of the central issues that is the cause for the harm

20  is the widespread use of metal detectors.  Now, we've

21  submitted numerous declarations about metal detectors, and

22  how they are used, and how they do not pick up these plastic

23  guns.  But I'd highlight the declaration from Mary McCord.

24  She was the Acting Assistant Attorney General for National

25  Security, retiring in May 2017.  But she oversaw all federal

1    counterterrorism, espionage, and export control prosecutions,

2    including prosecutions of terrorists.

3        And she details the difficulties that would occur if these

4    guns become prevalent.  Because they're just not picked up by

5    metal detectors.  And it's well known by the government, it's

6    in Lisa Aguirre's declaration as well.  Then there's numerous

7    other declarations that make the same point.

8        But metal detectors, as are in the declarations, are used

9    throughout the United States, in airports, the courthouse --

10   in fact, the courthouse downstairs -- government buildings,

11   prisons, stadiums, even schools.  One of the interesting

12   things one of the experts pointed out that I hadn't even

13   thought about, that with 3D printers in schools, if the

14   school has a metal detector, the gun could be printed in the

15   school, even evading it further.

16       Now, this all demonstrates the public-safety concern that

17   the states have raised here, by the government's sweeping

18   change of its position that it had for five years.  Now, the

19   states have numerous laws about who is prohibited from owning

20   a gun, such as felons, domestic abusers, those with mental

21   health issues, or for age.  And we have background checks

22   that are used to identify those folks.

23       Some states even have limits on the manufacturing of a

24   gun.  Massachusetts does, for instance.  New Jersey does as

25   well.  Well, all of those could easily be evaded, again, with

1   a 3D printer and these files.  And then the issue becomes,

2   that I just identified, the metal detectors are not going to

3   be useful at all.

4       Just a few other points I'll highlight on irreparable

5   harm, and then I'll move on.  I want to just focus on, for a

6   moment, the deposition of Professor Patel from the University

7   of Washington, who is a MacArthur Genius Fellow.  He talks

8   about how 3D printing works now, and that this Liberator gun

9   could easily be printed.  But then also discusses the

10  advances that he believes, in his opinion, will occur rapidly

11  in this area, that the technology will proceed far -- be far

12  better than we currently have, as new gun designs come out,

13  and, frankly, the 3D printing advances.

14      I also want to highlight that the 3D guns will spread.

15  And by that I'm referring to the declaration from Ron Hosko.

16  He's a 30-year career FBI agent.  He was the Assistant

17  Director of the FBI's Criminal Investigative Division and led

18  the Bureau's largest program worldwide.  But his declaration

19  discusses his experiences and his belief that the 3D printers

20  will be embraced by criminal enterprises, if it becomes

21  available.

22      One other thing to highlight, and then I'll kind of go on

23  to a few other points here, is that we do know, from the

24  declaration from Blake Graham, the special agent for the

25  California Department of Justice, that ghost guns, these are

1   the metal guns that don't have any identifier on them, they

2   are emerging more and more in California.  They've been used

3   in a number of mass shootings.

4       There's heightened risk of terrorist attacks.  And the

5   Aguirre and McCord declarations detail those.  Then the

6   ability of law enforcement to use serial numbers to solve

7   crimes would be greatly compromised if these became

8   widespread.  And there, I point to the declaration of John

9   Camper from the Colorado Bureau of Investigation, who they

10  did some testing on these guns, and they concluded that

11  standard forensic techniques cannot be applied to link a

12  projectile or bullet to a particular 3D-printed firearm.

13  That's because the barrel is not rifled, and the firing

14  conditions can't be replicated.  And, frankly, it was unsafe

15  to fire some of the guns.

16      One of the things we hear in response is, well, the

17  Undetectable Firearms Act, you know, that covers this, so why

18  are you complaining, states?  Well, as Mary McCord in her

19  declaration notes that the Undetectable Firearms Act does

20  nothing to deter terrorists or bad actors from making a 3D

21  weapon.  In fact, the current system has firearms dealers

22  whose livelihood depends on compliance with federal and state

23  law.  But those will be removed if these become widespread.

24      I think Chief Best from the Seattle Police Department

25  summed it up best with if we have 3D guns, you know, such a

1  world will be more dangerous for the public and for the

2  police officers whose job it is to protect the public.

3      So we believe the irreparable harm element has been shown

4  to grant a preliminary injunction.  And we note that there is

5  no evidence to the contrary submitted by the government or

6  the other private defendants.

7      Turning now to likelihood of success on the merits.  As we

8  discussed last time, I think it's pretty clear the items are

9  on the Munitions List.  The government has taken that

10 position for five years starting in 2013, all the way up to

11 April 2018 in court filings.

12     They then took two actions to remove the items from the

13 Munitions List, the temporary modification and the letter.

14 Both require notice, 30 days' notice to Congress.  And that's

15 -- the statute that requires that is 22 -- excuse me --

16 2778(f)(1).

17     There's no dispute that the notice to Congress was not

18 given.  And that's in the record with the declarations from

19 Representative Engel, as well as the letter from Senator

20 Menendez.  The position of the government is, though, that it

21 wasn't required because they believe that the statute, when

22 it refers to items, is actually referring to a category or

23 subcategories of items.  We've discussed this in the brief,

24 but we don't believe that finds support in the actual text of

25 the statute or the case law.

1     And they also talk about a *Skidmore* defense.  But *Skidmore*

2 doesn't apply if the statute is unambiguous.  In support we

3 would highlight the CFR section that we highlighted, as well

4 as the case law, which distinguishes between categories and

5 items.  And even the executive order that we have at issue,

6 refers to items or categories of items.  And if an item was a

7 category it wouldn't make any sense.

8     So we believe that when these were removed, that notice

9 was required.  And there's no dispute it was not given.

10          THE COURT:  Mr. Rupert, when we first met, the

11 absence of 30-days notice was particularly acute, because we

12 were acting on virtually no notice whatsoever.  Now Congress

13 obviously has, even if they haven't received the official

14 notice, they're on notice.  And they will have had about

15 30 days to act.  And I think it's fairly obvious they're not

16 going to act.  So what is the irreparable harm of not giving

17 the notice?

18          MR. RUPERT:  Actually the notice, if you look at the

19 statute provision, it requires the notice shall describe the

20 nature of any controls to be imposed, and that item under any

21 other provision of law.  It's just not clear what position

22 the government is taking, if it is going to do anything to

23 protect these weapons, under another mechanism or not.  And

24 it is a formal mechanism to Congress that is required to be

25 done.  And, again, it's a procedural claim, but it was not

1   done.

2      The other procedural claim that we identify was the

3   concurrence of the Secretary of Defense.  And there's a bit

4   of a dispute whether that's reviewable.  We believe it is

5   based on the *City of Carmel* case from the Ninth Circuit.  The

6   government had cited a district court decision out of the

7   D.C. -- D.C., the *Defender of Wildlife* case, which had some

8   similar language.  But I would say the *Defender of Wildlife*

9   case noticeably has a section labeled, "Application and

10  judicial review."  That's not in the executive order that we

11  have here.  And we believe, therefore, that the *City of*

12  *Carmel* case controls.

13     So as far as the Department of Defense, the declarations

14  submitted by the government trying to explain what did occur,

15  there's no mention in that declaration whatsoever that the

16  Department of Defense concurred in the temporary

17  modification.

18     I will say, though, that that declaration does say that

19  the Department of Defense concurred in the letter.  Now,

20  there's no details about the date, time, or person that gave

21  it.  But it does say that.  And I would note that there's a

22  distinction between the letter and the modification, too.

23  The letter addresses just the specific articles that were at

24  issue.  That's the Liberator gun and a few other items.  The

25  modification, on the other hand, was much broader, because

13

1    that covered not only the guns that -- the designs that had

2    been submitted, but as well as any future 3D guns that might

3    be submitted by private defendants or anyone else.  So that's

4    the much broader one that there's no concurrence from the

5    Department of Defense.

6         Just to give background here.  Removals from the Munitions

7    List rarely occur.  And I'm referring to the declaration from

8    Representative Engel's letter as well as Senator Menendez's

9    letter.  And they explained the usual process that occurs

10   where, well, 30 days is what is required statutorily.  Often

11   it's far greater than that.  And the Department of Defense is

12   involved in this whole process.  And that just wasn't done

13   here.

14        I want to move to the arbitrary and capricious claim.  We

15   don't have the record here, and we will need that when we

16   reach the final merits of this, but we believe there is

17   sufficient information before you right now to demonstrate a

18   likelihood of success on the merits.  That's because of the

19   following:  First, there's a prior CJ determination in 2015,

20   as well as the Aguirre declarations that have findings that

21   these items need to be on the Munitions List for national

22   security reasons.  And they also detail the harm that would

23   occur if they were removed.

24        Second, the government in past litigation filings for over

25   three years, said essentially the same thing, discussing the

1    harms and need for national security for these items to

2    remain on the Munitions List.  And the third, I would cite

3    the Heidema declaration that the government has submitted in

4    opposition.  Now, this declaration details the government's

5    rationale for making its decision.

6        Now, it does, as I mentioned, address the concurrence to

7    the letter by the Department of Defense.  But it's notable

8    about what is not in this declaration.  This declaration

9    doesn't say there's any justification, rationale or findings

10   for the government's change in position from 2015 in the CJ

11   or the Aguirre declaration until now.

12       The government's declaration does not say there's any

13   national security or public safety, it doesn't even mention

14   at all about putting these guns out there.  And there's --

15   the government doesn't say that a new CJ was done.  What the

16   government does rely on is proposed rulemaking that it has

17   done to move some items from Category I of the Munitions

18   List, over to the Commerce Department.

19       But this can't be a basis for this decision, at least if

20   it is -- it's an arbitrary and capricious one, because it

21   would be an attempt to make an end run around the rulemaking

22   process.  Because these rules are not final.  We don't know

23   what will come out of it, in fact.  And if they're trying to

24   short-circuit the rulemaking process by using this

25   modification, I think it fails right there as arbitrary and

1    capricious.

2        Then more telling, I would look at the actual rationale

3    that they identify for moving items from the Munitions List

4    over to Commerce.  And I'm referring to paragraph 19 of

5    Ms. Heidema's declaration.  She refers to the transfer of

6    certain items was informed by the Defense Department's

7    assessment that the items proposed for transfer are already

8    commonly available.

9        We know plastic guns are not commonly available.  So if

10   that's the rationale for the government's decision now to

11   make plastic guns available, not even the declaration

12   supports that.  And we believe that it's arbitrary and

13   capricious.

14       One of the other items in paragraph 19 that's highlighted

15   is that little national security concern is highlighted by

16   the fact that the Department of Defense does not generally

17   review export license applications for the physical items

18   described in Category I, as the Department does for license

19   applications in other categories.  Well, we know that they

20   actually did review this one here, that's the 2015 CJ

21   determination.  So, again, this declaration by Ms. Heidema of

22   trying to justify the government's decisions in this case,

23   actually does not justify it at all, and shows the arbitrary

24   nature of it.

25       The final thing -- two other things to highlight.  There

1    has been suggestions by the private defendants that the First

2    Amendment was a factor in this analysis.  But Ms. Heidema's

3    declaration makes clear that the Department denies and

4    continues to deny that it violated the First or Second

5    Amendment or acted in ultra vires.  So that was not the

6    rationale either.

7         And, finally, I'm not quite sure how best to categorize

8    it, because it's so unusual it's hard to find any case law.

9    But we have the President himself tweeting, that this doesn't

10   seem to make much sense.  And that's not quite the legal

11   standard, but ultimately that's what is an arbitrary and

12   capricious decision.  Does this make sense or not?  And we

13   believe that based on Ms. Heidema's declaration, as well as

14   the prior declarations in the 2015 CJ determination that it

15   does not.

16        I was going to move on to standing, unless the Court had

17   any questions about the likelihood of success on the merits.

18             THE COURT:  Well, on the Heidema declaration, she's

19   not somebody who was brought in in a new administration or

20   anything like that.  It seems like she's been part of the

21   government agencies that have been looking at this for

22   several years.  The federal defendants have made the argument

23   that this was a kind of boring bureaucratic look at

24   something, and just happened to cover the 3D guns, but it

25   wasn't set out to change things, in particular to that, it

1  was this 50-caliber or below.

2    What evidence do the states have that this really was a

3  setup to change the 3D guns, rather than a bureaucratic

4  process that could put anyone to sleep?

5         MR. RUPERT:  I think the timing is one of the big

6  questions that we have throughout this whole thing, the way

7  it was revealed at certain times, the settlement.

8    Overall, though, regardless of why it was done, what's in

9  that declaration versus what is not, the case law is clear on

10 arbitrary and capriciousness.  If you're going to make a

11 significant change, you need to have a rationale for it.  It

12 doesn't need to be a better rationale.  But you do need to

13 have a rationale.  And none is identified in this

14 declaration.  Because as I pointed out, this doesn't apply to

15 plastic guns, the rationale that they have, that it's readily

16 available, the guns, because that's just not so for plastic

17 guns.

18        THE COURT:  So the action may not be arbitrary and

19 capricious to the larger categories, but its impact on the

20 plastic gun issue is?

21        MR. RUPERT:  Correct.  That's why we do wonder what

22 will come out in the final rulemaking, which we don't know.

23 But you do wonder, do plastic guns get excepted from the

24 final rulemaking.  And then we'll just have to see what they

25 do, and then we'll have to see if there's any challenges to

1    that.

2              THE COURT:  Okay.  You can move on now, to standing.

3              MR. RUPERT:  Sure.

4        As we discussed last time, standing is injury in fact,

5    traceability and redressability.  But these requirements are

6    relaxed in the APA case.  And the state has standing, if it's

7    either sovereign, quasi-sovereign, or proprietary interest.

8    I want to highlight the *Massachusetts v. EPA* case that talks

9    about the special solicitude in the standing analysis,

10   because that does change it somewhat when the states are

11   involved.  And that was applied for the *EPA* case, and also

12   recently applied in the *Texas v. United States* case, that was

13   affirmed by an equally divided court in 2016.

14       This is, I think, pretty well laid out in the briefs, so I

15   was going to move through it somewhat quickly.  The states

16   have a sovereign interest to create and enforce the legal

17   code.  And we believe that the government's actions under

18   forces our ability to enforce the statutory codes.  And we

19   have multiple declarations that support that.

20       It also undermines the maintenance and recognition of

21   borders, because this will allow guns, based on the McCord

22   declaration, to come across the borders by air, sea, and

23   water.  Also affects the police power, because it seriously

24   impedes the ability to protect the residents from injury and

25   death.  And there's numerous declarations that go into that.

19

1          On the proprietary standing, the state has submitted

2     declarations related to its jails.  Metal detectors are

3     widely used there.  And if this technology, that technology

4     being 3D guns, is widely implemented, the metal detectors are

5     going to have a significant hole.  And we'll have to buy a

6     whole new wave of technology to scan folks when they come

7     back in, or guests that come in.  And we're going to have to

8     do hand searches.  So there's going to be significant expense

9     involved.

10          The same with law enforcement, anybody who is relying on

11     metal detectors is going to have to upgrade their technology,

12     if such technology exists, or they're going to have to go to

13     more hand searches, which is going to be more intensive and

14     require more manpower.  So we believe that's the proprietary

15     interest right there.

16          As far as quasi-sovereign, we believe there's, again, a

17     threat, similar to the sovereign and proprietary, a threat to

18     safety and physical well-being, to the states' residents by

19     making these weapons more available, which sort of dovetails

20     with what I've discussed about irreparable harm.

21          The next part of a standing analysis is zone of interest

22     and prudential standing.  This is not meant to be an

23     especially demanding test.  And it's presumptive -- agency

24     actions are presumptively reviewable.  When you look at the

25     AECA itself, it's intended to protect domestic security by

1   restricting the flow of military information abroad.  But it

2   does so in furtherance of world peace and the security and

3   foreign policy of the United States.

4       As I said before, the states are the United States.  If

5   this is going to -- if we're doing it to protect national

6   security, we should be doing it to protect the states.  And

7   we have declarations in the record that talk about these guns

8   flowing across our borders, or the potential that somebody in

9   a foreign country could seize an airplane by getting onto the

10  airplane in a foreign country and flying it towards the

11  States.

12      I'm going to move on to the First Amendment issues, unless

13  Your Honor had any questions about standing.

14      We believe the First Amendment is irrelevant to the merits

15  of the case.  And we do that because the government, in the

16  Heidema declaration, states that they didn't rely on the

17  First Amendment in deciding these decisions.  Now, I do

18  believe the Court should consider the First Amendment when it

19  balances the equities, and that element of the temporary

20  restraining order.  We believe it's an easy decision there,

21  though, because Judge Pitman has already done that review,

22  being on a somewhat different standard, but on a preliminary

23  injunction standard, and determined that plaintiffs have not

24  shown a substantial likelihood of success on the merits of

25  their claim under the First Amendment.

21

1       We have a number of arguments in here, and I'm going to

2   focus on Judge Pitman's analysis.  But I do want to highlight

3   some of those arguments before I get to Judge Pitman.

4       First is that 3D guns themselves are not an expressive

5   act.  And for that, I'm relying on the *Vartuli* case cited in

6   the briefs.  Because the nature of these guns is that you

7   just press a button and it prints.  So we don't believe that

8   itself is an expressive act.

9       One of our other arguments that we raise in our briefs is

10  that these load files are integral to criminal conduct and

11  are, therefore, exempt from the First Amendment.  And there's

12  some cases that we cite for that.  But the gist of that is

13  that with the Undetectable Firearms Act, as well as the state

14  law restrictions, it's illegal to possess a weapon such as a

15  plastic gun.  So, therefore, these guns -- excuse me, the

16  files are so tied to those plastic guns, that they themselves

17  have no First Amendment protection.

18      But what I want to focus most on is intermediate scrutiny

19  or whether this is content neutral, as Judge Pitman had

20  determined.  Before we get there, though, we need to look at

21  this issue of a prior restraint.  Because the private

22  defendants have claimed that if there's a prior restraint,

23  that strict scrutiny automatically applies.  Well, that's

24  just not so in the case law.

25      As Judge Pitman cited, the standard review for analyzing

1    prior restraints, there's different standards of review

2    depending on the restraint at issue.  While there's a heavy

3    presumption against validity, that's not a standard review in

4    itself.  And he cites, for instance, the *Seattle Times* case,

5    where there was a prior restraint, but strict scrutiny was

6    not applied.

7         Following Judge Pitman's analysis, he determined that the

8    law is content neutral.  And he did so because the ITAR does

9    not regulate disclosure of technical data, based on the

10   message it's communicating.  And that's exactly our position

11   as well.  Because the fact that some of these private

12   defendants are in favor of global access to firearms or have

13   some other agenda, is not the basis for regulating the export

14   of the computer files at issue.

15        The motivation of the government, as the government said

16   itself in its brief, is not the product of hostility towards

17   their ideas or the spread of 3D printing technology, but it's

18   the very means to easily do so.  So I believe that

19   intermediate scrutiny applies here because it's content

20   neutral.

21        If there is intermediate scrutiny, again, I'm going to

22   follow Judge Pitman's reasoning here.  There's a substantial

23   government interest in regulating the dissemination of

24   military information and combatting terrorism.  And there's

25   numerous cases on that point.  We believe that the

1   regulations here are narrowly tailored, and there's a

2   procedure to challenge it with a CJ.  And the declaration

3   from Ms. Aguirre indicated that most CJs are granted.  By

4   that, I mean you're allowed to export the item.

5       Finally, there are alternative avenues to produce this

6   information.  But here, notably, it only applies to Internet

7   posting.  They can hand them around domestically.  And also

8   there's a wide exception in the statute for general

9   scientific, mathematical or engineering papers.

10      I would note that Judge Pitman's decision relied on a

11  Ninth Circuit case, which we again believe controls, is the

12  *Chi Mak* case, from the Ninth Circuit in 2012, where the Ninth

13  Circuit quoted -- quote says, it repeatedly rejected First

14  Amendment challenges to the AECA, its implementation of

15  regulations in its predecessor statute.

16      So, again, we believe that decides the issue with the

17  First Amendment.  But Your Honor only has to reach these

18  issues on the balancing of the equities test for an

19  injunction.

20      Moving on to the balancing of the equities.  We believe

21  there's a real and present danger to the public safety.  The

22  President seems to agree.  And the preliminary injunction, if

23  it were issued, as with temporary restraining orders, will

24  not harm the government.  It would put us back to where we

25  were before this all happened.  As to the First Amendment

1   issues that have been raised by the private defendants, I'll

2   just address them there.  And they didn't have this ability

3   to publish for five years here.  And just continuing it on

4   while this litigation proceeds, we don't believe will cause

5   much harm, when compared with the irreparable harm that the

6   states would suffer, as demonstrated by our declarations.

7       I don't have anything further, unless Your Honor has any

8   questions.

9           THE COURT:  I'll catch you in rebuttal.

10          MR. RUPERT:  Okay.  Thank you.

11          THE COURT:  Um-hum.  Mr. Myers.

12          MR. MYERS:  Thank you, Your Honor.  The federal

13  government agrees that undetectable plastic firearms pose a

14  significant risk to domestic public safety.  The Department

15  of Justice is fully committed to vigorously enforcing the

16  Undetectable Firearms Act.

17          THE COURT:  How do you vigorously enforce an act to

18  find undetectable guns, until that gun ends up being used?

19  How do you proactively stop and find those things?

20          MR. MYERS:  Your Honor, federal law enforcement is

21  involved in finding all kinds of illicit contraband;

22  undetectable firearms, unlawful drugs, any number of things.

23  The federal government has a lot of experience doing that.

24          THE COURT:  Right.  But we don't just wait for the

25  heroin to be produced, and then try to find it.  We say it's

1   against the law to produce the heroin.

2           MR. MYERS:  Correct, Your Honor.

3           THE COURT:  If we have something that, by definition,

4   is undetectable and untraceable, wouldn't it make sense that

5   it should not be manufacturable?

6           MR. MYERS:  And to be clear, Your Honor, it is

7   unlawful to produce an undetectable firearm.

8           THE COURT:  Right.

9           MR. MYERS:  As in other contexts it's unlawful to

10  produce illegal drugs.  So that is our point.  It is unlawful

11  to produce an undetectable firearm.  And it's the

12  Undetectable Firearms Act that is the basis for that

13  illegality.  And the government is fully committed to

14  enforcing that statute.

15      It's also fully committed to enforcing other prohibitions

16  on firearms ownership, by people who are ineligible to own

17  firearms:  Felons, and those who were judged mentally ill,

18  and others.  But the fact that a weapon is dangerous

19  domestically, and there's a basis to regulate it

20  domestically, doesn't mean that it provides a critical

21  military or intelligence advantage, which is the standard

22  that applies when the State Department exercises its

23  authority under the Arms Export Control Act.

24          THE COURT:  So are you saying it never should have

25  been there in the first place?

1    MR. MYERS:  Your Honor, the key event, from the

2    government's perspective, is the May notices of proposed

3    rulemaking from state and commerce, that reflect the

4    government's judgment that nonautomatic firearms, sub

5    50-caliber, do not present a critical military or

6    intelligence advantage.  So, no, I'm not saying it never

7    should have been.

8         THE COURT:  But we now have a new proposed

9    modification that will take all those weapons off the table,

10   as far as the Export Control Act goes.

11        MR. MYERS:  Correct.

12        THE COURT:  And I didn't require production of the

13   record under this tight time schedule, because I didn't want

14   you worrying about that.  But at some point the question of

15   whether this was the bureaucracy at work, but not noticing

16   that it affected 3D printed weapons; or, my goodness, let's

17   get these 3D weapons unregulated and this is the way to do

18   it, does become important, doesn't it?

19        MR. MYERS:  Your Honor, if this case -- assuming this

20   case proceeds and we're directed to produce the

21   administrative record, everything that is part of the record

22   will be before the Court.

23        THE COURT:  Well, do you know the answer to the

24   question?  Was it -- did somebody notice that this

25   modification is going to change the 3D gun thing, and it was

1    part of the process; or, we just wanted to change the

2    50-caliber or less, nonautomatic, and we didn't even think

3    about the 3D printing?

4                MR. MYERS:  Your Honor, I think the face of the

5    documents that we've relied on and put before the Court

6    suggests that there's been a year's long effort to revise the

7    United States Munitions List.  And as part of that, the

8    judgment has been made that sub-50-caliber nonautomatic

9    firearms ought not be regulated under the AECA and ITAR.  And

10   that extends to professional firearms or plastic firearms,

11   provided that they are nonautomatic and sub-50-caliber.

12               To be clear, even if the Court were to grant plaintiffs

13   every ounce of relief that they seek in this case, Defense

14   Distributed could still mail every American citizen in the

15   country the files that are at issue here.  And what that gets

16   at, and what I really want to underscore, is the fundamental

17   disconnect between the claims that plaintiffs are asserting

18   here, and the statutory regime at issue.

19          Again, there are domestic prohibitions on undetectable

20   firearms, on firearm possession.  Some of those are federal.

21   Some of those are state.  And all remain on the books and

22   capable of being enforced.  But plaintiffs are trying to rely

23   on the wrong statutes.

24          So let me start by talking about plaintiffs' theory of

25   injury, which is relevant to their claims of both standing

28

1    and irreparable harm.  Their main argument is that as a

2    result of these files being available, that's going to lead

3    to the proliferation of undetectable guns.  Again, that harm,

4    that potential harm is not properly traceable to the

5    regulatory action that's at issue here.  If those harms

6    occur, it will be because of separate violations of separate

7    statutory prohibitions.

8        Plaintiffs similarly try to question defendants' national

9    security judgment.  But the federal government's judgment is

10   that the risk of small-caliber weapons of this kind does not

11   justify their regulation under the Arms Export Control Act.

12       And that judgment, the federal government's national

13   security judgment, to the extent it's reviewable at all, is

14   entitled to significant deference from the Court.

15       Plaintiffs make the observation that the states are the

16   United States.  And I suppose that's true in some sense, of

17   course.  But the federal government has principal

18   responsibility for ensuring the national security of the

19   country.  And the Arms Export Control Act is part of that.

20   That's the function of that statute.

21       With respect to abrogation of state laws, plaintiffs say

22   that somehow the federal government is interfering with their

23   ability to enforce their state laws.  But that's just not so.

24   We are not suggesting that the actions at issue here

25   undermine or preempt state law in any respect.  Plaintiffs

1   are just as able to enforce those laws today as they were a

2   year ago.

3        As I've tried to indicate, this fundamental mismatch

4   between what plaintiffs are concerned about and the statute

5   on which they're relying, also really undermines their

6   prudential standing.  As a matter of prudential standing,

7   they need to show that their claims are in the zone of

8   interests of the statutory provision upon which they rely.

9   But as the Ninth Circuit has made clear, the Arms Export

10   Control Act is designed to, and I'm quoting, "Protect against

11   the national security threat caused by the unrestricted flow

12   of military information abroad."  That's the *United States v.*

13   *Posey* case from the Ninth Circuit.

14        The vast majority of the harms that they're talking about

15   are purely domestic harms that are properly the subject of

16   domestic regulation.  But they're not relevant to the foreign

17   affairs concerns of the Arms Export Control Act.  And, again,

18   plaintiffs are not able and should not be able to

19   second-guess the executive national security determinations.

20   That is the essential function of the federal government, not

21   state governments.

22        Unless Your Honor has questions on what I've said so far,

23   I'll turn to the likelihood of success on the merits of their

24   APA claims.

25             THE COURT:  Go ahead.

1          MR. MYERS:  Their primary argument is this 30-day

2    notice provision that arises from 22 U.S.C. Section 2278(f).

3    And what that statute says is that before items are removed

4    from the Munitions List, there needs to be 30 days' notice to

5    Congress.

6          Your Honor can simply look at the United States Munitions

7    List to see that nothing, no items have been removed from the

8    Munitions List.  The Munitions List consists of 21

9    categories.  And then there are items within those

10   categories.  And the items, for example in Category I, are

11   things like nonautomatic and semiautomatic firearms, to

12   caliber 50, or combat shotguns, or silencers, mufflers and

13   flash suppressors.  Again, all of those items are still

14   there.  The USML has not changed at all as a result of the

15   actions challenged here.

16         What the July 27th notice did was temporarily exclude very

17   specific technical data from the scope of the USML, and

18   essentially meant that the USML would not be applied as to

19   those specific files pertaining to those specific articles.

20   But, again, the items on the USML remain exactly the same.

21         The Heidema declaration, which we have submitted, makes

22   clear that the government has consistently, since at least

23   2011, understood the statute's use of the term "items" in

24   exactly that way.  And it further makes clear that Congress

25   has been put on notice that that's how the State Department

1   understands the statute.  So that understanding is entitled

2   to some degree of deference from this Court.

3       Indeed, 22 CFR Section 126.2 specifically contemplates

4   temporary suspensions of the regulations as to particular

5   articles.  And so what I think plaintiffs are really

6   suggesting is that that regulation is an impermissible

7   interpretation of the statute.  And that regulation is

8   likewise entitled to some degree of deference, as a

9   reasonable construction of what the statute means.

10      Plaintiffs further say that defendants have violated the

11  executive order which requires the concurrence of the

12  Secretary of Defense.  First of all, that claim only can go

13  forward if there has, in fact, been a change to items or

14  categories of items.  So in a certain sense, it's duplicative

15  of the notice to Congress claim that I was just discussing.

16  In addition, Section 6(c) of the executive order is explicit

17  that it does not create rights that are enforceable at law

18  against the United States; which is not the case in the

19  authority upon which plaintiffs have relied to try to say

20  that they can litigate under the executive order.

21      And, finally, the Heidema declaration makes perfectly

22  clear that the Defense Department has been consulted

23  throughout this process, both with respect to the notices of

24  proposed rulemaking, which would exclude all -- which would

25  remove all nonautomatic small-caliber firearms from

```
1    Category I, and specifically with respect to the subject

2    files that are at issue here.

3         Finally, with respect to plaintiffs' arbitrary and

4    capricious claim, we submit that the notices of proposed

5    rulemaking directly answer that claim.  Those notices of

6    proposed rulemaking make clear that the federal government

7    has been involved in a year's long process to determine what

8    kinds of weapons present a critical military or intelligence

9    advantage.  And they further reflect the government's

10   judgment that small-caliber, nonautomatic firearms, of a kind

11   that you can buy in essentially any gun store in the United

12   States, do not present such a critical military or

13   intelligence advantage.

14        And so we think that answers their arbitrary and

15   capricious claim.

16        THE COURT:  Of course you cannot buy a 3D-printed gun

17   in any firearms store in the United States that's

18   undetectable and untraceable, can you?

19        MR. MYERS:  No, Your Honor, if it were undetectable

20   and untraceable, that would be a violation of the

21   Undetectable Firearms Act.

22        THE COURT:  So what I keep coming back to, Mr. Myers,

23   is saying we're just doing this gross category of "under

24   50-caliber nonautomatic" because that has no defense or

25   international implications, may apply to every other weapon,
```

1    but does it apply to a 3D gun that is undetectable and

2    unprintable?  And if you look at the government's positions

3    in the case in front of Judge Pitman in Texas, they kept

4    saying:  This is different.  This is serious.  This could be

5    utilized in ways that have a direct impact on our country,

6    because of the proliferation in foreign lands, the fact that

7    people who don't have our best interests in mind can get the

8    guns and then come in with them, or use them to get on

9    airplanes.  And we could end up with other kinds of 9/11

10   situations or shoe-bomber situations.  That this was a very

11   serious issue, in and apart from the 50-caliber issue.

12       You keep wanting to say:  That's just not part of the

13   process.  It's not what we were talking about.  If it happens

14   to implicate that, we'll deal with it in the way we deal with

15   law enforcement in general.  And that doesn't comfort people,

16   because we already see mentally ill people get their hands on

17   guns and have mass shootings.  We already see people who are

18   felons get their hands on guns.  We see people, who are not

19   entitled to have guns, get their hands on guns.  We see

20   children shoot other children with what they think are toy

21   guns.  And, my goodness, these plastic guns look even more

22   like toy guns.

23       Where is the recognition, seems to be coming somewhat from

24   the President that:  Wait a minute, this is a different

25   matter, and Sarah Sanders, we're glad that the judge put a

1   little stop in this so we can take a better look at it.

2   Where is the better look at it?

3   MR. MYERS:  Your Honor, since Your Honor entered the

4   TRO, the government has been further studying and further

5   looking into this issue, as the press secretary I think

6   indicated she was -- or the President was welcoming that

7   opportunity.  That further look has concluded.  And the

8   government's position on this issue has not changed.  And the

9   position of the United States is the position that we've set

10  out in the brief filed with this Court.

11  THE COURT:  Okay.  So that review internally in the

12  Executive Branch did occur, and the decision was made not to

13  change the position?

14  MR. MYERS:  There has been no change in position

15  since we filed our TRO brief and since we filed the PI brief

16  and this morning's hearing.

17  THE COURT:  Right.  But my question was a little bit

18  different, though.  I understand there's been no change.  But

19  was that decision not to make a change at the highest levels

20  of the Executive Branch, or we just don't know why it wasn't

21  changed.

22  MR. MYERS:  Your Honor, I can't really speak as to

23  who or where in the Executive Branch considerations, you

24  know, have or haven't taken place.  I can say that the

25  position I'm articulating today is the vetted, authorized

 1    position of the United States Government.

 2            THE COURT:  Great.  Thanks, Mr. Myers.  I don't want

 3    to stop you.  Are you moving on to anything else?

 4            MR. MYERS:  Your Honor, I think all I would add or

 5    all I would just underscore is that the government

 6    understands all of the harms and issues that Your Honor has

 7    just identified.  Again, we understand that undetectable

 8    plastic firearms are a serious security threat.  The

 9    Department of Justice takes the issue seriously, is committed

10    to vigorously enforcing statutes that deal with those topics,

11    we just don't think that the Arms Export Control Act is the

12    relevant statute here.

13            THE COURT:  As far as the First Amendment issues go,

14    the federal government has never taken a position that

15    anything that had to do with the Arms Export Control Act

16    implicated First Amendment issues, correct?

17            MR. MYERS:  We've denied liability on the First

18    Amendment claim.

19            THE COURT:  And even the settlement with Defense

20    Distributed didn't admit to any First Amendment violations?

21            MR. MYERS:  It continues to deny liability, right.

22            THE COURT:  Okay.  And you understand that you and

23    the private defendants do separate on this last issue that

24    you talked about.  They want everyone to have an

25    undetectable, untraceable gun, because they -- at least

1    according to Mr. Wilson -- that's the way they will protect

2    themselves from an overbearing, overcontrolling government.

3    And so you're not on the same page on that.

4             MR. MYERS:  Again, the Department of Justice is fully

5    committed to enforcing all federal criminal laws that

6    regulate these topics.

7             THE COURT:  Thanks, Mr. Myers.

8             MR. MYERS:  Thank you, Your Honor.

9             THE COURT:  Mr. Flores.

10            MR. FLORES:  Thank you, Your Honor.  We appreciate

11   the Court's indulgence in letting us brief and argue this

12   case as something of a bystander.  We should probably start

13   by recognizing that as the Court correctly saw at the TRO

14   stage, and as we see in footnote 1 of the motion, the

15   plaintiffs don't seek any relief against us in this case.

16   And so we have views we'd like to express, but our role is a

17   unique one.

18       I think it's also critical to acknowledge that what we

19   heard both from counsel for the plaintiffs and the government

20   is that my clients could mail the files at issue to anyone in

21   the country and violate no law.  And so really what we're

22   talking about isn't the question of whether, but how much.

23   How much of this activity can occur, due to the use of the

24   Internet?  And I think that's a critical thing to realize

25   when we're looking at things like irreparable harm and the

1   evidence that you look at from the plaintiffs.

2       When you decide whether or not to enter an injunction, you

3   can't look at evidence of all of the activity that's going

4   on, you have to look at the marginal increase that would be

5   at issue in this case, because of this particular set of

6   parties.

7       I don't really want to get into the merits of a lot of the

8   discussion here.  I actually want to focus on a procedural

9   point.  And that is that this isn't an up-or-down question of

10  whether or not to continue the TRO and whether or not the

11  temporary modification should stay in place.  I think that in

12  order to sign the order that they've drafted for you, you

13  would need to conduct the analysis, the full analysis of

14  standing, and the merits, and irreparable harm, and the

15  constitutional claims, at least four times.

16      Because, remember, the temporary modification doesn't just

17  apply to 3D guns generally.  We're talking about very

18  particular files that are defined consistently throughout the

19  actions.  You have four categories.  Category I is the

20  published files, which is a defined set of expression.

21  Category II is the ghost gunner files.  Category III is the

22  CAD files.  And Category IV is the other files.

23      And the procedural point I have to make is that we have

24  very strong arguments that apply to many of these.  And the

25  plaintiffs have some okay counterarguments.  I acknowledge

1   they are close arguments.  But I think that at worst, you're

2   going to have to split the baby here.

3       For example, I think our best argument is that the cat is

4   out of the bag as to the files that are already online.

5   There is an enumerated list of ten files at issue.  These

6   belong in the category of the published files and the CAD

7   files that are already available online, no matter what

8   happens in this case.

9       And so we think that takes out their case, both at a

10  standing level and at a traceability level.  And they have an

11  answer.  And their answer is, yes, but the order also

12  concerns other files that don't exist yet.  That may be the

13  case.  I have other answers as to other files.  But that

14  means you can't issue an injunction as to the matters that

15  are already out in the public domain.

16      And so throughout the analysis, they have to thread the

17  needle all the way through as to all four pieces that we're

18  talking about here.

19      Now, on that last piece, the other files that don't exist

20  yet, we do have a solution to that, and that's a standing

21  problem.  This is precisely the kind of speculative harm that

22  isn't justiciable.  Because remember, we don't know what

23  files we're talking about.  We're just imagining what could

24  be created in the future by, not us, but the people who we

25  send expressive files to.  And so that, we think, there

1    doesn't have standing to assert.

2        The standing analysis also needs to be divided, we think.

3    We see three standing arguments.  And I think only one of

4    them is debatable.  And that one really narrows the case.

5    The first standing argument that we don't think they succeed

6    on is this pure sovereign interest in the states' ability to

7    enact their laws and to have their Executive Branch enforce

8    those laws.  They can still do that for the reasons that my

9    friend for the government explained.  But that's not at risk

10   here.

11       The second kind of standing argument they have is this

12   quasi-sovereign interest in protecting the safety of the

13   citizens and making sure that there's a peaceable place to

14   live.  This is a parens patriae argument.  The argument that

15   the government can assert the general interest in the safety

16   of its citizens.  And as a matter of law, if that ever works,

17   it only works between a state and another state or a state

18   and a private party.  It does not run in actions against the

19   government.  Because when there are two governments, only one

20   of them can assert the interests of the people, and in this

21   case it's the federal government.

22       So the best argument they have is actually not one that

23   they can deploy against the government here.

24       Then we come to the third standing piece.  And I think the

25   most arguable point is about the jails, and the notion that

1   this may make jails more expensive.  I don't think that gets

2   them there.  I think that's a speculative kind of claim.  But

3   if it does, remember when you're balancing the equities,

4   you're not balancing the harm of every citizen in the state.

5   What you're balancing is the increased expense of new weapon

6   detectors versus the balances on the other side.  So these

7   are two critical examples of how we can't just paint with a

8   broad brush and say:  3D guns, okay or not okay.  We're

9   talking about a very specific set of files.

10       I have two more points that I want to make, Your Honor.

11  One of them is a little bit in the weeds and another is sort

12  of a separate issue.  The first point is in the weeds of the

13  merits of the case, about whether a removal occurred.  You

14  heard an argument from the government that said the reason

15  there haven't been procedural violations is because an item

16  isn't at issue here.  We have a slightly different argument.

17  Even if you think that an item is at issue, removal didn't

18  occur.  Because there is a difference between removing things

19  from the list and supplying an exemption.

20       And I'll start with an analogy and then I'll take you to

21  the text.  The analogy is:  I am arguing before the Court

22  today.  I haven't been admitted to the bar.  There are rules

23  that say I have to take and be a member of the Washington

24  bar, and I'm not.  And yet I'm here.  And the fact that I'm

25  here, the Court admitted me pro hoc, it doesn't mean the

1    Court removed the requirement of bar admission from the usual

2    way of getting into court.  There's a separate system.

3         And you can see this in the statute.  It's at 2278(g)(6).

4    And that's where the statute says that the President can

5    require a license or other form of authorization.  So you see

6    this throughout the regulatory provisions as we go pretty

7    deep into it in the briefs, is that there isn't just one way

8    to turn the switch on and off.  The President has

9    flexibility.  This isn't removing anything.  We're talking

10   about an exemption.

11        The last issue I want to talk about today is the matter

12   that we filed with the Court on Sunday night.  And it's a

13   question of subject matter jurisdiction.  We are in the case

14   because the plaintiffs say we're a necessary party.  And I'm

15   not sure that that is so.  If the case continues, we'll have

16   to litigate that.  We'll have to litigate a lot of things.

17        But according to the complaint in paragraph 24, the reason

18   we're in the case is because the relief that they ask for may

19   affect the settlement agreement.  And recall that the

20   settlement agreement is a contract that involves the United

21   States as a party and my client, Defense Distributed.  So

22   they say we're here because something in this case is going

23   to affect the contract.

24        If that's so, we may have a Tucker Act problem.  And the

25   Tucker Act problem is that suits on contract belong only in

1    the court of federal claims.  And even when they can be

2    brought in district court, no injunctive relief is available.

3        Now, I'm not sure exactly what the plaintiffs mean when

4    they say this case could affect our rights under the

5    settlement agreement, so maybe we can hear that in rebuttal.

6    But if part of this case entails changing the obligations of

7    the settlement agreement, the Court has to take a hard look.

8    We've given the Court, I think, a starting point for that

9    analysis textually, so it would be a question of 1491 on

10   whether the case is founded upon the contract.  And maybe

11   it's not.  In which case, we would acknowledge if it's not

12   founded on that, we're out.  But it's a matter of subject

13   matter jurisdiction.  And I wanted to bring it to the Court's

14   attention, because of our somewhat attenuated role in the

15   case.

16       Unless the Court has further questions, we'll yield the

17   remainder of our time.

18           THE COURT:  Thanks very much, Mr. Flores.  It's nice

19   to have you here, even if it's under an exemption.

20       All right.  Mr. Rupert.  I don't think I'll need to hear

21   from Mr. Sprung.

22           MR. RUPERT:  Thank you.  Your Honor, we've had a

23   discussion of statutory schemes and going through all the

24   elements.  But I do want to highlight what's at issue here.

25   For instance, we have Moms Demand Action in the courtroom

43

1   here.  The public is very concerned about these 3D weapons

2   and the potential harm that they could cause.  So I want to

3   focus on the irreparable harm.  And I will certainly address

4   the points that were made.  But I think that's what drove our

5   action and is one of the defining features of this case, is

6   all of the undisputed evidence in the record demonstrating

7   irreparable harm, both from the states as well as the federal

8   government, before it made this change.

9        We heard a number of things from the federal government

10  which I think we have addressed many of them on my initial

11  presentation, but I'll just highlight a few.  We heard again

12  this idea that items, removal of items is, in fact, a

13  category.  And, again, I think we would point to largely what

14  we did before.  If you look at, particularly the executive

15  order that refers to items or categories of items, that

16  interpretation just doesn't find support.  I would also

17  highlight the declarations from the congressmen, who

18  certainly believe that they were required to give notice for

19  this.

20       There was also this idea that there was not a removal of

21  items.  Well, I submit that when you exclude items, that is,

22  in fact, a removal.  And I don't think that bears a lot of

23  discussion, unless Your Honor has questions about that.

24       I do want to highlight the arbitrary and capricious claim.

25  We had some discussion, I thought Your Honor had some very

1  good questions.  Because it's the exact points that we're

2  making here that if they're going to justify this, or attempt

3  to justify this decision about 3D guns, they can't do it by

4  referring to a rule that's not yet final.  And then even in

5  that rule, as Your Honor identified, it seems to have been a

6  broad category.  And we don't know what the reasoning was, if

7  it was administrative oversight, or if it was an intentional

8  decision.

9      But either way, when you look at the justifications in the

10  Heidema declaration for making that rulemaking proposed

11  change, again not final, it's that the items are readily

12  available.  And it's obvious that 3D guns are not readily

13  available.  And as the government then notes that, in fact,

14  it would be illegal to possess it.  So we have a disconnect

15  there.  And we believe that demonstrates, very vividly, the

16  arbitrary and capricious nature of the government's action

17  here.

18      Now, we have the private defendants kind of pointing out

19  there were a number of files at issue here and wanting a

20  separate analysis for those.  I would just point to Judge

21  Pitman's analysis, that's the one that we have followed.  And

22  I believe Judge Pitman readily addressed this issue there.

23  So I think the Court can look to Judge Pitman for that.

24      And then there's also this, I'll call it the

25  cat-out-of-the-box argument, that the idea that, well, some

1    of these files are out there on the Web, so that means that

2    whatever we're here doing today is for no good.  I

3    fundamentally disagree with that.  I mean, it's one thing to

4    have them out there on the far reaches of the Internet, but

5    it is a far different thing to have them readily available

6    for anyone to find.  So I do think that this temporary

7    restraining order that Your Honor has issued, as well as

8    potentially a preliminary injunction, has a real effect in

9    preventing the harm that we've identified.  And, again, we

10   have declarations supporting our position.  And we have

11   speculation on the other side.

12      We also have this question that, well, this idea that, you

13   know, one of the things we focused on is we that have certain

14   files right now, but then what the government has done with

15   the temporary modification is opened up all kinds of 3D gun

16   files that will come.  And they say, well, it's too

17   speculative.

18      Again, let's look at the record.  We have Professor Patel

19   talking about the advances that are going to come in 3D

20   printing.  So it's not speculative at all.

21      Then, finally, there was a question about standing.  But

22   the standing analysis or argument overlooks the case law, the

23   special solicitude case law, in *Massachusetts v. EPA* and

24   *Texas v. United States of America*, which recognized that.  I

25   would point Your Honor to that, which is in our briefs as

 1   well.  And even the private defendants recognize that the

 2   proprietary standard is a much closer call, we would say it's

 3   an easy call.

 4        But if our metal detectors, like the one downstairs, are

 5   no longer effective, we're going to have to get something

 6   new.  And that doesn't come for free.  Or the other

 7   alternative is start going back to hand searches, which are

 8   going to present some issues of their own, about trying to

 9   get everybody through, and all kinds of other situations that

10   are going to arise; if you have to search everyone by hand

11   and pat them down, it's going to take a lot more manpower.

12   So we have proprietary standing right there.

13        Then, finally, I'll address this subject matter issue

14   that's been raised in this last-minute filing with just this

15   case.  This is not a contract case.  We said that last time

16   we were here.  This is an APA case.  The reason we included

17   them in the case is that when we balanced the equities, they

18   may have an interest in that.  And so we wanted them to be

19   heard.  And they are here making their arguments.

20        But at the end of the day, this is not a contract case at

21   all.  We are attacking the government's decision to allow

22   these 3D guns to be readily available, and the administrative

23   process there.  We're not attacking the settlement agreement

24   itself.

25             THE COURT:  There may be contractual issues between

1    Defense Distributed and the federal government, based on the

2    settlement agreement.  But it's not in front of me and it's

3    not part of this lawsuit is what you're saying?

4         MR. RUPERT:  That's correct, Your Honor.

5         THE COURT:  I agree with that.  But I'm glad to have

6    Mr. Flores and his client here to express a point of view

7    that obviously the federal government isn't willing to go

8    that far.  So it's very useful to have him here.  But I agree

9    with you, I'm not touching any contract issue in the case.

10        You know, it's a little bit frustrating to be sitting in

11   this chair as a United States District Court Judge and seeing

12   this is an issue that should be solved by the political

13   branches of government.  Like I say, when the issue came

14   before me on July 30th and I had to make a decision on

15   July 31st, on probably the most significant case that I've

16   handled as a United States District Court Judge, and having

17   the shortest amount of time possible to rule on the case,

18   that was one thing.

19        But where are the political branches to step up and deal

20   with an important issue like this?  And it's very

21   frustrating, because there are justifiable criticisms:  Who

22   is this federal judge out in Seattle that's going to make

23   such an important decision?  And I'm not going to make an

24   important decision about these issues that you've raised.

25   It's not for me to do.  But it is for me to determine:  Did

1   the federal government follow their rules in making the

2   modification and sending the letter?  And I will deal with

3   those in that technical arena.

4       But a solution to the greater problem is so much better

5   suited to the other two branches of government.  And I really

6   hope and wish that the Executive Branch and Congress would

7   face up to this and say, it's a tough issue, but that's why

8   you got into public service to begin with.

9       But thanks very much.  Did you have anything else,

10  Mr. Rupert?

11          MR. RUPERT:  I do not, Your Honor.

12          THE COURT:  I'm going to take the matter under

13  advisement.  There is some excellent briefing and issues that

14  I want to take a closer look at.  I will definitely get a

15  written decision out by Monday, August 27th.  So you'll have

16  it for sure before the expiration of the TRO on the 28th.

17      Okay.  Thanks very much, counsel.  We are adjourned.

18              (Adjourned.)

19          C E R T I F I C A T E

20

21      I certify that the foregoing is a correct transcript from

22  the record of proceedings in the above-entitled matter.

23

24  */s/ Debbie Zurn*

25  DEBBIE ZURN
    COURT REPORTER

**Exhibit C**

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| DEFENSE DISTRIBUTED and SECOND AMENDMENT FOUNDATION, INC., | § § § | Case No. 1:18-CV-637-RP |
| Plaintiffs, | § § | |
| v. | § § | **Plaintiffs' Motion for a Preliminary Injunction** |
| GURBIR GREWAL, in his official capacity as New Jersey Attorney General; MICHAEL FEUER, in his official capacity as Los Angeles City Attorney; ANDREW CUOMO, in his official capacity as New York Governor; MATTHEW DENN, in his official capacity as Attorney General of the State of Delaware; JOSH SHAPIRO, in his official capacity as Attorney General of Pennsylvania; and THOMAS WOLF, in his official capacity as Pennsylvania Governor, | § § § § § § § § § § § § § | |
| Defendants. | § § | |

# TABLE OF CONTENTS

Page

SUMMARY OF THE ARGUMENT ............................................................... 1

STATEMENT OF THE CASE.......................................................................... 4

I.  Defense Distributed publishes digital firearms information. ............................ 4

A.  Defense Distributed publishes digital firearms information via the internet. .............. 5

B.  Defense Distributed publishes digital firearms information via the U.S. mail. ............ 7

C.  Defense Distributed offers and advertises digital firearms information. ................ 8

II.  New Jersey is censoring Defense Distributed with both civil and criminal law. .............. 9

A.  New Jersey's civil actions erect an informal system of prior restraints. ................. 9

B.  New Jersey's new speech crime targets Defense Distributed. ................. 10

ARGUMENT ................................................................................. 13

I.  The Court should enjoin enforcement of the Section 3(*l*)(2) speech crime. .................. 13

A.  Plaintiffs will likely succeed on the merits of the First Amendment claim. .......... 13

1.  Content-based censorship makes Section 3(*l*)(2) unconstitutional. .......... 14

2.  Overbreadth makes Section 3(*l*)(2) unconstitutional. .............................. 17

3.  A missing scienter element makes Section 3(*l*)(2) unconstitutional. ......... 20

B.  Plaintiffs will likely succeed on the merits of the Due Process Clause claim. ..... 20

C.  Plaintiffs will likely succeed on the merits of the Commerce Clause claim. ....... 22

D.  Plaintiffs will likely succeed on the merits of the Supremacy Clause claim. ....... 23

1.  CDA Section 230 preempts Section 3(*l*)(2). ............................................ 23

2.  The State Department's authority preempts Section 3(*l*)(2). ................... 24

E.  Plaintiffs will suffer irreparable harm in the absence of immediate relief. .......... 25

F.  The balance of equities favors the Plaintiffs and a preliminary injunction will serve the public interest. .................................................................. 27

II.  The Court should enjoin New Jersey's civil enforcement efforts.................................... 27

CONCLUSION.................................................................................. 28

CERTIFICATE OF SERVICE .................................................... 30

Plaintiffs Defense Distributed and the Second Amendment Foundation, Inc. ("SAF") move for a preliminary injunction against Defendant Gurbir Grewal, the New Jersey Attorney General.

## SUMMARY OF THE ARGUMENT

In November 2018, the State of New Jersey enacted Senate Bill 2465, a new criminal law. Section 3(*l*)(2) criminalizes constitutionally protected speech that Defense Distributed has engaged in before and desires to engage in again soon. Defense Distributed now refrains from engaging in that speech for fear of prosecution by Defendant Gurbir Grewal, the New Jersey Attorney General.

Section 3(*l*)(2) does not address conduct. Rather, it addresses a specific kind of speech: *digital firearms information*. The new law criminalizes "digital instructions" that "may be used" to "produce a firearm" with a "three-dimensional printer." Section 3(*l*)(2) makes it a crime to "distribute" that speech "to a person in New Jersey" (except for manufacturers and wholesalers). The law provides a nearly limitless definition of "distribute": "to sell, or to manufacture, give, provide, lend, trade, mail, deliver, publish, circulate, disseminate, present, exhibit, display, share, advertise, offer, or make available via the Internet or by any other means, whether for pecuniary gain or not, and includes an agreement or attempt to distribute."

This law is unconstitutional. It is an extreme act of content-based censorship that has no hope of satisfying strict scrutiny because it is ineffective, overbroad, and underinclusive all at once. It punishes speakers worldwide not because the speech itself does any harm, but because of speculation that the speech may sometimes bear a contingent and indirect relationship to bad acts.

No medium escapes this new crime. Section 3(*l*)(2) outlaws speech delivered "by any means." It expressly criminalizes the sharing of information "via the Internet" and also expressly criminalizes sharing via standard postal "mail." The crime also extends to rudimentary in-person interactions such as "display[ing]," "present[ing]," and "giv[ing]" information. New Jersey's new speech ban sweeps in every way that people might possibly share these ideas with one another.

All kinds of digital firearms information are censored by this new speech crime. The ban covers both "computer-aided design files" *and* "other code or instructions stored and displayed in electronic format as a digital model." How the information is *actually* used is irrelevant. The crime applies if information "*may be used*" by a third party in certain activities. The speech's mere *potential* relationship to that conduct is adequate for a conviction. It matters not how unlikely that potentiality may be, or whether the speaker had any specific knowledge or intent. In addition, the new law makes it a crime to merely "offer" or "advertise" or "make available" the information.

For years, Defense Distributed has done what Section 3(*l*)(2) now criminalizes: openly distribute digital firearms information to the public domain through both the internet and the mail. In addition, Defense Distributed made offers and advertisements about both distribution methods.

New Jersey is targeting Defense Distributed with the new crime. At the law's signing ceremony, the Attorney General singled out Defense Distributed founder Cody Wilson by name. He said that this law must be enacted because of "a Texan named Cody Wilson" and "his supporters," who had "take[n] advantage of loopholes" in the past and are "still trying to release these codes." Section 3(*l*)(2) was made "to stop them" and to "stop the next Cody Wilson." With his new speech crime "tool" in hand, New Jersey's Attorney General threatened Defense Distributed and everyone else that shares digital firearms information: "we will come after you."

Irreparable harm of the highest constitutional order will occur if Section 3(*l*)(2) is enforced against Defense Distributed and/or SAF's members. But the harm is not just prospective. With each passing day, Section 3(*l*)(2) causes irreparable harm by chilling constitutionally protected speech and triggering self-censorship. Plaintiffs are not the only ones so injured. Every American who dares speak to a fellow citizen about modern firearm production under the First and Second Amendments suffers because of this law's effort to mute all digital firearms information.

In this action, Plaintiffs are likely to succeed in having Section 3(*l*)(2) held unconstitutional and its enforcement permanently enjoined. This is true both as to the First Amendment actions and as to those brought under the Due Process Clause, Commerce Clause, and Supremacy Clause. Until then, the Court should preserve the status quo and prevent irreparable harm by enjoining New Jersey's enforcement Section 3(*l*)(2) against the Plaintiffs.

In addition to its new *criminal* law, New Jersey's Attorney General has for months been acting to censor the Plaintiffs under the color of state *civil* laws. He sent cease-and-desist letters to Defense Distributed, sued Defense Distributed in state and federal court, and threatened Defense Distributed's service providers in an effort to shut down the speech indirectly. Through these civil legal actions, New Jersey's Attorney General has attempted to impose a prior restraint that is just as violative of the First Amendment as is Section 3(*l*)(2)'s new speech crime. The New Jersey Attorney General's civil actions are also bound to be held unconstitutional in this action. They too should be enjoined until the Court issues a final judgment stopping this censorship for good.

"The right to think is the beginning of freedom, and speech must be protected from the government because speech is the beginning of thought." *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 253 (2002). Hence, a "law imposing criminal penalties on protected speech is a stark example of speech suppression." *Id.* at 244. The Constitution is no less offended by suppressive actions that take the form of "informal sanctions." *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67 (1963). Both kinds of suppression are at issue here and both deserve to be halted immediately.

The New Jersey Attorney General's effort to abridge the First Amendment for the sake of muting the Second Amendment is unprecedented and unconstitutional. By the authority of 42 U.S.C. § 1983 and *Ex parte Young*, 209 U.S. 123 (1908), the Court should issue a preliminary injunction against the New Jersey Attorney General and stop his unlawful efforts to ban the free exchange of digital firearms information that belongs in the public domain.

## STATEMENT OF THE CASE

Plaintiffs' First Amended Complaint states the basic facts.  Doc. 23 (hereinafter "FAC"). Plaintiffs adopt that pleading here by reference.  *See* Fed. R. Civ. P. 10(c).[1]  Exhibits are submitted by Plaintiffs' Motion for a Preliminary Injunction Appendix in order, such that Exhibit 1 is the Appendix's Attachment #1, Exhibit 2 is the Appendix's Attachment #2, and so forth.

## I.   Defense Distributed publishes digital firearms information.

This action begins where the Court left off in *Defense Distributed v. United States Department of State*, No. 1:15-CV-372-RP (W.D. Tex.) (hereinafter *Defense Distributed I*).  That case concerned whether federal law lets the State Department halt Defense Distributed's online publication of certain digital firearms information. *See* FAC ¶¶ 27-39.

Plaintiffs and the State Department settled *Defense Distributed I* by entering into a Settlement Agreement, Ex. 14, which, among other things, obligates the State Department to alter certain regulations and grant the *Defense Distributed I* Plaintiffs—including Defense Distributed and SAF—a federal license to freely publish digital firearms information.  *See* FAC ¶¶ 42; Ex. 26 ¶ 16-17.  The State Department did so in July by modifying the regulations, Ex. 16, and issuing the license, Ex. 15.[2]

---

[1] This motion also sets forth facts occurring after the complaint's filing, which should be accounted for even if pleadings need to be amended later.  *See* 11A Charles Alan Wright & Arthur R. Miller et al., Federal Practice & Procedure § 2949 & nn. 5-6 (3d ed. West 2018); *see also* Fed. R. Civ. P. 15.  The Court should also employ Federal Rule of Evidence 201 to take judicial notice of facts such as other courts' dockets, *see* Exs. 4, 13, 17, 19, 20; *Orabi v. Att'y Gen. of the U.S.*, 738 F.3d 535, 537 & n.1 (3d Cir. 2014), and the contents of pertinent internet websites, *see* Exs. 6, 27, 29, 30-41, 49; *see United States v. Flores*, 730 F. App'x 216, 221 n.1 (5th Cir. 2018) (unpublished) (Haynes, J., concurring); *Kitty Hawk Aircargo, Inc. v. Chao*, 418 F.3d 453, 457 (5th Cir. 2005); *Helen of Troy, L.P. v. Zotos Corp.*, 235 F.R.D. 634, 640 (W.D. Tex. 2006).

[2] The Department of Justice had long taken the position that such a censorship regime would be unconstitutional.  *See* U.S. Dep't of Justice Office of Legal Counsel ("OLC"), Mem. to Dr. Frank Press, Science Advisor to the President, on the Constitutionality Under the First Amendment of ITAR Restrictions on Public Cryptography (May 11, 1978) (Ex. 42); OLC, Mem. for the Office of Munitions Control, Department of State on the Constitutionality of the Proposed Revision of

The regulatory changes and license that resulted from *Defense Distributed I* may be *sufficient* to establish the Plaintiffs' right to share the digital firearms information at issue here. But as a matter of law, they are *not necessary*. The Constitution guarantees the Plaintiffs' right to engage in the speech at issue. The Plaintiffs can legally do so now *regardless* of whether the State Department acknowledges that right with a regulatory modification and/or license.[3]

### A. Defense Distributed publishes digital firearms information via the internet.

Defense Distributed has published digital firearms information to the internet's public domain for lengthy periods of time on multiple occasions. *See* FAC ¶¶ 1, 2, 10, 11, 31, 53-55. Indeed, doing so is Defense Distributed's core mission. *See* Ex. 26 ¶ 4; Ex. 23 ¶ 2. The nature of the digital firearms information that Defense Distributed has published is well-documented. *See* FAC ¶¶ 30-34; Ex. 26 ¶¶ 4-11, 19-20, 26-27; Ex. 23 ¶¶ 3, 8; Ex. 12; Ex. 6 at 1-2; Ex. 13 ¶¶ 25, 36, 44-45; Ex. 53[4]; Dkt. 57 at 2; *Def. Distributed v. United States Dep't of State*, 838 F.3d 451, 461 (5th Cir. 2016) (Jones, J., dissenting).

---

the International Traffic in Arms Regulations (July 1, 1981) (Ex. 43); OLC, Mem. for the Director, Capital Goods Production Materials Division, Dep't of Commerce on the Constitutionality of the Proposed Revision of the International Traffic in Arms Regulations (July 28, 1981) (Ex. 44); OLC, Mem. for Davis R. Robinson, Legal Advisor, Dep't of State, on Revised Proposed International Traffic in Arms Regulations (ITAR) (July 5, 1984) (Ex. 45); U.S. Dep't of Justice, Report on the Availability of Bombmaking Information (1997) (Ex. 46).

[3] In *State of Washington v. United States Department of State*, No. 2:18-cv-1115-RSL (W.D. Wash.), New Jersey and other states are suing the State Department to invalidate the regulatory modification and license issuance that occurred in July 2018. The case concerns whether the State Department complied with the Administrative Procedure Act in performing those actions. The case's preliminary injunction applies only to the State Department; it does not order Defense Distributed to do or not do anything. Ex. 20 at 25. Even if the states in that case ultimately prevail, the State Department will *not* be barred from complying with the Settlement Agreement. Success for the states in the Washington action means only that the State Department can simply re-perform the regulatory modification and license issuance in accordance with the APA. Indeed, the Settlement Agreement requires the government to perform its obligations thereunder in a manner "authorized by law (including the Administrative Procedure Act)." Ex. 14 ¶ 1(a).

[4] Plaintiffs' Exhibit 53 is the document filed in *Defense Distributed I* as docket entry number 37-5. In *Defense Distributed I*, the Court granted a motion to file docket entry number 37-5 under seal,

First, Defense Distributed published digital firearms information to the internet's public domain via its websites (known as "DEFCAD") in 2012, before *Defense Distributed I* began. *See* FAC ¶ 31; Ex. 26 ¶¶ 8-15; Ex. 23 ¶ 3; Ex. 4 at 15-16, ¶¶ 13-16. This publication period lasted from December 2012 to May 2013. *See id.*

Second, Defense Distributed published digital firearms information to the internet's domain via DEFCAD in 2018, after settling *Defense Distributed I*. *See* FAC ¶ 53-54; Ex. 26 ¶¶ 16-25. This publication period lasted from July 27, 2018, to July 31, 2018. *See id.*

The digital firearms information that Defense Distributed published on the internet— before and after *Defense Distributed I*—continues to be independently republished on the internet. *See* FAC ¶¶ 54-55. To this day, the files that Defense Distributed published on DEFCAD continue to be republished for free download by independent third parties on websites that can be located by a simple Google search. *See* Ex. 24 at 1-2; Ex. 8 at 1; Ex. 28 at 1; Ex. 27 at 10.

Without question, Defense Distributed seriously desires to continue publishing digital firearms information on its website to the internet's public domain. *See* FAC ¶ 3; Ex. 26 ¶¶ 3-7, 20, 21, 23, 32; Ex. 27 at 3-5. But Defense Distributed refrains from doing so now for fear of being punished by states like New Jersey. *See* FAC ¶ 116; Ex. 26 ¶¶ 28-32.

The recipients of Defense Distributed's online publications include SAF's members, who refrain from receiving and republishing Defense Distributed's online digital firearms information for fear of being prosecuted by states like New Jersey. *See* FAC ¶¶ 1, 13; Ex. 21 ¶¶ 7-9; Ex. 22 ¶¶ 6-9. Once those threats cease, SAF's members intend to resume receiving information from Defense Distributed and republishing it. *See* FAC ¶¶ 13; Ex. 21 ¶¶ 7-9; Ex. 22 ¶¶ 6-8.

---

and it remains so sealed. The document should remain under seal now for the same reasons that it was placed under seal originally. In a separate filing in this case, Plaintiffs are moving to have the document filed under seal in this docket. Until that motion is ruled upon, Plaintiffs request that the Court take judicial notice of the document filed in *Defense Distributed I* as docket entry number 37-5 and treat it as this action's Exhibit 53. *See* Fed. R. Evid. 201.

**B.      Defense Distributed publishes digital firearms information via the U.S. mail.**

Apart from online publications, Defense Distributed has spent the last several months distributing digital firearms information by U.S. mail.  *See* FAC ¶ 1, 10-11.  In *State of Washington v. United States Department of State*, No. 2:18-cv-1115-RSL (W.D. Wash.), the State Department and the State of New Jersey expressly conceded that Defense Distributed has a right to do just that—to mail digital firearms information without violating any law.[5]

During the Washington action's preliminary injunction hearing, counsel for the State Department stated that "even if the Court were to grant [New Jersey and the other plaintiff states] every ounce of relief that they seek in this case, Defense Distributed could still mail every American citizen in the country the files that are at issue here."  Ex. 19 at 27:12-15. At that same hearing, counsel for New Jersey's Attorney General agreed that, apart from internet publication, Defense Distributed had a right to distribute digital firearms information via the mail or otherwise "hand them around domestically" without violating any law.  Ex. 19 at 23:5-9.

Thus, ever since both the State Department and New Jersey acknowledged Defense Distributed's right to do so legally, Defense Distributed has been distributing digital firearms information files by mailing them via the U.S. Postal Service.  *See* Ex. 26 ¶¶ 5-7, 26-27. Specifically, "Defense Distributed sold digital firearms information by using an ecommerce platform on DEFCAD to facilitate the transaction and using the U.S. Postal Service as its means of delivering the information."  *Id.* ¶ 26.  After "customers entered an order using DEFCAD's online ecommerce platform," Defense Distributed put the "information on a USB drive or SD card and mailed the drive or card to . . . customers via the U.S. Postal Service."  *Id.* ¶ 27.

---

[5] *Cf. Def. Distributed v. U.S. Dept. of State*, 121 F. Supp. 3d 680, 695 (W.D. Tex. 2015) ("As [the State Department] point[s] out, Plaintiffs are free to disseminate the computer files at issue domestically in public or private forums, including via the mail or any other medium that does not provide the ability to disseminate the information internationally.").

For Defense Distributed, SAF, and anyone else interested in digital firearms information, the postal mail alternative to internet publication is not an "adequate substitute[]." *City of Ladue v. Gilleo*, 512 U.S. 43, 56 (1994). Internet distribution is essential for many reasons. Most importantly, it is essential because it enables the collaborative development of digital firearms information in the public forum now known as the "Open Source Community."[6]

Defense Distributed refrains from continuing to distribute digital firearms information via the mail for fear of being punished by states like New Jersey. Once that threat ceases, Defense Distributed intends to continue engaging in this speech, *see* FAC ¶¶ 3, 116; Ex. 26 ¶¶ 4-7, 20, 23, 28-32, and SAF's members intend to continue receiving it, benefitting from it, and republishing it, Ex. 21 at ¶¶ 7-9; Ex. 22 ¶¶ 6-9.

### C.    Defense Distributed offers and advertises digital firearms information.

In addition to its actual publications via the internet and mail, Defense Distributed also offers and advertises the distribution of digital firearms information to potential recipients. *See* FAC ¶ 1, 10; Ex. 26 ¶¶ 6, 26-27. These efforts include advertisements and offers on DEFCAD itself, participation in trade shows, e-mail advertisements, and media advertising efforts. Ex. 26 ¶¶ 6, 26, 32; Ex. 9 at 2.

---

[6] The "open-source community" is a "loosely organized, ad-hoc community of contributors from all over the world who share an interest in meeting a common need, ranging from minor projects to huge developments, which they carry out using a high-performance collaborative development environment, allowing the organizational scheme and processes to emerge over time." Javier Soriano, Genovea López & Rafael Fernández, *Collaborative Development Environments*, in Goran D. Putnik & Maria M. Cunha, I *Encyclopedia of Networked and Virtual Organizations* at 231 (2008) (Ex. 50). "The concept represents one of the most successful examples of high-performance collaboration and community-building on the Internet." *Id*; *see also* Georg von Krogh, *Open-Source Software Development*, 44 MIT-Sloan Mgmt. Rev. 3, 14 (2003) (Ex. 47); Eric S. Raymond, *The Cathedral and the Bazaar*, 3 First Monday 3 (1998), https://firstmonday.org/article/view/578/499 (Ex. 48).

Out of fear of prosecution by New Jersey, Defense Distributed refrains from continuing to offer and advertise its digital firearms information to persons in New Jersey. Ex. 26 ¶ 32. Once that threat ceases, Defense Distributed plans to resume offering and advertising its willingness to engage in the speech at issue. *See* Ex. 26 ¶¶ 4-7, 29-32.

## II.   New Jersey is censoring Defense Distributed with both civil and criminal law.

New Jersey is engaged in a concerted and deliberate effort to stop Defense Distributed's expression of digital firearms information. *See* FAC ¶¶ 75-87. The censorship effort has taken three forms. First, New Jersey is attempting to unsettle the resolution of *Defense Distributed I.* *See* FAC ¶¶ 56-63; Exs. 7-8. Second and third, New Jersey is censoring Defense Distributed directly under the color of both state civil and criminal law.

### A.   New Jersey's civil actions erect an informal system of prior restraints.

Apart from and before the enactment of New Jersey's new criminal statute, the New Jersey Attorney General has spent months censoring Defense Distributed with a campaign of civil legal actions that amount to a prior restraint. He inflicts this system of informal censorship upon both Defense Distributed itself and the third parties that service Defense Distributed's website.

This campaign began on July 26, 2018, when the New Jersey Attorney General sent Defense Distributed a cease-and-desist letter. Ex. 3. That cease-and-desist letter claimed that publishing and republishing files on the internet violated New Jersey's "public nuisance and negligence laws." *Id*. at 1. Then it commanded Defense Distributed to stop publishing digital firearms information or else: "If you do not halt your efforts to proceed with publication, I will bring legal action against your company. . . ." Ex. 3 at 1.

Four days later, the Attorney General sued Defense Distributed in a New Jersey state court and sought an *ex parte* temporary restraining order to prevent Defense Distributed's publication of digital firearms information. *See* FAC ¶ 81; Ex. 4; *see also* Exs. 9-10; Dkt. 57 at 4 & n.2. This

action, a quintessential prior restraint, was removed to federal court and administratively terminated. Ex. 51.

Additionally, New Jersey's Attorney General is waging an external campaign to silence Defense Distributed's speech by sending coercive legal letters to Defense Distributed's interactive computer service providers. *See* FAC ¶¶ 82-87. First, the Attorney General urged Dreamhost, an internet hosting provider, to terminate its service contract with Defense Distributed by deploying threats, coercion, and intimidation—all under the banner of "public nuisance law." Ex. 5 at 1. Second, the New Jersey Attorney General delivered a similarly threatening, coercive, and intimidating "Legal Request" to Cloudflare, an internet security provider. Ex. 5 at 3.

The New Jersey Attorney General's own press releases promote these activities as part of a unified and intentional campaign. The cease-and-desist letters, the intimidation of service providers, and the commencement of civil actions are all part of the New Jersey Attorney General's plan to stop Defense Distributed "from publicly releasing computer files." Ex. 6 at 1.

**B.     New Jersey's new speech crime targets Defense Distributed.**

Senate Bill 2465 amplified New Jersey's existing regime of unconstitutional civil actions by creating a new speech crime. The Governor signed Senate Bill 2465 at a public ceremony, flanked by the Attorney General and the bill's leading legislative sponsor. The statements delivered at this event prove that New Jersey's new speech crime was enacted for the purpose of censoring—and eventually, selectively prosecuting—Defense Distributed. [7]

---

[7] In addition to the event's transcript, Ex. 2, the government's version of the video is at https://www.youtube.com/watch?v=lJiQ6iFH5x4 and another copy of the same video is available at https://files.beckredden.com/dl/bKzFup6UmV.

First, the Governor called Senate Bill 2465 part of the very same "fight" and very same "efforts" as the cease-and-desist letter that the Attorney General sent to Defense Distributed:

> The Attorney General has been a national leader in this fight. Last June he issued *a cease and desist letter to the companies that deal in ghost guns, saying explicitly that New Jersey is off limits to them*. He joined likeminded attorneys general in successfully stopping in federal court the release of blueprints that would have allowed anyone with a computer and access to a 3D printer the ability to build their own, untraceable firearm. *This law that we're going to sign today further backs up his efforts*, and I thank him for all that he has done. Thank you, Gurbir.

Ex. 2 at 7:15-8:1 (emphasis added). The Governor also praised the Attorney General's campaign of "naming and shaming" Defense Distributed and other companies that engage in constitutionally protected activity. *Id.* at 9:7.

Next, Attorney General Grewal called out Defense Distributed founder Cody Wilson by name. He said that he needed "stronger tools to stop them" because "a Texan named Cody Wilson," Defense Distributed, and its supporters—i.e., the Second Amendment Foundation—were "not relenting" and "still trying to release these codes online." *Id.* at 12:6-12:24.

Later in the ceremony, the Attorney General called out Defense Distributed founder by name *again*. After tacitly admitting that prior law did not make Defense Distributed's expression illegal, he said that the new criminal law was being enacted "to stop the next Cody Wilson - to fight the ghost gun industry":

> [B]*ad actors were trying to take advantage of loopholes because no law squarely addressed printable guns or ghost guns*. So we had to rely on other laws, like our public nuisance law or our assault weapons law, to fight back. Now don't get me wrong: Those laws are important and they're great tools, and they helped us stop the spread of these dangerous, untraceable weapons. But a law right on point strengthens law enforcement's hand even more.
>
> And so today, there is no question that printable guns and ghost guns are deadly, and selling them in New Jersey is illegal. And that's why I'm so proud to support Governor Murphy's efforts and the legislature's efforts to close those loopholes, *to stop the next Cody Wilson, to fight the ghost gun industry,* and to regulate the next dangerous gun models before they spread into our communities.

*Id.* at 14:8-25 (emphasis added).

11

Finally, Attorney General Grewal promised that New Jersey intends to "come after" "anyone who is contemplating making a printable gun" and "the next ghost gun company."  *Id.* at 15:1-11.  A press release further touted the enforcement threats.  Ex. 52.

New Jersey's Governor signed Senate Bill 2465 into law at the end of that ceremony.  Ex. 1, S. 2465, 218th Leg., Reg. Sess., 2018 NJ Sess. Law Serv. Ch. 138 (N.J. 2018) (hereinafter "SB 2465") (Ex. 1); *see* Dkt. 57 at 3.  The law took effect immediately.  SB 2465 § 4.

Section 3(*l*)(2) of SB 2465 criminalizes speech about firearms.  Neighboring provisions criminalize conduct.  But Section 3(*l*)(2) imposes a freestanding prohibition on speech; its operation does not depend on the previous criminal acts.  Speech and speech alone is the sole ingredient of the Section 3(*l*)(2) crime:

> *l.* Manufacturing or facilitating the manufacture of a firearm using a three-dimensional printer. In addition to any other criminal penalties provided under law it is a third degree crime for:
> . . .
>> (2) a person to distribute by any means, including the Internet, to a person in New Jersey who is not registered or licensed as a manufacturer as provided in chapter 58 of Title 2C of the New Jersey Statutes, digital instructions in the form of computer-aided design files or other code or instructions stored and displayed in electronic format as a digital model that may be used to program a three-dimensional printer to manufacture or produce a firearm, firearm receiver, magazine, or firearm component.
>
> As used in this subsection: "three-dimensional printer" means a computer or computer-driven machine or device capable of producing a three-dimensional object from a digital model; and "distribute" means to sell, or to manufacture, give, provide, lend, trade, mail, deliver, publish, circulate, disseminate, present, exhibit, display, share, advertise, offer, or make available via the Internet or by any other means, whether for pecuniary gain or not, and includes an agreement or attempt to distribute.

SB 2465 § 3(*l*)(2).  A conviction entails at least three to five years of imprisonment, *see* N.J. Stat. 2C:43-6(a)(3); N.J. Stat. 2C:43-7(a)(4) (sometimes five to ten), and a fine of up to $15,000, *see* N.J. Stat. 2C:43-3(b)(1).

In this way, New Jersey has delivered a worldwide censorship edict by denying the Plaintiffs' right to share digital firearms information on the internet, via the mail, and via any other conceivable method. The American public now has no right to access and share the digital information that is indispensable to any true engagement in the technical discussions, mechanical engineering, and other development activities that inhere in modern private firearms ownership.

## ARGUMENT

Plaintiffs move for a preliminary injunction against Defendant Gurbir Grewal in his official capacity as New Jersey Attorney General. The Court should enjoin the New jersey Attorney General from (1) enforcing Section 3(*l*)(2) of Senate Bill 2465 against the Plaintiffs, and (2) using cease-and-desist letters and other civil legal actions to stop the Plaintiffs' publication of digital firearms information. *See* 42 U.S.C. § 1983; *Ex parte Young*, 209 U.S. 123 (1908).

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *see Tex. v. Seatrain Int'l, S.A.*, 518 F.2d 175, 180 (5th Cir. 1975) ("[N]one of the four prerequisites has a fixed quantitative value. Rather, a sliding scale is utilized, which takes into account the intensity of each in a given calculus."). With respect to both the criminal and civil censorship actions at issue here, the test for injunctive relief is met.

## I.      The Court should enjoin enforcement of the Section 3(*l*)(2) speech crime.

### A.      Plaintiffs will likely succeed on the merits of the First Amendment claim.

The complaint pleads that New Jersey has violated and is threatening to violate 42 U.S.C. § 1983 by acting, under color of state law, to abridge the Plaintiffs' First Amendment freedoms. *See* FAC ¶¶ 120-30. With respect to the enforcement of Section 3(*l*)(2), Plaintiffs are likely to succeed on the merits of the First Amendment claim for at least three independent reasons.

13

Before addressing those arguments, the Court should hold that the Plaintiffs' distribution of the digital firearms information at issue qualifies as First Amendment speech. In accordance with the complaint, *see* FAC ¶¶ 3, 10, 11, 30-34, proof shows that the digital firearms information at issue here qualifies as First Amendment speech under all of the applicable modern precedents.[8]

### 1. Content-based censorship makes Section 3(*l*)(2) unconstitutional.

Section 3(*l*)(2) is a content-based speech restriction. Facially, the law is content-based because it criminalizes "digital instructions" that "may be used to program a three-dimensional printer to manufacture or produce a firearm, firearm receiver, magazine, or firearm component." SB 2465 § 3(*l*)(2); *see Reed v. Town of Gilbert, Ariz.*, 135 S. Ct. 2218, 2227 (2015); *Nat'l Inst. of Family & Life Advocates v. Becerra* ("*NIFLA*"), 138 S. Ct. 2361, 2371 (2018). The law's justification also makes it content-based because its enactors created the crime to punish the *idea* being conveyed—digital firearm information. *See* Ex. 2; *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989); *Boos v. Barry*, 485 U.S. 312, 320-21 (1988).

---

[8] *Compare* Ex. 26 ¶¶ 5-10, 19-20, 26-27 (Defense Distributed's Director explaining the nature of exemplary digital firearms information), Ex. 53 (same), *and* Ex. 25 (industry expert explaining 3D printing processes), *with Sorrell v. IMS Health Inc.*, 564 U.S. 552, 570 (2011) ("[T]he creation and dissemination of information are speech within the meaning of the First Amendment."), *Bartnicki v. Vopper*, 532 U.S. 514, 526-27 (2001) (similar), *Junger v. Daley*, 209 F.3d 481, 482 (6th Cir. 2000) ("Because computer source code is an expressive means for the exchange of information and ideas about computer programming, we hold that it is protected by the First Amendment."), *Universal City Studios, Inc. v. Corley*, 273 F.3d 429, 449 (2d Cir. 2001) ("[C]omputer code, and computer programs constructed from code can merit First Amendment protection."), *Bernstein v. U.S. Dep't of State*, 922 F. Supp. 1426, 1436 (N.D. Cal. 1996) ("For the purposes of First Amendment analysis, this court finds that source code is speech."); *see also* Brief of Amicus Curiae Electronic Frontier Foundation in Support of Plaintiffs-Appellants, *Defense Distributed v. U.S. Dep't of State*, 2015 WL 9267338, at * 11, 838 F.3d 451 (5th Cir. 2016) ("The functional consequences of speech are considered not as a bar to protection, but to whether a regulation burdening the speech is appropriately tailored."); *Def. Distributed v. U.S. Dept. of State*, 121 F. Supp. 3d 680, 692 (W.D. Tex. 2015) ("Plaintiffs made clear at the hearing that Defense Distributed is interested in distributing the files as 'open source.' That is, the files are intended to be used by others as a baseline to be built upon, altered and otherwise utilized. Thus, at least for the purpose of the preliminary injunction analysis, the Court will consider the files as subject to the protection of the First Amendment.").

As a content-based speech restriction, the Constitution renders Section 3(*l*)(2) presumptively invalid; it is enforceable only if New Jersey "prove[s] that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest." *Reed*, 135 S. Ct. at 2231. New Jersey cannot meet that burden for at least four reasons.

First, Section 3(*l*)(2) does not survive strict scrutiny because it does not advance a compelling state interest. The holding of *Ashcroft v. Free Speech Coalition*, 535 U.S. 234 (2002), applies directly to this case: "The mere tendency of speech to encourage unlawful acts is not a sufficient reason for banning it." *Id.* at 253. The government lacks a compelling state interest and "may not prohibit speech" if the speech merely "increases the chance an unlawful act will be committed 'at some indefinite future time.'" *Id.* A mere "remote connection" between speech and a third party's criminal conduct is not enough. *Id.* "Without a significantly stronger, more direct connection, the Government may not prohibit speech on the ground that it may encourage [third-parties] to engage in illegal conduct." *Id.* Under *Ashcroft*, New Jersey lacks a compelling state interest in banning Plaintiffs' expression of digital firearms information.

Second, Section 3(*l*)(2) does not meet strict scrutiny's narrow tailing requirement because of plausible, less restrictive alternatives. New Jersey could achieve its ends by banning only the harmful *conduct* at issue—not speech that is merely and only sometimes remotely associated with that conduct. *See Bartnicki v. Vopper*, 532 U.S. 514, 529 (2001) ("The normal method of deterring unlawful conduct is to impose an appropriate punishment on the person who engages in it."). Indeed, other provisions of SB 2465 do just that by criminalizing the *possession* of certain firearms.

Third, Section 3(*l*)(2) does not survive strict scrutiny because it is substantially underinclusive. While it criminalizes the "distribution" of digital firearms information, Section 3(*l*)(2) does nothing about the *possession* of that same information. While it criminalizes speech regarding "firearms," Section 3(*l*)(2) does nothing about speech regarding other dangerous

15

instrumentalities such as poison and bombs. And while it criminalizes speech by normal people, Section 3(*l*)(2) does nothing about the speech of firearms manufacturers or wholesalers. The statute ignores these and many other appreciable sources of the problem it supposedly targets. Therefore, Section 3(*l*)(2) is *not* narrowly tailored. *See Reed*, 135 S. Ct. at 2231-32.

Fourth, Section 3(*l*)(2) does not survive strict scrutiny because New Jersey cannot prove that the law actually advances the state's aims. In the First Amendment context, government justifications backed by mere "anecdote and supposition" will not suffice, *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 822 (2000), and neither will "ambiguous proof," *Brown v. Entm't Merchs. Ass'n.*, 564 U.S. 786, 800 (2011). Compelling "empirical support" of efficacy must be supplied. *Globe Newspaper Co. v. Superior Court for Norfolk County*, 457 U.S. 596, 609 (1982). But there is none here—not in the text of the bill, not its legislative history, and not anywhere else. *Cf. Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292, 2313-14 (2016) ("Determined wrongdoers, already ignoring existing statutes and safety measures, are unlikely to be convinced to adopt safe practices by a new overlay of regulations.").

In particular, New Jersey's effort to prove efficacy is bound to fail because the information they seek to censor is already freely available across the internet. The digital firearms information that Defense Distributed already published was thereby committed to the internet's public domain, where independent republishers beyond Defense Distributed and New Jersey's control will make those files readily accessible on one website or another forever—regardless of whether New Jersey's Attorney General decides to exact vengeance on the publisher he most dislikes.

New Jersey has repeatedly admitted as much in its own court filings, which take the position that "posting these codes is a bell that can never be un-rung." Ex. 4 at 99; *see also* Ex. 6 at 1 ("Once [Defense Distributed] opens that Pandora's box, it can never be closed."). Proof of this reality is, indeed, overwhelming.[9] Because of this fact, New Jersey cannot possibly establish that post-hoc prosecution of Defense Distributed will effectuate its supposed interest in erasing already-released information from the public domain.

### 2. Overbreadth makes Section 3(*l*)(2) unconstitutional.

Plaintiffs are also likely to succeed on the merits of their First Amendment claim because Section 3(*l*)(2) is unconstitutionally overbroad. The overbreadth doctrine "prohibits the Government from banning unprotected speech" where, as is the case with Section 3(*l*)(2), "a substantial amount of protected speech is prohibited or chilled in the process." *Ashcroft*, 535 U.S. at 255. Section 3(*l*)(2) violates this doctrine in no less than six separate ways.

First, Section 3(*l*)(2) is overbroad because it criminalizes speech regardless of its relationship to illegal conduct. Constitutionally, the "government may not prohibit speech because it increases the chance an unlawful act will be committed 'at some indefinite future time'"; it may "suppress speech for advocating the use of force or a violation of law only if 'such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action.'" *Id.* at 253-54 (quoting *Hess v. Indiana*, 414 U.S. 105, 108 (1973) (per curiam), and *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969) (per curiam)). In other words, states can only prohibit speech to prevent illegal conduct when the speech is "*integral* to criminal conduct," *United States v. Stevens*, 559 U.S. 460, 468 (2010) (emphasis added). But speech cannot be "integral to criminal conduct" if it has only a "contingent and indirect" relationship to that conduct.

---

[9] *See* Ex. 8 at 1; Ex. 12 at 3; Ex. 23 ¶ 4; Ex. 24; Ex. 27 at 10; Ex. 28 at 1; Ex. 29; Ex. 30; Ex. 32 at 1, 3; Ex. 33; Ex. 37; Ex. 38; Ex. 39; Ex. 40; Ex. 41; Ex. 49; *see also* Ex. 30; Ex. 31.

*Ashcroft*, 535 U.S. at 250. It is not enough for the state to allege, as New Jersey does here, that there is "some unquantified potential for subsequent criminal acts." *Id.* Indeed, the Supreme Court has recognized that "it would be quite remarkable to hold that speech by a law-abiding possessor of information can be suppressed in order to deter conduct by a non-law abiding third party." *Bartnicki*, 532 U.S. at 529-30.

Virtually all of the speech covered by Section 3(*l*)(2) falls squarely on the protected side of *Brandenburg* and *Ashcroft's* line, either because the expression's recipient commits no illegal act at all or because, if they did, the causal link is merely contingent and indirect. *Cf. Staples v. United States*, 511 U.S. 600, 610 (1994) ("[T]here is a long tradition of widespread lawful gun ownership by private individuals in this country."). Yet Section 3(*l*)(2) still criminalizes every instance of "distribut[ion]" no matter what. That alone constitutes classic overbreadth.

Second, Section 3(*l*)(2) is overbroad because it also criminalizes the low-tech, in-person "offer" and "advertise[ment]" of instructions—squarely protected speech—even if no actual distribution of the information occurs. In the case of an unconsummated offer or advertisement, the state lacks a sufficiently compelling interest in applying its content-based speech ban.

Third, Section 3(*l*)(2) is overbroad because it criminalizes an "agreement or attempt to distribute." New Jersey lacks a compelling interest to criminalize an "agreement or attempt to distribute" instructions if the distribution never comes to fruition. The same overbreadth logic applies to the statute's criminalization of instructions that "may be used" toward a prohibited purpose but are not in fact.

Fourth, Section 3(*l*)(2) is overbroad because it also criminalizes sharing information about any "firearm component." This covers a wide array of generic items—such as fasteners, nuts, bolts, and screws—that have unlimited potential uses and are not unique to firearms. Even if New

Jersey could criminalize certain speech concerning a completed "firearm," it could not possibly criminalize speech about mundane parts available in any hardware store.

Fifth, Section 3(*l*)(2) is overbroad because it fails to distinguish between information that has, and has not, been committed to the public domain. Digital firearms information is already freely circulating in the public domain because of publications that took place before this law was enacted. *See supra* at pp. 16-17 nn. 5-6. "[T]he Government may not . . . restrict individuals from disclosing information that lawfully comes into their hands in the absence of a 'state interest of the highest order.'" *United States v. Aguilar*, 515 U.S. 593, 605 (1995). However, this statute draws no distinction between truly novel "instructions" and those that anyone has been able to obtain with simple Google searches for months. Therefore, the statute's coverage of these readily-available files renders it overbroad.

Finally, the state cannot salvage its statute by proffering a narrow reading. The statute covers all of these problematic situations too clearly to allow for any such attempt at narrowing (which would not necessarily bind future criminal prosecutions anyhow). *See Dana's R.R. Supply v. Att'y Gen., Florida*, 807 F.3d 1235, 1242 (11th Cir. 2015) ("We will not, however, contort, disfigure, or vitiate a law's plain meaning and readily discerned purpose merely for the sake of statutory preservation."). Because Section 3(*l*)(2)'s ordinary meaning is so overly broad, it creates an unconstitutional "chilling effect on free speech" for countless Americans, regardless of any atextual saving construction the state's lawyers might conjure. *Brown v. Entm't Merchs. Ass'n*, 564 U.S. 786, 807 (2011). The overbreadth doctrine does not permit such legerdemain in the First Amendment context. *See Stevens*, 559 U.S. at 481.

### 3. A missing scienter element makes Section 3(*l*)(2) unconstitutional.

The Plaintiffs' First Amendment claim is also likely to succeed because Section 3(*l*)(2) lacks a necessary scienter element. States cannot create speech crimes without including a stringent requirement of scienter—that is, knowledge of the fact that truly distinguishes innocent acts from guilty ones. *See, e.g., Holder v. Humanitarian Law Project*, 561 U.S. 1, 16-17 (2010); *New York v. Ferber*, 458 U.S. 747, 765 (1982); *Smith v. California*, 361 U.S. 147, 153-54 (1960). Section 3(*l*)(2) lacks the needed scienter element because it does not even require the speaker to know that instructions will "be used to program a three-dimensional printer to manufacture or produce a firearm, firearm receiver, magazine, or firearm component"—let alone know that the recipient would use the information to engage in *illegal* production of a firearm.[10] Hence, the requisite scienter requirement is missing. *See Rice v. Paladin Enters., Inc.*, 128 F.3d 233, 247-48 (4th Cir. 1997); *see also Boos*, 485 U.S. at 320-21.

### B. Plaintiffs will likely succeed on the merits of the Due Process Clause claim.

Plaintiffs are also likely to succeed on the merits of their claim that Section 3(*l*)(2) is void for vagueness under the Due Process Clause. *See* FAC ¶¶ 147-56.[11] "A law may be vague in violation of the Due Process Clause for either of two reasons: 'First, it may fail to provide the kind

---

[10] Federal laws permit the manufacture of a firearm for personal use. *See Does an Individual Need a License to Make a Firearm for Personal Use?*, Bureau of Alcohol, Tobacco, Firearms and Explosives (Nov. 6, 2017), https://www.atf.gov/firearms/qa/does-individual-need-license-make-firearm-personal-use ("[A] license is not required to make a firearm solely for personal use."); William J. Krouse, *Gun Control: 3D-Printed AR-15 Lower Receivers*, Cong. Res. Serv. Insight, 2 (Aug. 22, 2018), https://fas.org/sgp/crs/misc/IN10957.pdf ("In short, unfinished receivers and the components needed to build fully functional AR-15s and other firearms are legally available on the U.S. civilian gun market and can be purchased without a background check under federal law."); *see also, e.g.*, 18 U.S.C. § 922(a)(1)(a).

[11] Pre-enforcement facial vagueness challenges are allowed to address the Due Process Clause's concern for "arbitrary and discriminatory enforcement," *Act Now to Stop War & End Racism Coal. & Muslim Am. Soc'y Freedom Found. v. D.C.*, 846 F.3d 391, 410 (D.C. Cir. 2017), and also to the extent that they seek to halt the chilling of protected speech, *Dana's*, 807 F.3d at 1241. Plaintiffs' claim implicates both concerns.

of notice that will enable ordinary people to understand what conduct it prohibits; second, it may authorize and even encourage arbitrary and discriminatory enforcement.'" *Act Now*, 846 F.3d at 409 (quoting *City of Chicago v. Morales*, 527 U.S. 41, 56 (1999)).  Section 3(*l*)(2) is unconstitutionally vague in both respects.

A key Section 3(*l*)(2) vagueness problem is that it criminalizes the "publication" of "code or instructions stored and displayed in electronic format as a digital model *that may be* used to program a three-dimensional printer to manufacture or produce a firearm, firearm receiver, magazine, or firearm component."  Yet it is impossible for sophisticated parties, let alone ordinary people, to understand what counts as "code . . . *that may be* used to" engage in the proscribed programming.

In the same way that "(w)hat is contemptuous to one man may be a work of art to another," *Smith v. Goguen*, 415 U.S. 566, 575 (1974), what "may be used" by one programmer can be totally useless to another.  Speakers like Defense Distributed cannot tell in advance on which side of the line their speech will fall.  Indeed, like the residual clause at issue in *Johnson v. United States*, 135 S. Ct. 2551 (2015), Section 3(*l*)(2) ties the crime's meaning not to "real-world facts or statutory elements," but to a "judicially imagined" notion of what information "may be used" by hypothetical persons.  *Id.* at 2557.

Because of indeterminacies like this, the statute both chills speech nationwide and encourages arbitrary and discriminatory enforcement, *see Smith*, 415 U.S. at 575 ("Statutory language of such a standardless sweep allows policemen, prosecutors, and juries to pursue their personal predilections.").  Indeed, this case proves the latter point especially: the statements made during Section 3(*l*)(2)'s signing ceremony show that New Jersey's Attorney General wishes to prosecute Defense Distributed not because it poses some sort of unique threat, but because Defense Distributed and its founder espouse views that New Jersey's politicians dislike.  *See* Ex. 2.

C.    **Plaintiffs will likely succeed on the merits of the Commerce Clause claim.**

Plaintiffs are also likely to succeed with the claim that New Jersey has subjected and is subjecting the Plaintiffs to an unconstitutional deprivation of the right to be free of commercial restraints that violate the dormant Commerce Clause.  *See* FAC ¶¶ 157-66.  Two modes of judicial review occur in dormant Commerce Clause cases.  Apart from the default balancing test of *Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970), strict scrutiny applies to any law that discriminates against out-of-state economic interests on its face, in its purpose, or in its practical effect.  *E.g.*, *Rocky Mtn. Farmers Union v. Corey*, 730 F.3d 1070, 1087 (9th Cir. 2013).

Section 3(*l*)(2) triggers strict scrutiny because it discriminates against out-of-state economic interests by "regulat[ing] conduct that takes place exclusively outside the state." *Backpage.com, LLC v. Hoffman*, No. 13-CV-03952 DMC JAD, 2013 WL 4502097, at *11 (D.N.J. Aug. 20, 2013).  Specifically, discrimination occurs with respect to website publication: even though speakers like Defense Distributed operate their websites in a passive fashion from outside of New Jersey, Section 3(*l*)(2) expressly projects New Jersey's law about what can and cannot be said on the internet throughout the entire Union.  *See Am. Libraries Ass'n v. Pataki*, 969 F. Supp. 160, 182 (S.D.N.Y. 1997).

Discrimination also occurs with respect to the statute's "offer" and "advertisement" bans. That conduct will often occur entirely outside of New Jersey—such as at the trade shows that Defense Distributed attends—and still qualify as a crime under Section 3(*l*)(2).

Because these applications are direct and substantial parts of the statute, Section 3(*l*)(2) is unconstitutional per se, "regardless of whether the statute's extraterritorial reach was intended by the legislature." *Healy v. Beer Inst.*, 491 U.S. 324, 336 (1989); *see Am. Booksellers Found. v. Dean*, 342 F.3d 96, 104 (2d Cir. 2003); *Pataki*, 969 F. Supp. at 182.  The Court should so hold.

D.      **Plaintiffs will likely succeed on the merits of the Supremacy Clause claim.**

Plaintiffs' complaint pleads that New Jersey is violating 42 U.S.C. § 1983 by censoring speech with state laws that Congress chose to preempt and immunize the citizenry from.  FAC ¶¶ 167-73.  Plaintiffs are likely to succeed on the merits of this claim for multiple reasons.

1.      **CDA Section 230 preempts Section 3(*l*)(2).**

First, Congress immunized the Plaintiffs from prosecution under Section 3(*l*)(2) with the Communications Decency Act of 1996 ("CDA"), "Congress's grant of 'broad immunity' to internet service providers 'for all claims stemming from their publication of information created by third parties.'"  *Google, Inc. v. Hood*, 822 F.3d 212, 220 (5th Cir. 2016).  CDA Section 230(c)(1) provides that, for interactive computer services such as a website, "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider."  47 U.S.C. § 230(c)(1).[12]  Section 230(e)(3), in turn, preempts state laws that are "inconsistent with" subsection (c)(1).  47 U.S.C. § 230(e)(3).

The Plaintiffs' case directly implicates CDA Section 230.  Much of the digital firearms information that Defense Distributed published in the past, and desires to publish in the future, is "information provided by another information content provider."  47 U.S.C. § 230(c)(1).

The digital firearms information that Defense Distributed published in July 2018 is a perfect example.  "With the exception of the Liberator CAD files, which were previously posted by Defense Distributed before receiving the State Department's letter, the other CAD files posted at this time were created by persons other than Defense Distributed and had been posted on the internet by persons other than Defense Distributed before Defense Distributed republished them

---

[12] "The term 'information content provider' means any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service."  § 230(f)(3).

on DEFCAD." Ex. 26 ¶ 19. Thus, while this action certainly concerns the Plaintiffs' right to publish *new* digital firearms information, for purposes of the CDA, this case also implicates Plaintiffs' right to *republish* digital firearms information that was provided by other people engaged in the open source development process.[13]

Section 3(*l*)(2) criminalizes the distribution of information regardless of whether information was *re*published—i.e., "provided by another information content provider." As such, Section 3(*l*)(2) is facially "inconsistent with" Section 230(c)(1) and preempted. This fault makes Section 3(*l*)(2) facially invalid, for "there can be no constitutional application of a statute that, on its face, conflicts with Congressional intent and therefore is preempted by the Supremacy Clause." *United States v. Arizona*, 641 F.3d 339, 346 (9th Cir. 2011).

This conclusion is not novel. Courts have consistently invalidated similar state criminal laws because they were preempted by CDA Section 230. *See Backpage.com, LLC v. Hoffman*, No. 13-CV-03952 DMC JAD, 2013 WL 4502097, at *1 (D.N.J. Aug. 20, 2013); *Backpage.com, LLC v. Cooper*, 939 F. Supp. 2d 805, 823 (M.D. Tenn. 2013); *Backpage.com, LLC v. McKenna*, 881 F. Supp. 2d 1262, 1271 (W.D. Wash. 2012). The Court should follow those decisions here.

**2. The State Department's authority preempts Section 3(*l*)(2).**

Additionally, New Jersey's use of Section 3(*l*)(2) to stop Defense Distributed's publication of digital firearms information is preempted by the federal government's exclusive authority over foreign affairs. Specifically, Congress charged the executive branch with administering and enforcing pertinent provisions of the Arms Export Control Act of 1976 ("AECA"), 22 U.S.C. ch. 39, and the International Traffic in Arms Regulations ("ITAR"), 22 C.F.R. Parts 120-130. *See* 28

---

[13] A judgment based solely on the CDA would not provide *complete* relief to Plaintiffs, as Defendants could rely on other provisions of state law—such as "public nuisance and negligence laws"—to prohibit the distribution of *new* digital firearm information. *See infra* Part II.

U.S.C. §§ 516, 519; *see also* 22 U.S.C. § 2778(a)(1); 22 U.S.C. § 2778(g)(6); 22 U.S.C. § (e)(2)(A); 22 C.F.R. § 126.7(a).

By seeking to criminalize Plaintiffs' publication of matters that the State Department has expressly authorized for publication, New Jersey seeks to have its legislature take over the President's job of "control[ling] the import and the export of defense articles." § 2778(a)(1). Indeed, Attorney General Grewal declared, "[t]he federal government is no longer willing to stop Defense Distributed from publishing this dangerous code, and so New Jersey must step up." Ex. 6 at 1. States cannot regulate this aspect of foreign policy. *See Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 375 (2000); *Nat'l Foreign Trade Council, Inc. v. Giannoulias*, 523 F. Supp. 2d 731, 738-742 (N.D. Ill. 2007). The Supremacy Clause forbids this usurpation of federal power. *See Armstrong v. Exceptional Child Ctr., Inc.*, 135 S. Ct. 1378, 1384 (2015).

### E.    Plaintiffs will suffer irreparable harm in the absence of immediate relief.

New Jersey's enforcement of Section 3(*l*)(2) causes irreparable harm currently, and unless enjoined, will do so to an even greater extent in the near future. Plaintiffs have engaged—and desire to engage in the future—in at least three distinct courses of conduct that New Jersey's speech crime unconstitutionally outlaws. For fear of being prosecuted under New Jersey's new speech crime, Plaintiffs have stopped engaging in these constitutionally protected courses of conduct. In each respect, Plaintiffs' speech lies squarely within Section 3(*l*)(2)'s proscriptions. And because the law is unconstitutional, the looming threat of its enforcement against Plaintiffs causes irreparable harm.

First, Section 3(*l*)(2) causes irreparable harm because Plaintiffs have published digital firearms information on the internet and intend to do so in the future. *See supra* pp. 5-6. Section 3(*l*)(2) clearly covers this conduct by making it a crime to distribute the banned "digital instructions" "by any means, including the Internet."

Second, Section 3(*l*)(2) causes irreparable harm because Defense Distributed has published digital firearms information via the mail and intends to do so in the future. *See supra* at pp. 7-8. Section 3(*l*)(2) clearly covers this conduct by making it a crime to "distribute" the banned "digital instructions" and defining "distribute" to mean "mail."

Third, Section 3(*l*)(2) causes irreparable harm because Defense Distributed has offered and advertised digital firearms information and intends to do so in the future. *See supra* at 8-9. Section 3(*l*)(2) clearly covers this conduct by making it a crime to "distribute" the banned "digital instructions" and defining "distribute" to mean "offer" and "advertise."

In each of these respects, New Jersey's enforcement of Section 3(*l*)(2) would cause irreparable harm by subjecting the Plaintiffs to unconstitutional punishment. Moreover, the looming threat of such unconstitutional enforcement causes a nationwide chilling effect that stops Plaintiffs and other law-abiding people from engaging in speech that the Constitution entitles them to express freely. *See supra* at pp. 5-9; *Dana's*, 807 F.3d at 1241 ("Litigants who are being 'chilled from engaging in constitutional activity,' . . . suffer a discrete harm independent of enforcement."). Both of these harms—the actual enforcement of New Jersey's unconstitutional criminal law and the chilling effect caused by the specter of its enforcement—are irreparable. *See, e.g.*, *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality op.) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.").[14]

---

[14]The irreparable injury requirement is met notwithstanding the United States District Court for the District of Washington's entry of a preliminary injunction against the State Department. *See supra* note 3. Additionally, New Jersey bears a "formidable" burden to demonstrate that it is no longer threatening the Plaintiffs. *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 92 (2013). Specifically, under the "voluntary cessation" doctrine, the Defendant must "show that the challenged behavior cannot reasonably be expected to recur." *Id.* New Jersey cannot meet that burden here because the state continued its suppression efforts against the Plaintiffs well *after* the preliminary injunction's entry—both by enacting the Section 3(*l*)(2) speech crime and by continuing its civil legal actions against Plaintiffs. *See* Exs. 9-10.

**F.      The balance of equities favors the Plaintiffs and a preliminary injunction will serve the public interest.**

The balance of equities favors an injunction.  The Plaintiffs have approached this litigation in a fair manner, having both exhausted all possible avenues for relief in *Defense Distributed I* and sought a Temporary Restraining Order shortly after New Jersey enacted its new speech crime.  The risk of erroneously denying the injunction entails the "potential for extraordinary harm and a serious chill upon protected speech."  *Ashcroft v. Am. Civil Liberties Union*, 542 U.S. 656, 671 (2004).  "The harm done from letting [an] injunction stand pending a trial on the merits, in contrast, will not be extensive," especially where, as here, "[n]o prosecutions have yet been undertaken under the law, so none will be disrupted if the injunction stands."  *Id.*  The state's interest in enforcing under their new law will be just as feasible a few weeks from now as it is at present.

Finally, it is always in the public interest to prevent the violation of a party's constitutional rights.  *See, e.g.*, *O'Donnell v. Goodhart*, 900 F.3d 220, 232 (5th Cir. 2018).  And with respect to preemption, in particular, the "[f]rustration of federal statutes and prerogatives are not in the public interest."  *United States v. Alabama*, 691 F.3d 1269, 1301 (11th Cir. 2012).

**II.      The Court should enjoin New Jersey's civil enforcement efforts.**

The Court should also issue a preliminary injunction against the New Jersey Attorney General's use of civil legal actions to censor Defense Distributed.  In every key respect, the same constitutional analysis that applies to the new speech crime applies to the New Jersey Attorney General's use of civil legal methods to achieve the same censorship ends.  Indeed, the application of "public nuisance and negligence laws" to speech on the internet is orders-of-magnitude more overbroad, underinclusive, and vague than Section 3(*l*)(2).  Additionally, the Plaintiffs are likely to succeed on the merits of their Section 1983 action's First Amendment claim because New Jersey's conduct violates the doctrine regarding unconstitutional prior restraints.  *See* FAC ¶ 124.

New Jersey's delivery of a cease-and-desist letter to Defense Distributed constitutes a prior restraint because it demands—in advance, and upon pain of legal punishment—that Defense Distributed *never* publish "printable-gun computer files for use by New Jersey residents." Ex. 3 at 1. So do civil actions like the New Jersey Attorney General's effort to obtain an *ex parte* temporary restraining order against Defense Distributed. *See* Ex. 4.

As prior restraints, the state's civil censorship efforts bear a heavy presumption of unconstitutionality. *See Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 71-72 (1963); *Test Masters Educ. Servs., Inc. v. Singh*, 428 F.3d 559, 579 (5th Cir. 2005). But New Jersey cannot overcome this burden. The same reasoning that prevents Section 3(*l*)(2) from surviving strict scrutiny also spells defeat for the civil censorship effort as a prior restraint. *See Bernard v. Gulf Oil Co.*, 619 F.2d 459, 473 (5th Cir. 1980) (en banc), aff'd, 452 U.S. 89 (1981).

Importantly, this constitutional violation encompasses both the action taken directly against Defense Distributed and New Jersey's associated efforts to threaten, coerce, and intimidate Defense Distributed's service providers. *See Backpage.com, LLC v. Dart*, 807 F.3d 229 (7th Cir. 2015); *Okwedy v. Molinari*, 333 F.3d 339 (2d Cir. 2003); *Rattner v. Netburn*, 930 F.2d 204 (2d Cir. 1991). *Backpage.com, LLC* is on all fours, and supports every major element of Defense Distributed's request for this additional category of injunctive relief.

## CONCLUSION

The motion for a preliminary injunction should be granted. The Court should enjoin Defendant Gurbir Grewal, in his official capacity as New Jersey Attorney General, from enforcing Section 3(*l*)(2) of Senate Bill 2465 against the Plaintiffs. The Court should also enjoin the New Jersey Attorney General's use of cease-and-desist letters and other civil legal actions to stop the Plaintiffs' publication of digital firearms information.

Date: December 4, 2018.                          Respectfully submitted,

                                                 BECK REDDEN LLP
                                                 By /s/ Chad Flores
                                                 Chad Flores*
                                                 cflores@beckredden.com
                                                 State Bar No. 24059759
                                                 1221 McKinney St., Suite 4500
                                                 Houston, TX 77010
                                                 (713) 951-3700 | (713) 952-3720 (fax)

                                                 FARHANG & MEDCOFF
                                                 Matthew Goldstein*
                                                 mgoldstein@fmlaw.law
                                                 D.C. Bar No. 975000
                                                 4801 E. Broadway Blvd., Suite 311
                                                 Tucson, AZ 85711
                                                 (202) 550-0040 | (520) 790-5433 (fax)

                                                 Josh Blackman
                                                 joshblackman@gmail.com
                                                 Virginia Bar No. 78292
                                                 1303 San Jacinto Street
                                                 Houston, TX 77002
                                                 (202) 294-9003 | (713) 646-1766 (fax)

                                                 *Admitted *pro hac vice*

                                                 Attorneys for Plaintiffs Defense Distributed
                                                 and Second Amendment Foundation, Inc.

**CERTIFICATE OF SERVICE**

On December 4, 2018, I served this filing on the following persons via CM/ECF:

        Counsel for Defendants Gurbir S. Grewal and Matthew Denn
        Kenneth W. Taber
        Ronald Casey Low

        Counsel for Defendant Michael Feuer
        Connie K. Chan
        James P. Clark
        Michael M. Walsh
        Jason P. Steed

        Counsel for Defendants Josh Shapiro and Thomas Wolf
        J. David Cabello
        John D. Kimball

        Counsel for Defendant Andrew Cuomo
        Pete Marketos
        Tyler Bexley

        Counsel for Plaintiffs
        Chad Flores
        Matthew A. Goldstein
        Joshua Michael Blackman

/s/ *Chad Flores*
Chad Flores

**Exhibit D**

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| DEFENSE DISTRIBUTED and SECOND AMENDMENT FOUNDATION, INC., | § § § | Case No. 1:18-CV-637-RP |
| Plaintiffs, | § § § | |
| v. | § § | |
| GURBIR GREWAL, in his official capacity as New Jersey Attorney General; MICHAEL FEUER, in his official capacity as Los Angeles City Attorney; ANDREW CUOMO, in his official capacity as New York Governor; MATTHEW DENN, in his official capacity as Attorney General of the State of Delaware; JOSH SHAPIRO, in his official capacity as Attorney General of Pennsylvania; and THOMAS WOLF, in his official capacity as Pennsylvania Governor, | § § § § § § § § § § § § § | |
| Defendants. | § | |

## DECLARATION OF PALOMA HEINDORFF

I, Paloma Heindorff, declare:

1.      I am a resident of Texas.

2.      I am a custodian of records and Director of Defense Distributed

### DEFENSE DISTRIBUTED AND DEFCAD

3.      Defense Distributed is a Texas corporation headquartered in Austin, Texas.

4.      Defense Distributed is organized and operated for the purpose of defending the civil liberty of popular access to arms guaranteed by the United States Constitution.

1

To that end, Defense Distributed facilitates global access to, and the collaborative production of, information and knowledge related to the digital manufacturing of arms; and publishes and distributes, at no cost to the public, such information and knowledge on the internet in promotion of the public interest.

5.     Defense Distributed has distributed computer-aided design ("CAD") files and other digital information that can assist efforts to digitally manufacture or produce firearms or firearm components ("digital firearms information").  With respect to a given firearm component, the digital firearms information that Defense Distributed distributes takes the form of stereolithography (.stl) files about the component, Initial Graphics Exchange Specification (.igs) files about the component, SoLiDworks PaRT (.sldprt) files about the component, SketchUp (.skp) files about the component, Standard for the Exchange of Product Data ("STEP") (.stp) files about the component, diagrams of the component, renderings of the component, "read me" plain text files about the component's assembly methods, "read me" plain text files about the National Firearms Act and the Undetectable Firearms Act, and/or software licenses. Defense Distributed desires and intends to continue distributing digital firearms information lawfully.

6.     Defense Distributed's distributions have included the sale, giving, providing, mailing, delivering, publishing, circulating, disseminating, presenting, exhibiting, displaying, sharing, advertising, offering, and/or making available of digital firearms information.  Defense Distributed desires and intends to continue distributing digital firearms information in these manners lawfully.

7.     To accomplish its distribution activities, Defense Distributed maintains a publicly accessible website at www.defcad.org and www.defcad.com (collectively referred to as "DEFCAD").  Posting information on DEFCAD is a primary means by which Defense Distributed accomplishes its distribution of digital firearms information. Defense Distributed desires and intends to continue maintaining DEFCAD lawfully.

DISTRIBUTION OF DIGITAL FIREARMS INFORMATION—ROUND ONE

8.      Beginning in 2012, Defense Distributed generated digital firearms information in the form of CAD files that can assist an individual in digitally manufacturing or producing a single-shot firearm known as the "Liberator," a firearm receiver for AR-15 rifles, and a magazine for AR-15 rifles.  Defense Distributed posted this digital firearms information on DEFCAD for free download by the public.

9.      The digital firearms files that Defense Distributed published about the "Liberator" are accurately described by docket entry number 36-2 in *Defense Distributed et al. v. United States Department of State et al.*, No. 1:15-372-RP (W.D. Tex.).

10.      Some of the digital firearms information that Defense Distributed posted to DEFCAD at this time was originally created by other information content providers and posted on other websites before Defense Distributed posted the information to DEFCAD.

11.      The digital firearms information that Defense Distributed posted to DEFCAD at this time was downloaded approximately 100,000 times.  News reports documented this.  Exhibit A is an exemplary news article that provides proof of this fact.

12.      In May 2013, Defense Distributed received a letter dated May 8, 2013, from Glenn Smith, Chief of the Enforcement Division at the State Department Directorate of Defense Trade Controls.  Exhibit B is a copy of that letter.

13.      The State Department letter warned that the digital firearms information published on DEFCAD is described in the International Traffic in Arms Regulations, 22 C.F.R. Parts 120-130 ("ITAR"), and that Defense Distributed may have released ITAR-controlled technical data without required prior authorization from the State Department. The State Department letter instructed Defense Distributed to remove the digital firearms information from public access.

14.      At the time it posted this set of digital firearms information on DEFCAD, Defense Distributed did not know that the government would demand to pre-approve its

speech. Defense Distributed believed, and continues to believe, that its right to distribute digital firearms information on the Internet and otherwise is guaranteed by the United States Constitution. Nevertheless, due to fears of adverse civil and criminal legal action, Defense Distributed promptly complied with the State Department's demands and removed this set of digital firearms information from public access on DEFCAD.

16. But for the State Department's imposition of the prior restraint upon the distribution of the digital firearms information, Defense Distributed would have continued to freely distribute this set of digital firearms information on DEFCAD.

<u>DISTRIBUTION OF DIGITAL FIREARMS INFORMATION—ROUND TWO</u>

16. In 2015, Defense Distributed and the Second Amendment Foundation, later joined by Conn Williamson, filed a lawsuit in the United States District Court for the Western District of Texas against the State Department and several of its officers, styled *Defense Distributed et al. v. United States Department of State et al*., No. 1:15-372-RP (W.D. Tex.) (hereinafter "*Defense Distributed I*"). As part of this action, among other things, Defense Distributed challenged the constitutionality of the State Department's prior restraint of public speech imposed under the ITAR.

17. In June 2018, the *Defense Distributed I* Plaintiffs entered into a settlement agreement with the State Department. The Settlement Agreement requires, among other things, that the State Department issue a license to the *Defense Distributed I* Plaintiffs that allows them to freely publish digital firearms information. Exhibit C is a copy of the Settlement Agreement.

18. On July 27, 2018, the State Department issued the license to Defense Distributed and the other *Defense Distributed I* Plaintiffs. Exhibit D is a copy of that license.

19. Beginning on July 27, 2018, Defense Distributed published digital firearms information on the Internet at DEFCAD for free download by the public. This set of

4

digital firearms information consisted of ten subsets of CAD files, including the Liberator CAD files.  With the exception of the Liberator CAD files, which were previously posted by Defense Distributed before receiving the State Department's letter, the other CAD files posted at this time were created by persons other than Defense Distributed and had been posted on the internet by persons other than Defense Distributed before Defense Distributed republished them on DEFCAD.

20.     The Liberator files that Defense Distributed published to DEFCAD exemplify the kind of digital firearms information that Defense Distributed intends to develop and distribute in the future.  The other files that Defense Distributed published to DEFCAD are accurately described by Exhibit I, and they too exemplify the kind of digital firearms information that Defense Distributed intends to distribute in the future.

21.     Beginning on July 29, 2018, various state attorney generals filed lawsuits in New Jersey, Pennsylvania, and Washington State to stop Defense Distributed's publication of digital firearms information online.  In the course of this litigation, Defense Distributed agreed to take certain measures to block online access to the digital firearms information by persons in New Jersey, Pennsylvania, and Los Angeles.  But for the states' unfounded legal actions, Defense Distributed would not have engaged in these access-blocking activities.

22.     On July 30, 2018, attorney generals of various states sued the State Department and the *Defense Distributed I* Plaintiffs in *State of Washington et al., v. United States Department of State et al.*, No. 2:18-cv-1115-RSL (W.D. Wash.).  In that action, Judge Robert Lasnik issued a temporary restraining order that enjoined the State Department from implementing or enforcing the license and an ITAR regulatory change that the State Department had made for the purpose of complying with the Settlement Agreement.

23.     Despite this ruling, Defense Distributed maintains that the Constitution

5

guarantees its right to distribute the digital firearms information at issue. Nonetheless, out of an abundance of caution and for fear of further prosecution, Defense Distributed ceased posting digital firearms information to DEFCAD for free download by the public.

24. Judge Lasnik issued a preliminary injunction on August 27, 2018. The preliminary injunction reaffirmed the temporary restraining order, enjoining the State Department from implementing the license and the ITAR regulatory change that it had made for the purpose of complying with the Settlement Agreement.

25. During the preliminary injunction proceedings, the State of Washington Attorney General's office, speaking on behalf of all of that case's plaintiffs, and the Department of Justice, speaking on behalf of the State Department, represented to Judge Lasnik that it is legal for Defense Distributed to hand or mail digital firearms information to U.S. persons in the United States. Exhibit E is the transcript of those proceedings.

DISTRIBUTION OF DIGITAL FIREARMS INFORMATION—ROUND THREE

26. After August 27, 2018, in light of the representations that both the state and federal governments made to Judge Lasnik during the preliminary injunction proceedings, Defense Distributed used DEFCAD to advertise and offer digital firearms information for sale to U.S. persons, as defined in the ITAR, inside the United States (i.e., domestic-only sales). Exhibit F is a DEFCAD advertisement that exemplifies these efforts. In advertisements and offers, DEFCAD provided notice that domestic sales of the information were not available to residents of New Jersey, Pennsylvania, and other states involved in the multidistrict litigation (a/k/a states "behind the Blue Wall"). Exhibit G is an exemplary DEFCAD publication that provides such a notice.

27. In conjunction with these advertisements and offers, Defense Distributed sold digital firearms information by using an ecommerce platform on DEFCAD to facilitate the transaction and using the U.S. Postal Service as its means of delivering the information. After customers entered an order using DEFCAD's online ecommerce

platform, and following Defense Distributed's review, Defense Distributed placed purchased information on a USB drive or SD card and mailed the drive or card to domestic-only sales customers via the U.S. Postal Service.

28.     On November 2, 2018, Defense Distributed learned that the New Jersey Legislature passed Senate Bill 2465, Section 3($l$)(2) of which, if signed into law by the Governor, would make it a crime to, among other things "publish, circulate, disseminate, present, exhibit, display, share, advertise, offer, or make available via the Internet or by any other means" to a person in New Jersey any digital instructions in the form of CAD files or other electronic code or instructions that "may be used" to program a 3D printer to manufacture or produce a firearm, firearm receiver, magazine, or firearm component.

29.     Realizing that the New Jersey Governor may sign Senate Bill 2465 at any time, Defense Distributed feared criminal enforcement of the new law against Defense Distributed, its officers, its employees, or its agents.  Namely, Defense Distributed feared the commencement of criminal enforcement actions under Section 3($l$)(2) if digital firearms information was ever provided to a person in New Jersey, if digital firearms information was ever offered for sale to a person in New Jersey, if digital firearms information was ever advertised for sale to a person in New Jersey, if digital firearms information was presented or exhibited or displayed to a person in New Jersey, and if digital firearms information was otherwise distributed to a person in New Jersey.  Based upon this fear, Defense Distributed ceased offering, advertising, selling, or otherwise distributing digital firearms information on DEFCAD.  All distributions of digital firearms information via DEFCAD ceased.  This involved blocking all public access to DEFCAD and halting all shipments of digital firearms information via the U.S. Postal Service. Exhibit I provides proof of this fact.

30.     I saw New Jersey's Governor sign Senate Bill 2465 on November 11, 2018. At that event, New Jersey's Attorney General stated that Defense Distributed was a focus

of the new law. This and other official statements made by the New Jersey Governor and Attorney General confirm Defense Distributed's fear that any further distribution of digital firearms information will likely result in enforcement actions against Defense Distributed, as well as against Defense Distributed's officers, employees, and/or agents.

31. Because of New Jersey's effort to criminalize and otherwise censor the distribution of digital firearms information that "may be used" to program a 3D printer to manufacture or produce a firearm, firearm receiver, magazine, or firearm component, Defense Distributed has incurred and continues to incur the burden of altering its business practices to avoid the risk that the New Jersey Attorney General will prosecute Defense Distributed and/or Defense Distributed's officers, employees, and/or agents for information received or information that is merely viewed by a person in New Jersey.

32. Because of New Jersey's effort to criminalize and otherwise censor the distribution of digital firearms information, Defense Distributed refrains from engaging in the following constitutionally protected activities that it would otherwise conduct lawfully:

    A.    Posting digital firearms information on the DEFCAD website for free download by the public;

    B.    Selling digital firearms information to persons in New Jersey on the DEFCAD website for shipment on USB drive or SD cards mailed via the U.S. Postal Service;

    C.    Advertising its digital firearms information offerings on the DEFCAD website.

    D.    Participating in trade shows where Defense Distributed is unable to determine the state of residence of attendees that may view its displays and other advertisements;

    E.    Sending advertisements via email lists where Defense Distributed is unable

to determine the states of residence of the recipients and has no way of knowing in which states recipients will be when they receive emails; and

F.      Participating in any national advertising network, radio communication, televised media, and other media that may advertise and promote Plaintiffs' respective missions.

I declare under penalty of perjury that the foregoing is true and correct.

DATED this 3rd day of December, 2018.

Paloma Heindorff
Director, Defense Distributed

Exhibit A

111,437 views | May 8, 2013, 05:12pm

# 3D-Printed Gun's Blueprints Downloaded 100,000 Times In Two Days (With Some Help From Kim Dotcom)



**Andy Greenberg** Forbes Staff
Security
*Covering the worlds of data security, privacy and hacker culture.*

If gun control advocates hoped to prevent blueprints for the world's first fully 3D-printable gun from spreading online, that horse has now left the barn about a hundred thousand times.

That's the number of downloads of the 3D-printable file for the so-called "Liberator" gun that the high-tech gunsmithing group Defense Distributed has seen in just the last two days, a member of the group tells me. The gun's CAD files have been ten times more popular than any component the group has previously made available, parts that have included the body of an AR-15 and the magazine for an AK-47."This has definitely been our most



Defense Distributed founder Cody Wilson, displaying the world's first fully 3D-printed gun, the "Liberator." Click to enlarge.
(Credit: Michael Thad Carter for Forbes)

well-received download," says Haroon Khalid, a developer working with Defense Distributed. "I don't think any of us predicted it would be this much."

**Update**: The State Department has now demanded Defense Distributed take down its printable gun files due to possible export control violations.

The controversial gun-printing group is hosting those files, which include everything from the gun's trigger to its body to its barrel, on a service that has attracted some controversy of its own: Kim Dotcom's Mega storage site. Although the blueprint is only publicly visible on Defense Distributed's own website Defcad.org, users who click on it are prompted to download the collection of CAD files from Mega.co.nz, which advertises that it encrypts all users' information and has a reputation for resisting government surveillance. **Update**: Mega now says it's deleting the gun files from its servers, and Kim Dotcom has declared the weapon a "serious threat to the security of the community."

Cody Wilson, Defense Distributed's 25-year-old founder, says that the group chose to use Mega mostly because it was fast and free. But he also says he feels a degree of common cause with Kim Dotcom, the ex-hacker chief executive of Mega who has become a vocal critic of the U.S. government after being indicted for copyright infringement and racketeering in early 2012. "We're sympathetic to Kim Dotcom," says Wilson. "There are plenty of services we could have used, but we chose this one. He's down for the struggle."

The most downloads of Defense Distributed's "Liberator," surprisingly, haven't come from the U.S., but from Spain, according to Khalid's count. The U.S. is second, ahead of Brazil, Germany, and the U.K., he says, although he wasn't able to provide absolute download numbers for each country.

**YOU MAY ALSO LIKE**

**Update**: Although Spain was initially outpacing the U.S. in downloads, it seems more Americans have now downloaded the file.

The gun's blueprint, of course, may have also already spread far wider than Defense Distributed can measure. It's also been uploaded to the filesharing site the Pirate Bay, where it's quickly become one of the most popular files in the site's 3D-printing category. "This is the first in what will become an avalanche of undetectable, untraceable, easy-to-manufacture weapons that will turn the tables on evil-doers the world over," writes one user with the name DakotaSmith on the site. "Share and enjoy."

It's worth noting that only a fraction of those who download the printable gun file will ever try to actually create one. Defense Distributed used an $8,000 second-hand Stratasys Dimension SST to print their prototype, a 3D printer that the vast majority of its fans won't have access to.

Nonetheless the "Liberator," which I first revealed last Friday and then witnessed being test-fired over the weekend, has caused an enormous stir online. Defense Distributed says that it received 540,000 users to its website in the two days since its printable gun was released, and its video revealing the gun has attracted 2.8 million views on YouTube.

The project has also already immediately inspired a legal backlash. New York congressmen Steve Israel and Chuck Schumer have both called for the renewal of the Undetectable Firearms Act to ban any gun that can't be spotted with a metal detector.

But Defense Distributed's real goal hasn't been to create an undetectable gun so much as an uncensorable, digital one. As the group's founder radical libertarian founder Cody Wilson sees it, firearms can be made into a printable file that blurs the line between gun control and information censorship, blending the First Amendent and the Second and demonstrating how technology can render the government irrelevant.

"Call me crazy, but I see a world where contraband will pass underground through the data cables to be printed in our homes as the drones move overhead," Wilson said when we first spoke in August of last year. "I see a kind of poetry there...I dream of this very weird future and I'd like to be a part of it."

—

Follow me on **Twitter**, and check out my new book, *This Machine Kills Secrets: How WikiLeakers, Cypherpunks and Hacktivists Aim To Free The World's Information*.

*Related on Forbes:*



## Gallery: Ten Wild Things You Can 3D Print At Home

10 images

View gallery →

---

*I'm a technology, privacy, and information security reporter and most recently the author of the book* [This Machine Kills Secrets](), *a chronicle of the history and future of infor... MORE*

106,791 views | Nov 1, 2018, 09:00am

# #Futureproofing: Why This Company Sources Talent Locally (And Why You Should Too)



**U.S. Chamber of Commerce Staff** Brand Contributor
**Grads of Life** BRANDVOICE

---



**U.S. Chamber of Commerce Staff** Brand Contributor

<span>Follow</span>

---

Every day, American businesses are solving some of the world's greatest challenges, and in the process, they're creating opportunity, strengthening their communities, and moving our country forward. Brought to you by the U.S. Chamber of Commerce, Free Enterprise brings their... **Read More**

---

Exhibit B



United States Department of State

*Bureau of Political-Military Affairs*
*Office of Defense Trade Controls Compliance*
*Washington, D.C. 20522-0112*

MAY 0 8 2013

In reply refer to
▬▬▬▬▬▬▬▬▬▬▬▬

Mr. Cody Wilson
Defense Distributed


Dear Mr. Wilson:

The Department of State, Bureau of Political Military Affairs, Office of Defense Trade Controls Compliance, Enforcement Division (DTCC/END) is responsible for compliance with and civil enforcement of the Arms Export Control Act (22 U.S.C. 2778) (AECA) and the AECA's implementing regulations, the International Traffic in Arms Regulations (22 C.F.R. Parts 120-130) (ITAR). The AECA and the ITAR impose certain requirements and restrictions on the transfer of, and access to, controlled defense articles and related technical data designated by the United States Munitions List (USML) (22 C.F.R. Part 121).

DTCC/END is conducting a review of technical data made publicly available by Defense Distributed through its 3D printing website, DEFCAD.org, the majority of which appear to be related to items in Category I of the USML. Defense Distributed may have released ITAR-controlled technical data without the required prior authorization from the Directorate of Defense Trade Controls (DDTC), a violation of the ITAR.

Technical data regulated under the ITAR refers to information required for the design, development, production, manufacture, assembly, operation, repair, testing, maintenance or modification of defense articles, including information in the form of blueprints, drawings, photographs, plans, instructions or documentation. For a complete definition of technical data, see § 120.10 of the ITAR. Pursuant to § 127.1 of the ITAR,

it is unlawful to export any defense article or technical data for which a license or written approval is required without first obtaining the required authorization from the DDTC. Please note that disclosing (including oral or visual disclosure) or transferring technical data to a foreign person, whether in the United States or abroad, is considered an export under § 120.17 of the ITAR.

The Department believes Defense Distributed may not have established the proper jurisdiction of the subject technical data. To resolve this matter officially, we request that Defense Distributed submit Commodity Jurisdiction (CJ) determination requests for the following selection of data files available on DEFCAD.org, and any other technical data for which Defense Distributed is unable to determine proper jurisdiction:

1. Defense Distributed Liberator pistol

2. .22 electric

3. 125mm BK-14M high-explosive anti-tank warhead

4. 5.56/.223 muzzle brake

5. Springfield XD-40 tactical slide assembly

6. Sound Moderator – slip on

7. "The Dirty Diane" 1/2-28 to 3/4-16 STP S3600 oil filter silencer adapter

8. 12 gauge to .22 CB sub-caliber insert

9. Voltlock electronic black powder system

10. VZ-58 front sight.

DTCC/END requests that Defense Distributed submit its CJ requests within three weeks of receipt of this letter and notify this office of the final CJ determinations. All CJ requests must be submitted electronically through an online application using the DS-4076 Commodity Jurisdiction Request Form. The form, guidance for submitting CJ requests, and other relevant information such as a copy of the ITAR can be found on DDTC's website at http://www.pmddtc.state.gov.

Until the Department provides Defense Distributed with final CJ determinations, Defense Distributed should treat the above technical data as ITAR-controlled. This means that all such data should be removed from public access immediately. Defense Distributed should also review the remainder of the data made public on its website to

determine whether any additional data may be similarly controlled and proceed according to ITAR requirements.

    Additionally, DTCC/END requests information about the procedures Defense Distributed follows to determine the classification of its technical data, to include the aforementioned technical data files. We ask that you provide your procedures for determining proper jurisdiction of technical data within 30 days of the date of this letter to Ms. Bridget Van Buren, Compliance Specialist, Enforcement Division, at the address below:

<div align="center">

Office of Defense Trade Controls Compliance



</div>

    We appreciate your full cooperation in this matter. Please note our reference number in any future correspondence.

<div align="center">

Sincerely,

Glenn E. Smith
Chief, Enforcement Division

</div>

Exhibit C

# SETTLEMENT AGREEMENT

Defense Distributed ("DD"), Second Amendment Foundation, Inc. ("SAF"), and Conn

Williamson (collectively, "Plaintiffs,") and the United States Department of State ("State"), the

Secretary of State, the Directorate of Defense Trade Controls ("DDTC"), the Deputy Assistant

Secretary, Defense Trade Controls, and the Director, Office of Defense Trade Controls Policy

(collectively, "Defendants"), out of a mutual desire to resolve all of the claims in the case

captioned *Defense Distributed, et al. v. Dep't of State, et al.*, Case No. 15-cv-372-RP (W.D.

Tex.) (the "Action") without the need for further litigation and without any admission of liability,

hereby stipulate and agree as follows:

Plaintiffs and Defendants do hereby settle all claims, issues, complaints, or actions

described in the case captioned, and any and all other claims, complaints, or issues that have

been or could have been asserted by Plaintiffs against Defendants in accordance with the

following terms and conditions:

1.  *Consideration*: In consideration of Plaintiffs' agreement to dismiss the claims in the

Action with prejudice as described in paragraph 2, below, Defendants agree to the following, in

accordance with the definitions set forth in paragraph 12, below:

    (a)    Defendants' commitment to draft and to fully pursue, to the extent authorized by

                law (including the Administrative Procedure Act), the publication in the <u>Federal</u>

                <u>Register</u> of a notice of proposed rulemaking and final rule, revising USML

                Category I to exclude the technical data that is the subject of the Action.

    (b)    Defendants' announcement, while the above-referenced final rule is in

                development, of a temporary modification, consistent with the International

Traffic in Arms Regulations (ITAR), 22 C.F.R. § 126.2, of USML Category I to

exclude the technical data that is the subject of the Action. The announcement

will appear on the DDTC website, www.pmddtc.state.gov, on or before July 27,

2018.

(c)    Defendants' issuance of a letter to Plaintiffs on or before July 27, 2018, signed by

the Deputy Assistant Secretary for Defense Trade Controls, advising that the

Published Files, Ghost Gunner Files, and CAD Files are approved for public

release (i.e., unlimited distribution) in any form and are exempt from the export

licensing requirements of the ITAR because they satisfy the criteria of 22 C.F.R. §

125.4(b)(13). For the purposes of 22 C.F.R. § 125.4(b)(13) the Department of

State is the cognizant U.S. Government department or agency, and the Directorate

of Defense Trade Controls has delegated authority to issue this approval.

(d)    Defendants' acknowledgment and agreement that the temporary modification of

USML Category I permits any United States person, to include DD's customers

and SAF's members, to access, discuss, use, reproduce, or otherwise benefit from

the technical data that is the subject of the Action, and that the letter to Plaintiffs

permits any such person to access, discuss, use, reproduce or otherwise benefit

from the Published Files, Ghost Gunner Files, and CAD Files.

(e)    Payment in the amount of $39,581.00.  This figure is inclusive of any interest and

is the only payment that will be made to Plaintiffs or their counsel by Defendants

under this Settlement Agreement. Plaintiffs' counsel will provide Defendants'

2

counsel with all information necessary to effectuate this payment.

The items set forth in subparagraphs (a) through (e) above constitute all relief to be

provided in settlement of the Action, including all damages or other monetary relief,

equitable relief, declaratory relief, or relief of any form, including but not limited to,

attorneys' fees, costs, and/or relief recoverable pursuant to 2 U.S.C. § 1302, 2 U.S.C. §

1311, 2 U.S.C. § 1317, 22 U.S.C. § 6432b(g), 28 U.S.C. § 1920, Fed. R. Civ. P. 54(d),

and the Local Rules.

2.   *Dismissal with Prejudice:* At the time of the execution of this Settlement Agreement,

Plaintiffs agree to have their counsel execute and provide to Defendants' counsel an

original Stipulation for Dismissal with Prejudice pursuant to Fed. R. Civ. P.

41(a)(1)(A)(ii) and 41(a)(1)(B).  Counsel for Defendants agree to execute the stipulation

and file it with the Court in the Action, no sooner than 5 business days after the

publication of the announcement described in Paragraph 1(b) of this Settlement

Agreement and issuance of the letter described in Paragraph 1(c) of this Settlement

Agreement. A copy of the Stipulation for Dismissal with Prejudice is attached hereto.

3.   *Release:* Plaintiffs, for themselves and their administrators, heirs, representatives,

successors, or assigns, hereby waive, release and forever discharge Defendants, and all of

their components, offices or establishments, and any officers, employees, agents, or

successors of any such components, offices or establishments, either in their official or

individual capacities, from any and all claims, demands and causes of action of every

kind, nature or description, whether currently known or unknown, which Plaintiffs may

have had, may now have, or may hereafter discover that were or could have been raised

in the Action.

4.    *No Admission of Liability:* This Settlement Agreement is not and shall not be construed

as an admission by Defendants of the truth of any allegation or the validity of any claim

asserted in the Action, or of Defendants' liability therein. Nor is it a concession or an

admission of any fault or omission in any act or failure to act. Nor is it a concession or

admission as to whether the monetary or equitable relief, attorneys' fees, costs, and

expenses sought by Plaintiffs in the Action, are reasonable or appropriate. None of the

terms of the Settlement Agreement may be offered or received in evidence or in any way

referred to in any civil, criminal, or administrative action other than proceedings

permitted by law, if any, that may be necessary to consummate or enforce this Settlement

Agreement. The terms of this Settlement Agreement shall not be construed as an

admission by Defendants that the consideration to be given hereunder represents the

relief that could be recovered after trial.  Defendants deny that they engaged in *ultra vires*

actions, deny that they violated the First Amendment, Second Amendment, or Fifth

Amendment of the United States Constitution, and maintain that all of the actions taken

by Defendants with respect to Plaintiffs comply fully with the law, including the United

States Constitution.

5.  *Merger Clause:* The terms of this Settlement Agreement constitute the entire agreement of Plaintiffs and Defendants entered into in good faith, and no statement, remark, agreement or understanding, oral or written, which is not contained therein, shall be recognized or enforced. Plaintiffs acknowledge and agree that no promise or representation not contained in this Settlement Agreement has been made to them and they acknowledge and represent that this Settlement Agreement contains the entire understanding between Plaintiffs and Defendants and contains all terms and conditions pertaining to the compromise and settlement of the disputes referenced herein. Nor does the Parties' agreement to this Settlement Agreement reflect any agreed-upon purpose other than the desire of the Parties to reach a full and final conclusion of the Action, and to resolve the Action without the time and expense of further litigation.

6.  *Amendments:* This Settlement Agreement cannot be modified or amended except by an instrument in writing, agreed to and signed by the Parties, nor shall any provision hereof be waived other than by a written waiver, signed by the Parties.

7.  *Binding Successors*: This Settlement Agreement shall be binding upon and inure to the benefit of Plaintiffs and Defendants, and their respective heirs, executors, successors, assigns and personal representatives, including any persons, entities, departments or agencies succeeding to the interests or obligations of the Parties.

8.  *Consultation with Counsel:* Plaintiffs acknowledges that they have discussed this
    Settlement Agreement with their counsel, who has explained these documents to them
    and that they understand all of the terms and conditions of this Settlement Agreement.
    Plaintiffs further acknowledge that they have read this Settlement Agreement, understand
    the contents thereof, and execute this Settlement Agreement of their own free act and
    deed. The undersigned represent that they are fully authorized to enter into this
    Settlement Agreement.

9.  *Execution:* This Settlement Agreement may be executed in one or more counterparts,
    each of which shall be deemed an original, and all of which together constitute one and
    the same instrument, and photographic copies of such signed counterparts may be used in
    lieu of the original.

10. *Jointly Drafted Agreement:* This Settlement Agreement shall be considered a jointly
    drafted agreement and shall not be construed against any party as the drafter.

11. *Tax and Other Consequences:* Compliance with all applicable federal, state, and local tax
    requirements shall be the sole responsibility of Plaintiffs and their counsel. Plaintiffs and
    Defendants agree that nothing in this Settlement Agreement waives or modifies federal,
    state, or local law pertaining to taxes, offsets, levies, and liens that may apply to this

Settlement Agreement or the settlement proceeds, and that Plaintiffs are executing this Settlement Agreement without reliance on any representation by Defendants as to the application of any such law.

12.  *Definitions*: As used in this Settlement Agreement, certain terms are defined as follows:

-   The phrase "*Published Files*" means the files described in paragraph 25 of Plaintiffs' Second Amended Complaint.

-   The phrase "*Ghost Gunner Files*" means the files described in paragraph 36 of Plaintiffs' Second Amended Complaint.

-   The phrase "*CAD Files*" means the files described in paragraph 40 of Plaintiffs' Second Amended Complaint.

-   The phrase "*Other Files*" means the files described in paragraphs 44-45 of Plaintiffs' Second Amended Complaint.

-   The phrase "*Military Equipment*" means (1) Drum and other magazines for firearms to .50 caliber (12.7 mm) inclusive with a capacity greater than 50 rounds, regardless of jurisdiction of the firearm, and specially designed parts and components therefor; (2) Parts and components specially designed for conversion of a semi-automatic firearm to a fully automatic firearm; (3) Accessories or attachments specially designed to automatically stabilize aim (other than gun rests) or for automatic targeting, and specially designed parts and components therefor.

-   The phrase "*technical data that is the subject of the Action*" means: (1) the Published Files; (2) the Ghost Gunner Files; (3) the CAD Files; and (4) the Other Files insofar as those files regard items exclusively: (a) in Category I(a) of the United States Munitions List (USML), as well as barrels and receivers covered by Category I(g) of the USML that are components of such items; or (b) items

7

covered by Category I(h) of the USML solely by reference to Category I(a), excluding Military Equipment.

Dated: June 29, 2018

Dated: June 29, 2018

_____

Matthew A. Goldstein
Snell & Wilmer LLP
One South Church Ave. Ste. 1500
Tucson, Arizona 85701
*Counsel for Plaintiffs*

Dated: June 29, 2018

_____

Eric J. Soskin
Stuart J. Robinson
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., N.W.
Washington, D.C. 20001
Tel. (202) 353-0533

*Counsel for Defendants*

8

Exhibit D



**United States Department of State**
*Bureau of Political-Military Affairs*
*Directorate of Defense Trade Controls*
*Washington, D.C. 20522-0112*

July 27, 2018

Mr. Cody R. Wilson, Defense Distributed, and Second Amendment Foundation, Inc.
c/o Mr. Matthew A. Goldstein
Snell & Wilmer
One South Church Avenue
Suite 1500
Tucson, AZ 85701-1630

RE:   Directorate of Defense Trade Controls Approval of Certain Files for Public Release

Dear Mr. Wilson, Defense Distributed, and Second Amendment Foundation, Inc.:

This letter is provided in accordance with section 1(c) of the Settlement Agreement in the matter of *Defense Distributed, et al., v. U.S. Department of State, et al.,* No. 15-cv-372-RP (W.D. Tx.) (hereinafter referred to as "*Defense Distributed*"). As used in this letter,

- The phrase "Published Files" means the files described in paragraph 25 of Plaintiffs' Second Amended Complaint in *Defense Distributed*.
- The phrase "Ghost Gunner Files" means the files described in paragraph 36 of Plaintiffs' Second Amended Complaint in *Defense Distributed*.
- The phrase "CAD Files" means the files described in paragraph 40 of Plaintiffs' Second Amended Complaint in *Defense Distributed*.

The Department understands that Defense Distributed submitted the Published Files, Ghost Gunner Files, and CAD Files to the Department of Defense's Defense Office of Prepublication and Security Review (DOPSR) in 2014 to request review for approval for public release pursuant to International Traffic in Arms Regulations (ITAR) § 125.4(b)(13). It is our further understanding that DOPSR did not make a determination on the eligibility of these files for release, but instead referred you to the Directorate of Defense Trade Controls (DDTC) regarding public release of these files.

I advise you that for the purposes of ITAR § 125.4(b)(13), the Department of State is a cognizant U.S. government department or agency, and DDTC has authority to issue the requisite approval for public release. To that end, I approve the Published Files, Ghost Gunner Files, and CAD Files for public release (i.e., unlimited distribution). As set forth in ITAR § 125.4(b)(13), technical data approved for public release by the cognizant U.S. government department or agency is not subject to the licensing requirements of the ITAR.

Sincerely,

Acting Deputy Assistant Secretary for the
Directorate of Defense Trade Controls

Exhibit E

```
 1              UNITED STATES DISTRICT COURT

 2         WESTERN DISTRICT OF WASHINGTON AT SEATTLE

 3    _____

 4                             )
      STATE OF WASHINGTON, et al.,  ) C18-1115-RSL
 5                             )
                   Plaintiffs,  ) SEATTLE, WASHINGTON
 6                             )
      v.                       ) August 21, 2018
 7                             )
      UNITED STATES DEPARTMENT OF  ) MOTION HEARING
 8    STATE, et al.,           )
                               )
 9                 Defendants.  )

10    _____

11            VERBATIM REPORT OF PROCEEDINGS
          BEFORE THE HONORABLE ROBERT S. LASNIK
12            UNITED STATES DISTRICT JUDGE
      _____
13

14
      APPEARANCES:
15

16

17    For the Plaintiffs:    Jeffrey G. Rupert
                             Attorney General's Office
18                           PO Box 40110
                             Olympia, WA  98504
19
                             Jeffrey T. Sprung
20                           Kristin Beneski
                             Zachary P. Jones
21                           Attorney General's Office
                             800 5th Avenue
22                           Suite 2000
                             Seattle, WA  98104
23
                             Scott J. Kaplan
24                           Oregon Department of Justice
                             100 SW Market Street
25                           Portland, OR  97201
```

1    regulations here are narrowly tailored, and there's a

2    procedure to challenge it with a CJ.  And the declaration

3    from Ms. Aguirre indicated that most CJs are granted.  By

4    that, I mean you're allowed to export the item.

5        Finally, there are alternative avenues to produce this

6    information.  But here, notably, it only applies to Internet

7    posting.  They can hand them around domestically.  And also

8    there's a wide exception in the statute for general

9    scientific, mathematical or engineering papers.

10       I would note that Judge Pitman's decision relied on a

11   Ninth Circuit case, which we again believe controls, is the

12   *Chi Mak* case, from the Ninth Circuit in 2012, where the Ninth

13   Circuit quoted -- quote says, it repeatedly rejected First

14   Amendment challenges to the AECA, its implementation of

15   regulations in its predecessor statute.

16       So, again, we believe that decides the issue with the

17   First Amendment.  But Your Honor only has to reach these

18   issues on the balancing of the equities test for an

19   injunction.

20       Moving on to the balancing of the equities.  We believe

21   there's a real and present danger to the public safety.  The

22   President seems to agree.  And the preliminary injunction, if

23   it were issued, as with temporary restraining orders, will

24   not harm the government.  It would put us back to where we

25   were before this all happened.  As to the First Amendment

1   part of the process; or, we just wanted to change the

2   50-caliber or less, nonautomatic, and we didn't even think

3   about the 3D printing?

4           MR. MYERS:  Your Honor, I think the face of the

5   documents that we've relied on and put before the Court

6   suggests that there's been a year's long effort to revise the

7   United States Munitions List.  And as part of that, the

8   judgment has been made that sub-50-caliber nonautomatic

9   firearms ought not be regulated under the AECA and ITAR.  And

10  that extends to professional firearms or plastic firearms,

11  provided that they are nonautomatic and sub-50-caliber.

12          To be clear, even if the Court were to grant plaintiffs

13  every ounce of relief that they seek in this case, Defense

14  Distributed could still mail every American citizen in the

15  country the files that are at issue here.  And what that gets

16  at, and what I really want to underscore, is the fundamental

17  disconnect between the claims that plaintiffs are asserting

18  here, and the statutory regime at issue.

19          Again, there are domestic prohibitions on undetectable

20  firearms, on firearm possession.  Some of those are federal.

21  Some of those are state.  And all remain on the books and

22  capable of being enforced.  But plaintiffs are trying to rely

23  on the wrong statutes.

24          So let me start by talking about plaintiffs' theory of

25  injury, which is relevant to their claims of both standing

1   the federal government follow their rules in making the

2   modification and sending the letter?  And I will deal with

3   those in that technical arena.

4       But a solution to the greater problem is so much better

5   suited to the other two branches of government.  And I really

6   hope and wish that the Executive Branch and Congress would

7   face up to this and say, it's a tough issue, but that's why

8   you got into public service to begin with.

9       But thanks very much.  Did you have anything else,

10  Mr. Rupert?

11          MR. RUPERT:  I do not, Your Honor.

12          THE COURT:  I'm going to take the matter under

13  advisement.  There is some excellent briefing and issues that

14  I want to take a closer look at.  I will definitely get a

15  written decision out by Monday, August 27th.  So you'll have

16  it for sure before the expiration of the TRO on the 28th.

17      Okay.  Thanks very much, counsel.  We are adjourned.

18                  (Adjourned.)

19              C E R T I F I C A T E

20

21      I certify that the foregoing is a correct transcript from

22  the record of proceedings in the above-entitled matter.

23

24  */s/ Debbie Zurn*

25  DEBBIE ZURN
    COURT REPORTER

Exhibit F







https://defcad.com/ Go
JUL AUG OCT
272 captures
2 Feb 2011 – 19 Nov 2018
30
2017 2018 2019
About this capture

# DEFCAD

$280K/$400K (70%) DONATE

SEARCH PARTNER LOGIN SIGN UP

## BUY YOUR FILES TODAY. SIGN UP TO SELL.

### DISCOVER

Browse a growing library of files from enthusiasts and engineers.

### BUY

DEFCAD is a public marketplace.

### CONTRIBUTE

Participate in the active development of your Second Amendment.

FEATURED MOST RECENT ALPHABETICAL

# DEFCAD

ABOUT        FAQ        CONTACT        PRIVACY

DEFENSE DISTRIBUTED. ALL RIGHTS RESERVED.

  

Exhibit G



# DEFCAD

$342K/$400K (86%) DONATE

SEARCH PARTNER LOGIN SIGN UP

# DD AR-15 80% LOWER

BY DEFDIST

PURCHASE

INTERNET ARCHIVE WayBackMachine
https://defcad.com/library/0dd85faa-faa6-42b5-8167-52f8f863bfd8/ Go
1 capture
23 Sep 2018
AUG SEP
About this capture

SHARE

only available to U.S. Persons, as defined at 22 C.F.R. 120.15. The files are also not available to persons outside the United States or to residents of and persons in the following blue states: State of New Jersey, Commonwealth of Pennsylvania, State of Washington, State of Connecticut, State of Maryland, State of New York, State of Oregon, Commonwealth of Massachusetts, District of Columbia, State of California, State of Colorado, State of Delaware, State of Hawaii, State of Illinois, State of Iowa, State of Minnesota, State of North Carolina, State of Rhode Island, State of Vermont, Commonwealth of Virginia, State of Maine

CREATED DATE: JULY 27, 2018

FILETYPES: SLDPRT, STP

CATEGORY: NONE

TAGS: NONE

FILES (1) TYPE

📄 AR15_80_PERCENT_LOWER.ZIP                     SLDPRT, STP

NO LICENSE

🏳 REPORT THIS CONTENT



💬 COMMENTS (30)

PLEASE LOGIN TO ADD COMMENTS



**MAXKULIK**

My download link to get ALL the DD files has changed to:
http://MaxKulik.net/downloads.html
Happy Printing!

2 DAYS, 12 HOURS



**HARDWIRED79**

Thanks MaxKulik!

3 DAYS, 9 HOURS



**MAXKULIK**

I would like to just share again:

The files are downloadable on my personal server here:
http://MaxKulik.net/DDCAD.zip

1 WEEK, 4 DAYS



**HAMMERHEAD1911**

can't download -_-

1 MONTH, 2 WEEKS



**VYRD**

why i can't download?

1 MONTH, 2 WEEKS



**BLACKCELL**

find book on new weapons www.DELTAPress.com

1 MONTH, 3 WEEKS

**TREND777**

Is it not downloadable? Im at Puerto Rico

1 MONTH, 3 WEEKS

**MARKHARGRAVE**

are these just the mill ones or is the 3D print one out there?

1 MONTH, 3 WEEKS

**LOBISON**

so we still can not download ?

1 MONTH, 3 WEEKS

**NOBACK**

Good

1 MONTH, 3 WEEKS

Load more comments

# DEFCAD

ABOUT    FAQ    CONTACT    PRIVACY    TERMS

DEFENSE DISTRIBUTED. ALL RIGHTS RESERVED.

   

Exhibit H



**Paloma Heindorff <paloma@defdist.org>**

---

# DEFCAD file shipping
3 messages

---

**Paloma** <paloma@defdist.org>                                                                         Fri, Nov 2, 2018 at 2:11 PM
To: Stephen Sheftall <sales@ghostgunner.net>, Stacie Frost <shipping@ghostgunner.net>, Justin Frost
<jrf@ghostgunner.net>

Hi guys, quick note: please halt all shipments of DEFCAD files until further notice.

--

Paloma Heindorff
Director

---

Defense Distributed

---

2320 Donley Drive, Unit C
Austin, TX 78758
p:  512.584.8013

---

www.ghostgunner.net

---

This e-mail transmission contains
confidential information that is the property
of the sender and the organization
(DEFENSE DISTRIBUTED, INC.) for which
the sender represents. If you are not the
intended recipient and have by accident
received this email, please do not retain,
disclose, reproduce or distribute the
contents of this e-mail transmission, or take
any action in relevance thereon or pursuant
thereto.  Please notify the sender of the
error by responding to the email
accordingly in a timely and reasonable
fashion otherwise failure to do so may
cause legal action to be taken.
Thank you.

---

**Stephen Sheftall** <sales@ghostgunner.net>                                                             Fri, Nov 2, 2018 at 2:28 PM
To: Paloma <paloma@defdist.org>

Copy that.

Stephen Sheftall
Ghost Gunner Sales

---

Ghost Gunner

---

2320 Donley Drive Suite C
Austin, TX 78758
p:  512.584.8013

---

www.ghostgunner.net

---

This e-mail transmission contains
confidential information that is the property
of the sender and the organization (GHOST
GUNNER, INC.) for which the sender
represents. If you are not the intended
recipient and have by accident received this
email, please do not retain, disclose,

reproduce or distribute the contents of this
e-mail transmission, or take any action in
relevance thereon or pursuant thereto.
Please notify the sender of the error by
responding to the email accordingly in a
timely and reasonable fashion otherwise
failure to do so may cause legal action to
be taken.
Thank you.

[Quoted text hidden]

---

**Justin Frost** <jrf@ghostgunner.net>        Fri, Nov 2, 2018 at 2:31 PM
To: paloma@defdist.org

Got it.
[Quoted text hidden]
--

Justin Frost

Ghost Gunner Tech Support

Ghost Gunner

2320 Donley Drive Suite C
Austin, TX 78758
p: 737-212-1979

www.ghostgunner.net

This e-mail transmission contains
confidential information that is the property
of the sender and the organization (GHOST
GUNNER, INC.) for which the sender
represents. If you are not the intended
recipient and have by accident received this
email, please do not retain, disclose,
reproduce or distribute the contents of this
e-mail transmission, or take any action in
relevance thereon or pursuant thereto.
Please notify the sender of the error by
responding to the email accordingly in a
timely and reasonable fashion otherwise
failure to do so may cause legal action to
be taken.
Thank you.

Exhibit I

**DECLARATION OF CODY WILSON**

I, Cody Wilson, declare:

1.  I am a citizen of the United States and a resident of Texas.

2.  I co-founded and now lead Defense Distributed.

3.  Defense Distributed maintains DEFCAD.com

4.  Each of the ten files posted by Defense Distributed on July 27, 2018 were already

in the public domain before that date, as follows:

> (1) The AR-15 assembly files were available at the following sites:
>
> > Grabcad: https://grabcad.com/library/ar-15-m16-a1
> > CNCguns: https://www.cncguns.com/downloads.html
>
> (2) The VZ. 58 assembly files were available at the following site:
>
> > Grabcad: https://grabcad.com/library/vz-58-rifle-1
>
> (3) The AR-10 assembly files were available at the following site:
>
> > Grabcad: https://grabcad.com/library/ar-10-battle-rifle-7-62x51mm-1
>
> (4) The Liberator pistol assembly files were available at the following sites:
>
> > Grabcad: https://grabcad.com/library/liberator-guns-full-1
> >
> > PirateBay:
> > https://thepiratebay.org/torrent/8444391/DefDist_Liberator_Pistol
>
> (5) The Beretta M9 assembly files were available at the following sites:
>
> > Grabcad: https://grabcad.com/library/beretta-92fs
>
> (6) The 1911 assembly files were available at the following sites:
>
> > Grabcad: https://grabcad.com/library/colt-m1911-a1-2
> > CNCguns: https://www.cncguns.com/downloads.html

1000002.1

Scanned with CamScanner

(7) The 10/22 assembly files were available at the following sites:

> Grabcad: https://grabcad.com/library/ruger-10-22-1
> CNCguns: https://www.cncguns.com/downloads.html

(8) The Ghost Gunner 2 assembly files (not ITAR-controlled) were available at the following site:

> Ghost Gunner: https://ghostgunner.net/downloads/

(9) The 308 80% lower model files were available at the following site:

> CNCguns: https://www.cncguns.com/downloads.html

(10) The AR-15 80% lower model files were available at the following sites:

> Grabcad: https://grabcad.com/library/mil-spec-ar-15-lower
> CNCguns: https://www.cncguns.com/downloads.html

**I declare under penalty of perjury that the foregoing is true and correct.**

**This the 15th day of August, 2018.**

Cody Wilson

1000002.1

Scanned with CamScanner

**Exhibit E**

The Honorable Robert S. Lasnik

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT SEATTLE**

| | |
|---|---|
| STATE OF WASHINGTON, et al. | No. 2:18-cv-01115-RSL |
| Plaintiffs, | |
| v. | **DECLARATION OF** **PALOMA HEINDORFF** |
| UNITED STATES DEPARTMENT OF STATE, et al., | |
| Defendants. | |

I, Paloma Heindorff, declare under penalty of perjury under the laws of the State of Texas and the United States of America that the following is true and correct:

1.      I am over the age of 18 and have personal knowledge of all the facts stated herein.

2.      I am a custodian of records and Director of Defense Distributed.  I am familiar with Defense Distributed's operations and the characteristics of both the persons that work at Defense Distributed and the persons that Defense Distributed speaks and associates with.

3.      I have reviewed in detail both the Plaintiff States' Motion to Compel Discovery Responses and all of its exhibits.

4.      Both on the whole and individually, complying the Plaintiffs States' interrogatories and requests would significantly and substantially interfere with

Defense Distributed's First Amendment right to engage in its desired associations and expressions about the distribution of digital firearms information.

5.  Complying with the Plaintiff States' Interrogatory Numbers 1, 3, 4, 5, 6, and 9 would significantly and substantially interfere with Defense Distributed's First Amendment right to engage in its desired associations and expressions about the distribution of digital firearms information. In particular, the interference would include (but would not be limited to) subjecting identified persons to harassment and community hostility, discouraging persons from affiliating with Defense Distributed, encouraging Defense Distributed's current affiliates to terminate their relationship with Defense Distributed, chilling the free flow of information within Defense Distributed, and chilling Defense Distributed's ability to freely speak and associate with outside persons about the distribution of digital firearms information. Also, the logistical demands entailed by compliance with these interrogatories would seriously impair and unduly disrupt Defense Distributed's normal operations, which are carried out by a small staff that is already fully dedicated to the company's existing day-to-day operations.

6.  Complying with the Plaintiff States' Request for Production Numbers 1, 2, 3, 4, 5, and 6 would significantly and substantially interfere with Defense Distributed's First Amendment right to engage in its desired associations and expressions about the distribution of digital firearms information. In particular, the interference would include (but would not be limited to) subjecting identified persons to harassment and community hostility, discouraging persons from affiliating with Defense Distributed, encouraging Defense Distributed's current affiliates to terminate their relationship with Defense Distributed, chilling the free flow of information within Defense Distributed, and chilling Defense Distributed's ability to freely speak and associate with outside persons about the distribution of digital firearms information. Also, the logistical demands entailed by compliance with these requests would seriously impair and unduly disrupt Defense Distributed's normal operations, which are carried out by a small staff that is already fully dedicated to the company's existing day-to-day operations.

7.  The foregoing conclusions draw support, in part, from the important role that anonymity plays with respect to Defense Distributed's associations and expressions This is true both internally—amongst the persons that work at Defense Distributed to study, create, synthesize, and distribute digital firearms information—and externally—amongst Defense Distributed and the persons that Defense Distributed associates with in distributing and discussing the digital firearms information at issue. In each of these respects, the prospect of complying with discovery efforts such as the instant requests chills the free flow of

information that is essential to the vibrant and open discussion of the technical, scientific, artistic, and political information that both Defense Distributed and its audience are committed to engaging in.

8.  The foregoing conclusions also draw support, in part, from the experience as Defense Distributed Director of both Cody Wilson and myself. Both experiences show that a substantial level of public harassment and community hostility befalls those who are publicly associated with Defense Distributed's efforts to distribute digital firearms information.

9.  Exhibit 1 to this declaration is a true and correct transcript of the public event at which New Jersey's Governor signed New Jersey Senate Bill 2465 into law alongside the New Jersey Attorney General and another New Jersey lawmaker. The statements made at this event about Defense Distributed and the individuals associated with Defense Distributed exemplify the kind of harassment and community hostility that would occur with respect to other persons if Defense Distributed is forced to disclose their identities as part of this action's discovery efforts.

10. Exhibits 2, 3, and 4 to this declaration are true and correct copies of letters sent by state law enforcement officials to Defense Distributed. The statements made about Defense Distributed in these letters exemplify the kind of harassment and community hostility that would occur with respect to other persons if Defense Distributed is forced to disclose their identities as part of this action's discovery efforts.

11. Exhibit 5 to this declaration is a true and correct copy of a letters sent by a state law enforcement official to one of Defense Distributed's website service providers. It too exemplifies the kind of harassment and community hostility that would occur with respect to other persons if Defense Distributed is forced to disclose their identities as part of this action's discovery efforts.

DATED this 17th day of December, 2018.

_____
Paloma Heindorff
Director, Defense Distributed

**Exhibit 1**

```
 1              IN THE UNITED STATES DISTRICT COURT

 2             FOR THE WESTERN DISTRICT OF TEXAS

 3                      AUSTIN DIVISION

 4

 5    DEFENSE DISTRIBUTED and  )  Case No. 1:18-CV-637-RO

 6    SECOND AMENDMENT          )

 7    FOUNDATION, INC.,         )  Plaintiff's Emergency

 8         Plaintiffs,          )  Motion for a Temporary

 9    v.                        )  Restraining Order and

10    GURBIR GREWAL, in his     )  Preliminary Injunction

11    Official capacity as      )

12    New Jersey Attorney       )

13    General; MICHAEL FEUER,   )

14    in his official capacity  )

15    as Los Angeles City       )

16    Attorney; ANDREW CUOMO,   )

17    in his official capacity  )

18    as New York Governor;     )

19    MATTHEW DENN, in his      )

20    official capacity as      )

21    Attorney General of the   )

22    State of Delaware; JOSH   )

23    SHAPIRO, in his official  )

24    capacity as Attorney      )

25    General of Pennsylvania;  )
```

1    and THOMAS WOLF, in his  )

2    official capacity as     )

3    Pennsylvania Governor,    )

4        Defendants.          )

5

6

7    *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

8              AUDIOTAPE TRANSCRIPTION OF

9              GOVERNOR SIGNS GHOST GUN BILL

10   *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25           TRANSCRIBED BY Donnette Cowgill

```
 1              P R O C E E D I N G S

 2              MR. RESIK:  Good afternoon, everyone.

 3    My name is John Resik (phonetic) and I'm a freshman,

 4    studying at Princeton University.  I grew up in

 5    Jersey City where, unfortunately, gun violence

 6    seemed to surround our community every single day,

 7    taking needless lives and cutting short the

 8    potential of so many.  I have family that still

 9    lives in Jersey City and while it continues to get

10    better and better, there's still needless gun

11    violence on the streets.

12              Last month, news broke that 11 people had

13    been killed at a Pittsburgh synagogue but closer to

14    home that same weekend, Jersey City teen, Jade

15    Saunders (phonetic) was shot and killed in front of

16    her friends.  This type of violence cannot continue.

17    It is through the sustained efforts of our leaders

18    that we can work toward a safer future where no

19    person has to worry about having their life cut

20    short for fear of a gun.

21              Thanks to some of the strictest gun safety

22    laws in the nation, New Jersey has one of the lowest

23    gun death rates in the country.  Since taking

24    office, Governor Murphy has done a phenomenal job in

25    enacting legislation to protect the citizens of New
```

1    Jersey.  Rather than a reaction-based approach to

2    gun safety, Governor Murphy has proactively signed

3    important laws that take commonsense steps to make

4    us safer.  He has mandated background checks, helped

5    put a system in place to keep guns out of the hands

6    of people who should not have them, and vowed to do

7    so much more.  Today, we take another stop toward a

8    better New Jersey as the governor prepares to sign

9    legislation that will outlaw ghost guns in this

10   state.

11        No weapon should ever be untraceable and

12   after today, our communities will not have to worry

13   about these firearms.  Thank you to Governor Murphy,

14   to Attorney General Gurbir Grewal, and all the

15   legislators who came and worked together to make

16   this a reality for the citizens of New Jersey.  It

17   is because of your continued efforts that the people

18   of New Jersey and the children of our state will

19   live and grow in a safer community.

20        Now it is my honor to introduce Governor

21   Phil Murphy.

22        GOVERNOR MURPHY:  Thank you, John.

23   Man, I'm a big John fan.  Thank you, John Resik, for

24   that -- for your introduction, for your efforts in

25   our fight against gun violence.  Your generation has

Governor Signs Ghost Gun Bill

1    already shown so much courage and resolve and I urge

2    you to keep at it.  And your brother, Peter, I think

3    lives in Squirrel Hill, right?

4              MR. RESIK:  Yeah, he does.

5              GOVERNOR MURPHY:  In Pittsburgh, and

6    I read your piece about that.

7              Before we jump into a -- the topic of the

8    day, which was scheduled before what happened

9    overnight -- but last night, we were given another

10   reminder as to why we need you, John, and your peers

11   to never give up.  In Thousand Oaks, California,

12   another mass shooting.  This time at a club hosting

13   a college theme night.  Eleven people who went out

14   just to be with their friends are now dead.  A

15   heroic Ventura County Sheriff's Sergeant responding

16   to the scene, Ron Helus, was also murdered.

17             Attorney General Grewal and I were both at

18   the Blue Mass at the cathedral in Newark this

19   morning for fallen officers, which reminds us of the

20   indelible impact that gun violence has on all of us

21   but also it's had on the lives of our law

22   enforcement brothers, sisters, and families.

23             Another 12 Americans whose lives have been

24   cut short by senseless gun violence.  At what point

25   do we finally wake up to the reality that we remain

1   the only advanced society that tolerates such horror

2   on such a regular basis?  At what point do we wake

3   up to the reality that we're the only advanced

4   nation so awash in easy-to-access guns?  When do we

5   finally put two and two together?  We dedicate today

6   and all of our efforts going forward to the simple

7   and commonsense premise that mass murder is not the

8   price we have to pay for the Second Amendment?

9           Peter and John and his generation have

10  already done more in the last year to move this

11  conversation forward than my generation, our

12  generation, has done in decades.  We need to listen.

13  We need to act.  And today we're doing just that.

14          It is an honor to stand up here with the

15  Attorney General, Gurbir Grewal -- honored to be

16  with you, General -- and dear friend, Senator Joe

17  Cryan, and importantly, not just Senator Joe Cryan,

18  a dear friend, former Sheriff Joe Cryan from Union

19  County.  Also honored in the front row, in Seat 1A,

20  to be joined by Mercer County Executive Brian

21  Hughes; Senior Advisor to my office, and dear

22  friend, on gun safety matters, Bill Castner; and the

23  rock in legislative 15th representatives, Senator

24  Shirley Turner, Assemblywoman Verlina Renolds-

25  Jackson and Assemblyman Anthony Verelli.  It's an

1  honor to be with you and, as usual, with the panoply

2  and colors of t-shirts with us today, more red than

3  blue, by the way.  The Brady folks are in the house

4  but the moms are here in the house in a big way.

5  But it's great to have you all here.

6          We're here for an important purpose.

7  We're here to close a dangerous loophole in our gun

8  laws and to expressly outlaw so-called ghost guns

9  here in New Jersey.  We are ensuring that anyone

10  caught possessing a homemade or a 3D printed

11  firearm, meaning guns manufactured specifically to

12  be untraceable by law enforcement, will be

13  prosecuted to the fullest extent of the law and face

14  up to five years in prison.

15          The Attorney General has been a national

16  leader in this fight.  Last June he issued a cease

17  and desist letter to the companies that deal in

18  ghost guns, saying explicitly that New Jersey is off

19  limits to them.  He joined like-minded attorneys

20  general in successfully stopping in federal court

21  the release of blueprints that would've allowed

22  anyone with a computer and access to a 3D printer

23  the ability to build their own, untraceable firearm.

24  This law that we're going to sign today further

25  backs up his efforts, and I thank him for all that

Governor Signs Ghost Gun Bill

1    he has done.  Thank you, Gurbir.

2           I thank Senator Cryan for his leadership,

3    generally, and specifically for sponsoring this bill

4    along with Senator Nick Scutari, Assemblyman Paul

5    Moriarty -- and I was back and forth with Paul many

6    times this morning, talking about last night in

7    Thousand Oaks and the importance of what we're doing

8    today -- Assemblyman Gary Schaer, and Assemblywoman

9    Annette Quijano, was well as the overwhelming

10   majority in the legislature who passed this bill --

11   and I might add by tremendous bipartisan margins.

12          These votes show that, unlike in

13   Washington, we could -- we can work across the aisle

14   to pass commonsense gun safety laws.  The NRA, to

15   the surprise of absolutely no one, has mocked the

16   effort to outlaw ghost guns.  Well, let them explain

17   why they would protect criminals who attempt to get

18   around our laws by buying ghost gun kits and

19   building untraceable guns.  I can't wait to hear

20   their excuses as to why.  Somehow, by some extreme

21   stretch of poorly conceived logic, untraceable and

22   undetectable ghost guns are a good thing that need

23   to be protected, not made illegal.  I just don't get

24   it.

25          Already this year, we have taken action to

1    ensure that our gun laws have the strength they need

2    to make our communities and families safer.  Signing

3    the first package of bills on June 13 ranks as one

4    of the most fulfilling days of my administration.

5    But we continue to do more because we must.  The

6    attorney general has taken the unprecedented step of

7    naming and shaming the sources of crime guns that

8    flow into New Jersey from states with lax laws.

9           I have said it before, I will say it

10   again:  plus or minus 80 percent of the crimes

11   committed -- gun crimes committed in this state are

12   committed with guns that illegally came into New

13   Jersey from outside of New Jersey, which means we

14   can't do this just by our self, although we have to

15   continue to do that; therefore, we've joined with

16   our fellow states in partnership to undertake

17   important gun safety research that Congress

18   stubbornly forbids.

19          Last week, I stood with the attorney

20   general and Assembly Majority Leader Lou Greenwald

21   to unveil our next round of commonsense bills that

22   will close remaining loopholes, institute sensible

23   regulations on ammunition sales, speed the

24   development of smart gun technology, and combat gun

25   violence in our communities, like Jersey City.

Governor Signs Ghost Gun Bill                                            10

1          We have all shared the shock and despair

2     of our fellow Americans following these mass

3     shootings, whether it was in Parkland, in Annapolis,

4     Pittsburgh, and now Thousand Oaks.  But we've been

5     spurred to act by the need to combat gun violence

6     right here in our own communities, right here

7     including in Trenton, which is why it's so important

8     that the legislators who do such an extraordinary

9     job are with us today.

10          I will not let the next generation of New

11    Jerseyans grow up in fear.  I have no intention of

12    letting up in the fight for commonsense gun safety,

13    and I know the leaders up here with me and in the

14    first row with me don't intend to let up.  I know

15    the grassroots advocates and activists, who have

16    been so strong through this fight and who I'm

17    honored to stand shoulder-to-shoulder with, don't

18    either.

19          I particularly want to acknowledge the

20    efforts of the Giffords Law Center, which brought

21    this issue to our attention and Every Town For Gun

22    Safety and the Brady Campaign to Prevent Gun

23    Violence, which helped us along the way.

24          We must change the conversation and we

25    will.  We will not let the NRA and their small

1    fringe of extremists instill their guns-in-every-

2    corner beliefs here in New Jersey.  Together, we

3    will win this battle.  It may be one step at a time,

4    one commonsense law at a time, but we will win it.

5            Thank you all so much, again, for

6    everything you do, particular our leaders here, our

7    activists -- thank you for everything.  It's now my

8    honor to introduce the attorney general of the great

9    state of New Jersey, Gurbir Grewal.

10            ATTORNEY GENERAL GREWAL:  Thank you,

11   Governor, and good afternoon everyone.

12            Here we are, yet again, gathering after

13   another tragedy, another mass shooting, another law

14   enforcement officer killed, another community in

15   mourning, another list of lives lost and families

16   shattered.  Now, while we don't know the full story

17   of what transpired in Thousand Oaks, California,

18   last night, we know this:  enough is enough.

19            And so we gather this afternoon, committed

20   as ever in our efforts to ensure public safety, to

21   ensure law enforcement safety, to ensure lawful gun

22   ownership, to combat the gun violence that plagues

23   communities across our state, and importantly, to

24   prevent the next Sandy Hook; the next Aurora,

25   Colorado; the next Oak Creek; the next Las Vegas;

1   Parkland; Pittsburgh; and now Thousand Oaks.  And

2   today, we're doing that by closing dangerous

3   loopholes in our existing laws -- loopholes that

4   some companies and individuals have tried to

5   exploit.

6           This summer, for example, a Texan named

7   Cody Wilson promised to publicly release computer

8   files that would let anyone, even terrorists,

9   felons, and domestic abusers, create firearms using

10  a 3D printer.  These guns would have no serial

11  numbers, meaning that they would be untraceable,

12  making it more difficult for our law enforcement

13  officers to solve gun crimes.  And because some of

14  these weapons would be made entirely of plastic,

15  they wouldn't necessarily activate metal detectors.

16  That meant these weapons would be particularly

17  appealing to anyone trying to access a secure

18  facility, whether it was a courthouse, an airport,

19  or a government building.

20          And so back in July, we successfully

21  challenged Cody Wilson in court.  We obtained legal

22  orders that temporarily halted the release of these

23  codes.  But his supporters are not relenting,

24  they're still trying to release these codes online.

25  And so it's clear that we need stronger tools to

1   stop them, tools like the -- excuse me -- tools like

2   the legislation crafted by Senator Cryan and that

3   Governor Murphy is signing today.

4          But it's not just about printable guns.

5   We have similar concerns about the so-called ghost

6   gun industry.  These folks know that they can't sell

7   their weapons -- weapons like assault weapons --

8   into New Jersey.  So instead, they sell all the

9   parts for these weapons and then provide a link to a

10  video that shows you how to build them at home.  So

11  they essentially sell you weapons that you couldn't

12  otherwise buy in the Garden State.  And they sell

13  you these weapons without conducting any background

14  checks.  And they sell you these weapons without

15  serial numbers on them so we can't trace them or

16  link them to their owners when they're found in

17  connection with gun crimes.

18          Their conduct poses a serious and

19  immediate threat to the community and to our law

20  enforcement officers.  But they believe that they

21  can do all of this with impunity because they're not

22  technically selling fully assembled assault weapons.

23  And so they incorrectly believe that our firearms

24  laws don't apply to them.

25          So earlier this year, we went after some

1    of the biggest players in this industry.  We told

2    them that they were wrong on the law.  We told them

3    that they were, in fact, breaking the law here in

4    New Jersey by selling those weapons here.  And we

5    told them to stop.  And some of them complied.  But

6    others did not, and so those investigations are

7    ongoing at this time.

8              But in both of those cases, bad actors

9    were trying to take advantage of loopholes because

10   no law squarely addressed printable guns or ghost

11   guns.  So we had to rely on other laws, like our

12   public nuisance law or our assault weapons law, to

13   fight back.  Now, don't get me wrong:  Those laws

14   are important and they're great tools and they

15   helped us stop the spread of these dangerous,

16   untraceable weapons, but a law right on point

17   strengthens law enforcement's hand even more.

18             And so today, there is no question that

19   printable guns and ghost guns are deadly and selling

20   them in New Jersey is illegal.  And that's why I'm

21   so proud to support Governor Murphy's efforts and

22   the legislature's efforts to close those loopholes,

23   to stop the next Cody Wilson, to fight the ghost gun

24   industry, and to regulate the next dangerous gun

25   models before they spread into our communities.

1          And here's my message today to anyone who

2   is contemplating making a printable gun or to the

3   next ghost gun company trying to sell their

4   dangerous weapons into New Jersey:  Your products

5   are unlawful and if you break our laws we will come

6   after you.  And to anyone else who thinks of trying

7   to find other loopholes in our laws, especially to

8   sell dangerous firearms, we're just as committed to

9   stopping each of you.  The safety of our residents,

10  the safety of our law enforcement officers demands

11  nothing less.

12          Thank you.

13          GOVERNOR MURPHY:  Well said, man.

14  Well said.  Well said and thank you, General, for

15  your leadership on this and so many other matters.

16          I -- I can't say enough good things about

17  the leadership and the public service of Senator Joe

18  Cryan, a guy who's got courage, who's willing to

19  stand up and speak truth to power, will occasionally

20  give me a -- a shot upside the head to make sure I

21  got my head screwed on straight, and I particularly

22  can't thank him enough -- he has to get in line, by

23  the way, to do that -- I -- I particularly can't

24  thank him enough for his leadership on this

25  incredibly important piece of legislation.  Ladies

1    and gentleman, Senator Joe Cryan.

2                SENATOR CRYAN:  Thank you, Governor.

3    Thank you.  Thank you.  Thank you.  Thank you,

4    Governor, and thanks for -- for the nice intro.

5                I just want to begin by acknowledging John

6    again.  We had a chance to chat, the three -- the

7    four of us, in the back.  John's a -- John's got a

8    remarkable story.  Grew up Jersey City.  His

9    brother, who was in Squirrel Hill, goes to Carnegie-

10   Mellon.  John's twin, Anna, was accepted to all

11   eight -- all nine Ivy League schools, eight Ivy --

12               MR. RESIK:  Eight.

13               SENATOR CRYAN:  -- all eight Ivy

14   League schools.  She chose Brown, for those of you

15   that are counting.  So John is the slouch in the

16   family.  He's -- he's in his freshman year in

17   Princeton.  So -- so John, thank you for being here.

18               MR. RESIK:  Thank you.

19               SENATOR CRYAN:  Governor, thank you

20   for your leadership on this -- in this -- for this

21   legislation and most importantly, thank you for

22   signing it in just a moment or two.

23               GOVERNOR MURPHY:  Thank you.

24               SENATOR CRYAN:  And I want to thank

25   some folks and the -- and then just tell you the

1    genesis as to how this bill came about, with the

2    advocates and how we molded a bill that began in one

3    area and became something much more important and

4    much more -- much more greater for the sum of its

5    parts.

6              I want to thank two folks who moved it out

7    of their houses -- Senate President Steve Sweeney

8    and Assembly Speaker Coughlin, and I want to thank

9    Kevin Drennan from the Majority Office and Skip

10   Ciminio from the Assembly Majority Office for their

11   leadership on this.  We were able to get these bills

12   on the same day coincided.  I thank them very much

13   for that, and I'd be remiss if I didn't thank my

14   Chief of Staff who helped coordinate all this, and

15   that's Jessica Cohen over there.  I appreciate it,

16   Jessica.  Thank you.

17             I have one other thank-you to say and --

18   and General, I know that the big guys do all the

19   work, but once in a while we let the others, right?

20             ATTORNEY GENERAL GREWAL:  Right.

21             SENATOR CRYAN:  And one of them is

22   Steve Finkel from your office who did an amazing

23   job.  Stephan, thank you for your work here.  We --

24   we appreciate it.

25             So the genesis of this bill was, as Phil

Governor Signs Ghost Gun Bill                                                        18

1   was nice enough to mention, I -- I used to have the

2   privilege of being the Union County Sheriff.  And

3   one of my officers came into the office one day and

4   sat down and said, "Look, you just got elected to

5   the senate but you need to start thinking about

6   this.  There are people here that can buy guns off

7   the internet and people we deal with that can buy

8   untraceable weapons," 80/20s is what he specifically

9   talked about.

10       Then he sat down on the computer and in

11  less than two minutes showed me how to buy an AR-15

12  unassembled that I could have, literally at that

13  moment, if I wanted to, with my credit card.  I was

14  flabbergasted, to tell you the truth.  I knew that

15  we had issues in the Sheriff's Office over a variety

16  of things, but perhaps the most important or most

17  difficult is when we dealt with untraceable weapons

18  in our crime scene unit and how important it is that

19  any sort of clue or ability to fingerprint or lift

20  anything we can from a crime scene.  Without the

21  idea of a serial number was frightening to all.

22       And if you wonder, when we talk about

23  untraceable, you get that, right?  That we don't

24  have a serial number, we can't find out where it

25  came from.  Think about for a moment -- and the

1    general mentioned it -- for those of you that have

2    walked through an airport scanner or any building

3    where you felt safer because you were scanned,

4    imagine the person behind you has a weapon that is

5    untraceable to that.  And that's what we're talking

6    about here.  This affects every individual in the

7    State of New Jersey, if not the country.  You know,

8    it's an important piece of the puzzle that the

9    governor has taken so much of leadership on with the

10   general and gun safety here in New Jersey and

11   throughout the nation.  When you think about that

12   and put it in context, we realize the importance of

13   today.

14          And with that in mind, we began with a

15   bill that began with just 80/20s, internet sales.

16   And thanks to the intervention of Bill Castner from

17   the Governor's Office and others, we took a

18   leadership role in amendment after amendment.  This

19   bill evolved, and which I think is -- is what makes

20   legislation particularly -- particularly special.

21   When you take an idea, you take the best ideas that

22   you can, people willing to work with you, whether

23   they're the leader of the state, the general of the

24   state, or folks that come by in advocacy and say,

25   "This is a better idea."

Governor Signs Ghost Gun Bill

1   We could've had this bill done a couple

2   months ago, but it wouldn't be the bill it is today.

3   And for that, I say thank you to the advocates and a

4   particular shout-out to Bill Castner for your work.

5   I appreciate it very much.

6   I finally want to say this:  If you don't

7   know what a 3D printer is, just google it and take a

8   look.  You're not talking about buying a cartridge

9   down at Staples.  And if you watch it and actually

10  watch videos of how one of these things can actually

11  be made, what Cody Wilson wants for New Jersey and

12  for this country -- which is stunning to me -- it is

13  frightening to watch, and it is alarming to

14  appreciate that people believe that somehow this is

15  a free right in America to have an untraceable,

16  undetectable weapon.

17  And whether it's for John, his amazing

18  sister and his amazing brother and their safety and

19  their generation's safety, or whether it's for our

20  safety or your mom's and your dad's safety -- it's

21  for everyone that, today, we sign this bill and,

22  today, we make New Jersey a little bit safer.  So I

23  thank you very much.  Thank you.

24  GOVERNOR MURPHY:  Well said, Senator.

25  Thank you, Joe, for that.  I'll take a couple of

1     questions before we sign this one on the dotted

2     line.  Please, Nick.

3                    AUDIENCE:  I -- I believe the

4     attorney general's cease and desist letter earlier

5     this summer actually said that untraceable assault

6     weapons were already illegal, and it's already

7     illegal to possess it, so how does this law strike

8     the matter of obtaining (inaudible)?

9                    ATTORNEY GENERAL GREWAL:  Sure.  As I

10    mentioned in my remarks, we were using the assault

11    weapon law to target those ghost gun manufacturers

12    because we didn't have a law directly on point

13    outlawing ghost guns, as this law does, that the

14    buying of these parts of these partially completed

15    guns is unlawful, so we were using another tool that

16    we had.  Now we have a tool directly on point to go

17    after future manufacturers or people who are still

18    persisting in marketing these products into New

19    Jersey.

20                   AUDIENCE:  Did you name those

21    manufacturers (inaudible)?

22                   ATTORNEY GENERAL GREWAL:  So the --

23    we sent, I -- I believe about seven or eight cease

24    and desist letters this -- earlier this summer.  I'm

25    not going to name them because like I mentioned in

Governor Signs Ghost Gun Bill                                          22

1   my remarks, some had complied, others have not.  I

2   don't want to flag the particular companies who

3   we're still investigating at this point, by naming

4   them.

5                GOVERNOR MURPHY:  I think the point

6   you make is a good one.  You could've cobbled this

7   together, but this, thanks to Joe's leadership and

8   the other sponsors, this is a -- a -- a precision

9   shot into this type of gun and that's what makes it

10  important.  Please.

11               AUDIENCE:  Governor, a question on

12  another topic.  Do you want me to wait?

13               GOVERNOR MURPHY:  You're kidding?

14  Any other -- I'll come back to you.  Any other gun

15  safety questions?  Anybody?  Please.

16               AUDIENCE:  Senate President Steve

17  Sweeney was with the Association of CPAs this

18  morning.  He was talking about a couple of different

19  things, including --

20               GOVERNOR MURPHY:  The Association of

21  CPAs?  Okay.

22               AUDIENCE:  CPAs.  And he was

23  discussing what was going on with the marijuana

24  legislation and why it hasn't gone through yet, and

25  one of the things he's talked about was the fact

1    that there is differing opinions about how much tax

2    should be charged for recreational marijuana.  He

3    said he wouldn't go higher than 12 percent.  I was

4    wondering, Governor, obviously, you have a lot of

5    input into this as it's moving forward.  What's your

6    feeling about this?  Is there any agreement on the

7    horizon?  What kind of -- should the towns get a cut

8    and piece of the action, in terms of the tax and

9    where are we right now?

10                   GOVERNOR MURPHY:  So, I -- I won't

11   get into the specifics of it because I would not

12   normally do that with a piece of legislation that's

13   evolving, and I've not married myself to a

14   particular tax rate.  The -- the key, I think, is

15   just as in sports betting, which by the way, is

16   booming and may it continue to do so, even when the

17   NFL is not in season -- you want to have a rate to

18   the consumer that allows you to eliminate, as best

19   you can, the black market.  And that's the key here.

20                   So I'm not sure I -- I -- I'm not sure

21   where the senate president gets that particular

22   number.  I don't begrudge him that, by the way, I

23   just have not married myself to a number.  I'm going

24   to defer to experts on this who have looked at how

25   -- how it's evolved in other states, in particular

Governor Signs Ghost Gun Bill

1   where the -- as -- as I've said many times and I

2   don't use marijuana -- I'm sure as heck glad we're

3   not state number one.  I want to do it; I want to do

4   it for the social justice reasons, but I want to do

5   it right.

6                    AUDIENCE:  Could I just follow, sir?

7                    GOVERNOR MURPHY:  Real quick, yeah.

8                    AUDIENCE:  With -- with regard to the

9   black market, he expressed the same concerns you're

10  talking about.

11                   GOVERNOR MURPHY:  Yep.

12                   AUDIENCE:  That you don't want to

13  push people that way.  In your mind, is there any

14  kind of a figure where that would happen or --

15                   GOVERNOR MURPHY:  I -- I don't have

16  a --

17                   AUDIENCE:  -- (inaudible) make sure

18  that --

19                   GOVERNOR MURPHY:  -- don't have a

20  specific number for you, but I share the same

21  passion that you want to -- it -- it's best -- you

22  know, why are we doing this?  We're doing this

23  because we have the widest white/non-white gap of

24  persons incarcerated in America.  It's not the only

25  reason but a big reason is low-end drug crime.  So

1    let's start with that and we -- by the way we've got

2    to have -- and I think we all agree on this -- we've

3    got to have a lookback provision that mirrors what

4    -- what it is that we're ultimately going to

5    legalize.

6              Secondly, we want to take the business out

7    of the hands of the bad guys.  Thirdly, we want to

8    protect our kids.  We want to regulate it, and

9    lastly, if we can make a few bucks on it, I'm --

10   count me -- count me in for that.

11             David?

12             AUDIENCE:  Governor, the Special

13   Committee on Investigations held their first meeting

14   today.  There has been some concern expressed by

15   some in your administration and others -- concern

16   about this becoming an unwieldy process and the

17   committee looking into areas that are not

18   necessarily part of their initial charge.  Are you

19   concerned that this could turn into some fishing

20   expedition?

21             GOVERNOR MURPHY:  You know, I'm --

22   I'm -- I'm -- I'm in the same place I've been --

23   Gurbir and I were in the Blue Mass, I think, when

24   they met this morning, so I haven't -- I haven't

25   really taken any time to see what -- what the

Governor Signs Ghost Gun Bill                              26

1    proceedings looked like. I respect the processes

2    that we've put in place. One is with a former

3    member of the supreme court, former chief counsel,

4    former chief of staff who's doing an investigation,

5    figuring out how the heck this happened.

6            Secondly, inside of government process led

7    by Mampta Patel (phonetic) to look at. You know, we

8    think we've got good laws and policies around EEO

9    and other matters, but, you know what, we can be

10   better. We know and we must be better. So, she's

11   leading a process on that respect and the attorney

12   general is leading the more holistic process. At

13   the end of the day, the one that's probably going to

14   have the most impact on a going-forward basis,

15   particular for survivors, and that is how can New

16   Jersey be the best in class in our entire country if

17   something like this awful happens to somebody.

18           So I respect those processes. I have no

19   reason not to respect the legislative process. I

20   think the -- the guidelines the -- this sort of the

21   benchmarks for all of us to keep in mind are: One,

22   is we stand with survivors. Two, we can't let

23   politics get into this at all. This has got to be

24   calling balls and strikes. And thirdly, it's got to

25   be a whole of government. We got to -- all of us,

Governor Signs Ghost Gun Bill

 1   as I said a couple weeks ago -- we're looking in the

 2   mirror and it, at times, that can be very

 3   uncomfortable.  And I just want to make sure that

 4   we're all going to look in the mirror together.

 5              Please.  Maybe one more.

 6              AUDIENCE:  Yes.  And in regards to

 7   last night's shooting, how will, you know, how will

 8   (inaudible) be address PTSD, you know, mental

 9   illness or (inaudible)?

10              GOVERNOR MURPHY:  Yeah, I'm not --

11   I'm not familiar with the details and as to whether

12   or not that was a causal factor but I will say this:

13   One of the things that I'm proud we've done -- away

14   from -- so let -- let me just stipulate.  We want to

15   be the number one state in the nation as it relates

16   to commonsense gun safety laws.  And we think

17   there's no reason we -- we can't be that and still

18   respect the Second Amendment.  So I find those

19   arguments to be completely unpersuasive and

20   obviously, we're going to sign, in a minute, another

21   piece toward that end.

22              I'm very proud that we, very early on in

23   our administration, opened up the medical marijuana

24   regime.  And I hope through legislation we could

25   continue to open it up.  And you're already seeing

1   thousands of more people qualified, the stigma

2   associated with physicians reducing, and PTSD is one

3   of the -- one of the list of maladies that is on

4   there and that's a big deal.  We -- as soon as I --

5   almost as soon as we had signed that executive

6   order, a guy walked up to me in a diner in East

7   Newark and said, "You've just changed my life."  So

8   I think it's -- a lot of the things that New Jersey

9   does well but we all need to, again, continue to

10  look in the mirror and ask ourselves, "How can we

11  even be better?" particularly with our veterans.

12          You know, we just continue to, as a

13  country, and I -- I think we do a good job, but we

14  must do a much better job in our state with veterans

15  as it relates to mental health, healthcare

16  generally, jobs, housing and homelessness.  Again,

17  relative to other states, I'm proud of where we are

18  but we're not where we need to be.

19          I think with that, we're going to turn to

20  the table, invite our distinguished guests in the

21  front row to come on up and join us, and let's sign

22  this.  Thank you-all.

23          Give you the money shot here.  I've got my

24  glasses.

25          Okay.

Governor Signs Ghost Gun Bill

1    Pen number one is the one and only, John

2    Resik.  Come on, man.

3    Attorney General Gurbir Grewal.  Thanks,

4    man.  Bless you.

5    Senator Joe Cryan.  God bless you, Joe.

6    (Inaudible.)

7    The Senator Shirley Turner from the house.

8    Assemblywoman Verlina Reynolds-Jackson.

9    Verlina, where are you?

10    Assemblyman Anthony Verelli.  (Inaudible.)

11    And last but not least, County Executive

12    (inaudible) Brian Hughes.

13    MR. HUGHES:  Anything you want to

14    call me, Joe.

15    GOVERNOR MURPHY:  Love you, buddy.

16    Congratulations.

17    This is now effective -- by the way, this

18    law is effective immediately.  It's the law of the

19    land.  Only I'm a man who (inaudible).  Thank you

20    all, so much, for coming up.

21    (End of Proceedings.)

22

23

24

25

```
 1                      CERTIFICATION

 2            TO THE AUDIO TRANSCRIPTION OF

 3                  RECORDED AUDIO OF

 4              GOVERNOR SIGNS GHOST BILL

 5

 6            I, DONNETTE COWGILL, do hereby

 7   certify that I have listened to and transcribed the

 8   above-referenced audio to the best of my ability.

 9            I FURTHER CERTIFY that the foregoing

10   pages comprise a true and correct computer

11   transcription by me of said audio.

12            Subscribed and sworn to by me on this

13   the 8th day of November, 2018.

14

15

16

17   _____

18                  Donnette Cowgill

19

20

21

22   Lexitas – Firm Registration No. 95

23   13101 Northwest Freeway, Suite 210

24   Houston, TX 77040

25   (281) 469-5580
```

**Exhibit 2**



**State of New Jersey**

OFFICE OF THE ATTORNEY GENERAL
DEPARTMENT OF LAW AND PUBLIC SAFETY
DIVISION OF LAW
PO Box 080
TRENTON, NJ 08625-0080

PHILIP D. MURPHY
*Governor*

SHEILA Y. OLIVER
*Lt. Governor*

GURBIR S. GREWAL
*Attorney General*

Defense Distributed
2320 Donley Dr., Suite C
Austin, TX 78758

July 26, 2018

To Whom It May Concern:

You are directed to cease and desist from publishing printable-gun computer files for use by New Jersey residents. The files you plan to publish offer individuals, including criminals, codes that they can use to create untraceable firearms—and even to make assault weapons that are illegal in my state. These computer codes are a threat to public safety, and posting them violates New Jersey's public nuisance and negligence laws. If you do not halt your efforts to proceed with publication, I will bring legal action against your company before August 1, 2018.

The computer files that you plan to publish will undermine the public safety of New Jersey residents. These files allow anyone with a 3-D printer to download your code and create a fully operational gun. More than that, the codes you plan to post will enable individuals to print assault weapons that are illegal in New Jersey. And because the printed guns would not have serial numbers, they would not be traceable by law enforcement. Worst of all, you are going to make the codes available to everyone—regardless of age, criminal status, or history of mental illness. That would undermine New Jersey's comprehensive scheme for keeping guns out of dangerous criminals' hands, and it would undermine the safety of our residents.

Not only are your codes dangerous, but posting them would also be illegal. New Jersey's law is clear: an individual who interferes with public health, safety, peace, and comfort violates our public nuisance law. *See James v. Arms Tech., Inc.*, 359 N.J. Super. 291, 329-33 (App. Div. 2003). As New Jersey courts have held, "[n]o one can seriously debate" that regulated guns are "dangerous instrumentalities" and thus implicate our public nuisance law. *Id.* at 320. So when a group of manufacturers "flood[ed] the gun market" through a high volume of sales, while failing to develop "reasonable safeguards over the distribution scheme" and "refus[ing] to oversee or supervise the control of handgun distribution in order to prevent the foreseeable channeling of guns to such an illegal market," New Jersey courts found they could be held responsible when their actions "facilitate[d] the illegal sale of weapons to criminals and other unlawful users." *Id.* at 312. That is what your actions will do as well—make do-it-yourself guns available to anyone, even if the individuals are prohibited from owning guns because of prior convictions, history of mental illness, or history of domestic violence, even if the weapons they print are illegal in my



July 26, 2018
Page 2

state, and even if they plan to use their weapons to further crimes and acts of violence. Because your actions will flood the illegal firearms market and pose a direct threat to the public safety of my state, they constitute a public nuisance.

Worse still, your comments make clear that you hope your actions will undermine all the efforts of states like New Jersey to keep guns out of criminals' hands. You have stated, "All this Parkland stuff, the students, all these dreams of 'common sense gun reforms'? No. The internet will serve guns, the gun is downloadable."[1] You have also stated, "I'm not worried about public safety."[2] And on July 10, 2018, you tweeted a photo of a gravestone engraved with the words "American Gun Reform."[3] These comments show that you have no intention of precluding your printable-gun computer files, including designs for assault weapons, from winding up in the hands of criminals, minors, and the mentally ill. Not only does that reveal a lack of regard for safety, but it also shows that your interference with the public's health and safety is intentional and per se unreasonable. *James*, 359 N.J. Super. at 330.

Finally, your widespread dissemination of printable-gun computer files is negligent because it encourages an illegal gun market, which will foreseeably lead to increased crime and violence in New Jersey, and which will lead to an increase in expenditures of public funds for combatting crime and protecting our resident's health. *See id.* at 308-24 (finding a legally valid negligence claim against same manufacturers of guns that flooded the illegal market). Your planned method of making codes available and your public comments show that you are ignoring and violating your duty. By broadly sharing an inherently dangerous product, you should reasonably foresee the resulting governmental and public costs and must bear them. *Id.* at 323-24.

As the chief law enforcement officer for New Jersey, I demand that you halt publication of the printable-gun computer files. Should you fail to comply with this letter, my Office will initiate legal action barring you from publishing these files before August 1, 2018.

Sincerely,

Gurbir S. Grewal
Attorney General

---

[1] Andy Greenberg, "A Landmark Legal Shift Opens Pandora's Box for DIY Guns," Wired (July 10, 2018), available at https://www.wired.com/story/a-landmark-legal-shift-opens-pandoras-box-for-diy-guns/.

[2] Tess Owen, "Get Ready for the New Era of 3D-Printed Guns Starting August 1," Vice News (July 18, 2018), available at https://news.vice.com/en_us/article/ev8xjn/get-ready-for-the-new-era-of-3d-printed-guns-starting-august-1.

[3] Cody R. Wilson (@Radomysisky), TWITTER (July 10, 2018, 12:25 P.M.), https://twitter.com/Radomysisky/status/1016765282017337344.

**Exhibit 3**



**MICHAEL N. FEUER**
City Attorney

July 27, 2018

The Hon. Robert Pitman
United States District Court for the
Western District of Texas
501 West 5th St., Suite 5300
Austin, TX 78701

      Re: *Defense Distributed et al. v. United States Department of State et al.,*
      (Case No. 15-CV-00372-RP).

Dear Judge Pitman:

      The purpose of this letter is to apprise the Court that the City of Los Angeles intends to move to intervene in *Defense Distributed, et al. v. Dep't of State, et al.*, Case No. 15-cv-372-RP (W.D. Tex.) (the "Litigation") to seek to enjoin Defense Distributed from publishing its blueprints of firearms and firearm components on the internet.  The City has a concrete, particularized, and legally protectable interest in the Litigation: the potential public distribution of Defense Distributed's blueprints on the internet would pose a direct and immediate threat to public safety in the City of Los Angeles, and cause numerous violations of California and City laws designed to protect the public from gun violence.

      I am the City Attorney for the City of Los Angeles (the "City").  As the City's chief lawyer and prosecutor, it is my job to enforce the gun laws of the City and California to ensure the safety of the City's nearly four million residents as well as its millions of visitors.[1]

      I have reviewed a settlement agreement (the "Agreement") purporting to resolve the Litigation.  Under the Agreement, the plaintiff, Defense Distributed, is allowed to publicly upload blueprints of firearms and firearm components to the Internet so that any terrorist, violent felon, domestic abuser, mentally ill individual, or minor with access to the Internet and a 3D printer may create completely untraceable and undetectable guns and gun components, including

---

[1] In 2016, Los Angeles County had over 47 million visitors.  https://www.discoverlosangeles.com/press-releases/facts-about-los-angeles.

The Honorable Robert Pitman
Page 2

"do-it-yourself" semi-automatic weapons.  This is not hyperbole.  Indeed, in paragraph 1(d) of the Agreement, the State Department acknowledges and agrees that temporary modification of the Category 1 munitions list permits "any United States person" to "access, discuss, use, reproduce, or otherwise benefit" from Defense Distributed's automated blueprints.  This will undoubtedly facilitate the manufacture of 3D guns in California, as well as the importation of such guns into California, in violation of numerous California and City laws.  The threat to public safety in our jurisdiction is clear.

For example, California law has labeled "undetectable firearms"—like those that Defense Distributed's blueprints may enable people to make—as a nuisance.  (Cal. Pen. Code § 24690.)[2] As such, my office is authorized to file lawsuits to "enjoin" the manufacture, importation, or possession of an undetectable firearm.  (*Id*. § 18010.)  Furthermore, under California law, it is also a crime to "manufacture[] or cause[] to be manufactured, import[] into the state, … or possess[] any undetectable firearm," subjecting a violator to imprisonment for up to a year.  (*Id*. § 24610.)  Defense Distributed's blueprints may allow individuals to print undetectable 3D firearms in direct violation of these laws.

The threat to public safety in Los Angeles posed by undetectable firearms is obvious and immeasurable.  For example, it is illegal under the Los Angeles Municipal Code ("LAMC") to possess the "frame, receiver or barrel of a firearm" at an airport.  (LAMC § 55.17(a)(1).)  This is for good reason; the Los Angeles International Airport is the fifth busiest airport in the world, and served over 84 million passengers in 2017.  https://www.businessinsider.com/busiest-airports-in-the-world-2018-2018-4#6-chicago-ohare-international-airport-ord-79828183-passengers-in-2017-15.[3]  One way we enforce this law is through the use of X-ray machines.  But undetectable gun and gun components may render metal detectors and X-ray machines useless.  Thus, the online distribution of Defense Distributed's blueprints will allow criminals and terrorists to evade our law.  How will we keep airports and airplanes safe?

It is also unlawful under California law to sell or transfer a manufactured or assembled firearm (Cal. Pen. Code § 29180(d)),[4] and to aid or abet certain high-risk individuals (e.g., felons, sex offenders, etc.) in the manufacture or assembly of a firearm.  (*Id*. § 29180(e).) Defense Distributed's blueprints will allow individuals to circumvent these laws with ease.

In addition, numerous other California and City laws will be directly undermined by the publishing of Defense Distributed's blueprints.  For example, it is a felony in California to manufacture, import, or sell an assault weapon, punishable by up to eight years in prison.  (Cal.

---

[2] An undetectable firearm is generally defined as a weapon that is not detectable by a walk-through metal detector or "the types of X-ray machines commonly used at airports."  (Cal. Pen. Code § 17280.)

[3] In addition to the significant traffic through Los Angeles's airport, the Port of Los Angeles is the largest container port in North America.  https://www.portoflosangeles.org/about/facts.asp.  This is another potential access point for 3D guns to slip into Los Angeles undetected.

[4] "For purposes of this chapter, 'manufacturing' or 'assembling' a firearm means to fabricate or construct a firearm, or to fit together the component parts of a firearm to construct a firearm."  (Cal. Pen. Code § 29180(a).)

The Honorable Robert Pitman
Page 3

Pen. Code § 30600(a).)   Defense Distributed's blueprints may allow individuals to print 3D assault weapons in direct violation of this law.

California also has a comprehensive scheme to ensure that firearms do not fall into the hands of felons and other individuals deemed by the court system to pose a danger to others as a result of mental disorder or illness through a robust background check process.  (Cal. Pen. Code §§ 26815, 28210, 28220, 29800; Cal. Wel. & Inst. Code §§ 8103-04.)  And the City has similar laws designed to prevent gun violence and assist law enforcement in the apprehension of those who misuse firearms.  (*See*, *e.g.*, LAMC § 55.14 (prohibiting the purchase and sale of more than one handgun to the same person in a thirty day period); *id*. § 55.15 (requiring fingerprinting of firearms purchasers).)  All of these laws are directly undermined if felons can simply print their own 3D firearms with the assistance of Defense Distributed's blueprints.

In sum, the potential public distribution of Defense Distributed's blueprints would pose a direct and immediate threat to public safety in the City and would directly cause numerous violations of California and City law.  We were recently made aware of the hearing this Court will hold this afternoon on the Motion to Intervene by The Brady Campaign to Prevent Gun Violence, Everytown for Gun Safety Action Fund, Inc. and Giffords ("the Proposed Intervenors").  We urge the Court to grant the Proposed Intervenors' Motion, and respectfully apprise the Court of our intent to move to intervene ourselves at our earliest opportunity.

Very truly yours,

By:
MICHAEL N. FEUER
Los Angeles City Attorney

𝔗𝔧 𝔗𝔘𝔣 &



**DEPARTMENT OF JUSTICE**

MATTHEW P. DENN
ATTORNEY GENERAL

820 NORTH FRENCH STREET
WILMINGTON, DELAWARE 19801

PHONE (302) 577-8400
FAX (302) 577-2610

July 30, 2018

Defense Distributed
2320 Donley Dr., Suite C
Austin, TX 78758
crw@defdist.org

To Whom It May Concern:

You are hereby directed to cease and desist from publishing printable gun computer files for use by Delaware residents. The State of Delaware Department of Justice will take legal action to prevent any effort by Defense Distributed intended to publish or offer individuals – including criminals – programs, codes, drawings, or other sources of data that an individual can use to create untraceable firearms. Any such action constitutes a threat to public safety and a likely violation of our criminal law. Any action to disseminate this information constitutes a violation of the State of Delaware's nuisance and negligence laws. If you do not immediately halt your efforts to distribute this information, by whatever electronic form and by whatever electronic means, Delaware DOJ will bring legal action against your company.

Because the printed guns would not have serial numbers, they will permit the untraceable use of firearms and prevent effective law enforcement. Due to the nature of your intended distribution of this date, everyone – regardless of age, criminal status, or mental health history – will be able to own a firearm. Your action would seriously undermine the safety of our residents. *See* 11 *Del. C.* §1448.

A person who engages in conduct that is unlawful or unreasonable under the circumstances and who knowingly or recklessly creates or maintains a condition that endangers the health or safety of others, is guilty of Criminal Nuisance. 11 *Del.C.* §1322(1). *See also, e.g.* 11 *Del.C.* §§ 1444 and 1447. Your public comments and deliberate indifference to the safety of citizens in Delaware is disturbing. Your public comments and statements are evidence of the reckless nature of your intended actions and will be considered in a civil enforcement action.

Delaware DOJ demands that you halt publication of the printable-gun computer files in the State of Delaware immediately.  Should you fail to comply with this letter, our office will initiate legal action barring you from publishing these files and seeking costs and attorney fees in order to make the public whole.

Sincerely,

Matthew Denn
Delaware Attorney General

**Exhibit 5**



## *State of New Jersey*

OFFICE OF THE ATTORNEY GENERAL
DEPARTMENT OF LAW AND PUBLIC SAFETY
DIVISION OF LAW
PO Box 080
TRENTON, NJ 08625-0080

PHILIP D. MURPHY
*Governor*

SHEILA Y. OLIVER
*Lt. Governor*

GURBIR S. GREWAL
*Attorney General*

Legal Department
DreamHost
707 Wilshire Boulevard, Suite 5050
Los Angeles, CA 90017

July 30, 2018

To Whom It May Concern:

I write to inform you that the website https://defcad.com/ ("Defcad Website"), operated by the company Defense Distributed, is violating your Acceptable Use Policy. Starting on Wednesday, Defense Distributed plans to publish computer files on the Defcad Website that enable anyone with a 3-D printer to download codes to create a fully operational firearm. These files specifically offer individuals, including criminals, codes they can use to create untraceable firearms—and even to make assault weapons that are illegal in my state. The codes put law enforcement safety and public safety at risk, and posting them violates New Jersey's public nuisance and negligence laws. I sent a cease and desist letter to Defense Distributed on July 26, 2018, based on violations of New Jersey law, and filed suit in state court today. Because your Acceptable Use Policy bars websites from transmitting material in violation of state law, Defense Distributed's plans will be in violation of that policy.

There is no doubt that the codes Defense Distributed will place on the Defcad Website undermine the public safety of New Jersey residents and law enforcement officers. These files allow anyone with a 3-D printer to create a fully operational gun. The codes enable individuals to print assault weapons that are illegal in New Jersey. And because these guns would not have serial numbers, they cannot be traced by law enforcement. The codes will be available to all—regardless of age, criminal status, or history of mental illness. These codes thus undermine New Jersey's comprehensive scheme for keeping guns out of dangerous criminals' hands.

Not only are these codes dangerous, but posting them would also be illegal. New Jersey's law is clear: an individual who interferes with public health, safety, peace, and comfort violates our public nuisance law. *See James v. Arms Tech., Inc.*, 359 N.J. Super. 291, 329-33 (App. Div. 2003). As New Jersey courts have held, "[n]o one can seriously debate" that regulated guns are "dangerous instrumentalities" and thus implicate our public nuisance law. *Id.* at 320. So when a group of manufacturers "flood[ed] the gun market" through a high volume of sales, while failing to develop "reasonable safeguards over the distribution scheme" and "refus[ing] to oversee or

July 30, 2018
Page 2

supervise the control of handgun distribution in order to prevent the foreseeable channeling of guns to such an illegal market," New Jersey courts found they could be held responsible when their actions "facilitate[d] the illegal sale of weapons to criminals and other unlawful users." *Id.* at 312. That is what Defense Distributed's actions on the Defcad Website will do—make do-it-yourself guns available to all, even if the individuals are prohibited from owning guns because of prior convictions, history of mental illness, or history of domestic violence, even if the weapons they print are illegal in New Jersey, and even if they plan to use their weapons to further crimes and acts of violence.

Indeed, Defense Distributed seeks to use the Defcad Website to undermine all the efforts of states like New Jersey to keep guns out of criminals' hands. As Defense Distributed found Cody Wilson stated, "All this Parkland stuff, the students, all these dreams of 'common sense gun reforms'? No. The internet will serve guns, the gun is downloadable."[1] Wilson also stated, "I'm not worried about public safety."[2] Not only does that reveal a lack of regard for safety, but it also shows that Defense Distributed's interference with the public's safety is intentional and thus per se unreasonable. *James*, 359 N.J. Super. at 330.

As a result, Defense Distributed is plainly planning to use the Defcad Website in a way that violates DreamHost's Acceptable Use Policy. Your Policy says that the "Customer may only use DreamHost Web Hosting's Server for lawful purpose. Transmission of any material in violation of any Country, Federal, State or Local regulation is prohibited…. Also, using DreamHost's servers or network to conspire to commit or support the commission of illegal activities is forbidden."[3] Violations may "result in immediate and permanent disablement" of the customer's website. That is why I write to inform you that Defense Distributed will be using the Defcad Website to violate New Jersey law.

Sincerely,

Gurbir S. Grewal
Attorney General

---

[1] Andy Greenberg, "A Landmark Legal Shift Opens Pandora's Box for DIY Guns," Wired (July 10, 2018), available at https://www.wired.com/story/a-landmark-legal-shift-opens-pandoras-box-for-diy-guns/.

[2] Tess Owen, "Get Ready for the New Era of 3D-Printed Guns Starting August 1," Vice News (July 18, 2018), available at https://news.vice.com/en_us/article/ev8xjn/get-ready-for-the-new-era-of-3d-printed-guns-starting-august-1.

[3] "Acceptable Use Policy," available at https://www.dreamhost.com/legal/acceptableuse-policy/.