Exhibit 3

The Honorable Robert S. Lasnik

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | | |
|---|---|---|
| STATE OF WASHINGTON, et al., | ) | No. 2:18-cv-1115-RSL |
| Plaintiffs, | ) | |
| v. | ) | |
| UNITED STATES DEPARTMENT OF STATE, et al., | ) | **DECLARATION IN SUPPORT OF THE FEDERAL DEFENDANTS' DISCOVERY RESPONSE** |
| Defendants. | ) | |

MONJAY DECLARATION IN SUPPORT OF THE FEDERAL DEFENDANTS' DISCOVERY
RESPONSE
*State of Washington, et al. v. Dep't of State, et al.*, 2:18-cv-1115-RSL

U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
450 Golden Gate Ave.
San Francisco, CA 94102
Tel: (415) 436-6635

I, Robert Monjay, do hereby declare as follows:

1.  I am a Foreign Affairs Officer and acting Co-Division Chief of the Technology and Jurisdictional Analysis Division, within the Directorate of Defense Trade Controls ("DDTC"), in the Bureau of Political-Military Affairs, U.S. Department of State (the "Department"). I have held this position since February 2019, and my responsibilities include management of the United States Munitions List (USML) review and update for the Department. I have worked in DDTC since February 2015, including in a variety of positions covering export control issues.

2.  I had primary staff-level responsibility for reviewing the comments received on the Department's Notice of Proposed Rulemaking (NPRM) "International Traffic in Arms Regulations: U.S. Munitions List Categories I, II, and IIII," 83 Fed. Reg. 24198 (May 24, 2018). The comment period on the NPRM closed July 9, 2018. The Department received 3250 comments on this rule, which includes 3181 comments submitted through the website regulations.gov and 69 comments submitted directly to the Department.

3.  During the comment acceptance period (May 24, 2018 through July 9, 2018), I monitored comments the Department received directly and through regulations.gov. I reviewed the submissions during this time to verify that they were uploading correctly and were legible, and to gauge the general volume of response to the NPRM in order to more accurately forecast resources and timing for development of a final rule. I quickly skimmed some comments for content. From time to time I updated the acting Division Chief for the Regulatory and Multilateral Affairs Division (Robert Hart), the Director of the Office of Defense Trade Controls Policy (Sarah Heidema), and the acting Deputy Assistant Secretary of State for Defense Trade Controls (Michael Miller), on the volume of comments received and my preliminary assessment of the general content of the comments. I cannot recall each of these updates with specificity;

MONJAY DECLARATION IN SUPPORT OF THE FEDERAL DEFENDANTS' DISCOVERY RESPONSE
*State of Washington, et al. v. Dep't of State, et al.*, 2:18-cv-1115-RSL

U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
450 Golden Gate Ave.
San Francisco, CA 94102
Tel: (415) 436-6635

however, to the best of my recollection, I provided updates on approximately a dozen occasions during the period May 24, 2018 through July 9, 2018.  These updates were generally provided as part of staff meetings on a variety of topics in which the NPRM was discussed and during unscheduled encounters with these officials.

4.   I received a download of the comments submitted through regulations.gov on July 12, 2018 (*see* Exhibit A).  After receiving the download, I began reviewing the comments for duplicates and bulk submissions.  I recall mentioning or discussing in early July 2018 the comment letters included in Exhibit B with others in the Department.  I recall discussing the comment letter from Susan Waltz, specifically the issue of various statutes referring to "defense articles," with the acting Division Chief for the Regulatory and Multilateral Affairs Division, but I do not specifically recall any one else with whom I discussed these comments.  I further recall being advised by the Bureau's Congressional and Public Affairs Director (Joshua Paul), that three United States Senators, Sen. Robert Menendez (N.J.), Sen. Ben Cardin (Md.), and Sen. Dianne Feinstein (Cal.) had jointly submitted a comment through regulations.gov, at which time I located the comment and shared a link to it with DDTC and Bureau of Political-Military Affairs leadership (*see* Exhibit C).  After litigants, including Giffords Law Center, the Brady Center, and the Brady Campaign to Prevent Gun Violence, filed motions to intervene in the matter of *Defense Distributed, et al. v. U.S. Department of State, et al.*, No. 1:15-cv-00372-RP (W.D. Tex.), I confirmed that they had submitted comments on the NPRM (*see* Exhibit D).

5.   By July 20, 2018 I had identified an initial set of 49 substantive comments that required in-depth review and analysis (*see* Exhibit E).  On July 20, 2018, I delegated the review and analysis of these comments to two of my coworkers to prepare a draft for my review during a period when I was absent from Washington, DC for travel abroad on temporary duty.  From July

MONJAY DECLARATION IN SUPPORT OF THE FEDERAL DEFENDANTS' DISCOVERY RESPONSE
*State of Washington, et al. v. Dep't of State, et al.*, 2:18-cv-1115-RSL

U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
450 Golden Gate Ave.
San Francisco, CA 94102
Tel: (415) 436-6635

21, 2018 until July 30, 2018, I was out of the office for this travel abroad; however, as part of the process of preparing this declaration, I have been informed that my coworkers began to review the comments on approximately July 25, 2018 and that they did not discuss them with DDTC leadership prior to July 27, 2018.  I began my own substantive review of the full set of comments beginning in mid-August 2018.  Apart from myself and these coworkers, to whom I delegated responsibilities, no other Department personnel were responsible for the review of comments received on the NPRM.

6.  I assisted other staff in the Directorate of Defense Trade Controls Policy Office in the drafting of the text of the Temporary Modification of the ITAR, letter to Defense Distributed, and website announcement, based on the text of the settlement agreement.  To the best of my recollection, my assistance was limited to technical drafting assistance to ensure that the text did what was provided in the settlement agreement and to ensure that the website announcement appropriately described the actions being taken by the Department, including which documents could be posted on the Department's website with the website announcement.  To the best of my recollection, I did not consider the comments to the NPRM during this process.


Pursuant to 28 U.S.C. § 1746, I certify under penalty of perjury that the foregoing is true and correct.

Executed this 16th day of April, 2019.


Robert Monjay
Foreign Affairs Officer
Office of Defense Trade Controls Policy
Directorate of Defense Trade Controls
Bureau of Political Military Affairs

MONJAY DECLARATION IN SUPPORT OF THE FEDERAL DEFENDANTS' DISCOVERY RESPONSE
*State of Washington, et al. v. Dep't of State, et al.*, 2:18-cv-1115-RSL

**U.S. DEPARTMENT OF JUSTICE**
Civil Division, Federal Programs Branch
450 Golden Gate Ave.
San Francisco, CA 94102
Tel: (415) 436-6635

# Exhibit A

**NO DISCERNIBLE CLASSIFICATION**

| | |
|---|---|
| **From:** | Peckham, Yvonne M |
| **Sent:** | Thursday, July 12, 2018 6:51 AM |
| **To:** | Monjay, Robert |
| **Cc:** | Peckham, Yvonne M; Kottmyer, Alice M |
| **Subject:** | FW: You have received a FileCatalyst Webmail package from FDMS EXTRACT |

Rob,

Sending you the comments received for AE30.

Yvonne

Yvonne Peckham
Management Analyst
Office of Directives Management
Department of State
Suite 2400, SA 22
1800 G Street NW
Washington, DC
202-312-9613

---

**From:** FDMS EXTRACT <USG_ERULE_EXTRACT@bah.com>
**Sent:** Wednesday, July 11, 2018 3:19 PM
**To:** Peckham, Yvonne M <PeckhamYM@state.gov>
**Subject:** You have received a FileCatalyst Webmail package from FDMS EXTRACT

**Enterprise solution for sending large files**

**You received a File Package from FDMS EXTRACT**

**Click on the tracking number to download your files**

| | |
|---|---|
| Sender's Name: | FDMS EXTRACT |
| Link to download: | https://filetransfer.fdms.gov/fcweb/GET/123R0JPQJ902GN0B |
| | Please use the following PIN number to download the files:  648142 |
| | For security reasons, the file will be downloaded with the .z1p extension. After your file download is complete, open the folder where you saved the file and rename the file with the extension changed from 'z1p' to 'zip'. |
| | Your file package will be available for 14 days. |
| Unable to open the link? | Click on this link https://filetransfer.fdms.gov/fcweb/jsp/downloadFiles.jsp and paste the following tracking number: 123R0JPQJ902GN0B and then enter the PIN (if required). |
| Message from Sender: | Your FDMS bulk extract is ready to be downloaded. |
| Files Sent with Package: | DOS-2017-0046 2018-07-11 15-01-38.z1p |
| Total File Size: | 9922 KB |

Thank you for using FileCatalyst®.

Exhibit B

30 June 2018

To:        DDTCPublicComments@state.gov
                Office of Defense Trade Controls Policy, Department of State
                     and
                Regulatory Policy Division, Bureau of Industry and Security, U.S. Department of
                Commerce, Room 2099B, 14th Street and Pennsylvania Avenue NW, Washington DC
                20230

Subject:    ITAR Amendment - Categories I  II, and III
                EAR Amendment - RIN 0694-AF47

---

I am writing to submit comments on the proposed changes to ITAR (USML) and EAR (CCL) recently published in the Federal Register. I write in a personal capacity but the views expressed are informed by my research, policy analysis, and teaching as a professor at the University of Michigan, Gerald R. Ford School of Public Policy.

By way of a few introductory remarks, I am familiar with the complexities of US arms export laws and policy, as well as the regulatory framework.  There is a legitimate need for periodic updates of the USML and—in view of the labyrinth of entangled laws, regulations, and agencies involved in the current system—I am supportive of the reform initiative.  I am generally more concerned about keeping weapons out of the hands of those who would misuse them than in making them easier to procure, but that end is not at odds with the objective of putting in place a single control list and a single administrative agency. The reform effort has not progressed to that point, however, and I am wary about these proposed regulatory changes as an interim step. I will also add that I have been following the export control reform project since it was announced in 2009 and this is the only time I have felt the need to express concerns about the proposed changes. That is largely due to the particular, complete and recognizable, weapons that are being considered for change.

**1.      I urge you to delay the effective date of the proposed changes until the Government Accounting Office or the Library of Congress has publicly reported to the Congress their impact on numerous statutes referring to "defense articles."**

If enacted, the changes would have implications for several provisions of law.  From my reading of both sets of proposed regulations, I am not reassured that the implications have been fully considered. The USML is formally defined in the AECA (22 USC 2778) as a definitive list of defense articles,[1] and from a quick search of US statutes the term "defense article" appears in some 45 sections,[2] in many instances (but

---

[1] 22 USC 2778(a)(1).

[2] Office of the Law Revision Counsel, United States Code, http://www.uscode.house.gov.

not always) explicitly linked to the USML. In addition, several provisions of the AECA itself are explicitly linked to an item's presence on the USML (without necessarily referring to "defense articles"). On a separate statutory track, the Foreign Assistance Act was recently amended to include CCL 600 series items as defense articles, along with all items contained on the USML [22 USC 2304.(d)(2)(C)], but the legislation did not anticipate the new 500 series so there is likely a gap there with regards to Congressional intentions. To complicate things further, the US Munitions Import List (USMIL) makes liberal use of the term "defense article," defined as articles on the USMIL–which currently include the same items that are slated to lose the "defense article" designation that extends from inclusion on the USML – so that items designated as defense articles on the USMIL will not be considered defense articles for purposes of export.[3]

It is very challenging to sort out the tangle.  Some of the instances where terms and definitions are at variance may not prove significant, but others may have far-reaching implications. Due to the disparate definitions and linkages, the proposal to remove specified firearms from the USML raises some important questions about the continuing applicability of provisions of law that refer to "defense articles," a term that currently encompasses such firearms.  In numerous situations the current statutory treatment of non-automatic firearms would be altered – or at least become ambiguous—as a result simply of moving these weapons from Category I of the USML to the 500-series on CCL. Statutory provisions that could be affected by the proposed change range from Export-Import Bank financing of defense article sales to human rights conditionality on security assistance, to the provisions for third-party transfer of grant-supplied defense articles, and various reports to Congress.  (See references in the footnote below.[4]) In some cases, the law in question is not directly linked to arms exports, but the relevant statute refers to defense articles and links the definition to items on the USML. In this way, removing specified firearms from the USML is likely to have a host of unintended and unanticipated repercussions.

Further, if semi-automatic weapons and other non-automatic firearms are removed from the USML it will impact the ability of law enforcement to charge weapons traffickers with violating the AECA as was done in several of the cases cited in a recent report from the Department of Justice on export enforcement.[5]

---

[3] 27 CFR 447.11 and 27 CFR 447.21.

[4] The numerous places where the meaning of "defense article" would be called into question by the proposed rules include:
- Export-Import Bank financing of defense article sales, including multiple end use considerations and other conditions (12 USC 635);
- Requirement to give Congress notice of commercial firearms sales of $1,000,000 or more (22 USC 2776)
- Annual report to Congress on military assistance, and specifically on transfers of USML Category I firearms (22 USC 2415)
- Provisions for supplying defense articles on a grant-basis, and multiple restrictions (22 USC 2314)
- Conditions for third-party transfer of defense articles provided on a grant basis (22 USC 2314)
- Certification of end use as a condition of sale or lease of defense article (22 USC 2753)
- Post-delivery verification of credible reports of misuse of weapons (22 USC 2753)
- Brokers of items included on the USML are required to register and activity must be licensed; exporters of USML items must identify all consignees and freight forwarders in license application (22 USC 2778)

[5] Department of Justice, "Summary Of Major U.S. Export Enforcement, Economic Espionage, And Sanctions-Related Criminal Cases," January 2018, https://www.justice.gov/nsd/page/file/1044446/download .

As Acting Assistant Secretary for Political-Military Affairs Tina Kaidanow explained to the House Foreign Affairs Committee last June,[6] the US arms export architecture is very complex and involves what her predecessors have described as "cradle to grave" oversight of exported US *defense articles*. Removing that designation *defense article* from weapons that are not fully automatic has the effect of detaching them from the US Munitions List and the regulatory framework built around it: there may well be significant unintended consequences.

In the event that consideration of the proposals is not delayed, I would recommend several other changes to the proposed ITAR and EAR revisions.

**2.     Retain existing USML I(a) and (d) unchanged; retain the existing coverage of USML II(a) unchanged; delete proposed 0A501.a and .b; and limit proposed 0A502 to renumbering existing 0A984.**

My concern here is based on principle and definition. Several of the weapons that would be moved to CCL are military-style weapons that are either used in battlefield situations or are substantially comparable to weapons as used in battlefield situations – including semi-automatic assault rifles and bolt-action sniper rifles. All of USML I(a), I(d), and II(a) are currently designated "significant military equipment" due to "their capacity for substantial military utility or capability," per the ITAR definition.[7]  The prevalence of armed extremists and insurgents who depend on weapons currently included in USML Categories I and II makes the military utility or capability of these weapons as relevant as ever. Due to their size and long shelf life, firearms are easily diverted and resold on black markets around the world. The Department of Justice's January 2018 summary of major US export enforcement cases noted above includes recent smuggling of semi-automatic assault rifles (and other firearms) to Dominican Republic, the Gambia, Russia via Latvia, Thailand and other destinations. In addition, the report documents the case of two men in Georgia attempting to export firearms to a range of international on the dark net, and another similar case from Kansas.[8]

While the US military may not derive great advantage from most of these weapons, they still have the military utility and capability of threatening the lives and welfare of many people around the world.   It is in the interest of the US and American citizens to keep the tightest control on them. Indeed, it is for that very reason that the same weapons being proposed for removal from the US Munitions List are expected to remain on the US Munitions *Import* List, where their entry into the US will remain tightly controlled. It is also for that reason that a growing number of states are imposing limitations on the retail availability of these weapons and many retailers are voluntarily removing them from their shelves.  They should remain where they are, on the USML.

---

[6]  "Foreign Military Sales: Process and Policy," testimony from Tina S. Kaidanow, Acting Assistant Secretary, Bureau of Political-Military Affairs, Statement Before the Subcommittee on Terrorism, Nonproliferation and Trade, House Foreign Affairs Committee, June 2017. https://www.state.gov/t/pm/rls/rm/2017/271928.htm.

[7] 22 CFR 120.7 at https://www.gpo.gov/fdsys/pkg/CFR-2004-title22-vol1/pdf/CFR-2004-title22-vol1-sec120-7.pdf .

[8] Department of Justice, op. cit..

**3.     Before proposed regulatory changes are adopted, an opinion should be obtained from the Department of Justice concerning the legality of applying ITAR brokering restrictions to exports of firearms transferred from the USML to the CCL.  Furthermore, Congress and the public should be informed as to how the proposed arrangements will address the risk of diversion.**

There are several reasons to be concerned about the proposed rules pertaining to brokering.
From their origin in the 1930s, a major intent of efforts to regulate arms exports has been to curtail illicit and undesirable trafficking in weapons. In the 1980s and 1990s, illicit flows of small arms flooded international markets, with calamitous effects in every region of the world. The rate of flow may have slowed since the 1990s, but as the 2018 Justice Department report attests, the efforts to supply contraband firearms are very much alive in our own time. From a global perspective, brokering laws are considered a weak link in the regulatory apparatus, to the extent that in the 1990s there was some talk of negotiating an international treaty focused entirely on arms brokering. Provisions written into US law around that time were considered some of the strongest in the world. With the transfer of specified semi-automatic and non-automatic weapons to CCL, the brokering laws would no longer be applied to these weapons (or would be applied only in a much-weakened version) and they would not be available to law enforcement for prosecution purposes.

**My specific concerns with the proposal to apply existing AECA/ITAR brokering rules to items intended for transfer to the CCL are twofold, related to the dubious statutory underpinnings of the proposed rule change and to its practical implications.**

(a) <u>The first concern is a matter of statutory coherence and proper statutory authority</u>. The brokering clauses of the AECA require commercial brokers involved in the transfer of defense articles to register with the State Department and apply for their transactions to be licensed (22 USC 2778).[9] The AECA brokering provisions are explicitly linked to defense articles on the USML (and by implication, ITAR). Because the proposed changes to ITAR and CCL would remove specified non-automatic and semi-automatic firearms from the USML, on the face of it, it would seem that commercial brokers of these items would be released from ITAR registration and brokering requirements. To prevent this outcome, the State Department proposes a patch, by asserting that the AECA brokering provisions will also apply to the US Munitions *Import* List (which, as noted above, will continue to include the items that—for export purpose—are deemed no longer to warrant control under the USML). The intended effect is that brokers wanting to *export* items included on the list of items controlled as defense articles for *import* (but not for export) will be subject to the rules pertaining to the export of such items. The logic is convoluted at best, and it raises questions about the statutory grounding for requiring brokers who are exporting items "no longer warranting control under USML" to register with the State Department and comply with related ITAR requirements. Given the complexity of the issue and the risks associated with brokering activities, it would seem advisable and prudent to seek a legal opinion within the Executive Branch to ensure that the provisions of the AECA pertaining to brokers—including the registration requirement-- can be applied

---

[9] Per 22 USC 2778 (b)(1)(A)(i), "…every person (other than an officer or employee of the United States Government acting in official capacity) who engages in the business of brokering activities with respect to the manufacture, export, import, or transfer of any defense article or defense service designated by the President under subsection (a)(1), or in the business of brokering activities with respect to the manufacture, export, import, or transfer of any foreign defense article or defense service (as defined in subclause (IV)), shall register with the United States Government agency charged with the administration of this section, and shall pay a registration fee which shall be prescribed by such regulations.

robustly to all involved in the wide range of brokering activities associated with the *export* of items on the US Munitions Import List.[10] Such a legal opinion should be obtained and considered before the regulatory changes are adopted.

(b) The second issue about brokering rules relates to the practical effects of the numerous proposed changes to ITAR section 129. It is hard to imagine, in the first place, the steps by which the licensing of a transaction will be handled by Commerce and any brokering aspects (including completion of information required by 22 CFR 129.6) will be handled by State. It boggles the mind to consider how this might actually amount to a time-saving simplification of rules. <u>I am primarily concerned about the proposed amendment 129.2(b)(2)(vii), however, which appears to negate the controls on brokering for transactions subject to EAR and open a significant loophole for unscrupulous brokers</u>. If I have understood the proposed changes to Section 129.2 correctly, if a Michigan-based retail sports outlet licensed to sell firearms in the US wanted to sell, say, AR-15 semi-automatic rifles to clients in another country, then so long as the Michigan retailer could secure approval via the BIS licensing process, the various parties involved in shipment, financing, and possibly transshipment would be exempt from any registration and approval requirements. Nor would they necessarily be known to licensing and enforcement agents based in the Commerce Department. What in this scenario would deter an unknown and independent handler from diverting the weapons to unauthorized end-users? I would like to assume that government officials in the State and Commerce Departments have thought through the implications of the proposed rules as they might be bent for nefarious purpose as well as their service for industry cost and convenience, but the published rules do not provide assurance in that regard. **More clarification is needed about how the brokering regulations will be applied, how the inter-agency process will be managed, and the extent to which the proposed arrangements for registering and licensing brokers involved in acquiring, financing and transporting exported firearms will address the risk of diversion to non-authorized end-users.** One effect of transferring non-automatic firearms from the USML to the CCL is to remove them from the remit of the State Department's Blue Lantern program, which otherwise might be engaged to make post-shipment checks. It is not clear whether Commerce has a comparable program or what resources it will assign to monitoring the commerce in semi-automatic firearms.

4.      **Amend proposals for EAR Section 734.**

BIS has indicated that items moving "to the CCL would be subject to existing EAR concepts of jurisdiction and controls related to 'development' and 'production,' as well operation, installation, and maintenance 'technology.'" This approach would appear to give rise to the possibility of widespread and openly sanctioned circulation of open source, non-proprietary instructions for using computer-aided design (CAD) files to produce via 3D-printing technology, or text files to produce via CNC milling the firearms removed from USML. Until now, this development has been blocked in the courts via application of ITAR provisions requiring export license. **Either the Department of Commerce should clarify that it views any software instructions for producing controlled firearms already to be within the ambit of the EAR, or EAR Section 734.7 should be amended to bring circulation of open-source, non-proprietary CAD and other electronic files under EAR control - possibly by establishing that electronic files for producing functional firearms are subject to EAR control as production technology.**

---

[10] When questions arose in 1996 as to the authority of the President to restrict munitions imports under the AECA, the Office of Legal Counsel in the Justice Department was asked to provide an opinion. A similar request for opinion is warranted here. See https://www.justice.gov/sites/default/files/olc/opinions/1996/02/31/op-olc-v020-p0049_0.pdf .

5.      **Amend provisions for License Control – Crime Control**

Shotguns controlled under 0A502 are subject to the Crime Control because they are not controlled by Wassenaar. It is not evident, however, why items 0A501a are controlled for Regional Security but not Crime Control, as firearms are a main element of crime control equipment used by police and security forces. Moreover, federal statutes explicitly prohibit the export of crime control equipment to police and security forces in countries whose governments have a consistent pattern of gross violations of internationally recognized human rights, with exceptions requiring Presidential certification. **To bring the proposed regulations into alignment with provisions of the Foreign Assistance Act [22 USC 2304(a)(2), which makes explicit reference to crime control equipment under the aegis of the (expired) Export Administration Act], items in 0A501A should be subject to Crime Control.**


6.      **Include information from enhanced reporting on certain firearms exports in annual 655 Report.**

Enhanced reporting of items in the 501 series is potentially one bright spot in the proposed regulations. Several proposed changes are welcome, including: proposed changes in EAR part 748 requiring information about required import licenses; proposed changes in reporting mandated in EAR part 758; the required use of EEI filing for 0A501.a firearms; and the proposed recordkeeping requirement in part 762.

If the proposed rules are ultimately accepted, the information provided to the Wassenaar Arrangement and the UN Register of Conventional Arms will provide more granular information about US commercial exports of firearms, which seemingly could be included without significant additional effort in the annual 655 report mandated by the Foreign Assistance Act, 22 USC 2415.


7. **The balance of costs and benefits significantly favors industry over the taxpayer.**

The two sets of proposed rules include calculations of expected costs and benefits of the changes. Having invested several hours parsing the proposed rules, I suspect that one major benefit of the changes will accrue to the attorneys who help clients wend their way through federal regulations. The registration system as it was initially set up was intended to pay for itself, via modest registration and licensing fees that covered the costs of recording and updating information on US arms manufacturers and reviewing details for proposed transactions. In some sense, it has been a fee-for-service arrangement. The proposed changes significantly alter that approach with regards to firearms proposed for transfer to the CCL.

Except for the presumably few brokers unable to qualify for the firearms registration exemption outlined in proposed changes to ITAR section 129.2, no registration or license fees will be collected. Some of the transactions may be straightforward, but the workload promises to be substantial, with 4000-10,000 applications and virtually every 0A501 transaction subject to at least regional security controls, with no license exceptions available. **Whereas under the current system fees paid by industry and brokers help offset the costs of processing the license applications, under the proposed system the expenses associated with reviewing license applications will be charged to the taxpayer.** In the current political environment where government hiring is anathema, unless a streamlined new process delivers extraordinary returns, it is difficult to imagine how the tally could come out in the taxpayer's favor without

significant sacrifice of quality control. With respect to firearms exports, taxpayers and the public at large should be concerned about pressures to cut corners that could result in authorization of irresponsible transfers. **In my view as a taxpayer, the ITAR fee structure is yet one more reason for retaining non-automatic and semi-automatic firearms on the USML, and should these weapons ultimately be transferred to the CCL, I urge public officials at the Commerce Department to explore charging a service fee for processing export license applications.**

<strong>Conclusion</strong>

I appreciate the opportunity to comment on these rules. I am disappointed, however, that by and large they downplay the lethality of the weapons currently controlled in ITAR categories I and III. I realize that these documents were prepared for a different purpose than the materials posted to inform the global public about US government programs and policy, but **the difference between the tone and emphasis of the proposed rules and the public presentation of US policy on the export of small arms and light weapons over the past twenty years is striking**. By contrast to the public statements and documents, including the 2017 Congressional testimony by a State Department official, the emphasis in these regulations is on reducing transaction costs for industry rather than promoting the public good, including national security and public safety.

In response to public comments on the proposed regulatory changes, I hope that the Departments of State and Commerce will reconsider the proposal to transfer any complete weapons from the USML to CCL. In the event that the proposed regulations go forward substantially unchanged, I can only hope that other countries will tighten and strictly enforce their own import restrictions to reduce the risk of diversion and misuse.

Thank you,

Susan Waltz
Professor
Gerald R. Ford School of Public Policy
University of Michigan
Ann Arbor, Michigan

swaltz@umich.edu

| | |
|---|---|
| **From:** | Steve Baker |
| **To:** | DDTCPublicComments |
| **Subject:** | Re: ITAR Amendment – Categories I, II, and III |
| **Date:** | Friday, May 18, 2018 6:37:01 AM |
| **Attachments:** | The Hearing Protection Act and Silencers.pdf |
| | Options to Reduce or Modify Firearms Regulations.pdf |

A few minor corrections to my email below.

1. A Special Occupational Taxpayer stamp is not required to manufacture or sell magazines over 50+ rounds nor is a FFL required as it is an accessory, not a firearm. The SOT and FFL are required only for manufacturing or selling NFA firearms and suppressors.
2. By extrapolation, there are likely over one million suppressors (silencers) lawfully in civilian hands per the ATF's NFA registry database (the NFRTR). The attached Washington Post article is focused on civilian use of firearms suppressors and their history in the US and in Europe. It should further illuminate the fact that firearms suppressors are definitely "not inherently for military end use." Their wide availability in civilian markets in European countries further negates any claim that suppressors somehow contain any critical military or intelligence advantaged technology that would justify continued inclusion on the USML.


On May 18, 2018, at 3:23 AM, Steve Baker <sbaker@thebakerfamily.org> wrote:

Suppressors and 50+ round magazines are not inherently for military end use and are commonly available in commercial retail gun stores that have paid the Special Occupational Tax Stamp. These stores are common in the over 40 states that do not have Prohibition-era laws prohibiting silencers. It is unclear why the Department of State would remove semi-automatic firearms from the USML but retain the burdensome registration fee for companies that manufacture suppressors and high-capacity magazines - many of which DO NOT export any of their products. In aggregate, civilian sales of these items over the last couple of decades far outnumber contract sales of these accessories to the US military or the militaries of other countries. In fact, most small companies that manufacture these items sell them exclusively into domestic markets for lawful use by private parties. Sound suppressors are becoming widely accepted by civilian gun owners and despite the current $200 transfer tax and burdensome paperwork, they are in common use at rifle ranges in the above 40+ states. They are also legal in a growing number of states for use in hunting since they reduce the likelihood of hearing loss in hunters and in their animal companions afield.

The decision to retain 50+ round magazines and sound suppressors on the USML seems to contradict the Department of State's stated goal to "revise the U.S. Munitions List so that its scope is limited to those defense articles that provide the United States with a critical military or intelligence advantage or, in the case of weapons, are inherently for military end use."

President Trump has required federal agencies to take a long, hard look at the efficacy of their regulations and to take action to roll back or eliminate unnecessary or obsolete regulations. To this end, the Bureau of Alcohol,

Tobacco, Firearms and Explosives put forth a framework white paper for firearm deregulation options that the Bureau views as not compromising its public safety mission.  Part of the deregulation framework outlined in the ATF's white paper is a long overdue proposal relating to firearm suppressors -  removing them from the purview of the National Firearms Act and regulating their manufacture and transfer the same as ordinary Title I firearms under the 1968 Gun Control Act. 
 The following attached document is authored by Ronald Turk, Associate Deputy Director (Chief Operating Officer) Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF).  For relevant input related to the proposed ITAR Amendment and firearms suppressors, refer to section 8 as it outlines the ATF's deregulation proposal to treat firearm sound suppressors (silencers) the same as ordinary Title I firearms - the same firearms that the ITAR Amendment proposes to transfer from the USML to the Department of Commerce EAR regime.

Steve Baker
Arvada, CO

UNCLASSIFIED
Official

| | |
|---|---|
| **From:** | Monjay, Robert |
| **Sent:** | Wednesday, July 11, 2018 8:59 AM |
| **To:** | Paul, Joshua M; Miller, Michael F; Heidema, Sarah J; Dearth, Anthony M; Hamilton, Catherine E; Shin, Jae E; Douville, Alex J; Rogers, Shana A; PM-CPA |
| **Cc:** | PM-DTCP-RMA |
| **Subject:** | RE: Public Comments on Cats I-III Rules |

The two other signers are Feinstein and Cardin, both of whom were on the letter in the fall and were initiators of the GAO review of the rules, and whom we've not spoken to about this. You are likely right that they would still make hay out of this, especially the lack of congressional notification procedures, but that does not mean that we should not at least try to look like we are listening to them and their colleagues.

**Official**
**UNCLASSIFIED**

**From:** Paul, Joshua M
**Sent:** Wednesday, July 11, 2018 7:50 AM
**To:** Monjay, Robert <MonjayR@state.gov>; Miller, Michael F <Millermf@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Dearth, Anthony M <DearthAM@state.gov>; Hamilton, Catherine E <HamiltonCE@state.gov>; Shin, Jae E <ShinJE@state.gov>; Douville, Alex J <DouvilleAJ@state.gov>; Rogers, Shana A <RogersSA2@state.gov>; PM-CPA <PM-CPA@state.gov>
**Cc:** PM-DTCP-RMA <PM-DTCP-RMA@state.gov>
**Subject:** RE: Public Comments on Cats I-III Rules

Rob – not sure what you mean.  We literally briefed Menendez's staff; and as for making this a public platform, there's no briefing we could give that would stop Dem Senators from trying to score public points on a gun control issue.

**Official**
**UNCLASSIFIED**

**From:** Monjay, Robert
**Sent:** Tuesday, July 10, 2018 4:07 PM
**To:** Paul, Joshua M <PaulJM@state.gov>; Miller, Michael F <Millermf@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Dearth, Anthony M <DearthAM@state.gov>; Hamilton, Catherine E <HamiltonCE@state.gov>; Shin, Jae E <ShinJE@state.gov>; Douville, Alex J <DouvilleAJ@state.gov>; Rogers, Shana A <RogersSA2@state.gov>; PM-CPA <PM-CPA@state.gov>
**Cc:** PM-DTCP-RMA <PM-DTCP-RMA@state.gov>
**Subject:** RE: Public Comments on Cats I-III Rules

For anyone interested. https://www.regulations.gov/document?D=DOS-2017-0046-3131

Surprisingly, it is critical and unsupportive, even a little mean.

UNCLASSIFIED
Official

But seriously, I still do not understand why we are not doing any engagement to these Senators (and other interested Hill folks), or at least offering to hear out their staff on their concerns. When we do not let them talk to us directly, we force them to use public platforms, which make more work for all of us and are less useful.

Thanks
Rob

Official
UNCLASSIFIED

---

**From:** Paul, Joshua M
**Sent:** Tuesday, July 10, 2018 2:19 PM
**To:** Monjay, Robert <MonjayR@state.gov>; Miller, Michael F <Millermf@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Dearth, Anthony M <DearthAM@state.gov>; Hamilton, Catherine E <HamiltonCE@state.gov>; Shin, Jae E <ShinJE@state.gov>; Douville, Alex J <DouvilleAJ@state.gov>; Rogers, Shana A <RogersSA2@state.gov>; PM-CPA <PM-CPA@state.gov>
**Cc:** PM-DTCP-RMA <PM-DTCP-RMA@state.gov>
**Subject:** RE: Public Comments on Cats I-III Rules

Hi – a birdie tells me you should check the comments for one from a certain Mr. Robert Menendez and colleagues, submitted around 8pm last night.

Official
UNCLASSIFIED

---

**From:** Monjay, Robert
**Sent:** Tuesday, July 10, 2018 2:03 PM
**To:** Miller, Michael F <Millermf@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Dearth, Anthony M <DearthAM@state.gov>; Hamilton, Catherine E <HamiltonCE@state.gov>; Shin, Jae E <ShinJE@state.gov>; Douville, Alex J <DouvilleAJ@state.gov>; Rogers, Shana A <RogersSA2@state.gov>; PM-CPA <PM-CPA@state.gov>
**Cc:** PM-DTCP-RMA <PM-DTCP-RMA@state.gov>
**Subject:** Public Comments on Cats I-III Rules

The public comments period on the Cat I-III (firearms) rule closed on July 9.

We received 3,250 total public comments. 3181 comments came in through regulations.gov and 69 comments came in via email.

We are reviewing the comments for duplicates and bulk submissions (form letters), which should reduce the number of unique comments that we need to address. More info to follow.
Thanks
Rob

*Robert J. Monjay*
*U.S. Department of State*
*Office of Defense Trade Controls Policy*
*Phone: 202.663.2817*
*Mobile: 202.294.2478*
*Email: MonjayR@state.gov*

UNCLASSIFIED
Official

*SIPR:* *MonjayR@state.sgov.gov*

**Official**
**UNCLASSIFIED**

Exhibit C

# PUBLIC SUBMISSION

**As of:** November 29, 2018
**Tracking No.** 1k2-946o-2whj
**Comments Due:** July 09, 2018

**Docket:** DOS-2017-0046
Amendment to the International Traffic in Arms Regulations: Revision of U.S. Munitions List Categories I, II, and III

**Comment On:** DOS-2017-0046-0001
International Traffic in Arms Regulations: U.S. Munitions List Categories I, II, and III

**Document:** DOS-2017-0046-3131
Comment on DOS-2017-0046-0001

---

## Submitter Information

**Name:** Robert  Menendez

---

## General Comment

We support the Export Control Reform Initiative reforms that have been implemented to date. These changes have rationalized and streamlined a cumbersome and opaque U.S. Munitions List (USML) in ways that make it more useful for American exporters and make non-militarily-sensitive exports easier to process and more competitive internationally.

However, the Department of State has published draft regulations that would remove small arms, light weapons, and associated equipment and ammunition from Categories I, II, and III of the International Trafficking in Arms Regulations, to be subject instead to the Commerce Control List (CCL) of the Department of Commerce. This will result in less rigorous oversight of the export of these deadly weapons.

Small arms and associated ammunition are uniquely lethal; they are easily spread and easily modified, and are the primary means of injury, death, and destruction in civil and military conflicts throughout the world. As such, they should be subject to more not less rigorous export controls and oversight. We strongly oppose any changes to Categories I, II, and III that do not adequately reflect the life-and-death impact such changes will have, including by maintaining congressional oversight over these sales before export. Specifically, combat rifles, including those commonly known as sniper rifles should not be removed from the USML, nor should rifles of any type that are U.S. military-standard 5.56 (and especially .50) caliber. Semi-automatic firearms should also not be removed, and neither should related equipment or ammunition or associated manufacturing equipment, technology, or technical data.

The Arms Export Control Act (AECA) enables congressional review of exports of these articles to ensure that they comport with U.S. foreign policy goals and values. Congress took action in 2002 to ensure that the sale and export of these weapons would receive close scrutiny and oversight, including by amending the AECA to set a lower reporting threshold (from $14 million to $1 million) specifically for firearms on the USML. Moving such firearms from the USML to the CCL, as is being proposed, would be directly contrary to congressional intent, made clear in 2002, and would effectively eliminate congressional oversight of exports of these weapons.

Congressional oversight has proven important on multiple occasions. Over the last several years, the Executive branch has considered and proposed sales to countries and foreign entities that have engaged in human rights abuses and atrocities. In May 2017, for example, the Administration sought to sell semi-automatic pistols to the bodyguard unit of President Erdogan of Turkey, despite the fact that members of that unit had viciously attacked peaceful protestors near the Turkish Embassy in Washington, DC. The sale was only halted because congressional notification was required by law. In addition to the proposed Turkey sale, State proposed the export of 27,000 automatic rifles to the Philippine National Police in August 2016, some members of which have been credibly alleged to have committed extrajudicial killings as part of President Dutertes so-called war on drugs, which has targeted mostly low-level drug users.

The Departments of State and Commerce have noted that State will still review the sales for human rights concerns if licensing is moved to the CCL. However, as demonstrated by the above examples, State has at times fallen short of its responsibility to prioritize such concerns in its consideration of such sales. Therefore, while we oppose this transfer of licensing authority to the Department of Commerce, we will also seek to ensure that congressional oversight is maintained if the proposal is implemented.

SEN. ROBERT MENENDEZ
Ranking Member, Committee on Foreign Relations, U.S. Senate

BENJAMIN L. CARDIN
United States Senator

DIANNE FEINSTEIN
United States Senator

Exhibit D



July 9, 2018

**SUBMITTED VIA FEDERAL E-RULEMAKING PORTAL**

Director of Defense Trade Controls
U.S. Department of State
DDTCPublicComments@state.gov

AND
Regulatory Policy Division,
Bureau of Industry and Security,
U.S. Department of Commerce, Room 2099B
14th Street and Pennsylvania Avenue NW
Washington, DC 20230

RE: Docket Nos. DOS-2017-0046, BIS-2017-0004

**ITAR Amendment -- Categories I, II, and III and Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control under the United States Munitions List (USML)**

This comment is submitted on behalf of Giffords and Giffords Law Center ("Giffords") in response to the Proposed Rules published by the Departments of State and Commerce on May 24, 2018 regarding the classification and administration of exports of certain firearms and ammunition. The Proposed Rules are complex and would represent a dramatic change in the regulatory structure governing firearm exports. We are concerned that the Proposed Rules may not adequately address our national security, foreign policy, international crime, or terrorism threats.  In sum, we are concerned about potential loss of life.  We also believe the Proposed Rules do not adequately address the need for transparency so Congress and the public may understand the impact of these Rules on potential weapons exports.

Giffords is committed to advancing common-sense change that makes communities safer from gun violence. Operating out of offices in San Francisco, New York, and Washington, DC, our staff partners with lawmakers and advocates at the federal, state, and local levels to craft and enact lifesaving gun safety laws, participate in critical gun-violence-prevention litigation, and educate the public on the proven solutions that reduce gun violence.



## THE PROPOSED RULES APPEAR DRIVEN BY THE INTERESTS OF THE GUN INDUSTRY

Even the National Rifle Association (NRA) admits that the Proposed Rules were drafted with "the goal of increasing U.S. manufacturers' and businesses' worldwide competitiveness." These Rules are "designed to enhance the competitiveness of American companies in the firearms and ammunition sectors," allowing firearms and ammunition "to be subject to a more business-friendly regulatory climate."[1]

We are concerned that the Proposed Rules elevate the desire of American gun manufacturers to compete with international arms dealers over the danger that exported firearms will contribute to international gun crime and violence. The United States must not prioritize gun industry profits over human lives.

## THE PROPOSED RULES WILL DRAMATICALLY CHANGE THE LAW, RISKING NEW LOOPHOLES

We are concerned that the Proposed Rules, by shifting firearms and ammunition from the United States Munitions List (USML) to the Commerce Control List (CCL), would weaken oversight over exports of these items. As even the NRA has acknowledged, "items on the USML controlled under ITAR are generally treated more strictly," whereas regulation under the CCL "is more flexible." The NRA has also admitted that license applications for items on the USML are subject to "more stringent vetting" than items on the CCL.[2]

The Departments of State and Commerce, in drafting the Proposed Rules, have made some efforts to ensure that exports of firearms and ammunition will still be subject to oversight. But the dramatic nature of the proposed changes, and the complexity of the Proposed Rules raise serious concerns about hidden loopholes. Some areas of potential concern include:

- Congressional notification and the methods for Congress to disapprove of proposed firearm exports;
- The extent to which the Commerce Department monitors the end-users of its products; and the extent to which Congress and the public have access to information about the results of this monitoring;
- The online posting of designs for the production of firearms, and their use in the 3D printing of untraceable firearms;
- Firearms training provided to foreign security forces;
- The reporting of political contributions by gun exporters and related entities;
- The Commerce Department's bandwidth to properly oversee these exports; and
- The regulation of brokers who act as middlemen in firearms transactions, and the threat that firearms will be diverted by these middlemen to violent ends.

---

[1] National Rifle Association, *Trump Administration's Proposed Rulemakings a Win-Win for America's Firearms Industry, National Security*, https://www.nraila.org/articles/20180525/trump-administration-s-proposed-rulemakings-a-win-win-for-americas-firearms-industry-national-security

[2] Ibid.



According to the State Department's Proposed Rules, "The Department of Commerce estimates that 4,000 of the 10,000 licenses that were required by the [State] Department will be eligible for license exceptions or otherwise not require a separate license under the EAR." This statement seems to directly contradict the statement in the Commerce Department's Proposed Rules that "BIS would require licenses to export, or reexport to any country a firearm or other weapon currently on the USML that would be added to the CCL by the proposed rule." The Commerce Department later clarifies, "The other 4,000 applicants may use license exceptions under the EAR or the "no license required" designation, so these applicants would not be required to submit license applications under the EAR." While we recognize that other forms of oversight may be available, this dramatic difference in the number of licenses raises our concern.

We are also particularly concerned that these changes will result in an increase in the number of untraceable firearms in circulation. As 3D printing technology becomes more widely available, the likelihood that it may be used to construct operable firearms that are exempt from serialization requirements increases. Under current law, the proliferation of 3D printed firearms is held in check by the Fifth Circuit's decision in *Defense Distributed v. U.S. Dep't of State*,[3] which upheld the State Department's decision that the posting of online data for the 3D printing of firearms fell within the USML. The Proposed Rules would throw that determination into question.

Inadequate gun safety laws cost human lives. When gun purchasers are not properly vetted and laws against gun trafficking are not properly enforced, guns often fall into the wrong hands and are used to perpetrate horrendous crimes and violence. The U.S. experiences this loss of life on a daily basis, with over 90 people killed each day.  We do not wish to see a similar effect on an international level from the weakening of our laws regarding gun exports.

### THIS CHANGE LACKS SUFFICIENT CONGRESSIONAL NOTIFICATION REQUIREMENTS

We have not seen anything in the Proposed Rules that would continue Congressional notification requirements for any of the Category I firearms that are being moved to the CCL. There are several types of sales controlled under the Arms Export Control Act that require Congressional notification. Under current law, a certification must be provided to Congress prior to the granting of any license or other approval for transactions involving the export of a firearm controlled under Category I of the USML in an amount of $1 million or more.[4] Congress then has the ability to enact a joint resolution prohibiting the export, which would prevent the State Department from licensing the sale. Congress generally is given 15 days or 30 days to review the transaction before a license can be granted, depending on the items being exported and the

---

[3] 838 F.3d 451 (5th Cir. 2016).
[4] See 22 U.S.C. § 2776, 22 C.F.R. 123.15(a)(3).



country to which it is being exported. While there are Congressional notification requirements for certain products that are controlled under the CCL, it seems that such notification requirements would not be as broad that as under the USML.

Congress should continue to receive advance notification of transactions involving firearms and to have the opportunity to prohibit these exports when appropriate. The Proposed Rules should be strengthened to protect Congress's authority in this area.

### THE CHANGE MAY RESULT IN LESS TRANSPARENT END-USE MONITORING

We are concerned about a possible reduction in the monitoring of the end-users of exported firearms and publicly available information about this monitoring. The State Department currently monitors the end-users of firearm exports through its Blue Lantern program. Public reporting of Blue Lantern information is mandatory[5] and there are readily available statistics about the results. While the Commerce Department also conducts end use monitoring, there does not appear to be as fulsome a public reporting requirement for these end use checks as under the Blue Lantern program.

The Proposed Rules do not discuss end use monitoring of the items being moved to the CCL. It is reasonable to assume that these items will fall under the general Bureau of Industry and Security end use check program. This end use check program is not as well-publicized or as formal as the Blue Lantern program, and only a very small percentage of exported items are reviewed. If the Proposed Rules move forward, this program must be strengthened to address the need to monitor the end-users of exported firearms and provide the public with information about the results.

### THIS CHANGE IGNORES THE MILITARY NATURE OF MANY FIREARMS

The Proposed Rules are based on an assumption that automatic firearms are designed for and used by the military, and semiautomatic firearms are not "inherently military." This is inaccurate. Consequently, we question the President's determination that semiautomatic firearms and ammunition no longer warrant control under the USML.

In fact, members of the U.S. armed forces routinely use firearms in semiautomatic mode in combat conditions, and the designs of many semiautomatic firearms are inherently military. Assault rifles like the AR-15 were originally designed for military use. Earlier models included a selective fire option that allowed service members to switch easily between automatic and semiautomatic modes. The military included the option to fire in semiautomatic mode because military combat sometimes requires use of a firearm in

---

[5] 22 U.S.C.§§ 2785, 2394, 2394-1a



semiautomatic mode. Shooting in semiautomatic mode is more accurate and hence more lethal.[6] In fact, some members of the military use the semiautomatic mode exclusively.

The fact that some gun enthusiasts "enjoy" shooting these weapons and have labeled this activity "modern sport shooting" or "tactical shooting" does not change the design or purpose of these firearms or the danger they pose in civilian hands. The horrendous rise in mass shootings our country has suffered and the frequency with which these firearms are used in these shootings testify to this danger.

Military-style semiautomatic firearms were used to perpetrate the tragedies that occurred in an elementary school in Newtown, Connecticut, at a music festival in Las Vegas, Nevada, at a workplace in San Bernardino, California, in a movie theatre in Aurora, Colorado, and at a high school in Parkland, Florida, among others. Because of the dangerous nature of these weapons, D.C. and seven states, including the populous states of California and New York, ban them.[7] Because of the military nature and serious lethality of these weapons; they belong on the USML.

## THERE ARE ALTERNATIVES TO THE PROPOSED RULES THAT HAVE NOT BEEN EXPLORED

The real concern that seems to be driving this significant change in the way the U.S. government regulates firearms exports is that firearms and ammunition manufacturers are currently required to register with the State Department and pay a registration fee. According to the NRA, "Any business that manufactures an item on the USML, or even just a part or component of such an item, also has to register with the State Department and pay an annual fee, which is currently set at \$2,250. This registration is required even if the manufacturer has no intent to ever export the items. ... Manufacturers of items on the CCL, or their parts or components, do not have to pay an annual registration fee to the Commerce Department."[8]

The registration fee appears to be the NRA's primary concern with the current system for regulating the export of firearms and ammunition. The simple solution to this problem might be to waive the fee for manufacturers who do not, in reality, export these items. Waiving the fee would relieve industry of this "burden" without undoing the important policy choices made by the State Department in the regulation of these exports or requiring the Commerce Department to "reinvent the wheel" with respect to these regulations. While we would not necessarily support this proposal (it might shift the costs of manufacturer

---

[6]With AR-15s, Mass Shooters Attack With the Rifle Firepower Typically Used by Infantry Troops, NY Times, Feb. 28, 2018, https://www.nytimes.com/interactive/2018/02/28/us/ar-15-rifle-mass-shootings.html.

[7] See Giffords Law Center to Prevent Gun Violence, *Assault Weapons* at http://lawcenter.giffords.org/gun-laws/policy-areas/hardware-ammunition/assault-weapons/.

[8] National Rifle Association, *supra*.



registration to the taxpayers), we urge the Administration to carefully and thoroughly consider other alternatives to the Proposed Rules.

Sincerely,

Lindsay Nichols
Giffords Federal Policy Director

**ABOUT GIFFORDS LAW CENTER**

For nearly 25 years, the legal experts at Giffords Law Center to Prevent Gun Violence have been fighting for a safer America by researching, drafting, and defending the laws, policies, and programs proven to save lives from gun violence.

**6**  giffordslawcenter.org



Comments of the Brady Center and Brady Campaign to Prevent Gun Violence
On the
Department of State Proposed Rule to Amend the International Traffic in Arms Regulations:
U.S. Munitions List Categories I, II, and III
And the
Department of Commerce Proposed Rule Regarding Control of Firearms, Guns, Ammunition
and Related Articles the President Determines No Longer Warrant Control Under the United
States Munitions List

*Filed via email to DDTCPublicComments@state.gov; electronically via
http://www.regulations.gov*

Together the Brady Center and the Brady Campaign to Prevent Gun Violence ("Brady") are
national leaders in strengthening, supporting and expanding gun laws, policies, and practices in
the United States.  Our complimentary missions are to significantly decrease the number of gun
deaths and injuries in America.  We achieve this by amplifying the voice of the American public;
changing social norms through public health and safety programs; and holding the gun industry
accountable for dangerous and irresponsible practices and products.[1]  These comments are
submitted in furtherance of those shared goals. Brady specifically seeks to ensure the safe use
and transfer of legal firearms within and outside of the United States by advocating for
appropriate regulations that reflect the sensitive nature of the firearms industry.

Brady hereby comments on the proposed rules published by the Department of State's Directorate
of Defense Trade Controls ("DDTC") and the Department of Commerce's Bureau of Industry and
Security ("BIS") on May 24, 2018 (83 Fed. Reg. 24198; 83 Fed. Reg. 24166) ("Proposed Rules"),
which seek comments on the transfer of certain firearms and related items from the International
Traffic in Arms Regulations' ("ITAR") U.S. Munitions List ("USML") to the Export
Administration Regulations' ("EAR") Commerce Control List ("CCL").   In particular, the
Proposed Rules would transfer a broad range of semi-automatic and non-automatic firearms,
including those used by the military, (along with their components and ammunition) from USML
Categories I, II, and III, where they are classified as significant military equipment, to the CCL,
where they will be categorized as "600 Series" items

We respectfully submit that the proposed transfer of semi-automatic and firearms used by the
military (and related items) from the stringent control of the USML to the more permissive regime
administered by the Commerce Department would be contrary to Congressional intent and would
undermine U.S national security interests, international stability and the protection of human
rights.  We respectfully request that the State and Commerce Departments withdraw their current

---

[1] For more about Brady's mission and work, see www.bradycampaign.org.

proposed rules, and keep these dangerous weapons (and related items) subject to State Department jurisdiction on USML, consistent with well-settled and established practice.

Both the Proposed Rules indicate that the firearms at issue, which include armor-piercing sniper rifles used by the military, side arms used by the military, and semi-automatic rifles such as AR-15 and other military-style weapons, no longer warrant control under the ITAR because they are not "inherently military" or are widely available for commercial sale. The transfer of these items to Commerce Department jurisdiction is framed by DDTC and BIS as merely technical measures to reduce procedural burdens and compliance associated with exports of firearms. The reality, however, is that these rule changes would significantly weaken existing controls on the exports of military-style weapons, and would thereby increase the supply of such weapons to dangerous repressive regimes, rebel movements, criminals, and gun and drug traffickers. Many state and non-state groups in importing countries use semi-automatic weapons and sniper rifles in armed conflicts, drug trafficking and crime, and would be eager beneficiaries of the proposed rule changes. Further, if U.S. troops are called upon to intervene in certain conflicts, they may be exposed to significant danger from enemy combatants using military sniper rifles and semi-automatic weapons exported from the United States because of the weaker standards set forth in this rule change. Since Congress first imposed these regulations many years ago, the world has not suddenly become more safe, nor our military less at risk.

In granting statutory authority to regulate arms exports to the State Department in the Arms Export Control Act ("AECA"), Congress emphasized the importance of promoting regional stability and preventing armed conflict. In contrast, the delegation of export control authority to the Commerce Department in the Export Administration Act ("EAA") provides that the promotion of trade and other commercial interests are significant factors in agency decisions. Congress purposefully delegated the authority for licensing arms exports to the State Department, recognizing that the two agencies have very different mandates. In the State Department licensing process, international security and human rights are given more weight, while in the Commerce Department licensing process, commercial interests are given more weight. To transfer jurisdiction over these firearms, which have substantial military utility, from the State to the Commerce Department means that U.S. international security and human rights interests will not have the appropriate weight required before determining whether exports of firearms should be undertaken.

We also note that many of the firearms that are subject to the proposed rules are not widely available for commercial sale. As set forth in more detail below, a number of countries prohibit the commercial sale and civilian possession of semi-automatic weapons and military-style firearms, and therefore these weapons cannot be considered to be widely commercially available. Transferring semi-automatic firearms to the more permissive Commerce Department regime would result in less control over these items and a greater likelihood that they will end up in the hands of repressive regimes, terrorist organizations, criminal gangs, gun traffickers and other dangerous actors. Less stringent state gun laws in the United States already fuel a gun pipeline across the border into Mexico and other Central and Latin American countries, causing an increase in violent crime in those countries and subsequently higher numbers of displaced citizens of those countries fleeing across the border into the United States. The proposed transfer of the firearms in question to the less stringent regulation of items on the CCL would further exacerbate these existing problematic firearm and migration flow issues.

We discuss below the various ways the current controls on exports of semi-automatic and military-style firearms would be weakened by the transfer of such items to the jurisdiction of the Commerce Department.

**1.  Types of Firearms that Would be Released from State Department Control**

The Proposed Rules would transfer a broad range of semi-automatic and non-automatic firearms, including firearms typically used by the military and military-style firearms, to Commerce Department jurisdiction.  For example, below is a non-exhaustive list of the types of weapons that would be transferred:

| Sniper Rifles Used by Armed Forces | | |
|---|---|---|
| • M40A5 (used by US Marines)<br>• M24 (used by US Army) | • L115A3 (used by UK Armed Forces)<br>• Barrett M82 (used by multiple armies including US) | • Knight's Armament M110 (used by US Army) |
| **Sidearms Used by Armed Forces** | | |
| • Sig Sauer XM17 and XM 18 pistols (used by US Army)<br>• Glock M007 (Glock 19M) pistol (used by US Marines) | • Heckler & Koch Mk 23 pistol (used by US Special Forces) | • SIG Sauer Mk 25 (used by Navy Seals) |
| **Semi-automatic Assault Rifles** | | |
| • Bushmaster XM15 (AR-type rifle)<br>• Daniel Defense M4A1 rifles (AR-type rifle)<br>• IWI TAVOR<br>• Kalashnikov KR-9 (AK-type rifle) | • Kel-Tec Sub-2000<br>• Mossberg MMR Tactical rifles (AR-type rifle)<br>• POF USA P415 (AR-type rifle) | • SIG Sauer MCX rifles<br>• SKS assault rifle (predecessor to the AK-47)<br>• Sturm, Ruger & Co. AR-556 rifles (AR-type rifle) |
| **Semiautomatic Assault Pistols** | | |
| • Bushmaster SquareDrop pistol<br>• CZ Scorpion pistol | • CORE Rifle Systems Core 14 Roscoe pistol<br>• Daniel Defense MH18 pistol | • PAP M92 pistol |

The sniper rifles set forth above are some of the deadliest and most lethal firearms used on the battlefield when used by trained snipers.  They can be used to target battlefield commanders, radio or heavy weapon operators, and other equipment, inflicting considerable damage to troop morale.[2]

A number of the semi-automatic rifles set forth above, including the Bushmaster XM15 and the Mossberg MMR Tactical Rifle, are AR-15 style rifles that were originally based on the M16 automatic rifle used by the U.S. military.  Certain semi-automatic rifles, including the Kalashnikov KR-9 above, are based on the original design of the AK-47 automatic rifle used by many militaries and terrorist groups around the world.

### 2. The Firearms at Issue Would be Subject to a Less Stringent Licensing Policy and Review Process under the EAR

The transfer of the firearms at issue, including those set forth above, to BIS jurisdiction would likely result in more permissive licensing of these firearms for export.  Congress enacted the AECA, which provides the statutory authority for the ITAR, in order to "bring about arrangements for reducing the international trade in implements of war and to lessen the danger of outbreak of regional conflict and the burdens of armaments."  AECA § 1.  In contrast, the Export Administration Act ("EAA"), which provided the original statutory authority for the EAR, emphasizes in addition to national security concerns that "[i]t is the policy of the United States to minimize uncertainties in export control policy and to encourage trade with all countries with which the United States has diplomatic or trading relations, except those countries with which such trade has been determined by the President to be against the national interest."  EAA § 3.

The purposeful delegation of authority by Congress in the AECA to regulate arms to the State Department, rather than the Commerce Department, reflects the reality that these two agencies have very different mandates governing their priorities and decision-making.  The State Department's mission is to promote international security and human rights, while the Commerce Department is tasked with promoting and regulating trade and the interests of U.S. industry in addition to protecting national security.  Specifically, in the DDTC review process for firearms, U.S. national security, U.S. foreign policy, and human rights considerations are important elements of the review.  Under the BIS licensing process, commercial considerations would have a heighted significance, which would result in less stringent licensing decisions.  The risk associated with transferring semi-automatic and military-style firearms from the State Department to the Commerce Department is that the latter will elevate commercial interests associated with increasing beneficial trade and assisting U.S. companies, while deemphasizing international security and human rights concerns.

---

[2] Kyle Mizokami, "5 Sniper Rifles That Can Turn Any Solider into the Ultimate Weapon," National Interest (March 11, 2018), located at <http://nationalinterest.org/blog/the-buzz/5-sniper-rifles-can-turn-any-solider-the-ultimate-weapon-24851>.

In addition, the State Department, unlike the Commerce Department, keeps a database of human rights violators that it uses to conduct Leahy Law vetting of military and police assistance overseas, and many recipients of exported firearms are military and police actors.  Under the ITAR, a license application involving firearms is reviewed against this database to prevent their use in human rights abuses.  It is not clear that this practice would continue once the licensing jurisdiction moves to the Commerce Department.

### **3.** **The Firearms at Issue are not Widely Available for Commercial Sale**

The Commerce Department's proposed rule provides that the scope of the items that are to be moved from the USML to the CCL "is essentially commercial items widely available in retail outlets and less sensitive military items."[3]  The rule adds that: "There is a significant worldwide market for firearms in connection with civil and recreational activities such as hunting, marksmanship, competitive shooting, and other non-military activities."[4]

The proposed rule, however, cites to examples of firearms sales in the United States rather than providing examples of countries that import firearms from the United States:

> "Because of the popularity of shooting sports in the United States, for example, many large chain retailers carry a wide inventory of the firearms described in the new ECCNs for sale to the general public.  Firearms available through U.S. retail outlets include rim fire rifles, pistols, modern sporting rifles, shotguns, and large caliber bolt action rifles, as well as their 'parts,' 'components,' 'accessories' and 'attachments.'"[5]

The U.S. market should not be the basis for assessing the commercial availability of firearms, as this is not the market to which the proposed rule would be directed.   Moreover, the U.S. retail firearms market is unique and cannot be used as a proxy for other markets, given that the United States, with less than 4.5% of the world's population, comprises more than 45% of the world's firearms in civilian possession.[6]

Furthermore, a number of importing countries outside the United States ban or otherwise substantially restrict the sale and transfer of firearms that are subject to the Proposed Rules, including semi-automatic and military-style weapons.  By way of example, in Mexico, there is only one retail outlet in the entire country for the legal purchase of any kind of firearm;[7] China bans firearm purchases for most people, and private gun ownership is almost unheard of;[8] Germany bans semi-automatic weapons not intended for hunting or marksmanship, as well as

---

[3] Department of Commerce, Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML), 83 Fed. Reg. 24,166 (proposed May 24, 2018).

[4] *Id.*

[5] *Id.*

[6] Aaron Karp, Estimating Global Civilian-Held Firearms Numbers, *Small Arms Survey* (June 2018), located at <http://www.smallarmssurvey.org/fileadmin/docs/T-Briefing-Papers/SAS-BP-Civilian-Firearms-Numbers.pdf>.

[7] Kate Linthicum, "There is only one gun store in all of Mexico. So why is gun violence soaring?" The Los Angeles Times (May 24, 2018), located at <https://www.latimes.com/world/la-fg-mexico-guns-20180524-story html>.

[8] Ben Blanchard, "Difficult to buy a gun in China, but not explosives," Reuters (October 2, 2015), located at <https://www.reuters.com/article/uk-china-security-idUSKCN0RV5QV20151002>.

some multiple-shot semi-automatic firearms; Norway bans certain semi-automatic weapons; Great Britain bans military-style weapons; Spain bans firearms "designed for war use"; and many other countries ban "military style" and other high capacity weapons.[9]  In the vast majority of countries, according to one of the few studies of firearms regulations, "there is a presumption against civilians owning firearms unless certain conditions and requirements are met."[10]

Given the significant differences in the regulation of semi-automatic and non-automatic firearms outside the United States, it appears that firearms that are covered by this rule change as "widely commercially available" are, in fact, not only not widely commercially available in many countries, but outright banned in other major developed countries. Therefore, at a minimum, BIS and DDTC should withdraw the proposed rules and further study the retail or commercial availability worldwide of the firearms at issue prior to taking any regulatory action.

### 4.  Under the EAR, Firearms Manufacturers Would no Longer be Subject to Registration Requirements

Under the ITAR, persons who engage in the business of manufacturing, exporting, or temporarily importing defense articles in the United States must register with the DDTC.  *See* ITAR Part 122. In order to register, manufacturers are required to submit a Statement of Registration and undergo a background check, and then must re-register and pay a registration fee annually.  In contrast, the EAR contain no such registration requirement, so firearms manufacturers will be able to engage in exports, re-exports, and other activities subject to the EAR, or seek an export license, without being subject to the additional controls of registering with the U.S. Government, being subject to a background check and paying an annual registration fee.   In addition, the U.S. Government would lose a valuable source of information about manufacturers of firearms in the United States, such as the registrant's name, address, organization stricture, directors and officers, foreign ownership, and whether directors or officers of the company have been charged, indicted or convicted of a U.S. or foreign crime.  This information is used by the U.S. Government to monitor gun manufacturers and exporters, and losing this source of information would increase the likelihood of dangerous firearms being manufactured and transferred in significant quantities without effective oversight.

### 5.  The Proposed Rules Would Permit Foreign Companies to Assume Control of U.S. Firearms Manufacturers with Minimal Oversight

The ITAR require registrants to notify DDTC at least 60 days in advance of any intended sale or transfer to a foreign person of ownership or control of the registrant or any entity owned by the registrant.  *See* ITAR § 122.4(b).  This 60-day notification from the registrant must include detailed information about the foreign buyer, the target, and the nature of the transaction, including any post-closing rights the foreign buyer will have with regard to ITAR-controlled

---

[9] *See* Firearms-Control Legislation and Policy, Law Library of the Library of Congress, February 2013, located at <http://www.loc.gov/law/help/firearms-control/firearms-control.pdf>.

[10] Sarah Parker, "Balancing Act: Regulation of Civilian Firearm Possession," States of Security: Small Arms Survey 2011 6, located at <http://www.smallarmssurvey.org/fileadmin/docs/A-Yearbook/2011/en/Small-Arms-Survey-2011-Chapter-09-EN.pdf>.

items and any related steps that will be taken to confirm compliance with the ITAR. The 60-day rule ensures that DDTC is aware of acquisitions that pose potential threats to U.S. national security or foreign access to controlled commodities and technical data, and can coordinate review by the Committee on Foreign Investment in the United States ("CFIUS") as necessary. In contrast, the EAR impose no such 60-day advance notification requirement for acquisitions of U.S. companies with sensitive items or technology by foreign entities. Therefore, to the extent a U.S. manufacturer of semi-automatic or non-automatic firearms (and related items) is acquired by a foreign company, there would no longer be an advance notification required to the U.S. Government. As such, the U.S. Government would be unaware of a potential acquisition of a U.S. firearms manufacturer by a foreign entity that could influence the sales and marketing activities of the manufacturer in a manner that undermines U.S. national security, international security, and human rights.

**6.** **Under the EAR, the Firearms at Issue Would no Longer be Subject to Congressional Reporting Requirements**

Once semi-automatic and military-style firearms are transferred to the CCL, there would no longer be any requirements for reporting significant sales of this significant military equipment to Congress. This would result in less transparency and would weaken Congress's ability to monitor exports of dangerous firearms to other countries.

Under the ITAR, Congress must be provided with a certification prior to the granting of "[a] license for export of a firearm controlled under Category I of the [USML] in an amount of $1,000,000 or more." *See* ITAR § 123.15(a)(3). The EAR does not impose similar reporting requirements on firearms controlled as 600 Series items.[11] Therefore, Congress would not be give advance notification of Commerce Department licensing of sizeable exports of firearms, undermining its oversight role with regard to these significant military equipment, which potentially could be diverted to repressive regimes, criminal enterprises, rebel factions, or terrorist organizations.

Congress has in the past played a vital role in halting arm sales that were inconsistent with U.S. interests. For example, Congress halted the $1.2 million sale of 1,600 semi-automatic pistols to the security force of Turkish President Recep Tayyip Erdoğan in 2017 after reports of public beatings of protestors. Furthermore, Senator Ben Cardin opposed the sale of 26,000 assault weapons to the Philippines police in 2016, citing grave human rights concerns. In sum, the State Department's regulatory framework ensures that both Congress and the public are kept aware of arms sales that raise human rights and other concerns. This critical oversight function, which stop transfers against U.S. national interests, would be lost if regulatory oversight of the firearms at issue were transferred to the Commerce Department.

---

[11] Under the EAR, items that are "600 Series Major Defense Equipment" are subject to Congressional notification requirements where such items are exported (a) in an amount exceeding $14,000,000 to a country outside the countries listed in Country Group A:5, or (b) in an amount exceeding $25,000,000, to a country listed in Country Group A:5. "600 Series Major Defense Equipment" is defined as "[a]ny item listed in ECCN 9A610.a, 9A619.a, 9A619.b or 9A619.c, having a nonrecurring research and development cost of more than $50,000,000 or a total production cost of more than $200,000,000," which would not include the firearms affected by the Proposed Rules. *See* EAR §§ 743.5.; 772.1.

**7.** **The Firearms at Issue Would no Longer be Subject to the ITAR's Controls on Public Release of Controlled Technology**

It has been DDTC's long standing practice to require prior authorization for any public release of ITAR-controlled technical data, source code or software (e.g., posting controlled technical data on a public website). BIS, however, takes a less stringent approach to publicly available information, removing technology, software, and source code from EAR controls once the items are made public (or intended to be made public) without requiring prior authorization BIS. *See* EAR § 734.3(b)(3). Therefore, if jurisdiction over technical data related to the design, production or use of semi-automatic or military-style firearms transfers to BIS, there would no longer be any controls on companies or individuals releasing such sensitive information into the public domain.

This significant risk is not hypothetical. In *Defense Distributed v. U.S. Department of State*, the Fifth Circuit ordered manufacturer Defense Distributed to remove 3-D printing instructions from the Internet after the State Department charged the company with violating the ITAR. In contrast, under the proposed rules, such manufacturers would be able to freely release 3-D printing instructions and code into the public domain (and thereby enable the private production of firearms overseas and in the United States), as the EAR permit publication of source code and technology (except encryption source code and technology) without authorization from BIS. If this were the case, the public would have significantly higher access to the knowledge needed to manufacture guns, which could result in huge increases in the private manufacture and transfer of firearms with little to no oversight by governments.

In general, items that would move to the CCL would be subject to existing EAR controls on technology, software, and source code. However, while the EAR control certain technology, software, and source code set forth in the CCL, Section 734.3 excludes certain published information and software from control under the EAR. For example, if a gun manufacturer posts a firearm's operation and maintenance manual on the Internet, making it publicly available to anyone interested in accessing it and without restriction on further dissemination (i.e., unlimited distribution), the operation and maintenance information included in that published manual would no longer be "subject to the EAR," and therefore no longer subject to export controls. *See* EAR §§ 734.3(b) and 734.7(a). Non-proprietary system descriptions, including for firearms and related items, are another example of information that are not subject to the EAR. *See* EAR § 734.3(b)(3)(v).

This lack of control on public release of technology, software and source code related to semi-automatic and non-automatic firearms appears to be a significant loophole that could be exploited to release sensitive design, production and use technology regarding highly dangerous weapons.

**8.** **The Proposed Rules Would Remove Licensing Requirements for Temporary Imports, Creating Another Channel for Criminals to Obtain Dangerous Weapons in the United States**

Temporary imports (import into the United States of defense articles, technical data, and defense services on the USML and their subsequent export) are regulated by the ITAR (*see* ITAR Part

123), while permanent imports of items on the U.S. Munitions Import List ("USMIL") are regulated by the Department of Justice's Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF").  The EAR imposes no import licensing requirements, so if semi-automatic or military-style firearms are transferred from the USML to the CCL, temporary imports of such items will not be regulated by any agency.  Therefore, semi-automatic and military-style firearms could be freely imported into the United States without any authorization if the importer intends to subsequently export the items (the subsequent export of the item would require an export license from BIS).  This includes temporary imports into the United States of semi-automatic and military-style firearms for gun shows, trade shows, or for repair or refurbishment.  While the subsequent export of these firearms would require an export license from BIS, a key control that requires U.S. Government authorization *before* the import of the controlled firearms into the United States would be removed.

This approach would not only cause confusion and make compliance more difficult, but could result in more firearms flooding the U.S. market without any meaningful regulation.  The United States already has a significant crime gun problem; while every firearm is manufactured as a legal consumer product, the opportunities for diversion to the criminal market are numerous.  Guns are trafficked across jurisdictional lines, from states with weak laws to those cities and states where there are more gun regulations.  This practice continues to fuel violence in cities like Chicago and Baltimore, which both have strong gun laws in place but border areas where it is easy to purchase multiple guns in one transaction with little or no regulation.  Additionally, the large private sale loophole continues to put guns in the hands of dangerous criminals, who can exploit a system that only requires licensed gun dealers to conduct background checks on firearms sales.  It is through this method that approximately at least one in five guns are sold in the United States today without a background check.  Continually flooding the market with a supply of cheap handguns and assault rifles by permitting the legal "temporary import" of firearms that may never be re-exported will only exacerbate these problems.

Furthermore, the ATF does not have the capacity or resources to pursue the illegal distribution of firearms that were originally intended to be temporary imports, but are subsequently sold in the United States (thus making them permanent imports).  While the ATF is tasked with regulating permanent imports of items on the USMIL, it is subject to severe resource constraints in exercising its jurisdiction, including finding and sanctioning individuals trying to distribute temporarily imported firearms in the United States.  Therefore, the BIS export licensing process and the reality of the ATF's capacity together mean that illegal gun sales and transfers within the United States may skyrocket if the Proposed Rules go into effect.

**9.**  **The Proposed Rules Would Make it Easier For Foreign Gun Manufacturers to Sell and Distribute Firearms Based on U.S. Origin Components and Technology**

Under the ITAR, defense articles, such as firearms and their components and ammunition, require export licensing regardless of their destination, unless a narrow exemption applies.  The ITAR "See-Through Rule" provides that foreign manufactured items are subject to the ITAR, including licensing requirements, if they contain any amount of U.S.-origin content subject to the ITAR, no matter how trivial.  As such, foreign manufacturers must seek authorization from DDTC prior to exporting foreign items that incorporate ITAR-controlled components or technology in their foreign made item.

9

BIS, however, has a less strict approach to incorporation of U.S.-origin content than DDTC. Unlike the ITAR, the EAR apply the "De Minimis Rule" to foreign items that are manufactured using U.S.-origin content.  *See* EAR § 734.4.  Under the De Minimis Rule, foreign items that have less than 25% U.S.-origin controlled content (by value) are not subject to the controls of the EAR.  Therefore, foreign manufacturers could use U.S.-origin components or technology to produce products that are not subject to U.S. export control laws if the value of the U.S.-origin controlled content is under 25% of the value of the final product.  With regard to components of semi-automatic and non-automatic firearms transferred to the CCL, such items would remain subject to the ITAR's See-Through Rule when incorporated into a foreign firearm and exported to certain countries subject to U.S. unilateral or United Nations arms embargoes. *See* ITAR § 126.1.  However, exports of such firearms with U.S. content outside of these arms embargoed countries would be subject to the more permissive De Minimis Rule under the EAR.  As such, foreign manufacturers would be able to export semi-automatic and military-style firearms made using less than 25% U.S.-origin controlled content without any U.S. Government scrutiny to most countries around the world (except for those subject to U.S. or United Nations arms embargoes).

For example, under the current State Department rules, if a foreign gun manufacturer in Germany sourced its barrels from a U.S. company and the barrels made up 20% of the value of the foreign manufactured gun, that gun would be subject to ITAR licensing and congressional reporting requirements if the German manufacturer wanted to export such guns to the Philippines.  Under the Commerce Department rules, such sales would not be subject to U.S. export control requirements.

Based on the foregoing, we urge DDTC and BIS to withdraw the proposed rule and keep semi-automatic and military-style guns (along with their components and ammunition) on the USML under DDTC jurisdiction.  This approach would best support the safe use and export of firearms outside the United States.

Brady is available to comment further on this proposed rule change and any other agency initiatives impacting the domestic or global firearms policy.  Please contact us by reaching out to Sean Kirkendall, Policy Director, Brady Campaign to Prevent Gun Violence, at skirkendall@bradymail.org or (202) 370-8145.

# Exhibit E

**NO DISCERNIBLE CLASSIFICATION**

---

| | |
|---|---|
| **From:** | Foster, John A |
| **Sent:** | Wednesday, July 25, 2018 9:26 AM |
| **To:** | Davidson-Hood, Simon |
| **Cc:** | Hart, Robert L; Monjay, Robert |
| **Subject:** | RE: Cat I-III Public Comments |


Simon,

Sounds like a plan.

Best,
John

---

**From:** Davidson-Hood, Simon
**Sent:** Wednesday, July 25, 2018 9:25 AM
**To:** Foster, John A <FosterJA2@state.gov>
**Cc:** Hart, Robert L <HartRL@state.gov>; Monjay, Robert <MonjayR@state.gov>
**Subject:** RE: Cat I-III Public Comments

Morning John,

In carving these up, you take the first 24 and I'll take the remaining 25.  Thus, in the share drive Rob referred to, you take the comments from "Aaron Carp" to "Loper FW," and I'll take "Mark Baines" to "William Root."  Sound good?

Best,
*SDH*

Regulatory and Multilateral Affairs
Office of Defense Trade Control Policy
Bureau of Political-Military Affairs
Department of State
Tel: 202-663-2811
Mobile: 202-674-5208
Email: davidsonhoodS@state.gov
SIPR: Davidson-hoodS@state.sgov.gov

**Official - SBU**
**UNCLASSIFIED**

---

**From:** Monjay, Robert
**Sent:** Friday, July 20, 2018 7:36 PM
**To:** Davidson-Hood, Simon <DavidsonHoodS@state.gov>
**Cc:** Hart, Robert L <HartRL@state.gov>
**Subject:** Cat I-III Public Comments

Simon,

**NO DISCERNIBLE CLASSIFICATION**

If you have time to start reviewing the Cat I-III public comments and creating the comment matrix next week, that would be great. I went through all the comments and identified 49 for use in the interagency review. They are in the below folder, and consolidated in the attached PDF.

S:\RMA\ITAR Rules\Cat I\Public Comments

Thanks
Rob
*Robert J. Monjay*
*U.S. Department of State*
*Office of Defense Trade Controls Policy*
*Phone: 202.663.2817*
*Mobile: 202.294.2478*
*Email: MonjayR@state.gov*
*SIPR: MonjayR@state.sgov.gov*

**Official - SBU**
**UNCLASSIFIED**